No. _____

In the

# United States District Court

## For the Northern District of Illinois

———————— ◆ ————————

MELISSA CALUSINSKI,

*Petitioner,*

v.

GLEN AUSTIN, WARDEN,
LOGAN CORRECTIONAL CENTER,

*Respondent.*

### PETITION UNDER 28 U.S.C. § 2254 FOR
### WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

KATHLEEN T. ZELLNER

**Kathleen T. Zellner & Associates, P.C.**
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
P: 630-955-1212
F: 630-955-1111
attorneys@zellnerlawoffices.com

Attorney for Petitioner Melissa Calusinski

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

MELISSA CALUSINSKI, REG. NO. R88005,

PETITIONER,

v.                                   CASE NO. _____

GLEN AUSTIN, WARDEN,
LOGAN CORRECTIONAL CENTER,            Lake County, Illinois
                                      Case No. 09-CF-252
RESPONDENT.

PETITION UNDER 28 U.S.C. § 2254 FOR
WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Now comes Petitioner, Melissa Calusinski, by and through her attorneys,

Kathleen T. Zellner & Associates, P.C., and petitions this Court for a Writ of Habeas

Corpus pursuant to 28 U.S.C. § 2254. In support thereof, Petitioner Melissa

Calusinski ("Melissa") states as follows:

1.     **Name and location of court where conviction entered:**

       Nineteenth Judicial Circuit Court, Lake County, Illinois
       18 N. County Street, Waukegan, Illinois 60085

2.     **Date of judgment of conviction:**

       November 16, 2011

3.     **Offense(s) of which Petition was convicted:**

       1. First degree murder
       2. Aggravated battery of a child

4.     **Sentence imposed:**

       31 years in the Illinois Department of Corrections followed by three years of
       mandatory supervised release

5.     **What was your plea?**

Not guilty

## PART I—TRIAL AND DIRECT REVIEW

1.     **Kind of trial:**

Jury

2.     **Did you testify at trial?**

No

3.     **Did you appeal from the conviction or the sentence imposed?**

Yes

(A)     **If you appealed, give the**

(1) **Name of court:** Appellate Court of Illinois, Second District
Case No. 2-12-0383
*People v. Calusinski*, 2014 IL App (2d) 120383-U

(2) **Result:**   Judgment affirmed

(3) **Date of ruling:**   February 19, 2014

(4) **Issues Raised:**

**Ground One:** The evidence was insufficient to prove Melissa's guilt beyond a reasonable doubt where there was evidence of a prior injury to the decedent. This prior injury evidence suggested that the Decedent's fatal injury was caused by a re-aggravation of the prior injury, not Melissa's intentional conduct. Further, an eyewitness made statements about the decedent striking his head on a tile floor then becoming lethargic before he became unresponsive. Taken together, this evidence demands the inference that Melissa did not cause the decedent's fatal injury.

**Ground Two:** Melissa's inculpatory statements were coerced, involuntary, and unreliable; the trial court, therefore, erred in admitting them. Investigators coerced Melissa's inculpatory statements where they refused to accept Melissa's denials of culpability and compelled

Melissa to agree with the scenarios they laid out. Moreover, Melissa made statements through her lengthy interrogation which undermined the reliability of her inculpatory statements. The investigators' conduct deprived Melissa of her Fifth Amendment right to freedom from involuntary confessions.

**Ground Three:** Trial defense counsel rendered constitutionally defective performance that prejudiced Melissa where counsel failed to tender a pattern jury instruction defining recklessness, the mental state for the offense of involuntary manslaughter.

**Ground Four:** The State's rebuttal expert was not qualified to render neurological opinions. The trial court erred when it permitted this witness to render opinions in the field of neurology. These opinions were rendered without scientific basis. These opinions prejudiced Melissa because they led the jury to discredit the unrebutted scientific findings of Melissa's experts.

**(B) If you did not appeal, explain briefly why not:**

Not applicable

**4. Did you appeal, or seek leave to appeal, to the highest state court?**

Yes—Supreme Court of Illinois Case No. 117725

**(A) If yes, give the**

**(1) Result:** Petition for leave to appeal denied

**(2) Date of ruling:** September 24, 2014

**(3) Issues raised:**

**Ground One:** The evidence was insufficient to prove Melissa's guilt beyond a reasonable doubt where there was evidence of a prior injury to the decedent. This prior injury evidence suggested that the Decedent's fatal injury was caused by a re-aggravation of the prior injury, not Melissa's intentional conduct. Further, an eyewitness made statements about the decedent striking his head on a tile floor then becoming lethargic before he became unresponsive. Taken together, this evidence demands the inference that Melissa did not cause the decedent's fatal injury.

4

**Ground Two:** Melissa's inculpatory statements were coerced, involuntary, and unreliable; the trial court, therefore, erred in admitting them. Investigators coerced Melissa's inculpatory statements where they refused to accept Melissa's denials of culpability and compelled Melissa to agree with the scenarios they laid out. Moreover, Melissa made statements through her lengthy interrogation which undermined the reliability of her inculpatory statements. The investigators' conduct deprived Melissa of her Fifth Amendment right to freedom from involuntary confessions.

**Ground Three:** Trial defense counsel rendered constitutionally defective performance that prejudiced Melissa where counsel failed to tender a pattern jury instruction defining recklessness, the mental state for the offense of involuntary manslaughter.

**Ground Four:** The State's rebuttal expert was not qualified to render neurological opinions. The trial court erred when it permitted this witness to render opinions in the field of neurology. These opinions were rendered without scientific basis. These opinions prejudiced Melissa because they led the jury to discredit the unrebutted scientific findings of Melissa's experts.

(B) **If you did not appeal explain briefly why not:**

Not applicable

5. **Did you petition the United States Supreme Court for a writ of *certiorari*?**

No

## PART II—COLLATERAL PROCEEDINGS

1. **With respect to this conviction or sentence, have you filed a post-conviction petition in state court?**

Yes

A. **Name of court:**   Nineteenth Judicial Circuit Court, Lake County, Illinois

B. **Date of filing:**   June 23, 2015

C. **Issues raised:**

**Ground One:** Newly discovered evidence negated the probable cause basis of Melissa's arrest. This evidence was composed of the medical examiner's admission that he had made a mistake during the decedent's autopsy and missed evidence of a pre-existing injury. The medical examiner's incorrect conclusions directly affected the investigators' interrogation of Melissa. To wit, the medical examiner advised the investigators that the decedent's injury could not have occurred without a brutal criminal act. Had the medical examiner rendered the correct opinion concerning the decedent's cause of death—i.e., re-aggravation of a prior injury, not intentionally inflicted force—Melissa would not have been arrested, prosecuted, convicted, and incarcerated because no crime was committed. It is axiomatic that if no crime was committed, there can be no finding of probable cause.

**Ground Two:** Newly discovered evidence—the medical examiner's incorrect conclusion—demonstrated that Melissa's confession was involuntary and unreliable. Specifically, the investigators used the medical examiner's incorrect conclusions to discredit Melissa's protestations of innocence. Because the medical examiner advised the investigators that the decedent's injuries could not have occurred without a brutal act, the investigators were intent upon extracting from Melissa a statement implicating herself in the supposed use of brutal force against the decedent. (Thus, the medical evidence upon which Melissa's alleged confession—and, by extension, her conviction—was based upon incorrect medical conclusions.

**Ground Three:** Timely disclosure of the medical examiner's error would have resulted in a different outcome at trial. The medical examiner was the only testifying expert for the prosecution to have reviewed the histology slides—every other expert deferred to the medical examiner's review. That the medical examiner missed the apparent prior head injury undermines confidence in all opinions he rendered at Melissa's trial. Thus, all medical evidence advanced by the prosecution is suspect. Most importantly, Melissa's primary defense at trial was that the decedent's death was caused by his re-aggravating an existing injury by banging his head against the ground. Had Melissa known that (1) there was scientific evidence of such existing injury and (2) the medical examiner failed to identify such evidence during autopsy, Melissa would have used this evidence to provide an innocent explanation for the decedent's death. Such evidence would have permitted Melissa to mount a defense that likely would have resulted in her acquittal.

**Ground Four:** Previously undisclosed evidence demonstrated that the decedent did not suffer a skull fracture. Instead, the mechanism of death was cerebral edema caused by a prior injury and exacerbated by repeated head-banging. In support thereof, Melissa submitted an affidavit from Dr. Nancy Jones wherein Dr. Jones averred that she had reviewed all medical evidence, and, to a

reasonable degree of medical and scientific certainty, the decedent had a well-developed, organizing subdural membrane. This finding supported the conclusion that the decedent had suffered at least one previous subdural hemorrhage, which was in the process of healing at the time of his death. Indeed, Dr. Jones averred that the mechanism of the decedent's death was cerebral edema consistent with a significant concussion, following cumulative incidences of head banging. In sum, the pattern of injuries suffered by the decedent did not comport with the manner in which Melissa demonstrated throwing him to the ground in the interrogation videos. Dr. Jones also viewed x-ray images that were withheld from Melissa's trial defense counsel. These x-rays showed that the decedent's head was shaped like an old-fashioned light bulb. It was known at trial that, at the time of his death, the decedent's head measured in the 95th percentile of similarly-aged children. Dr. Jones opined that the size of the decedent's skull was consistent with brain swelling; however, the nature of the swelling (including its extent and the lack of separation of cranial structures observed in the previously undisclosed x-ray) indicated that the swelling was related to a prior injury, not the alleged acute injury inflicted by Melissa. Reviewing the previously undisclosed x-ray, Dr. Jones further opined that what the medical examiner identified as a skull fracture was, in fact, an accessory suture. Had Melissa been provided with the previously undisclosed x-ray at trial, her experts would have concluded that the mechanism of death was cerebral edema arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident, witnessed by Nancy Kallinger, within 15–20 minutes of B.K. becoming unresponsive. Importantly, the alleged fracture was prominent in the State's prosecution of Melissa and her underling interrogation. The prosecution invoked the skull fracture no fewer than 32 times during trial. During interrogation, the investigators rejected Melissa's pleas of innocence by using the alleged skull fracture's presence as a weapon with which to coerce Melissa to make statements (1) that the decedent had suffered an acute injury and (2) that Petition had inflicted such an acute injury. Indeed, the supposed recreation of events performed by Melissa during her interrogation was inconsistent with the pattern of injuries sustained by the decedent. In the recreation, as prompted by the investigators, Melissa indicated she held the decedent with his face directed away from her; Dr. Jones opined that if Melissa had held the decedent in the manner described in the recorded interrogation, he would have sustained a different pattern of injuries.

Evidence that the medical examiner was mistaken about (1) the skull fracture and (2) the circumstances of the decedent's death was directly exculpatory to Melissa. Indeed, such evidence demonstrated that Melissa was actually innocent of the crime of conviction because, in fact, there was no crime; instead,

the cause of the decedent's death was cerebral edema arising from repetitive concussions and additional head-banging incidents.

**Ground Five:** As for the previously undisclosed x-rays, Melissa alleged the State's withholding of them rose to the level of a *Brady* violation. In support thereof, Melissa presented an affidavit from her trial defense attorney, Paul DeLuca. DeLuca averred that during the course of pretrial discovery, he issued two subpoenas for production of complete case files to the Lake County Coroner's Office. The entire coroner's file would include x-rays taken by the medical examiner during autopsy. At a subsequent status hearing, one of the prosecutors, Christen Bishop, advised the court that there were x-rays but that the x-rays were not readable or legible. Bishop then tendered to DeLuca a copy of the illegible x-rays saved to a CD in open court, stating for the record that "[the x-rays] are illegible on the digital." Despite Bishop's representation as to the x-rays' legibility, DeLuca attempted to view the files saved to the CD. He found the CD to contain three image files named "[B.K.]1", "[B.K.]2", and "[B.K.]3". The first two images appeared totally blank or black. DeLuca noted that "[B.K.]3" was dark but appeared to be an x-ray of the lower body. These were the only x-rays tendered to DeLuca by the prosecution.

Then, after trial in 2015, the Lake County Coroner's Office identified and produced a second CD containing five x-ray images from Melissa's case. These five x-ray images were significantly brighter and more readable. In his affidavit, DeLuca averred that, had these x-rays been tendered before trial, he would have given them to his experts to determine what, if any, information they might provide about the circumstances of the decedent's death. Using these x-rays, Melissa's experts concluded that the supposed skull fracture identified by the medical examiner during autopsy was, in fact, an accessory suture that was wholly unrelated to the decedent's death.

Further, Melissa presented the affidavit of Paul Forman, who assisted the medical examiner in performing the autopsy of the decedent. Forman was present when the medical examiner took the at-issue x-rays. All of the x-rays Forman observed were clear and readable.

As for the prejudice prong of *Brady*, Melissa argued the readable x-rays strengthened Dr. Jones's opinion that the cause of the decedent's death was cerebral edema and that Melissa's descriptions of inflicting the fatal injury were inconsistent with the mechanism of death. Thus, the nondisclosure of the x-rays greatly prejudiced Plaintiff.

As for the materiality prong of *Brady*, Melissa argued that because the crucial issue at trial was whether the decedent was intentionally injured or injured by accident, the x-rays were highly material. To show materiality, a defendant

8

must demonstrate a reasonable probability of a different result. The withheld x-rays were material because, had they been disclosed before trial, Melissa's experts would have determined that there was no fracture in the decedent's skull. This information would have directly contradicted the medical examiner's conclusions <u>and</u> bolstered Melissa's defense of pre-existing injury. Armed with this information, Melissa would have presented compelling evidence that—to a reasonable probability—would have changed the outcome of her trial. Indeed, Dr. Jones rendered the opinion that the information learned from the withheld x-ray, together with the known expansion of the decedent's head circumference, demanded the conclusion that the mechanism of the decedent's death was cerebral edema—not an acute injury. Thus, the withheld x-rays were material because they (1) permitted Dr. Jones to identify the supposed skull fracture as a naturally-occurring accessory suture and (2) permitted Dr. Jones to diagnose the mechanism of death as cerebral edema as opposed to an acute injury.

**D.** **Did you receive an evidentiary hearing on your petition?**   Yes

**E.** **What was the court's ruling?**   Post-conviction petition denied

**F.** **Date of court's ruling?**   September 30, 2016

**G.** **Did you appeal from the ruling on your petition?**   Yes

**H.** **(a) If yes,**

      **(1) what was the result?**  Judgment affirmed

      Appellate Court of Illinois, Second District, Case No. 2-16-0825 *People v. Calusinski*, 2018 IL App (2d) 160825-U

      **(2) date of decision?**   June 11, 2018

    **(b) If no, explain briefly why not:**   Not applicable

**I.** **Did you appeal, or seek leave to appeal this decision to the highest state court?**   Yes—Supreme Court of Illinois Case No. 123792

    **(a) If yes,**

      **(1) what was the result?**  Petition for leave to appeal denied

      **(2) date of decision:**   September 26, 2018

(b) If no, explain briefly why not:

Not applicable

2.  **With respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?**

    Yes

    Petition for Rehearing filed in the Appellate Court of Illinois, Second Judicial District on March 12, 2014.

    Result:        Judgment affirmed

    Date:          April 22, 2014

3.  **With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in federal court?**

    No

4.  **With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?**

    No

## PART III—PETITIONER'S CLAIMS

1.  **State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.**

    (A)   **Ground one:** Melissa's 14th Amendment due process rights were violated where the State, through its agent, reduced the size and quality of the x-rays saved to the Lake County Coroner's computer before producing them to Melissa, thereby effectuating a mere partial disclosure in violation of its disclosure requirement under *Brady*.

    In the alternative, Melissa's 14th Amendment due process rights were violated when the State withheld readable copies of x-rays that established that B.K. had not suffered a skull fracture, and the State's

Attorney represented to Melissa's attorney on the record that the only x-rays tendered to Melissa before trial were unreadable. Had the State made readable x-rays available to Melissa, Melissa's experts would have concluded that B.K. had not suffered a skull fracture, thereby enabling them to render the opinion that the supposed mechanism of death—i.e., violent force that caused a skull fracture—was not supported by the scientific evidence. Further, the readable x-rays are material because their disclosure would have permitted Melissa to impeach the testimony of rebuttal expert Dr. Manuel Montez, which included statements about digitally manipulating the alleged skull fracture. Because the readable x-rays demonstrated that there was, as a matter of fact, no facture in B.K.'s skull, Dr. Montez's testimony to its existence was untrue. Because the readable x-rays impeach Dr. Montez's testimony, they are properly deemed material for purposes of *Brady* analysis.

When evaluating the materiality of the readable-x-ray evidence, the State court improperly applied a sufficiency of evidence standard. In so doing, the State court improperly applied clearly established Federal law on the analysis of *Brady* material.

The State courts' denial of relief on this issue involves both an unreasonable application of clearly established Federal law and an unreasonable determination of the facts.

**Supporting facts:** On September 7, 2011, eight weeks before Melissa's trial began, former Lake County Assistant State's Attorney Christen Bishop gave Melissa's trial Attorney, Paul DeLuca, a disc containing three x-ray images. Bishop represented to DeLuca and the court that the images "were not legible or readable."

That same day, DeLuca attempted to view the files on the disc. Upon inserting the disc into his office computer and opening the disc's directory, DeLuca observed three image files and TigerView, a program for opening the files. The first image DeLuca observed was very dark but showed what appeared to be a white outline of the top of a skull. The second image DeLuca observed was entirely dark, almost to the point of being black. The third image DeLuca observed appeared very dark but showed B.K.'s lower torso, from around his waist to his feet. Because all three images appeared dark and illegible, DeLuca asked his secretary for assistance. DeLuca attempted to open the other files on the disc, but nothing opened.

After Melissa's trial, DeLuca attempted to open TigerView again. Although he could not open the program on his computer, DeLuca's

secretary was able to open it on her computer. When they tried to use TigerView to enhance the second x-ray image, the entire image appeared white.

On September 9, 2011, the State filed a Supplemental Answer to Discovery, which memorialized Bishop's production of a "[CD] with 3 digital x-ray images purporting to be of [B.K.]" and "the program required to view the [x-ray] images." DeLuca and his secretary attempted to open the program required to view the x-ray images, what was saved to the CD tendered by Bishop on September 7, 2011. The program was called TigerView. Neither DeLuca nor his secretary could open it. Because Bishop had represented to him that the images "were not legible or readable", DeLuca undertook no further effort to use TigerView to view the x-ray images before Melissa's trial.

Instead, DeLuca chose to formulate his pre-trial and trial strategy based upon the autopsy finding of the medical Examiner, Dr. Eupil Choi, that B.K.'s skull had been fractured. Because Dr. Choi did not preserve sections of the purported skull fracture for purposes of creating histology slides, he could not dispute the existence of the skull fracture without the skull x-rays that showed no fracture. In the absence of such x-rays, DeLuca had no choice but to proceed with a defense that assumed there was a skull fracture.

In 2015, the Lake County Coroner's Office located and produced legible copies of the x-rays of B.K. from his autopsy in 2009. These x-ray image files were not dark to the point of illegibility. Instead, they were bright and—according to Melissa's experts in post-conviction proceedings— clearly showed there was no fracture in B.K.'s skull.

The Prosecution is responsible for *Brady* material that is within the custody and control of State agents. Based upon the 2015 disclosure of clear and readable x-ray image files, it is apparent that the Lake County Coroner was in possession of clear and readable x-ray image files since 2009. Therefore, irrespective of any good or bad faith on the part of the Coroner's Office or the prosecution, the 2015 x-rays are properly considered withheld for purposes of *Brady* analysis.

As for the materiality and prejudice prongs of *Brady*, Melissa argues the pre-trial production of the x-rays likely would have led to a different outcome at trial because (1) they were favorable to Melissa and (2) they rebutted and impeached the State's experts' testimony.

The readable x-rays were favorable to Melissa because they did not show a skull fracture, and the absence of a skull fracture cuts strongly against Dr. Choi's diagnosis of abusive head trauma. Had the legible x-rays been tendered to him before Melissa's trial, DeLuca would have hired a pediatric neuroradiologist to determine whether or not there was a skull fracture. The pediatric neuroradiologist would have determined there was no skull fracture and rendered a diagnosis of cerebral edema arising from repeated occurrences of head-banging. Such a diagnosis is favorable to Melissa because if B.K. died as a result of accidental or self-inflicted head trauma, the crime of Melissa's conviction never occurred. Thus, such evidence is directly exculpatory.

Moreover, the readable x-rays would have rebutted the State's experts' testimony. Armed with the readable x-rays, DeLuca would have solicited expert opinions that contradicted the testimony of various witnesses, including Dr. Choi, that there was a skull fracture. After all, Dr. Choi had testified at trial that the x-rays were not legible, that he could not identify a skull fracture in the x-rays, but that he knew there was a skull fracture because he had observed it with the naked eye.

Additionally, with a pediatric neuroradiologist confirming there was no fracture, DeLuca could have refuted the accuracy of Melissa's reenactment in her filmed confession. Although DeLuca discussed the reliability of Melissa's reenactment in the filmed confession with his medical experts, the experts could not dispute the reenactment because they did not have x-rays that showed no skull fracture. Armed with medical opinions that refuted the accuracy of Melissa's reenactment, DeLuca could have effectively contradicted the reliability of every inculpatory statement Melissa made.

In *Kyles v. Whitley*, the United States Supreme Court held that, to comply with *Brady*, the prosecution bears the duty to learn of favorable evidence known to other government actors. The Coroner's office and its agents are properly considered government actors under the Supreme Court's formulation in *Kyles*. Therefore, knowledge that readable x-rays were saved to the Coroner's computer in 2009 is imputed to the prosecutors in Melissa's case. Because the prosecutors in Melissa's case did not tender the readable x-rays to Melissa before trial, they were withheld for purposes of *Brady* analysis. Because—as set forth herein and in Melissa's concurrently filed Memorandum—the readable x-rays are material and their nondisclosure prejudiced Melissa, the prosecution violated *Brady* when it withheld them.

The illegible x-ray image files Bishop tendered to DeLuca on September 7, 2011, were saved in the JPEG file format. The legible x-ray image files produced by the Lake County Coroner's Office in 2015 were saved in the TIFF file format. The TIFF file format is an uncompressed format that, in simple terms, contains all underlying data. The JPEG image files Bishop tendered DeLuca were compressed and contained very little data. Indeed, the sizes of the JPEG image files DeLuca received from Bishop in 2011 were approximately 2.5% of the sizes of the TIFF image files he viewed in 2015.

At the evidentiary hearing on her post-conviction petition, Melissa presented Jeffrey Mueller as an expert in the field of software engineering with a specialty in imaging. Mueller testified he reviewed the images Bishop gave to DeLuca in September 2011, which he identified as being saved as JPEG image files. Mueller also reviewed the image files that Dr. Shaku Teas, an expert whom DeLuca consulted, reviewed. Mueller identified these image files as JPEG. Mueller reviewed the image files from the Coroner's computer, which were saved in TIFF file format.

Mueller testified the amount of data contained in the JPEG image files given to DeLuca in 2011 was a small percentage of the data contained in the TIFF image files on the Coroner's computer. By way of analogy, the TIFF images are to the JPEG images as Dostoevsky's Crime and Punishment are to its CliffNotes™. Mueller testified the JPEG images given to DeLuca in 2011 had been compressed significantly. In contrast, the TIFF images saved to the Coroner's computer in 2009 were "uncompressed and [of] highest quality."

Mueller demonstrated for the trial court a comparison of the JPEG images given to DeLuca in 2011 and the three TIFF images saved to the Coroner's computer in 2009. The comparison included the metadata for all images. Metadata conveys information related to file properties including file size, file type, and creation date. The size of the TIFF files on the coroner's computer were approximately 17,800 kilobytes, 16,600 kilobytes, and 17,200 kilobytes, respectively. All three TIFF images on the coroner's computer were created on January 15, 2009, the date of B.K.'s autopsy.

In stark contrast, the three JPEG image files Bishop gave DeLuca had file sizes of 267 kilobytes, 411 kilobytes, and 979 kilobytes, respectively. This data compression amounts to the loss of approximately 98% of the data contained in the TIFF image files saved to the Coroner's computer.

The JPEG images tendered to DeLuca were created on September 6, 2011.

Using the TigerView software made available to DeLuca with the JPEG images in September 2011, Mueller improved the quality of the TIFF images saved to the Coroner's computer in 2009. Mueller could not, however, improve the quality of the JPEG images tendered to DeLuca in September 2011 using the same software. Mueller explained to the court that he could not improve the quality of DeLuca's images because the images were exported as extremely low-quality JPEG files. Further, Mueller explained that another modification was made to the images before they were exported.

Mueller demonstrated to the trial court how the very poor quality of the DeLuca image was created prior to being exported as a JPEG image file and tendered to DeLuca. Mueller modified one of the TIFF images from the Coroner's computer by reducing the window width to a value of three—thereby increasing the contrast to the point that only pure white and dark grey/black were visible—and exporting the image as a JPEG file with lowest quality settings. It was only after taking these steps that Mueller could replicate the low quality and small file size present in the DeLuca image files. Based upon his expertise and experience, Mueller concluded that, in addition to being exported as low-quality JPEG files, the images on the Coroner's computer had been deliberately degraded using image editing software. Specifically, Mueller explained that the only way to reduce the quality of the x-ray images to the same degree as the DeLuca JPEGs was by (1) exporting the TIFF image file as a low quality (i.e., highly compressed) JPEG image, (2) opening the resulting JPEG image in a separate image editing software, (3) darkening and reducing the quality of that JPEG image, and (4) exporting the image <u>again</u> as a low quality JPEG image. Only after taking these steps was Mueller able to substantially recreate the JPEG images Bishop tendered DeLuca in 2011.

When Mueller viewed the 718 other image files on the Coroner's computer, he did not see any whose quality had been reduced to the severe extent of the x-ray of B.K.'s skull. The same x-ray image of B.K.'s skull had been modified more than any other image on the Coroner's computer. While the window width of the x-ray image of B.K.'s skull had been reduced to three, the window widths of the other 718 files on the Coroner's computer were in the thousands—enabling minute gradation in the colors displayed in each x-ray.

15

Mueller testified that the B.K. x-ray image files on the Coroner's computer had been modified so as to reduce their quality.

Additionally, Mueller demonstrated for the trial court a comparison between the adjusted DeLuca images and the images from the Coroner's computer. Mueller explained that while he was able to adjust the brightness and contrast of the DeLuca images, he was unable to alter the underlying metadata of the image. Indeed, Mueller explained that it would be impossible to make the DeLuca JPEG images comparable in size and quality to the images saved to the Coroner's computer in 2009.

Dr. Zimmerman testified for Melissa at the evidentiary hearing. Dr. Zimmerman reviewed the DeLuca 2011 JPEG x-ray images and explained that they were so unreadable as to be useless. Lightening up the image would not aid Dr. Zimmerman in trying to interpret that poor image. However, upon viewing the TIFF image saved to the Coroner's computer in 2009, Dr. Zimmerman was able to testify to a reasonable degree of certainty that no fracture was present in B.K.'s skull.

In *United States v. Bagley*, the United States Supreme Court made clear that *Brady* disclosure obligations are violated when the prosecution makes a partial disclosure that misleads defense counsel into believing that no further exculpatory evidence as a certain issue exists. Here, the prosecution disclosed unreadable x-rays to DeLuca on September 7, 2011, represented to him that the x-rays were unreadable, and then continued to mislead DeLuca into believing no readable x-rays existed. As set forth fully above, the readable, uncompressed x-ray images saved to the Coroner's computer were exculpatory. Because the State gave DeLuca no choice but to accept the presence of a skull fracture, his trial strategy was dramatically affected, and Melissa was prejudiced. Armed with the readable x-rays, DeLuca would have solicited the opinions of a pediatric neuroradiologist who would have reviewed the x-rays and informed DeLuca that there was no fracture in B.K.'s skull. Such evidence creates a reasonable likelihood that, had the evidence been disclosed to DeLuca before trial, the result of Melissa's trial would have been different.

As noted above, the prosecution's partial disclosure of unreadable x-rays deprived Melissa of her right to due process. The State courts' conclusions to the contrary involve both an unreasonable determination of clearly established Federal law and an unreasonable determination of the facts. Melissa's convictions must therefore be vacated.

As noted above, the prosecution's nondisclosure of exculpatory and favorable x-rays deprived Melissa of her right to due process. The State courts' conclusions to the contrary involve both an unreasonable determination of clearly established Federal law and an unreasonable determination of the facts. Therefore, habeas relief is appropriate.

(B) **Ground two:** Melissa's 14th Amendment due process rights were violated where the State secured her conviction through the knowing use of perjury. The testimony of Dr. Montez regarding his alleged examination of B.K. on January 16, 2009, is demonstrably false. Dr. Montez's testimony substantially contributed to Melissa's conviction.

The State courts' denial of relief on this issue involves both an unreasonable application of clearly established Federal law and an unreasonable determination of the facts.

**Supporting facts:** At trial, Dr. Montez testified in surrebuttal that he came to the Lake County Coroner's office on January 16, 2009, to consult on B.K.'s autopsy. According to Montez, Deputy Coroner Paul Forman and Investigator Mike Young were present at the time of his alleged examination of B.K.'s body. Dr. Montez testified that he saw the skull fracture and felt the fracture. Specifically, Dr. Montez testified at trial that he took his examination gloves off to feel the fracture with his bare fingers to assess its freshness. According to Dr. Montez, he felt a ridge where the two sides of the supposed fracture were not flush and noted that the supposed fracture did not feel sticky, an indication that the bone had not started to mend. Dr. Montez went on to render an opinion as to the manner of B.K.'s death based upon his assessment of the skull fracture; according to Dr. Montez, the presence of a skull fracture meant that B.K. had been the victim of a violent, intentional throw to the ground with significant force. Dr. Montez ruled out that the apparent head injury was self-inflicted or accidental. Dr. Montez also testified that he examined B.K.'s brain and the bleeding he observed thereon.

At Melissa's evidentiary hearing, Dr. Zimmerman testified that, based upon his review of the TIFF x-ray images saved to the Coroner's computer in 2009, there was no fracture present in B.K.'s skull. Dr. Zimmerman testified unequivocally that it would have been impossible for someone to have examined B.K.'s skull and touched a fracture because no fracture was present.

Further, Deputy Coroner Paul Forman testified at Melissa's evidentiary hearing that Dr. Montez did not examine B.K.'s body. Specifically, Forman testified that he remembered meeting with Dr. Montez and

Lake County Coroner Keller on January 16, 2009, in reference to B.K.'s autopsy. Forman provided Dr. Montez with his preliminary narrative regarding the case, a copy of the report authored by Dr. Choi the previous day regarding his autopsy of B.K., and Dr. Choi's body charts and notes from the previous day's autopsy. When Forman asked Dr. Montez if he wanted to examine the body, Dr. Montez declined. Dr. Montez did not examine B.K.'s body. Coroner Keller informed Dr. Montez that he need only review Dr. Choi's results. Had Dr. Montez actually viewed B.K.'s body, Forman would have accompanied Dr. Montez in conformity with his duties as deputy coroner. Forman testified that Dr. Montez took the documents but at no time examined B.K.'s body before leaving the Coroner's office.

Moreover, Forman would have known if Dr. Montez had examined B.K.'s body outside his presence on January 16, 2009. B.K.'s brain was removed and dissected during Dr. Choi's first autopsy examination on January 15, 2009. At the conclusion of that autopsy, the brain was placed in a viscera bag, which was then placed in the abdomen. With the brain inside, Forman stitched the abdomen closed. Forman then placed the skull cap—which had been removed and examined—in place and stitched together the scalp.

After Dr. Montez left the Lake County Coroner's office on January 16, 2009, Dr. Choi and Forman began the second autopsy of B.K. Both the abdomen and scalp were stitched closed with the same sutures Forman had placed the day before. Dr. Montez could not have examined B.K.'s skull and brain without cutting Forman's sutures.

Based upon Dr. Zimmerman's medical conclusions and Forman's testimony, it is clear that Dr. Montez—in complete contradiction to his testimony at Melissa's trial—never examined B.K.'s body on January 16, 2009. Therefore, Dr. Montez committed perjury.

In *Napue v. Illinois*, the United States Supreme Court found that the State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process. This principle applies even when the State, although not soliciting the false evidence, allows it to go uncorrected when it appears. The State should not be able to avoid responsibility for Dr. Montez's testimony because Dr. Montez was—in his capacity as a consultant and witness for the State—an agent of the prosecution. His knowledge must be imputed to the prosecution.

Had the State courts properly found that Dr. Montez committed perjury, the prosecution would bear the burden of demonstrating that the perjury did not cause Melissa's conviction. As described fully herein and in Melissa's concurrently filed Memorandum, the presence or absence of a fracture in B.K.'s skull was of central importance to Melissa's conviction. Numerous witnesses testified about the presence of a skull fracture. The prosecutors argued to the jury that Melissa cracked B.K.'s skull when she threw him to the ground. Dr. Montez referenced the skull fracture as proof that the mechanism of B.K.'s death was violent force. The State cannot now, after holding out the presence of a skull fracture as evidence dispositive of Melissa's guilt, deny its materiality. Such an argument strains credulity.

As noted above, the prosecution's knowing use of perjured testimony deprived Melissa of her right to due process. The State courts' conclusions to the contrary involved an unreasonable determination of the facts. Therefore, habeas relief is appropriate.

**2.** **Have all grounds raised in this petition been presented to the highest court having jurisdiction?**

Yes

**3.** **If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:**

Not applicable

## PART IV—REPRESENTATION

**Give the names and addresses, if known, of each attorney who represented you in the following stages of the judgment attacked herein:**

**(A)** **At preliminary hearing**

Scott Gordon
120 South State Street, Suite 200
Chicago, Illinois 60603

**(B)** **At arraignment and plea**

Elizabeth Vonau
George Kililis
380 Terra Cotta Road, Suite K

Crystal Lake, Illinois 60012

**(C)** **At trial**

Paul DeLuca
1S450 Summit Avenue, Suite 140
OakBrook Terrace, Illinois 60181

Daniel Cummings
1280 Iroquois Avenue, Suite 100
Naperville, Illinois 60563

**(D)** **At sentencing**

Paul DeLuca
1S450 Summit Avenue, Suite 140
OakBrook Terrace, Illinois 60181

Daniel Cummings
1280 Iroquois Avenue, Suite 100
Naperville, Illinois 60563

**(E)** **On appeal**

Kathleen T. Zellner
Douglas H. Johnson
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515

**(F)** **In any post-conviction proceeding**

Kathleen T. Zellner
Douglas H. Johnson
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515

(G)     Other (state)

      Petition for Rehearing

      Kathleen T. Zellner
      Douglas H. Johnson
      Kathleen T. Zellner & Associates, P.C.
      1901 Butterfield Road, Suite 650
      Downers Grove, Illinois 60515

## PART V—FUTURE SENTENCE

**Do you have any future sentence to serve following the sentence imposed by this conviction?**

      No

**Name and location of the court which imposed the sentence:**

      Not applicable

**Date and length of sentence to be served in the sentence:**

      Not applicable

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court grant her all relief to which she may be entitled in this proceeding and asks that this Court:

1.      Issue a Writ of Habeas Corpus ordering that Melissa Calusinski be brought before the Court to be discharged from her unconstitutional confinement and relieved of her unconstitutional convictions and sentences;

2.      Schedule filing of legal briefs and memoranda in support of the issues of law in this Petition so that the Court may be fully informed;

3.      Hold an evidentiary hearing as to those disputed issues of fact necessary for the fair adjudication of the issues raised in the instant petition; and

4.      Grant all relief to which she may be entitled in this proceeding.

Dated:          March 27, 2019            Respectfully submitted,

/s/ Kathleen T. Zellner
KATHLEEN T. ZELLNER
IL Bar No. 6184574

KATHLEEN T. ZELLNER & ASSOCIATES, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
P: 630-955-1212
F: 630-955-1111
attorneys@zellnerlawoffices.com

Attorney for Petitioner Melissa Calusinski

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

MELISSA CALUSINSKI, REG. NO. R88005,

    PETITIONER,

        v.

    CASE NO. _____

GLEN AUSTIN, WARDEN,

    RESPONDENT.

    Lake County, Illinois
    Case No. 09-CF-252

## VERIFICATION

STATE OF ILLINOIS   §
               §   ss.:
COUNTY OF LOGAN   §

    I, Melissa Calusinski, hereby verify under penalty of perjury that I have reviewed the foregoing Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State Custody, I am familiar with its content, and I declare under penalty of perjury that the foregoing is true and correct.

Date: 3-20-19              *Melissa Calusinski*

                            MELISSA CALUSINSKI
                            Reg. No. R88005

                            Logan Correctional Center
                            1096 1350th Street
                            Lincoln, Illinois 62656

Subscribed and sworn to before me, a Notary Public of Logan County, Illinois, this 20 of March 2019

*Sharon Fitzer*
_____
Notary Public

My commission expires: 4/25/2021

OFFICIAL SEAL
SHARON FITZER
Notary Public - State of Illinois
My Commission Expires 4/25/2021