# EXHIBIT A

Petitioner's Brief in the
Illinois Court of Appeals
(Direct Appeal)
filed May 17, 2013

### No. 2-12-0383

# In the
# Appellate Court of Illinois
## Second Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

v.

MELISSA CALUSINSKI,

*Defendant-Appellant.*

Appeal from the Circuit Court of the Nineteenth Judicial Circuit,
No. 09 CF 252.
The Honorable **Daniel Shanes**, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLANT
## MELISSA CALUSINSKI

KATHLEEN T. ZELLNER
DOUGLAS H. JOHNSON
KATHLEEN T. ZELLNER
& ASSOCIATES, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

*Counsel for Defendant-Appellant*

### ORAL ARGUMENT REQUESTED

 COUNSEL PRESS · (866) 703-9373       PRINTED ON RECYCLED PAPER

A_01

## <u>POINTS AND AUTHORITIES</u>

NATURE OF THE CASE ........................................................................................1

ISSUES PRESENTED FOR REVIEW .................................................................1

JURISDICTION ...................................................................................................2

STATEMENT OF FACTS ...................................................................................2

ARGUMENT .....................................................................................................29

I.      THE EVIDENCE IS INSUFFICIENT TO PROVE GUILT BEYOND
      A REASONABLE DOUBT ..........................................................................29

***Standard of Review*** ......................................................................................29

*People v. Bishop,*
   218 Ill.2d 232 (Ill. 2006)..............................................................................29

*Jackson v. Virginia,*
   443 U.S. 307 (1979)......................................................................................29

*People v. Smith,*
   185 Ill.2d 532 (1999) ...................................................................................29

***Overview of the Evidence*** .............................................................................30

***B.K.'s Prior Injury and Eyewitness Account of B.K.'s Condition Between 3:35
and 3:51 p.m.*** ...............................................................................................31

*People v. Swart,*
   369 Ill.App.3d 614 (2nd Dist. 2006)............................................................32

***The State's Medical Experts' Admissions*** .....................................................33

*People v. Smith,*
   185 Ill.2d 532 (1999) ...................................................................................35

***Defendant's Confession*** ...............................................................................36

*Escobedo v. Illinois,*
   378 U.S. 478 (1964)......................................................................................36

*People v. Cunningham,*
   212 Ill.2d 274 (2004) ...................................................................................37

i

*People v. Nelson,*
  235 Ill.2d 386 (2009) ...............................................................................40

***The Corpus Delicti Rule*** ...............................................................................40

*People v. Willingham,*
  89 Ill.2d 352 (1982) .................................................................................40

*Smith v. United States,*
  348 U.S. 147 (1954)...................................................................................40

*People v. Furby,*
  138 Ill.2d 434 (1990) ...............................................................................41

*People v. Dalton,*
  91 Ill.2d 22 (1982) ...................................................................................41

*People v. Ehlert,*
  211 Ill.2d 192 (2004) ...............................................................................41

*People v. Cloutier,*
  156 Ill.2d 483 (1993) ...............................................................................41

*People v. Lambert,*
  104 Ill.2d 375 (1984) ...............................................................................41

*People v. Sargent,*
  239 Ill.2d 166 (2010) ...............................................................................41

*People v. Lara,*
  2012 IL 112370 *modified on denial of reh'g* (Feb. 7, 2013) .........................................41

***The Confession was Created by the Pathologists and Detectives, not Defendant*** ..........44

*People v. Nieves,*
  207 Ariz. 438, 87 P.3d 851 (2004)....................................................................45, 46

*People v. Rivera,*
  2011 IL App. (2d) 091060 ...............................................................................46, 47, 48

You Think He Got Shot?  Did You Maybe Shoot Him by Accident" *Linguistic Manipulation of the Communicatively Immature During Police Interrogations,*
  13 Rich. J. L. & Pub. Int. 143 (2009) ...............................................................47

II.    DEFENDANT'S STATEMENTS WERE COERCED, INVOLUNTARY,
      AND UNRELIABLE, THUS INADMISSIBLE ...............................................................50

A_03

***Standard of Review*** ..................................................................................51

*People v. Enoch,*
  122 Ill.2d 176 (1998) ..........................................................................51

*People v. Bennett,*
  376 Ill.App.3d 554 (1st Dist. 2007) ....................................................51

*People v. Moore,*
  397 Ill.App.3d 555 (1st Dist. 2009) ....................................................51

*People v. Cosby,*
  231 Ill.2d 262 (2008) ..........................................................................51

*People v. Luedemann,*
  222 Ill.2d 530 (2006) .......................................................................51-52

***Detectives' Conduct Violated Defendant's Fifth Amendment Rights*** ...........................52

*Beckwith v. United States,*
  425 U.S. 341 (1976) ............................................................................52

*People v. Melock,*
  149 Ill.2d 423 (1992) ..........................................................................52

*People v. Gilliam,*
  172 Ill.2d 484 (1996) ..........................................................................52

*People v. Willis,*
  215 Ill.2d 517 (2005) ..........................................................................52

725 ILCS 5/114-11(d) ..........................................................................52

*People v. Koesterer,*
  44 Ill.App.3d 468 (1st Dist. 1976) ......................................................53

*People v. Hill,*
  39 Ill.2d 125 (1968) ............................................................................53

*Brown v. Illinois,*
  422 U.S. 590 (1975) ............................................................................54

*Edward v. Arizona,*
  451 U.S. 477 (1981) ............................................................................54

*People v. Edwards,*
  144 Ill.2d 108 (1991) ........................................................................54

*Wong Sun v. United States,*
  371 U.E.471 (1963) ..........................................................................54

*People v. Pettis,*
  184 Ill.App.3d 743 (2nd Dist. 1989) ..............................................54

*Aleman v. Village of Hanover Park,*
  662 F.3d 897 (7th Cir. 2011) *cert. denied,* 133 S.Ct. 26 (U.S. 2012) .................... *passim*

*Rogers v. Richmond,*
  365 U.S. 534 (1961) ..........................................................................59

III.    DEFENSE COUNSEL WAS INEFFECTIVE IN FAILING TO TENDER
        I.P.I. 5.01 DEFINING RECKLESSNESS, THE REQUISITE MENTAL
        STATE FOR THE OFFENSE OF INVOLUNTARY MANSLAUGHTER ........59

I.P.I. 5.01 ..............................................................................................59

***Standard of Review*** ..........................................................................59

U.S. Const., amends. VI, XIV ............................................................59

Ill.Const. 1970, art. I, § 8 ..................................................................59

*Strickland v. Washington,*
  466 U.S. 668 (1984) ..................................................................59, 60

*People v. Richardson,*
  189 Ill.2d 401 (2000) ........................................................................59

*People v. Foster,*
  119 Ill.2d 69 (1987) ..........................................................................60

720 ILCS 5/9-1(a)(2) ..........................................................................60

720 ILCS 5/9-3(a) ..............................................................................60

720 ILCS 4/3-6 ....................................................................................60

I.P.I. 7.07 ..............................................................................60, 61, 65

I.P.I. 11.37..................................................................................60, 65

iv

I.P.I. 5.01 ..................................................................................... *passim*

*People v. Bolden,*
    103 Ill.App.2d 377 (1st Dist. 1968) ...............................................61

*People v. Howard,*
    232 Ill.App.3d 386 (1st Dist. 1992) ...............................................61

720 ILCS 5/4-6 ...............................................................................61

*People v. Thurman,*
    104 Ill.2d 326 (1984) ...............................................................61-62

*People v. Lowry,*
    354 Ill.App. 760 (1st Dist. 2004) ...........................................64, 65

I.P.I. 5.01B ...............................................................................64, 65

IV.    DR. MONTEZ WAS NOT QUALIFIED TO RENDER NEUROLOGICAL
       OPINIONS ...............................................................................65

***Standard of Review*** ...................................................................65

*People v. Jordan,*
    103 Ill.2d 192 (1984) .....................................................................65

***Dr. Montez's Neurological Testimony*** ........................................65

***Dr. Montez was Not Qualified to Render Neurological Opinions*** ..................67

*People v. Park,*
    72 Ill.2d 203 (1978) ...........................................................67, 70, 71

*People v. Sims,*
    244 Ill.App.3d 966 (5th Dist. 1993)...................................67, 68, 69

*People v. Coleman,*
    205 Ill.App.3d 567 (1990) .......................................................67, 68

*People v. Morgan,*
    187 Ill.2d 500 (1999) .....................................................................68

*Lebrecht v. Tuli,*
    130 Ill.App.3d 457 (1985) .............................................................68

*People v. Swart,*
   369 Ill.App.3d 614 (2d Dist. 2006)...................................................................68

Child Neurology Society, "Who We Are," http://www.childneurologysociety.org......... 69

*Alm v. Loyola University Medical Center,*
   373 Ill.App.3d 1 (1st Dist. 2007) ...................................................................70

***Dr. Montez's Neurological Testimony was Clearly Prejudicial***.....................................70

*People v. Perry,*
   147 Ill.App.3d 272 (1st Dist. 1986) .............................................................71

CONCLUSION.......................................................................................................72

A_07

## NATURE OF THE CASE

This is a direct appeal of Defendant Melissa Calusinski's conviction for first degree murder and aggravated battery of a child. Defendant was convicted on November 16, 2011 following a jury trial and was subsequently sentenced to 31 years in the Illinois Department of Corrections. (C. 596-600, 844; R. 4928).[1] No questions are raised on the charging instrument.

## ISSUES PRESENTED FOR REVIEW

I.   *Whether the evidence was sufficient to support Defendant's conviction for first degree murder beyond a reasonable doubt*

II.  *Whether Defendant's confession was involuntary because the interrogators presented Defendant with false medical evidence that she caused B.K.'s death and she was induced by a promise of freedom in exchange for falsely confessing to the murder of B.K.*

III. *Whether Defendant received ineffective assistance of counsel when defense counsel failed to submit I.P.I. 5.01, the definition of "recklessness"*

---

[1] The common law record shall be denoted "C. __", the report of proceedings "R. __", and the supplemental report of proceedings "S.R. __". People's exhibits shall be denoted "PX __", and defense exhibits "DX __". The appendix to Defendant-Appellant's brief shall be denoted "A. __".

IV.     *Whether the State's forensic pathologist testified beyond his area of*
        *expertise by offering opinions as a neuropathologist*


## JURISDICTION

Defendant was convicted on November 16, 2011. (C. 596-600). She filed a motion for new trial on December 12, 2011, which was supplemented by leave of court on January 3, 2012 and January 27, 2012. (C. 607-635, 672-683). Defendant's motion for new trial was denied on February 23, 2012. (R. 4869). On March 1, 2012, Defendant filed a motion to reconsider the sentence, which was denied on March 29, 2012. (C. 847-48, 860; R. 4971-72). A timely notice of appeal was filed on March 29, 2012. (C. 856-57). Jurisdiction therefore lies with this Court pursuant to Illinois Supreme Court Rules 603, 604(b) and 606.


## STATEMENT OF FACTS

On January 14, 2009, at 3:51 p.m., the Lincolnshire Police Department Dispatch Center received a 911 call from Minee-Subee daycare, located at 400 Marriott Drive in Lincolnshire, Illinois. (PX 17). Beth Katz ("Katz") told the dispatcher that there was a 16-month-old child who was "foaming," "not breathing," and repeatedly vomiting while receiving CPR from the Minee-Subee staff. (PX 17, pp. 1-3; R. 2724). Katz advised the dispatcher that the child was throwing up two days earlier and did not attend the daycare on the previous day. (PX 17, p. 1). Police and paramedics arrived at around 3:54 p.m. (PX 17, p. 4; PX 16). The child, "B.K.," was transported to the hospital, where he was pronounced dead at 4:50 p.m. (R. 2811).

2

## I.      B.K.'s Prior Health History

### A.  General Health Issues

From his birth on August 31, 2007, B.K. suffered from a litany of conditions including jaundice, anemia and eczema. (R. 3171, 3139, 3143).  B.K. frequently got colds and ear infections, although Amy Kingan ("Mrs. Kingan") testified that she did not remember B.K. ever having a "stomach bug" prior to January 2008. (R. 2641, 2650). B.K. also had a history of  frequently spitting up, which his doctors attributed to acid reflux. (R. 3141).

### B.  Prior Head Injuries

B.K. had the habit of throwing himself hard and hitting the back of his head on whatever surface he was sitting on.   (R. 2679-80, 2927, 2988-89, 3076, 3086). Sometimes this action was enough for B.K. to injure himself.  (R. 2927-28).

On October 27, 2008, B.K. awoke from his daycare nap with a "large bump" on the back of his head. (R. 2901).  Sandy Jenner ("Jenner"), the director of Minee-Subee, described it as a large, goose-egg-like swollen bump. (R. 2902).  Crystal Calusinski ("Crystal"), Defendant's sister, described the bump as being "the size of like a golf ball." (R. 4137).  She also testified that the daycare workers "were not allowed to speak with anybody.  Not allowed to go up and down the rooms telling, oh, [B.K.] had a big bump." (R. 4444).  Nancy Kallinger ("Kallinger"), the teacher who was with B.K. when he woke up that day, claimed she did not see B.K. bump his head or fall.  (R. 3100).  Jenner testified that she did not have any information about an accident or fall.  (R. 2928). B.K.'s mother was told "they noticed a bump on the lower left hand, like, area of his skull like down by his neck."  (R. 2678).  Two days later, on October 29, Mrs. Kingan

3

consulted Dr. Patricia Brunner ("Dr. Brunner") about the bump. (R. 2681-82). Dr. Brunner visually inspected the bump and felt the area with her fingers. (R. 3147). Although the area was still visibly swollen, Dr. Brunner did not send B.K. to the emergency room, nor did she recommend a CT scan be performed – despite the fact that a CT scan would show whether B.K. had bleeding in his head. (R. 3147, 3179). When B.K. returned to the office three days later, no additional head exam was performed. (R. 3152).

On November 20, 2008, Mrs. Kingan reported to Dr. Daniel Lum ("Dr. Lum") that B.K. was spitting up and that he was "not quite himself." (R. 4077). Assuming B.K.'s acid reflux had returned, Dr. Lum prescribed Prevacid. (R. 3176). No evidence was presented that Dr. Lum inquired about B.K.'s October 27, 2008 injury or recommended radiological testing at this time. Dr. Lum testified that "repeated vomiting can be a sign of concussion, it can be a sign of increased cranial pressure, so repeated vomiting merits further inquiry as to what the nature of the vomiting is." (R. 4094-95).

For the first year of his life, B.K.'s head circumference was consistently around the 50th percentile. (R. 3136-37). On December 1, 2008, B.K.'s head circumference increased to the 75th percentile (R. 3136-37). At the time of his death, B.K.'s head measured at 19.5 inches in circumference, placing him in the 95th percentile among children his age. (R. 3614, 4092).

Despite B.K.'s prior head injury on October 27, 2008 and a history of throwing back his head, no doctor ever performed a CAT, CT or MRI scan to determine if B.K.

had a chronic, pre-existing condition.[2] (R. 3179). In fact, Dr. Adrianna Orozco ("Dr. Orozco"), B.K.'s ER doctor, admitted she could not determine whether B.K. had a pre-existing condition just from observing him – she would have had to call a radiologist to perform tests. (R. 2820-21). No radiologist was ever consulted about B.K's head injuries prior to January 14, 2009, and no radiologist was ever consulted after B.K.'s death to date and serialize the skull fracture. The cause of the October 27, 2008 head injury was undetermined at the time of B.K.'s death.

## II.     Sequence of Events

### A.  Monday, January 12, 2009

Mrs. Kingan testified that on January 12, 2009, B.K. vomited four to five times at daycare and at home. (R. 2649, 3323). Holly Schoen ("Schoen"), a teacher at Minee-Subee, testified that on January 12, 2009, she witnessed B.K. vomit four to six times, about five to ten seconds apart, while Defendant was holding him. (R. 4354-56). The vomit "spewed" out, hitting the tile floor in front of Defendant's feet, as well as Defendant's clothes. (R. 4355-56). Defendant did not become upset or angry. (R. 4356-57). Schoen took B.K.'s temperature and he did not have a fever. (R. 4357).

---

[2] In a new review of all of the pathological evidence, former Cook County Chief Medical Examiner Dr. Nancy Jones holds the opinion, to a reasonable degree of medical certainty, that B.K. suffered from an "old, healing subdural hemorrhage at the time of his death, an indication of a prior head injury, and the presence of this old injury was missed during the initial postmortem examination done by Dr. Choi and the additional, unofficial examination done by Dr. Montez." Based upon this new information, Defendant will be filing a motion to stay this appeal and a post-conviction petition in the very near future. The new review was requested by Thomas A. Rudd, M.S., M.D., the Lake County Coroner because of concerns he had about Dr. Choi and Dr. Montez's findings.

### B.  Tuesday, January 13, 2009

B.K. did not go to Minee-Subee on January 13, 2009.  Instead, Mrs. Kingan cared for B.K. (R. 2651-55).  Dr. Brunner, who saw B.K. briefly in the lobby of her practice on January 13, 2009, testified that B.K. looked fine, but had she known that he had vomited four to five times the day before, she would have asked questions.  (R. 3155, 3184).

### C.  Wednesday, January 14, 2009

B.K. returned to Minee-Subee on January 14, 2009.  (R. 2656-57).  B.K.'s classroom was known as "Infant Toddler Two," which was located just down the hall and within "looking distance" of Minee-Subee's front desk.  (R. 3267-68; 4147; PX 30). Infant Toddler Two included a kitchen area just to the right of the entry door that measured approximately nine feet wide by fourteen feet long, and was described as "[n]ot big at all."  (R. 2987; PX 30).   The room was almost completely carpeted, except for the "[n]ot big at all" kitchen area.  (R. 2987; PX 30; PX 84; PX 86; PX 87; PX 89).  Infant Toddler Two also had several "view through windows" that could be seen through by someone standing as far away as fifteen feet.  (R. 3267-69).  These windows were not tinted, and they were often used by the teachers to communicate, especially from around 3:15 to 4:00 p.m. when they would consolidate classrooms.  (R. 2098, 4143, 4167-68, 4487-89; PX 122).

Multiple Minee-Subee teachers came in contact with B.K. on January 14, 2009, including Gwendy Bautista ("Bautista"), Defendant, Kallinger, Kristen Emerson ("Emerson"), Jenner, and Crystal.  (R. 2605-06, 2732-33).  Up to twenty people could have been working at Minee-Subee at a given time, and it was normal for teachers to walk in and out of classrooms throughout the day.  (R. 2988, 4138-39).  There were eight

total children in Infant Toddler Two on January 14, 2009. (R. 3047). At around 11:15 a.m., Kallinger, a "floater" at Minee-Subee who covered for Defendant and Bautista during their breaks, witnessed B.K. throw himself backwards but did not see him hit his head on the tile. (R. 3075).

At around 3:00 or 3:15 p.m., Defendant and Bautista began serving the children their afternoon snack. (R. 2970). At 3:30 p.m., Kallinger relieved Bautista, whose shift had ended. (R. 2955, 2971, 3051). The children started to become restless, so, at that time, Defendant and Kallinger washed each of the eight children's hands, one by one. (R. 3052-53). Kallinger took four kids to the sink while Defendant used wipes to wash the other four kids' hands at the table. (R. 3071-72). They then washed all the tables and the dishes. (R. 3053). Once cleanup was completed, Defendant left the room for about five minutes to either use the restroom or visit her nephew in another room. (R. 3073). Defendant did not leave the room exactly when Kallinger arrived at 3:30 p.m., but rather performed the above-described tasks. (R. 3074).

While Defendant was out of the room, Kallinger removed B.K. from his seat, checked his diaper, and set him on the tile floor in the kitchen. (R. 3074-75). At that time, just minutes before B.K. became unresponsive, he threw his head back hard against the hard tile and cried. (R. 3074-75; R. 3084). Kallinger thought the head-banging incident occurred sometime between 3:35 and 3:45 p.m. (R. 3084). Kallinger sat B.K. upright and then washed her hands. (R. 3076). When she turned around, B.K. was again laying on the ground. (R. 3076). Kallinger picked B.K. up and placed him in a bouncy chair by the window. (R. 3076). He immediately became lethargic. When Defendant

7

returned to the room, Kallinger commented to her that B.K. was falling asleep in his chair. (R. 3085-86).

Defendant told the police that when B.K. started to fall asleep in his chair, she called his name three times and he did not respond. Immediately Defendant called for help and her sister, Crystal, entered the room. (R. 3207-13). Crystal rushed to the room and discovered B.K. sitting in the bouncy chair foaming from his nose. (R. 4146-48). Crystal picked B.K. up, placed him on the changing table, and began CPR. (R. 4146-48). Another Minee-Subee staff member entered and began assisting Crystal with the CPR. (R. 2907, 3054-57, 4149). Katz, the daycare director, called 911 at 3:51 p.m. (R. 2907, PX 17). No Minee-Subee employee has ever testified or otherwise stated that he or she witnessed the Defendant inflict any injuries on B.K. on January 14, 2009 or at any other time.

### D. Thursday, January 15, 2009

On January 15, 2009, Dr. Choi conducted B.K.'s first autopsy. (R. 3559, 3562-63). Dr. Choi is a retired medical examiner, but he performed autopsies for Lake County as a consultant. (R. 3552-54, 3559-60). Externally, there were only two small bruises on B.K.'s body, one on his forehead and one on his right upper arm. (R. 3565-68, 3616). B.K.'s internal organs were normal. (R. 3569-73). The only evidence of injury appeared on B.K.'s head and brain. (R. 3573). His spine was intact, he suffered no epidural hematoma, and there was no bruising around his neck, back, shoulders, legs, or buttocks. (A. 343; R. 3613-16). There was also no evidence of optic nerve bleeding. (R. 3536, 3615).

Once B.K.'s hair was removed, a bluish-red area became visible on his scalp.  (R. 3597; PX 34).  There were no cuts or abrasions.  (R. 3597).  Below the skin but above the skull Dr. Choi noted a subgaleal hemorrhage measuring approximately four inches by four inches.  (R. 3574-77; PX 38).  There was also a .8 inch simple linear skull fracture that was visible from the upper and inner tables of the skull.  (R. 3580, 3585-86).  Dr. Choi discovered blood beneath B.K.'s skull.  Namely, there was blood in the dura (membrane directly below the skull), the arachnoid membrane (below the dura), and the subarachnoid membrane (below the arachnoid).  (R. 3462, 3580, 3588, 3590-94, 4277; PX 43).  The blood was only present on the right side of the brain.  (R. 3588, 3590).

Detective Hyde, who is not a pathologist or employee of the coroner's office, attended the January 15, 2009, autopsy performed by Dr. Choi, and provided Dr. Choi with facts about the case.  (R. 3611).  Specifically, Hyde told Choi about statements that a "member of the institution the baby was from" made to the police.  (R. 3612-13).  Hyde did not advise Choi that B.K. suffered a head injury on October 27, 2008; Hyde did not advise Choi that B.K had thrown up a number of times just two days before his death; and Hyde did not advise Choi that B.K. had a history of throwing his head back to the point where he would hit his head.  (R. 3611-12).  The  first autopsy concluded at 6:00 p.m. on January 15, 2009. (R. 3298).  Despite the fact that the autopsy was unusually long (R. 3298) and included an examination of the head, brain, and internal organs, Dr. Choi made no conclusion as to the cause or manner of death.  (A. 342).

**E.  Friday, January 16, 2009**

Detective Hyde returned to Minee-Subee on January 16 and advised Defendant that the police needed to ask her more questions.  (R. 3225, 3350).  Detective Hyde

testified that he walked Defendant outside and introduced her to Chief George Filenko ("Filenko"). (R. 3226). Filenko testified that he asked Defendant to enter his unmarked SUV, where Detective Sean Curran ("Curran") was already seated. (R. 3815-17). Filenko did not tell Defendant where they were going or how long they would be gone, nor did he give her the opportunity to provide her own transportation. (R. 3885-86). Defendant was never told she could make a phone call. (R. 3890).

Filenko and Curran were with Defendant throughout the rest of the day. (R. 3824). DVD recordings of their conversations with Defendant were admitted and published to the jury as People's Exhibits 52, 53, and 54. (R. 3836).[3] People's Exhibit 55 is a transcript of the DVD videos.[4] (R. 3835-36). The recordings began at about 9:35 a.m. Defendant was told that being read her *Miranda* rights was "routine and protocol" and "standard procedure." Curran read Defendant the *Miranda* form at 9:47 a.m. (R. 3834; PX 55, p. 7).

Defendant remained in the interview room for the next nine hours. She was never told she could leave or make a phone call. The door remained shut at all times. At one point, Filenko noted the confining and intimidating nature of Defendant's circumstances, stating "You're a scared young lady. You got two detectives. You're in a place where you don't know what's what." (PX 55, p. 55). He also recognized Defendant was not at the station voluntarily: "[Y]ou're thinking I don't want to be here . . . . If, if you had a choice right now, you'd be as far away from us as possible and this whole situation." (PX 55, p. 56). Nobody other than the police knew Defendant's location. (R. 3911-14).

---

[3] The trial court denied the defense's attempts to bar statements made during these videos via motions to quash the arrest and suppress the statements. (C. 228-234; R. 961-95).
[4] For ease of reference, all citations to the interrogations are made to the transcript, PX 55.

At the outset of the interrogation, Defendant explained that when Kallinger left the room to do the dishes, B.K. was in his chair and he started to fall asleep. (PX 55, pp. 31-32). Defendant called his name, but he did not respond. (PX 55, pp. 31-32). Crystal then entered the room and began CPR. (PX 55, pp. 33-34). After a five minute break around 10:25 a.m., the Detectives returned to the interrogation room. The Detectives kept Defendant in the interrogation room until about 7:10 p.m. and questioned her throughout the day, taking breaks from about 10:25 to 10:30 a.m.; 11:15 a.m. to 12:20 p.m.; 1:35 to 3:00 p.m; 3:25 to 4:00 p.m.; 4:05 to 4:20 p.m.; 4:55 p.m. to 6:05 p.m.; and 6:45 p.m. to 6:55 p.m.

Dr. Manuel Montez ("Dr. Montez"), a non-board-certified pathologist, was brought in at 10:00 a.m. on January 16, to examine the body. (R. 4517-18). Dr. Montez performed an unorthodox, unreported, undocumented, unphotographed, and undisclosed examination of B.K.'s body, brain, and skull. (R. 4518-29). Dr. Montez described his examination as a "curbside consult." (R. 4557). However, he went beyond simply consulting and performed an examination of the entire body. Based on his exam Dr. Montez concluded that B.K. suffered "violent trauma" to his head that was not self-inflicted. (R. 4519; 4554). The Deputy Coroner, Paul Foreman ("Foreman") specifically requested that Dr. Montez not prepare a report. (R. 4557).

Starting at around 10:30 a.m., the Detectives informed Defendant that they were called in because this was a homicide. (PX 55, p. 45). Over the next several hours, in a manner set out more fully in Section II of the Argument below, the Detectives repeatedly informed Defendant that it was a "medical fact" that someone harmed B.K., that the person did so immediately before he went unconscious, that she was present when it

11

happened, and that she was involved in causing the injuries. (*E.g.,* PX 55, pp. 45-46, 48, 50, 52-53, 58, 65-66, 88, 103-104). Despite telling Defendant that it was a "flat out murder" (PX 55*,* pp. 65-66) the Detectives strongly encouraged her to say she caused B.K.'s injuries by "accident." (*E.g.,* PX 55, pp. 45-49, 82, 88, 93). They specifically suggested that she dropped B.K. (PX 55, pp. 45, 53, 81, 88, 94-95). The Detectives also explained that the law treats accidents differently than intentional acts. (*E.g.,* PX 55, pp. 45-49, 82, 93, 96, 101-02, 117, 119-20, 130). Defendant repeatedly denied causing any harm to B.K., accidentally or otherwise. (*E.g.,* PX 55, pp. 45, 47-54, 58, 62-64, 72-73, 82-83, 94-99, 118). At about 1:30 p.m., Defendant stated that B.K. hit his head hard on the floor from a cross-legged seated position, as he had a history of doing, while Bautista or Kallinger was in the room. (PX 55, pp. 108, 111). The officers took a break.

At approximately 3:00 p.m., the officers returned, and Defendant continued to proclaim her innocence. Detective Filenko did not accept her denials. Filenko summarized Defendant's situation at 3:05 p.m. as follows:

> We've got this narrowed down to a very, very tight time frame um, and there is only one thing here is that something happened where you got frustrated, aggravated, whatever, and I'm telling you it was not intentional. It was an accident, but it wasn't him flipping backwards. It wasn't. You know that, we know that. The forensic scientists are telling us that.

(PX 55, p. 117). He told her that she got frustrated and the forensic evidence established that she used great force on B.K. (PX 55, p. 117). He explained "This is fact, ok" Then, the following took place:

> [Filenko]      You really need to just tell me <u>the truth</u>.
> [Defendant]   Um.
> [Filenko]      Please no denials. Please.

(PX 55, p. 118, emphasis added).

Defendant continued to deny harming B.K. and the Detectives continued to explain they knew she harmed B.K. Curran told her "We know it happened within minutes from the time he went unresponsive. And we know you were the only one in the room and it's something he can't cause by himself." (PX 55, p.120). Defendant then stated she accidently dropped B.K., but he was fine. (PX 55, p. 121).

At around the same time the officers left the interrogation room after Defendant first stated that she may have accidentally dropped B.K. (PX 55, p. 121), which was about 3:30 p.m. (PX 54, 51:20), Evidence Technician David Thomas ("Thomas") was instructed by the Task Force to go to the Lake County Coroner's Office "to conduct a further investigation in [B.K.'s] death." (R. 4032-33).

Thomas arrived at the coroner's office a little before 4:00 p.m. (R. 4033). Foreman was already there, and Dr. Choi arrived at about 4:00 p.m. (R. 4033-35). After surveying the room and putting on scrubs, Dr. Choi began a second autopsy. (R. 4035).

Dr. Choi "look[ed] for bruising" by making incisions across the top of B.K.'s shoulders, down the back of his arms, down the center of his back, and down the back of his legs. (R. 4035-36). Dr. Choi determined that there did not appear to be any injuries to the back area. (R. 4036).

At around 4:30 p.m., Thomas received a phone call from Curran. (R. 4036). Curran told Thomas where he was and related what Defendant stated could have happened to B.K. at the daycare. (R. 4037). Thomas relayed this information to Foreman and Dr. Choi. (R. 4038). The three of them then positioned B.K.'s body in a seated position with his legs crossed and reclined his head back until his head touched the

13

table. (R. 4038). Thomas told Curran that the point of injury on B.K.'s skull did not line up with the table. (R. 4038-39).

Thomas testified that at some point between 5:00 and 5:30 p.m., Curran called him again. (R. 4039). Curran provided another scenario he attributed to Defendant, which involved a wooden chair from the daycare center. (R. 4039-40). Thomas relayed that information to Foreman and Dr. Choi. (R. 4040). Dr. Choi then requested that chairs be brought from the daycare to the coroner's office. (R. 4040). About an hour or an hour and a half later, the chairs arrived. (R. 4041). Dr. Choi, Thomas, and Foreman put a chair on an examining table and placed the back of B.K.'s body against the back of the chair. (R. 4044). They extended his head back to the point where his head met the top of the chair. (R. 4044). Thomas testified that the injury on B.K.'s head was not in the same area where the head met the chair during this reenactment. (R. 4044-45). Thomas relayed this information back to Curran. (R. 4046).

Thomas testified that he thereafter received a third phone call from Curran. (R. 4046). Curran told Thomas that B.K. was dropped onto the floor, landed on his buttocks, and then his head fell back into one of the wooden chairs. (R. 4046). Thomas, Dr. Choi, and Foreman reconstructed this drop and observed that the point of contact on his head during their experiment was not in the area where the injury was. (R. 4046). Thomas relayed this information back to Curran, but he does not know at what time. (R. 4046-47).

Thomas testified that he received a fourth phone call from Curran. This time, Curran stated that "Defendant had admitted to throwing him down onto the ground and his head hitting the floor." (R. 4047). Defendant did not make any such statement until

14

around 6:30 p.m. The next break did not occur until 6:45 p.m. Thomas conveyed Defendant's admission to Dr. Choi. (R. 4047). Dr. Choi gave Thomas his opinion as to whether or not that could have caused B.K.'s injury. (R. 4048-49). Thomas relayed Dr. Choi's opinion back to Curran. (R. 4049). Thomas then left the coroner's office.

Curran also testified that "every time [he and Filenko] were given a scenario" Curran "relay[ed] it to the doctor so he could give us an opinion on that." (R. 4013). The first scenario communicated by Curran was B.K. falling backwards from a cross-legged sitting position. (R. 4038). Defendant told the officers that B.K. threw himself from a cross-legged seated position at about 1:30 p.m. (PX 54, 1:18:50). The next break occurred just five minutes later (three hours before 4:30 p.m.) and lasted over an hour and twenty minutes.

After these experiments with B.K.'s body and communications with the interrogators in which he learned Defendant had confessed, Dr. Choi changed his opinion as to the cause of death. The cause of death was described as "craniocerebral injuries due to blunt trauma." (R. 3599). Dr. Choi testified that he formed his opinion as to the cause of death on the 15th but that is contradicted by his report on the 15th which fails to document a cause of death. (R. 3599; A. 342). Dr. Choi did not re-examine the skull and brain and discarded them. (R. 3641).

At the conclusion of the interrogation, Defendant agreed to a final scenario. Filenko had told Defendant that "we talked to the doctor, the um, [t]he pathologist" who "does the autopsies" (PX 55, p. 139), and that "other babies were screaming, crying, whatever," she was "taking care of them by [herself]" while she had B.K. "in her hands." (PX 55, pp. 180-81). Defendant agreed that B.K. started "acting up" and she "got mad at

him and threw him on the floor." (PX 55, p. 181). According to Defendant's statement, "[B.K.'s] head hit . . . right in the center . . . between the tile and ... the carpet. . . . [B.K.] picked himself up . . . put his binky in his mouth . . . crawled a little bit to his blanket and then he started crawling to his chair." (PX 55, p. 182).

Defendant stated she did not recognize B.K. was hurt because he "seemed perfectly normal." (PX 55, p. 182). He did not cry at all. (PX 55, p. 189). He went to his chair, "he was happy" and "fine." (PX 55, p. 192). He even "smiled" at Crystal when she came in the room about three or four minutes after Defendant threw him to the ground. (PX 55, pp. 193-94). Five minutes later Defendant noticed he was pale, not responding and falling asleep. (PX 55, pp. 184, 192, 194). Kallinger's "back was behind … she was at the sink … doing dishes." (PX 55, pp. 186, 189). Kallinger did not see or hear anything because "she had the water running." (PX 55, p. 189).

At the conclusion of Curran and Filenko's interrogation, Defendant told them her plan was to stay with her boyfriend that evening (PX 55, p. 204) and that she needed to warm up her car. (PX 55, p. 203). She summed up the interrogation as follows:

> And I, I want to help because this is a good thing for me too. That teaches me a lesson because I've always wanted to think about doing an actual career because actually it was business management and law enforcement and there were no courses open so …

(PX 55, p. 197).

On January 16, 2009, Defendant was 22 years old. Her composite GPA in high school was a 1.925, placing her 560 out of 637 students. (R. 4333). Her ACT score was a 13, placing her in the fifth percentile among American students. (R. 4331). And her IQ was an 82, placing her in the fourth percentile nationally. (R. 4335). Her verbal intelligence IQ score, a 74, placed her in the "borderline mentally retarded" range of

16

intelligence, though she was not mentally retarded. (R. 4335, 4346). Dr. Robert Hanlon ("Dr. Hanlon"), a board certified clinical neuropsychologist, testified to a reasonable degree of neurological and scientific certainty that Defendant suffers specific cognitive and intellectual difficulties, including cognitive dysfunction in the areas of verbal reasoning, reading comprehension, and her ability just to name objects. (R. 4338).

Defendant was not released but was charged with first degree murder shortly thereafter. On January 17, Defendant was recorded in the back of a police car saying "I'm innocent." (R. 3311)

## III. Trial Experts

At trial, each side called two expert witnesses in their cases-in-chief to testify as to B.K.'s injuries and death. All four experts, Eupil Choi, M.D., ("Dr. Choi") and Jordan Greenbaum, M.D., ("Dr. Greenbaum") for the State, and Jan Leestma, M.D., ("Dr. Leestma") and Shaku Teas, M.D., ("Dr. Teas") for the defense, are board certified. (R. 3555, 3412, 3695, 4184).

### A. State's Experts

Dr. Greenbaum is the medical director of the child protection center at Children's Healthcare of Atlanta. (R. 3404). She has not performed autopsies or viewed microscopic slides in at least ten years. (R. 3428, 3483). Before rendering an opinion in this case, Dr. Greenbaum reviewed, among other things, Defendant's statements and the nine hour interrogation of Defendant during which she "confessed" to injuring B.K.[5] (R. 3451, 3505-08). The majority of Dr. Greenbaum's report was dedicated to the

---

[5] Dr. Leestma, one of Defendant's experts, testified that it would have been inappropriate for him to review the confession as a pathologist. He is not qualified to evaluate whether someone is factual, complete, or truthful. (R. 3763).

17

circumstantial evidence of the case (i.e., witness statements, etc.) rather than the pathology. (R. 3509).

Dr. Greenbaum testified at length about "abusive head trauma" (R. 3440-47), a broad term encompassing "injuries that are inflicted by somebody else non-accidentally." (R. 3441). She explained that most children with abusive head trauma have bleeding around their brain and skull, brain injury such as bruising, and bleeding in the back of their eyes. (R. 3445, 3459). Dr. Choi likewise testified that hemorrhaging in the eyes can be associated with violent shaking or movement of a child at B.K.'s age. (R. 3616). B.K. did not have bleeding in the back of his eyes or any visible injury to his brain. (R. 3462).

Dr. Choi and Dr. Greenbaum testified that the cause of B.K.'s death was blunt force impact to the head, and that his injuries were consistent with being thrown to the ground by another person.[6] (R. 3452, 3494, 3599, 3605-06). Dr. Greenbaum also opined that B.K.'s injuries, as a whole, were inconsistent with him throwing his head back against the ground or with being dropped from two to three feet. (R. 3542-44).

These opinions were based on the totality of B.K.'s injuries: he suffered bruising on the scalp, a skull fracture, a subgaleal hemorrhage, and bleeding in multiple levels or "compartments" of his brain (subdural and subarachnoid).[7] (R. 3461, 3478-79). The doctors were unable to establish, however, that these injuries occurred at the same time,

---

[6] Dr. Choi apparently told investigators that B.K.'s injuries were consistent with a one to two story fall. Dr. Choi retracted this assessment at trial, stating "I think that is not exactly happen. [*sic*]" (R. 3633-34). Dr. Choi and other experts confirmed that a one to two story fall would have yielded much more substantial injuries. (R. 3634-35, 3751-52, 4228).

[7] The doctors did not place any particular significance on the bruises on B.K.'s forehead or arm in reaching their conclusions. (R. 3490).

or even on the same day of B.K.'s death. They both admitted that it is impossible for them, utilizing the tools of science and pathology, to precisely date the injuries. (R. 3518, 3642). For example, although both Dr. Greenbaum and Dr. Choi referred to the blood in B.K.'s skull and brain as "fresh" or "recent," such terms mean anywhere from hours to days old. (R. 3517-18, 3526, 3598-99, 3618, 3638). And Dr. Choi testified that he cannot state that B.K.'s skull fracture, though purportedly "fresh," was an hour or day old.[8] (R. 3632, 3638). Dr. Choi did not indicate an estimated time of injury in his autopsy report. (R. 4198; A. 342).

Both doctors agreed that the existence of darker brown and/or yellow blood indicates even older, not "fresh" or "recent," injuries. (R. 3486). When they viewed the autopsy photos of the subgaleal hemorrhage, each doctor had a different explanation as to why what appears to be darker segments of blood (PX 38) are actually "recent": Dr. Greenbaum testified that it was "thick" blood packed layer upon layer (R. 3470, 3487), while Dr. Choi, who was present when the photos were taken, testified that the photos misrepresent reality in that the blood was actually red, not a darker brown or black color. (R. 3629, 3676-79).

Rather than rely on science, Dr. Greenbaum focused on the circumstances surrounding B.K.'s death to determine the timing of his injuries. (R. 3439-45, 3494, 3544). Dr. Greenbaum opined that B.K.'s injuries were all sustained "shortly before if not immediately before he became very symptomatic" because he would not have been able to play, eat, and interact after sustaining such "lethal" injuries. (R. 3494).

---

[8] Dr. Choi admitted that simple linear fractures such as B.K.'s could take several weeks to heal. (R. 3632).

In making her timing assessment, Dr. Greenbaum never addressed the undisputed fact that B.K. threw himself back on the tile floor between 3:35 and 3:45 p.m. (R. 3074-75, 3084). Defendant was out of the room when B.K. hit his head. None of the State's experts even acknowledged the head-banging incident when only Kallinger was in the room. It is undisputed that after that incident B.K's condition changed abruptly from alertness to lethargy.

Additionally, the doctors admitted that B.K. could sustain many, if not all, of his injuries from a short fall and survive in a relatively normal fashion. Specifically, the doctors admitted that B.K. could suffer a simple skull fracture from a short fall and live normally, as many children with skull fractures do. (R. 3631-32; 2798). The skull fracture was not the cause of B.K.'s demise. (R. 3631). Children such as B.K. can also live with subdural hematomas, which can be caused by minor trauma such as falling down. The doctors admitted that short falls can re-aggravate pre-existing injuries, including chronic subdural hematomas. (R. 3543-46, 3527, 3531-32, 3663). And subarachnoid bleeding is commonly seen when there is a subdural hematoma. (R. 3591).

Histology is the examination of tissue under a microscope in order to determine if there is any evidence of healing from an old injury. (R. 3623-24, 4217-18, 4228-29, 4272). For pathologists, histological slides are the most important tool for dating injuries. (R. 3628, 4560; C. 650-53). Dr. Choi did not view histological slides during his autopsy of B.K or before he determined the cause and manner of death. When he looked at the slides taken from B.K.'s dura weeks later, he noted mesothelial cells, calcification, and the presence of iron. The calcification and presence of iron suggest a healing injury. (R. 3653-61).

Histological slides are necessary because healing begins at the cellular level – evidence of an older injury cannot be seen with the naked eye. (R. 3626). For example, the presence of iron in the blood suggests the blood is at least a few days old, as iron is not present in the blood until after that amount of time. (R. 3627). Iron in the blood is not visible to the naked eye. (R. 3626). Dr. Choi admitted that iron was present on the slides that he reviewed. (R. 3660). He testified, "after healing process going on [*sic*] then eventually (iron) show up. Probably I would say weeks or months, yes." (R. 3661). Dr. Choi also admitted that a minor fall or minor trauma to the area can aggravate a pre-existing chronic subdural hematoma. (R. 3663). Additionally, microscopic examination of a fracture is necessary to pinpoint approximate age; a pathologist cannot determine the age of a skull fracture just by looking at it. (R. 4230). Rather, the pathologist can take a section of the fracture and look at it under a microscope; Dr. Choi and Dr. Montez failed to do such an examination in this case. (R. 3639, R. 4538).

Dr. Greenbaum testified that she did not require histological slides to render her opinion that the cause of death was blunt force trauma. (R. 3484). Even so, she relied on Dr. Choi's findings regarding the slides-- findings he made weeks after submitting his opinion on the cause and manner of death. (R. 3483-84, 3534). Dr. Choi testified that he did not see any old or recent subdural membrane when viewing slides from the dura. (R. 3602). Dr. Choi also testified, however, that he could not identify certain aspects of what he saw in the slides (R. 3655) and noted the existence of "mesothelial," a cell he testified could be suggestive of injury (R. 3657-58), but, in reality, is indicative of asbestos exposure and is never found anywhere near the brain. (R. 4253).

Dr. Choi admitted that the existence of scarring, old membrane, and macrophages in histological slides indicate healing. (R. 3624-27). Dr. Greenbaum similarly testified that certain regenerative microscopic cells migrate to areas of injury and provide insight to the extent of the healing and age of the injury. (R. 3521-26). Dr. Greenbaum testified that she did not see a chronic subdural hematoma in the autopsy photographs, but she admitted that certain subdural hematomas can only be seen with histological slides. (R. 3541, 3545).[9] The doctors agreed that an increase in an infant's head circumference can indicate the existence of a chronic subdural hematoma and intracranial pressure. (R. 3529-32, 3641). Dr. Choi testified that once a person sustains a head injury, he can have lucid intervals of clear consciousness that can wax and wane over time. (R. 3663; *see also* R. 4213).

When confronted about his prior statements about what happened to B.K., Dr. Choi stated candidly, "[I]t's hard to say exactly what happened." (R. 3634).

### B. Defense Experts

Dr. Leestma is a self-employed consultant and neuropathologist. (R. 3684). Dr. Teas is a physician and practicing forensic pathologist. (R. 4183-84). Drs. Leestma and Teas testified on behalf of the defense. Dr. Leestma was the only neuropathologist to testify. In accord with Dr. Choi's admission that he cannot say what happened in this

---

[9] Dr. Greenbaum also stated that B.K.'s death was inconsistent with death caused by a chronic subdural hematoma because he was fine up until 20 minutes before his death and a chronic hematoma would "ooze" slowly. (R. 3542). Dr. Greenbaum ignored the undisputed fact that B.K. became lethargic after banging his head between 3:35 and 3:45 p.m. while Defendant was not in the room. She admitted that a short fall could aggravate a pre-existing injury (chronic subdural hematoma) and cause a skull fracture. (R. 3545-46).

case, Dr. Leestma testified that it is pathologically impossible to say how much force was necessary to cause B.K.'s injuries. (R. 3739).

Dr. Teas testified to a reasonable degree of medical certainty that B.K. had a chronic subdural hematoma that was weeks and up to months old at the time of his death. (R. 4228-29, 4251-52, 4292). Dr. Teas based this conclusion on pathology: her naked eye and microscopic evaluation of B.K.'s blood and tissue revealed chemical and cellular reactions indicative of healing, which typically do not develop for days, weeks, or even months. (R. 4214-17, 4228-29, 4239-47, 4292).

Dr. Teas and Dr. Leestma reviewed photographs of the subgaleal hemorrhage taken during the autopsy. Based on their visual examination of these photographs, they concluded that there was a mixture of ages in the subgaleal hemorrhage. (R. 3720-21, 4214-17). Some blood was red or black in color, which indicated it was "fresh" (within a few days), while some of the blood was granular and a dark chocolate color which indicated it had undergone a chemical change and was older (between four and seven days). (R. 3714-15, 3270-21, 3735-37, 4215-17). Contrary to Dr. Choi's statement that areas of blood appeared darker because of how the photos were taken and developed, Dr. Teas testified that the darkness was "pretty consistent" from photo to photo. (R. 4199-4200). Additionally, Dr. Leestma testified that the subgaleal bleeding was diffuse in nature, meaning it took time (several days) to develop to its final size. (R. 3716-18, 3720-21). In a blown-up photo of the hemorrhage, Dr. Leestma noted yellowing, which indicated that some blood was a third age: a couple weeks or more old. (R. 3737, 4219).

Because gross visual examination has many limitations in assessing the age of injuries, Dr. Leestma and Dr. Teas thoroughly analyzed the histological slides in this

case. (R. 3710-12). Dr. Nancy Jones ("Dr. Jones"), a county forensic examiner, and Dr. Larry Blum ("Dr. Blum"), an experienced pathologist, both testified via affidavit that viewing histological slides is necessary in determining the cause and manner of death, especially in an infant death case. (C. 650-653).

Drs. Leestma and Teas testified that slides taken from the subdural hematoma revealed the presence of membrane with enough complexity and layers of fibroblasts to indicate it was between a couple of weeks and months old. (R. 3722-23, 3728-29, 3738-39, 4238-39, 4291; DX 14, 15). This membrane, or "neomembrane," is synonymous with chronic subdural hematoma - it represents the healing of a subdural hematoma that had been present for weeks or more. (R. 3722; 4236-38). Dr. Teas applied pigments to portions of the subdural, revealing the presence of iron and collagen tissue. (R. 3726, 4240-41, 4244, 4245-46). Iron appears when the hemoglobin in the red cells break down, which takes five to seven days. (R. 3729, 4241). It generally takes several weeks for collagen tissue, which is seen in a scar, to develop to the point demonstrated in the slides. (R. 4237, 4245-46).[10]

When a child has a chronic subdural hematoma, it can re-bleed spontaneously or as a result of minor trauma, causing excessive pressure in the cranial compartment. (R. 4206). If that pressure reaches a certain point, it will cause decompensation. (R. 3742). The increased pressure, however, can be compensated for to some extent by the absorption of cerebrospinal fluid. (R. 3745). Therefore, the hematoma can wax and

---

[10] In assessing the age of injuries based on histological observations, pathologists, including Drs. Leestma and Teas, utilize the American Monroe Chart, which provides time periods, rather than precise conclusions. (R. 4251). It is the "best" study available; it is utilized by pathologists and recognized as an authority in the pathological community. (R. 4284, 4311).

wane as it rebleeds and then absorbs fluid. (R. 3746-47). During this process, as the pressure increases and begins to reach a dangerous point, a 16-month-old child such as B.K. can display symptoms that are non-specific to brain injury--repeated vomiting, lethargy, and fussiness--but then these symptoms can disappear as the body regulates the pressure. (R. 3436-47, 4208). Such children are often able to function and perform fairly complex motor skills because the hematoma is not affecting the brain tissue itself. (R. 4208-09).

Based on all this information, Dr. Leestma testified to a reasonable degree of medical certainty that a child with a chronic subdural hematoma can be asymptomatic in one instance and, if pressure increases, symptoms can appear and escalate alarmingly, ultimately leading to decompensation. (R. 3750-51; *see also* R. 4214). Babies are particularly susceptible to being put into a symptomatic situation because they cannot accommodate increased pressure as easily as, for example, fourteen-year-olds. (R. 3748-49).

The doctors pointed out that there was a more recent component to the subdural hemorrhage. Drs. Teas and Leestma testified that B.K. suffered an impact that ultimately caused his death. (R. 3769, 4221, 4252). Because of the chronic subdural hematoma, the force of the trauma necessary to cause B.K.'s injuries and death was up to half less than what would otherwise be required. (R. 3740). The necessary force is consistent with B.K. throwing himself back and hitting his head against the hard tile, or falling from a short distance. (R. 3741-42, 4254). Likewise, the simple fracture on B.K.'s skull and the subgaleal hemorrhage discovered beneath his scalp are consistent with a short fall. (R 3751-52, 3793). The fracture alone would not have caused B.K.'s death. (R. 4227).

On cross-examination, Dr. Leestma admitted that one of the most common forms of head injury observed in victims of fatal child abuse is a subdural hematoma with or without a skull fracture.[11]  (R. 3767, R. 4282 (Dr. Teas concurring)).  He also stated that B.K.'s injuries were consistent with being slammed to the floor and that B.K. could not have caused all the injuries on his own.  (R. 3768-70).  He did not testify, however, that it was his opinion that B.K.'s injuries were caused by being slammed down.  Nor did  Dr. Leestma testify that all the injuries occurred less than thirty minutes prior to his death. The impact that caused B.K.'s death did not need to be substantial and it occurred more than thirty minutes before he went unresponsive.  (R. 3739-40, 4253).

### C.  Dr. Montez's Rebuttal Testimony

All of the experts agreed that, based on the autopsy findings, they could not pinpoint the timing of B.K.'s injuries.  (R. 2816, R. 3440, R. 3617, R. 4220, R. 4562). Dr. Choi completed B.K.'s autopsy on January 15, 2009 without rendering an opinion. (A. 342).  At this time, Dr. Choi noted a skull fracture and bleeding in and around the brain, but was unable to determine the timing, mechanism, and manner of B.K.'s injury. (A. 342).  Because of this, Dr. Montez was brought in to perform an undocumented examination of the body and then do what Dr. Choi could not do -- determine the timing of the injury to specifically connect it to Defendant.

Dr. Montez was able to provide the answer none of the other board-certified pathologists could as to the timing of the injuries. Dr. Montez pinpointed the injuries to a time period after 3:30 p.m. but before 3:51 p.m.  (R. 4551).  Based on Kallinger's

---

[11] Similarly, Dr. Leestma admitted that he believes, generally, the apparent lack of external evidence of injury in connection with massive intracranial trauma correlates better with a willful injury than an accidental one.  (R. 3787).

testimony the headbanging incident occurred between 3:35 and 3:45 p.m. (R. 3084), which means Dr. Montez could pinpoint the time of the murder to between 3:45 and 3:51 p.m. to connect Defendant to it and separate the prior incident, a truly remarkable feat. All of this was accomplished without viewing the histological slides or passing the anatomic pathology board exam or sitting for the forensic boards. (R. 4538-39, 4949-52).

After his visual inspection of B.K., Dr. Montez was also unable to determine the timing of B.K.'s death, explaining he asked for "some more information so that [he] could sort of form an idea of what [he] think[s] happened." (R.S. 1).  Dr. Montez then testified at trial that B.K.'s injuries occurred within a twenty-one-minute window, sometime between 3:30 and 3:51 p.m. on January 14. (R. 4550).  Dr. Montez made this determination based on his subjective findings which included a review of B.K.'s history, medical records, a videotape of B.K. made in November 2008, and witness statements. (R.4550).  Dr. Montez testified based on his review of these materials that B.K. was normal up to 3:30 p.m.  (R.4550).  He did not look for any microscopic evidence of a previous injury. (R. 4560).  Dr. Montez never addressed the undisputed fact that B.K. threw himself back on the tile floor after 3:30 p.m. when Defendant was not present. (R.3074-75, 3084).  When B.K. hit his head on the tile floor he  immediately became lethargic and was never alert again.  (R. 3085).

**IV.    Post-trial Motion**

Defendant argued in her post-trial motion that Dr. Montez failed to use the correct standard to date B.K.'s fatal injury; that is, looking at histological slides. Indeed, one of the State's own medical examiners, Dr. Jones, remarked on the necessity of using histological slides in her sworn affidavit following Defendant's trial:

> In every case involving child death, especially if it involves head trauma, histological slides should always be reviewed. It is a standard of care to review histological slides. Dr. Montez should have reviewed the slides.

(C. 650, emphasis added). Further still, Dr. Blum also remarked on the necessity of using histological slides to date a fatal injury in his sworn affidavit following Defendant's trial. Dr. Blum noted that "[i]n a case involving the death of a child, a pathologist should always take slides and review all pertinent information available, including histological slides." (C. 652, emphasis added). Going on, Dr. Blum stated:

> To attempt to date an area of hemorrhage, it must be viewed under a microscope. If there are hemosiderin macrophages present, the hemorrhage has been present for a minimum of 48 to 72 hours.

(C. 652, emphasis added). It is clear that using histological slides to date a fatal injury is the standard of care for pathologists, and Dr. Montez failed to follow this standard of care.

Dr. Choi admitted that using histological slides is important because a pathologist cannot see everything with the naked eye. (R. 3628). In fact, Dr. Choi used histological slides to examine tissue from various parts of B.K.'s body. (R. 3601-02). Again, Dr. Choi failed to more accurately date the skull fracture by analyzing a section of it microscopically. (R. 3639).

The other pathologists at trial agreed that viewing histological slides under a microscope most precisely dates a fatal injury. Dr. Greenbaum testified that histological slides can be used to determine if there was an old subdural injury. (R. 3545). Dr. Leestma testified that without microscopic tissue slides of some areas of B.K.'s scalp, he could only rely on his visual inspection of B.K.'s scalp and the "imprecision that that has with it." (R. 3738). Dr. Teas testified that the best way to learn what the age of an injury

may be is to "take a section from that area and look at it in the microscope." (R. 4217). Dr. Teas even went so far as to state that "[a]s a forensic pathologist, if you are concerned about aging, histology is the best method." (R. 4228). Finally, even Dr. Montez agreed that histology is an important part of forensic pathology. (R. 4560).

## ARGUMENT

### I. THE EVIDENCE IS INSUFFICIENT TO PROVE GUILT BEYOND A REASONABLE DOUBT

*Standard of Review*

When considering a challenge based upon the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Bishop*, 218 Ill.2d 232, 249 (Ill. 2006). Although an admittedly rare occurrence, "a properly instructed jury[12] may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). On such occasions, it is the solemn duty of the reviewing court to reverse the conviction. As much as our judicial system ordinarily defers to juries, "the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Id.* at 317, n.10. The jury's determination is not conclusive. Rather, this Court should "reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

---

[12] As demonstrated in Issue III of this brief, Defendant's jury was not properly instructed. But even assuming, *arguendo,* that it was, the evidence was insufficient.

*Overview of the Evidence*

The medical evidence established that B.K. suffered a blunt force trauma injury to his head on October 27, 2008. He developed a chronic subdural hematoma and exhibited symptoms of that injury until his death on January 14, 2009. On that date, he threw his head back as he had been known to do. Tragically, on that occasion he aggravated his prior injury and immediately exhibited symptoms demonstrating that his chronic subdural hematoma re-bled and he died shortly thereafter. Not only did Defendant's medical experts establish this sequence of events, but admissions and concessions from the State's medical experts showed it to be the only reasonable explanation for what medically had occurred. No evidence connected Defendant to B.K.'s death.

Without any medical evidence to support its theory, the State introduced Defendant's confession. But because Defendant could not be connected to B.K.'s death by evidence independent of the confession, her conviction could not be based upon it. Further, there are numerous indicators that show the confession is false. For hours during the grueling interrogation, Defendant repeatedly denied harming B.K. But while that was going on, Dr. Choi and Coroner Foreman experimented with B.K.'s body and concocted scenarios of what could have happened to B.K., communicating the results of their experiments to her interrogators. Her interrogators then forced Defendant to agree to one of their scenarios. Defendant, terrified after the hours of abuse she had suffered, agreed only because she was given no choice and because she believed her agreement would result in her freedom.

***B.K.'s Prior Injury and Eyewitness Account of B.K's Condition Between 3:35 and 3:51 p.m.***

On October 27, 2008, caregivers at Minee-Subee noticed a large bump on the back of B.K.'s head. (R. 2901-02). The cause of that "golf ball" size bump (R. 4137) was not determined at that time, but it was known Defendant did not cause it. The caregivers were not permitted to mention the injury. (R. 4444). On October 29, B.K.'s mother consulted Dr. Brunner about the bump. Dr. Brunner observed the bump but did not order a CT or MRI scan. (R. 3147, 3179). Such radiological studies would have revealed bleeding in B.K.'s head. (R. 3147, 3179).

It is undisputed that an increase in head size is indicative of a chronic subdural hematoma, (R. 3529-32, 3641) and B.K.'s head was expanding. Prior to the injury he suffered on October 27, B.K.'s head measured in the 50th percentile for a child his age. (R. 3136-37). In December, his head size had increased to the 75th percentile. (R. 4092). On January 14, 2009, B.K.'s head measured in the 95th percentile. (R. 3614, 4092).

In addition to the increasing circumference of B.K.'s head, B.K. exhibited other symptoms showing that his October 27 injury resulted in a chronic subdural hematoma. On January 12, 2009, B.K. vomited repeatedly (R. 2649, 3323). Such vomiting is one sign of increased cranial pressure. (R. 4094-95). His illness caused his mother to keep him home the next day. He returned to Minee-Subee on January 14. (R. 2656-57).

On that date, Kallinger was one of up to twenty teachers that cared for B.K. and/or had contact with him. (R. 2605-06, 2732-33, 2988, 4138-39). Starting at 3:30 p.m., she and Defendant washed the hands of the eight children and cleaned up the room. (R. 3071-72). They washed all of the tables and dishes. (R. 3053). Then, Defendant left the room. (R. 3074).

While Defendant was out of the room, Kallinger removed B.K. from his seat, checked his diaper, and set him on the tile floor in the kitchen. (R. 3074-75). At that time, just minutes before B.K. became unresponsive, he threw his head back hard against the hard tile and cried. (R. 3074-75; R. 3084). It was undisputed that B.K. had a habit of throwing his head back in this fashion. (R. 2679-80, 2988-89, 2927, 2988, 3076, 3086, 2927). Kallinger thought the head-banging incident occurred sometime between 3:35 and 3:45 p.m. (R. 3084). Kallinger sat B.K. upright and then washed her hands. (R. 3076). When she turned around, B.K. was again lying on the ground. (R. 3076). Kallinger picked B.K. up and placed him in a bouncy chair by the window. (R. 3076). He immediately became lethargic and never recovered.

The injury B.K. suffered on October 27, 2008, the symptoms he manifested and the injury he suffered when he threw his head back on the tile on January 14, 2009, together with the fact that there was no evidence independent of Defendant's statements that suggested Defendant was connected to the injury, established Defendant's factual innocence.

*People v. Swart*, 369 Ill.App.3d 614 (2nd Dist. 2006) is a case where the child succumbed to "shaken baby syndrome." Because the *Swart* defendant undisputedly had sole control over the child in the hours prior to her loss of consciousness, that control allowed the inference that the defendant inflicted the injuries. Here, State expert Dr. Greenbaum rendered the same opinion as the experts in *Swart*, explaining that B.K. would have become immediately symptomatic when the final injury was inflicted. (R. 3494). Defendant agrees. The evidence established that B.K. became immediately symptomatic when he threw his head back as Nancy Kallinger testified. He could no

longer sit up, became lethargic and appeared to fall asleep. (R. 3074-77; R. 3084-86). Defendant not only had no control of B.K. at that time, she was out of the room. (R. 3076-77, 3084).

This evidence creates more than a "reasonable doubt" about Defendant's guilt. The State merely invited the jury to speculate and find Defendant guilty despite the existence of the compelling evidence of her innocence. Her conviction cannot stand on such baseless speculation.

### *The State's Medical Experts' Admissions*

The State's medical experts made several concessions and admissions that force the conclusion that B.K. died when his October 27 injury was aggravated and re-bled. The State argued that the timing of B.K.'s injury suggested Defendant was with him when he was injured. But the State's own experts contradicted this assertion and the Defense experts destroyed it. They all agreed they could not pinpoint the timing of B.K.'s injuries. (R. 2816, 3440, 3617, 4220, 3652). Dr. Choi did not even include an estimate of the time of injury in his autopsy report. (R. 4198; A. 342). Drs. Choi and Greenbaum noted the bruising on B.K.'s skull, his subgaleal hemorrhage and the bleeding in the multiple compartments of his brain, but failed to establish that B.K's injuries occurred at the same time, or even on the day of his death. Science and pathology did not permit them to opine with such precision. (R. 3518, 3642). Dr. Choi could not even narrow the timing of B.K.'s skull fracture to January 14. (R. 3632, 3638).

Certain well-known procedures must be implemented if one seeks to opine as to the timing of injuries such as B.K.'s. As one would expect, a skull fracture cannot be aged simply by viewing it. (R. 4230). Dr. Choi admitted the age of B.K.'s skull fracture

could have been pinpointed had a section of it been submitted to the lab for analysis, but this was not done. (R. 3639).

Histology, the microscopic examination of tissue, is the most important tool a pathologist can use to date injuries (R. 3628; 4560; C. 650-53) because it allows the examiner to determine whether evidence of healing is present. (R. 3623-24, 4217-18, 4228-29, 4271). Drs. Jones and Blum noted the necessity of viewing such slides, especially in infant death cases, and they both criticized Dr. Montez for failing to do so to identify the healing which had occurred. (C. 652-53). Such healing is evidenced by the presence of calcification, iron, scarring, old membrane, and macrophages. (R. 3624-27).

Dr. Choi admitted that he rendered his opinion as to the cause and manner of B.K.'s death without reviewing histological slides. Once he did so, he found that iron and fibroblasts were present, as did Dr. Teas. (R. 3653-61, 4237-38, 4243-44). Those findings establish that B.K. had suffered a prior injury, dating back weeks or months. (R. 3661). Dr. Choi's time frame encompasses the October 27, 2008 injury B.K. suffered. Likewise, Drs. Leestma and Teas testified that the slides revealed the presence of a membrane, another indicator of healing that had taken place over weeks or months. (R. 3722-23; 3728-29, 3738-39, 4238-39, 4291; DX 14, 15). Drs. Leestma and Teas utilized the American Monroe Chart to time the injuries, as it is considered authoritative in the field of pathology.

Dr. Greenbaum admitted that certain subdural hemotomas can only be seen with histological slides. (R. 3545). Still, she did not require histological slides prior to rendering her opinion. (R. 3484). Rather, she admitted she relied on Dr. Choi's review

of the slides, and he had found the evidence of healing set forth above. (R. 3534, 3653-61).

Both Drs. Greenbaum and Choi admitted that the existence of darker blood is indicative of older injuries. (R. 3486, 3621). The autopsy photographs of B.K.'s subgaleal hemorrhage contained dark segments of blood. (PX 38).

Although they attempted to rule out the fact that B.K. suffered a chronic subdural hematoma and died after that prior injury was aggravated, the State's experts made admissions supporting that sequence of events. Dr. Choi initially reported that B.K.'s injuries would have been caused by an incident akin to a one to two story fall, but retreated from that opinion during trial. (R.3633-34). Dr. Greenbaum opined that B.K. would have become symptomatic almost immediately upon being injured, which is completely consistent with Nancy Kallinger's testimony that B.K. cried, fell down, and became lethargic after hitting his head between 3:35 and 3:45 p.m. on the date of his death.[13] The State's experts all admitted that otherwise seemingly minor events can re-aggravate chronic subdural hematomas. (R.3543-46, 3527, 3531-32, 3663). Summarizing the State's lack of medical evidence connecting B.K.'s death to Defendant, Dr. Choi testified "[I]t's hard to say exactly what happened." (R. 3634).

As the Illinois Supreme Court held in *People v. Smith*, it is not enough for the prosecution to merely advance unsupported theories about how its evidence can be reconciled with the facts of the case. 185 Ill. 2d 532, 543-545 (1999). Rather, the State must present evidence from which reasonable inferences can be made. *Id.* In *Smith*, the

---

[13] Neither Dr. Greenbaum, nor any of the State's experts, considered Kallinger's eyewitness account of B.K.'s injury immediately prior to his death, a tacit admission that in light of that event, the State's attempt to connect Defendant must fail.

A_42

Court reversed a murder conviction that was based on eyewitness testimony that was inconsistent with other testimony in the case. *Id.* at 542-44. The Supreme Court reversed the defendant's conviction because the State failed to present direct evidence of its explanation of the witness' conflicting accounts. *Id.* at 542-45. In the absence of such evidence, the Court found the State's suggested inference unreasonable, and held that, despite deference to the trier of fact, the evidence was insufficient. *Id.* at 545.

Here, among other shortcomings, the State presented no direct evidence to counter Nancy Kallinger's testimony of what exactly transpired that led to B.K.'s tragic death. The State's experts also made admissions that establish that even when the evidence is viewed in a light most favorable to the State, Defendant's conviction must be reversed.

### *Defendant's Confession*

Through an interrogation that constitutes an insult to the justice system and which poses a threat to future innocent people, the Detectives extracted a false confession from Defendant. The case against Defendant rested exclusively on this false confession. But the law has long been concerned about over reliance on a defendant's confession or statements to determine guilt. Long ago, the Supreme Court wrote, "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses, than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964) (citations omitted).

Here, Defendant's statements are captured on videotape. Thus, the Court must decide what inferences to draw from the statements. The Court should consider all the circumstances surrounding Defendant's statements, including the Detectives' conduct and all the other evidence in the case. From that analysis, this Court should decide if the statements actually reflect Defendant's guilt, or whether they should be regarded as false statements, statements not reflective of reality. This is not a credibility determination; the videotape demonstrates what the Detectives said and what Defendant said. However, the Detectives are not omniscient and thus they cannot determine whether the statements are true or false.[14] In deciding whether Defendant's statements reflect actual guilt, this Court must draw inferences from various facts that are in evidence. Such inferences command deference when they are reasonable, but it is a reviewing court's responsibility to reverse any conviction in which a finding of proof beyond a reasonable doubt necessarily depends on unreasonable inferences in light of the record. *See People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

In light of the complete lack of evidence against Defendant, including the complete lack of evidence placing Defendant with B.K. at the time he sustained any injury, it was unreasonable for the jury to conclude that statements attributed to Defendant established proof beyond a reasonable doubt. Simply put, the content of the statements in this case and the context in which they were made does not justify an inference that the statements are true.

---

[14] Although the Detectives' own words at the end of the interrogation suggest they knew the final story was not true. (PX 55, pp. 142 ("We don't want to feed you a story"), 183 ("Nobody wants to make you make any story up"), 184 ("Is this a story?")).

The circumstances surrounding Defendant's statements and the statements themselves possess many characteristics that the law recognizes as indicative of the false nature of the statements. They were extracted from a young, mentally deficient woman with no criminal record and no prior experience with the criminal justice system.[15] (R. 4335). Her verbal IQ placed her in the "borderline mentally retarded range." (R. 4335, 4346). It is undisputed that Defendant suffered from specific cognitive and intellectual difficulties, including, but not limited to, deficits in the area of verbal reasoning. (R. 4338).

Defendant was forced to undergo a surprise interrogation by two aggressive detectives that made it clear they would never accept her repeated denials. Those detectives yelled at her, swore at her and confronted her throughout the entire day and into the night. (PX 55, pp. 59, 60, 91, 93, 97, 120, 161, 162, 170, 173, 176, 188; PX 57, pp. 1-21). They took breaks when they chose to, leaving Defendant alone to suffer in the small room.[16] She suffered physical as well as obvious emotional pain. (PX 55, pp. 167, 195, 203). She repeatedly explained how much they were scaring her. (PX 55, pp. 122, 135, 163, 187, 188, 190, 200). After Filenko and Curran finished with her, Detective Hyde continued and scared her with his own interrogation. (PX 57, p. 1). Surprised he started in on her again, Defendant advised Hyde, "I just want this to be over." (PX 57, p. 2).

---

[15] Other than experience with the system as a rape victim. (PX 55, pp. 8-9).

[16] Defendant makes statements indicative of her innocence when she is alone. She cannot fathom what the Detectives are accusing her of, declaring while they are out of the room "I am not a baby killer," "I swear this is ridiculous," and "I cannot believe this. My God." (PX 55, p. 167).

A_45

The Detectives threatened her because she refused to implicate herself (PX 55, pp. 47-49, 51, 54, 62, 67, 103-04, 106, 109, 116, 118, 120, 141, 144, 148, 160, 174) and promised her leniency if she did. (PX 55, pp. 55-56, 62, 67, 81, 99, 103-104, 120, 122, 161, 175, 179). They told her the abundance of irrefutable medical evidence would establish her guilt. (PX 55, pp. 44-45, 52, 103, 116, 142). They told her the medical evidence did not lie, that B.K. did not harm himself and that he would not have acted normally after the injury. (PX 55, pp. 45-46, 49-50, 52, 103, 116, 142). Then, they added that she was alone with B.K. when the injury to B.K. occurred. (PX 55, pp. 88, 120, 172). All that was left was for her to admit she did it.

Surely, nothing about the circumstances surrounding the interrogations inspires trust that the ensuing statements were accurate reflections of reality.

Aside from the tactics used by the Detectives, examining the content of the statements further establishes they are untrue. Defendant immediately cooperated and spoke openly with the Detectives throughout the first session, telling them everything she knew and saying nothing to suggest she had ever caused B.K. any harm. (PX 55, pp. 1-41). When they began to accuse her, she stood firm. She denied participating in any wrongdoing, denied witnessing any wrongdoing and did not blame anyone else. When the Curran/Filenko interrogation was over, she had made 79 denials. The Detectives compelled her to admit to applying more and more force to B.K. so that the story, in their minds, would fit the medical evidence.

Defendant acknowledges that in some interrogations, concerns regarding the psychological condition of the suspect, and leading questions and factual errors in a confession, are reasonably overcome by other evidence or because the confession is

inherently self-corroborating in particularly powerful ways. *See People v. Nelson*, 235 Ill. 2d 386, 432 (2009) (defendant disclosed facts that the "Detectives could not have suggested" to him because the autopsy had not yet been performed and the police had been unable to enter parts of the crime scene). In contrast, none of Defendant's statements here are of that sort. She did not provide the Detectives with any information that was previously unknown to them. That is because she did not know what happened to B.K. She did not provide the Detectives with any evidence that they could verify to suggest she had harmed B.K. Both interrogations consist entirely of the three Detectives suggesting scenarios to her and labeling her a liar until she agreed to what they deemed the proper amount of force to B.K.'s head.

### *The Corpus Delicti Rule*

The concern about confessions is based, in large part, on the longstanding recognition that people sometimes confess to crimes they did not commit. For example, the *corpus delicti* rule, which demands the introduction of some evidence other than a defendant's confession to sustain a conviction, is premised on the recognition that just because a defendant says "I did it," does not mean she actually did. As the Illinois Supreme Court has explained, the *corpus delicti* rule "recognizes that the reliability of a confession 'may be suspect if it is extracted from one who is under the pressure of a police investigation – whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past.'" *People v. Willingham,* 89 Ill. 2d 352, 359 (1982) (quoting *Smith v. United States*, 348 U.S. 147, 153 (1954)). In addition, the rule recognizes that some people will falsely confess for "various psychological

reasons." *People v. Furby*, 138 Ill. 2d 434, 447 (1990) (quoting *People v. Dalton*, 91 Ill. 2d 22, 29 (1982)).

To prove an offense, the State must prove two concepts: "first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged." *See People v. Ehlert*, 211 Ill.2d 192, 202 (2004) (citing *People v. Cloutier*, 156 Ill.2d 483, 503 (1993)). The *corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone. When a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence. *People v. Lambert,* 104 Ill.2d 375, 379 (1984); *People v. Sargent,* 239 Ill.2d 166, 183 (2010); *People v. Lara*, 2012 IL 112370, ¶ 17, *as modified on denial of reh'g* (Feb. 7, 2013). Sufficient corroborating evidence is evidence which tends to connect the defendant with the crime. *Willingham,* 89 Ill.2d at 359. If independent evidence tends to prove the *corpus delicti* and corresponds with the circumstances related in the confession, both may be considered to determine the sufficiency of the evidence. *Lara*, 2012 IL 112370, ¶ 44.

Here, Defendant cannot be connected with the crime. Between six and twenty adults had contact with B.K. throughout the day. Further, Defendant cannot be sufficiently connected because Nancy Kallinger testified that she witnessed B.K. injure himself when Defendant was not present. Tragically, that injury led to his immediate demise. Rather than connecting Defendant to a crime, the State's independent evidence established that Defendant promptly alerted daycare personnel.

The independent evidence does not correspond with the circumstances related in Defendant's statements such that the *corpus delicti* can be proven that way. That is because there is no independent evidence suggesting Defendant's guilt. In the final story

compelled from Defendant by Filenko and Curran, which the State appeared to accept, (or least accepted enough to cease its relentless interrogation[17]), Defendant merely agreed with the Detectives. She agreed that the children were acting up while she had B.K. in her hands so she threw him on the floor. (PX 55, pp. 180-81). She said he hit his head, then picked himself up and crawled to his blanket, then his chair. (PX 55, p. 182). Defendant said he seemed normal and smiled at Crystal when she visited shortly thereafter. *Id.* Then, he appeared to fall asleep. (PX 55, pp. 184, 192, 194). Defendant agreed Kallinger did not see anything. (PX 55, p. 196, 189).

Defendant's statement set forth above is completely inconsistent with, and unsupported by, the independent evidence. No witness testified that the children were acting up. No witness testified they were screaming and crying. In fact the evidence established that things were calm that day. (R. 3084, 2996-97). Common sense demands the conclusion that if the children were so unruly that their behavior caused a career child care provider (who had never abused a child in her years of caring for them and never even exhibited inappropriate frustration toward any children) to kill one of them, at least one witness would have remembered some substantial commotion. In the absence of such testimony, the independent evidence does not correspond with the circumstances related in the confession.

Further, substantial contradictions between the statements and the evidence prohibit the State from relying on the independent evidence to prove the *corpus delicti*. No witness testified that Defendant was holding B.K. in her arms shortly before he became unresponsive. Defendant was not taking care of the children by herself at that

---

[17] Until Detective Hyde interrogated her again at the Lincolnshire Police Department.

time.  According to the statements, Kallinger was in the room but she heard and saw nothing at all out of the ordinary.  Common sense dictates that if Defendant murdered a child a few feet away, Kallinger would have heard or seen something.  Further, the evidence established that the facility was crowded with people and that the location where the alleged murder occurred could be seen from different places outside the room.  If it had happened, someone would have seen something.[18]

Common sense also dictates that the final "episode"[19] the Detectives compelled from Defendant was nothing more than a script forced down Defendant's throat.  To believe it, one must believe that B.K. was thrown to the ground and killed, but he did not cry.  Rather, he immediately gathered himself, and headed over to rest in his chair, which he was able to crawl into under his own power.  After suffering the murderous blow, he was still happy and fine, even able to flash a smile to Ms. Crystal when she visited, just before dying.  (PX 55, p. 193).

Of course, Crystal's testimony was not consistent with Defendant's statements.  She testified that between 3:30 and 4:00 she was at the front desk.  (R. 4147).  During that time, she never went to B.K.'s room and never saw him.  She did not testify that B.K. smiled at her.  She reported to the room only to answer Defendant's plea for help.  (R. 4148).

Kallinger's testimony is also irreconcilable with Defendant's statements / the product of the Detectives' interrogation.  Kallinger did not testify that she washed the dishes with her back to Defendant.  She testified that she and Defendant cleaned up and

---

[18] And of course, Nancy Kallinger did see something.  She saw the event that led to B.K.'s death, while Defendant was not present.

[19] Like the script writer that he was, Detective Filenko referred to the final story as the "final episode."  (PX 55, p. 187).

started an art project. (R. 3054). Defendant left the room and B.K. was fine. (R. 3073, 3084). With Defendant gone, B.K threw himself back hard as he had been known to do, crying in the process. (R. 3074-76). Kallinger placed B.K. in his chair where he was later noticed to be unresponsive.

Thus, the independent evidence does not correspond with Defendant's statements. Further, Kallinger's eyewitness account of the events destroys the State's attempt to prove the *corpus delicti* with the statements.

### The Confession was Created by the Pathologists and Detectives, not Defendant

Undoubtedly, the State will look to what it deems the "medical evidence" as proof of the *corpus deliciti*. But the medical evidence is not independent evidence. When Dr. Choi concluded his extensive autopsy at 6:00 p.m. on January 15, he held no opinion as to the cause of death. (R. 3298; A. 342). Dr. Choi still had not arrived at an opinion as to the cause of B.K.'s death on the afternoon of January 16 when Evidence Technician David Thomas joined him for a second autopsy. (R. 4032-35). Thomas had been sent to the coroner's office by law enforcement and he relayed Curran and Filenko's interpretations of Defendant's statements to Dr. Choi. (R. 4038). Based upon those representations, Dr. Choi, Thomas and Coroner Foreman experimented with B.K.'s body and Thomas then advised Curran whether they could make Curran's scenario fit B.K.'s injuries. These interchanges went on repeatedly. (R. 4040-47). At approximately 6:45 p.m., the "team" got what they wanted. Curran called Thomas and represented that Defendant had admitted throwing B.K. to the ground such that his head hit the floor. (R. 4047). Only then did Dr. Choi agree that his opinion would be that B.K. died as a result of blunt force trauma at the hands of another person. At the time Dr. Choi rendered this opinion, he had not been advised of numerous facts, including B.K.'s October 27, 2008

44

head injury, his habit of throwing his head back, or his repeated vomiting on January 12, 2009. (R. 3611-12).

In light of the communications between the medical examiner and interrogators, it is overwhelmingly clear that this case does not involve any corroboration of Defendant's statements by medical findings. Instead, the medical examiner's opinion as to the cause of death arose only *after* he was provided with non-medical information from the interrogators. Dr. Choi did not re-examine B.K.'s brain or skull on January 16. He did not review histological slides. His opinion was based solely on what he was being told Defendant was saying.

This case is very similar to *People v. Nieves*, 207 Ariz. 438, 87 P.3d 851 (2004). There, the defendant was convicted of suffocating and murdering her 10 month old daughter. *Id.* at 438-39. The infant exhibited symptoms that she was sick shortly before her death. *Id.* at 441. An autopsy was performed the day after she died, and the medical examiner found no evidence of suffocation and concluded that the child's demise was "probably a SIDS death." *Id.* Subsequently, the medical examiner was advised that the defendant made inculpatory statements to the police suggesting she suffocated the infant. *Id.* In turn, the medical examiner "changed his conclusion from SIDS as the probable cause of death to being unable to rule out suffocation." *Id.* On appeal, the defendant argued that because evidence apart from her statements failed to establish the *corpus delicti*, her statements could not be used. *Id.* at 440. The State was required to prove that apart from the defendant's statements the death resulted from criminal conduct. *Id.* The Court explained that an expert's opinion based wholly on the defendant's statements is

not independent of the statements. *Id*. at 442-43. The defendant's conviction was reversed. *Id*. at 444.

That is precisely what happened here. On January 16, 2009, Dr. Choi did not re-examine B.K.'s skull fracture or perform any further examination of B.K.'s brain that would have led him to change his opinion as to the cause of death. (R. 3600, 4034-36). The only additional information he received upon which to base that change were law enforcements' representations as to Defendant's words. *Nieves* demonstrates that the formation of an opinion, only after learning of a defendant's statements, is not a valid form of independent corroboration. The State did not prove the *corpus delicti.*

This Court recently decided *People v. Rivera*, 2011 IL App. (2d) 091060. There, the State argued that the *corpus delicti* was proven and the evidence was sufficient because the defendant's confession was corroborated by the independent evidence. *Id.*, at ¶ 28. The State admitted that the defendant lied during the interrogations and gave many stories, but submitted that the defendant had knowledge he could only have had because he committed the crime. *Id.* at ¶ 42. This Court disagreed, explaining that the State had the burden of establishing that the defendant had not learned the facts of the crime from the police, and the State had failed to meet that burden. *Id.* at ¶¶ 43-44.

Here, one wonders if the State will even attempt to suggest that Defendant provided unknown corroborative evidence to the Detectives. Such an attempt is very doubtful and would be disingenuous based upon a simple review of the interrogations. All of the information, including the medical evidence, came from the Detectives. They admitted they were in constant contact with the "medical team" and repeatedly advised Defendant of the team's opinions. That was the entire theme of their interrogation. The

State is unable to cite a single utterance by Defendant that could constitute her independent knowledge suggesting she harmed B.K.

In finding the evidence insufficient, the *Rivera* Court noted the interrogators' use of leading questions. 2011 IL App. (2d) 090160, ¶ 44. The Court explained that the evidence supported an "inference that details of the crime were provided to defendant, intentionally or unintentionally, during the investigative process." *Id.* The Court also held that the evidence supported an inference that "the details that defendant provided were the result of psychological suggestion or linguistic manipulation." *Id.* (citing *"You Think He Got Shot? Did You Maybe Shoot Him by Accident?" Linguistic Manipulation of the Communicatively Immature During Police Interrogations,* 13 Rich. J. L. & Pub. Int. 143 (2009)).

Here, the interrogations were replete with leading questions, suggestions, and indeed demands, by the Detectives. The Detectives did not ask Defendant what happened. They told her 1) they knew what happened and that 2) she was with B.K. when it happened. (PX 55, p. 52). They told her it was not a little "smack" (PX 55, p. 53) but involved force akin to a fall from "the second floor of a building onto some concrete." (PX 55, p. 66). They suggested she was "frustrated" with B.K. (PX 55, p. 62), "lost patience" with him (PX 55, p. 96) and "lost control … because he aggravated the hell out of" her. (PX 55, p. 172). They demanded that she talk because she was "running out of time." (PX 55, p. 174). Defendant did not tell the Detectives what happened. They told her. (PX 55, pp. 180-81).

The Detectives may claim that they merely wanted the Defendant to tell the truth. That claim is also disingenuous. While they did say on occasion that they wanted

Defendant to tell the "truth" (PX 55, p. 174) they made it abundantly clear that the only "truth" they would accept was the "truth" that she was guilty of causing B.K.'s death. Defendant was not permitted to deny their accusations. (PX 55, p. 170).

Just as in *Rivera*, Defendant finally succumbed to the Detectives' psychological suggestion and manipulation, and began offering words of agreement to the scenarios they introduced. Providing her with the details of their team of medical and law enforcement experts' "investigation" and experiments, the interrogators fed her everything she needed to know to satisfy them. According to them she was frustrated[20] and she harmed B.K. It was not planned or premeditated.[21] His skull was fractured.[22] Great force was used.[23] As in *Rivera*, the State fed her all the information she had about the incident.

The *Rivera* Court held that the independent evidence did not "inspire belief in defendant's candid acknowledgement of guilt" and based upon that conclusion, reversed the defendant's conviction. 2011 IL App. (2d) 090160, ¶¶ 43, 46. The same result is required here. Nothing about the interrogative process or content of Defendant's statements inspires a belief that her statements were true.[24]

In fact, Defendant repeatedly made statements revealing that, with truth no longer an option, she was merely attempting to satisfy the interrogators by agreeing to the story they created from their misrepresentation of the medical evidence. Late in the

---

[20] Introduced by Curran. (PX 55, p. 62).
[21] Introduced by Filenko. (PX 55, p. 116).
[22] Introduced by Curran. (PX 55, pp. 44-45).
[23] Introduced by Filenko. (PX 55, pp. 45-46).
[24] Defendant incorporates by reference her arguments set forth in Issue II addressing the involuntary nature of the statements as additional support for her assertion that the statements were not reliable.

interrogation, the Detectives asked Defendant why she started to believe she caused B.K.'s injury. (PX 55, p. 160). She responded "Because of what you told me, I was thinking straight." (PX 55, p. 160). In the middle of one later scenario, she tells them "I'm trying to make it sound right." (PX 55, p. 183). She explains that the story "scientifically" fits their evidence. (PX 55, p. 185). When they ask her why she incorrectly mentioned that B.K.'s head hit a chair, she said she thought such a story would suffice, telling them "I thought it would have been a done deal." (PX 55, p. 187). Then, she makes a statement that clearly shows she is attempting to satisfy the Detectives and not making reliable statements. She tells them she is having trouble with the motive the Detectives had attributed to her, that she was motivated by anger. Specifically, she states "I'm so confused. The last thing where it's pushing and me getting angry and I don't ever go to that stage ever." (PX 55, p. 187). But the Detectives ignored this statement, moved forward and in the end, Defendant met their proposed facts with one word responses signaling agreement. (PX 55, pp. 189, 191, 194).

Filenko and Curran then handed Defendant off to Detective Hyde and he took his turn with her. (PX 57; R. 4493). Hyde accomplished nothing of value, but one of Defendant's statements during that session further illustrates that the concocted story was untrue. Hyde forced her to repeat the story in spite of her pleas for it to "be over." (PX 57, p. 2). He asked her how she was holding B.K. immediately prior to throwing him to the ground. (PX 57, p. 3). Defendant explained "His back was facing me" (PX 57, p. 3) and she threw him "straight down." (PX 57, p. 3). Of course, B.K. would not have exhibited the injuries he did if he was thrown down face first. Apparently, without the true authors of the story present, Defendant could not keep the story straight. Perhaps

this is why Hyde's interrogation was abruptly cut short after he received a telephone call. (PX 57, pp. 20-21). One can infer someone wanted to avoid the possibility of the truth poisoning the story they had worked so hard to create.

The evidence was insufficient. No independent evidence corroborates Defendant's statements. Nothing about the statements themselves inspires belief that they are true. Defendant's convictions must be reversed.

## II. DEFENDANT'S STATEMENTS WERE COERCED, INVOLUNTARY, AND UNRELIABLE, THUS INADMISSIBLE

Defendant's confession was involuntary and unreliable, thus inadmissible. The coercion that demands this conclusion is apparent from a review of Defendant's videotaped statements and the conduct of Detectives Filenko, Curran and Hyde. The Detectives refused to accept the truth, which was that Defendant did not harm B.K., nor would they accept that she did not observe anyone harm B.K. Instead, the Detectives relentlessly demanded that Defendant incriminate herself. Defendant's repeated denials[25] served only to elevate the Detectives' accusations that she was a liar and a murderer. Her pleas that she did not know what happened to B.K. triggered more anger and threats from the Detectives. To achieve their goal of obtaining statements that they hoped someone could interpret as incriminating, they constructed scenarios and compelled her to agree to them by taking advantage of her fright, naivete, mental capability and overall psychological make-up. They told her implicating herself would benefit her, help her avoid consequences, and reduce her punishment.

Defendant believed the Detectives. In the end, she had no choice but to adopt their false story. Only that would satisfy them, end the interrogation and, she believed,

---

[25] Defendant denied Detectives Curran and Filenko's accusations 79 times.

set her free.[26]  Like any reasonable person in her situation, she did not believe that helping them as they demanded would result in her continued incarceration.  That is evidenced by what she said when she was finally released from the interrogation room.  She obviously did not think they would charge her with murder.  Rather, she had had no choice but to do exactly what they told her to do, so she believed they would let her go home.  Her only concern at that point was that it was "gonna take a while for [her] car to warm up."  (PX 55, p. 203).

As the product of the Detectives' demands, coercion and compulsion, Defendant's statements were unreliable and not reflective of reality and should not have been admitted.

### *Standard of Review*

To preserve a claim of error for appellate review, counsel must object to the error at trial and raise the error in a motion for new trial.  *People v. Enoch*, 122 Ill.2d 176, 186 (1998).  Defendant filed a motion prior to trial to suppress her statements and raised the issue in her post-trial motions.  (C. 119-22, 228-34; 607-10).  Because the trial court had the opportunity to consider the alleged claim of error, both prior to and after trial, the issue is preserved.  *People v. Bennett*, 376 Ill.App.3d 554 (1st Dist. 2007).  If an error is properly preserved, once the error is established it is the State's burden to prove that the error was harmless and did not affect the outcome of the trial.  *People v. Moore*, 397 Ill.App.3d 555, 580 (1st Dist. 2009).

In reviewing a trial court's ruling on a motion to suppress, a two-part standard of review is implicated.  *People v. Cosby*, 231 Ill.2d 262, 271 (2008) (citing *People v.*

---

[26] Just before the final version, Detective Curran told Defendant "the truth is gonna set you …"  (PX 55, p. 179).

*Luedemann*, 222 Ill.2d 530 (2006)).  Under this standard, a trial court's findings of fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder.  *Id*.  In other words, great deference is given to the trial court's factual findings, and an appellate court will reverse those findings only if they are against the manifest weight of the evidence.  *Id*.  However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted.  *Id*.  Accordingly, the trial court's ultimate legal ruling as to whether suppression is warranted is reviewed *de novo*.  *Id*.

### Detectives' Conduct Violated  Defendant's Fifth Amendment Rights

The Fifth Amendment demands that a defendant's confession be voluntary. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976); *People v. Melock*, 149 Ill.2d 423, 447 (1992).  The test for voluntariness is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed."  *People v. Gilliam*, 172 Ill.2d 484, 500 (1996).  In making this determination, a court is to consider the totality of the circumstances surrounding the statement, including:  (1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention.  *See, e.g., People v. Willis*, 215 Ill.2d 517, 536 (2005).  The State bears the burden of proving, by a preponderance of the evidence, that the confession was voluntary.  725 ILCS 5/114-11(d).

Defendant was a mentally deficient twenty-two-year-old with no prior experience with the criminal justice system when Detectives Filenko and Curran took her to the Lake Zurich Police Department, took her phone and placed her in the small room she would remain in for the rest of the day.  (R. 3225-3226) (PX 55, pp. 1, 8-9) (R. 4331, 4335, 4338, 4346).[27]

Defendant was confronted by two aggressive Detectives that refused to accept her truthful statements that she caused no harm to B.K., and saw no one harm him.  Those detectives yelled at her, swore at her and confronted her all day long and into the night.  (PX 55, pp. 59-60, 91, 93, 97, 120, 161-62, 170, 173, 176, 188; PX 57, pp. 1-21).  They repeatedly verbally abused her, then left her alone to suffer in the small room.[28]  She suffered physical as well as obvious emotional pain.  (PX 55, p. 203).  She repeatedly explained how much they were scaring her.  (PX 55, pp. 122, 135, 163, 187, 188, 190, 200).  Detective Hyde then started in on her and Defendant begged, "I just want this to be over."  (PX 57, p. 2).

Although Defendant was read *Miranda* rights (PX 55, p. 7), the Detectives downplayed their importance.  (PX 55, p. 7, PX 57, p. 1).  The fact that the Detectives admonished Defendant of her *Miranda* rights does not render her statements admissible.  *Miranda* warnings are not *per se* sufficient to make a confession given thereafter voluntary.  *People v. Koesterer*, 44 Ill. App. 3d 468, 478 (1st Dist. 1976) (citing *People v. Hill*, 39 Ill. 2d 125 (1968)).  A statement made after a *Miranda* warning still must be

---

[27] As illustrative of her mindset, after she made inculpatory statements, Defendant asked the "Detectives "how much more, cause … I just want to go home and spend time with my parents and my puppy."  (PX 55, p. 199).
[28]  Defendant shows she cannot fathom what the Detectives are accusing her of, declaring while they are out of the room "I am not a baby killer,"  "I swear this is ridiculous," and I cannot believe this, My God."  (PX 55, p. 167).

given voluntarily, and the fact that such a warning was administered is only one factor to be considered. *Id*. (citing *Brown v. Illinois*, 422 U.S. 590 (1975). Not only must a defendant be advised of her constitutional rights prior to a custodial interrogation, but any waiver of these rights must be made voluntarily, knowingly, and intelligently. *Edward v. Arizona*, 451 U.S. 477, 482 (1981); *People v. Edwards*, 144 Ill. 2d 108, 137 (1991). Evidence must be excluded if it is obtained by exploitation of illegal police conduct. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *People v. Pettis*, 184 Ill. App. 3d 743, 751 (2nd Dist. 1989).

Defendant never voluntarily, knowingly, and intelligently waived her rights. Her words demonstrate she did not understand the magnitude of the situation. After what the State argues was a truthful and reliable confession, Defendant advised of her plans to warm up her car and meet her boyfriend that evening. (PX 55, pp. 203-04). Even after allegedly "confessing" to the brutal murder of a defenseless infant, Defendant believed the process was complete and she was free. She called the experience a "good thing." (PX 55, p. 197) Instead of expressing concerns about her impending incarceration, she was discussing career options. (PX 55, 197). Her words manifest her complete failure to recognize the true nature of the situation from which a waiver of her rights could be deemed valid.

At the outset, Defendant cooperated fully and answered the Detectives' questions, explaining what she had observed about B.K. on and before the day of his death. (PX 55, pp. 1-41). Filenko admitted that Defendant said nothing inculpatory during this initial session, which lasted about an hour, until 10.25 a.m. (R. 3901). But the Detectives did not accept her full disclosure and cease their interrogation. Instead, the Detectives told

Defendant she needed to "compose" herself and left her alone while they took a break. (PX 55, p. 41). The Detectives returned and questioned Defendant as to matters she had already discussed. She repeated what she had observed, consistent with her earlier statements. (PX 55, pp. 41-44).

The interrogation should have ended there. Defendant's denials were not vague and she had answered all of the questions posed to her. Even though she was forced to repeat her answers, she said nothing that should have aroused the Detectives' suspicion. They accused her of telling lies and making inconsistent statements, but she had not done either of those things. But the interrogation did not end. It would not end for many hours. Instead, the Detectives transformed from investigators into abusive and manipulating accusers with a clear objective. They wanted Defendant to incriminate herself and they engaged in illegal behavior in their attempts to achieve that goal. They lied to her beyond the limit the law permits. They scared her and threatened her because she refused to implicate herself (PX 55, pp. 47-49, 51, 54, 62, 67, 103-04, 106, 109, 116, 118, 120, 141, 144, 148, 160, 174) and promised her leniency if she did. (PX 55, pp. 55-56, 62, 67, 81, 99, 103-04, 120, 122, 161, 175, 179). They told her they already knew generally what had happened to B.K. and soon would know exactly what had happened to him, because of the "huge" team of experts involved and the abundance of irrefutable medical evidence. (PX 55, pp. 44-45, 52, 103, 116, 142). They told her the medical evidence did not lie, that B.K. did not harm himself and that he would not have acted normally after the injury. (PX 55, pp. 45-46, 49-50, 52, 103, 116, 142). Then, they

added that they knew she was alone with B.K. when the injury to B.K. occurred. (PX 55, pp. 88, 120, 172). All that was left was for her to admit she did it.[29]

In *Aleman v. Village of Hanover Park*, the Seventh Circuit reviewed an interrogation reflecting police tactics very similar to, but not as abusive as, those implemented here. 662 F.3d 897, 901-03 (7th Cir. 2011) *cert. denied*, 133 S. Ct. 26, (U.S. 2012). In *Aleman*[30] the Court explained that a confession must be suppressed if an interrogator's false statements destroy the information required by a suspect to make a rational choice. *Id.* at 906. There, the interrogator misrepresented the medical facts to the criminal defendant. *Id.* at 906-07. Not being a medical expert, the defendant could not contradict what was represented to him as settled medical opinion. *Id.* According to the interrogator, the irrefutable medical evidence excluded any cause of the child's death other than the actions of the defendant. *Id.* at 907. Therefore, the interrogator advised the defendant, he *must* have been the cause of death. *Id.* In doing so, the defendant had no rational basis, given his ignorance of medical science, to deny that he had to have been the cause of the child's death. *Id.*

The *Aleman* Court explained as follows:

If a question has only two answers—*A* and *B*—and you tell the respondent that the answer is not *A,* and he has no basis for doubting you, then he is compelled by logic to "confess" that the answer is *B.* That was the vise the police placed Aleman in. They told him the only possible cause of

---

[29] The Detectives repeatedly suggested to Defendant that B.K. could have died as the result of an accident, but that was illogical and contrary to the irrefutable medical evidence they said existed, because no accident could have involved the amount of force they were demanding.

[30] *Aleman* was a civil rights case brought by a daycare provider after murder charges stemming from the death of a child in his care were dropped. The criminal case unraveled after the prosecutor viewed the police interrogation and after the doctors decided that the child was not injured in Aleman's care, but collapsed in his care as the result of the delayed effect of a subdural hematoma suffered earlier. *Id.* at 902.

> Joshua's injuries was that he'd been shaken right before he collapsed; not being an expert in shaken-baby syndrome, Aleman could not deny the officers' false representation of medical opinion. And since he was the only person to have shaken Joshua immediately before Joshua's collapse, it was a logical necessity that he had been responsible for the child's death. Q.E.D. A confession so induced is worthless as evidence, and as a premise for an arrest. *Id.*

(citations omitted).

The same conduct that caused the *Aleman* Court to hold the defendant's statements inadmissible and unreliable was utilized here. After Defendant related everything she knew, they confronted her and demanded a response to the following:

> The reason that we were called in on this incident is 'cause [B.K.'s] skull was fractured . . . [and] it's a medical certainty that somebody's done this to him. What we need to know right now is if this was done by accident or did somebody intentionally hurt him?

(PX 55, pp. 44-45).

Defendant met this first accusation with an immediate and complete denial, but the Detectives did not stop. (PX 55, p. 45). They repeated this demand throughout the day, making it clear they were taking the position that Defendant knew what had happened and anything she said to the contrary constituted a lie that further convinced them she was guilty of murdering B.K. (PX 55, p. 68).

As time passed, the Detectives further compelled Defendant by narrowing the responses they would accept. As a result, Defendant was left with no rational choice but to give the statements they demanded. They repeated that the medical evidence established that someone used great force to cause B.K.'s death the day he died, (PX 55, pp. 45, 49-50, 52, 103) telling her: "**This is flat out murder, ok, Um, we're gonna give you another opportunity … to either be a good witness … or a co-conspirator to a**

**murder**.”  (PX 55, p. 66 (emphasis added)).  Later, Curran told her: “**Well, Melissa, this whole time thing and this whole injury to his head was when you were alone with him**.”  (PX 55, p. 88 (emphasis added)).

The Detectives told Defendant she killed B.K., but they weaved in the term “accident.”  (PX 55, p. 117).  Despite referencing an “accident,” they had already told her that B.K. was “flat out murdered.”  (PX 55, p. 66).  Defendant continued to deny harming B.K. and the Detectives continued to explain they knew she harmed B.K.  Curran told her “**We know it happened within minutes from the time he went unresponsive.  And we know you were the only one in the room and it's something he can't cause by himself**.”  (PX 55, p. 120 (emphasis added)).  Labeling anything but an admission to murder “absolute crap, ” Filenko later reminds her “**We've got the time limited down to when this occurred, where only one person was responsible for this, and that was you**.”[31]  (PX 55, p. 172 (emphasis added)).

Just as in *Aleman*, there was no possibility Defendant could rebut the medical science the Detectives were misrepresenting to her.  She had no applicable medical knowledge.  The *Aleman* Court held “Aleman had no rational basis, given his ignorance of medical science, to deny that he had to have been the cause.”  *Aleman*, 662 F.3d at 906.  Likewise, Curran and Filenko coerced Defendant's statements by lying to her about the medical evidence.  The lies convinced Defendant that she would be held responsible for B.K.'s death because, according to Curran and Filenko, the medical evidence excluded any other possibility.  They left Defendant with no rational choice.  Her statements were compelled, unreliable and must be suppressed.

---

[31] This was a lie, and went far beyond the permissible “minor fraud” the *Aleman* Court referenced.

The State may argue that Defendant's statements are corroborated by the medical evidence. Defendant vehemently disagrees that any such corroboration exists. However, it is important to note that "The question of coercion is separate from that of reliability. A coerced confession is inadmissible ... even if amply and convincingly corroborated." *Aleman*, 662 F.3d at 906 (citing *Rogers v. Richmond*, 365 U.S. 534, 540–41 (1961)).

For all these reasons, Defendant's statements should not have been admitted.

## III.  DEFENSE COUNSEL WAS  INEFFECTIVE IN FAILING TO TENDER I.P.I. 5.01 DEFINING RECKLESSNESS, THE REQUISITE MENTAL STATE FOR THE OFFENSE OF INVOLUNTARY MANSLAUGHTER.

Defense counsel was ineffective in failing to submit the pattern jury instruction defining "recklessness."  (I.P.I. 5.01).  The term was set forth in the instructions defining involuntary manslaughter and reckless conduct, but never defined for the jury.  The failure to submit I.P.I. 5.01 was error, and Defendant was prejudiced as a result.

### Standard of Review

The United States and Illinois Constitutions guarantee the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8.  A defendant claiming ineffective assistance of counsel must demonstrate that counsel's performance fell below an objective standard of reasonableness prejudicial to defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984).  Prejudice exists where there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.  *Id*. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  *Id*.  That is, that counsel's deficient performance rendered the trial result unreliable or rendered the proceeding fundamentally unfair.  *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).  In judging

counsel's performance, the court must look to the totality of the circumstances. *Strickland*, 466 U.S. at 688.

Finding that the evidence was sufficient to permit the jury to find Defendant guilty of the lesser included offenses of involuntary manslaughter and reckless conduct, the trial court submitted instructions defining both offenses. (C. 565-66, 570-71; R. 4725-29). Thus, the jury had several options, including, but not limited to, finding Defendant guilty of involuntary manslaughter, or guilty of first degree murder.

The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death. *People v. Foster*, 119 Ill. 2d 69, 87 (1987). Involuntary manslaughter requires a less culpable mental state than first degree murder. Basically, first degree murder occurs when a defendant kills an individual when he knows or intends that his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2). In contrast, a defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly. 720 ILCS 5/9-3(a).

Recklessness is statutorily defined under 720 ILCS 4/3-6 as follows:

A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

The instructions defining involuntary manslaughter (I.P.I. 7.07) and reckless conduct (I.P.I. 11.37) both define each offense as an act or acts performed "recklessly." The committee notes to each instruction *require* that I.P.I. 5.01, which defines the term recklessly, also be given. Failure to submit the instruction at the conference constituted reversible error.

The Court's decision in *People v. Bolden*, 103 Ill. App. 2d 377 (1st Dist. 1968), illustrates the importance of properly instructing a jury on the requisite mental state for involuntary manslaughter. There, this Court reversed the defendant's involuntary manslaughter conviction because although involuntary manslaughter was defined for the jury, the mental state of recklessness was not. *Id*. at 379-80, 382. The State conceded error, but argued that the error was harmless. *Id*. at 380. The Court explained that "recklessness" was the "gist" of the offense of involuntary manslaughter and an essential element of that offense. *Id*. The trial court's failure to define that crucial term for the jury was deemed "prejudicial error and deprived the defendant of a fair trial." *Id*. at 382.

In *People v. Howard*, this Court reviewed the same claim made by Defendant here. 232 Ill. App. 3d 386 (1st Dist. 1992). The defendant was convicted of murder and argued on appeal that he received ineffective assistance of counsel due to his attorney's failure to tender I.P.I. 5.01 where the jury was given I.P.I. 7.07. *Id*. at 390-91. The *Howard* Court explained that "The I.P.I. instruction on involuntary manslaughter specifically refers to the definitional instruction which should accompany it. Moreover 'recklessness' may be commonly understood by a lay person to be ordinary negligence." *Id*. at 392. The defendant had argued that he was prejudiced since "many jurors may have thought that recklessness meant ordinary negligence and therefore they chose murder, the only alternative." *Id*. at 390. The Court agreed that prejudice occurred, noting that the I.P.I. 5.01 defines recklessness in part as "a gross deviation from the standard of care which a reasonable person would exercise in the situation." *Id*. at 392; 720 ILCS 5/4-6. Similarly, in *People v. Thurman*, the Court dismissed the State's

argument that the jury could easily and invariably distinguish between reckless and intentional conduct.  104 Ill. 2d 326, 330-31 (1984).

Here, I.P.I. 5.01 was not discussed at the jury instruction conference.  (R. 4598-4607).  It was not submitted to the jury.  (R. 4718-4739; C. 550-93).  In failing to tender I.P.I 5.01, defense counsel erred and prejudice ensued.

That Defendant was prejudiced was also shown during the jury's deliberations. At that time, the jury sent out the following note:

1.  If 1st Degree Murder:
a)  Do we have to decide on aggravated battery?
b)  Do we have to decide on reckless conduct?
2.  If manslaughter, do we have to decide on a & b above?
3.  What is reckless conduct?
4.  What is aggravated battery?

(C. 594).

The jury's note indicated the jury did not understand the reference to "recklessly" in the "Definition of Involuntary Manslaughter" instruction and the issues instruction pertaining to that offense.  (C. 565-66).  But instead of submitting I.P.I. 5.01, the definition of the requisite mental state for two of the charges under consideration by the jury, defense counsel advised the trial court that "they have already been instructed on this."  (R. 4757).  Thereafter, with defense counsel's full acquiescence, the jury was instructed:

Answer to Questions 1 & 2:  Yes.  The defendant is charged with both first degree murder and aggravated battery of a child.  You have three verdict forms pertaining to each offense.  From these three verdict forms pertaining to each offense, select and sign the one verdict form that reflects your verdict on each of those offenses.  You must consider both the charges of first degree murder and aggravated battery of a child.

(C. 595).  The court tendered the above response in typewritten form after noting:

62

> Yes. Good. That's fine. Along the lines of what you [defense counsel] said before I also agree regarding questions 3 and 4, we did instruct them on that. Please refer to your instructions of law on these offenses as to 3 and 4.

(R. 4759).

The response was not only incomplete, it was incorrect. The jurors were advised to refer to their instructions of law as to reckless conduct and aggravated battery, as if making reference to the original instructions would define the offenses for them. However, the offenses were not adequately defined because "recklessness" was not defined. No amount of time spent reviewing its original instructions would have assisted the jury in answering its question on its own. I.P.I. 5.01 was not provided.

The jurors were clearly seeking guidance and a pattern instruction existed to direct them. I.P.I. 5.01 would have explained the mental state required for involuntary manslaughter and reckless conduct. That I.P.I. would have also assisted the jury in properly interpreting and applying the issues instruction that accompanied those offenses. (C. 566, 571).

The verdict in this case depended upon the mental state the jury attributed to Defendant. Both parties used the term reckless in the closing arguments. The State argued the case did not involve reckless conduct (R. 4619, 4640-41, 4714), while Defendant argued her conduct was, at most, reckless. (R. 4689-90). But the jury would never receive a definition of the term. While determining what exhibits to send back to the jury room, the prosecutor sought to send a copy of the daycare center's child discipline policies to the jury (R. 4745-46). Noting the importance of the issue of Defendant's mental state, the prosecutor explained "Judge, it is relevant. It is from our position it is knowledge – knowledge versus reckless." (R. 4746). The Court agreed that "both sides have made an issue of mental state." (R. 4746).

In *People v. Lowry*, defense counsel was held to be ineffective because he failed to propose the proper instruction after the jury asked for the legal definition applicable to defendant's conduct and the result of that conduct. 354 Ill. App. 3d 760 (1st Dist. 2004). The jury had posed a question involving the defendant's mental state, inquiring as to the meaning of "knowingly." *Id.* at 762, 765. The defendant was charged with aggravated battery and the jury had been instructed as to that charge. *Id.* at 763-64. The instructions defining aggravated battery included the term "knowingly" but that term was not defined. *Id.* at 765. Instead of answering the question, the parties and the trial court agreed to advise the jury that it "had heard the evidence and been instructed in the law" so it should "please keep deliberating." *Id.* at 762.

On appeal, the defendant argued defense counsel should have tendered I.P.I. 5.01B defining "knowingly." *Id.* at 763. The Appellate Court agreed, explaining that that I.P.I. would have provided the jury with the guidance they were requesting because it defined the term. *Id.* at 766. The State argued that the term "knowingly" had a plain meaning within the jury's understanding and defense counsel had agreed to the response the jury was given. *Id.* at 764. The Appellate Court disagreed, holding that "the failure to offer an instruction essential to the fair determination of the case by the jury cannot be excused as trial strategy." *Id.* at 767. The Court further noted that the record established that the failure to propose the instruction was not trial strategy, but the result of counsel's confusion. *Id.* Reversible error had occurred.

That is what happened here, and the prejudice to Defendant exceeded that which ensued to the defendant in *Lowry*. Here, defense counsel was not utilizing trial strategy. Rather, defense counsel believed the jury had already been instructed as to the requisite

mental states and that belief was incorrect. Further, defense counsel argued in his closing argument that defendant's conduct was at most "reckless." (R. 4689-90). Defense counsel had no reason to avoid defining the term for the jury.

In addition, it must be noted that the instruction at issue in *Lowry* was I.P.I. 5.01B. The committee notes that accompany that instruction do not mandate that it be given. On the other hand, I.P.I. 5.01 is required when the jury is considering involuntary manslaughter and/or reckless conduct. *See* I.P.I. 7.07 (committee notes); I.P.I. 11.37 (committee notes). While reversible error may have only existed in *Lowry* after the jury posed its question, such error occurred here when I.P.I. 5.01 was not originally submitted. Had the jury been properly instructed from the beginning, it very likely would not have asked its questions. In any event, when defense counsel again failed to propose the proper instructions, reversible error occurred.

## IV. DR. MONTEZ WAS NOT QUALIFIED TO RENDER NEUROLOGICAL OPINIONS

### *Standard of Review*

The party who tenders an expert has the burden of establishing the expert's qualifications. *People v. Jordan*, 103 Ill. 2d 192, 208 (1984). A court's decision as to whether a party has met this burden is a matter of discretion, and may be reversed where there is abuse of that discretion. *Id.*

### *Dr. Montez's Neurological Testimony*

The State's medical experts in its case-in-chief were not able to time B.K.'s head injuries with any precision. (R. 3518, 3618, 3642). The defense's experts, Dr. Leestma (the only neuropathologist to testify) and Dr. Teas, in turn established that B.K. suffered a chronic subdural hematoma as a result of prior trauma that was up to months old at the

65

A_72

time of his death.  (R. 3739-40, 4228-29, 4251, 4292, 3739-40, 3792).  This pre-existing injury "re-bled" prior to B.K.'s death, causing him to become unresponsive.  (R. 3741-43, 4254).  B.K. banging his head against the floor on January 14 constituted enough force to cause the re-bleed.  (R. 3741-43, 4254).  The defense experts relied on the substantial evidence of healing visible grossly and in the histological slides in reaching their conclusions.  (R. 3714-27, 4199-4200, 4216-17, 4239-47).

Dr. Montez was called in rebuttal and was admitted as an expert in forensic pathology.  (R. 4516).  Dr. Montez could not and did not refute the existence of a chronic subdural hematoma, primarily because he brazenly decided it was not necessary for him to view the histological slides.[32]  (R. 4538-39).  Indeed, there is no pathological basis for refuting the existence of the chronic hematoma.  Recognizing as much, the State asked Dr. Montez to instead present *neurological* testimony to refute the existence of a chronic subdural hematoma "big enough" to cause B.K.'s death, and to establish that B.K. did not suffer a head trauma prior to 3:30 p.m. on January 14.[33]

Dr. Montez claimed he performed a "neurological assessment just like a doctor would do to a living patient that walks into his office," which included looking at B.K.'s motor responses, hearing, speech, vision, coordination, mood, and mental status to determine if there was "any neurological deficit."  (R. 4540).  Dr. Montez conducted this

---

[32] Two highly regarded forensic pathologists, Dr. Nancy Jones and Dr. Larry Blum, testified via affidavit that histological slides should be viewed in every case involving a child death, especially when it involves a head trauma.  (C. 650, 652).  Thus, "Dr. Montez should have reviewed the slides." (C. 650).

[33] Dr. Montez ignored the fact that B.K. had thrown his head back in a fit between 3:35 p.m. and 3:45 p.m., and became "sleepy" right away.  (R. 3074-75; R. 3084-86).

66

A_73

"neurological assessment" by viewing a 53-second video of B.K. using a cart to walk around his house in November 2008.[34]  (R. 4540-41; PX 121).

Dr. Montez testified extensively as to his findings and opinion based on his purported "neurological assessment."   (R. 4540-52).  He testified that if B.K. had a large enough chronic subdural hematoma to do "anything," he would exhibit "some neurological deficit."   (R. 4539-40).   According to Dr. Montez's neurological-video-assessment-and-analysis, however, B.K. suffered no neurological deficits (R. 4542, 4545), and did not display the "clinical" neurological manifestations (i.e., mood changes, vomiting, irritability, etc.) he would expect to see of a closed traumatic head injury.  (R. 4546).  According to Dr. Montez, because B.K. was neurologically "completely normal" and "fine" up to 3:30 p.m., the injuries that caused his death "had to [have] occurred after 3:30 p.m. on Wednesday, but before 3:51 p.m. when the call was made.  That is the window."  (R. 4550-51).   It is "scientifically unreliable" to date the injuries in such a way.  (C. 653).

### Dr. Montez was Not Qualified to Render Neurological Opinions

An expert must be qualified to render an opinion.  *See People v. Park*, 72 Ill. 2d 203, 209 (1978); *People v. Sims*, 244 Ill. App. 3d 966, 1030-31 (5th Dist. 1993).  To be qualified, the expert must have some specialized knowledge in the relevant field that would assist the jury in evaluating the evidence.  *People v. Coleman*, 205 Ill. App. 3d 567, 584 (1990).  Although there is no precise measurement as to what is "enough" expertise, "the degree and manner of knowledge and the experience required of an alleged expert is directly related to the complexity of the subject matter and the

---

[34] Dr. Montez also reviewed medical, health, and daycare records, but it was the video that was "key" in his assessment.  (R. 4542).

corresponding likelihood of error by one insufficiently familiar therewith." *Park*, 72 Ill. 2d at 209-10.

In this context, it belies common sense that a forensic pathologist would be able to perform a neurological assessment of a child based on a 53-second video and without ever viewing the child in person. Defendant is aware of no Illinois case where any expert was permitted to perform a neurological assessment based on a short video. Indeed, where experts testify regarding neurological assessments, they are in reference to more extensive in-person physical and mental examinations conducted by neurologists, not forensic pathologists. *E.g., People v. Morgan*, 187 Ill. 2d 500, 522-23 (1999) (neurological assessment consisted of at least 30 tests and was performed by chief of neurology at Georgetown University Hospital); *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 469 (1985) (neurosurgeon testified that a neurological examination takes at least five to ten minutes and can take up to an hour). And in cases where experts testify in rebuttal regarding neurology and the existence of a chronic subdural hematoma, those experts are *actual highly qualified neuropathologists* who review histological slides and medical records; they are not non-board-certified forensic pathologists performing "neurological assessments" based on home-videos. *See, e.g., People v. Swart*, 369 Ill. App. 3d 614, 629-30 (2d Dist. 2006).

Dr. Montez is particularly unqualified to conduct a neurological assessment or provide neurological testimony.[35] In *People v. Sims,* the Illinois Appellate Court determined that Dr. Mary Case, a noted neuropathologist, was qualified to present an expert opinion in that field. 244 Ill. App. 3d at 1030-31. At the time, Dr. Case had

---

[35] Defendant raised this issue in her Second Supplement to Motion for New Trial. (C. 672-76)

completed a two-year residency in the field of neuropathology, had extensive experience in neuropathology, was a board certified neuropathologist, had published several works in neuropathology, and had given numerous lectures and seminars on the subject. *Id.* at 1030.

Dr. Montez testified as to his qualifications, and his curriculum vitae was admitted as People's Exhibit 69. Unlike Dr. Case, Dr. Montez is not a neuropathologist and has no neuropathological or neurology education or experience. (PX 69) He has not completed any residency or published any works in those fields. (PX 69; R. 4513-14). He is not even board certified in forensic or anatomic pathology, let alone the more specialized areas of neurology, child neurology, and neuropathology. (R. 4513); *see also* Child Neurology Society, "Who We Are," http://www.childneurologysociety.org (stating requirements for child neurologists). In fact, he failed the anatomic pathology board exam. (R. 4949-52).

There is no evidence that Dr. Montez has performed any neurological treatment of any kind. He admitted that the entirety of his neurological background was that he has "consulted" with neuropathologists and he was "required to save brains in any case that had some potential issues with the nervous system." (R. 4514).

There is nothing about Dr. Montez's education or experience that would make him qualified to perform a neurological assessment of B.K., especially via a 53-second video of him walking around with a cart.[36] And Dr. Montez was certainly not qualified to render neurological and neuropathological opinions based on the purported assessment.

---

[36] It is worth noting that where Dr. Case, a renowned neuropathologist, was admitted as an expert, she merely testified about the effects that a 30-45 minute period of unconsciousness would have on a person. She did not perform a "neurological assessment" or view any video of the deceased. *See Sims*, 244 Ill. App. 3d at 976-77.

*See Park,* 72 Ill. 2d at 208-11 (police officer not qualified to testify as to identification of marijuana due to his "complete lack of training" on the subject); *Alm v. Loyola University Medical Center,* 373 Ill. App. 3d 1, 5-6 (1st Dist. 2007) (pathologist not qualified to provide opinions as to plastic surgery and anesthesiology where the pathologist had no educational or professional experience in those fields, merely "consulted" with plastic surgeons, and focused primarily on the examination of dead bodies).

As stated by the medical director for the Midwest Children's Brain Tumor Center, "Dr. Montez, as a forensic pathologist, was not a competent witness to testify as to the neurologic condition of the victim."  (C. 687; *see also* C. 691 (forensic pathologist Dr. Nancy Jones stating, "Dr. Montez should not have discussed clinical neurological observations from the video shown in court, especially if it was several weeks after the victim's head injury in October 2008."); C. 684 (forensic pathologist Dr. Larry Blum agreeing that any neurological observations should have been made by a neurologist).

### Dr. Montez's Neurological Testimony was Clearly Prejudicial

The defense experts' pathological testimony that B.K. suffered a re-bleed of a pre-existing subdural hematoma when he threw himself to the ground aligned with Kallinger's testimony that B.K. became immediately lethargic when he threw himself against the floor between 3:35 p.m. and 3:45 p.m. (R. 3074-75; R. 3084-86), and with Defendant's original statement--before the coercive police conduct set forth in Issue II--that B.K. became unresponsive while sitting in his bouncy seat.  (PX 55, pp. 30-38). Thus, the defense established that B.K. died with no fault to Defendant.

Dr. Montez could not pathologically refute the testimony of Drs. Teas and Leestma.[37]  Therefore, he provided the neurological testimony detailed above.  In doing so, Dr. Montez was able to testify, without scientific basis, that (1) B.K. did not have a chronic subdural hematoma significant enough to cause his death, and (2) B.K. did not suffer a significant head trauma until 3:30 p.m.  This testimony was inadmissible and prejudicial.  By making these conclusions without the necessary qualifications, Dr. Montez tainted the entire fact-finding process in such a manner that could not be remedied by cross-examination.  *Park*, 72 Ill. 2d at 211.  This is especially true considering expert testimony tends to "overpersuade in favor of the party introducing it." *People v. Perry*, 147 Ill.App.3d 272, 276 (1st Dist. 1986).  The importance of Dr. Montez's testimony thus weighs substantially in favor of reversal.

Moreover, through Dr. Montez's neurological testimony, the court admitted over the defense's objection the highly prejudicial video of B.K. walking with a cart.  (R. 4459-68).  The court noted that the video contained a "significant amount" of prejudicial material, but explained that "an expert can even testify to things that [a] jury may not otherwise see."  (R. 4467-68).  The State presented no basis for publishing the video to the jury other than to assist Dr. Montez's testimony regarding B.K.'s "neurological integrity."  (R. 4459-60).

In sum, Dr. Montez's neurological testimony permitted the jury to discredit the unrebutted scientific findings of the defense experts, determine a precise time frame in which B.K.'s injuries "had" to have occurred, and view a heart-wrenching video of the 16-month-old victim.  As is evident from the prior issues presented in this brief, this was

---

[37] It remains unrebutted that the histological slides showed substantial evidence of healing.

a closely balanced case. The prejudice of Dr. Montez's unqualified expert testimony is clear, and Defendant's conviction should be reversed.

## **CONCLUSION**

For the reasons stated herein, Defendant-Appellant, Melissa Calusinski, respectfully asks this Court to reverse her convictions for first degree murder and aggravated battery of a child, and/or grant her any other relief deemed appropriate.

Respectfully submitted,

Melissa Calusinski


By: _____
     Kathleen T. Zellner
     Attorney for Appellant


By: _____
     Douglas H. Johnson
     Attorney for Appellant


Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

**Certificate of Compliance**

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages containing the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 72 pages.

_____
Kathleen T. Zellner

A_80

**NOTICE OF FILING and PROOF OF SERVICE**

In the Appellate Court of Illinois
Second Judicial District

| | | | |
|---|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | | |
| | ) | | |
| | ) | | |
| *Plaintiff-Appellee,* | ) | | |
| | ) | | |
| v. | ) | No. | 2-12-0383 |
| | ) | | |
| MELISSA CALUSINSKI, | ) | | |
| | ) | | |
| | ) | | |
| *Defendant-Appellant.* | ) | | |

The undersigned, being first duly sworn, deposes and states that he filed an original and eight copies of the Brief of Defendant-Appellant and nine copies of the Separate Appendix to Brief of Defendant-Appellant with the above court and that he also served three copies of the Brief and Separate Appendix in the above entitled cause by depositing the same in the United States Mail at Chicago, Illinois on the 17th day of May, 2013 properly stamped and addressed to:

Mr. Lawrence Bauer
State's Attorney Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123

Subscribed and sworn to before me
this 17th day of May, 2013.

_____        _____

Notary Public

A_81

May 17, 2013


Appellate Court of Illinois
Second Judicial District
55 Symphony Way
Elgin, IL 60120

        Re:    People of the State of Illinois v. Melissa Calusinski
                No. 2-12-0383

Dear Clerk of the Court:

Enclosed please find the original and 15 copies of the Brief of Defendant-Appellant Melissa Calusinski.  An employee of Kathleen T. Zellner & Associates will be by to pick up the six file-stamped copies.

Thank you for your kind assistance.

Sincerely,



Rose E. Olvera, Paralegal

cc:    Mr. Lawrence Bauer
        State's Attorney Appellate Prosecutor
        Kathleen T. Zellner & Associates, P.C.

A_82