# EXHIBIT C

Petitioner's Petition for
Rehearing in the Illinois Court of
Appeals filed March 12, 2014

RECEIVED

MAR 1 2 2014

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

FILED

MAR 1 2 2014

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

**2-12-0383**
**IN THE APPELLATE COURT OF ILLINOIS**
**SECOND JUDICIAL DISTRICT**

PEOPLE OF THE STATE OF ILLINOIS,   )
                                 )    Appeal From Lake County
        Plaintiff-Appellee,     )    Circuit Court No. 09 CF 252
                                 )
    v.                           )    Honorable Daniel Shanes
                                 )    Judge Presiding
MELISSA CALUSINSKI,        )
                                 )
        Defendant-Appellant    )

## PETITION FOR REHEARING FOR

## DEFENDANT - APPELLANT

Kathleen T. Zellner
Douglas H. Johnson
KATHLEEN T. ZELLNER & ASSOCIATES
1901 Butterfield Road, Suite #650
Downers Grove, Illinois 60515
(630) 955-1212

2-12-0383
IN THE APPELLATE COURT OF ILLINOIS
SECOND JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, <br>       Plaintiff-Appellee, <br><br> v. <br><br> MELISSA CALUSINSKI, <br><br>       Defendant-Appellant. | Appeal from the Circuit Court of Lake County, Illinois <br><br> Case No. 09 CF 252 |

## DEFENDANT-APPELLANT'S PETITION FOR REHEARING

Now Comes Defendant-Appellant, by and through her attorneys, Kathleen T. Zellner & Associates, P.C., and pursuant to Supreme Court Rule 367, hereby respectfully petitions this Court to reconsider its decision denying Defendant relief on appeal. In support thereof, Defendant states as follows:

### INTRODUCTION

Defendant, Melissa Calusinski, is innocent of the crime for which she stands convicted. This case bears the trademark of a wrongful conviction. Defendant, a young, inexperienced woman of sub-average intelligence, gave a "confession" conforming to her interrogators' theory of the case only after hours of coercive questioning. The "corroboration" of Defendant's conviction consists of dubious, incomplete medical testimony offered by the State. The objectivity and credibility of the State's "experts" is in serious doubt, given

1

C_02

their persistence in denying the existence of a pre-existing injury despite conclusive scientific evidence to the contrary. Defendant's conviction is an affront to due process and must be reversed.

## I.   DEFENDANT'S STATEMENTS WERE IMPROPERLY ADMITTED

In ruling on Defendant's claim that her statements were illegally coerced, this Court held that the trial court's denial of Defendant's motion to suppress was not against the manifest weight of the evidence. Specifically, this Court held that the officers were "never abusive or threatening toward [Defendant] in any manner." (Op. at p. 33). This Court concluded that while Defendant "may have been scared of the potential consequences she faced, she was not afraid of the officers." (*Id.*).

Respectfully, the record refutes the Court's implicit holding that Defendant understood the gravity of her situation. As pointed out in her brief (Def. Br., pp. 53-54), Defendant made a number of statements that demonstrated her failure to comprehend the significance of the interrogation process. After Defendant made a number of statements implicating herself in Ben's death, Defendant repeatedly referenced the fact that she believed – based on perceived and actual assurances made by the officers during the interrogation[1] – that she would be able to go home. This included the fact

---

[1] There are myriad examples to cite to. For instance, after Defendant told the officers that she did not know what caused the injury, Chief Filenko refused to believe her, prompted her to tell the truth, and stated, "You need to get to that point, so we can all go home and get out of here." (PX 55, pp. 174-75).

C_03

that she wanted to know how much longer she would be at the station because she wanted to see her parents and her puppy (PX 55, p. 199), she was concerned that it would take a while for her car to warm up (PX 55, p. 203), and she even described the interrogation process as a "good thing" and talked about her future career ambitions. (PX 55, p. 97). Thus, the record refutes the notion that Defendant was aware of the consequences of what she was saying.

Given that Defendant did not understand the "potential consequences she faced," her expressions of fear were clearly directed at the manner in which the police were dealing with her. (*E.g.*, PX 55, pp. 115, 122, 135). Defendant's fears were warranted. Defendant was young with no criminal history. She was placed in a relatively small interrogation room with two male officers and interrogated over a span of 10 hours. Those officers refused to accept her denials that she knew what happened to Ben. Instead the officers suggested that whatever happened was likely just an accident. The officers repeatedly invoked the need for closure, and told Defendant she could provide it. (PX 55, pp. 46, 47, 52, 57, 62, 83, 120, 175). Once Defendant acquiesced to an accident scenario, the officers continued to question her until she would acquiesce to acts that constituted murder. Defendant never had any reason to believe that the interrogation would end unless she admitted to having intentionally caused Ben's death.

3

In response to Defendant's argument that Defendant had no choice but to adopt the officers' version of events, this Court held that "There is no indication that either Chief Filenko or Detective Curran had a preconceived idea of what happened." Respectfully, this conclusion is absolutely refuted by the record. Chief Filenko and Detective Curran held nothing but preconceived notions of what happened to Ben prior to their interrogation of Defendant. In fact, Detective Curran specifically so states during the course of the interrogation:

> What we think happened here . . . [i]s Ben...? This is what we think, sorry George, this is what we talked about from the very get go, ok. 'Cause we all know, first of all, we all know what's gonna happen when somebody gets frus... with a baby, they get frustrated. It happens to everybody. We think in this situation, the other babies are screaming, crying, whatever. You're taking care of them by yourself. You have Ben in your hands, he starts acting up and, you get mad at him and you throw him on the floor.

(PX 55, pp. 180-81) (emphasis added).[2] That the officers would not accept Defendant's denials, and that they continued to question her based on their perception of the irrefutable medical evidence, is also evidence that they would not cease the interrogation until Defendant gave a statement that fit their theory. Of course, the scenario posed by the officers was the precise scenario eventually agreed to by Defendant and advanced by the prosecution at trial:

---

[2] It is also readily apparent that the officers would not accept what Defendant claimed throughout the first portion of the interrogation – that she had no idea how Ben was injured. This is the very definition of a "preconceived notion."

4

> The defendant, a teacher's assistant, assigned to protect and care for Ben, forcefully threw Ben on the floor that afternoon because he was throwing a fit and he didn't want his hands washed. She threw him to the floor, causing his death.

This Court distinguished *Aleman* on the basis that the officers in this case did not lie about the medical evidence and did not force a conclusion on Defendant. (Op. at p. 35). On the contrary, whether the officers intended to or not, they did misrepresent the medical evidence. The officers repeatedly told Defendant that the injury had to have occurred while she was alone with Ben. (*E.g.*, PX 55, pp. 88, 120, 178). For example, Detective Curran told Defendant, "You said you were with him for ten, over ten minutes before this happened. He had been pretty much going into unconsciousness within ten minutes of this happening." (PX 55, p. 53). This is patently false. Even the State's own medical examiner confirmed that he could not fix with that precision when Ben was injured. (R. 3642; *see also* R. 3618, 3638).[3] This is exactly the type of misrepresentation that was made to the criminal defendant in the *Aleman* case.

What separates *Aleman* from the instant case is Defendant actually states during the interrogation that she is trying to provide the officers with an accounting that is consistent with what they want her to say. As noted in Defendant's brief (Def. Br., p. 49), when asked why she transitioned into

---

[3] This Court also noted that the officers did not foreclose the possibility that the death had occurred accidentally by, for example, BEN falling off the changing table. However, the officers did in fact rule out such a possibility when they told Defendant that the force required to inflict BEN's injuries was the equivalent of a two-story fall. (PX 55, p. 118). This was yet another misrepresentation of the medical evidence, as the experts at trial universally confirmed that a fall from that distance would result in much greater injuries. (R. 3633-35, 3751-52, 4228).

5

stating that she had caused Ben's injury, Defendant responded, "Because of what you told me, I was thinking straight." (PX 55, p. 160). She later told the officers, "I'm trying to make it sound right" and that the story "scientifically" fit their evidence. (PX 55, p. 183, 185). She even questioned the motive they had suggested, telling them that she was confused because she never gets angry. (PX. 55, p. 187).

In summary, Defendant was a young, intellectually challenged woman with no history in the criminal justice system. She was taken into a small room with two male officers and interrogated for hours. The officers refused to accept her repeated denials of culpability. The officers suggested that Ben was injured as the result of an accident, when in fact their belief the entire time was that he had been murdered. The officers misrepresented that the injury had to have occurred while Ben was in Defendant's sole custody. They repeatedly suggested that by acquiescing they could "all go home," and appealed to Defendant's ability to provide "closure" by just telling the "truth." Defendant went along with what they suggested, clearly not realizing the implications of what she was saying. In short, Defendant's statements were not voluntary, they were not reliable, and the admission of the statements violates due process.

## II. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S CONVICTION

In addressing the sufficiency of the evidence, this Court acknowledged that although Defendant's theory of the case is a conclusion the jury could

C_07

have adopted, it was "not the only reasonable one." (Op. at p. 43). Having ruled that Defendant's confession was properly before the jury, this Court held that the trier of fact could have found that Defendant was the person who inflicted blunt force trauma upon Ben and that, in combination with testimony from the State's experts, the evidence was sufficient to prove Defendant's guilt.

Defendant will not restate her arguments as to why the confession was improperly admitted, or why Defendant's statements are unreliable as a result of the methods employed by the officers. Defendant would point out, however, that the hotly contested medical evidence certainly elevated the importance of Defendant's "confession" to the jury. That the admission of Defendant's statements most certainly tipped the balance in favor of the prosecution merely reinforces the conclusion that the unreliable, involuntary confession tainted the entirety of the trial.

Respectfully, with regard to the medical evidence, this Court omitted several undisputed facts that conclusively demonstrate the shortcomings in the State's theory of the case. For example, on October 27, 2008, Ben suffered a head injury severe enough to cause a "golf ball" size lump on his head. (R. 4137). This is clearly the injury that caused the bleeding in the different compartments of the brain. Between Ben's visit to his pediatrician at 12 months and 16 months, his head circumference grew from the 50th to the 75th percentile. (R. 3136-37, 4092). By the date of his death just a few

7

C_08

short weeks later, Ben's head circumference alarmingly grew to the 95th percentile. (R. 3614, 4092). It is also undisputed that on January 12, 2009, Ben vomited repeatedly. (R. 3323). The growth in head circumference in conjunction with the repeated vomiting – neither of which is in dispute – weighs heavily in favor of the inference that Ben had suffered a chronic subdural bleed pre-dating January 14. (4094-95).

To suggest that Ben just coincidentally had some other illness two days before his death ignores the histological evidence. Histology slides are the single most important tool to date injuries at the disposal of a pathologist. (R. 3628, 4560). Dr. Choi admitted he noted the presence of iron and fibroblasts in sections he took during autopsy, which indicates an older injury. (R. 3653-61). Dr. Choi denied seeing a subdural membrane which would be indicative of a chronic subdural hematoma, but his credibility on this point is overwhelmed by the testimony of Drs. Teas and Leestma. Drs. Teas and Leestma both identified the presence of iron, fibroblasts, and membrane on the slides they reviewed.[4] (R. 3653-61, 3722-23, 3728-29, 3738-39, 4237-38, 4243-44, 4291). Simply put, the slides irrefutably established the presence of a head injury that took place weeks or months prior to Ben's death.

---

[4] The presence of iron, fibroblasts, and membrane are not subjective findings. The cellular activity is either apparent on the slides or it is not. Drs. Teas and Leestma pointed out the iron, fibroblasts, and membrane on the slides. That Dr. Choi failed to properly review the slides (in addition to identifying mesothelial cells at trial, which are nowhere present in the brain) calls into question the validity of the autopsy he performed and his testimony at trial as a whole.

8

C_09

This Court erred where it stated that Dr. Greenbaum testified that "her review of the slides did not reveal a chronic subdural hematoma." (Op. at p. 44). Dr. Greenbaum testified that in reviewing the case she never looked at the slides. (R. 3519). She also conceded that she is not an expert in histology. (*Id.*). In preparing her report, Dr. Greenbaum relied on Dr. Choi's findings with regard to histology. (R. 3534). Thus, Dr. Greenbaum did not refute, and had no basis to refute, the microscopic findings of the defense experts.

This Court also erred in finding that the jury could have believed Defendant's theory that Ben had a chronic subdural hematoma, and still found that Defendant caused Ben's death. (Op. at p. 45). The prosecution did not offer a single witness that acknowledged the existence of the chronic subdural hematoma.[5] There was not a single expert witness that testified that the medical evidence supported the existence of both an injury allegedly caused by Defendant and a chronic subdural hematoma so extensive that it caused swelling of the brain and vomiting two days prior to Ben's death. To the extent this Court relied on Dr. Leestma's acknowledgment that Ben's "throwing himself backwards could not have caused all of his injuries," Defendant's theory of the case was not that Ben's injuries were caused by throwing himself back and hitting his head. Rather, the defense's theory, consistent with Dr. Leestma's testimony, is that Ben suffered a prior injury

---

[5] Of the State's experts, only Dr. Choi reviewed any of the histology slides. Drs. Greenbaum and Montez failed to even review the histology slides before rendering opinions in this first degree murder case.

9

which was exacerbated by Ben throwing himself back and hitting his head that resulted in the findings on autopsy. To suggest that the defense's theory and the State's theory are not mutually exclusive is speculation not commensurate with proof beyond a reasonable doubt.

Defendant is not asking this Court to usurp the role of the jury. Rather, Defendant is asking this Court to set aside findings that are clearly at odds with the weight of the evidence, which this Court is entitled to do. *E.g., People v. Smith*, 185 Ill. 2d 532, 541 (1999). Given the error in admitting Defendant's pre-trial statements, the evidence was simply not sufficient to support guilt beyond a reasonable doubt.

## III. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

In her third argument on appeal, Defendant argued that defense counsel was ineffective for failing to tender a jury instruction defining the term "recklessness." (Op. at p. 46). This Court held that "counsel made a strategic decision not to instruct the jury on the definition of recklessness." (Op. 49). Defendant respectfully submits that this determination should be reconsidered and reversed.

This Court's opinion is premised upon its determination that Defendant did not present, and/or did not emphasize, the theory that she was guilty of at most involuntary manslaughter. But Defendant submits that the record demonstrates that after thoughtful consideration, she clearly desired that the jury be given the option of acquitting her of first degree murder and

10

C_11

convicting her of the lesser offense. (R. 4454). The theory was presented. Thus, there was no strategic reason not to submit IPI 5.01 as mandated under these circumstances, defining the mental state required for involuntary manslaughter.

During the hearing addressing the issue of whether jury would be permitted to consider the offense of involuntary manslaughter, defense counsel stated:

> The decisions about lesser included have been discussed and reflected upon over the last several years and numerous conversations back and forth to the point where I just -- it is a very considered decision both parts. We didn't come to this decision a week ago for sure, but we have been discussing the whole case all along.

(R. 4454).

That Defendant presented this theory is shown by her request that the jury be instructed as to the offense of involuntary manslaughter. Over the State's objection, the trial court ruled that the lesser included offense instruction would be given. (R. 4457). Inherent in that ruling is the trial court's finding that the evidence adduced at trial permitted the jury to convict her of involuntary manslaughter and acquit her of first degree murder. *See*, *People v. Thomas*, 374 Ill. App. 3d 319, 323 (2ND Dist. 2007). In asking the trial court to instruct the jury, Defendant made it clear that based on the evidence the jury had heard, one of her theories was that she was guilty of, at most, involuntary manslaughter.

11

C_12

Contrary to this Court's decision, there was not merely a "brief and isolated reference to recklessness" at the trial. (Op. at p. 49). Not only were the instructions containing (but not defining) the term requested and given, but whether Defendant's conduct was knowing or reckless was argued by both sides. The prosecutor argued in closing that "this is not reckless." (R. 4619). The prosecutor continued: "This is a knowing act. There is nothing reckless about that. There is nothing involuntary or reckless about what she did on that day." (R. 4640). The prosecutor would not counter a theory Defendant was not presenting.

And defense counsel did present the theory in closing argument, specifically asking that the jury consider convicting Defendant of the lesser offense. In addition to the reference this Court cites, defense counsel argued, "I submit to you the most, most because this case was overcharged, the most she is guilty of -- could be found guilty of is involuntary manslaughter, not murder, not aggravated battery." (R. 4689). Defense counsel then actually read the instruction to the jury:

> And you will be instructed, I believe, that to sustain the charge of involuntary manslaughter, the State must prove the following propositions: One, that the Defendant performed the acts which caused death of Benjamin, and than (sic) that the Defendant performed that **recklessly**, and that those acts were likely to cause death or great bodily harm.

(R. 4690) (emphasis added). Yet defense counsel did not provide the jury with a definition of the lesser mental state.

After closing arguments, in arguing what exhibits would be presented to the jury, the prosecutor explained that the day care center's discipline policies were "relevant" and noted "it is from our position it is knowledge versus reckless." (R. 4746). The trial court agreed, holding "both sides have made an issue of mental state." (R. 4746). Because the mental state of recklessness was at issue, it should have been defined.

Once defense counsel requested and received the trial court's favorable ruling that the jury would be given the option of convicting Defendant of the involuntary manslaughter, the failure to define the lesser offense cannot be excused as trial strategy. Defense counsel obtained no benefit by failing to define "recklessness" for the jury. The mandate that IPI 5.01 be given whenever IPI 7.07 is tendered is recognition that the term "recklessness" does not have commonly understood meaning. *See, People v. Howard*, 232 Ill. App. 3d 386, 392 (1st Dist. 1992).

This Court cites *People v. Lemke,* 384 Ill. App. 3d 347 (5th Dist. 2008). (Op. at p. 46). But in that case, defense counsel obtained an obvious benefit when he quoted an expert witness's testimony as to the definition of "recklessness." That expert had provided a less stringent definition of the term that strongly supported Defendant's theory of the case. Defense counsel specifically referred to the expert's definition when he argued that Defendant was guilty of no more than involuntary manslaughter. Here, no definition of recklessness was provided by any witness. There is nothing in the record

defining the term. Failing to define the term was not strategy. It was an unfortunate mistake.

That the failure was a mistake and not strategy is established by defense counsel's statements. In response to the jury's question as to the definition of the offenses, defense counsel advised: "they have already been instructed on this." (R. 4757). But defense counsel was wrong. The jury had asked for guidance as to how it should proceed if it found Defendant guilty of involuntary manslaughter. (C. 594). The jury also specifically asked "What is reckless conduct?" (*Id.*). The definitions of involuntary manslaughter and reckless conduct require the definition of "recklessness" as set forth in IPI 5.01. Therefore, contrary to defense counsel's representation, the jury had not been properly instructed. (R. 4757).

In rejecting this argument and labeling defense counsel's conduct to be immunized as trial strategy, this Court explained, "all agreed that the jury had been instructed on the definitions of those offenses." (Op. at p. 50). This is incorrect. Immediately after defense counsel represented that the jury had been properly instructed, the prosecutor stated:

> Judge, our position would be that obviously with the verdict forms there is on the first degree there is (sic) three verdict forms and on aggravated battery of a child there is (sic) three verdict forms. While all of us may believe 26.01(q) may be clear to us there appears to be some confusion in that **we do believe the questions need to be answered.**

(R. 4757) (emphasis added).

14

The prosecutor did not agree with defense counsel. Following the prosecutor's request that the trial court answer the jury's questions, the trial court remarked:

> It sounds like the parties are in basic agreement. I concur with the defense, but not to disagree with the State since the parties are essentially in agreement.

(R. 4757).

But the parties were not in agreement. Neither at that time nor at anytime thereafter did the prosecutor ever agree that the jury had already been properly instructed as to those definitions. The trial court later addressed defense counsel and decided, "Along the lines of what you said before I also agree regarding questions 3 and 4, we did instruct them on that." (R. 4759). Thus, defense counsel mistakenly, not strategically, misled the court.

Defendant's argument and the court's ruling at the post trial hearing also demonstrate that defense counsel's failure to properly instruct the jury was not trial strategy. As part of the motion for a new trial, defense counsel argued that the trial court erred in not defining the mental states of recklessness and knowing. (R. 4867). By making this argument, defense counsel conceded that the failure to define recklessness was not trial strategy. In denying defense counsel's argument, the trial court made no reference to trial strategy. Instead, the trial court acknowledged that the case involved potential verdicts of involuntary manslaughter and first degree

15

C_16

murder, then ruled that it was "not asked by anybody to define the mental states of knowing or reckless." (R. 4867). There is simply no suggestion anywhere in the record that the failure to define the crucial mental state was trial strategy.

Defendant agrees with this Court's conclusion that "it was prudent [for defense counsel] to offer the jury alternatives to the charged offenses." (Op. at p. 48). Defendant had the right to have those alternatives to the charged offenses properly defined as required by law.

16

C_17

## CONCLUSION

WHEREFORE, for the reasons stated herein, Defendant-Appellant respectfully requests that this Court grant the instant Petition for Rehearing, and/or grant any and all other relief deemed appropriate.

Respectfully submitted,

Melissa Calusinski

By: _____

Kathleen T. Zellner
One of her attorneys

By: _____

Douglas H. Johnson
One of her attorneys

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

17

C_18

## CERTIFICATE OF COMPLIANCE

I certify that this Petition conforms to the requirements of Rules 341(a) and (b), and Rule 367. The length of this Petition, excluding pages containing the Rule 341(d) cover, the Rule 341(c) certificate of compliance, and the certificate of service is 17 pages.

Kathleen T. Zellner
Attorney for Defendant

C_20