# EXHIBIT E

Petitioner's Petition for Leave to Appeal to the Illinois Supreme Court, filed May 27, 2014

NO: **1 1 7 7 2 5**

## IN THE SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | On Petition for Leave to Appeal |
| | ) | from the Appellate Court of Illinois |
| Plaintiff-Petitioner, | ) | Second Judicial District |
| | ) | No: 2-12-0383 |
| | ) | |
| -v- | ) | There on Appeal from the Circuit |
| | ) | Court of the 19th Judicial District |
| | ) | Lake County, Illinois |
| MELISSA CALUSINSKI, | ) | No: 09 CF 252 |
| | ) | |
| Defendant-Respondent. | ) | The Honorable Daniel Shanes |
| | ) | Judge Presiding. |

### PETITION FOR LEAVE TO APPEAL

KATHLEEN T. ZELLNER & ASSOCIATES
1901 Butterfield Road
Suite #650
Downers Grove, Illinois 60515
(630) 955-1212

Counsel for Defendant-Petitioner

**FILED**

MAY 2 7 2014

**SUPREME COURT
CLERK**

E_01

No. _____

## IN THE SUPREME COURT OF ILLINOIS

| | |
|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Appeal from the Appellate Court** |
| ) | **of Illinois, Second Judicial District** |
| **MELISSA CALUSINSKI,** ) | |
| ) | **App. No. 2-12-0383** |
| **Defendant.** ) | **Trial Ct. No. 09 CF 252** |

### PETITION FOR LEAVE TO APPEAL

### INTRODUCTION

Defendant-Appellant, Melissa Calusinski, stands convicted of first degree murder stemming from the tragic death of a sixteen-month-old at Minee-Subee, a daycare facility in Lincolnshire, Illinois. Defendant is innocent of the crime. Her conviction rests on faulty, misguided medical expert testimony and a custodial statement that is patently involuntary and unreliable.

Defendant respectfully asks that this Court grant the instant petition because the issues raised herein are of constitutional importance. Moreover, this Court's review is warranted to correct a manifest miscarriage of justice in that an innocent, vulnerable person was exploited by law enforcement and, as a result, has been sentenced to 31 years in the Illinois Department of Corrections for a crime she did not commit.

E_02

## I. PRAYER FOR RELIEF

Defendant-Appellant, Melissa Calusinski, pursuant to Supreme Court Rule 315, respectfully petitions this Honorable Court grant her leave to appeal from the judgment of the Appellate Court of Illinois, Second Judicial District, affirming her conviction for first degree murder and aggravated battery of a child.

## II. PROCEEDINGS BELOW

Defendant was convicted of first degree murder and aggravated battery of a child. (C. 132-34).[1] The trial court sentenced Defendant to 31 years in the Illinois Department of Corrections. (C. 596-600, 844). The appellate court affirmed Defendant's conviction on February 19, 2014. Defendant filed a petition for rehearing on March 12, 2014. The appellate court issued a modified order upon denial of rehearing on April 22, 2014. (A. 1-52).

## III. POINTS RELIED UPON FOR REVERSAL

I.  *The appellate court erred in affirming Defendant's conviction because the evidence was insufficient to prove guilt beyond a reasonable doubt*

II.  *The appellate court erred in affirming Defendant's conviction because her "confession" was involuntary*

III.  *The appellate court erred in affirming Defendant's conviction because trial counsel was ineffective in failing to submit a jury instruction defining "recklessness"*

IV.  *The appellate court erred in affirming Defendant's conviction because the State's forensic pathologist testified beyond his area of expertise*

---

[1] The common law record shall be denoted "C. ___," the report of proceedings shall be denoted "R. ___," and the People's exhibits shall be denoted "PX ___." The appellate court order is appended to this Petition and shall be denoted "A. ___."

2

## IV. STATEMENT OF FACTS

On January 14, 2009, Benjamin Kingan ("Ben"), a sixteen-month-old, became unresponsive at the Minee-Subee daycare located in Lincolnshire, Illinois. (R. 2724). 911 was contacted at 3:51 p.m. (PX 17). Police and paramedics arrived at approximately 3:54 p.m.. (PX 17, p. 4; PX 16). Ben was transported to the hospital and pronounced dead at 4:50 p.m. (R. 2811).

Ben had a history of throwing himself back and hitting his head on whatever surface he was sitting on. (R. 2679-80, 2927-28). On October 27, 2008, Ben woke up from a nap at Minee-Subee with a large, goose-egg-like swollen bump on his head. (R. 2902). Nancy Kallinger ("Kallinger"), the teacher in Ben's room when he woke up that day, claimed she did not see Ben bump his head or fall. (R. 3100). Two days later Dr. Patricia Brunner noted the area was still visibly swollen, but did not order any further testing to rule out bleeding in his head. (R. 3147, 3179).

On November 20, 2008, Ben's mother, Mrs. Kingan, reported to his pediatrician, Dr. Daniel Lum ("Dr. Lum") that Ben was spitting up and not quite himself. (R. 4077). Dr. Lum agreed that repeated vomiting can be a sign of concussion or increased cranial pressure. (R. 4094-95). Ben's head circumference, which was consistently in the 50th percentile throughout the first year of his life, had increased to the 75th percentile by December 1, 2008. (R. 3136-37). At his death Ben's head circumference measured in the 95th percentile among children his age. (R. 3614, 4092).

Two days prior to Ben's death, Ben vomited four to five times at daycare and at home. (R. 2649, 3323). One witness at the daycare described the vomit as projectile and

3

E_04

repeated. (R. 4354-56). Ben did not have a temperature that day. (R. 4357). Mrs. Kingan, Ben's mother, kept Ben home from daycare the following day. (R. 2651-55).

Ben returned to daycare on January 14, 2009. (R. 2656-57). His room included a kitchen area just to the right of the entry door. (R. 2987). With the exception of the kitchen the room was completely carpeted. (*Id.*). Many daycare employees came into contact with Ben on the date of his death, including Defendant, Gwendy Bautista, Kallinger, Kristen Emerson, Sandy Jenner, and Crystal Calusinski. (R. 2605-06, 2732-33). As many as twenty teachers work at the daycare at a time, and it was normal for them to walk in and out of classrooms throughout the day. (R. 2988, 4138-39).

Kallinger was a "floater" on the day of Ben's death, meaning she covered for teachers during their breaks. (R. 3075). At around 11:15 a.m., Kallinger witnessed Ben throw himself backwards but did not see him hit his head. (*Id.*).

At around 3:00 or 3:15 p.m., Defendant and Bautista began serving the children their afternoon snack. (R. 2970). At 3:30 p.m., Kallinger relieved Bautista, whose shift had ended. (R. 2955, 2971, 3051). At the end of snack Defendant and Kallinger washed each of the children's hands one by one. (R. 3052-53). Kallinger took four children to the kitchen sink, while Defendant used wipes at the table. (R. 3071-72). Kallinger and Defendant then washed all the tables and dishes. (R. 3053). Once cleanup was complete, Defendant left the room for about five minutes. (R. 3073).

While Defendant was out of the room, Kallinger removed Ben from his seat, checked his diaper, and set him on the tile floor in the kitchen. (R. 3074-75). At that time, just minutes before he became unresponsive, Ben threw his head back hard against the kitchen tile and cried. (R. 3074-75, 3084). Kallinger estimated this occurred between

4

3:35 and 3:45 p.m. (R. 3084). Kallinger sat Ben upright, turned to wash her hands, and when she turned back Ben was again lying on the ground. (R. 3076). Kallinger picked Ben up and put him in a bouncy chair by the window. (*Id.*). Ben became lethargic; when Defendant returned to the room, Kallinger told her that Ben was falling asleep in his chair. (R. 3085-86). Kallinger then left the room to sanitize the dishes. (R. 3054).

Defendant later told police that Ben became unresponsive while in his chair. Defendant called for help and her sister, Crystal, entered the room. (R. 3207-13). Crystal discovered Ben sitting in the bouncy chair foaming from his nose. (R. 4146-48). Crystal and another staff member began administering CPR. (R. 2907, 6054-57, 4149).

The medical evidence was subject to heated dispute at trial. Dr. Choi performed his first autopsy of Ben on January 15, 2009. (R. 3559, 3562-63). Externally Dr. Choi found only two small bruises – one on Ben's forehead and one on his upper arm. (R. 3565-68, 3616). The only evidence of injury was found in Ben's head and brain. (R. 3573). Dr. Choi found a subgaleal hemorrhage measuring approximately four inches by four inches. (R. 3574-77, PX 18). Dr. Choi noted blood in the dura (membrane directly below the skull), the arachnoid membrane (below the dura), and the subarachnoid membrane (below the arachnoid). Apart from the hemorrhage, Dr. Choi noticed what he perceived to be a .8 inch simple linear skull fracture. (R. 3580, 3585-86). The State's experts agreed that a child can suffer a simple skull fracture from a short fall and live normally, and that Ben's death was not caused by the fracture. (R. 3631-32, 2798).

Dr. Jordan Greenbaum, the medical direct of the child protection center at Children's Healthcare of Atlanta, testified on behalf of the State. (R. 3404). In rendering her opinions Dr. Greenbaum reviewed, among other things, Defendant's statements made

E_06

after nine hours of interrogation. (R. 3451, 3505-08). The majority of Dr. Greenbaum's report was dedicated to circumstantial evidence (i.e., witness statements), rather than pathology. (R. 3509).

Both Drs. Choi and Greenbaum testified that Ben's death was caused by blunt force impact to the head, and that his injuries were consistent with being thrown to the ground by another person.[2] (R. 3452, 3494, 3599, 3605-06). These opinions were based on the nature of Ben's injuries, namely the bleeding in multiple levels of the brain. (R. 3461, 3478-79). Dr. Greenbaum disputed that Ben's fatal injury could have been caused by throwing his head back against the ground or a short fall. (R. 3542-44). Both doctors admitted that it is impossible to precisely date injuries, and that their description of seeing "fresh" or "recent" blood in the brain is a term that means anything from hours to days old. (R. 3517-18, 3526, 3598-99, 3618, 3638).

Histology is the examination of tissue under a microscope to determine if there is any evidence of healing from an old injury. (R. 3623-24, 4217-18, 4228-29, 4272). For a pathologist, histological slides are the most important tool for dating injuries. (R. 3628, 4560). Dr. Choi did not review histology slides taken from the dura before making a determination as to cause of death. When he viewed the slides weeks later, he saw "mesothelial"[3] cells, calcification, and the presence of iron. (R. 3653-61). Dr. Choi agreed that the presence of iron indicates an older injury "weeks or months" old. (R. 3661). Dr. Choi admitted that a minor fall or trauma can aggravate a pre-existing chronic

---

[2] Dr. Choi initially told investigators that Ben's injuries were consistent with a one to two story fall. Dr. Choi retracted his assessment at trial, most likely because the evidence does not even come close to supporting such a claim. (R. 3633-35, 3751-52, 4228).

[3] A "mesothilial" cell is indicative of asbestos exposure and is never found anywhere near the brain. (R. 4523).

6

subdural hematoma. (R. 3663). However, Dr. Choi testified he did not see any old or recent subdural membrane when viewing the slides. (R. 3602).

For her part, Dr. Greenbaum testified that she did not require histology slides to render her opinions. (R. 3484). Nevertheless, she relied on Dr. Choi's findings regarding the slides to the extent they bore on her conclusions. (R. 3483-84, 3534).

Dr. Shaku Teas, a forensic pathologist, and Dr. Jan Leetsma, a neuropathologist, testified for the defense. Drs. Teas and Leetsma agreed that Ben had a chronic subdural hematoma that was weeks and up to months old at the time of his death. (R. 4228-29, 4251-52, 4292). They based their opinions in small part on the photographs taken at Ben's autopsy. While some of the blood appeared "fresh" (meaning within a few days), some blood was granular and had a dark chocolate color which indicated it was days older. (R. 3714-15, 3270-71, 3735-37, 4215-17).

More important to their opinions, however, was their review of the histology slides. Drs. Teas and Leetsma agreed that the slides taken from the subdural hematoma revealed the presence of membrane with enough complexity and layers of fibroblasts to indicate it was between a couple of weeks and months old. (R. 3722-23, 3728-29, 3738-39, 4238-39, 4291). The membrane is synonymous with a chronic subdural hematoma – it represents healing that has gone on for weeks or longer. (R. 3722; 4236-38).

A chronic subdural hematoma can re-bleed spontaneously or as a result of minor trauma, which can lead to excessive pressure in the cranial compartment. (R. 4206). The increased pressure can be compensated for to some extent by the absorption of cerebrospinal fluid. (R. 3745). Thus, the hematoma can wax and wane as it re-bleeds and then fluid is absorbed. (R. 3746-47). When the pressure builds to a dangerous point, a child

7

such as Ben can display symptoms non-specific to a brain injury, including repeated vomiting, lethargy, and fussiness. (R. 3436-47, 4208). The symptoms can come and go as the body regulates the intracranial pressure. (*Id.*).

Due to the existence of a chronic subdural hematoma, the force of trauma necessary to cause Ben's injuries was as much as half than what would otherwise be required. (R. 3740). The amount of force needed was consistent with Ben throwing his head back and hitting it against hard tile, or falling a short distance. (R. 3741-42, 4254).

Despite the irrefutable fact that Ben was showing signs of head injury two days prior to his death, Kallinger's testimony that Ben hit his head multiple times prior to being left alone with Defendant, the lack of any apparent motive for Defendant to perpetrate a senseless killing, and the irrefutable medical evidence showing the existence of a chronic injury, the jury undoubtedly convicted Defendant based on statements she made to police following a lengthy interrogation.[4] In short, after repeated denials Defendant agreed to a scenario posed by detectives in which she threw Ben to the ground because he was acting up. (PX 55, pp. 180-182). According to the statement, Ben hit his head between the tile and carpet, and then crawled to his chair. (*Id.*). Per the statement, Kallinger was in the room at the time but did not see or hear anything because she was at the sink doing dishes. (PX 55, pp. 186, 189).

## V. ARGUMENT

### I.  THE EVIDENCE IS INSUFFICIENT TO SUSTAIN DEFENDANT'S CONVICTION

The evidence against Defendant falls short of proof beyond a reasonable doubt. Ben suffered blunt force trauma on October 27, 2008, which resulted in a golf-ball-sized

---

[4] The interrogation is discussed in greater detail, infra.

E_09

lump on the back of his head. Throughout the following months he showed signs of suffering from a chronic subdural hematoma. His head size dramatically increased from the 50th to the 95th percentile. An increase in head size is indicative of a chronic subdural hematoma. (R. 3529-32, 3641). Just two days before his death Ben was projectile vomiting without a fever. Such vomiting is consistent with increased cranial pressure. (R. 4094-95). The histology slides of his dura conclusively show the presence of iron, fibroblasts, and neomembrane, which are all irrefutable cellular evidence of an older injury, i.e., a chronic subdural hematoma.[5]

It cannot be disputed that Ben self-inflicted a head injury on the date of his death. Ben had a history of throwing himself back and hitting his head on the floor. According to Nancy Kallinger, Ben threw his head back and hit it hard on the tile just minutes before he became unresponsive. She testified that Ben threw himself back a second time when she was turned the other direction. Immediately afterwards she placed Ben in his bouncy chair and she noted he became lethargic.[6]

Critical to the State's theory of the case was that Ben's injury occurred in the few minutes Defendant was left alone with him. Yet every expert to testify in the case agreed they could not pinpoint the timing of the injury with that level of precision. (R. 2816, 3440, 3617, 3652, 4220). Moreover, histology slides are essential to dating an injury, and

---

[5] The presence or absence of iron, fibroblasts, and membrane is not subject to interpretation. Dr. Choi admitted seeing iron and calcification in the slides. Neither of the State's other experts reviewed the slides prior to testifying. While Dr. Choi denied seeing membrane, he also testified that he viewed mesothelial cells, which is patently incorrect.

[6] Ben was found unresponsive in the same chair Kallinger put him in prior to leaving the room. To accept the State's theory of Defendant's guilt, one must conclude that Defendant picked Ben out of his chair, threw him to the ground, and then put him back in his chair for no apparent reason.

even Dr. Greenbaum conceded that certain subdural hematomas can only be seen with histology slides. (R. 3545). Dr. Choi admitted that the presence of iron and fibroblasts indicated a prior injury, dating back weeks or months. (R. 3661). The State's experts failed to account for these microscopic findings. At the same time, they agreed that otherwise seemingly minor events can re-aggravate a chronic subdural hematoma. (R. 3543-46, 3527, 3531-32, 3663).

The injury Ben suffered on October 27, 2008, the symptoms he manifested in the days preceding his death, and the injury he suffered when he threw his head back against the tile, in combination with a complete lack of evidence independent of Defendant's statements connecting her to the injury, establish Defendant's innocence of this crime.

The appellate court held that the jury was presented with a "battle of experts regarding the timing of Ben's injuries and the cause of death." (A. 44). The court further held that the jury properly considered Defendant's confession in reaching its verdict. (A. 45). (See Issue II, *infra*).[7] The court concluded that it could not "usurp the jury's role in weighing the evidence and assessing the credibility of the witnesses" by reversing Defendant's conviction.

Respectfully, the appellate court's analysis falls short by failing to take into account the admissions and flaws in the State's experts' testimony. Dr. Greenbaum based her testimony largely on eyewitness accounts (i.e., Defendant's confession) without reviewing the most important scientific evidence in the case - the histology slides. Dr. Greenbaum testified that she relied on Dr. Choi's review of the slides. While Dr. Choi

---

[7] The appellate court's opinion serves only to underscore the prejudice flowing from the admission of the unreliable, involuntary, tainted "confession."

10

conceded the presence of iron and fibroblasts in the dura, he also testified that he saw "mesothelial cells" which, as noted, *supra* (fn 4), calls into serious question the reliability of Dr. Choi's testimony as a whole. Notably, the State's experts never explained the discrepancy between their opinions regarding the lack of a chronic injury and the indisputable microscopic evidence that such an injury in fact existed.[8]

Dr. Choi and Dr. Greenbaum offered divergent testimony on the autopsy photographs. The photographs show darker colored blood, which is indicative of an older injury. In an effort to explain away this visual evidence, Dr. Choi testified that the photographs made the blood look darker than it appeared at autopsy. (R. 3629, 3676-79). Dr. Greenbaum, on the other hand, testified that the darker areas of bleeding were layers of blood superimposed on each other. (R. 3470, 3487).

Finally, the State's experts agreed that an existing subdural hematoma can be reaggravated by minor trauma. That Ben suffered from a re-bleed is apparent from Kallinger's undisputed testimony that Ben became lethargic after hitting his head on the tile floor while Defendant was not even in the room. Ben became unresponsive just minutes later. None of the State's experts addressed this crucial testimony.

Defendant's and the State's experts were not on equal footing, as the State's experts did not review the most important forensic evidence in reaching their conclusions. The State's experts seemingly assumed Defendant's guilt, interpreting evidence to support that conclusion while ignoring the forensic evidence to the contrary. Given (1) the incontrovertible evidence of a prior injury, (2) the fact that minor trauma may re-

---

[8] Two additional highly regarded and renowned experts in the field of forensic pathology – Drs. Nancy Jones and Larry Blum – provided affidavits appended to Defendant's post-trial motion attesting that viewing histology slides is **necessary** to determining cause and manner of death, particularly where the deceased is an infant. (C. 650-53).

11

aggravate a chronic subdural hematoma, and (3) Kallinger's testimony that Ben suffered trauma prior to being left in Defendant's care, the evidence fell short of proving beyond a reasonable doubt that Ben was murdered, let alone that Defendant perpetrated the crime.

Review by this Court is warranted because Defendant's conviction rests on unreliable expert testimony that disregards indisputable forensic evidence undermining the experts' conclusions.

## II.     DEFENDANT'S STATEMENTS WERE COERCED, INVOLUNTARY, AND UNRELIABLE

Defendant's "confession" was the product of deceptive, compulsory tactics on the part of police that took advantage of Defendant's fright, naivete, mental capability, and overall psychological makeup. The Detectives refused to accept Defendant's repeated denials, and instead accused her of being a liar and a murderer.[9] They further told Defendant that by implicating herself she would reduce her punishment and avoid consequences. Defendant's demeanor on the tape, as well as statements she made following her "confession," demonstrates that Defendant's statements were involuntary, unreliable, and the product of an overborne will.

As of January 16, 2009, Defendant was 22 years old. Her composite GPA in high school was 1.925, placing her 560 out of 637 students. (R. 4333). Her ACT score was 13, placing her in the fifth percentile nationally. (R. 4331). Defendant's IQ was 82, placing her in the fourth percentile nationally. (R. 4335). Defendant's verbal intelligence IQ was 74, placing her in the "borderline mentally retarded" range of intelligence. (R. 4335, 4346). Dr. Robert Hanlon, a board certified clinical neuropsychologist, testified that De-

---

[9] Defendant denied the Detectives accusations 79 times.

12

fendant suffers cognitive dysfunction in the areas of verbal reasoning, reading comprehension, and her ability to name objects. (R. 4338).

On that date, Defendant was driven by police to the station for questioning. (R. 3225, 3350). The detectives did not give Defendant the opportunity to provide her own transportation, and she was never told she could make a phone call. (R. 3885-86, 3890). Defendant was placed in an interview room and, starting at approximately 9:35 a.m., she was questioned by Detectives Filenko and Curran throughout the rest of the day.

When first questioned, Defendant told the Detectives that when Kallinger left the room to the dishes, Ben was in his chair and he started to fall asleep. (PX 55, pp. 31-32). After Ben did not respond to his name, Crystal entered the room and started CPR. (PX 55, pp. 33-34). Approximately one hour into the interrogation, the Detectives first informed Defendant that it was a "medical fact" that someone harmed Ben, that the person did so immediately before he went unconscious, that she was present when it happened, and that she was involved in causing the injuries. (*E.g.*, PX 55, pp. 45-46, 48, 50, 52-53, 58, 65-66, 88, 103-04). Despite telling Defendant that it was "flat out murder" (PX 55, pp. 65-66), they encouraged her to say she caused Ben's injuries by "accident." (*E.g.*, PX 55, pp. 45-49, 82, 88, 93). The Detectives also explained that the law treats accidents differently than intentional acts. (*E.g.*, PX 55, pp. 45-49, 82, 93, 96, 101-02, 117, 119-20, 130). Defendant continued to deny causing any harm to Ben. (*E.g.*, PX 55, pp. 45, 47-54, 58, 62-64, 72-73, 82-83, 94-99, 118).

At about 3:00 p.m., Defendant continued to proclaim her innocence. In response, Detective Filenko stated as follows:

> We've got this narrowed down to a very, very tight time frame um, and there is only one thing here is that something happened where

13

> you got frustrated, aggravated, whatever, and I'm telling you it was
> not intentional. It was an accident, but it wasn't him flipping
> backwards. It wasn't. You know that, we know that. The forensic
> scientists are telling us that.

(PX 55, p. 117). Filenko told her that the forensic evidence showed she had used great

force on Ben, explaining, "This is fact, ok." (PX 55, p. 117). Then he stated:

| [Filenko] | You really need to just tell me the truth. |
| [Defendant] | Um. |
| [Filenko] | Please no denials. Please. |

(PX 55, p. 118).

Defendant continued to deny harming Ben, and the Detectives continued to state

their belief that she had killed him. Detective Curran told her, "We know it happened

within minutes from the time he went unresponsive. And we know you were the only

one in the room and it's something he can't cause by himself."[10] (PX 55, p. 120). De-

fendant then stated she accidentally dropped Ben, but he was fine. (PX 55, p. 121).

Though the Detectives had encouraged Defendant to tell them that she had acci-

dentally dropped Ben, they of course did not accept that she had not intentionally harmed

him. The Detectives continued with their attempts to get Defendant to implicate herself.

During the interrogation, it became apparent that the Detectives would only accept a ver-

sion of events wherein Defendant admitted culpability. That Defendant eventually ceded

to their demands is evident by statements she made late in her interrogation. When asked

why she started to believe she had caused Ben's injury, Defendant responded, "Because

of what you told me, I was thinking straight." (PX 55, p. 160). In the middle of a later

scenario, Defendant stated, "I'm trying to make this sound right." (PX 55, p. 183). De-

---

[10] This, of course, was untrue as the forensic evidence was unable to pinpoint with that
level of precision when Ben may have been injured.

fendant even told the Detectives that she was having trouble understanding her motive for committing the murder, i.e., that she was angry. Specifically, she states, "I'm so confused. The last thing where it's pushing and me getting angry and I don't ever go to that stage ever." (PX 55, p. 187).

Defendant's inability to comprehend the significance of her situation is apparent following her inculpatory statements. Defendant wanted to know how much longer the interrogation would take because she wanted to go home and see her puppy. (PX 55, p. 199). Defendant told the Detectives that her plan was to stay with her boyfriend that evening and that she needed to warm up her car. (PX 55, p. 203). She summed up her interrogation as follows:

> And I, I want to help because this is a good thing for me too. That teaches me a lesson because I've always wanted to think about doing an actual career because actually it was business management and law enforcement and there were no courses open so. . .

(PX 55, p. 197).

A confession must be suppressed if an interrogator's false statements deprive the information required by a suspect to make a rational choice. *Aleman v. Village of Hanover Park*, 662 F.3d 897, 901-03 (7th Cir. 2011).[11] In *Aleman*, the interrogator misrepresented the medical facts to a criminal defendant. *Id.* at 906-07. According to the interrogator, the irrefutable medical evidence excluded any cause of the child's death other than the actions of the defendant. *Id.* at 907. The interrogator thus advised the defendant that he must have been the cause of death. *Id.* The defendant had no rational basis, given his

---

[11] In *Aleman* a daycare provider filed a lawsuit after murder charges against him stemming from the death of a child in his care were dropped. The criminal case unraveled after it was determined that the child was not injured in the provider's care, but rather had collapsed as the result of the delayed effect of a subdural hematoma suffered earlier. *Id.* at 902.

ignorance of medical science, to deny the allegations. *Id.* In finding the tactics unconstitutional, the 7th Circuit held:

> If a question has only two answers – A and B – and you tell the respondent that the answer is not A, and he has no basis for doubting you, then he is compelled by logic to "confess" that the answer is B. . . Aleman could not deny the officers' false representation of medical opinion. . . A confession so induced is worthless as evidence, and as a premise for an arrest.

*Id.* (citations omitted).

The Detectives, after weaving in the term "accident" to wear down Defendant's denials, told Defendant that Ben had been murdered and that the murder had occurred while she was alone with him. (PX 55, p. 66, 88, 117, 120). Labeling anything other than an admission "absolute crap," the Detectives reminded her, "We've got the time limited down to when this occurred, where only one person was responsible for this, and that was you." (PX 55, p. 172). As in *Aleman*, such tactics overwhelmed Defendant's will, rendering her statements inadmissible. Further review by this Court is warranted.

## III. DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO SUBMIT AN INSTRUCTION DEFINING RECKLESSNESS

Finding that the evidence was sufficient to permit the jury to find Defendant guilty of the lesser included offenses of involuntary manslaughter and reckless conduct, the trial court submitted instructions defining both offenses. (C. 565-66, 570-71; R 4725-29). Contrary to the mental state for first degree murder, a defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs the acts recklessly. 720 ILCS 5/9-3(a). In turn, recklessness is statutorily defined as follows:

> A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or

16

> that a result will follow, described by the statute defining the of-
> fense; and such disregard constitutes a gross deviation from the
> standard of care which a reasonable person would exercise in the
> situation.

720 ILCS 4/3-6. The committee notes defining involuntary manslaughter and reckless conduct each **require** that I.P.I. 5.01, which defines the term recklessly, also be given.

I.P.I. 5.01 was not discussed during the instructions conference, and it was not submitted to the jury. In fact, the jury sent a note to the trial court during deliberations asking, "What is reckless conduct?" (C. 594). Rather than submit I.P.I. 5.01, defense counsel advised the trial court that the jury has "already been instructed on this." (R. 4757). The trial court referred the jurors back to the instructions that had already been submitted. (C. 595; R. 4759). Thus, the jurors were left without an essential pattern instruction on an issue for which they were clearly seeking guidance. Defendant was prejudiced by this error, and her conviction must be reversed. *E.g., People v. Howard*, 232 Ill. App. 3d 386 (1st Dist. 1992) (holding that the defendant was prejudiced by the failure to tender I.P.I. 5.01 because jurors may have thought recklessness meant ordinary negligence).

Despite clear error on the part of defense counsel, the appellate court held that the "decision not to request a jury instruction defining recklessness was sound trial strategy." (A. 48). The appellate court held that because Defendant's theory of the case was that her confession was false and she did nothing to Ben, counsel could have reasonably believed that defining recklessness would have been detrimental to the defense's theory of the case. (*Id.*).

The appellate court's ruling is patently wrong. Defense counsel did not make a "strategic" decision to not define recklessness. Rather, defense counsel erroneously be-

lieved the instruction had already been tendered when the jury sent a note asking for that very definition. (R. 4757). Defense counsel was the one who requested that the jury be instructed on the elements of involuntary manslaughter and recklessness **over the State's objection.**[12] (R. 4457). Counsel noted on the record that the decision to do so was made after very careful consideration. (R. 4454). Counsel's theory of the case was that Defendant was innocent but, if guilty of anything, she was guilty of at most involuntary manslaughter. Trial counsel made that very argument during closing: "I submit to you the most, most because this case was overcharged, the most she is guilty of – could be found guilty of is involuntary manslaughter, not murder, not aggravated battery." (R. 4689). Counsel even read the elements instruction as to involuntary manslaughter to the jury – instructions which were incomplete because they did not define recklessness. (R. 4690). In essence, trial counsel conceded error after the verdict was rendered when he raised the failure to define recklessness for the jury in his post-trial motion. (R. 4867).

This Court's review is warranted because the appellate court's ruling distorts the record, confounds logic, and misapplies prior precedent. Defendant was denied her right to effective assistance of counsel, a fundamental constitutional right. For this reason Defendant respectfully asks that the instant petition be granted.

## IV.    THE STATE'S REBUTTAL EXPERT TESTIFIED BEYOND THE AREA OF HIS EXPERTISE

Dr. Manuel Montez ("Dr. Montez"), a non-board-certified pathologist, testified for the State in rebuttal. Recognizing that Dr. Montez could not dispute the histological evidence indicative of a chronic hematoma, the prosecution instead asked Dr. Montez to

---

[12] Logic dictates that if trial counsel made the strategic decision to forego a possible guilty verdict on a lesser included offense, he would not have requested that the jury be instructed on involuntary manslaughter and reckless conduct in the first place.

provide expert testimony in the field of neurology to establish that Ben had not suffered head trauma prior to 3:30 p.m. on January 14. To that end, Dr. Montez claimed he performed a "neurological assessment just like a doctor would do to a living patient that walks into his office," which included looking at Ben's motor responses, hearing, speech, vision, coordination, mood, and mental status to determine if there was "any neurological deficit." (R. 4540). Dr. Montez conducted his posthumous neurological assessment by viewing a 53-second video of Ben using a cart to walk around his house in November 2008. (R. 4540-41; PX 121).

Dr. Montez testified to his neurological findings. Dr. Montez testified that if Ben had a large enough chronic subdural hematoma to do "anything" he would exhibit "some neurological deficit." (R. 4539-40). Per Dr. Montez's review of the video, he determined that Ben did not display the "clinical" neurological manifestations he would expect to see of a closed traumatic head injury (i.e., mood changes, vomiting, irritability, etc.). (R. 4546). Based on the 53-second video, Dr. Montez testified that Ben was neurologically "completely normal" and "fine" up to 3:30 p.m. on January 14, and that the injuries causing his death must have occurred sometime thereafter. (R. 4550-51).

Dr. Montez clearly lacked the expertise and basis to offer his neurological opinions. Undersigned counsel is not aware of a single reported decision in Illinois where an expert testified to a neurological assessment based on a short video clip. Indeed, where experts so testify they do so based on an extensive in-person physical and mental examination conducted by a **neurologist**. *E.g., People v. Morgan*, 187 Ill. 2d 500, 522-23 (1999); *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 469 (1985). And in cases where experts testify in rebuttal regarding neurology and the existence of a chronic subdural hematoma,

19

those experts are **highly qualified neuropathologists** who review histological slides and medical records; they are not non-board-certified forensic pathologists whose opinions have been formed by watching a short video clip. *E.g., People v. Stewart*, 369 Ill. App. 3d 614, 629-30 (2nd Dist. 2006).

Defendant was clearly prejudiced by Dr. Montez's testimony, as it went to the heart of the issue in the case – when and how Ben suffered his fatal injury. Dr. Montez testified that Ben did not have a chronic subdural hematoma significant enough to cause his death, and that he did not suffer trauma until after 3:30 p.m. Cloaked with the label of "expert" – when Dr. Montez was anything but – his testimony tainted the entire fact-finding process by offering unqualified rebuttal testimony to Defendant's experts. At the same time, by allowing Dr. Montez to so testify the jury was exposed to a heart-wrenching video of the sixteen-month-old deceased. Allowing such testimony denied Defendant her right to a fair trial, warranting further review by this Court.

## VI. CONCLUSION

For the reasons stated herein, Defendant-Appellant, Melissa Calusinski, respect-fully requests that this Court grant the instant Petition for Leave to Appeal, and/or grant any and all other relief deemed appropriate.

Respectfully submitted,

Melissa Calusinski

By: Kathleen T. Zellner                    Douglas H. Johnson

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

E_21

## Certificate of Compliance

I certify that this Petition for Leave to Appeal conforms to the requirements of Rules 341(a) and (b). The length of this Petition for Leave to Appeal, excluding the pages containing the Rule 341(d) cover, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the Petition is 20 pages.

Respectfully submitted,

By: Kathleen T. Zellner

Kathleen T. Zellner & Associates
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

E_22

# APPENDIX

2014 IL App (2d) 120383-U
No. 2-12-0383
Order filed February 19, 2014
Modified upon denial of rehearing April 22, 2014

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) |
| v. | ) No. 09-CF-252 ) |
| MELISSA CALUSINSKI, | ) Honorable ) Daniel B. Shanes, |
| Defendant-Appellant. | ) Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's conviction of first-degree murder was affirmed where the State proved her guilty beyond a reasonable doubt; the trial court did not err in denying defendant's motion to suppress her statements to police; trial counsel was not ineffective for failing to tender a particular jury instruction; and the trial court did not abuse its discretion in allowing rebuttal testimony by the State's expert witness.

¶ 2   Following a jury trial, defendant, Melissa Calusinski, was convicted of the first-degree murder (720 ILCS 5/9-1(a)(2) (West 2008)) of 16-month-old Ben Kingan, who attended the day care center where defendant was employed as a teacher's assistant.  Also in connection with

A1

E_24

2014 IL App (2d) 120383-U

Ben's death, defendant was convicted of aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2008)), which merged into the first-degree murder conviction. Defendant was sentenced to 31 years' imprisonment. On appeal, defendant argues that (1) the evidence was insufficient to prove her guilty beyond a reasonable doubt of first-degree murder, (2) the trial court erred in denying her motion to suppress her statements to police because her confession was involuntary, (3) trial counsel was ineffective for failing to submit a jury instruction defining "reckless" in connection with jury instructions on the lesser-included offenses of involuntary manslaughter and reckless conduct, and (4) the trial court abused its discretion in admitting a forensic pathologist's neurological opinion during the State's rebuttal case. For the following reasons, we affirm.

¶ 3                              BACKGROUND

¶ 4    Ben and his twin sister, Emily, were born on August 31, 2007, to Amy and Andy Kingan. At the age of nine weeks, Ben and Emily began attending day care at Minee-Subee in the Village of Lincolnshire, Illinois. The family had been using the day care center for several years for their older children. Defendant was the full-time teacher's assistant in Ben's and Emily's classroom. On January 14, 2009, at approximately 3:50 p.m., defendant found Ben unresponsive in a bouncy seat in the classroom and called for assistance. Staff members responded by commencing CPR and calling 911. Paramedics quickly arrived and transported Ben to Condell Medical Center in Libertyville, Illinois. He was pronounced dead at 4:50 p.m., at the age of 16 months. A grand jury indicted defendant on 14 counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) and 2 counts of aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2008)). A three-week jury trial was conducted in October and November 2011. We summarize the pertinent trial testimony and evidence as follows.

- 2 -

A2

E_25

2014 IL App (2d) 120383-U

¶ 5                              Ben's Relevant Health History

¶ 6      Ben was a healthy baby, meeting all of his developmental milestones. By the age of 16

months, Ben was beginning to take a few steps on his own and knew several words. In addition

to typical childhood illnesses, Ben developed acid reflux disease at the age of four months. His

pediatricians treated him with Prevacid. Ben responded well to the medication and subsequently

was taken off of it.

¶ 7      Ben had a habit of throwing himself backwards while he was seated and hitting his head

on the floor behind him when he was angry. This behavior did not alarm Amy or the day care

staff. Dr. Daniel Lum, Ben's primary pediatrician, described "headbanging" as a "pretty

common" behavior in infants from six months to two years old. Dr. Lum never knew of a child

seriously injuring himself from the habit.

¶ 8      On October 27, 2008, Ben awoke from his nap at day care with a golf-ball-sized bump on

the back of his head. No one at the day care could explain how Ben got the bump. Amy

telephoned Dr. Lum, who advised Amy that she did not need to do anything, because Ben had

not lost consciousness or vomited, and was acting normally.

¶ 9      Two days later, on October 29, 2008, Ben had a fever of 103.5 degrees, so Amy took Ben

to the doctor. He saw another pediatrician in Dr. Lum's practice, Dr. Patricia Brunner, whom he

frequently saw. Amy also mentioned the bump on Ben's head. Dr. Brunner examined Ben's

head, which still had some slight swelling. Dr. Brunner was not concerned about the bump,

because Ben exhibited no signs related to it, such as vomiting, and she found no signs of any

head trauma. Dr. Brunner palpated the area with her fingers and found no skull fracture. She

checked Ben's anterior fontanel, commonly known as the baby's soft spot, and found it was

normal. Dr. Brunner did not think that a CT scan or x-ray was necessary. She told Amy to keep

- 3 -

A3

E_26

2014 IL App (2d) 120383-U

an eye on Ben for any change in mental status and to give him Tylenol or Motrin for the fever.

¶ 10    Three days later, on November 1, 2008, Amy took Ben back to the pediatrician because he still had a fever. Dr. Brunner diagnosed an ear infection and prescribed Amoxicillin.

¶ 11    On November 20, 2008, Amy called the pediatrician's office and spoke to Dr. Lum about Ben spitting up, not being "quite himself," and arching his back. Dr. Lum attributed these symptoms to a return of Ben's acid reflux disease and prescribed Prevacid again. Dr. Lum and Amy did not discuss the October 27, 2008, bump.

¶ 12    On December 1, 2008, Ben had his 15-month-old well-baby visit, during which Ben's length, weight, and head circumference were measured and charted as they had been at previous well-baby visits. Dr. Lum testified that Ben's head was growing normally. Dr. Brunner testified that Ben's growth was age appropriate and that he was "growing beautifully." Dr. Brunner noted that, since his 12-month-old well-baby visit, Ben's head circumference had increased from being in the 50th percentile to being in the 75th percentile but did not see any issues with that fact. Dr. Lum testified that, based on the measurement taken at Ben's autopsy, Ben's head circumference was in the 95th percentile at the time of his death. Dr. Lum also had seen Ben on December 2, 2008, for pink eye.

¶ 13                         Defendant's Background

¶ 14    Defendant was 22 years old at the time Ben's death. She graduated from Barrington High School in 2005 and attended college for three months. She had no criminal history. Defendant lived with her parents but sometimes stayed with her boyfriend. Prior to being hired by Minee-Subee, defendant had worked in retail, in food service, and at her parents' bait shop. She had also done a lot of babysitting and worked for four years as a nanny for a family with five children. Defendant worked as a teacher's assistant at the Minee-Subee in Arlington Heights,

- 4 -

2014 IL App (2d) 120383-U

Illinois, for about a year and then transferred to the Lincolnshire center in the fall of 2008. There were never any complaints about defendant's performance at work.

¶ 15    Defendant's high school guidance counselor, Ray Piagentini testified that he knew defendant well throughout her high school career and that she was a "very quiet kid," who "wouldn't hurt anybody." Thomas Mitchell testified that defendant babysat for his five children hundreds of times. Robert Wessel testified that he had known defendant since 2007 and was of the opinion that she was "very peaceful." Ericka Faldstein, one of defendant's best friends, testified that she had observed defendant with children and believed that defendant was a peaceful and "kind hearted person."

¶ 16    Dr. Robert Hanlon, a clinical neuropsychologist, testified as an expert in neuropsychology. He conducted a battery of neuropsychological tests on defendant and reviewed her school records but not her college or employment records. Defendant's grades and class rank were very low. Defendant's overall IQ was 82; her verbal IQ of 74, was in the "borderline range," but defendant was "not mentally retarded." Dr. Hanlon opined that defendant manifested "specific cognitive and intellectual deficiencies." He agreed that defendant understood his testing instructions and that her "reasoning and executive functions" were "relatively advanced."

¶ 17                                  Minee-Subee

¶ 18    Minee-Subee was licensed for up to 145 children between the ages of 6 weeks and 12 years. Minee-Subee employed approximately 20-24 staff members. Sandy Jenner was the director. The teaching staff members, including defendant, were certified in CPR and first aid, and regularly attended educational conferences. Each classroom had one lead teacher and at least one assistant teacher. Gwendy Bautista was the lead teacher in Ben's classroom; she

2014 IL App (2d) 120383-U

worked from 6:30 a.m. to 3:30 p.m. Defendant was Gwendy's full-time assistant; she began work at approximately 8 a.m. The staff also included "floaters," who moved between classrooms as needed. Nancy Kallinger and defendant's sister, Crystal Calusinski, were floaters.

¶ 19 Ben's classroom, one of two infant-toddler rooms, served eight children, ages 12 to 20 months. The classroom was carpeted except for the tiled kitchen area that contained a sink/counter area facing the wall, a changing table, two high chairs, and two tables with four chairs each. The chairs had straps for buckling the children in when they ate snacks and lunch. There was a telephone by the door. There were two windows in the classroom that allowed viewing between Ben's classroom and the "infant toddler one" classroom and the four-year-old classroom.

¶ 20                            Monday, January 12, 2009

¶ 21 Amy took Ben to day care on Monday morning, January 12, 2009, as usual. After naptime, Ben did not look well—he was pale and coughing but had no fever. He ate a few oyster crackers. At about 4 p.m., defendant carried Ben into the other infant room, where Holly Schoen was working. Ben began "almost spewing" vomit as defendant told Holly that he was not feeling well. Ben vomited four to six times in a row. Holly said that defendant was not upset with Ben, even though some of the vomit had gotten on defendant's clothes. Amy was called to pick Ben up. When Amy was leaving the day care with Ben, he vomited again in the hallway. At home that evening, Ben vomited up to four more times, took a nap, and drank some Gatorade. He went to sleep as usual and was fine throughout the night.

¶ 22                            Tuesday, January 13, 2009

¶ 23 Amy kept Ben home with her on Tuesday, January 13, 2009, pursuant to Minee-Subee's health policy. Ben was fine all day and did not vomit. Amy ran some errands with Ben; he was

- 6 -

2014 IL App (2d) 120383-U

"smiling and giggling." They stopped by the pediatrician's office to pick up a prescription for one of Ben's siblings. Dr. Brunner briefly observed Ben playing with toys on the floor, and he was "perfectly normal and fine." Amy told Dr. Brunner that Ben had vomited the day before but did not say how many times. If Dr. Brunner had known Ben had vomited five times, she might have asked Amy some questions about Ben's condition.

¶ 24                          Wednesday, January 14, 2009

¶ 25     Amy took Ben back to Minee-Subee on Wednesday morning, January 14, 2009, as usual. Ben ate breakfast at day care and was acting and playing normally. Throughout the morning, Ben was happy and behaving normally. Ben ate well at lunch—grilled cheese, tomato soup, and milk. Nap time began at about 12:15 or 12:30. According to Gwendy, Ben fell asleep as usual but awoke early, so she did an art project with him. Ben was able to glue various items onto a piece of paper to make a collage. After all of the children woke up, at about 3 or 3:15 p.m., Gwendy and defendant buckled all of the children into their chairs, and served animal crackers. Nancy came into the classroom to relieve Gwendy, who went home at about 3:30 p.m.

¶ 26     Nancy testified that, after Gwendy left, the children finished eating their snacks and were "getting restless." They were "a little bit loud, antsy," so she and defendant began unbuckling them from their chairs, washing their hands, and letting them play. According to Nancy, she and defendant each took a table; defendant had Ben's table. Nancy took each of the four children at her table to the sink, one by one, to wash their hands. Nancy thought that defendant used wipes to wash the four children at her table, as she usually did. Nancy did not actually see defendant wash Ben's hands. The children were fussy, including Ben. After Nancy finished washing the four children at her table, she began washing dishes in the classroom's kitchen sink. Her back was to the room; it was loud, because the water was running and the children were fussing.

- 7 -

A7

E_30

2014 IL App (2d) 120383-U

Nancy testified that, after they took the children out of the snack area, defendant left the room for four or five minutes to use the restroom. While Nancy was alone in the classroom, she removed Ben from the bouncy chair where he had gone after his snack and took him to the changing table to check his diaper, which he did not like. Between 3:35 and 3:45 p.m., Nancy put Ben down on the tiled kitchen floor, and he threw himself backwards. Nancy testified that she did not actually see Ben hit his head but assumed he did because he cried a little bit. Nancy sat him back up and went to the sink and washed her hands. When she turned back around, Ben was lying on the tiled floor again. Nancy carried him back to the bouncy chair.

¶ 27    Nancy testified that, when defendant returned to the classroom, Nancy helped her start an art project. Nancy then took the dishes to the sanitizer in the main kitchen, leaving defendant alone in the classroom with the children. The children were under control at that time; everything seemed fine. Before Nancy left, she told defendant that Ben was in the bouncy chair, starting to fall asleep. Nancy was gone for 10 to 20 minutes. When she returned, Crystal and Sandy were giving Ben CPR on the changing table. Paramedics had not yet arrived. Defendant was crying, and Nancy tried to comfort her.

¶ 28    Crystal testified that she was at the front desk and heard defendant call for help on the intercom. Crystal ran into the classroom and saw Ben in the bouncy chair with "foam coming out of his nose." Crystal picked up Ben, went to the door to call for help, and placed Ben on the changing table where she commenced CPR. Sandy Jenner came in and began assisting Crystal. Defendant kept the other children out of the way. Beth Katz, an administrator, entered and called 911 from the classroom telephone at 3:51 p.m. Police and paramedics arrived moments later; paramedics transported Ben to the hospital.

¶ 29    Beth Katz called Amy at about 4 p.m. to tell her that paramedics were taking Ben to the

- 8 -

E_31

2014 IL App (2d) 120383-U

hospital. Amy rushed to the hospital, notifying Andy on the way. By the time Amy and Andy could see Ben, he had already passed away.

¶ 30    Dr. Adriana Orozco was the pediatric emergency room physician on duty when Ben arrived at the hospital. Ben presented "in full arrest," meaning that there was no spontaneous respiration and no cardiac activity. His eyes were "fixed and dilated," which usually indicates a significant head injury. Emergency room personnel took over performing CPR. They intubated Ben and gave him three or four rounds of epinephrine and atropine. Despite all of these efforts, Dr. Orozco pronounced Ben dead at 4:50 p.m.

¶ 31    Detective Adam Hyde of the Lincolnshire police department arrived at the hospital at about 5 p.m. He spoke with Dr. Orozco for a few minutes and then with Amy and Andy separately. Amy told Detective Hyde that Ben had vomited about five times on Monday and about his history of acid reflux. Andy reported Ben's habit of throwing himself backward.

¶ 32    From the hospital, Detective Hyde went to Minee-Subee, where staff had been asked to remain and were informed that Ben had died. Detective Hyde spoke with Nancy, defendant, Crystal, and Sandy Jenner, because they had each spent time with Ben that day. Gwendy had already gone for the day.

¶ 33    Detective Hyde testified that he spoke with defendant for about 20 minutes. Defendant told him that she and Nancy were giving the children snacks at about 3:30 p.m. It was extremely hectic, so defendant called Crystal to come in and help them. Defendant said that Ben finished his snack and crawled to a bouncy chair. Defendant told Detective Hyde that she began an art project with the other children and " 'exactly one minute later' " noticed that Ben appeared to be falling asleep. Defendant called Ben's name three times; when he did not respond, she walked over to him and saw foam and blood coming from his nose and mouth. Crystal picked up Ben

- 9 -

2014 IL App (2d) 120383-U

and started doing CPR.

¶ 34    Detective Hyde testified that, at that point in the conversation, he told defendant that Nancy never mentioned that Crystal had been in the room.  Defendant looked away and said that Nancy had not been there, just defendant and Crystal were in the room.  Detective Hyde asked if defendant was sure, and defendant "put her head down, paused a moment" and then admitted that Crystal had not been in the room.  Defendant said that she had been in the room by herself. Detective Hyde asked defendant to tell him the whole story again.  Defendant said that Nancy had left the room to go to the sanitizer.  Ben got down from his snack chair and crawled to the bouncy chair.  A few minutes later, defendant noticed that Ben was " 'lethargic.' "  Defendant called for help, and Crystal came and performed CPR.  Defendant told Detective Hyde that she was alone for only a moment.

¶ 35    Defendant did not testify at trial.  Her account of the day's events as provided to police officers in statements videotaped on Friday, January 16, 2009, which were admitted at trial, is summarized below.

¶ 36                    Thursday, January 15, 2009: Autopsy

¶ 37    Dr. Eupil Choi testified as an expert in anatomical, clinical, and forensic pathology.  He performed Ben's autopsy on the afternoon of January 15, 2009.  Deputy Coroner Paul Foreman and Detective Hyde were also present.  Dr. Choi conducted both an external and an internal examination of Ben.  Ben weighed 22 pounds and measured 30 inches tall.  Ben's head circumference was 19.5 inches.  Dr. Choi found a bruise on the left side of Ben's forehead and one on his upper right arm, both of which were less than one centimeter.

¶ 38    Dr. Choi's internal examination included the respiratory, cardiovascular, lymphatic, endocrine, urinary, and gastrointestinal systems, which all appeared to be normal.  His internal

- 10 -

2014 IL App (2d) 120383-U

examination of Ben's head revealed a four-by-four inch subgaleal hemorrhage under the scalp on the back of the head. Dr. Choi also discovered a .8 inch linear skull fracture, visible on both sides of the skull, because it went "complete[ly] through the thickness of the skull." When Dr. Choi cut the dura, which lies under the skull, "the blood was gush out [*sic*]." He testified that the blood was "fresh red" and not coagulated. Beneath the subdural area, Dr. Choi found a subarachnoid hemorrhage. Dr. Choi explained that the subgaleal, the subdural, and the subarachnoid areas were separate layers. Dr. Choi noted swelling in the brain caused by the pressure of the subdural hematoma. He shaved part of the scalp that corresponded with the internal injuries and discovered "some bluish/red change one inch wide." Dr. Choi opined that Ben's injuries were caused by a hard, flat surface. He opined that Ben "died of craniocerebral injuries due to blunt trauma." Ben's injuries were consistent with having been thrown to the floor by someone. Dr. Choi further opined that the injuries were very recent, meaning probably less than one day old.

¶ 39    Dr. Choi testified that he discussed his opinion with Detective Hyde. When asked if he had told Detective Hyde that the injury had occurred within a range of 30 minutes to 3 hours from the time of Ben's becoming unresponsive, Dr. Choi replied, "Probably did. I'm not sure exactly the word I used, ***. Considering the findings, probably yes." When asked if he had told Detective Hyde that the force necessary to cause Ben's injury was consistent with being thrown from a one to two-story building, Dr. Choi replied, "Probably did. I think that is not exactly happen [*sic*] but I think it was just comparison of the circumstances. That's why I mentioned."

¶ 40    Dr. Choi further testified that his gross observations, in other words, what was visible to the naked eye, were sufficient to support his findings; nevertheless, he also collected tissue to

- 11 -

2014 IL App (2d) 120383-U

create histology slides to confirm his findings under the microscope later. A few weeks after the autopsy, Dr. Choi viewed the histology slides to determine if there was any evidence of healing, which would indicate an older injury. Dr. Choi testified that he did not see any neomembranes or macrophages, which would have indicated healing. Dr. Choi testified that fibroblasts are also indicative of healing but could not say for certain if he saw them. Dr. Choi explained that the layering of red blood appeared to be darker colored blood. Dr. Choi agreed that he could not pinpoint exactly the time of Ben's injuries but could estimate a range.

¶ 41    Dr. Choi additionally testified about the differences between an acute subdural hematoma and a chronic one. An acute subdural hematoma is one that "happened right now." A chronic subdural hematoma is one that has begun to heal, which could take weeks, months, or years. Dr. Choi agreed that a minor fall or trauma could aggravate a preexisting chronic subdural hematoma.

¶ 42    After the autopsy, Detective Hyde contacted the Lake County Major Crimes Task Force (task force) for assistance. Police Chief George Filenko of the Round Lake Park police department and Detective Sean Curran of the Highland Park police department were two of the task force members called to attend a meeting at the Lincolnshire police department on Thursday evening. Detective Hyde told the task force members that a 16-month-old infant had been found unresponsive at Minee-Subee and had died at the hospital. Specifically, he told them that the autopsy revealed a skull fracture, that the injury had occurred within a three-hour time span of the death, and that the severity of the injury was comparable to a fall from a one- to two-story building. A plan was made for the next morning to interview the Minee-Subee employees who had had contact with Ben on the day he died. Chief Filenko and Detective Curran were assigned to interview defendant.

A12

2014 IL App (2d) 120383-U

¶ 43                     Friday, January 16, 2009: Defendant's Statements to Police

¶ 44    At about 9 a.m. the next morning, Friday, January 16, 2009, the task force members, in plain clothes, arrived at Minee-Subee in unmarked cars. They waited outside while Detective Hyde went in and asked Sandy Jenner if he could speak with defendant, Crystal, Nancy, and Gwendy. Sandy called defendant, Crystal, and Gwendy, in turn, out of the classrooms. (Nancy was not scheduled to work until later in the day, but Sandy agreed to call her in early.) Detective Hyde told defendant that the police had a few more questions to ask her. Defendant was very cooperative and agreed to go with the police. She retrieved her coat, purse, and sunglasses and walked outside with Detective Hyde, who introduced her to Chief Filenko at the main entrance. Detective Hyde followed the same procedure with Crystal and Gwendy, who went with other pairs of task force officers.

¶ 45    Defendant got into the front passenger seat of the sport utility vehicle that Chief Filenko was driving. Chief Filenko and Detective Curran had their guns and handcuffs on their persons but under their clothing. Detective Curran had moved to the backseat; there was no cage or glass barrier between the front and back seats. The officers did not handcuff defendant or search her or her purse. The three engaged in small talk while they drove about 20 minutes to the Lake Zurich police department. (It had been agreed that the pairs of task force officers would go to various police departments, because the Lincolnshire department did not have enough interview rooms to accommodate them all.)

¶ 46    They parked in the public parking lot and entered the building through the public entrance. After waiting a few minutes in the main lobby, Chief Filenko, Detective Curran, and defendant were escorted to a 6-by-12-foot interview room. The officers secured their weapons outside the interview room, and defendant's purse was placed on a shelf outside the interview

- 13 -

2014 IL App (2d) 120383-U

room. Defendant retained her coat and sunglasses, which were on top of her head. Defendant entered the interview room and sat down. She was not told where to sit, nor was she fingerprinted, photographed, or searched.

¶ 47    Through Chief Filenko's testimony, the trial court admitted three DVDs containing the officers' interview of defendant. The jury viewed the DVDs and was given a printed transcript as a demonstrative exhibit. The DVDs cover a time span from approximately 9:30 a.m. to 7 p.m. Several times, the officers asked defendant if she needed anything; defendant had a few beverages throughout the day. Chief Filenko sat at a small table near the door to the right of defendant. Defendant sat next to the table, in the corner of the room. Detective Curran sat across from defendant. The video camera was behind and to the right of Detective Curran.

¶ 48    There were several breaks in the interview, during which the officers left the room, sometimes for up to an hour or more. Each time, the door closed but was not locked. Detective Curran testified that, during the breaks, he called other task force members to share information so that they could "put everything together." In the afternoon, Detective Curran also spoke on the phone a few times with evidence technician Dave Thomas, who was at the coroner's office with Dr. Choi. During the calls, Detective Curran related to Thomas defendant's various versions of what happened to Ben. Dr. Choi and his team conducted "experiments" with Ben's body to see if defendant's stories were consistent with the medical evidence. The following is derived from our review of the DVDs.

¶ 49    After Chief Filenko gathered some background information, he told defendant that, before they could ask any questions about the incident, they were "obligated" to read defendant her *Miranda* rights. Detective Curran told defendant that it was "standard procedure." Detective Curran read defendant her *Miranda* rights. Defendant said that she understood the rights, and

- 14 -

A14

E_37

2014 IL App (2d) 120383-U

she signed a *Miranda* waiver at 9:43 a.m.

¶ 50    Chief Filenko asked defendant to tell them what happened on January 14, 2009. Defendant's statements regarding the morning's events were consistent with the trial testimony. Defendant's initial version of the afternoon's events was as follows. After Gwendy went home, defendant and Nancy took the children out of their snack chairs and washed their hands. Nancy then washed dishes in the classroom while defendant started an art project. Ben was in one of the bouncy chairs, playing with his sister and another child there. At about 4 p.m., Nancy left the classroom "for like a second" to take the dishes to the sanitizer in the main kitchen. Defendant noticed that Ben was starting to fall asleep in the bouncy chair. Defendant called out Ben's name to rouse him. When Ben did not respond, defendant went over to him, shook his arm, and continued calling his name. She saw orange-red foam coming from Ben's nose and called the front desk from the classroom telephone. Crystal responded to the classroom, picked up Ben, called for Beth, and began performing CPR on Ben on the changing table. Beth called 911.

¶ 51    After defendant told this version of events, the officers left the room for a short break. When they returned a few minutes later, the officers explained that they needed to clarify the details of what happened because Ben's skull was fractured. Detective Curran told defendant that it was "a medical certainty that somebody's done this to him. What we need to know right now is if this was done by accident or did somebody intentionally hurt him?" He further told defendant that the medical examiner knew that Ben had received his injuries at the day care that day. Defendant denied ever hurting any child and said she had never seen anyone at Minee-Subee do so. In rather extensive monologues, the officers told defendant that there were discrepancies in her story. They cautioned her that she needed to tell the whole truth up front or else her credibility would be diminished, that they were trained professionals, and that they

- 15 -

2014 IL App (2d) 120383-U

would discover the truth. They explained that they were talking with everyone who had knowledge of Ben's day. They said that accidents happen and that defendant should not be scared to tell them what happened.

¶ 52    Defendant continued to deny any knowledge of how Ben was injured. Detective Curran told defendant that it was a "medical fact" that, with the injury he had, Ben would not have been able to eat or play, so "all this stuff had to happen right away when he went unconscious." Defendant suggested that the officers talk to Nancy, because she was the only person with defendant before everything happened. They told her that Nancy was being interviewed. Detective Curran asked if she or someone else had accidentally hit Ben's head or dropped him. Defendant said no but again suggested that the officers talk to Nancy. Defendant explained how she herself was always careful with the children's heads but pointed out that Nancy sometimes did not watch the children's heads and might bang them accidentally on the changing table or a chair. The officers told defendant not to cover for anyone and to stop telling half truths. Defendant said she would not cover for anyone. Defendant related that Ben was known in the day care center for his tantrums, where he would throw himself backwards onto the ground. Detective Curran told defendant that Ben could not possibly have generated enough force to fracture his skull. He said, "I've got a good idea that you've seen what happened or you were involved with what happened [be]cause you were the only one in the room at the onset of this."

¶ 53    Defendant repeatedly denied doing anything to Ben. The detectives told defendant that they understood how frustrating it must be to deal with eight children and how young children took tumbles all the time. Detective Filenko said, "[W]e're not here to condemn you. We're not here to put you in jail. *** You were there. You saw what happened. What happened? What happened?" Defendant began to speculate that maybe Nancy had done something. Detective

- 16 -

2014 IL App (2d) 120383-U

Filenko told defendant that she needed to tell them what happened so they could "all go home tonight and have this entire situation put to rest." Detective Curran said that either defendant or Nancy did something because it was something that "had to be done with a considerable amount of force."

¶ 54    Defendant continued to deny any knowledge of what happened. The officers took another break, for about an hour. When they returned, they told defendant that they had talked to detectives who were interviewing Crystal, Nancy, and Gwendy. Chief Filenko reiterated that they were "convinced" that Ben's injury occurred at the day care, within a couple of hours of his becoming unresponsive. He said the injury was as serious as being dropped from the second floor of a building. He told defendant that they were "getting into the serious phase of this." Chief Filenko said this was "flat out murder" and that defendant could either be a "good witness or a co-conspirator in a murder." Defendant continued to deny any wrongdoing. Defendant again speculated about Nancy, pointing out that Ben often cried when Nancy entered the room. Defendant pointed out that Nancy was alone in the classroom at about 3:35 p.m. while defendant used the restroom.

¶ 55    Defendant continued to stick to her story. Detective Curran told defendant that maybe Ben's injury was an accident, "but it would be an accident that someone would know about." Defendant said she had not seen anything. Detective Curran told defendant that they had very good photographs of the injury and that they would soon know exactly what happened. Defendant asked if the injury was on the front or back of Ben's head. When asked why she wanted to know, defendant replied that she was "just kind of curious" and maybe she could "re-think." Defendant surmised that Ben might have hit his head on the changing table when Crystal put him down to do CPR. She explained that she understood that the children's skulls were still

- 17 -

2014 IL App (2d) 120383-U

growing. Detective Curran suggested that maybe Ben had fallen from the changing table but that defendant had not said anything because he seemed fine. Defendant said, "I am telling you the truth, I did not drop him." Detective Curran said, "Or?" Defendant responded, "Anything, nothing serious." When asked what she meant by "nothing serious," defendant said she would never put her hands on Ben. She admitted to getting frustrated but said she would "deal with it."

¶ 56    The officers reiterated that it was probably easy to lose patience with children. They asked defendant if anybody had hit Ben in the head. She said no. Defendant admitted to raising her voice and telling Ben, "no, not nice." Detective Curran asked if defendant had accidentally pushed Ben into the wall when she was disciplining him. She said no. Detective Filenko then commenced a rather lengthy discourse about unintentional accidents and how even a doctor initially might not see a serious injury. Chief Filenko explained that science could tell them a lot but that only the person who was involved could fill in all of the details. He said that he did not think defendant was a liar but that she was just worried and scared.

¶ 57    At about 1:25 p.m., defendant stated, "Ok. I, to be honest, I have yelled like I said, 'not nice,' but he was sitting up and he just like drops, and like he, like I heard him hit his head." Defendant said that this happened "before they had snack maybe." Ben was sitting on the carpet and threw himself back really hard. He cried but seemed fine. When asked why she waited to tell them what happened, defendant explained that she was nervous and did not want to lose her job. She added that she just "wasn't thinking about it." As defendant continued to relate the story, she was inconsistent as to whether Gwendy or Nancy was there at the time. When asked if it were Gwendy or Nancy, defendant said, "Ok, um, um, I'm gonna say Gwendy maybe."

¶ 58    The officers left the room for about an hour and a half. They returned at 3 p.m. and told defendant that the specialist physician on their team said that Ben could not have generated

- 18 -

2014 IL App (2d) 120383-U

enough force to cause his injuries by throwing himself backwards. They also told her that Gwendy said that Ben had not thrown himself backwards. Detective Filenko again explained at length how they could confirm or disprove defendant's version of events with science and how defendant was losing credibility every time she told a false story. He told her that he understood how children could be frustrating and that he did not think she did anything intentionally, but he insisted that she knew what happened. Defendant said that she was afraid that if it were her fault, no one would talk to her and she would "probably get a fine, or go to jail or something." Detective Curran told defendant that they had to "clear this with the state's attorney" and that if defendant were cooperative and truthful, it would be better for her.

¶ 59    Defendant then said that, after snack time, she accidentally dropped Ben and that he hit his head on the wooden snack chair. She explained that she was holding Ben, facing away from her, she was not paying attention, and he slipped out of her hands. When asked for more details, defendant said she had been in a hurry, not paying attention, and let him go too soon. Defendant said that Ben did not cry and that his head seemed fine. Nancy's back was turned because she was doing dishes. Defendant said that Ben crawled to get his blanket and to the bouncy chair. She kept a close eye on him. Defendant noticed that Ben looked sleepy after 5 or 10 minutes.

¶ 60    Defendant was crying softly. Detective Curran told her that it was okay, that accidents happen, and that they knew that she did not intend for Ben to die. Defendant told the officers that she was scared. Detective Curran asked defendant to promise not to lie anymore and that he promised that they would make things as easy as possible for her. The officers asked defendant to demonstrate what happened. At first, defendant said that Ben's toes were almost touching the ground when she dropped him. Detective Curran told defendant not to exaggerate to make it sound better because "if it's an accident, it's an accident." Chief Filenko reminded defendant to

- 19 -

A19

E_42

2014 IL App (2d) 120383-U

be specific, because they had to verify her story scientifically. Defendant demonstrated with her hand that Ben's feet had been about 12 to 18 inches off of the ground when she dropped him.

¶ 61    Chief Filenko left the room and returned with a teddy bear to help defendant demonstrate what happened, which she did. Chief Filenko reassured defendant, "Alright sweetie, you're doing good." Detective Curran apologized but said he needed her to demonstrate again so that he could fully understand what happened. Defendant repeated her demonstration. Detective Curran stated that the incident as described did not seem like enough force to cause Ben's injuries. Defendant insisted that this was the truth. She said that Ben had hit his head really hard. Detective Curran asked her if she had "slam[med] him" for doing something wrong. She denied that.

¶ 62    At about 3:35 p.m., the officers left the room. Defendant cried softly. Detective Curran returned a few minutes later, asked defendant several questions about the snack chair, and left again. Both officers returned at about 4:10 p.m. and told defendant that they had talked to the doctor and had some concerns about how far Ben had fallen and how solid the chair was. Defendant demonstrated that Ben was two feet off of the floor when she dropped him. Detective Curran left the room. Chief Filenko reminded defendant that "this has got to be dead on accurate." He explained that if the doctor ruled out defendant's story, "Then obviously, we've got a major problem. I think we're done." Defendant said that she was telling the truth. Chief Filenko reminded defendant that they had gone through at least a half dozen different versions of what happened. He told her they were being patient because they wanted her to "get the fairest opportunity here." Defendant asked if her "sister and them" were still there. Chief Filenko told her that they were never there; they were at other police departments. He left the room.

¶ 63    The officers returned a few minutes later and told defendant that the doctor said that

- 20 -

2014 IL App (2d) 120383-U

Ben's injury would have required more force than what she described. Defendant repeated that she had dropped Ben. Detective Curran asked if she had "grab[bed] his feet and slam[med] his head on the ground." She said no. She said that Ben was not flailing around when she dropped him. Defendant insisted that she was telling the truth. The officers warned defendant that if she was lying again, it would look like she intentionally killed Ben. They asked more questions about exactly where the chair was, whether it wobbled, and how hard Ben hit his head. Defendant said she heard Ben's head hit the snack chair.

¶ 64    As the conversation continued, the officers asked defendant what she told paramedics right after the incident. She said she "froze" and did not know what to do because she "was in complete shock." Defendant said she did not tell police at Minee-Subee "about the whole head thing." Defendant said she just "wasn't thinking" and thought that Ben had a seizure. Chief Filenko told defendant to start getting her "spiel straight" because she was "going in circles." Defendant repeated that she did not even tell her boss what happened because she just was not thinking straight. She was "scared, shaking to death" and did not know what was going on. Chief Filenko said, "I think that you were scared because something went really, really wrong here and you didn't want to get your ass in trouble. And we're trying to give you every opportunity to get your ass out of trouble." Defendant thought her career would end and began explaining how difficult her life had been. The officers told defendant that she was not helping herself by lying. They explained how "horrendous" Ben's injury was and how it could not have resulted from her dropping him as described. The officers left the room at about 5 p.m.

¶ 65    About 15 minutes later, Chief Filenko entered the room and asked defendant if she was okay. She said yes, "just a little antsy." He left. At about 6:05 p.m., Detective Curran stood in the doorway and asked defendant if she was okay. She said, "no, not really. I'm

- 21 -

A21

2014 IL App (2d) 120383-U

claustrophobic." Detective Curran asked if she was hungry, she replied that she felt nauseous because she had not eaten. He offered to order her some food; she declined, saying her parents did not know where she was.

¶ 66    At about 6:10 p.m., the officers came back with one of the snack chairs from Minee-Subee. They asked defendant to re-enact what had happened with the chair and the teddy bear, which she did. Defendant asserted, "I'm being quite honest, [be]cause like right now it's to a point where I feel like I'm gonna be getting blamed for something I completely did not do." Detective Curran responded, "Sit down. First of all, you're having an attitude right now, ok. There's a dead kid." Defendant said she was trying to be honest. Detective Curran said, "And second of all, you are involved in this, ok." Defendant said, "I know I am." Detective Curran continued, "Third of all, this story you're giving us is a load of shit ***." Defendant interrupted, "I am not." She clapped her hands for emphasis, saying, "That is what I am telling you." She continued saying that she did not hit Ben, throw him on the ground, or hit him against the wall. Detective Curran told defendant that the doctor just did an experiment and that there was no way that defendant's dropping Ben as she described could have caused his injuries. He said somebody had slammed him on the ground or into the wall or something else. Defendant denied doing anything else.

¶ 67    Chief Filenko told defendant again that she needed to tell them exactly what happened, reminding her that she had changed her story several times. Defendant said it seemed like she was getting blamed. Chief Filenko said they were not blaming her, but that she really needed to think; all she needed to do was tell the truth and then "we're done." He said that no one would think less of her. He said they would tell her employer whatever defendant wanted, but that defendant needed to tell the officers the truth. Chief Filenko said that defendant's stories were

2014 IL App (2d) 120383-U

"mathematically, physically impossible." He continued saying that he thought defendant was focused on how bad her life had been. He used the word "fuckin' " several times. He reminded her that "this is a human life." He said not to make him go to the state's attorney "with all this garbage."

¶ 68     At about 6:30 p.m., defendant said, "Ok. Well it did include the chair, but with the whole situation he hit the corner, Ben, he was, he hit the corner really hard and he was moving. I'm being honest with you, Detective." She explained that Ben was moving around in her arms "wobbling and getting frustrated" because he did not want to be held. Defendant said that she became frustrated and she put him down and he hit the edge of the chair. Chief Filenko asked her how hard she put him down, because it made a difference. As defendant was demonstrating, Chief Filenko stood up. He asked, "Did you *put* him down?" as he demonstrated a forceful action with his arms. Defendant was not visible on the DVD at that point, but she apparently indicated that that was what she had done. She said she had been angry and frustrated because Ben was wiggling and squirming, the other children were screaming, and Nancy was just doing dishes.  The officers asked her to demonstrate how hard she put him down. Defendant demonstrated. Chief Filenko encouraged defendant to go "the whole full route" and show how angry she was. Defendant said she got angry and "I went boom." She demonstrated throwing Ben down on the floor.

¶ 69     Defendant then pointed to places on the chair where Ben's head hit.  The officers explained that the chair would have left two marks and asked why she kept lying. Defendant denied lying. Detective Curran said they thought "from the very get go" that the babies were crying, she was taking care of all of them by herself, Ben started acting up in her arms, she got mad, and threw him on the floor. Defendant responded, "Yeah and the chair was there too."

- 23 -

A23

2014 IL App (2d) 120383-U

Chief Filenko said, "You threw him on the floor?" Defendant said, "Yeah." He asked where Ben's head hit. Defendant started to say on the chair but Detective Curran said, "Please..." Defendant said Ben's head hit the floor really hard and bounced. Detective Curran handed defendant his notebook and asked her to show hard she had thrown Ben onto the floor. She forcefully slammed the notebook onto the floor.

¶ 70    Detective Curran told defendant that he wanted to believe her but she had told them "so many lies." Defendant said that she did not tell them lies; she was "trying to make it sound right." Chief Filenko responded, "We don't want you to make it sound right. We want you to tell us the truth." Defendant clarified that Ben's head hit the threshold between the carpet and the tile and part of his head hit the tile. The officers told defendant that they were going to call their bosses and left the room.

¶ 71    The officers came in and out of the room. Defendant asked to use the restroom. At about 6:50 p.m., defendant asked the officers how much longer, because she "just want[ed] to go home and spend time with [her] parents and [her] puppy." At 6:55 p.m., defendant was taken to use the restroom. When she came back, Detective Curran asked defendant to explain one more time what had happened, which she did. At about 7:30 p.m., defendant asked if she could make a quick telephone call so that her parents would not be worried. Chief Filenko told defendant that they had someone on the way to take her back to Lincolnshire. Defendant remarked that it would take a while for her car to warm up and that she thought she would just go to her boyfriend's house that night, instead of to her parents' house, because it was closer. At 7:40 p.m., defendant left the room with Detective Curran. The video ended.

¶ 72    Detective Hyde testified that he was the officer who picked up defendant and transported her to the Lincolnshire police department. He was told only that defendant had confessed to

- 24 -

2014 IL App (2d) 120383-U

throwing Ben on the ground. When Detective Hyde arrived at the Lake Zurich police department, he told defendant that she was under arrest, handcuffed her, searched her, and placed her in the back seat of the squad car. Detective Curran rode back with Detective Hyde and defendant. When asked if she wanted anything to eat, defendant requested McDonald's. When they arrived at the Lincolnshire police department, defendant told Detective Hyde, "You're the one I lied to the other night." Defendant apologized for lying and said she wanted to tell him what happened. Detective Hyde took defendant to the booking room; it was about 8 p.m. The following is based on our review of a 40-minute DVD of Detective Hyde's interview of defendant, which was admitted at trial.

¶ 73    Defendant sat on a bench next to the door and Detective Hyde sat across from her by a desk. Defendant's food was on the counter next to her, but she said she was too scared to eat. Detective Hyde read defendant her *Miranda* rights, and defendant said she understood them. He asked defendant, who was crying softly, to tell him what happened. She explained and demonstrated the events as she did in her final version to Chief Filenko and Detective Curran. When asked how hard, on a scale of 1 to 10, she had thrown Ben, she replied 8.

¶ 74    Detective Hyde left the interview room at about 9 p.m. to attend a task force debriefing in the building. He handcuffed defendant to the bench and got her a blanket before he left. When Detective Hyde returned to the booking room (from this point on, the DVD is video only, no audio), defendant requested to call her father, as she had requested earlier during the booking process. It was between 11 p.m. and midnight when Detective Hyde called defendant's father and let defendant speak to him. Detective Hyde remained in the room. The phone conversation lasted less than 10 minutes. Detective Hyde testified that both defendant and her father were yelling. At one point, defendant said, " 'I threw him to the ground, Daddy, with a full strength

2014 IL App (2d) 120383-U

throw.' " She told her father she had been frustrated and that it was her fault. Detective Hyde took the phone and informed defendant's father about bond court the next day.

¶ 75    Defendant's father, Paul Calusinski, testified that he spoke with defendant on the telephone for seven or eight minutes at 11:40 p.m. Defendant was crying really hard. She never said that she had thrown Ben to the floor; she said the opposite.

¶ 76                                    Medical Evidence

¶ 77    Drs. Brunner and Lum, Ben's pediatricians, testified for the State as experts in pediatrics. Dr. Brunner opined that Ben did not suffer a traumatic head or brain injury prior to January 14, 2009. She also opined that he had no medical condition that contributed to his death. Dr. Lum opined that nothing in Ben's medical history caused his death.

¶ 78    Dr. Adriana Orozco testified for the State as an expert in pediatrics and emergency medicine. Based on the manner in which Ben presented in the emergency room and his lack of significant medical history, Dr. Orozco opined that there was a "very high suspicion for non-accidental trauma."

¶ 79    Dr. Jordan Greenbaum testified for the State as an expert in forensic pathology and child abuse. She testified that Ben had a big area of bleeding between the scalp and the skull—a subgaleal hemorrhage—caused by a flat surface, such as a floor or a wall. His skull was fractured all the way through. Ben also had a big area of bleeding in the subdural space beneath the skull. Further, Ben had bright red blood in the subarachnoid space, which indicated that the injury was "fairly recent" because the watery fluid there is always changing. Each of these areas was separate or compartmentalized from the others. Dr. Greenbaum opined that Ben died "of head injury involving blunt force trauma." She further opined that Ben died as a direct result of being thrown to the floor and that the injury happened "shortly before if not immediately before

- 26 -

2014 IL App (2d) 120383-U

he became very symptomatic." She did not believe that Ben's injuries were consistent with his having thrown himself backward.

¶ 80    Dr. Greenbaum agreed that small subdural hematomas can result from minor trauma and can become chronic, lasting for months. A chronic subdural hematoma can be asymptomatic, but as the intracranial pressure reaches a certain point, the child gradually will exhibit symptoms such as a seizure. Dr. Greenbaum agreed that, in some cases, a minor trauma can cause a chronic subdural hematoma to re-bleed. Dr. Greenbaum testified that a significant chronic subdural hematoma is usually visible to the naked eye, and she did not see a chronic subdural hematoma in Ben. Dr. Greenbaum testified that, when she "looked at the [autopsy] photographs[,] they were consistent with what [Dr. Choi] said he saw under the microscope." Dr. Greenbaum thought that Ben's vomiting two days before his death was unrelated to his death, because he was completely normal in all aspects and then "essentially die[d] in 20 minutes." She elaborated that this was not a picture of a child with a chronic subdural hematoma.

¶ 81    Dr. Jan Edward Leestma testified for the defense as an expert in anatomical pathology and neuropathology. Dr. Leestma explained that it was necessary to view the histology slides to determine accurately the age of Ben's injuries. The histology slides of the dura showed "layers of healing" going back possibly many months. Dr. Leestma testified that he also observed iron on the histology slides, which indicated healing of five to seven days. Based on the dark color and granularity of the blood, Dr. Leestma testified that Ben's subgaleal hematoma was three to seven days old. Dr. Leestma opined that Ben had chronic subdural hematoma.

¶ 82    Dr. Leestma testified that, because of the chronic subdural hematoma, it was not possible to opine with a reasonable degree of medical certainty as to the force necessary to cause Ben's injuries. He said, "Once a child has a subdural hematoma and some form of healing, then the

- 27 -

A27

2014 IL App (2d) 120383-U

injury threshold is very likely much less." Dr. Leestma opined that a short fall, such as from a child throwing himself backward from a sitting position, could exacerbate a chronic subdural hematoma. Ben's simple linear skull fracture was consistent with a short fall. Dr. Leestma explained that "symptoms can appear and escalate alarmingly." Dr. Leestma was under the impression that Ben had been ill for a couple of days before he died. Dr. Leestma acknowledged that Ben's injuries were also consistent with being slammed to the floor. He admitted that there was also evidence of a recent injury and that Ben's throwing himself backwards could not have caused all of his injuries.

¶ 83     Dr. Shaku Teas testified for the defense as an expert in forensic pathology. She testified that Ben suffered from a subgaleal hemorrhage, a subarachnoid hemorrhage, and a subdural hemorrhage. Dr. Teas saw a "defect" on the skull but could not be sure that it was a fracture. She not only viewed the histology slides prepared by Dr. Choi but also prepared her own slides, because that was the best way to determine the age of the injury. Dr. Teas observed a neomembrane, iron, collagen, fibroblasts, granulation tissue, and macrophages, all of which are indicative of healing. Dr. Teas opined that Ben suffered from a chronic subdural hematoma that was weeks old and had re-bled. She further opined that Ben's "injury occurred way more than 30 minutes" prior to his becoming unresponsive. She explained that a healing chronic subdural hematoma can re-bleed from a minor injury or even spontaneously. She said that nonspecific symptoms such as fussiness, sleepiness, lethargy, and projectile vomiting can indicate head injury. Dr. Teas elaborated that very young children, though maybe not 16-month-old children are "brain stem creatures," not using their higher functions; so any deficits might not be apparent.

¶ 84     Dr. Manuel Montez testified as an expert in forensic pathology in the State's rebuttal

- 28 -

2014 IL App (2d) 120383-U

case. On the morning of January 16, 2009, he physically examined Ben's body. He noted the fresh contusion on the outside of the scalp. Dr. Montez also observed a subgaleal hemorrhage, a subdural hemorrhage, a subarachnoid hemorrhage, each with fresh blood. Dr. Montez saw a through-and-through skull fracture, which he concluded, from manually manipulating it, was fresh, because it was not sticky like it would have been if the bone had started to mend. Dr. Montez opined that Ben died of non-accidental abusive head trauma that occurred after 3:30 p.m. on the day he died. He further opined that Ben could not have generated enough force himself to cause his own injuries.

¶ 85    Dr. Montez testified that Ben did not have a chronic subdural hematoma that was visible to the naked eye. Dr. Montez elaborated that a microscopic chronic subdural hematoma would be "too small to do anything." He further explained that if a chronic subdural hematoma were big enough to have an effect, neurological deficits would have been apparent. Dr. Montez testified that he viewed a 53 second video taken of Ben in November 2008. In the video, Ben was in his home with his family, pushing around a toy shopping cart as he practiced walking. From his review of the video, and Ben's medical and day care records, Dr. Montez concluded that Ben had no motor, audio, visual, or speech deficits.

¶ 86                              ANALYSIS

¶ 87                         Motion to Suppress

¶ 88    Defendant contends that the trial court erred in denying her motion to suppress statements because her statements were "coerced, involuntary, and unreliable," and thus, inadmissible. Defendant limits her argument on appeal to her statements to Chief Filenko and Detective Curran at the Lake Zurich police station. The hearing on defendant's motion to suppress statements spanned several days, during which the trial court heard testimony and viewed the DVDs of the

- 29 -

2014 IL App (2d) 120383-U

interview. The court, aware of the factors it was to consider in determining the voluntariness of defendant's statements, made the following findings of fact.

¶ 89    On January 16, 2009, defendant voluntarily accompanied Chief Filenko and Detective Curran. Defendant was not handcuffed, searched, or put in the back of a squad car. The officers were not in uniform. At the beginning of the interview and past the first break, defendant seemed at ease; the officers were cordial and friendly; the pace was relaxed. Defendant "clearly understood her constitutional rights" and waived them. As the conversation continued, defendant was alternately loud and calm; sometimes she cried. The officers' tone was okay. Defendant's affect was sometimes flat, but she remained cooperative. At one point, defendant became angry and defiant. In response to defendant's "physical and verbal energy," the officers leaned back away from defendant and toward the wall. The court found that "by all indications, she wants to talk, and may not always like what she's hearing, but she's happy to talk." The court noted defendant's comment that she was claustrophobic, and that her parents did not know where she was, but also found that defendant did not say that she wanted to leave. Defendant later said she wanted to go home to be with her family and her puppy but was still cooperative and conversational. Defendant was not overly suggestible; she actually denied what police told her for hours. She became defensive and angry and "stood her own ground." The court reasoned that the fact that defendant's story changed did not mean that the officers made her change it. The court ruled that defendant's confession was voluntary.

¶ 90    "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). The voluntariness of a confession is determined by an examination of the totality of the

- 30 -

2014 IL App (2d) 120383-U

circumstances. *People v. Murdock*, 2012 IL 112362, ¶ 30. The court should consider such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of the detention and questioning; the duration of the interrogation; the presence of *Miranda* warnings; whether there was any physical or mental abuse by the police; and the legality and duration of the detention. *People v. Willis*, 215 Ill. 2d 517, 536 (2005). No single factor is dispositive. *Murdock*, 2012 IL 112362, ¶ 30. When a defendant challenges the voluntariness of her confession in a motion to suppress, the State bears the burden of proof that the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2012); *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Our review of the trial court's ruling on a motion to suppress is governed by a two-pronged standard of review. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). We accord great deference to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence. *Cosby*, 231 Ill. 2d at 271. However, we review *de novo* the ultimate legal question of whether suppression was warranted. *Cosby*, 231 Ill. 2d at 271.

¶ 91    Our review of the DVDs reveals that the trial court's findings were not against the manifest weight of the evidence. We first examine defendant's characteristics and condition at the time of the questioning; defendant was a 22-year-old high school graduate, with some college, and a significant work history. While she might not have been at the top of her class, defendant was certainly a fully functioning and intellectually capable adult. Dr. Hanlon's testimony that defendant's verbal IQ was in the "borderline range" does not undermine what the video recording shows. That defendant had no criminal history did not appear to impede her ability to assert herself when she felt it necessary. Several times, defendant raised her voice to the officers, disagreed with what they said, clapped her hands at them for emphasis, and was, at

- 31 -

2014 IL App (2d) 120383-U

one point, told to sit down because she was getting "an attitude." Throughout the interview, defendant was articulate and showed no apparent communication difficulties.

¶ 92    Regarding the duration of the interrogation, although defendant was in the interview room for about 10 hours, as the trial court found, she spent several hours of that time by herself—she was not subjected to 10 hours of interrogation. The officers repeatedly asked defendant if she needed anything; she generally declined but did have several beverages.

¶ 93    With respect to the presence of *Miranda* warnings, defendant was given her *Miranda* rights, said that she understood them, and signed a written waiver. Defendant never indicated that she wanted a lawyer, that she wanted to leave, or that she did not want to talk. The DVDs support the trial court's finding that defendant wanted to talk and voluntarily waived her *Miranda* rights. Though not expressly arguing that the court's finding was against the manifest weight of the evidence, defendant asserts that her waiver was invalid. She points to her comments to officers, after confessing to throwing Ben to the floor, which reflected a belief that she was going home that night—that she wanted to go home and play with her puppy, that she would go to her boyfriend's because it was closer, and that it would take awhile for her car to warm up. According to defendant these comments "demonstrate that she did not understand the magnitude of the situation." We recognize that these few comments at the end of the interview suggest that, at that point in time, defendant might have believed that she would be going home that evening. Nonetheless, she had not been arrested or formally charged at that point. In any event, the presence of *Miranda* warnings is but one factor to be considered in determining the voluntariness of a confession. *Murdock*, 2012 IL 112362, ¶ 30. We conclude that defendant's waiver was valid. See *People v. Braggs*, 209 Ill. 2d 492, 515 (2003) ("A criminal suspect is not required to know and understand every possible consequence of a waiver of the Fifth

- 32 -

A32

2014 IL App (2d) 120383-U

Amendment privilege for it to be knowingly and intelligently made."); *People v. Foster*, 168 Ill. 2d 465, 479 (1995) ("Where the record shows that a defendant's limited mental capacity did not interfere with his ability to understand his *Miranda* rights and voluntarily waive them, his statements will not be suppressed.").

¶ 94    Regarding whether there was any physical or mental abuse by the police, the officers were never abusive or threatening toward defendant in any manner. They were generally solicitous toward her. Even when they were frustrated by her changing stories, they counseled her that she was losing credibility, which would not help her. The officers' tones were generally calm and their voices were raised rarely. The minimal amount of profanity they used was certainly not directed at defendant. While defendant did say several times that she was scared, reviewing the interview as a whole and defendant's demeanor throughout, we conclude that while she may have been scared of the potential consequences she faced, she was not afraid of the officers.

¶ 95    With respect to the final factor, the detention was legal and of a reasonable duration. Defendant voluntarily accompanied the officers from her place of employment at a reasonable hour of the day. We note that defendant filed a separate motion to quash, in which she argued that she had been illegally seized. The trial court denied this motion and defendant does not contest that ruling on appeal. Defendant was in the Lake Zurich interview room for about 10 hours before she was placed under arrest. This length of time was not unreasonable, especially given that the investigation was of the death of a 16-month-old infant. We conclude that the relevant factors support the trial court's determination that defendant's confession was voluntary.

¶ 96    Defendant specifically contends that the officers "relentlessly demanded that Defendant incriminate herself," that defendant's repeated denials "served only to elevate the Detectives'

- 33 -

A33

E_56

2014 IL App (2d) 120383-U

accusations that she was a liar and a murderer," and that the officers were angry and threatening. Defendant contends that the officers "constructed scenarios and compelled her to agree to them by taking advantage of her fright, naiveté, mental capability and overall psychological makeup." Defendant asserts that she had "no choice but to adopt their false story" and believed that was the only way she could leave.

¶ 97    Defendant's assertions are belied by the DVDs. There is no indication that either Chief Filenko or Detective Curran had a preconceived idea of what happened. The officers relied on what Detective Hyde had told them at the briefing the night before, which in turn was based on what Dr. Choi had told Detective Hyde during the autopsy. The two main premises upon which the officers conducted the interview were that Ben's injuries were caused shortly before he became unresponsive and that Ben himself could not have generated enough force to cause them. Defendant had not been singled out. All three of the caregivers in Ben's room, as well as Crystal, were interviewed.

¶ 98    Also telling is that the officers spent a significant amount of time with defendant exploring her various stories. To the extent that the officers were skeptical of defendant's stories, such skepticism was not unwarranted given the inconsistency between defendant's ever-changing stories and the medical evidence. As defendant repeatedly denied doing anything to Ben, the officers spent quite a bit of time exploring her vague assertions that perhaps Nancy had done something to Ben. Later, when defendant told the officers that she had dropped Ben, they spent a great deal of time discussing the details of that scenario. They repeatedly asked her to explain and demonstrate that scenario so that they could verify that it was consistent with the medical evidence.

2014 IL App (2d) 120383-U

¶ 99    Defendant's reliance on *Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir. 2011), is unavailing. *Aleman* involved an arrestee's civil rights action against police officers, whose interrogation of Mr. Aleman about the death of a child in his care violated his *Miranda* rights. *Aleman*, 662 F.3d at 900. The court addressed the issue of whether the "confession" had been induced by a particular police officer's lies about the medical reports. *Aleman*, 662 F.3d at 906. The police officer repeatedly said that three doctors had said that the baby had been shaken in such a way that he would have become unresponsive immediately, "meaning that Aleman's shaking must have caused [the baby's] injury." *Aleman*, 662 F.3d at 902. Mr. Aleman had shaken the baby gently when he became unresponsive pursuant to performing CPR. *Aleman*, 662 F.3d at 901. Mr. Aleman confessed, " 'I know in my heart that if the only way to cause [the injuries] is to shake that baby, then, when I shook that baby, I hurt that baby…I admit it. I did shake the baby too hard.' " *Aleman*, 662 F.3d at 902. The Seventh Circuit Court of Appeals reasoned that the "lies convinced Aleman that he must have been the cause" of the baby's death because the doctors had excluded any other possibility. *Aleman*, 662 F.3d at 906. The court explained that the crucial word in the confession was "if." The court elaborated, "By lying about the medical reports, [the officer] changed 'if' to 'because' and thereby forced on Aleman a premise that led inexorably to the conclusion that he must have been responsible for [the baby's] death; the lie if believed foreclosed any other conclusion." *Aleman*, 662 F.3d at 906.

¶ 100    Unlike in *Aleman*, the officers here did not lie about the medical evidence and did not force a conclusion on defendant. As discussed above, they relied on the medical evidence from Dr. Choi's autopsy that Ben's injury occurred within a short time frame from when he became unresponsive and that Ben himself could not have generated the force necessary to cause his own injuries. Moreover, the medical evidence that the officers shared with defendant did not exclude

- 35 -

2014 IL App (2d) 120383-U

the possibilities that Ben had been hit in the head, that Ben had fallen from the changing table, or that Ben had been slammed against the wall—any of which could have been done by either Nancy or defendant. The officers clearly had not singled out defendant and were not focused on a predetermined conclusion that she had thrown Ben to the floor. They asked many different questions and explored various possibilities with defendant.

¶ 101                                   *Corpus Delicti* Rule

¶ 102    Within her argument that the evidence was insufficient to prove her guilty beyond a reasonable doubt, defendant contends that the use of her confession at trial violated the *corpus delicti* rule. The *corpus delicti* is defined as the commission of a crime. *People v. Lara*, 2012 IL 112370, ¶ 17. To obtain a valid conviction, the State must prove beyond a reasonable doubt both the *corpus delicti* and the identity of the offender. *Lara*, 2012 IL 112370, ¶ 17. Because courts historically have not trusted out-of-court confessions, which could be coerced or unreliable, the *corpus delicti* rule arose. *Lara*, 2012 IL 112370, ¶ 19. The rule provides that, "[w]hen a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Lara*, 2012 IL 112370, ¶ 17. The independent corroborative evidence must "*tend to show*" that a crime was committed but need not prove the commission of the offense beyond a reasonable doubt. (Emphasis in original.) *Lara*, 2012 IL 112370, ¶ 18. "If the corroborating evidence is sufficient, it may be considered, together with the defendant's confession, to determine if the State has sufficiently established the *corpus delicti* to support a conviction." *Lara*, 2012 IL 112370, ¶ 18.

¶ 103    Here, the medical evidence tended to show that Ben was the victim of murder. Drs. Brunner and Lum, Ben's pediatricians, each testified for the State that Ben had no prior medical conditions that would have caused his injuries. Dr. Orozco, the emergency room physician,

- 36 -

2014 IL App (2d) 120383-U

opined for the State that there was a "very high suspicion for nonaccidental trauma." Dr. Choi, who performed the autopsy, opined that Ben "died of craniocerebral injuries due to blunt trauma" and that the injuries were very recent. Dr. Greenbaum opined that Ben died "of head injury involving blunt force trauma" consistent with having been thrown to the floor shortly or immediately before he became unresponsive. Dr. Greenbaum further concluded that Ben did not have a chronic subdural hematoma, that he could not have caused his own injuries, and that his vomiting two days earlier was not related to his death. Taken in the aggregate, the State's independent medical evidence established that Ben was the victim of abuse that caused severe injuries to discrete parts of his head shortly before he became unresponsive and that Ben himself could not have generated enough force to cause his own injuries. Overall, this evidence tended to show that Ben was the victim of murder, which corroborated defendant's confession that she forcefully threw Ben to the floor and that he landed on his head.

¶ 104 The State's nonmedical independent evidence further corroborated defendant's confession. Ben's parents, Amy and Andy, as well as Ben's pediatricians, testified that Ben was a healthy baby. Amy and Dr. Brunner testified that Ben was fine all day on Tuesday, the day before he died. Amy, along with Nancy and Gwendy, testified that Ben was fine all day on Wednesday, the day he died, up until the time that Gwendy went home at about 3:30 p.m., while Ben was eating his snack, as usual. This evidence tends to show that something happened to Ben shortly before he became unresponsive at 3:50 p.m., which is consistent with the State's medical evidence, and corroborates defendant's confession that she threw Ben down at about 3:35 or 3:40 p.m. The testimony of Gwendy, Nancy, and the director, Sandy Jenner, established that only three people—Gwendy, Nancy, and defendant—cared for Ben at Minee-Subee on the day he died. Therefore, only Nancy and defendant were with Ben during the 20 minutes or so before he

- 37 -

2014 IL App (2d) 120383-U

became unresponsive. Defendant's confession that she threw Ben as she was wiping his hands after his snack was corroborated by Nancy's testimony that defendant was the one who cleaned up the children at Ben's table. Defendant told police that Nancy did not see her throw Ben, because Nancy's back was turned as she washed dishes at the sink; these circumstances were exactly corroborated by Nancy's testimony. Nancy's testimony that the children were restless and fussy and that the room was noisy further corroborated defendant's statement describing the same circumstances.

¶ 105    We conclude that the State's independent evidence tended to show that a murder had been committed and was sufficiently corroborative of defendant's confession. Accordingly, the *corpus delicti* rule was satisfied and defendant's confession was properly admitted for the jury's consideration. See *Lara*, 2012 IL 112370, ¶ 47 (explaining that a properly admitted confession is "one stick in the evidentiary bundle" to be used by the trier of fact and that "[s]etting the bar too high for finding sufficient corroboration of a defendant's confession under the *corpus delicti* rule would intrude on the scope of the fact finder's exclusive duties").

¶ 106    Nonetheless, defendant maintains that the medical evidence was not independent. She asserts that Dr. Choi had not determined the cause of death at the conclusion of the January 15 2009, autopsy.[1]    Defendant further asserts that, on January 16, 2009, Dr. Choi conducted

----

[1] Defendant cites pages in the appendix to her brief on appeal, where she included a copy of Dr. Choi's autopsy report. Our review of the record indicates that the report was not admitted into evidence. Accordingly, we will not consider it. *In re Marriage of Duggan*, 376 Ill. App. 3d 725, 746 (2007) (noting that materials outside the record on appeal may not properly be included in an appendix).

- 38 -

A38

E_61

2014 IL App (2d) 120383-U

"experiments" to make Detective Curran's interpretations of defendant's statements "fit" Ben's injuries. Defendant's arguments are belied by the record.

¶ 107   At trial, Dr. Choi was asked specifically if he had formed a cause-of-death opinion based on his January 15, 2009, autopsy. He answered affirmatively and testified that, based on that autopsy, he opined that Ben died of "craniocerebral injuries due to blunt trauma." Evidence technician David Thomas testified that, on January 16, 2009, while he was in the autopsy room with Dr. Choi and Deputy Coroner Paul Foreman, he received phone calls from Detective Curran, relating stories that defendant had told. Each time Dr. Choi would re-enact with Ben's body defendant's version of events. There is absolutely no evidence that Dr. Choi's team concocted any scenarios. Dr. Choi simply determined whether what defendant described could have caused Ben's injuries. Thomas related to Detective Curran that defendant's initial stories about Ben's having thrown himself backwards and about defendant's dropping Ben could not have caused the injuries. There is no evidence that Dr. Choi's team ever told Detective Curran that defendant threw Ben on the floor or even suggested any possible scenario.

¶ 108   In support of her position, defendant relies on *People v. Rivera*, 2011 IL App (2d) 091060, and *People v. Nieves*, 87 P.3d 851 (Ariz. App. Ct. 2004). In *Rivera*, this court reversed for insufficiency of the evidence the defendant's conviction of first-degree murder based on an underlying criminal sexual assault. *Rivera*, 2011 IL App (2d) 091060, ¶ 46. We began by recounting the complete lack of evidence: there was no physical evidence linking the defendant to the offense (*Rivera*, 2011 IL App (2d) 091060, ¶ 29); DNA evidence determined that the defendant was not the source of the sperm found in the victim (*Rivera*, 2011 IL App (2d) 091060, ¶ 30); and no reasonable trier of fact could have found the jailhouse informants' testimony credible (*Rivera*, 2011 IL App (2d) 091060, ¶ 38). We then considered the remaining

- 39 -

2014 IL App (2d) 120383-U

evidence—the defendant's confession. We held that admission of the confession, the product of a statement written by police, which was obtained over four days of interrogation by 10 different law enforcement officers, who provided details of the crime in leading questions, violated the *corpus delicti* rule. *Rivera*, 2011 IL App (2d) 091060, ¶¶ 44-45.

¶ 109 *Rivera* is distinguishable. Notwithstanding defendant's claim that the officers' "interrogations were replete with leading questions, suggestions, and indeed demands," the DVDs reveal otherwise. The officers related the medical evidence they had received from the briefing the night before—that a great deal of force, an amount that Ben could not have generated himself, was necessary to cause Ben's injuries and that Ben suffered the injuries shortly before becoming unresponsive. This was unlike the situation in *Rivera* where officers admitted to asking leading questions that included such details of the crime as what the victim had been wearing (*Rivera*, 2011 IL App (2d) 091060, ¶ 11).

¶ 110 In support of her position that the officers asked leading questions, defendant cites isolated portions of the transcript of her interview. We reiterate that our review of the DVDs reveals nothing improper about the interview. Furthermore, defendant's specific citations are taken out context. For example, defendant alleges that the officers told her that she was with Ben when he was injured. The citation provided was from a portion of the interview just after defendant suggested that Nancy had done something, and the officers were asking defendant if she were covering up for someone. Detective Curran said, "[F]rom what you were telling us, you were in the room." Defendant further points to Chief Filenko's comment that the force involved was akin to "being dropped from the second floor of a building onto some concrete." This statement reflects the language that Dr. Choi testified he probably used with Detective Hyde. Notably, Chief Filenko made this statement in connection with the discussion of what

- 40 -

A40

2014 IL App (2d) 120383-U

Nancy might have done; he told defendant that she had the opportunity to either "be a good witness or a co-conspirator in a murder." Defendant asserts that the officers told her that she was frustrated with Ben, but the portion of the interview she cites was still in the context of exploring Nancy's possible involvement, wherein Detective Curran said, "We think this could have been either someone getting real frustrated or an accident." Defendant next asserts that the officers told her that she had lost patience with Ben or lost control because "he aggravated the hell out of her." The officers asked defendant if she had lost her patience and told her it would be understandable. In the context of reminding defendant that she had changed her story several times, Chief Filenko told defendant that she was "running out of time." Similarly, where defendant says the officers told her what happened—that Ben's head hit the floor not the chair— was a point after which defendant had admitted to being angry and forcefully putting Ben on the floor.

¶ 111 Even taken together, the comments cited by defendant do not indicate, as she maintains, that the officers told her what happened and that the only "truth" they would accept was that she was guilty. As discussed above, the officers spent a significant amount of time with defendant exploring her various versions of events, including her vague assertions that perhaps Nancy had done something and that defendant had accidentally dropped Ben as she was putting him down. They repeatedly asked her to explain and demonstrate each scenario so that they could verify defendant's stories with the medical evidence. The record establishes that the officers knew that Ben suffered a tremendous amount of force to his head shortly before becoming unresponsive, but that they had no preconceived notions regarding how it had happened or who was responsible for it.

- 41 -

2014 IL App (2d) 120383-U

¶ 112   In *Nieves*, the court reversed the defendant's conviction of first-degree murder, holding that the *corpus delicti* rule was not satisfied.   There, the only independent evidence was the medical examiner's opinion that the victim's death was unexplained, which was not corroborative of the defendant's confession to smothering her infant. *Nieves*, 87 P.3d at 857. The court noted that, after he learned of the defendant's confession, the medical examiner changed his opinion to conclude that asphyxia due to smothering could not be ruled out as a cause of death. *Nieves*, 87 P.3d at 854. Not only is *Nieves* not binding on this court (*Kostal v. Pinkus Dermatopathology Lab., P.C.*, 357 Ill. App. 3d 381, 395 (2005)), but also it is inapposite. Here, unlike the medical examiner in *Nieves*, Dr. Choi testified that he concluded that Ben died of craniocerebral injuries due to blunt trauma before he learned of defendant's confession. That Dr. Choi did not know exactly how Ben suffered the blunt trauma did not render the cause of death unexplained.   Rather than changing his opinion, Dr. Choi simply helped police verify whether defendant's various versions of what happened to Ben were consistent with his autopsy findings—that Ben died of blunt force trauma.

¶ 113                                Sufficiency of the Evidence

¶ 114   Having determined that defendant's confession was properly considered by the jury, we turn to defendant's contention that the State failed to prove her guilty beyond a reasonable doubt of first-degree murder.   When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 32. Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307,

2014 IL App (2d) 120383-U

319 (1979)). The reviewing court should not substitute its judgment for that of the trier of fact, who is responsible for weighing the evidence, assessing the credibility of witnesses, resolving conflicts in the evidence, and drawing reasonable inferences and conclusions from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). However, a reviewing court must set aside a defendant's conviction if a careful review of the evidence reveals that it was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 115   Here, consistent with the defense theory at trial, defendant contends that the evidence established that Ben suffered a blunt force trauma to the head in October 2008, months before his death, and developed a chronic subdural hematoma, exhibiting symptoms of that injury until the day he died, when he threw himself backwards and hit his head on the tile floor, aggravating the prior injury and causing a re-bleed. Defendant further contends that the evidence establishes that Nancy was the only adult in the classroom when Ben injured himself, and that, therefore, defendant was unconnected to Ben's death. According to defendant, the evidence creates more than a reasonable doubt about her guilt. Although defendant's assessment of the evidence represents a conclusion that the jury possibly could have adopted, for the following reasons, it was certainly not the only reasonable one.

¶ 116   The State's medical experts testified that Ben was the victim of abuse that caused severe injuries to discrete parts of his head shortly before he became unresponsive, that those injuries caused his death, and that Ben himself could not have generated enough force to cause his own injuries. Specifically, Dr. Orozco, the emergency room physician, testified that there was a "very high suspicion for non-accidental trauma." Dr. Choi opined that Ben died of blunt force trauma inflicted recently, probably the same day. Dr. Greenbaum testified that she saw no

- 43 -

2014 IL App (2d) 120383-U

evidence of chronic subdural hematoma and that Ben's injuries were "fairly recent." She elaborated that Ben's being completely normal in his activities, behavior, and eating the day before and the day of his death was not a picture of a child with a chronic subdural hematoma. Although she thought that viewing the histology slides was unnecessary in this case, Dr. Greenbaum testified that her review of the autopsy photographs was consistent with what Dr. Choi reported he saw under the microscope—that there was no evidence of a chronic subdural hematoma. Ben's pediatricians testified that Ben was a healthy baby, that he had no medical condition that would have contributed to his death, and that his increasing head circumference was not a cause for concern. Dr. Manuel Montez's rebuttal testimony was substantially corroborative of the State's other medical experts.

¶ 117  In contrast, defense experts testified that they observed signs of healing in Ben's head injuries, which indicated the injuries were weeks or months old. Dr. Leestma testified that a review of the histology slides was necessary to determine the age of Ben's injuries; Dr. Teas even prepared some of her own slides. They both testified that Ben suffered a chronic subdural hematoma that could have re-bled if he threw himself backwards. Dr. Leestma testified that even a short fall, such as Ben's throwing himself backwards, could have exacerbated his chronic subdural hematoma. Dr. Leestma testified that Ben's simple linear skull fracture was consistent with a short fall; Dr. Teas testified that she could not even be sure that Ben suffered a skull fracture.

¶ 118  The jury was presented with a battle of experts regarding the timing of Ben's injuries and the cause of death. It was the sole province of the jury to weigh this evidence and to assess the credibility of the witnesses. *Sutherland*, 223 Ill. 2d at 242. We note that all of the experts agreed that Ben suffered from a subgaleal hematoma, a subdural hematoma, and a subarachnoid

- 44 -

2014 IL App (2d) 120383-U

hematoma—all of which were in separate compartments of the head. Indeed, even one of the defense experts, Dr. Leestma, acknowledged that Ben's injuries were consistent with having been thrown to the floor and that Ben's throwing himself backward could not have caused all of his injuries. On this record, we cannot say that no rational trier of fact could have found that Ben died of blunt force trauma at the hands of another shortly before becoming unresponsive.

¶ 119   Given defendant's confession that she forcefully threw Ben down on the floor after cleaning him up from snack, a rational trier of fact could have found that defendant was the person who inflicted blunt force trauma upon Ben. We will not repeat our discussion from above explaining how defendant's confession was corroborated by the other evidence.

¶ 120   Moreover, the jury was not required to disregard defendant's confession, even assuming that it believed defendant's theory that Ben had a chronic subdural hematoma. As the jury was instructed (Illinois Pattern Jury Instruction, Criminal, No. 7.15 (4th ed. 2000)), it was not necessary that defendant's act of throwing Ben to the floor be the sole and immediate cause of his death; the jury must have found only that defendant's act contributed to Ben's death. *People v. Krueger*, 260 Ill. App. 3d 841, 848 (1994). Thus, the jury was not required to reject defendant's confession even if it believed Nancy's testimony that Ben threw himself backwards minutes before he became unresponsive. Several witnesses testified that it was not uncommon for Ben to throw himself backwards; the jury was not required to find that this tantrum resulted in death. As noted above, even defense expert Dr. Leestma acknowledged that Ben's throwing himself backward could not have caused all of his injuries. A rational trier of fact could have found both that Ben had a chronic subdural hematoma that re-bled when he threw himself backwards with Nancy and that defendant threw Ben forcefully to the floor as the two scenarios are not mutually exclusive.

- 45 -

A45

2014 IL App (2d) 120383-U

¶ 121   Defendant relies on *People v. Smith*, 185 Ill. 2d 532 (1999), in support of her contention that the State failed to prove her guilty beyond a reasonable doubt.  In *Smith*, the supreme court reversed the defendant's murder conviction, because it rested solely on the testimony of one eyewitness, whose testimony and credibility were completed undermined in several ways. *Smith*, 185 Ill. 2d at 542-46.  *Smith* is inapposite to the present case.  As we have discussed at length, the State produced ample evidence—including medical experts, testimony of defendant's co-workers and Ben's parents, and defendant's confession—to prove defendant's guilt beyond a reasonable doubt.

¶ 122   Defendant's arguments boil down to a request that we usurp the jury's role in weighing the evidence and assessing the credibility of the witnesses.  This we cannot do.  *People v. Larson*, 379 Ill. App. 3d 642, 654 (2008) ("We, as a reviewing court, are not to substitute our own judgment for that of the jury.").  As explained above, defendant's confession was properly before the jury, because it was voluntary and because the *corpus delicti* rule was satisfied. Therefore, the confession was evidence to be weighed by the jury with all of the other evidence. Defendant's theory of the case was not the only reasonable conclusion to be drawn from all of the evidence.  Accordingly, because the evidence was not so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt (*Evans*, 209 Ill. 2d at 209), we hold that the State proved defendant guilty beyond a reasonable doubt of first-degree murder.

¶ 123                    Ineffective Assistance of Counsel: Jury Instruction

¶ 124   Defendant next argues that defense counsel was ineffective for failing to tender a jury instruction defining the term "reckless."  To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *People v. Patterson*, 217 Ill.2d 407, 441 (2005); *People v.*

- 46 -