# EXHIBIT G

Petitioner's Post-Conviction in
the Circuit Court of Lake County,
Illinois, filed June 23, 2015

## IN THE NINETEENTH JUDICIAL CIRCUIT COURT
## LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff | ) | Circuit Court No. 09 CF 252 |
| | ) | |
| v. | ) | Honorable Daniel Shanes |
| | ) | Judge Presiding |
| MELISSA CALUSINSKI, | ) | |
| | ) | |
| Defendant | ) | |

**FILED**

JUN 23 2015

*Keith Brin*
**CIRCUIT CLERK**

## DEFENDANT'S VERIFIED PETITION FOR
## POST-CONVICTION RELIEF PURSUANT TO
## 725 ILCS 5/122-1

KATHLEEN T. ZELLNER & ASSOCIATES
1901 Butterfield Road, #650
Downers Grove, Illinois 60515
(630) 955-1212

G_001

TABLE OF CONTENTS

Page

Introduction .................................................................. 1

Procedural History ......................................................... 4

Statement of Facts ......................................................... 5

    Eyewitness Evidence of Prior Injury ............................... 5

    Interrogation of Petitioner ......................................... 9

    Lack of Corroboration For Petitioner's "Confession" ............... 11

    Dr. Choi's Inaccurate Medical Findings Controlled
    Petitioner's Interrogation and Resulted in Her False
    Confession, Which Led to her Arrest Without
    Probable Cause .................................................... 13

    Reliance of Medical Experts at Trial on Dr. Choi's
    Opinions To Support State's  Position That Ben Did
    Not Suffer Any Injury Prior to January 14, 2009 ................. 18

    The State's Claim that Ben's Skull was Fractured
    was Critically Important to the Success of Petitioner's
    Successful Prosecution ........................................... 23

PETITIONER HAS NEWLY DISCOVERED EVIDENCE
THAT NEGATES THE PROBABLE CAUSE BASIS
FOR PETITIONER'S ARREST ........................................... 36

PETITIONER HAS NEWLY DISCOVERED EVIDENCE THAT
DEMONSTRATES THAT PETITIONER'S CONFESSION WAS
INVOLUNTARY AND UNRELIABLE .................................... 40

PETITIONER HAS NEWLY DISCOVERED EVIDENCE THAT
WOULD RESULT IN THE OUTCOME OF THE TRIAL BEING
DIFFERENT............................................................ 43

PETITIONER HAS NEW, PREVIOUSLY UNDISCLOSED
EVIDENCE THAT THERE WAS NO SKULL FRACTURE
AND THAT THE MECHANISM OF DEATH WAS
CEREBRAL EDEMA CAUSED BY THE PRIOR INJURY
AND EXACERBATED BY REPETITIVE HEAD-BANGING ............. 47

Applicable Law ........................................................... 56

PETITIONER'S CONSTITUTIONAL RIGHTS UNDER
*BRADY V. MARYLAND* WERE VIOLATED WHERE
STATE FAILED TO DISCLOSE TWO X-RAYS THAT
COMPLETELY CONTRADICTED EVIDENCE THE
STATE PRESENTED TO THE JURY ................................................. 59

Materiality and Prejudice ..................................................... 63

Conclusion ........................................................................... 67

## TABLE OF AUTHORITIES

CASES                                                                    PAGES

*Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir. 2011)..................................41

*Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194................................................................1

*Ex Parte Cathy Lynn Henderson*, 384 S.W.3d 833 (Tex. 2012)....................................58

*Ex Parte Neal Hampton Robbins,* 2014 WL 6751684.........................................................57

*Kyles v. Whitley,* 514 U.S. 419, 436–41 (1995) ..............................................................61

*Moran v. Burvine*, 475 U.S. 412, 467 (1986) .....................................................................4

*People v. Calusinski*, 2014 IL App (2d) 120383-U.............................................................4

*People v. Coleman,* 2013 IL 113307, ¶ 96..........................................................................56

*People v. Ehlert*, 211 Ill.2d 192 (2004) ...........................................................................44

*People v. Henderson*, 2014 IL App (2d) 121219, ¶ 24......................................................56

*People v. Molstad,* 101 Ill.2d 128, 134, (1984) ..............................................................56

*People v. Ortiz*, 235 Ill.2d 319, 333 (2009) ....................................................................56

*People v. Washington,* 171 Ill.2d 475  (1996) ................................................................56

*People v. White*, 2014 IL App (1st) 130007, ¶ 24............................................................56

*Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005) ................................................................58

*United States v. Bagley,* 473 U.S. 667, 682 (1985). ........................................................60

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 CF 252 |
| | ) | |
| MELISSA CALUSINSKI, | ) | Honorable Daniel Shanes, |
| | ) | Judge Presiding. |
| Defendant. | ) | |

## VERIFIED PETITION FOR POST-CONVICTION RELIEF PURSUANT TO 725 ILCS 5/122-1

Defendant/Petitioner, MELISSA CALUSINSKI, by and through her attorneys, Kathleen T. Zellner & Associates, P.C., submits that she has newly discovered evidence supporting her claim of actual innocence and of a *Brady* violation. (*Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194). As a result of the newly discovered evidence, Petitioner is entitled to relief pursuant to 725 ILCS 5/122-1 et seq. In support of this Petition, Petitioner states as follows:

### Introduction

*"It is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted." – Nancy L. Jones, M.D. (Affidavit attached and incorporated herein as Exhibit D)*

Petitioner was convicted of the first degree murder of Ben Kingan ("Ben") who tragically died on January 14, 2009. Compounding the tragedy is that Petitioner, who has no history of violence and had absolutely no motive to harm Ben, was convicted based on irrefutably false

1

medical evidence offered by the State's testifying experts. The State experts denied the existence of a chronic subdural hematoma, and claimed that it was clear Ben had suffered an acute injury on the date of his death because he had a skull fracture. The State referenced the skull fracture no less than 32 times during the trial.

Petitioner's experts testified that Ben's death was the result of a re-bleed of a chronic subdural hematoma, caused by Ben's own head-banging on January 14, 2009. The State claimed there was not a chronic subdural hematoma, and that there was a skull fracture that occurred immediately before Ben's death. The State's denial of a chronic subdural hematoma and claim of the existence of a skull fracture, immediately prior to Ben's death, tainted every aspect of Petitioner's case, from her arrest to her conviction. Now, Petitioner presents new evidence that both of the State's claims are demonstrably false.

Dr. Eupil Choi ("Dr. Choi"), who performed the autopsy, directed the interrogation of Petitioner, and testified for the State, now admits that he failed to correctly identify Ben's chronic subdural hematoma. Specifically, the gross and microscopic evidence of a well-developed, organizing membrane indisputably shows a chronic subdural hematoma occurring 2-3 months prior to Ben's death. The State's repeated attacks on Petitioner's theory at trial were done by using the false and misleading testimony of Dr. Choi and Dr. Emanuel Montez ("Dr. Montez"). Dr. Choi and Dr. Montez made a second egregious mistake. Both claimed Ben suffered an acute injury, a skull fracture, on January 14, 2009. However, Ben did not suffer a skull fracture, so there was no acute injury and the State's case collapses on this point alone.

Dr. Nancy Jones, without question one of the most highly-regarded and experienced

2

forensic pathologists in the country, who has been used repeatedly by the State during her long career, concluded that the State's medical experts missed the chronic subdural hematoma and mistakenly identified an accessory suture as a skull fracture. In her affidavit, Dr. Jones states that "It is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted." *Exhibit D, ¶30.*

According to Dr. Jones, the autopsy findings, histology slides, and other medical records prove that Ben died as a result of cerebral edema, consistent with a significant concussion sustained several months before his death, and exacerbated by repetitive incidences of self-inflicted head-banging, that culminated in a final incident of head-banging 15-20 minutes before he became unresponsive. Most importantly, due to the existence of a chronic subdural hematoma and no evidence of a skull fracture on January 14, 2009, Dr. Jones concludes that the State's medical evidence presented to the jury as to the mechanism of death was totally wrong.

Therefore, Petitioner was wrongfully convicted based on this false medical evidence that was interjected into her alleged confession. As with all false confessions, the false facts were provided to Petitioner by the detectives, who were parroting what Dr. Choi was telling them. Dr. Choi provided false medical facts to the detectives about the absence of a chronic subdural hematoma and the presence of a skull fracture. Detectives pressured Petitioner to mold her confession to fit these false medical facts. There can be no more conclusive proof of the falsity of Petitioner's confession than that the false medical evidence allegedly communicated by Dr. Choi ended up creating the final version of Petitioner's confession. Petitioner was repeatedly encouraged to demonstrate a scenario in which she exerted enough force in throwing Ben to the

3

floor to create a skull fracture. Petitioner was told that she could not have simply dropped Ben on the floor accidently and caused a skull fracture; rather, she had to demonstrate that she forcefully slammed Ben to the ground.

Petitioner was arrested, prosecuted, and convicted because the jury was completely misled by the erroneous medical testimony by the State's experts. Because the medical evidence presented by the State was false, Petitioner's confession is also false. Petitioner was forced to go along with the false medical facts, because she believed that she would be allowed to go home if she parroted the story provided to her by the detectives. The detectives' story was based upon the false medical evidence provided to them by Dr. Choi.

Petitioner's conviction is an affront to the constitutional right to due process, which requires "fairness, integrity, and honor in the operation of the criminal justice system." *Moran v. Burvine*, 475 U.S. 412, 467 (1986) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Petitioner did not receive a fair trial and this Court should therefore vacate her conviction.

### Procedural History

1.    On February 11, 2009, Petitioner was indicted for first degree murder and aggravated battery of a child.  Petitioner was convicted by jury on November 16, 2011, and was subsequently sentenced to 31 years of incarceration in the Illinois Department of Corrections.

2.    Petitioner's conviction was affirmed by the Illinois Appellate Court on February 19, 2014. *See People v. Calusinski*, 2014 IL App (2d) 120383-U.

3.    On September 24, 2014, the Illinois Supreme Court denied Petitioner's Petition for Leave to Appeal.  This timely petition for post-conviction relief follows.

4

G_008

## Statement of Facts[1]

4. On January 14, 2009, at 3:51 p.m., the Lincolnshire Police Dispatch Center received a 911 call from Minee-Subee daycare, located in Lincolnshire, Illinois. Beth Katz ("Katz") informed the dispatcher that there was a 16-month-old child, Ben, "foaming," "not breathing," and repeatedly vomiting while receiving CPR from the Minee-Subee staff.

5. Katz further advised the dispatcher that Ben was throwing up two days earlier and had not attended the daycare the previous day.

6. Ben was transported to the hospital and pronounced dead at 4:50 p.m.

*Eyewitness Evidence of Prior Injury*

7. It is undisputed that Ben had suffered a prior head injury in October 27, 2008 which resulted in a chronic subdural hematoma. It is undisputed that Ben was a head-banger.

8. Nancy Kallinger ("Kallinger"), who was one of the teachers in Ben's room on the date of his death, was interrogated by police on January 16, 2009.

9. Kallinger told police that Ben "sporadically" fell asleep, which she found to be unusual. Kallinger found it "very odd" that for as long as she had known Ben, he would often want to go to sleep shortly after getting up from a nap.

10. Kallinger also told police that Ben would "throw himself" when he got upset. She described that Ben would throw his legs out and throw himself back on the floor. Kallinger talked to Ben's mother ("Amy") about this, and Amy stated, "Oh, yeah, that's [Ben] for you,

---

[1] Petitioner relied upon the Statement of Facts set forth in the Appellate Court opinion. *See People v. Calusinski*, 2014 IL App (2d) 120383-U.

5

he's always bumping his head. He does that at home, you know, throws himself back all the time."

11.     At trial multiple witnesses testified that on October 27, 2008, Ben had a "large bump" on the back of his head. Various witnesses described the bump as being "large," "goose-egg-like" and the "size of a golf ball." Two days later the area was still visibly swollen. Ben's pediatrician observed the bump but chose not to order a CT scan or x-ray to rule out bleeding or swelling of the brain.

12.     Kallinger likewise described this incident to police during her January 16 interrogation. Kallinger told detectives that "like two months ago" Ben got a bump on his head. Kallinger stated that at that time she was cleaning or putting some toys away, and Brenda Navarrete ("Brenda") was putting Ben in the crib when Kallinger heard a thump. Kallinger informed police that Brenda quit working at Minee-Subee the following day. On information and belief, Brenda never picked up her last paycheck from Minee-Subee after Ben was injured while in her care. The daycare workers were instructed not to communicate any information to Ben's mother about the bump and not to discuss the incident among themselves.

13.     On October 29, 2008, Amy took Ben to the doctor. He saw another pediatrician in Dr. Daniel Lum ("Dr. Lum")'s practice, Dr. Patricia Brunner ("Dr. Brunner"). Ben's mother mentioned the bump on his head; Dr. Brunner examined Ben's head, which still had some swelling. Dr. Brunner was not concerned about the bump. Dr. Brunner palpated the area with her fingers and found no skull fracture. Dr. Brunner did not order a CT scan. On November 20, 2008, Amy reported that Ben was spitting up and "not quite himself." Repeated vomiting can be

6

a sign of a concussion or increased cranial pressure. Dr. Lum assumed that Ben was suffering from acid reflux and did not order a CT scan.

14. For the first year of his life, Ben's head circumference was consistently around the 50th percentile. On December 1, 2008, Ben's head circumference increased to the 75th percentile. At the time of his death a few short weeks later, Ben's head measured in the 95th percentile among children his age. On information and belief, Ben's fraternal twin did not have a comparable increase in head size during this time span.

15. Amy testified that on January 12, 2009, two days prior to Ben's death, he vomited four to five times at daycare and at home. Holly Schoen ("Schoen"), a teacher at the daycare, testified that she witnessed Ben vomit four to six times about five to ten seconds apart. Schoen's description of the vomit as "spewing" is consistent with projectile vomit, another symptom of a head injury.

16. Ben did not attend Minee-Subee on January 13, 2009. He returned to Minee-Subee on January 14, 2009.

*January 14, 2009*

17. Many people came into contact with Ben on January 14, 2009 while he was at daycare, including Gwendy Bautista ("Bautista"), Kallinger, Kristen Emerson ("Emerson"), Sandy Jenner ("Jenner"), and Petitioner's sister, Crystal Calusinski ("Crystal"). It was commonplace for any of the twenty teachers who worked at the facility to walk in and out of the various classrooms throughout the day.

18. At around 11:15 a.m., Kallinger witnessed Ben throw himself backwards but did

7

G_011

not see him hit his head on the tile.

19.    At around 3:00 or 3:15 p.m., Petitioner and Bautista served the children their afternoon snack. Kallinger arrived back from her break. She relieved Bautista at approximately 3:30 p.m. When the children finished their snack, Petitioner and Kallinger began washing each of the children's hands, one by one. Kallinger then washed the tables and dishes, and Petitioner left the room for about five minutes. At the time Petitioner left Ben was in a bouncy seat.

20.    Kallinger testified at trial that while Petitioner was out of the room, she removed Ben from his seat, checked his diaper, and set him on the tile floor. At that time Ben threw his head backwards and hit the back of his head against the tile. Kallinger testified that she did not actually see Ben hit his head but assumed he did because he cried a little bit. Kallinger believed this occurred sometime between 3:35 and 3:45 p.m.

21.    Kallinger sat Ben upright then washed her hands. By the time she turned around, Ben was lying on the ground. Kallinger picked him up and placed him in a bouncy chair by the window. She noticed that Ben was lethargic. Upon Petitioner's return, Kallinger informed her that Ben was falling asleep in his chair. Kallinger then left the room, taking toys with her to the kitchen to sanitize them.

22.    Petitioner later told police that she called Ben's name three times, and he did not respond. Petitioner immediately called for help. Minee-Subee staff responded to the room, and found Ben foaming from his nose. Crystal began CPR, while Katz contacted 911 at 3:51 p.m.

23.    No Minee-Subee employee has ever testified or otherwise stated that they witnessed Petitioner harm Ben in any way on January 14, 2009, or at any other time.

8

*Interrogation of Petitioner*

24.     On January 16, 2009, Detectives Filenko and Curran (collectively, "the detectives") met Petitioner at the Minee-Subee and transported her to the station. After arriving at the station, Petitioner was placed in a room and read her *Miranda* rights. Petitioner – who was a young, impressionable woman with no experience in the criminal justice system – was told that being read her *Miranda* rights was "routine and protocol" and "standard procedure."

25.     At the time of the interrogation, Petitioner was young and suffered from cognitive defects.

26.     Most importantly, Petitioner had only been exposed to the criminal justice system after she had been raped. She had been pinned down on a couch in a small room, and her perpetrator covered her head with a blanket during the sexual assault and kept her wrapped in the blanket all night. Petitioner managed to escape the next morning. Petitioner reported the sexual assault to the police, but the perpetrator had removed all forensic evidence of the sexual assault by the time police questioned him. No further action was taken.

27.     That experience was fresh in Petitioner's mind when the detectives confronted her in the small room where she would spend the next 9 hours. The door remained shut at all times. She was never told she could leave or make a phone call. Nobody other than the police knew of Petitioner's whereabouts.

28.     Petitioner told the detectives the truth. Petitioner explained that when Kallinger left the room, Ben was in his bouncy chair and started to fall asleep. Petitioner called Ben's name, but he did not respond. Petitioner summoned help, and Crystal began CPR. She denied

9

harming Ben intentionally or by accident.

29.     Over the next several hours, in an effort to obtain an inculpatory statement from Petitioner the detectives falsely told her it was a "medical fact" that someone harmed Ben, and that the person did so immediately before Ben became unconscious. The detectives convinced Petitioner that only she was present with Ben when the fatal injuries were inflicted. They stated that the medical evidence clearly and unequivocally established her guilt, telling her:

> "We've got this narrowed down to a very, very tight time frame um, and there is only one thing here is that something happened where you got frustrated, aggravated, whatever, and I'm telling you it was not intentional. It was an accident, but it wasn't him flipping backwards. It wasn't. You know that, we know that. The forensic scientists are telling us that."

30.     That statement is absolutely false. The detectives were creating the story and feeding it to Petitioner. After repeated denials, Petitioner succumbed to the detectives' suggestions that Ben was injured as the result of an accident. Petitioner, who had been traumatized by a prior rape, suffered extreme mental anguish when she was trapped in a small room by the two detectives. As a result, Petitioner was led through varying scenarios as to how Ben hit his head. As to each scenario, the detectives contacted the medical examiner's office, where experiments[2] were performed to determine whether the injuries could have occurred as described. The detectives then informed Petitioner that the injuries could not have been inflicted as she had stated.

31.     At the conclusion of the interrogation, Petitioner, in an effort to escape from the

---

[2]   None of the "experiments" included any consideration of the effect of the prior injury because Dr. Choi completely missed the presence of the chronic subdural hematoma that was clearly evident on the autopsy photographs.

10

room, agreed to a final scenario posed by the detectives, stating that she got mad at Ben and threw him on the floor. Per the statement, Ben's head hit between the tile and the carpet, and afterwards Ben crawled to his chair. Incredibly, Kallinger – who was eight feet away when this alleged vicious attack took place – did not see or hear anything, ostensibly because she was standing at the sink with the water running and her back to Petitioner at the time he was thrown to the ground.

32.     Petitioner "demonstrated" the manner in which she "threw" Ben to the ground, using one of the detective's portfolios. Petitioner, who was 5' 2" tall and 120 lbs., held the portfolio with two hands. She then bent her elbows slightly, lifted the portfolio toward her and then pushed the portfolio toward the ground. She released the portfolio just above the floor. Petitioner claimed she saw the head "bounce."

33.     Ben did not sustain a single injury to his back, shoulders, or neck as a result of allegedly being thrown to the ground.

### Lack of Corroboration for Petitioner's "Confession"

34.     None of the independent eyewitnesses or medical evidence corroborates Petitioner's "confession." Indeed, a careful review of the interrogation reveals that Petitioner merely adopted the story forced upon her by police because she thought she was going home. Her story is inconsistent with the actual evidence, and those inconsistencies should have been easily recognized by a competent board-certified forensic pathologist.

35.     Adopting what the detectives offered as a possible motive, Petitioner's statement indicates that she was frustrated because the children were acting up. However, no other witness

11

testified that the children were acting up, or that they were screaming and crying. In fact, Kallinger indicated that the children were calm and nothing was out of the ordinary at the time she left the room. Kallinger would have known if the children were screaming or crying and she reported they were calm.

36.     No witness testified that Petitioner was holding Ben shortly before he became unresponsive. On the contrary, Kallinger testified that Ben was in his chair, falling asleep at the time she left the room. Prior to that, Kallinger did not see Petitioner (who was just feet away) holding Ben. Despite the best efforts of police to compel her to say otherwise, Kallinger did not see or hear Petitioner throw Ben to the ground; she did not see him lying on the ground with Petitioner standing over him; she did not hear Ben cry; and she did not observe Petitioner act angry or frustrated with the children. Even when Kallinger described Ben throwing himself back on the tile floor between 3:35 and 3:45, she stated that he cried, so it is not credible that he would be slammed on a tile floor and Kallinger would not have heard him cry.

37.     Of course, none of the witnesses testified that they observed Petitioner to have a temper, or that she was prone to act out of frustration when watching the children. In fact, Schoen testified that, just days earlier, she observed Ben repeatedly vomit on Petitioner while she held him. Petitioner remained calm and did everything to ensure Ben was cleaned up and treated appropriately.

38.     In short, not a single independent witness or piece of physical evidence substantiates Petitioner's motive or the supposed manner in which Petitioner allegedly perpetrated the murder.

12

39.     Thus, the State's case rested entirely on the testimony of its pathologists.

40.     The entire case turned upon the medical evidence presented at trial. The State maintained that Ben's injury was acute and inflicted moments before he became unresponsive. It was critically important to the State's theory of an acute injury that there was a skull fracture. The defense argued that Ben suffered a chronic subdural hematoma from a prior injury which re-bled on January 14, 2009, when he banged his own head in the presence of Nancy Kallinger.

*Dr. Choi's Inaccurate Medical Findings Controlled Petitioner's Interrogation and Resulted in Her False Confession, Which Led to her Arrest Without Probable Cause*

41.     On January 15, 2009, Dr. Choi advised Investigator Hyde as to his belief of the medical facts that governed the investigation. Investigator Hyde specifically asked Dr. Choi whether Ben exhibited any injuries prior to the injury that led to his death. Dr. Choi advised him that there were no prior injuries[3]. (R.251).

42.     Upon information and belief, Lake County Deputy Coroner Paul Forman ("Forman") has stated and will testify, that as of January 15, 2009, there was no medical evidence learned from Dr. Choi's autopsy supporting the conclusion that Ben was the victim of a homicide. In fact, at the conclusion of Dr. Choi's autopsy, he indicated that in his opinion, the manner of death was "inconclusive." Forman will testify that the conclusion it was a homicide was based exclusively upon the fact that Petitioner had allegedly confessed, and was not based upon the autopsy findings.

43.     On January 16, 2009, Dr. Choi played a substantial role in the interrogation of

---

[3] As discussed below, Dr. Choi has now admitted that this is incorrect. There was medical evidence that established Ben had suffered a prior injury that resulted in a chronic subdural hematoma.

13

Petitioner by advising the detectives of his autopsy findings and rejecting Petitioner's explanations of her interaction with Ben.

44. The State summarized the evidence and explained the importance of Dr. Choi's medical opinion, pursuant to Petitioner's pre-trial Motion to Quash the Arrest for lack of probable cause:

> "Detective Hyde[4] also <u>spoke with Dr. Choi at the autopsy and he learned some very valuable things on the 15th</u>. He learned that Ben's injury was equivalent to a one-to-two story fall, that it was a skull fracture[5], that it was not self-inflicted, that it happened 30 minutes to three hours before his death, that it was not from falling off a changing table or hitting his head while being picked up. That it was, quote, fresh and recent in respect to injury to death. And most importantly, it was not accidental. Now, Your Honor, at this point, at this point, the officers would have probable cause to arrest the defendant." (R.988-989).

45. The State argued at that pre-trial hearing that when Dr. Choi conveyed his medical opinion to the detectives, probable cause was established:

> "So while the defense has claimed ... that PC attached sometime later in the interview and they didn't have it all day. Judge, if you look at what the officers knew, they had **it as soon as Choi gave them [his] report** ... when they knew that this was a non-accidental trauma caused in the window where she was alone with Ben, when she started lying from word go to Detective Hyde at Mince Subee the night of the 14th, they had PC right there. (emphasis added)." (R.992-993).

46. At trial, Detective Filenko explained that his conduct during the January 16 interrogation was directed by the medical opinions of Dr. Choi:

> [Question]    And as we discussed on [January 14, 2009 and January 15, 2009] you indicated to [Petitioner] that throwing himself

---

[4] While Hyde spoke to Dr. Choi, Hyde did not advise Dr. Choi that he had learned from Ben's father that Ben had suffered a prior head injury in late October that was followed up with medical care and consultation with a doctor. (R.126-127).

[5] In light of Dr. Choi's admission that he missed the prior head injury, Dr. Jones has reviewed the medical evidence. She has submitted her opinion, discussed below, that Ben did not suffer a skull fracture. The emphasis the State placed on the (false) fact that Ben had suffered a skull fracture is discussed at length later in this Petition.

14

| | |
|---|---|
| | backwards couldn't have caused that injury; is that correct? |
| [Filenko] | Yes. |
| [Question] | Is that something that you knew yourself or that you got from Dr. Choi? |
| [Filenko] | I believe that was something I got from Detective Curran. |
| [Question] | Who was in communication with Dr. Choi? |
| [Filenko] | Yes. (R.3928-3929). |

***

| | |
|---|---|
| [Question] | Throughout the entire [interrogation of Petitioner] when you speak of doctor or physician, you are speaking of Dr. Choi; correct? |
| [Filenko] | Yes. (R.3929). |

***

| | |
|---|---|
| [Question] | [During the interrogation Curran asked Petitioner] This injury was like being dropped off a second story; right? |

***

| | |
|---|---|
| [Filenko] | Yes. |
| [Question] | And that again as far as you know, came from Choi, right? |
| [Filenko] | That came from our briefing the night before and yes, Choi. (R.3936-3937). |

47.   Detective Filenko explained how the interrogation of Petitioner proceeded with the involvement of Dr. Choi after Petitioner had repeatedly asserted her innocence:

| | |
|---|---|
| [Question] | And from 3:15 forward for the next several hours, you were in contact or Sean Curran was in contact with the Coroner's Office, correct? |
| [Filenko] | Yes. |
| [Question] | And various scenarios were presented to the Coroner regarding whether the injury thresholds were sufficient, correct? |
| [Filenko] | Yes. (R.3942). |

***

| | |
|---|---|
| [Question] | As far as you are aware, Dr. Choi was at the Coroner's Office making decisions and giving you advice as to whether or not what Melissa told you reached the level of sufficient injury threshold; is that true? |
| [Filenko] | Yes. (R.3942-3943). |

***

| | |
|---|---|
| [Question] | The only pathologist involved in this case was Dr. Choi? |
| [Filenko] | At that point, yes. (R.3943). |

15

G_019

***

| | |
|---|---|
| [Question] | [Detective Curran] would come back, and he would say certain things to [Petitioner] regarding <u>whether or not Dr. Choi found those to be sufficient</u>; correct? |
| [Filenko] | Yes. |
| [Question] | That went on -- I mean I know there is breaks. There is a number of things that went on there for several hours regarding that particular aspect of the investigation; is that right? |
| [Filenko] | Yes. (R.3943). |
| [Question] | Now, there came a point, Chief, where it was decided that the injury thresholds were not sufficient; correct? |
| [Filenko] | Yes. (R.3944). |
| [Question] | The pathologist [Dr. Choi] had run some experiments; is that true? |
| [Filenko] | Yes. (R.3951). |

***

| | |
|---|---|
| [Question] | What were the facts that you learned about the experiments? |
| [Filenko] | That what she was describing to us about dropping Ben on the chair couldn't have caused the severity of that injury. (R3951-.3952). |

***

| | |
|---|---|
| [Question] | You don't know what physically they did? |
| [Filenko] | Correct. |
| [Question] | You just learned Dr. Choi said it couldn't have happened the way she described it; is that true? |
| [Filenko] | Correct. (R.3952). |

***

| | |
|---|---|
| [Question] | Now, the window that Dr. Choi had given you as to when this occurred would have been within three hours; correct? |
| [Filenko] | Originally, yes. |
| [Question] | Did he give you a later time? |
| [Filenko] | Later on in the day, there was a time frame of approximately half an hour given to us. (R.3953). |

***

| | |
|---|---|
| [Question] | You indicate to her, "And that's why I'm being adamant about this. How we don't believe that's it. It's impossible. It's mathematically, physically impossible for him to sustain those injuries based on what you showed us," correct? |
| [Filenko] | Yes. |

16

| [Question] | That came from Dr. Choi; correct? |
|---|---|
| [Filenko] | Yes. (R.3955). |

48.     The basis of the trial court's decision to deny Petitioner's Pre-trial Motion To Quash the Arrest was the court's erroneous belief that Dr. Choi had correctly interpreted the medical evidence to the detectives:

> "Dr. Choi was called. Dr. Choi could not recall exactly what he said to Investigator Hyde initially. Deputy Coroner Forman was called. He was present with Choi and Investigator Hyde for the autopsy. He recalls Choi having a lengthy conversation about the timeline, looking at the paperwork from the school. Choi gave information on the timing of the injury, the 30-minute window from the injury to death Forman recalls Choi saying. He also recalls Choi characterizing the injury as being recent or fresh as well." (R.1022-1023).

49.     The trial court explained the importance of Dr. Choi in the probable cause analysis prior to ruling on the pre-trial motion as follows:

> "Because what Choi tells this witness [Investigator Thomas] and what this witness tells Curran is the basis for Detective Curran and Detective Filenko forming their belief that the defendant or that they had probable cause to believe the defendant committed this offense." (R.861-862).

50.     The trial court explained how Dr. Choi was the decisionmaker as to whether probable cause existed:

> "The conclusions that are reached by Choi with regard to these different scenarios ... you have three things -- [1] Ben sitting Indian style  throwing his head back,  [2] [Petitioner] dropping Ben on the floor where he lands on his back side and hits his head on the chair, and then the last scenario where [3] she drops him on the ground.  Those are the three that I'm talking about. Those are the three times ... that Curran reaches out to Choi, Choi offers some opinion." (R.862).

51.     As to the first scenario, Dr. Choi conducted an experiment and advised the detectives in no uncertain terms that Ben had not injured himself.  (R.864).

17

G_021

52.     As to the second scenario, Dr. Choi conducted another experiment and advised the detectives that Ben could not have been injured by hitting his head on the chair in that fashion. (R.867).

53.     In denying Petitioner's pre-trial motion, the trial court explained that the detectives reliance on Dr. Choi's medical opinions during their interrogation justified denial of the motion:

> "If [the detectives] had decided that [Petitioner] was responsible for this, why would they have been communicating with Dr. Choi to find out whether or not what [Petitioner] was saying was plausible or possible?
>
> I don't find that the police reached that conclusion at any point, and I'm making the further finding that the time that the police made that decision is the time where [Petitioner] admitted to dropping Ben on the floor from a distance of above her knees, and it's at that time that the Court finds that the police had probable cause to place [Petitioner] under arrest, and they did place [Petitioner] under arrest." (R.1041).

***Reliance of Medical Experts at Trial on Dr. Choi's Opinions To Support State's Position That Ben Did Not Suffer Any Injury Prior to January 14, 2009 .***

54.     Dr. Choi, Dr. Jordan Greenbaum, and Dr. Montez, all medical experts for the State, denied any evidence of a chronic subdural hematoma caused by a prior injury. But only Dr. Choi conducted the autopsy. Drs. Greenbaum and Montez relied on the conclusions Dr. Choi drew from that autopsy.

***Dr. Choi***

55.     Dr. Choi testified that Ben's skull fracture was "fresh", while the blood in Ben's skull and the different compartments of the brain was "fresh" or "recent."

56.     Specifically, Dr. Choi testified as follows:

> [Question]     Doctor Choi, did you form an opinion to a reasonable degree of

18

|                | medical certainty as to when these injuries occurred? |
| [Dr. Choi]     | Very recent.                                          |
| [Question]     | Did you say very recent?                              |
| [Dr. Choi]     | Yes. (R.3599-3600).                                    |

57.     In performing the autopsy, Dr. Choi took sections of the dura, which he described as a protective membrane and fibrous tissue of less than two millimeters thickness that covers the brain under the skull. (R.3625). Dr. Choi explained that he examined the dura with the goal of determining whether there was anything present that indicated a prior injury to Ben or the presence of older blood. (R.3625-3626). Specifically, Dr. Choi was "looking for an old membrane called neomembrane." (R.3626). Such a membrane, according to Dr. Choi, would be an indication of old blood or healing. (R.3626).

58.     Specifically, during the State's examination of Dr. Choi, he testified as follows:

Q:      And then did you, in fact, look at some tissue from the central nervous system or from the areas of injury that you described?
A:      Yes.
Q:      And when you did that in the slides, did you look at particularly blood stains of the dura?
A:      Yes.
Q:      When you did that, did you observe any subdural membranes?
A:      No, I did not see any recent or old membrane. (R.3602).

59.     Dr. Choi also discussed macrophages which he defined as "mesenchymal cell is a tissue grafting around the scar's older injuries" that are not visible to the naked eye. (R.3626). He testified that the presence of macrophages would be an indication of an old injury. (R.3626).

60.     As to the presence of macrophages, Dr. Choi was asked:

Q:      And, I mean, Doctor Choi, you didn't see any evidence of this; correct?
A:      No, I didn't see. (R.3626).

19

61.     Again, Dr. Choi denied seeing any evidence of healing in Defense Exhibits 15, 17, 18, 19, 20, and 29, which were sections of tissue taken from the dura.

62.     In summary, Dr. Choi testified that he saw no evidence of any kind that suggested a chronic subdural hematoma caused by a prior injury.  (R.3627-3628).

63.     Dr. Choi based his ultimate conclusion on the timing of the injury that caused Ben's death on his failure to find evidence of a chronic subdural hematoma caused by a prior injury.

***Dr. Greenbaum***

64.     Dr. Choi's opinion formed the basis of State expert Dr. Greenbaum's opinion. Consistent with this reliance, just as Dr. Choi had, Dr. Greenbaum based her conclusion as to the timing of the injury on Dr. Choi's failure to find any evidence, during his autopsy, of a chronic subdural hematoma caused by a prior injury.

65.     Dr. Greenbaum's reliance on Dr. Choi was clear.  She testified that in general: "I haven't looked at microscopic slides for about ten years, yeah, so I don't consider myself an expert at histology looking under the microscope anymore ... So now what I do is I rely on the results of the medical examiner who has looked at them under the microscope and he'll write in his reports.  Excuse me, He'll write the results... So I rely on [the medical examiner'] to help me. (R.3483).

66.     Specifically, Dr. Greenbaum testified:

[Question]          And did you in fact rely on Doctor Choi's examination of slides in this particular case?
[Dr. Greenbaum]     Yes. (R.3483-3484).

G_024

67.     Dr. Greenbaum added:

[Question]          Did you rely on findings of Dr. Choi in coming to your opinion.
[Dr. Greenbaum]     Yes.

68.     Clearly, Dr. Greenbaum's opinion that no chronic subdural hematoma caused by a

prior injury existed was based on Dr. Choi's conclusion that there was no microscopic evidence

of such an injury.

### Dr. Montez

69.     Dr. Montez, a non-board-certified pathologist, conducted a "curbside consult" by

examining Ben's body on January 16.  Based on his examination, Dr. Montez concluded that

Ben suffered "violent trauma" to his head that was not self-inflicted.

70.     Dr. Montez pinpointed the injury as having taken place between 3:30 and 3:51

p.m.  He did so without looking at any of the histology slides (R.4538), as every board certified

pathologist who testified agreed was appropriate to do when trying to determine the timing of the

injury. Additionally, Dr. Montez failed to account for the fact that Kallinger was alone with Ben

between 3:30 and 3:45, leaving less than 6 minutes for Petitioner to have inflicted a fatal injury,

called for help, and assisted in rendering CPR to Ben.

71.     Dr. Montez admitted his reliance on Dr. Choi when he testified:

[Question]          Now, Dr. Montez, Dr. Choi revealed (sic) some slides in this case.  Are
                    you aware of that?
[Dr. Montez]        Yes.
[Question]          And, in fact, you said you reviewed his autopsy report in forming your
                    opinion, correct?

[Dr. Montez]        Correct. (R.4538).

72.     Dr. Montez testified that there was no prior injury and in no uncertain terms

21

G_025

stated: "I do not see any indication of it on a medical record review or the review from the paperwork at the daycare center of the file that there is any issue at all with this category." (R.4547).

73.     Dr. Montez agreed, and it was undisputed, that Ben vomited on January 12, 2009. Dr. Montez testified that "This potentially could be significant because vomiting is a symptom or a sign that you can get from a head injury." (R.4547).

74.     Finally, the importance of Dr. Choi's opinion that there was no chronic subdural hematoa caused by a prior injury is demonstrated by Dr. Montez' ultimate conclusion:

> [Question]  Dr. Montez, do you have an opinion to a reasonable degree of scientific and medical certainty as to the timing of the injuries that you observed in Ben Kingan.
>
> [Answer]    It is based on history.  It is based on the investigative part of Ben's sort of period before death.  Everything that I read, medical records and witness statements, Ben is **completely normal** in his usual state of health up to 3:30 on Wednesday, the day he dies. (R.4550).

***State's Closing Argument***

75.     A review of the State's closing argument establishes the crucial role Dr. Choi's medical opinion that Ben did not exhibit a prior injury played in the case.  The State argued in no uncertain terms:

> "The subdural hematoma.  It is fair to say that no one disputes that Ben  had  subdural hemorrhage or hematoma.  The only issue on that in this trial has been the aging.  But, again, you cannot look simply at one finding.  You have to look at these altogether.  And Dr. Montez and Dr. Choi told you they did not see any old injury.  Dr. Greenbaum in her training and experience is saying live kids may present with some kind of bleed in their brain, she told you that is not what this looks like.  It is different.  **This is not old."** (R.4628).

22

76. The State repeated that Ben did not suffer a prior injury, stating:

"Use your common sense and know that **if this was an old injury**, Ben wouldn't have been fine." (R.4629).

77. Continuing, the State argued:

"If this was a chronic subdural as has been suggested by the defense, we would see something. We would see something, and it wouldn't go away. Dr. Greenbaum told you that kids do not get better. They don't improve **if they have this kind of traumatic brain injury in their head that is old**. If it starts to re-bleed, the symptoms will continue." (R.4630).

78. As to Dr. Montez, the State argued:

"Dr. Montez told you the same thing. Ben is not going to get better. It's Monday and vomiting is truly a symptom of a close[d] head injury, which I submit to you **there is no evidence** that it is in this case." (R.4630).

79. The State attacked Defense Expert Dr. Leestma, who had testified that Ben suffered from a chronic subdural hematoma. The State argued that if Dr. Leestma truly had seen evidence of a prior head injury to Ben, it would have been such important and crucial information that Dr. Leestma would have had a duty to relay his discovery of prior injury to Dr. Choi:

"Can you imagine [Dr. Leestma] finds this in the microscope? Nobody else knows it is there. [Dr. Leestma] doesn't pick up the phone and say, hey, Dr. Choi, did you see this? **We need to talk about this. This is an exceptional finding in this child.** [But Dr. Leestma] doesn't pick up the phone and call the pediatrician, did you realize this little boy was sick? You guys missed this. We need to talk about this. We can have other children that can be suffering from this." (R.4632).

***The State's Claim that Ben's Skull was Fractured was Critically Important to the Success of Petitioner's Successful Prosecution***

80. A key issue in the case became whether Ben suffered a skull fracture. The State

23

argued at length, before and during the trial, that Ben's skull was cracked.

81.  Prior to trial, the State advised the court that "Dr. Choi had performed an autopsy and found ... a **skull fracture**." (17-18).

82.  Detective Hyde testified as follows at a pre-trial hearing:

| | |
|---|---|
| [Question] | Did [Dr. Choi] tell you whether there was a skull fracture? |
| [Answer] | Yes. |
| *** | |
| [Question] | What did Dr. Choi tell you? |
| [Answer] | I then -- once we found that information out I then went through a couple ... scenarios with him. I said could this have been caused by Ben falling off a changing table. [Dr. Choi said] Absolutely not. Could this have happen[ed] by somebody picking Ben up and hitting his head on one of those cubby squares. [Dr. Choi said] No, it could not have been. (R.155) |
| *** | |
| [Question] | Did [Dr. Choi] give you any opinion as to how the blunt trauma was caused? |
| [Answer] | He did. |
| [Question] | What did he say? |
| [Answer] | He said it was consistent with somebody swinging Ben into a wall, hitting the back of his head on the wall. |
| [Question] | At great force I would take it? |
| [Answer] | Yes, sir. (R.157-158). |

83.  Detective Hyde testified as follows at a pre-trial hearing:

| | |
|---|---|
| [Question] | And were you then present for Dr. Choi to remove part of the skull and find the matching **skull fracture**? |
| [Answer] | Yes. |
| [Question] | And, in fact, you were present when Dr. Choi was doing this. Did he point out to you where the fracture was in relation to the bloody four by four area? |
| [Answer] | Yes. |
| [Question] | And, in fact, did the skull fracture match up with where that four by four area was on the back of his head? |
| [Answer] | It did. (R.159) |

24

G_028

84.     Detective Curran also testified as to the skull fracture:

|   |   |
|---|---|
| [Question] | And what other information did you learn? |
| [Answer] | I learned that the pathologist, Doctor Choi **found** that the **baby's skull had been cracked**. (R.360) |

***

|   |   |
|---|---|
| [Question] | You said that you found out that his **skull had been in your words, Detective, cracked?** |
| [Answer] | Yes. |
| [Question] | What you meant by that was there had been a fracture? |
| [Answer] | Fracture. (R.604-605) |

85.     Detective Filenko testified:

|   |   |
|---|---|
| [Question] | Now, you knew, as you've told us from Investigator Hyde and from the Medical Examiner Choi, or Dr. Choi, that the baby had suffered a **skull fracture**. |
| [Answer] | Yes. (R.675) |

86.     Detective Filenko testified:

|   |   |
|---|---|
| [Question] | Do you remember [Detective Curran] telling Melissa that the baby's skull had been fractured? |
| [Answer] | Yes. |

***

|   |   |
|---|---|
| [Question] | Did you also believe when you were interviewing Melissa that this injury, this skull father (sic), had been caused by another human being? |
| [Answer] | Yes. |
| [Question] | And that was because of the amount of force that Dr. Choi had indicated would be necessary to cause this type of injury, is that true? |
| [Answer] | The amount of severity of the injury, yes. (R.676-677) |

87.     The trial court, in ruling on the pre-trial motion, explained:

"[Dr. Choi's] conclusions were that the cause of death was blunt force trauma to the head consistent with a one-to-two story fall and a **skull fracture** that was about an inch or two long." (R.1010)

25

G_029

88.   Detective Curran testified at a pre-trial hearing:

    [Question]    Did you receive information on the 15th when you were briefed about the autopsy in addition to the **fractured skull**?
    [Answer]    Yes. (R.1303)

89.   Detective Curran testified at a pre-trial hearing:

    [Question]    You knew there were no broken -- maybe not at that time. Did you know whether or not there were any broken bones other than the apparent **skull fracture** which you were advised about the next day?
    [Answer]    I did not, no. (R.1586)

90.   Detective Hyde testified pre-trial:

    [Question]    What did you convey to Curran and Filenko in terms of what Dr. Choi had told you?
    [Answer]    I told the entire group that was there that Ben had died of a massive head injury. There was a large area of trauma to the back of his head, including blood area, brain bleeding, a **fracture on his skull** and some insignificant bruise on his head and his arm, a red mark on his arm.
    [Question]    Did you tell them that the injury was not caused by a fall from the changing table, highchair or a drop?
    [Answer]    I did. (R.1589).

91.   Then, at the trial, the State argued in her opening statement:

"[Prosecutor] [Dr. Choi] will tell you about the **skull fracture** that he found on the top right part of Ben's head, a four-inch by four-inch bloody area that corresponded to that **skull fracture**." (R.2608)

92.   Detective Hyde testified:

    [Answer]    I saw a **crack or a fracture**.
    [Question]    Had you seen **fractures** prior in your role as a major crash assistance team investigator?
    [Answer]    I have.
    [Question]    And did Dr. Choi point that area out to you during the autopsy?
    [Answer]    Yes. ma'am. he did.

G_030

| | |
|---|---|
| [Question] | Were you able to see it there on the examination table? |
| [Answer] | I was. |
| [Question] | Did you need to use a magnifying glass to see that? |
| [Answer] | No, not at all. |
| [Question] | Did Dr. Choi need to use a microscope to see that? |
| [Answer] | No, ma'am. (R.3293) |

93.     Detective Hyde testified:

| | |
|---|---|
| [Question] | With regards to this in the picture, what is directly under this discolored area? |
| [Answer] | Directly beneath it is the blood area we saw in the earlier, I don't know the number, but the earlier photograph. |
| [Question] | What about the **skull fracture**? |
| [Answer] | Also there below that. (R.3297-3298) |

94.     State expert Dr. Greenbaum testified:

| | |
|---|---|
| [Question] | Doctor Greenbaum, what is abusive head trauma? |
| [Answer] | Abusive head trauma is a broad term that encompasses all types of injury to the head, primarily not just a goose bump but **skull fractures** and bleeding inside the head and damage to the brain.  It includes all those types of injuries that are inflicted by somebody else non-accidently. |
| [Question] | And that is also called non-accidental head traumas. |
| [Answer] | Yes. |
| [Question] | Or inflicted head trauma. |
| [Answer] | Yes. (R.3441). |

96.     State expert Dr. Greenbaum testified:

| | |
|---|---|
| [Question] | What, if anything, is significant to you as either the forensic pathologist or the child abuse doctor if you have abusive head trauma with    a skull fracture? |
| [Answer] | It confirms that at least one of the mechanisms involved an impact to the head with significant force, enough to crack the skull. (R.3447) |
| *** | |
| [Answer] | It there's a hard impact to the head the skull may break and it absorbs that energy and there's a break, there's a crack in the skull and that would be a **skull fracture** so that would involve the bone underneath the scalp.   (R.3460). |

27

G_031

97.  State expert Dr. Greenbaum testified:

[Question]  So, Doctor Greenbaum, with regards to Ben Kingan in the case you reviewed, can you tell us as far as your opinion what were the findings that were significant to you at autopsy?

[Answer]  ... He had a big area of bleeding there and then he had a **broken skull bone**. (R.3460-3461)

\*\*\*

[Question]  So, Doctor Greenbaum, based on your training and experience, is that particular bruising consistent with impact to a broad surface?

[Answer]  Yes.

[Question]  Such as a floor or a wall?

[Answer]  Yes.

[Question]  And there were other injuries that you told us that Ben had to his head; is that correct?

[Answer]  Yes.

[Question]  One of those was a **skull fracture**?

[Answer]  **Yes**.

[Question]  Were you able to in fact see the **skull fracture** in the photographs?

[Answer]  Yes.

[Question]  Doctor Greenbaum, were you able to see that *in* the photographs with your naked eye?

[Answer]  Yes.

[Question]  And you didn't need a microscope to see that, did you?

[Answer]  No. (R.3472).

98.  State expert Dr. Greenbaum testified:

[Question]  Would these assist you in explaining **the skull fracture** injury that you saw in Ben?

[Answer]  Yes. (R.3474).

99.  State expert Dr. Greenbaum testified:

[Question]  Is it better in the actual photograph?

[Answer]  Right. So it's this little crack here with blood in it is a [skull] fracture. (indicating). (R.3475).

28

100.    State expert Dr. Greenbaum testified:

     [Question]    Okay. And then did you observe actually a picture to see then inside of the skull to look to see if there was a corresponding fracture that went through the skull?

     [Answer]    Yes. I did.

     [Question]    And then that would be what was attained in People's Exhibit 37 . And would that then --

     [Answer]    Depends on which way you ' re looking at the skull, but.

     [Question]    Right. It depends, and can you show us where the fracture is in this particular picture?

     [Answer]    Here you're looking at the inside of the **skull** and that dura, that canvas lining has been pulled off. This is just bone you're looking at here and you can see it's **broken** there and there' blood in it and jaggety line there.

     [Question]    So, Doctor Greenbaum, what, if anything, is significant about the fact that there is a through and through fracture that you could see on the outside and the inside of the skull?

     [Answer]    It's consistent with a true fracture and a trauma injury impact to the head enough to **crack the skull**. (R.3475-3476)

101.    Dr. Choi testified:

     [Question]    What other findings did you have on Ben's head in addition to t he subgaleal and then when you remove the skull, the subarachnoid, what, if anything, did you it?

     [Answer]    Skull -- I saw when I removed the part of the remove means stripped off the soft tissue of the area, I found an area of fracture right here (indicating).

     [Question]    Could you grossly observe the fracture?

     [Answer]    I did. (R.3580).

102.    Dr. Choi testified:

     [Question]    So you could see the fracture with your naked eye?

     [Answer]    Yes.

     [Question]    Could you describe the fracture for the Ladies and Gentlemen of the Jury?

     [Answer]    The fracture site was top of the head, so behind. Again, this *is* the front and this is the back (indicating), so behind the side and then there is a **fracture** line, .8 inches. It is two

centimeter long on the top of the head as well as underneath of the skull. (R.3581).

103. Dr. Choi testified:

[Question]   Does [People's Exhibit No. 36] in fact, show you what you saw as far as he **fracture in Ben's skull**?
[Answer]     Yes. (R.3583).

104. Dr. Choi testified:

[Question]   Were you able to use this on the other side or the inner part of Ben's skull as well?
[Answer]     Yes.
[Question]   I'm going to show you first People's Exhibit No. 44 which has been previously referred to but not admitted. Do you recognize that, Doctor Choi?
[Answer]     Yes.
[Question]   And what is that?
[Answer]     This picture shows the other part of the skull, that is, the previous exhibit was outside.   In order to look inside of the area, the skull is turned over and look inside of the skull we call inner table. There is corresponding outer table fracture . There is a fracture line as well.

[Question]   And looking at that, does that truly and accurately depict how that **skull fracture** in Ben ' s skull appeared on January 15th, 2009?
[Answer]     Yes. (R.3585).

105. Dr. Choi testified:

[Question]   So can you explain to the Ladies and Gentlemen of the Jury how it is  that you could see it on the outside and see it on the inside?
[Answer]     Yes. The **skull** has obviously certain thickness and you can see the **outside fracture line** as well as inside of the **fracture line** so that it was a complete through the thickness of the skull.  (R.3586).

30

G_034

106.    Dr. Choi testified:

    [Question]    So this [skull fracture] was completely through the bone?
    [Answer]    Yes.
    (R.3587)

107.    Dr. Choi testified:

    [Question]    Dr. Choi, you could see on the **inside of Ben's skull** the
                         **fracture line** grossly; is that right?
    [Answer]    Yes. (R.3587)

108.    Dr. Choi testified:

    [Question]    Does that truly and accurately depict how that **[skull]**
                         **fracture** appeared to you on January 15, 2009?
    [Answer]    Yes. (R.3587-3588).

109.    Dr. Choi testified:

    [Question]    Doctor Choi, that's the closer up version of the fracture that
                         you observed from the inside of Ben's skull?
    [Answer]    Yes. (R.3588).

110.    Dr. Choi testified:

    [Question]    Now, this [skull] **fracture**, did you take an x-ray of the
                         **fracture**?
    [Answer]    Yes, I did.
    [Question]    Why did you take an x-ray of the **fracture**?
    [Answer]    Well, that's another documentation of the **fractures** by way of
                         taking an x-ray.
    [Question]    Did you take that before you began the internal exam?
    [Answer]    Yes.
    [Question]    And did the x-ray come out?
    [Answer]    I look again after the autopsy and in asking the people, no, it
                         was poor quality.  It didn't show.
    [Question]    It was a poor quality x-ray; correct?  Well, let me ask you
                         this,  could you see anything on the x-ray film?
    [Answer]    No, I didn't see the **fracture line** on the x-ray. (R.3635-3636).

31

G_035

111.  Dr. Choi testified:

    [Question]    You testified before lunch that the x-ray that you had taken in this case was of poor quality; is that correct?

    [Answer]    I so stated. Sometimes a small -- no matter what the findings, when you take x-ray, a very small fracture line cannot be seen by ordinary procedures. (R.3674).

112.  At trial, Detective Filenko testified:

    [Question]    What information did you receive about this death investigation at that time?

    [Answer]    The death involved an infant, and it occurred the day before. There had been an autopsy, and Detective Hyde said that the result of the autopsy revealed that there was a **skull fracture** of the child. (R.3809).

113.  At trial, Detective Filenko testified:

    [Question]    And you were told that somebody caused it; is that correct?

    [Answer]    I wasn't told that. We were just told it was a severe head fracture, and it was similar to fall form a two story building. (R.3884)

114.  At trial, Detective Filenko testified:

    [Question]    Well, you told her after the first portion of the interview, now we are into the -- after you broke, **that Ben had died as a result of a skull fracture**; correct?

    [Answer]    Correct. (R.3903).

115.  Detective Curran testified:

    [Question]    He related facts to us about the investigation. One of the things he told you was that, as you said, the child had suffered a fracture; right?

    [Answer]    Yes.

    [Question]    And he told you that the force -was -- a tremendous amount of force was used to cause this fracture; right?

    [Answer]    Yes, he related that the pathologist stated that the force was equivalent to a one or two story fall. (R.3994).

32

116.   Dr. Montez testified:

      [Question]    Can you tell us please, please, what you observed?
      [Answer]     Can you tell us, please, what you observed?
      [Question]    What I did I observe a 16 month old child lying on the autopsy gurney. The autopsy had obviously been already performed ... What I found was significant trauma, violent trauma to the head. One, starting on the skin surface of the scalp was a contusion. On the deep side of the scalp, the underside of the scalp, which we call subgaleal tissue was a dense patch of fresh blood that measured 4 inches by 4 inches. Below the layer of the scalp which is the **top the 2 of the skull was an inch long through and through fracture of the skull itself**. (R.4519-4520).

117.   Dr. Montez testified:

      [Question]    At that time what did you do?
      [Answer]     At that time I then after examining the dura in the brain, I went back and looked at the head just to make sure what I was seeing was what I was seeing. **Again, I focused** this time I went inside out. I focused on the fracture. (R.4521).

118.   Dr. Montez testified:

      [Question]    After looking at the subgaleal hemorrhage you stated you were able to see a skull fracture, is that correct?
      [Answer]     Correct.
      [Question]    I will show you what has been marked first as People's Exhibit No. 36. In fact, in that photograph, Dr. Montez, you see an area that has been circled?
      [Answer]     I do.
      [Question]    Can you tell us what that is?
      [Answer]     That is a **linear fracture which is almost an inch long, and it goes to full thickness of the skull**. (R.4527).

119.   Dr. Montez testified:

      [Question]    And then you stated that this was a through-and-through **skull fracture**, is that right?
      [Answer]     Correct, the full thickness of the skull. (R.4528).

33

120.  Dr. Montez testified:

    [Question]    I will show you what is admitted as People's Exhibit No. 37.
                     Dr. Montez, is that in fact the same skull fracture that you
                     saw on January 16, 2009?
    [Answer]     That is it.
    [Question]    You told us that you were able to actually touch that with
                     your bare hands?
    [Answer]    Correct. (R. 4528-4529)

121.  Dr. Montez testified:

    [Question]    What is depicted in this photograph in what you
                     described?  Was that an abnormal suture?
    [Answer]    The parts that are circled, not at all. That is a skull fracture
                     through- and-through on both sides . (R. 4530)

122.  Dr. Montez testified:

    [Question]    Doctor, are the injuries that you observed in Ben and
                     everything else that you reviewed in this case come into your
                     opinion consistent with a preexisting condition in Ben's head
                     that could have been weeks or months old?
    [Answer]     Not at all. It is not weeks or months old.
    [Question]    Why not?
    [Answer]    Based on the examination of the injuries themselves, we have
                     got a contusion on the outside of the scalp, which is fresh. We
                     got fresh dense blood underneath the scalp itself. **We got a
                     skull fracture** that is in no way in any shape, or way of
                     healing, and we have blood that is found in the right side of
                     the head which when the head is open, it gushes. (R.4536).

123.  Dr. Montez testified:

    [Question]    Dr. Montez, do you have an opinion to a reasonable degree of
                     scientific and medical certainty as to whether or not Ben
                     Kingan could have caused this injury to himself?
    [Answer]    Which injury?
    [Question]    All of the injuries that you saw?
    [Answer]    He can 't.
    [Question]    Why not?

34

[Answer]    He can't generate by himself enough force to give us that much bleeding in the subgaleal tissues **fracture a pliable skull** causing a blood collection of the right side of his brain that gushes out when the head is open, and also compresses the brain, and also causes bleeding on the surface of the brain itself. (R. 4553-4554).

124.    Dr. Montez testified:

[Question]    But, again, a chronic subdural hematoma in conjunction with another traumatic incident such as a shortfall can cause bleeding, right?

[Answer]    Generally speaking, but not in Ben's case. Ben doesn't only have a subdural. We can't forget that. He has the subgaleal hemorrhage, **a fractured skull**, bleeding on the surface of the brain. (R. 4587)

125.    During Closing Arguments, the State argued as follows:

"The **skull fracture, it is a skull fracture**. Simple as that. He saw it. Dr. Choi saw it. We talked about what the Defense experts said about all these findings . It was **a skull fracture through** and through fresh with blood in between." (R. 4628).

126.    During Closing Arguments, the State argued as follows:
"Ladies and Gentlemen, use your common sense and experience. This line is a **fracture in the skull**. You do not need a doctor to see a **fracture**. What did Dr. Montes say? Remember how he manipulated this skull? He manipulated the skull. Why? To see how old that was. Look at that red substance in the crack and the two sides. What is that? Fresh blood. **That is a fresh fracture**. It was **a fresh fracture**." (R. 4697-4698).

127.    During Closing Arguments, the State argued as follows:
"First proposition we have to show that the Defendant [per]formed an action [that] caused death. We have it. What were the acts? Threw him to the ground. **Cracked his head**. **Fractured**." (R. 4715).

As shown by the extensive testimony from numerous witnesses for the State, the false medical evidence that Ben's skull had been fractured was crucial to the success of the State's prosecution of Petitioner.

35

*Appellate Court Opinion*

128.    Petitioner raised multiple arguments on direct appeal.  Those arguments were reviewed in a light most favorable to the state that Ben had not suffered any prior injury and that Ben had suffered a skull fracture at the time of his death.  Further, the Appellate Court did not find the State's evidence overwhelming. Rather, while it did find the evidence sufficient, the Appellate Court explained that its decision was based on the assumption, in the light most favorable to the State, that "Ben was a healthy baby, that he had no medical condition that would have contributed to his death." See Appellate Court Opinion attached and incorporated herein as *Exhibit A, ¶116.*

I.

**PETITIONER HAS NEWLY DISCOVERED EVIDENCE THAT NEGATES THE PROBABLE CAUSE BASIS FOR PETITIONER'S ARREST**

129.    Dr. Choi  has now admitted that he missed the fact that Ben suffered a prior injury.

130.    In an affidavit signed July 22, 2013, Dr. Choi acknowledges that he made a mistake and missed evidence of an injury that pre-dated January 14, 2009.  See affidavit of Dr. Choi, attached and incorporated herein as *Exhibit B.*

131.    Specifically, Dr. Choi states, in his affidavit, as follows:

"4.  That in my report and testimony, I missed that [Ben] had suffered an old injury that pre-dated January 14, 2009.

5.  That the photomicrographs and histology slides of [Ben] reveal there

36

are numerous siderphages, positive iron stains, and hemosiderin lade microphages which confirm the existence of a developed, organizing subdural membrane, which indicated an older injury that pre-dated January 14, 2009.

6. That I thought that cellular structure was of mesenchymal origin, but at the time of his death, [Ben] had a developed, organizing subdural membrane, which indicated an older injury that pre-dated January 14, 2009.

7. That it is my opinion based on a reasonable degree of medical certainty, that at the time of his death, [Ben] had suffered a head injury prior to January 14, 2009, as evidenced by the well developed, organizing subdural membrane present, which indicated an older injury that pre-dated January 14, 2009." *See Exhibit B, ¶¶4-7.*

132. With this admission, it is now clear that Dr. Choi incorrectly advised the Detectives before and during their interrogation of Petitioner.

133. Dr. Choi was directing the interrogation of Petitioner. The Detectives relied upon the accuracy of the medical opinions he conveyed to them to continue their interrogation.

134. Petitioner repeatedly explained that she had done nothing to harm the child. But in the face of these protestations of innocence, Dr. Choi advised the Detectives that Ben's injuries could not have occurred without a brutal criminal act.

135. Indeed, in deciding to deny Petitioner's pretrial Motion to Quash the Arrest for lack of probable cause, the trial court found that the interrogation properly continued until Petitioner "confessed" to throwing Ben on the ground. But that conclusion was based on the assumption that Petitioner's previous innocent explanations could not have caused Ben's injuries.

37

G_041

136.   Now that it is known Ben suffered a prior injury, it is now understood that Petitioner's protestations of innocence were explanations that should have been believed by the detectives. The Detectives were completely incorrect when they repeatedly told Petitioner that her innocent explanations were medically impossible.

137.   Because he suffered from a prior injury, Ben could have been injured through his own actions. The force Dr. Choi told the Detectives was required to cause the injuries was, in fact, not required.

138.   Viewed in this new light, even the State's experts that relied on Dr. Choi at trial would agree less force was required.

139.   For example, during his trial testimony, Dr. Montez admitted the following:

> [Question]    If a child had a subchronic subdural hematoma, you agree that a
>                minor trauma incident could cause that to re-bleed, correct?
>
> [Dr. Montez]  Correct.

140.   Additionally, Dr. Greenbaum agreed that, in some cases, a minor trauma can cause a chronic subdural hematoma to re-bleed. *Exhibit A, ¶ 80.*

141.   Even Dr. Choi admitted "that a minor fall or trauma could aggravate a preexisting chronic subdural hematoma." *Exhibit A, ¶ 41.*

142.   The Appellate Court's decision illustrates that the new evidence from Dr. Choi would almost surely change its decision. The Court believed the detectives correctly advised Petitioner that her truthful statements were untrue because that Court assumed that Ben had not suffered the prior injury Dr. Choi now admits he had:

38

Detective Curran told defendant that it was "a medical certainty that somebody's done this to him. What we need to know right now is if this was done by accident or did somebody intentionally hurt him?" He further told defendant that the medical examiner knew that Ben had received his injuries at the day care that day. *Exhibit A*, ¶ 51.

Chief Filenko [advised Petitioner that] the injury was as serious as being dropped from the second floor of a building. *Exhibit A*, ¶ 54.

The officers left the room for about an hour and a half. They returned at 3 p.m. and told defendant that the specialist physician on their team said that Ben could not have generated enough force to cause his injuries by throwing himself backwards. *Exhibit A*, ¶58.

The officers returned a few minutes later and told defendant that the doctor said that Ben's injury would have required more force than what she described. *Exhibit A*, ¶ 63.

The officers told defendant that she was not helping herself by lying. They explained how "horrendous" Ben's injury was and how it could not have resulted from her dropping him as described. *Exhibit A*, ¶ 64.

Detective Curran continued, "Third of all, this story you're giving us is a load of shit." Defendant interrupted, "I am not." She clapped her hands for emphasis, saying, "That is what I am telling you." She continued saying that she did not hit Ben, throw him on the ground, or hit him against the wall. Detective Curran told defendant that the doctor just did an experiment and that there was no way that defendant's dropping Ben as she described could have caused his injuries. *Exhibit A*, ¶ 66.

143.    Had the Appellate Court been aware that Dr. Choi missed a prior injury and incorrectly advised the Detectives as to the medical evidence, the above conclusions would not have been drawn.

144.    Because Petitioner's explanations would have been accepted by reasonable detectives had they been correctly advised as to the medical evidence, the interrogation would have ceased because probable cause never existed.

39

G_043

## II.

### PETITIONER HAS NEWLY DISCOVERED EVIDENCE THAT DEMONSTRATES THAT PETITIONER'S CONFESSION WAS INVOLUNTARY AND UNRELIABLE

145.    Assuming *arguendo*, that probable cause would have developed in the absence of Dr. Choi's mistakes and misdirection, which Petitioner vehemently denies, Petitioner's confession would still have been deemed involuntary and unreliable.

146.    As set forth above, the detectives obtained all of their medical information from Dr. Choi.  They utilized the opinions Dr. Choi provided to conduct their interrogation.  The detectives conveyed Dr. Choi's opinions to Petitioner.  When Petitioner repeatedly refused to implicate herself and repeatedly explained she had done nothing wrong, the detectives advised her she was lying, because Dr. Choi told them she was lying.

147.    Many of the ways the Detectives told Petitioner she was lying were noted by the Appellate Court.    For example, Chief Filenko said that [Petitioner's] stories were "mathematically, physically impossible." *Exhibit A, ¶ 67.*

148.    But it is now known that Ben had a chronic subdural hematoma caused by a prior injury. Dr. Choi conveyed to the detectives that Petitioner was lying because he had missed the presence of Ben's chronic subdural hematoma caused by a prior injury.  In light of that chronic subdural hematoma caused by a prior injury, it is now known that Petitioner had advised the Detectives of a version of events that was not "mathematically, physically impossible."

149.    Petitioner argued on appeal that the "confession" should have been suppressed as

40

involuntary and unreliable. In ruling against Petitioner on that issue, the Appellate Court explained "to the extent that the officers were skeptical of defendant's stories, such skepticism was not unwarranted given the inconsistency between [Petitioner's] ever-changing stories and the medical evidence." *Exhibit A,* ¶ 98.

150. Now it is known that the skepticism <u>was</u> "unwarranted" because Petitioner's statements were not "inconsistent" with the medical evidence. Dr. Choi's opinions were "inconsistent" with the medical evidence. Petitioner's "stories" only changed because her true statements were not accepted in light of Dr. Choi's incorrect opinions.

151. The Appellate Court also ruled that:

> When defendant told the officers that she had dropped Ben, they spent a great deal of time discussing the details of that scenario. They repeatedly asked her to explain and demonstrate that scenario so that they could verify that it was consistent with the medical evidence. *Exhibit A,* ¶ 98.

152. Now it is known that although the detectives may have been attempting to verify Petitioner's statements with the medical evidence, they were verifying those scenarios with medical evidence that had been incorrectly interpreted by Dr. Choi. If Dr. Choi had interpreted the medical evidence correctly, then the detectives would have verified her statements correctly.

153. Petitioner argued on direct appeal that her "confession" should have been suppressed because the detectives' false statements destroyed the information she required to make a rational choice. Petitioner based her argument on *Aleman v. Village of Hanover Park,* 662 F.3d 897 (7th Cir. 2011) *cert. denied.,* 133 S. Ct. 26 (U.S. 2012).

154. In finding against Petitioner on this issue, the Appellate Court discussed *Aleman* at length.

155.    Specifically, the Appellate Court framed the issue as one involving a determination as to whether the "confession" had been induced by a particular police officer's lies about the medical reports. *Aleman*, 662 F.3d at 906.  There, the police officer repeatedly advised the defendant that the medical evidence established that the baby had been shaken in such a way that he would have become unresponsive immediately, meaning that the defendant caused the baby's injury.  When confronted with this medical evidence, the defendant confessed. *Aleman*, 662 F.3d at 902. The Seventh Circuit Court of Appeals found the defendant's confession involuntary because the interrogators' lies convinced [the defendant] that he must have been the cause of the baby's death because the doctors had excluded any other possibility. *Aleman*, 662 F.3d at 906.

156.    In ruling against Petitioner, the Appellate Court held that "unlike in *Aleman*, the officers here did not lie about the medical evidence and did not force a conclusion on defendant." *Exhibit A, ¶ 100.*  Thus, the Appellate Court decision to deny Petitioner relief on this issue was premised on its conclusion that the detectives did not lie about the medical evidence.

157.    However, it now known that Dr. Choi, and in turn the detectives, conveyed false medical evidence to Petitioner.

158.    Had the Appellate Court (or perhaps the trial court) been aware of the new evidence establishing the false information conveyed to Petitioner, the "confession" would more likely than not have been suppressed.

G_046

III.

**PETITIONER HAS NEWLY DISCOVERED EVIDENCE THAT WOULD RESULT IN THE OUTCOME OF THE TRIAL BEING DIFFERENT.**

159.    Dr. Choi's mistake not only caused Petitioner's arrest and resulted in the failure to suppress her "confession," it also caused Petitioner's conviction.

160.    Had the new evidence of Dr. Choi's mistake been available at the time of trial, the outcome of the trial would far more likely than not have been an acquittal.

161.    The significance of this new evidence cannot be understated.  Petitioner's entire theory of the case was that Ben suffered a prior head injury which resulted in a chronic subdural hematoma caused by a prior injury.

162.    Dr. Choi was the only testifying expert for the State to have reviewed the histology slides.  Every other expert called by the State deferred to Dr. Choi's review of those slides. Dr. Choi has now admitted, contrary to his trial testimony, that in fact there is evidence of a developed, organized subdural membrane which underlined proves the existence of a chronic subdural hematoma caused by a prior injury that pre-dated January 14, 2009.

163.    The State argued to the jury that the defense's theory of the case could not be believed because Dr. Choi reviewed the histology slides and determined there was no evidence of a chronic subdural hematoma caused by a prior injury.  This is now known to be untrue.

164.    Certainly, this new evidence would have more than bolstered Petitioner's defense. Dr. Choi – acknowledged by the State to be a competent and credible witness – now admits the existence of a chronic subdural hematoma caused by a prior injury in accordance with Petitioner's theory. Not only does this support Petitioner's theory as to how the injury was

43

G_047

inflicted, but it undermines the aspersions cast upon Petitioner's experts by the State. Simply put, this new evidence offered by the State's own expert places the evidence in a completely different light.

165.    Dr. Choi's admission that he simply "missed" the obvious evidence of an older injury also calls into question the reliability of every other opinion he testified to at trial, including the amount of force necessary to inflict the injuries he observed during the autopsy and the timeframe within which that injury was inflicted.

166.    The case of *People v. Ehlert*, 211 Ill.2d 192 (2004) is instructive. There, the defendant was convicted of murdering her child. On appeal, the Appellate Court found the evidence insufficient. The Supreme Court affirmed.

167.    In finding the evidence insufficient, the Supreme Court reviewed the opinions and testimony of the pathologist that had performed the autopsy. That pathologist testified that when she completed the autopsy, she had not formed an opinion as to the child's cause of death. *Id.*, at 199. She testified that she was unsure of the cause of death and advised the police to investigate further. *Id.*

168.    Subsequently, the police advised the pathologist as to statements the defendant and another witness had made. Based on the information provided by the police, the pathologist reached her opinion that the death had been a homicide.

169.    The Court noted that on the death certificate, the pathologist had written "pending police investigation" in the space for cause of death and left blank the space for manner of death. *Id.,* at 206. Thus, it was apparent that the pathologist had based her final opinion on information

44

provided by the police.

170.    The Supreme Court set forth the opinion of one expert that explained that it was not a "generally accepted practice among forensic pathologists to base cause of death opinions on information in police reports." *Id.* at 208. That expert explained:

> "We are engaged in a scientific discipline in which the opinions regarding cause of death need to be related to findings in the examination, specifically in the case of forensic pathology in autopsy. And if those findings aren't there, then it's inappropriate to develop an opinion based on what someone heard or said. That's completely outside the discipline of science." *Id.,* at 209.

171.    The Supreme Court then explained that the defendant's conviction was based on the "equivocal testimony from the medical examiner regarding the cause and manner of death" and the statement of another witness and deemed the evidence insufficient. *Id.,* at 214.

172.    Here, the facts are very similar. Dr. Choi testified that he determined a cause of death on January 15, 2009. However, he listed his findings in his autopsy report on that date. See Dr. Choi's Autopsy Report, attached and incorporated herein as *Exhibit C*. In that report, in the blank where Dr. Choi was to insert his "Pathological Summary," among other medical findings, Dr. Choi wrote, "Police Investigation." *Exhibit C, p. 5.* In the blank space for Dr. Choi to submit his "Opinion," he wrote "Pending further studies." *Exhibit C, p. 5.*

173.    Then, on January 16, 2009, while Petitioner was being interrogated, further pathological examination of Ben's <u>body</u> was conducted. No further examination of his <u>head</u> was performed.

174.    Although no further examination of Ben's head had been performed, Dr. Choi submitted his opinion, which was no longer "pending further studies." Rather, Dr. Choi wrote

45

"This 16 months, *(sic)* male, White, Ben Kingan died of Cranio-Cerebral injuries due to Blunt Trauma of the head." *Exhibit C, p. 7.*

175.   Just as in *Ehlert*, Dr. Choi changed his opinion based on something other than scientific findings learned from an examination of Ben.

176.   Now, with the new evidence of Dr. Choi's mistake, his testimony must be deemed even more deficient than that of the pathologist in *Ehlert*. Dr. Choi admitted at the trial that where a prior head injury exists in a child, a minor impact may lead to the child's death. Now, it is known that Ben had a chronic subdural hematoma caused by a prior injury at the time of the autopsy. There would not have been a need for "pending further studies" if Dr. Choi had not missed the prior injury. Even if his opinion had been "pending further studies," later histological studies would have confirmed "that at the time of his death, [Ben] had suffered a head injury prior to January 14, 2009, as evidenced by the well developed, organizing subdural membrane present, which indicated an older injury that pre-dated January 14, 2009." *Exhibit B, ¶7.*

177.   For all of the above stated reasons, there was no probable cause for Petitioner's arrest. Petitioner's confession was uncorroborated and obviously coerced. If there had been a trial, the outcome would have likely been different.

46

## IV.

**PETITIONER HAS NEW, PREVIOUSLY UNDISCLOSED EVIDENCE THAT THERE WAS NO SKULL FRACTURE AND THAT THE MECHANISM OF DEATH WAS CEREBRAL EDEMA CAUSED BY THE PRIOR INJURY AND EXACERBATED BY REPETITIVE HEAD-BANGING.**

178.    Dr. Nancy Jones is one of the foremost forensic pathologists in the country. **She is not a retained expert of Petitioner**. She has independently reviewed all of the medical findings in the case and reached her own conclusions. She has explained the significance of this new evidence. Dr. Jones is board certified in clinical, anatomic, and forensic pathology. She has conducted over 10,000 autopsies, of which she estimates 10 to 15% have been of infants or small children. She has taught, published, and lectured in the field of forensic pathology, and specifically on the issue of child trauma and death. She has been qualified as an expert in forensic pathology and testified as such in Illinois courts more than 900 times.

179.    In fact, prior to the Lake County Coroner's Office contacting Dr. Montez for his "curbside consult," Deputy Coroner Forman contacted Dr. Jones to see if she was available to review the case. *Exhibit D, ¶¶5-7.*

180.    In 2013, after Dr. Choi admitted his mistake, Dr. Jones reviewed the following documents: all the gross photographs and photomicrographs taken by Dr. Choi, Dr. Teas, and Dr. Rudd; the original histology slides created by Dr. Choi; the re-cuts prepared by Dr. Rudd, and the new slides created by Dr. Teas and Dr. Rudd; the trial testimony of Drs. Choi, Montez and Teas; the reports of Drs. Teas and Leestma; the trial testimony of Detective Curran and Nancy Kallinger; the video and transcript of the interrogations of Petitioner; affidavits previously

47

G_051

signed by herself and Dr. Blum; a letter sent by Dr. Choi to Dr. Rudd following a recent review of all the original and additional autopsy material that Dr. Choi did at the request of Dr. Rudd; and Dr. Choi's affidavit of January 22, 2013. *Exhibit D, ¶9.*

181.    Dr. Jones offers the following opinions based upon a reasonable degree of medical and scientific certainty:

    a.   At the time of his death Ben Kingan had a well-developed, organizing subdural membrane that was missed by both Dr. Choi, during his initial postmortem examination, and by Dr. Montez, during his unofficial examination. *Exhibit D, ¶10.*

    b.  The subdural membrane is clearly visible in the gross autopsy photographs. Review of the photomicrographs and histology slides reveal the existence of numerous siderophages, positive iron stains, and hemosiderin laden macrophages, confirming the existence of the well-developed, organizing subdural membrane. *Exhibit D, ¶¶11-12.*

    c.  Ben Kingan had suffered at least one previous subdural hemorrhage, which was undergoing organization at the time of his death. Again, this old injury was missed by Dr. Choi and Dr. Montez. *Exhibit D, ¶13.*

    d.  A review of the materials provided revealed that Ben Kingan suffered a head injury in October 2008 and exhibited symptoms of a head injury, including repetitive vomiting and lethargy. The degree of organization seen in the microscopic studies is consistent with a subdural hemorrhage of 2 to 3 months of age. *Exhibit D, ¶14.*

    e.  In addition to an old injury, the autopsy photographs reveal a recent subdural and subarachnoid hemorrhage. *Exhibit D, ¶15.*

    f.  According to Nancy Kallinger, Ben Kingan struck his head, while in her presence at the Child Care Center on the day of his death, and he became unresponsive within 30 minutes. *Exhibit D, ¶16.*

    g.  The symptoms exhibited by Ben Kingan at the time of his injury, in October 2008, are consistent with a significant concussion, and the mechanism of Ben Kingan's death in January 2009 was cerebral edema consistent with a significant concussion, following cumulative incidences of head-banging. Additionally, the gross photographs taken at the autopsy and on January 16, 2009, show that what had been identified as a "0.8 inch linear skull fracture" was near to, but not involved in, the "4 inch by 4 inch" subgaleal hemorrhage on the back of Ben Kingan's head. *Exhibit D, ¶17.*

    h.  Because there was no hemorrhage seen in the periosteum or the subgaleum in the area of this defect, and the fact that a shorter, similar appearing defect was present

48

G_052

in the left parietal bone, the lack of hemorrhage in the area would speak against these being blunt trauma injuries. The lack of hemorrhage would be more consistent with a normal variation in the skull, known as accessory suture rather than a fracture. *Exhibit D, ¶18.*

i. Further, the gross photographs of the subgaleal hemorrhage show an area of brown discoloration, indicating that there is at least one portion of that area showing evidence of healing. Unfortunately, according to the record provided by Dr. Choi, there was no histologic section taken from the area where the brown discoloration is seen, to age this particular injury. *Exhibit D, ¶19.*

j. The degree of organization of the subdural membrane is too well-developed for the subdural membrane and the organizing subgaleal hemorrhage to have occurred at the same time. *Exhibit D, ¶20.*

k. The pattern of injuries sustained by Ben Kingan, does not reflect the manner in which Petitioner demonstrated throwing him to the ground in the interrogation videos. Petitioner demonstrated that she was holding Ben Kingan with his face directed away from her. If she had in fact held Ben Kingan in this manner, the injuries found at autopsy were entirely inconsistent with her video demonstration. If she had held Ben Kingan with him facing towards her body, Ben Kingan would have sustained a different pattern of injuries given the force and movement she demonstrated in the videos that Dr. Jones reviewed. *Exhibit D, ¶21.*

l. On June 11, 2015, Dr. Rudd provided Dr. Jones with additional x-rays that she had not reviewed previously. *Exhibit D, ¶22.*

m. Dr. Jones' understanding is that x-rays of Ben_Kingan 2 and 3 of Group Exhibit B were not disclosed to the defense attorneys prior to or during the trial. *Exhibit D, ¶23.*

n. Of particular significance is x-ray Ben_Kingan 3 of Group Exhibit B. This x-ray reveals that Ben Kingan's head is shaped like an old-fashioned light bulb, which is abnormal for a toddler Ben Kingan's age. It was known that Ben Kingan's head circumference stayed around the 50th percentile for about the first year of his life; at his 15-month visit, Ben Kingan's head circumference had grown to the 75th percentile; and at the time of his death, his head circumference measured in the 95th percentile; this evidence combined with the findings on the previously undisclosed x-ray Ben_Kingan 3 of Group Exhibit B are indicators of significant head trauma that occurred well before his death. *Exhibit D, ¶24.*

o. The head shape in x-ray Ben_Kingan 3 of Group Exhibit B is consistent with previous swelling of the brain which lead to the enlargement of the skull. The brain was swollen to a degree that resulted in the loss of the normal subarachnoid space. It is my opinion this brain swelling caused the abnormal light bulb shape of Ben Kingan's head. *Exhibit D, ¶25.*

p. While the head of a child Ben Kingan's age may swell a small amount overnight due to *acute* injury, it is highly unlikely that such a child's head would swell to the extent illustrated on x-ray Ben_Kingan 3 of Group Exhibit B. Furthermore, it

49

is unlikely that a child's head would swell to the extent illustrated by x-ray Ben_Kingan 3 of Group Exhibit B within the short amount of time Petitioner had contact with the child before his death. *Exhibit D, ¶26.*

q. Swelling of the head due to an *acute* injury is manifested by separation of the cranial sutures. No such separation is seen in x-ray Ben_Kingan 3 of Group Exhibit B, which would indicate that the enlargement of the head had occurred sometime in the past, and is not related to any *acute* injury. It is my opinion, after reviewing x-ray Ben_Kingan 3 of Group Exhibit B, that the fact that the sutures were not separated, indicates that, it is more likely than not, Ben Kingan had a chronic, as opposed to an acute, condition. *Exhibit D, ¶27.*

r. Dr. Jones was been able to identify an accessory suture that is visible in the right parietal bone on x-ray Ben_Kingan 3 of Group Exhibit B. The accessory suture further supports Dr. Jones' opinion that, it is more likely than not, the pathologist Dr. Choi mistakenly identified this accessory suture as a skull fracture. *Exhibit D, ¶28.*

s. It is my opinion that had the defense experts been provided with x-ray Ben_Kingan 3 of Group Exhibit B, they would not have concluded that the mechanism of death was a re-bleed. Rather, the defense experts would have concluded that the mechanism of death was cerebral edema, arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident, witnessed by Nancy Kallinger, within 15-20 minutes of Ben Kingan becoming unresponsive. *Exhibit D, ¶29.*

t. It is Dr. Jones' opinion that, at trial, neither the prosecution or defense experts accurately described the mechanism of death. It is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted. *Exhibit D, ¶30.*

u. It also Dr. Jones' opinion that Petitioner's description of inflicting a fatal injury on Ben Kingan was inconsistent with the cerebral edema mechanism of death she has described above based on her review of the previously-cited evidence. *Exhibit D, ¶31.*

182. The State referred to the existence of a skull fracture no less than 32 times during the course of the trial of Petitioner. cited Drs. Choi and Montez's finding of a skull fracture as proof of the tremendous force inflicted upon Ben causing his demise. The detectives cited the existence of a skull fracture, throughout their interrogation of Petitioner. The detectives rejected Petitioner's early statements that she had not dropped or thrown Ben to the ground, and used the

50

alleged existence of a skull fracture to coerce Petitioner until she demonstrated sufficient force to satisfy the detectives' mistaken conclusion that there was skull fracture. *See paragraphs 81-127.*

183.    As a preliminary matter, it is Dr. Jones' opinion that Petitioner's demonstration, as prompted by the Detectives, of holding Ben with his face directed away from her, does not fit the pattern of injuries sustained by him. Furthermore, in Dr. Jones' opinion, if Petitioner had held Ben facing towards her and used the force and movement demonstrated in the video, he would have sustained a different pattern of injuries. *Exhibit D, ¶21.*

184.    Assuming *arguendo* that there was a "fracture," according to Dr. Jones, the fracture was not correlated with the injury that occurred to Ben from the head-banging incident, described by Nancy Kallinger, that occurred within 30 minutes of him becoming unresponsive. According to Dr. Jones, the gross photographs taken at the autopsy and on January 16, 2009, show that what had been identified as a "0.8 inch linear skull fracture" was near to, but not involved in, the "4 inch by 4 inch" subgaleal hemorrhage on the back of Ben Kingan's head. *Exhibit D, ¶¶17.*

185.    More importantly, it is Dr. Jones' opinion that there is no fracture, and that the "fracture" noted by Dr. Choi is actually an accessory suture. *Exhibit D, ¶¶18.*

186.    Recently, Dr. Jones was able to detect the existence of an accessory suture in exactly the same location as the "fracture" described by Dr. Choi. Dr. Jones was able to definitively confirm the existence of an accessory suture after she was provided with an x-ray previously undisclosed to the defense counsel. (Ben_Kingan 3 of Group Exhibit B). *Exhibit D, ¶¶18, 28.*

51

187.    According to Dr. Jones, the symptoms exhibited by Ben Kingan at the time of his injury, in October 2008, are consistent with a significant concussion, and it is her opinion that the mechanism of Ben Kingan's death in January 2009 was cerebral edema consistent with a significant concussion, following cumulative incidences of head-banging. It is Dr. Jones' opinion that had the defense experts been provided with x-ray Ben_Kingan 3 of Group Exhibit B, they would not have concluded that the mechanism of death was a re-bleed. Rather, the defense experts would have concluded that the mechanism of death was cerebral edema, arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident, witnessed by Nancy Kallinger, within 15-20 minutes of Ben Kingan becoming unresponsive. *Exhibit D, ¶¶17, 29.*

188.    Dr. Jones concludes that neither the prosecution nor the defense experts to testify at Petitioner's trial accurately described the mechanism of Ben's death.

### *Brady Violation*

189.    On June 10, 2015, Paul Calusinski, Petitioner's father, received a phone call on his cell phone from a number that came up as "Private." When Mr. Calusinski answered, a male voice spoke and said, "Mr. Calusinski, you need to tell your attorneys to get the second set of x-rays of Ben Kingan from the Lake County Coroner's Office." Mr. Calusinski did not recognize the person's voice, and asked him "Who is this?" The person hung up without answering. Mr. Calusinski contacted the Lake County Coroner's Office and spoke to Dr. Rudd, informing him of the anonymous phone call he had received, about a second set of x-rays of Ben Kingan. See

52

G_056

affidavit of Paul Calusinski, attached and incorporate herein as *Exhibit E, ¶¶1-5.*

190.    On June 10, 2015, Dr. Rudd received a call from Mr. Calusinski regarding the Ben Kingan x-rays taken at his autopsy. Mr. Calusinski told Dr. Rudd that he had received a phone call from someone he did not know, who told him that there was a "second set" of x-rays taken of Ben Kingan. After receiving the phone call, Dr. Rudd reviewed the entire file pertaining to Ben Kingan (Case#09011417491).  Upon reviewing the file, Dr. Rudd could not find any x-rays. Dr. Rudd requested that Deputy Coroner Michael Reid search for x-rays in the Lake County Coroner's system. Deputy Reid informed Dr. Rudd that he found the x-rays that Mr. Calusinski was referencing, and Dr. Rudd disclosed the x-rays to Dr. Jones and Petitioner's counsel. See affidavit of Thomas Rudd, attached and incorporated herein as *Exhibit F, ¶¶3-8.*

191.    Petitioner's trial attorney, Paul DeLuca, has provided a post-conviction affidavit which states the following:

    a.  I was the lead attorney that represented the defendant, Melissa Calusinski, at trial in the above-captioned matter.
    b.  I reviewed all of the discovery tendered by the State and third-parties prior to trial.
    c.  During the course of pretrial discovery I subpoenaed the Lake County Coroner's Office twice for production of its entire file, which would include any x-rays taken of Benjamin Kingan prior to, during, or after the autopsy.
    d.  At a subsequent status date, assistant state's attorney Christen Bishop advised the Court that there were x-rays taken but that the x-rays were not readable or legible.
    e.  A copy of the illegible x-rays referenced by Ms. Bishop was produced to me on disc.  A copy of the disc is attached to this affidavit as Exhibit A Prosecutor Bishop tendered digital images on a disk to me in open court and represented to the court, "they are illegible on the digital." (R.1813).
    f.  I reviewed the disc that was produced by the State. The disc had a total of three images, labeled "Ben_Kingan1", "Ben_Kingan2", and "Ben_Kingan3."
    g.  The image labeled "Ben_Kingan1" is blank.
    h.  The image labeled "Ben_Kingan2" is blank.
    i.  The image labeled "Ben_Kingan3" is dark, but appears to be an x-ray of the lower

53

G_057

body.

j.  These are the only three x-rays that were ever produced to me by either the State or the Lake County Coroner's Office.

k.  Since Melissa Calusinski's trial, I have been informed that second set of x-rays of Benjamin Kingan was taken at the Lake County Coroner's Office that includes readable x-rays.

l.  I have reviewed a copy of this second set of x-rays. They are attached to this affidavit on disc as Exhibit B.

m.  There are five images on this disc, labeled, "Ben_Kingan1", "Ben_Kingan2", "Ben_Kingan3", "Ben_Kingan4", and "Ben_Kingan5."

n.  The image "Ben_Kingan1" on Exhibit B is similar to the "Ben_Kingan1" image that was produced to me on Exhibit A, except the image on Exhibit B has additional information at the top including "Patient", "Age", "Gender", "Provider", "Date Acquired", "Laterality", and "Anat. Region".

o.  The image "Ben_Kingan2" on Exhibit B is bright and appears to be of Benjamin Kingan's head and upper body. This image was never produced to me.

p.  The image "Ben_Kingan3" on Exhibit B appears to be a readable x-ray of Benjamin Kingan's head and upper body. This image was never produced to me by either the State or the Lake County Coroner's Office.

q.  The image "Ben_Kingan4" on Exhibit B is similar to the "Ben_Kingan3" image that was produced to me on Exhibit A, except the image on Exhibit B has additional information at the top including "Patient", "Age", "Gender", "Provider", "Date Acquired", "Laterality", and "Anat. Region".

r.  The image "Ben_Kingan5" on Exhibit B appears to be a brighter, readable x-ray of Benjamin Kingan's lower body. This image was never produced to me by either the State or the Lake County Coroner's Office.

s.  If the x-ray image "Ben_Kingan3" had been produced to me (the readable x-ray of Benjamin Kingan's head), I absolutely would have given the x-ray to my experts who testified at trial, Dr. Teas and Dr. Leestma. The x-ray would have been essential to determining the veracity of the prosecution's experts' claims that Benjamin Kingan suffered a "through and through" fracture.

t.  I also absolutely would have given the x-ray to my experts to determine what, if any, information it might provide regarding the cause of Benjamin Kingan's death.

u.  It is my understanding that if the x-ray image "Ben_Kingan3" had been reviewed by a pathologist, they would have concluded based on the image that Ben had a chronic condition of brain swelling that caused the brain to push the skull into malformation, similar to a light bulb.

v.  It is also my understanding that had a pathologist reviewed the x-ray image "Ben_Kingan3" they would have detected an accessory suture at the sight the prosecution was claiming there was a fracture, which was not correlated with any injury.

54

G_058

    w. This would have led my experts to conclude that Ben died a hypoxic death, as opposed to a re-bleed.

    x. The failure of the prosecution to produce this x-ray significantly impeded my ability to consult with my experts, cross-examine the State's experts, and ultimately defend my client. See Paul DeLuca's affidavit, attached and incorporated herein as *Group Exhibit G, ¶¶ 2-25.*

192.    Forman has also provided an affidavit to Petitioner. See affidavit of Paul Forman, attached and incorporated herein as *Exhibit J.* Forman states:

    a. I was employed by the Lake County Coroner's Office in January, 2009.
    b. I performed duties in relation to the death of Benjamin Kingan.
    c. I took x-rays of Benjamin Kingan, including an x-ray of his head.
    d. I was present when Dr. Choi reviewed the x-rays, including the head x-ray, and observed him reviewing the x-rays. All of the x-rays that I took were clear and readable. *Exhibit J, ¶ 4-7.*

193.    Petitioner has demonstrated that her conviction should be vacated for the following reasons: 1) They key expert witness for the State, Dr. Choi, has admitted that he mistakenly told the jury that there was no prior head injury when in fact there was a prior injury. 2) Dr. Choi was unable to reach a conclusion at the end of his autopsy that Ben was the victim of a homicide. Rather, Dr. Choi improperly relied upon Petitioner's confession to reach that conclusion. 3) Dr. Jones has re-reviewed all of the medical evidence about the cause and mechanism of Ben Kingan's death and she has concluded that he died from cerebral edema and not an acute injury or a rebleed of a prior injury. 4) The State's *Brady* violation alone should result in Petitioner's conviction being vacated. The cumulative impact of the above-stated errors should result in Petitioner's conviction being vacated.

194.    In light of Dr. Jones' opinion and Dr. Choi's admission and all that is now known, Petitioner's conviction should be vacated.

G_059

*Applicable Law*

195.    A claim of actual innocence is cognizable in a postconviction petition because the imprisonment of an innocent person violates the due process clause of the Illinois Constitution, as do procedural barriers to having a claim of innocence adjudicated on the merits. *People v. Washington,* 171 Ill.2d 475  (1996).  A postconviction petition presents an actual innocence claim where there is evidence that is (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Ortiz,* 235 Ill.2d 319, 333 (2009);  *People v. Molstad,* 101 Ill.2d 128, 134, (1984).

196.    The new evidence need not prove actual innocence; it is enough that " 'all of the facts and surrounding circumstances ... should be scrutinized more closely to determine guilt or innocence.' " *Ortiz,* 235 Ill.2d at 337, (quoting *Molstad,* 101 Ill.2d at 136); *People v. Henderson,* 2014 IL App (2d) 121219, ¶ 24.

197.    Material means the evidence is relevant and probative of Petitioner's innocence. *People v. Coleman,* 2013 IL 113307, ¶ 96.  Noncumulative means the evidence adds to what the jury heard. *Id.* Evidence is material and noncumulative if it goes to the ultimate issue in the case and, if believed, would " produce new questions to be considered by the trier of fact" that concern defendant's guilt. *People v. White*, 2014 IL App (1st) 130007, ¶ 24.

198.    Here, new evidence in the form of an admission by the State's own testifying pathologist that there was a pre-existing subdural hematoma would certainly produce new

56

.

questions to be considered by the trier of fact and probably change the result of a retrial. As a threshold matter, Dr. Choi's admission that there was in fact evidence of a pre-existing injury would have undermined the evidence used to prove Petitioner guilty beyond a reasonable doubt.

199. Moreover, testimony from Dr. Jones demonstrates that the likely mechanism of death was cerebral edema occasioned by the October, 2008 injury and repeated episodes of head-banging, including the head-banging seen by Kallinger a short period of time prior to Ben's demise. The incontrovertible medical evidence dictates that the head-banging episode described by Kallinger just minutes before Ben became symptomatic could have resulted in the new hemorrhages seen at autopsy, which directly refutes the State's evidence which was use to establish the arrest, prosecution, and conviction of Petitioner.

200. Furthermore, Dr. Choi's admission that he missed the evidence of chronic subdural hematoma caused by a prior injury casts the evidence received at trial in a completely different light. The State repeatedly sought to undermine the defense's theory of the case by pointing out that there was no evidence of a pre-existing head injury. Now, based on Dr. Choi's affidavit, and based further on Dr. Jones' review of the histology slides and other evidence in the case, it cannot be disputed that the State's medical evidence at trial was fundamentally flawed.

201. Such fundamentally flawed medical evidence has led to relief for defendants situated similarly to Petitioner. In addition to *Ehlert*, the defendant's conviction for the murder of his girlfriend's 17 month old daughter was set aside in *Ex Parte Neal Hampton Robbins*, 2014 WL 6751684. There, the pathologist that conducted the autopsy re-evaluated her opinion as to

57

G_061

the child's cause of death after the trial. Dr. Choi has done the same, and based on his re-evaluation, Dr. Jones has performed the only complete review of the case performed to date.

202.    In another case involving the death of a child, *Ex Parte Cathy Lynn Henderson*, 384 S.W.3d 833 (Tex. 2012), the medical examiner changed his testimony after scientific advances led him to do so. The Court granted the defendant relief, explaining that "crucial evidence that had supported both the cause of [the child's] death and [defendant's] intent to cause his death has been retracted." *Id.,* at 850. The Court further noted that the defendant "did not receive a fundamentally fair trial based upon reliable scientific evidence" and due to the inaccurate and incomplete medical evidence presented at the trial, the case "should be retried to ensure the accuracy of our verdicts and the integrity of our system." *Id.,* at 850-851.

203.    Finally, in *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005) the Court reviewed the defendant's claim after testifying experts retracted portions of their trial testimony. The Court granted the defendant relief, explaining that those retractions "not only serve[d] to bolster the defense's argument, but also undermine[d] the State's side by withdrawing their original trial opinions. Put another way, the new affidavits do not merely add to the defense, but also deduct from the prosecution." *Id.,* at 593.

204.    The same principle set forth in *Souter* mandates that Petitioner be granted relief here. The affidavits of Dr. Choi and Dr. Jones undermine the State's theory at trial. Dr. Choi performed the autopsy and the State's experts, Drs. Greenbaum and Montez, relied upon the opinions he drew from his autopsy. But now it is known the State experts were relying on incorrect opinions to formulate their own opinions on the key issue in the case.

58

205.     Further, with his admission that a prior injury existed, Dr. Choi has actually become a valuable defense witness.  He now offers testimony in complete support of Drs. Tea and Leestma that a prior injury existed.  This would remove the previously hotly contested issue from any dispute.

206.     Relief is mandated here.  The State secured a conviction based on concededly incorrect medical testimony, which violates Petitioner's right to due process.

### V.

### PETITIONER'S CONSTITUTIONAL RIGHTS UNDER *BRADY V. MARYLAND* WERE VIOLATED WHERE STATE FAILED TO DISCLOSE TWO X-RAYS THAT COMPLETELY CONTRADICTED EVIDENCE THE STATE PRESENTED TO THE JURY.

207.     Very recently, an anonymous caller provided crucial information theretofore unknown by Petitioner.  That caller advised that x-rays had been taken of Ben's head and those x-rays were never disclosed to Petitioner's defense team.  Armed with that information, Petitioner's undersigned attorney obtained those x-rays and provided them to Dr. Jones. Now, Dr. Jones has reviewed the previously undisclosed x-rays.  Dr. Jones offers the opinion that the x-rays provided valuable evidence supporting her opinion that Ben's demise was not the result of an intentional act by a third party, but due to a chronic condition.  Further, Dr. Jones concludes that the new evidence obtained as a result of the x-rays discovered by the defense team would have strengthened the opinions offered by the defense experts and undermined the opinions of the State's experts.  Armed with the x-rays, Ben's mechanism of death would have been identified as cerebral edema.  Finally, the x-rays reveal that Petitioner's videotaped descriptions of inflicting the fatal injury on Ben are inconsistent with that mechanism of death.  Therefore, the

59

non-disclosure of the x-rays greatly prejudiced Petitioner.

208.     The United States Supreme Court set forth the government's affirmative duty to disclose evidence favorable to a defendant in *Brady v. Maryland,* 373 U.S. 83 (1963). There, Petitioner was convicted of first degree murder and sentenced to death, and his conviction was affirmed on appeal. Subsequently, Petitioner learned of an extrajudicial confession by his accomplice admitting the homicide.  Although Petitioner had requested disclosure of his accomplice's statements before his trial, the State had suppressed one in which the accomplice admitted committing the homicide. The Supreme Court held that the prosecutor's suppression of this confession violated the due process clause of the fourteenth amendment to the United States Constitution. The Court in *Brady* set forth this general rule: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87.  The Court explained that this principle is not intended to punish society for the misdeeds of a prosecutor, but to ensure a fair trial for the accused and to protect the administration of justice. *Brady,* 373 U.S. at 87–88, 83 S.Ct. at 1197, 10 L.Ed.2d at 218–19.

209.     To establish a *Brady* violation, suppressed evidence must be both favorable to the accused and material. Favorable evidence is material in this context "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). A "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the

G_064

outcome." *Bagley,* 473 U.S. at 682. In making a materiality determination, a court considers the cumulative effect of all suppressed evidence favorable to the defense, rather than considering each piece individually. *Kyles v. Whitley,* 514 U.S. 419, 436–41 (1995).

210.    The State cannot escape its duty under *Brady* by contending that the suppressed evidence was known only to police investigators and not to the prosecutor. *Kyles,* 514 U.S. at 438. As the Supreme Court explained in *Kyles,* "any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles,* 514 U.S. at 438.

211.    On June 10, 2015, Petitioner's father Paul Calusinski received a phone call from an anonymous caller. *Exhibit E, ¶2-4.*

212.    The caller advised Mr. Calusinski that a second set of x-rays had been taken of Ben's head by the Lake County Coronor's Office. *Exhibit E, ¶3.*

213.    Mr. Calunsinki then contacted the Lake County Coroner's Office and learned there was second set of x-rays had been taken. *Exhibit E, ¶5.*

214.    Dr. Rudd subsequently reviewed the entire file pertaining to Ben Kingan (Case#09011417491) and he was unable to find the x-rays in that file. However, when he requested that Deputy Coronor Reid search for the x-rays, Reid located the second set of x-ray in the Lake County Coroner's Office system. *Exhibit F, ¶5-8.*

215.    Those x-rays were provided to Petitioner's undersigned attorney. *Exhibit F, ¶9.*

216.    Upon receipt of the x-rays undersigned counsel's attorney took steps to determine

61

whether the x-rays had been turned over to Petitioner's trial attorney.

217.    Petitioner's defense attorney did not receive the x-rays. *Exhibit G.*

218.    Attorney DeLuca issued two specific subpoenas to the Lake County Coroner's Office. Those subpoenas encompassed requests for the x-rays. See the 10/12/09 subpoena, attached and incorporated herein as *Exhibit H*. See the 9/29/10 subpoena, attached and incorporated herein as *Exhibit I.*

219.    Attorney DeLuca explains that after he issued subpoenas for x-rays prior to Petitioner's trial, the State advised the trial court that 3 x-rays had been taken but they were not legible. *Exhibit G, ¶5.*

220.    Those 3 x-rays were produced to Attorney DeLuca on a disc. *Exhibit G, ¶6.*

221.    Two of those x-rays were blank and one was an x-ray of Ben's lower body. *Exhibit G, ¶10.*

222.    Those three x-rays were the only x-rays ever produced by the State or the Lake County Coroner's Office. *Exhibit G, ¶11.*

223.    Attorney DeLuca then reviewed the newly discovered second set of x-rays. *Exhibit G, ¶13.*

224.    Three of the newly discovered x-rays were never produced to Attorney DeLuca. *Exhibit G, ¶16-18.*

225.    Thus, Petitioner has established that the three x-rays were suppressed and never disclosed to Petitioner's defense counsel.

*Materiality and Prejudice*

226.    In determining prejudice, the United States Supreme Court has stated: "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995). Rather, to be entitled to a new trial under the *Brady* standard, a defendant must show "a 'reasonable probability' of a different result." *id.* The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Id.* (Internal quotations omitted).

227.    The non-disclosure of the x-rays of Ben's head, where the crucial issue in the case is whether Ben's head was intentionally injured by a third party or by accident, seems to demand the reasonable inference that non-disclosure prejudiced Petitioner, undermining confidence in the outcome of the trial.

228.    If further proof at this stage is required, Petitioner offers the sworn statement of Attorney DeLuca in relation to how he would have used the images to attack the State's theory and prove Petitioner's innocence.

229.    Attorney DeLuca explains that he would have provided the images to Petitioner's experts, Drs. Leestma and Teas. *Exhibit G, ¶20.*

230.    The x-ray labeled "Ben_Kingan3" would have been utilized to demonstrate for

63

G_067

the jury that Ben did not exhibit a "through and through" fracture as repeatedly argued and emphasized by the State. *Exhibit G, ¶20.*

231.    Attorney DeLuca also explains that he would have provided the images to his experts in order to ascertain their opinions as to Ben's cause of death.  *Exhibit G, ¶21.*

232.    The impact of the images upon the opinions of the defense experts can be ascertained from Dr. Jones' review of the x-rays.

233.    Dr. Jones explains that the x-ray image labeled "Ben_Kingan 3" reveals that Ben's head "appears shaped like an old-fashioned light bulb, which is abnormal for an infant Ben Kingan's age." *Exhibit D, ¶22.*

234.    According to Dr. Jones, the information one can learn from the x-ray, which was not available at the time of the trial, together with the known expansion of Ben's head circumference, demands the conclusion that the mechanism of Ben's death  was cerebral edema and not an acute injury. *Exhibit D, ¶17, 26, 29.*

235.    Dr. Jones also notes that that x-ray reveals that Ben's brain was swelled in close proximity to his skull, causing the abnormal light bulb shape of Ben's head. *Exhibit D, ¶25.*

236.    According to Dr. Jones, while the head of a child Ben's age may swell a small amount overnight due to an acute injury, it is highly unlikely that such a child's head would swell to the extent illustrated on the x-ray. *Exhibit D, ¶26.*

237.    The recent discovery of the new undisclosed x-ray also provides valuable information which Petitioner could have used to attack the State's argument that Ben had suffered a skull fracture.  Dr. Choi claimed such a skull fracture existed but the undisclosed x-ray

64

demonstrates that, just as Dr. Choi was wrong when he initially decided no prior injury existed, he is wrong about the skull fracture.

238.   Dr. Jones explains that the undisclosed x-ray permits the identification of an accessory suture that is visible on the previously undisclosed x-ray "Ben_Kingan 3." According to Dr. Jones, the accessory suture further supports her opinion that it is more likely than not that Dr. Choi mistakenly identified the accessory suture as a fracture of the skull. *Exhibit D, ¶28. Exhibit D-1* (Dr. Jones' illustration of location of accessory suture on undisclosed x-ray).

239.   Further, after reviewing the x-ray Ben_Kingan 3 and determining that the sutures are not separated, Dr. Jones opines that it is more likely than not that Ben had a chronic, as opposed to an acute, condition. It is unlikely that a child's head would swell to the extent illustrated by x-ray Ben_Kingan 3, within the short amount of time Petitioner had contact with the child before his death. *Exhibit D, ¶26.*

240.   Attorney DeLuca has explained that he would have provided the undisclosed x-rays to Petitioner's experts prior to trial. *Exhibit G, ¶21.* When he did so, according to Dr. Jones, those experts, Drs. Teas and Leestma, would have concluded that the mechanism of death was not a re-bleed, but was the result of cerebral edema produced by a significant head injury in October 2008, combined with cumulative head-banging incidences culminating in a final head-banging incident, witnessed by Nancy Kallinger, within 15-20 minutes of Ben Kingan becoming unresponsive. *Exhibit D, ¶29.*

241.   In fact, both the State and defense experts would more likely than not have changed their testimony in light of the newly discovered x-rays. Dr. Jones notes that neither the

65

prosecution or defense experts accurately described the mechanism of death at trial, and that it is impossible to conclude to a reasonable degree of medical certainty that the final head injury was intentionally inflicted. The defense experts were not provided with the x-ray ("Ben_Kingan 3") which would have allowed them to correctly identify the mechanism of death as cerebral edema. *Exhibit D, ¶30.* The affidavit of Dr. J. Leestma is attached and incorporated herein as *Exhibit K.*

242. According to Dr. Jones, the newly-discovered head x-ray negates Dr. Choi's finding of a skull fracture. Dr. Choi mistakenly believed that an accessory suture was a skull fracture. The absence of a skull fracture, and the presence of an accessory suture, combined with the "light bulb shaped skull" of Ben Kingan conclusively demonstrates that his death was the result of cerebral edema from a prior significant injury and cumulative self-inflicted head-banging incidences up until 15-20 minutes before he became unresponsive. *Exhibit D, ¶29.*

243. Most importantly, Dr. Jones states that after reviewing all of the evidence including the undisclosed x-ray, "It is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted." *Exhibit D, ¶30.*

244. In addition to the fact that the State presented an entirely fictitious medical basis to support its conclusion that Petitioner was proven guilty beyond a reasonable doubt, the State is also responsible for the commission of a serious *Brady* violation. The cumulative effect of these egregious errors must result in Petitioner's conviction being vacated.

G_070

## **Conclusion**

WHEREFORE, Petitioner, Melissa Calusinski, respectfully requests that this Court:

1.      Grant Petitioner the authority to obtain subpoenas for witnesses, documents and other discovery necessary to prove the facts alleged in this petition;

2.      Grant Petitioner additional time and leave to amend the instant petition once the necessary documents and discovery are obtained;

3.      Conduct a hearing at which proof may be offered concerning the allegations of this petition;

4.      Vacate her conviction and sentence; and

5.      Grant such other and further relief as may be deemed appropriate.

Respectfully submitted,

Melissa Calusinski

Kathleen T. Zellner

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

67

G_071

## VERIFICATION

Melissa Calusinski, on oath states that she is the Defendant herein and that she has read the foregoing **VERIFIED PETITION FOR POST-CONVICTION RELIEF PURSUANT TO 725 ILCS 5/122-1** and reviewed same with his attorneys, and that its contents and the matters set forth therein are true in substance and in fact.


_Melissa Calusinski_
Melissa Calusinski


Subscribed and Sworn
to before me this _18th_
day of _May_, 2015


Notary Public

OFFICIAL SEAL
KATHLEEN T ZELLNER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/04/17

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 CF 252 |
| | ) | |
| MELISSA CALUSINSKI, | ) | Honorable Daniel Shanes, |
| | ) | Judge Presiding. |
| Defendant. | ) | |

---

**AFFIDAVIT OF COUNSEL PURSUANT TO SUPREME COURT RULE 651(c)**

---

The undersigned, as counsel for Petitioner in the above captioned matter, hereby certifies that she has consulted with Petitioner, in person, by mail and over the phone to ascertain her contentions of deprivation of constitutional rights, has examined the record of proceedings at the trial and on appeal, and has filed a petition adequately presenting those issues discussed which counsel believes have a basis in law and in fact.

Kathleen T. Zellner
Attorney For Petitioner

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road
Suite 650
Downers Grove, Illinois    60515
(630) 955-1212

1

## TABLE OF EXHIBITS

EXHIBIT A    Second District Appellate Opinion

EXHIBIT B    Affidavit of Eupil Choi, M.D.

EXHIBITC    Eupil Choi, M.D.'s Autopsy Report

EXHIBIT D    Affidavit of Nancy L. Jones, M.D. and her Curriculum Vitae

EXHIBIT D-1 Drawing of Nancy L. Jones, M.D.

EXHIBIT E    Affidavit of Paul Calusinski

EXHIBIT F    Affidavit of Thomas A. Rudd, M.D.

EXHIBIT G    Affidavit of Attorney Paul DeLuca including DeLuca Exhibit A (first set of x-rays) and DeLuca Exhibit B (second set of x-rays)

EXHIBIT H    Attorney DeLuca's subpoena of 10/13/09

EXHIBIT I    Attorney DeLuca's subpoena of 9/29/10

EXHIBIT J    Affidavit of Paul Forman

EXHIBIT K    Affidavit of Jan Leestma, M.D.

G_074

2014 IL App (2d) 120383-U
No. 2-12-0383
Order filed February 19, 2014
Modified upon denial of rehearing April 22, 2014

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09-CF-252 |
| | ) | |
| MELISSA CALUSINSKI, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

### ORDER

¶ 1  *Held*:  Defendant's conviction of first-degree murder was affirmed where the State proved her guilty beyond a reasonable doubt; the trial court did not err in denying defendant's motion to suppress her statements to police; trial counsel was not ineffective for failing to tender a particular jury instruction; and the trial court did not abuse its discretion in allowing rebuttal testimony by the State's expert witness.

¶ 2  Following a jury trial, defendant, Melissa Calusinski, was convicted of the first-degree

murder (720 ILCS 5/9-1(a)(2) (West 2008)) of 16-month-old Ben Kingan, who attended the day

care center where defendant was employed as a teacher's assistant.  Also in connection with



2014 IL App (2d) 120383-U

Ben's death, defendant was convicted of aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2008)), which merged into the first-degree murder conviction. Defendant was sentenced to 31 years' imprisonment. On appeal, defendant argues that (1) the evidence was insufficient to prove her guilty beyond a reasonable doubt of first-degree murder, (2) the trial court erred in denying her motion to suppress her statements to police because her confession was involuntary, (3) trial counsel was ineffective for failing to submit a jury instruction defining "reckless" in connection with jury instructions on the lesser-included offenses of involuntary manslaughter and reckless conduct, and (4) the trial court abused its discretion in admitting a forensic pathologist's neurological opinion during the State's rebuttal case. For the following reasons, we affirm.

¶ 3                                       BACKGROUND

¶ 4      Ben and his twin sister, Emily, were born on August 31, 2007, to Amy and Andy Kingan. At the age of nine weeks, Ben and Emily began attending day care at Minee-Subee in the Village of Lincolnshire, Illinois. The family had been using the day care center for several years for their older children. Defendant was the full-time teacher's assistant in Ben's and Emily's classroom. On January 14, 2009, at approximately 3:50 p.m., defendant found Ben unresponsive in a bouncy seat in the classroom and called for assistance. Staff members responded by commencing CPR and calling 911. Paramedics quickly arrived and transported Ben to Condell Medical Center in Libertyville, Illinois. He was pronounced dead at 4:50 p.m., at the age of 16 months. A grand jury indicted defendant on 14 counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) and 2 counts of aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2008)). A three-week jury trial was conducted in October and November 2011. We summarize the pertinent trial testimony and evidence as follows.

- 2 -

G_076

2014 IL App (2d) 120383-U

¶ 5         Ben's Relevant Health History

¶ 6 Ben was a healthy baby, meeting all of his developmental milestones. By the age of 16 months, Ben was beginning to take a few steps on his own and knew several words. In addition to typical childhood illnesses, Ben developed acid reflux disease at the age of four months. His pediatricians treated him with Prevacid. Ben responded well to the medication and subsequently was taken off of it.

¶ 7 Ben had a habit of throwing himself backwards while he was seated and hitting his head on the floor behind him when he was angry. This behavior did not alarm Amy or the day care staff. Dr. Daniel Lum, Ben's primary pediatrician, described "headbanging" as a "pretty common" behavior in infants from six months to two years old. Dr. Lum never knew of a child seriously injuring himself from the habit.

¶ 8 On October 27, 2008, Ben awoke from his nap at day care with a golf-ball-sized bump on the back of his head. No one at the day care could explain how Ben got the bump. Amy telephoned Dr. Lum, who advised Amy that she did not need to do anything, because Ben had not lost consciousness or vomited, and was acting normally.

¶ 9 Two days later, on October 29, 2008, Ben had a fever of 103.5 degrees, so Amy took Ben to the doctor. He saw another pediatrician in Dr. Lum's practice, Dr. Patricia Brunner, whom he frequently saw. Amy also mentioned the bump on Ben's head. Dr. Brunner examined Ben's head, which still had some slight swelling. Dr. Brunner was not concerned about the bump, because Ben exhibited no signs related to it, such as vomiting, and she found no signs of any head trauma. Dr. Brunner palpated the area with her fingers and found no skull fracture. She checked Ben's anterior fontanel, commonly known as the baby's soft spot, and found it was normal. Dr. Brunner did not think that a CT scan or x-ray was necessary. She told Amy to keep

- 3 -

G_077

2014 IL App (2d) 120383-U

an eye on Ben for any change in mental status and to give him Tylenol or Motrin for the fever.

¶ 10     Three days later, on November 1, 2008, Amy took Ben back to the pediatrician because he still had a fever.  Dr. Brunner diagnosed an ear infection and prescribed Amoxicillin.

¶ 11     On November 20, 2008, Amy called the pediatrician's office and spoke to Dr. Lum about Ben spitting up, not being "quite himself," and arching his back.  Dr. Lum attributed these symptoms to a return of Ben's acid reflux disease and prescribed Prevacid again.  Dr. Lum and Amy did not discuss the October 27, 2008, bump.

¶ 12     On December 1, 2008, Ben had his 15-month-old well-baby visit, during which Ben's length, weight, and head circumference were measured and charted as they had been at previous well-baby visits.  Dr. Lum testified that Ben's head was growing normally.  Dr. Brunner testified that Ben's growth was age appropriate and that he was "growing beautifully."  Dr. Brunner noted that, since his 12-month-old well-baby visit, Ben's head circumference had increased from being in the 50th percentile to being in the 75th percentile but did not see any issues with that fact.  Dr. Lum testified that, based on the measurement taken at Ben's autopsy, Ben's head circumference was in the 95th percentile at the time of his death.  Dr. Lum also had seen Ben on December 2, 2008, for pink eye.

¶ 13                              Defendant's Background

¶ 14     Defendant was 22 years old at the time Ben's death.  She graduated from Barrington High School in 2005 and attended college for three months.  She had no criminal history. Defendant lived with her parents but sometimes stayed with her boyfriend.  Prior to being hired by Minee-Subee, defendant had worked in retail, in food service, and at her parents' bait shop. She had also done a lot of babysitting and worked for four years as a nanny for a family with five children.  Defendant worked as a teacher's assistant at the Minee-Subee in Arlington Heights,

- 4 -

G_078

2014 IL App (2d) 120383-U

Illinois, for about a year and then transferred to the Lincolnshire center in the fall of 2008. There were never any complaints about defendant's performance at work.

¶ 15    Defendant's high school guidance counselor, Ray Piagentini testified that he knew defendant well throughout her high school career and that she was a "very quiet kid," who "wouldn't hurt anybody." Thomas Mitchell testified that defendant babysat for his five children hundreds of times. Robert Wessel testified that he had known defendant since 2007 and was of the opinion that she was "very peaceful." Ericka Faldstein, one of defendant's best friends, testified that she had observed defendant with children and believed that defendant was a peaceful and "kind hearted person."

¶ 16    Dr. Robert Hanlon, a clinical neuropsychologist, testified as an expert in neuropsychology. He conducted a battery of neuropsychological tests on defendant and reviewed her school records but not her college or employment records. Defendant's grades and class rank were very low. Defendant's overall IQ was 82; her verbal IQ of 74, was in the "borderline range," but defendant was "not mentally retarded." Dr. Hanlon opined that defendant manifested "specific cognitive and intellectual deficiencies." He agreed that defendant understood his testing instructions and that her "reasoning and executive functions" were "relatively advanced."

¶ 17                        Minee-Subee

¶ 18    Minee-Subee was licensed for up to 145 children between the ages of 6 weeks and 12 years. Minee-Subee employed approximately 20-24 staff members. Sandy Jenner was the director. The teaching staff members, including defendant, were certified in CPR and first aid, and regularly attended educational conferences. Each classroom had one lead teacher and at least one assistant teacher. Gwendy Bautista was the lead teacher in Ben's classroom; she

- 5 -

G_079

2014 IL App (2d) 120383-U

worked from 6:30 a.m. to 3:30 p.m. Defendant was Gwendy's full-time assistant; she began work at approximately 8 a.m. The staff also included "floaters," who moved between classrooms as needed. Nancy Kallinger and defendant's sister, Crystal Calusinski, were floaters.

¶ 19   Ben's classroom, one of two infant-toddler rooms, served eight children, ages 12 to 20 months. The classroom was carpeted except for the tiled kitchen area that contained a sink/counter area facing the wall, a changing table, two high chairs, and two tables with four chairs each. The chairs had straps for buckling the children in when they ate snacks and lunch. There was a telephone by the door. There were two windows in the classroom that allowed viewing between Ben's classroom and the "infant toddler one" classroom and the four-year-old classroom.

¶ 20                        Monday, January 12, 2009

¶ 21   Amy took Ben to day care on Monday morning, January 12, 2009, as usual. After naptime, Ben did not look well—he was pale and coughing but had no fever. He ate a few oyster crackers. At about 4 p.m., defendant carried Ben into the other infant room, where Holly Schoen was working. Ben began "almost spewing" vomit as defendant told Holly that he was not feeling well. Ben vomited four to six times in a row. Holly said that defendant was not upset with Ben, even though some of the vomit had gotten on defendant's clothes. Amy was called to pick Ben up. When Amy was leaving the day care with Ben, he vomited again in the hallway. At home that evening, Ben vomited up to four more times, took a nap, and drank some Gatorade. He went to sleep as usual and was fine throughout the night.

¶ 22                        Tuesday, January 13, 2009

¶ 23   Amy kept Ben home with her on Tuesday, January 13, 2009, pursuant to Minee-Subee's health policy. Ben was fine all day and did not vomit. Amy ran some errands with Ben; he was

- 6 -

G_080

2014 IL App (2d) 120383-U

"smiling and giggling." They stopped by the pediatrician's office to pick up a prescription for one of Ben's siblings. Dr. Brunner briefly observed Ben playing with toys on the floor, and he was "perfectly normal and fine." Amy told Dr. Brunner that Ben had vomited the day before but did not say how many times. If Dr. Brunner had known Ben had vomited five times, she might have asked Amy some questions about Ben's condition.

¶ 24                                    Wednesday, January 14, 2009

¶ 25    Amy took Ben back to Minee-Subee on Wednesday morning, January 14, 2009, as usual. Ben ate breakfast at day care and was acting and playing normally. Throughout the morning, Ben was happy and behaving normally. Ben ate well at lunch—grilled cheese, tomato soup, and milk. Nap time began at about 12:15 or 12:30. According to Gwendy, Ben fell asleep as usual but awoke early, so she did an art project with him. Ben was able to glue various items onto a piece of paper to make a collage. After all of the children woke up, at about 3 or 3:15 p.m., Gwendy and defendant buckled all of the children into their chairs, and served animal crackers. Nancy came into the classroom to relieve Gwendy, who went home at about 3:30 p.m.

¶ 26    Nancy testified that, after Gwendy left, the children finished eating their snacks and were "getting restless." They were "a little bit loud, antsy," so she and defendant began unbuckling them from their chairs, washing their hands, and letting them play. According to Nancy, she and defendant each took a table; defendant had Ben's table. Nancy took each of the four children at her table to the sink, one by one, to wash their hands. Nancy thought that defendant used wipes to wash the four children at her table, as she usually did. Nancy did not actually see defendant wash Ben's hands. The children were fussy, including Ben. After Nancy finished washing the four children at her table, she began washing dishes in the classroom's kitchen sink. Her back was to the room; it was loud, because the water was running and the children were fussing.

- 7 -

2014 IL App (2d) 120383-U

Nancy testified that, after they took the children out of the snack area, defendant left the room for four or five minutes to use the restroom. While Nancy was alone in the classroom, she removed Ben from the bouncy chair where he had gone after his snack and took him to the changing table to check his diaper, which he did not like. Between 3:35 and 3:45 p.m., Nancy put Ben down on the tiled kitchen floor, and he threw himself backwards. Nancy testified that she did not actually see Ben hit his head but assumed he did because he cried a little bit. Nancy sat him back up and went to the sink and washed her hands. When she turned back around, Ben was lying on the tiled floor again. Nancy carried him back to the bouncy chair.

¶ 27 Nancy testified that, when defendant returned to the classroom, Nancy helped her start an art project. Nancy then took the dishes to the sanitizer in the main kitchen, leaving defendant alone in the classroom with the children. The children were under control at that time; everything seemed fine. Before Nancy left, she told defendant that Ben was in the bouncy chair, starting to fall asleep. Nancy was gone for 10 to 20 minutes. When she returned, Crystal and Sandy were giving Ben CPR on the changing table. Paramedics had not yet arrived. Defendant was crying, and Nancy tried to comfort her.

¶ 28 Crystal testified that she was at the front desk and heard defendant call for help on the intercom. Crystal ran into the classroom and saw Ben in the bouncy chair with "foam coming out of his nose." Crystal picked up Ben, went to the door to call for help, and placed Ben on the changing table where she commenced CPR. Sandy Jenner came in and began assisting Crystal. Defendant kept the other children out of the way. Beth Katz, an administrator, entered and called 911 from the classroom telephone at 3:51 p.m. Police and paramedics arrived moments later; paramedics transported Ben to the hospital.

¶ 29 Beth Katz called Amy at about 4 p.m. to tell her that paramedics were taking Ben to the

2014 IL App (2d) 120383-U

hospital. Amy rushed to the hospital, notifying Andy on the way. By the time Amy and Andy could see Ben, he had already passed away.

¶ 30    Dr. Adriana Orozco was the pediatric emergency room physician on duty when Ben arrived at the hospital. Ben presented "in full arrest," meaning that there was no spontaneous respiration and no cardiac activity. His eyes were "fixed and dilated," which usually indicates a significant head injury. Emergency room personnel took over performing CPR. They intubated Ben and gave him three or four rounds of epinephrine and atropine. Despite all of these efforts, Dr. Orozco pronounced Ben dead at 4:50 p.m.

¶ 31    Detective Adam Hyde of the Lincolnshire police department arrived at the hospital at about 5 p.m. He spoke with Dr. Orozco for a few minutes and then with Amy and Andy separately. Amy told Detective Hyde that Ben had vomited about five times on Monday and about his history of acid reflux. Andy reported Ben's habit of throwing himself backward.

¶ 32    From the hospital, Detective Hyde went to Minee-Subee, where staff had been asked to remain and were informed that Ben had died. Detective Hyde spoke with Nancy, defendant, Crystal, and Sandy Jenner, because they had each spent time with Ben that day. Gwendy had already gone for the day.

¶ 33    Detective Hyde testified that he spoke with defendant for about 20 minutes. Defendant told him that she and Nancy were giving the children snacks at about 3:30 p.m. It was extremely hectic, so defendant called Crystal to come in and help them. Defendant said that Ben finished his snack and crawled to a bouncy chair. Defendant told Detective Hyde that she began an art project with the other children and " 'exactly one minute later' " noticed that Ben appeared to be falling asleep. Defendant called Ben's name three times; when he did not respond, she walked over to him and saw foam and blood coming from his nose and mouth. Crystal picked up Ben

- 9 -

2014 IL App (2d) 120383-U

and started doing CPR.

¶ 34    Detective Hyde testified that, at that point in the conversation, he told defendant that Nancy never mentioned that Crystal had been in the room. Defendant looked away and said that Nancy had not been there, just defendant and Crystal were in the room. Detective Hyde asked if defendant was sure, and defendant "put her head down, paused a moment" and then admitted that Crystal had not been in the room. Defendant said that she had been in the room by herself. Detective Hyde asked defendant to tell him the whole story again. Defendant said that Nancy had left the room to go to the sanitizer. Ben got down from his snack chair and crawled to the bouncy chair. A few minutes later, defendant noticed that Ben was " 'lethargic.' " Defendant called for help, and Crystal came and performed CPR. Defendant told Detective Hyde that she was alone for only a moment.

¶ 35    Defendant did not testify at trial. Her account of the day's events as provided to police officers in statements videotaped on Friday, January 16, 2009, which were admitted at trial, is summarized below.

¶ 36                     Thursday, January 15, 2009: Autopsy

¶ 37    Dr. Eupil Choi testified as an expert in anatomical, clinical, and forensic pathology. He performed Ben's autopsy on the afternoon of January 15, 2009. Deputy Coroner Paul Foreman and Detective Hyde were also present. Dr. Choi conducted both an external and an internal examination of Ben. Ben weighed 22 pounds and measured 30 inches tall. Ben's head circumference was 19.5 inches. Dr. Choi found a bruise on the left side of Ben's forehead and one on his upper right arm, both of which were less than one centimeter.

¶ 38    Dr. Choi's internal examination included the respiratory, cardiovascular, lymphatic, endocrine, urinary, and gastrointestinal systems, which all appeared to be normal. His internal

- 10 -

G_084

2014 IL App (2d) 120383-U

examination of Ben's head revealed a four-by-four inch subgaleal hemorrhage under the scalp on the back of the head. Dr. Choi also discovered a .8 inch linear skull fracture, visible on both sides of the skull, because it went "complete[ly] through the thickness of the skull." When Dr. Choi cut the dura, which lies under the skull, "the blood was gush out [*sic*]." He testified that the blood was "fresh red" and not coagulated. Beneath the subdural area, Dr. Choi found a subarachnoid hemorrhage. Dr. Choi explained that the subgaleal, the subdural, and the subarachnoid areas were separate layers. Dr. Choi noted swelling in the brain caused by the pressure of the subdural hematoma. He shaved part of the scalp that corresponded with the internal injuries and discovered "some bluish/red change one inch wide." Dr. Choi opined that Ben's injuries were caused by a hard, flat surface. He opined that Ben "died of craniocerebral injuries due to blunt trauma." Ben's injuries were consistent with having been thrown to the floor by someone. Dr. Choi further opined that the injuries were very recent, meaning probably less than one day old.

¶ 39    Dr. Choi testified that he discussed his opinion with Detective Hyde. When asked if he had told Detective Hyde that the injury had occurred within a range of 30 minutes to 3 hours from the time of Ben's becoming unresponsive, Dr. Choi replied, "Probably did. I'm not sure exactly the word I used, ***. Considering the findings, probably yes." When asked if he had told Detective Hyde that the force necessary to cause Ben's injury was consistent with being thrown from a one to two-story building, Dr. Choi replied, "Probably did. I think that is not exactly happen [*sic*] but I think it was just comparison of the circumstances. That's why I mentioned."

¶ 40    Dr. Choi further testified that his gross observations, in other words, what was visible to the naked eye, were sufficient to support his findings; nevertheless, he also collected tissue to

- 11 -

2014 IL App (2d) 120383-U

create histology slides to confirm his findings under the microscope later. A few weeks after the autopsy, Dr. Choi viewed the histology slides to determine if there was any evidence of healing, which would indicate an older injury. Dr. Choi testified that he did not see any neomembranes or macrophages, which would have indicated healing. Dr. Choi testified that fibroblasts are also indicative of healing but could not say for certain if he saw them. Dr. Choi explained that the layering of red blood appeared to be darker colored blood. Dr. Choi agreed that he could not pinpoint exactly the time of Ben's injuries but could estimate a range.

¶ 41    Dr. Choi additionally testified about the differences between an acute subdural hematoma and a chronic one. An acute subdural hematoma is one that "happened right now." A chronic subdural hematoma is one that has begun to heal, which could take weeks, months, or years. Dr. Choi agreed that a minor fall or trauma could aggravate a preexisting chronic subdural hematoma.

¶ 42    After the autopsy, Detective Hyde contacted the Lake County Major Crimes Task Force (task force) for assistance. Police Chief George Filenko of the Round Lake Park police department and Detective Sean Curran of the Highland Park police department were two of the task force members called to attend a meeting at the Lincolnshire police department on Thursday evening. Detective Hyde told the task force members that a 16-month-old infant had been found unresponsive at Minee-Subee and had died at the hospital. Specifically, he told them that the autopsy revealed a skull fracture, that the injury had occurred within a three-hour time span of the death, and that the severity of the injury was comparable to a fall from a one- to two-story building. A plan was made for the next morning to interview the Minee-Subee employees who had had contact with Ben on the day he died. Chief Filenko and Detective Curran were assigned to interview defendant.

- 12 -

2014 IL App (2d) 120383-U

¶ 43              Friday, January 16, 2009: Defendant's Statements to Police

¶ 44   At about 9 a.m. the next morning, Friday, January 16, 2009, the task force members, in plain clothes, arrived at Minee-Subee in unmarked cars. They waited outside while Detective Hyde went in and asked Sandy Jenner if he could speak with defendant, Crystal, Nancy, and Gwendy. Sandy called defendant, Crystal, and Gwendy, in turn, out of the classrooms. (Nancy was not scheduled to work until later in the day, but Sandy agreed to call her in early.) Detective Hyde told defendant that the police had a few more questions to ask her. Defendant was very cooperative and agreed to go with the police. She retrieved her coat, purse, and sunglasses and walked outside with Detective Hyde, who introduced her to Chief Filenko at the main entrance. Detective Hyde followed the same procedure with Crystal and Gwendy, who went with other pairs of task force officers.

¶ 45   Defendant got into the front passenger seat of the sport utility vehicle that Chief Filenko was driving. Chief Filenko and Detective Curran had their guns and handcuffs on their persons but under their clothing. Detective Curran had moved to the backseat; there was no cage or glass barrier between the front and back seats. The officers did not handcuff defendant or search her or her purse. The three engaged in small talk while they drove about 20 minutes to the Lake Zurich police department. (It had been agreed that the pairs of task force officers would go to various police departments, because the Lincolnshire department did not have enough interview rooms to accommodate them all.)

¶ 46   They parked in the public parking lot and entered the building through the public entrance. After waiting a few minutes in the main lobby, Chief Filenko, Detective Curran, and defendant were escorted to a 6-by-12-foot interview room. The officers secured their weapons outside the interview room, and defendant's purse was placed on a shelf outside the interview

- 13 -

G_087

2014 IL App (2d) 120383-U

room. Defendant retained her coat and sunglasses, which were on top of her head. Defendant entered the interview room and sat down. She was not told where to sit, nor was she fingerprinted, photographed, or searched.

¶ 47    Through Chief Filenko's testimony, the trial court admitted three DVDs containing the officers' interview of defendant. The jury viewed the DVDs and was given a printed transcript as a demonstrative exhibit. The DVDs cover a time span from approximately 9:30 a.m. to 7 p.m. Several times, the officers asked defendant if she needed anything; defendant had a few beverages throughout the day. Chief Filenko sat at a small table near the door to the right of defendant. Defendant sat next to the table, in the corner of the room. Detective Curran sat across from defendant. The video camera was behind and to the right of Detective Curran.

¶ 48    There were several breaks in the interview, during which the officers left the room, sometimes for up to an hour or more. Each time, the door closed but was not locked. Detective Curran testified that, during the breaks, he called other task force members to share information so that they could "put everything together." In the afternoon, Detective Curran also spoke on the phone a few times with evidence technician Dave Thomas, who was at the coroner's office with Dr. Choi. During the calls, Detective Curran related to Thomas defendant's various versions of what happened to Ben. Dr. Choi and his team conducted "experiments" with Ben's body to see if defendant's stories were consistent with the medical evidence. The following is derived from our review of the DVDs.

¶ 49    After Chief Filenko gathered some background information, he told defendant that, before they could ask any questions about the incident, they were "obligated" to read defendant her *Miranda* rights. Detective Curran told defendant that it was "standard procedure." Detective Curran read defendant her *Miranda* rights. Defendant said that she understood the rights, and

- 14 -

2014 IL App (2d) 120383-U

she signed a *Miranda* waiver at 9:43 a.m.

¶ 50    Chief Filenko asked defendant to tell them what happened on January 14, 2009. Defendant's statements regarding the morning's events were consistent with the trial testimony. Defendant's initial version of the afternoon's events was as follows. After Gwendy went home, defendant and Nancy took the children out of their snack chairs and washed their hands. Nancy then washed dishes in the classroom while defendant started an art project. Ben was in one of the bouncy chairs, playing with his sister and another child there. At about 4 p.m., Nancy left the classroom "for like a second" to take the dishes to the sanitizer in the main kitchen. Defendant noticed that Ben was starting to fall asleep in the bouncy chair. Defendant called out Ben's name to rouse him. When Ben did not respond, defendant went over to him, shook his arm, and continued calling his name. She saw orange-red foam coming from Ben's nose and called the front desk from the classroom telephone. Crystal responded to the classroom, picked up Ben, called for Beth, and began performing CPR on Ben on the changing table. Beth called 911.

¶ 51    After defendant told this version of events, the officers left the room for a short break. When they returned a few minutes later, the officers explained that they needed to clarify the details of what happened because Ben's skull was fractured. Detective Curran told defendant that it was "a medical certainty that somebody's done this to him. What we need to know right now is if this was done by accident or did somebody intentionally hurt him?" He further told defendant that the medical examiner knew that Ben had received his injuries at the day care that day. Defendant denied ever hurting any child and said she had never seen anyone at Minee-Subee do so. In rather extensive monologues, the officers told defendant that there were discrepancies in her story. They cautioned her that she needed to tell the whole truth up front or else her credibility would be diminished, that they were trained professionals, and that they

- 15 -

G_089

2014 IL App (2d) 120383-U

would discover the truth. They explained that they were talking with everyone who had knowledge of Ben's day. They said that accidents happen and that defendant should not be scared to tell them what happened.

¶ 52    Defendant continued to deny any knowledge of how Ben was injured. Detective Curran told defendant that it was a "medical fact" that, with the injury he had, Ben would not have been able to eat or play, so "all this stuff had to happen right away when he went unconscious." Defendant suggested that the officers talk to Nancy, because she was the only person with defendant before everything happened. They told her that Nancy was being interviewed. Detective Curran asked if she or someone else had accidentally hit Ben's head or dropped him. Defendant said no but again suggested that the officers talk to Nancy. Defendant explained how she herself was always careful with the children's heads but pointed out that Nancy sometimes did not watch the children's heads and might bang them accidentally on the changing table or a chair. The officers told defendant not to cover for anyone and to stop telling half truths. Defendant said she would not cover for anyone. Defendant related that Ben was known in the day care center for his tantrums, where he would throw himself backwards onto the ground. Detective Curran told defendant that Ben could not possibly have generated enough force to fracture his skull. He said, "I've got a good idea that you've seen what happened or you were involved with what happened [be]cause you were the only one in the room at the onset of this."

¶ 53    Defendant repeatedly denied doing anything to Ben. The detectives told defendant that they understood how frustrating it must be to deal with eight children and how young children took tumbles all the time. Detective Filenko said, "[W]e're not here to condemn you. We're not here to put you in jail. *** You were there. You saw what happened. What happened? What happened?" Defendant began to speculate that maybe Nancy had done something. Detective

- 16 -

2014 IL App (2d) 120383-U

Filenko told defendant that she needed to tell them what happened so they could "all go home tonight and have this entire situation put to rest." Detective Curran said that either defendant or Nancy did something because it was something that "had to be done with a considerable amount of force."

¶ 54    Defendant continued to deny any knowledge of what happened.   The officers took another break, for about an hour.  When they returned, they told defendant that they had talked to detectives who were interviewing Crystal, Nancy, and Gwendy.  Chief Filenko reiterated that they were "convinced" that Ben's injury occurred at the day care, within a couple of hours of his becoming unresponsive.  He said the injury was as serious as being dropped from the second floor of a building.  He told defendant that they were "getting into the serious phase of this." Chief Filenko said this was "flat out murder" and that defendant could either be a "good witness or a co-conspirator in a murder."  Defendant continued to deny any wrongdoing.  Defendant again speculated about Nancy, pointing out that Ben often cried when Nancy entered the room. Defendant pointed out that Nancy was alone in the classroom at about 3:35 p.m. while defendant used the restroom.

¶ 55    Defendant continued to stick to her story.  Detective Curran told defendant that maybe Ben's injury was an accident, "but it would be an accident that someone would know about." Defendant said she had not seen anything.  Detective Curran told defendant that they had very good photographs of the injury and that they would soon know exactly what happened. Defendant asked if the injury was on the front or back of Ben's head.  When asked why she wanted to know, defendant replied that she was "just kind of curious" and maybe she could "re-think."  Defendant surmised that Ben might have hit his head on the changing table when Crystal put him down to do CPR.  She explained that she understood that the children's skulls were still

- 17 -

2014 IL App (2d) 120383-U

growing. Detective Curran suggested that maybe Ben had fallen from the changing table but that
defendant had not said anything because he seemed fine. Defendant said, "I am telling you the
truth, I did not drop him." Detective Curran said, "Or?" Defendant responded, "Anything,
nothing serious." When asked what she meant by "nothing serious," defendant said she would
never put her hands on Ben. She admitted to getting frustrated but said she would "deal with it."

¶ 56    The officers reiterated that it was probably easy to lose patience with children. They
asked defendant if anybody had hit Ben in the head. She said no. Defendant admitted to raising
her voice and telling Ben, "no, not nice." Detective Curran asked if defendant had accidentally
pushed Ben into the wall when she was disciplining him. She said no. Detective Filenko then
commenced a rather lengthy discourse about unintentional accidents and how even a doctor
initially might not see a serious injury. Chief Filenko explained that science could tell them a lot
but that only the person who was involved could fill in all of the details. He said that he did not
think defendant was a liar but that she was just worried and scared.

¶ 57    At about 1:25 p.m., defendant stated, "Ok. I, to be honest, I have yelled like I said, 'not
nice,' but he was sitting up and he just like drops, and like he, like I heard him hit his head."
Defendant said that this happened "before they had snack maybe." Ben was sitting on the carpet
and threw himself back really hard. He cried but seemed fine. When asked why she waited to
tell them what happened, defendant explained that she was nervous and did not want to lose her
job. She added that she just "wasn't thinking about it." As defendant continued to relate the
story, she was inconsistent as to whether Gwendy or Nancy was there at the time. When asked if
it were Gwendy or Nancy, defendant said, "Ok, um, um, I'm gonna say Gwendy maybe."

¶ 58    The officers left the room for about an hour and a half. They returned at 3 p.m. and told
defendant that the specialist physician on their team said that Ben could not have generated

- 18 -

G_092

2014 IL App (2d) 120383-U

enough force to cause his injuries by throwing himself backwards. They also told her that Gwendy said that Ben had not thrown himself backwards. Detective Filenko again explained at length how they could confirm or disprove defendant's version of events with science and how defendant was losing credibility every time she told a false story. He told her that he understood how children could be frustrating and that he did not think she did anything intentionally, but he insisted that she knew what happened. Defendant said that she was afraid that if it were her fault, no one would talk to her and she would "probably get a fine, or go to jail or something." Detective Curran told defendant that they had to "clear this with the state's attorney" and that if defendant were cooperative and truthful, it would be better for her.

¶ 59    Defendant then said that, after snack time, she accidentally dropped Ben and that he hit his head on the wooden snack chair. She explained that she was **holding** Ben, **facing** away from her, she was not paying attention, and he slipped out of her hands. When asked for more details, defendant said she had been in a hurry, not paying attention, and let him go too soon. Defendant said that Ben did not cry and that his head seemed fine. Nancy's back was turned because she was doing dishes. Defendant said that Ben crawled to get his blanket and to the bouncy chair. She kept a close eye on him. **Defendant** noticed that Ben looked sleepy after 5 or 10 minutes.

¶ 60    Defendant was crying softly. Detective Curran told her that it was okay, that **accidents** happen, and that they knew that she did not intend for Ben to die. Defendant told the **officers** that she was scared. Detective Curran asked defendant to promise not to lie anymore and that he promised that they would make things as easy as possible for her. The officers asked de**fendant** to demonstrate what happened. At first, defendant said that Ben's toes were almost touching the ground when she dropped him. Detective Curran told defendant not to exaggerate to make it sound better because "if it's an accident, it's an accident." Chief Filenko reminded defendant to

- 19 -

2014 IL App (2d) 120383-U

be specific, because they had to verify her story scientifically. Defendant demonstrated with her hand that Ben's feet had been about 12 to 18 inches off of the ground when she dropped him.

¶ 61    Chief Filenko left the room and returned with a teddy bear to help defendant demonstrate what happened, which she did. Chief Filenko reassured defendant, "Alright sweetie, you're doing good." Detective Curran apologized but said he needed her to demonstrate again so that he could fully understand what happened. Defendant repeated her demonstration. Detective Curran stated that the incident as described did not seem like enough force to cause Ben's injuries. Defendant insisted that this was the truth. She said that Ben had hit his head really hard. Detective Curran asked her if she had "slam[med] him" for doing something wrong. She denied that.

¶ 62    At about 3:35 p.m., the officers left the room. Defendant cried softly. Detective Curran returned a few minutes later, asked defendant several questions about the snack chair, and left again. Both officers returned at about 4:10 p.m. and told defendant that they had talked to the doctor and had some concerns about how far Ben had fallen and how solid the chair was. Defendant demonstrated that Ben was two feet off of the floor when she dropped him. Detective Curran left the room. Chief Filenko reminded defendant that "this has got to be dead on accurate." He explained that if the doctor ruled out defendant's story, "Then obviously, we've got a major problem. I think we're done." Defendant said that she was telling the truth. Chief Filenko reminded defendant that they had gone through at least a half dozen different versions of what happened. He told her they were being patient because they wanted her to "get the fairest opportunity here." Defendant asked if her "sister and them" were still there. Chief Filenko told her that they were never there; they were at other police departments. He left the room.

¶ 63    The officers returned a few minutes later and told defendant that the doctor said that

- 20 -

2014 IL App (2d) 120383-U

Ben's injury would have required more force than what she described. Defendant repeated that she had dropped Ben. Detective Curran asked if she had "grab[bed] his feet and slam[med] his head on the ground." She said no. She said that Ben was not flailing around when she dropped him. Defendant insisted that she was telling the truth. The officers warned defendant that if she was lying again, it would look like she intentionally killed Ben. They asked more questions about exactly where the chair was, whether it wobbled, and how hard Ben hit his head. Defendant said she heard Ben's head hit the snack chair.

¶ 64    As the conversation continued, the officers asked defendant what she told paramedics right after the incident. She said she "froze" and did not know what to do because she "was in complete shock." Defendant said she did not tell police at Minee-Subee "about the whole head thing." Defendant said she just "wasn't thinking" and thought that Ben had a seizure. Chief Filenko told defendant to start getting her "spiel straight" because she was "going in circles." Defendant repeated that she did not even tell her boss what happened because she just was not thinking straight. She was "scared, shaking to death" and did not know what was going on. Chief Filenko said, "I think that you were scared because something went really, really wrong here and you didn't want to get your ass in trouble. And we're trying to give you every opportunity to get your ass out of trouble." Defendant thought her career would end and began explaining how difficult her life had been. The officers told defendant that she was not helping herself by lying. They explained how "horrendous" Ben's injury was and how it could not have resulted from her dropping him as described. The officers left the room at about 5 p.m.

¶ 65    About 15 minutes later, Chief Filenko entered the room and asked defendant if she was okay. She said yes, "just a little antsy." He left. At about 6:05 p.m., Detective Curran stood in the doorway and asked defendant if she was okay. She said, "no, not really. I'm

- 21 -

G_095

2014 IL App (2d) 120383-U

claustrophobic." Detective Curran asked if she was hungry, she replied that she felt nauseous because she had not eaten. He offered to order her some food; she declined, saying her parents did not know where she was.

¶ 66    At about 6:10 p.m., the officers came back with one of the snack chairs from Minee-Subee. They asked defendant to re-enact what had happened with the chair and the teddy bear, which she did. Defendant asserted, "I'm being quite honest, [be]cause like right now it's to a point where I feel like I'm gonna be getting blamed for something I completely did not do." Detective Curran responded, "Sit down. First of all, you're having an attitude right now, ok. There's a dead kid." Defendant said she was trying to be honest. Detective Curran said, "And second of all, you are involved in this, ok." Defendant said, "I know I am." Detective Curran continued, "Third of all, this story you're giving us is a load of shit ***." Defendant interrupted, "I am not." She clapped her hands for emphasis, saying, "That is what I am telling you." She continued saying that she did not hit Ben, throw him on the ground, or hit him against the wall. Detective Curran told defendant that the doctor just did an experiment and that there was no way that defendant's dropping Ben as she described could have caused his injuries. He said somebody had slammed him on the ground or into the wall or something else. Defendant denied doing anything else.

¶ 67    Chief Filenko told defendant again that she needed to tell them exactly what happened, reminding her that she had changed her story several times. Defendant said it seemed like she was getting blamed. Chief Filenko said they were not blaming her, but that she really needed to think; all she needed to do was tell the truth and then "we're done." He said that no one would think less of her. He said they would tell her employer whatever defendant wanted, but that defendant needed to tell the officers the truth. Chief Filenko said that defendant's stories were

- 22 -

2014 IL App (2d) 120383-U

"mathematically, physically impossible." He continued saying that he thought defendant was focused on how bad her life had been. He used the word "fuckin' " several times. He reminded her that "this is a human life." He said not to make him go to the state's attorney "with all this garbage."

¶ 68    At about 6:30 p.m., defendant said, "Ok. Well it did include the chair, but with the whole situation he hit the corner, Ben, he was, he hit the corner really hard and he was moving. I'm being honest with you, Detective." She explained that Ben was moving around in her arms "wobbling and getting frustrated" because he did not want to be held. Defendant said that she became frustrated and she put him down and he hit the edge of the chair. Chief Filenko asked her how hard she put him down, because it made a difference. As defendant was demonstrating, Chief Filenko stood up. He asked, "Did you *put* him down?" as he demonstrated a forceful action with his arms. Defendant was not visible on the DVD at that point, but she apparently indicated that that was what she had done. She said she had been angry and frustrated because Ben was wiggling and squirming, the other children were screaming, and Nancy was just doing dishes. The officers asked her to demonstrate how hard she put him down. Defendant demonstrated. Chief Filenko encouraged defendant to go "the whole full route" and show how angry she was. Defendant said she got angry and "I went boom." She demonstrated throwing Ben down on the floor.

¶ 69    Defendant then pointed to places on the chair where Ben's head hit. The officers explained that the chair would have left two marks and asked why she kept lying. Defendant denied lying. Detective Curran said they thought "from the very get go" that the babies were crying, she was taking care of all of them by herself, Ben started acting up in her arms, she got mad, and threw him on the floor. Defendant responded, "Yeah and the chair was there too."

- 23 -

2014 IL App (2d) 120383-U

Chief Filenko said, "You threw him on the floor?" Defendant said, "Yeah." He asked where Ben's head hit. Defendant started to say on the chair but Detective Curran said, "Please..." Defendant said Ben's head hit the floor really hard and bounced. Detective Curran handed defendant his notebook and asked her to show hard she had thrown Ben onto the floor. She forcefully slammed the notebook onto the floor.

¶ 70   Detective Curran told defendant that he wanted to believe her but she had told them "so many lies." Defendant said that she did not tell them lies; she was "trying to make it sound right." Chief Filenko responded, "We don't want you to make it sound right. We want you to tell us the truth." Defendant clarified that Ben's head hit the threshold between the carpet and the tile and part of his head hit the tile. The officers told defendant that they were going to call their bosses and left the room.

¶ 71   The officers came in and out of the room. Defendant asked to use the restroom. At about 6:50 p.m., defendant asked the officers how much longer, because she "just want[ed] to go home and spend time with [her] parents and [her] puppy." At 6:55 p.m., defendant was taken to use the restroom. When she came back, Detective Curran asked defendant to explain one more time what had happened, which she did. At about 7:30 p.m., defendant asked if she could make a quick telephone call so that her parents would not be worried. Chief Filenko told defendant that they had someone on the way to take her back to Lincolnshire. Defendant remarked that it would take a while for her car to warm up and that she thought she would just go to her boyfriend's house that night, instead of to her parents' house, because it was closer. At 7:40 p.m., defendant left the room with Detective Curran. The video ended.

¶ 72   Detective Hyde testified that he was the officer who picked up defendant and transported her to the Lincolnshire police department. He was told only that defendant had confessed to

- 24 -

G_098

2014 IL App (2d) 120383-U

throwing Ben on the ground. When Detective Hyde arrived at the Lake Zurich police department, he told defendant that she was under arrest, handcuffed her, searched her, and placed her in the back seat of the squad car. Detective Curran rode back with Detective Hyde and defendant. When asked if she wanted anything to eat, defendant requested McDonald's. When they arrived at the Lincolnshire police department, defendant told Detective Hyde, "You're the one I lied to the other night." Defendant apologized for lying and said she wanted to tell him what happened. Detective Hyde took defendant to the booking room; it was about 8 p.m. The following is based on our review of a 40-minute DVD of Detective Hyde's interview of defendant, which was admitted at trial.

¶ 73    Defendant sat on a bench next to the door and Detective Hyde sat across from her by a desk. Defendant's food was on the counter next to her, but she said she was too scared to eat. Detective Hyde read defendant her *Miranda* rights, and defendant said she understood them. He asked defendant, who was crying softly, to tell him what happened. She explained and demonstrated the events as she did in her final version to Chief Filenko and Detective Curran. When asked how hard, on a scale of 1 to 10, she had thrown Ben, she replied 8.

¶ 74    Detective Hyde left the interview room at about 9 p.m. to attend a task force debriefing in the building. He handcuffed defendant to the bench and got her a blanket before he left. When Detective Hyde returned to the booking room (from this point on, the DVD is video only, no audio), defendant requested to call her father, as she had requested earlier during the booking process. It was between 11 p.m. and midnight when Detective Hyde called defendant's father and let defendant speak to him. Detective Hyde remained in the room. The phone conversation lasted less than 10 minutes. Detective Hyde testified that both defendant and her father were yelling. At one point, defendant said, " 'I threw him to the ground, Daddy, with a full strength

- 25 -

2014 IL App (2d) 120383-U

throw.' " She told her father she had been frustrated and that it was her fault. Detective Hyde took the phone and informed defendant's father about bond court the next day.

¶ 75    Defendant's father, Paul Calusinski, testified that he spoke with defendant on the telephone for seven or eight minutes at 11:40 p.m. Defendant was crying really hard. She never said that she had thrown Ben to the floor; she said the opposite.

¶ 76                          Medical Evidence

¶ 77    Drs. Brunner and Lum, Ben's pediatricians, testified for the State as experts in pediatrics. Dr. Brunner opined that Ben did not suffer a traumatic head or brain injury prior to January 14, 2009. She also opined that he had no medical condition that contributed to his death. Dr. Lum opined that nothing in Ben's medical history caused his death.

¶ 78    Dr. Adriana Orozco testified for the State as an expert in pediatrics and emergency medicine. Based on the manner in which Ben presented in the emergency room and his lack of significant medical history, Dr. Orozco opined that there was a "very high suspicion for non-accidental trauma."

¶ 79    Dr. Jordan Greenbaum testified for the State as an expert in forensic pathology and child abuse. She testified that Ben had a big area of bleeding between the scalp and the skull—a subgaleal hemorrhage—caused by a flat surface, such as a floor or a wall. His skull was fractured all the way through. Ben also had a big area of bleeding in the subdural space beneath the skull. Further, Ben had bright red blood in the subarachnoid space, which indicated that the injury was "fairly recent" because the watery fluid there is always changing. Each of these areas was separate or compartmentalized from the others. Dr. Greenbaum opined that Ben died "of head injury involving blunt force trauma." She further opined that Ben died as a direct result of being thrown to the floor and that the injury happened "shortly before if not immediately before

- 26 -

G_100

2014 IL App (2d) 120383-U

he became very symptomatic." She did not believe that Ben's injuries were consistent with his having thrown himself backward.

¶ 80    Dr. Greenbaum agreed that small subdural hematomas can result from minor trauma and can become chronic, lasting for months. A chronic subdural hematoma can be asymptomatic, but as the intracranial pressure reaches a certain point, the child gradually will exhibit symptoms such as a seizure. Dr. Greenbaum agreed that, in some cases, a minor trauma can cause a chronic subdural hematoma to re-bleed. Dr. Greenbaum testified that a significant chronic subdural hematoma is usually visible to the naked eye, and she did not see a chronic subdural hematoma in Ben. Dr. Greenbaum testified that, when she "looked at the [autopsy] photographs[,] they were consistent with what [Dr. Choi] said he saw under the microscope." Dr. Greenbaum thought that Ben's vomiting two days before his death was unrelated to his death, because he was completely normal in all aspects and then "essentially die[d] in 20 minutes." She elaborated that this was not a picture of a child with a chronic subdural hematoma.

¶ 81    Dr. Jan Edward Leestma testified for the defense as an expert in anatomical pathology and neuropathology. Dr. Leestma explained that it was necessary to view the histology slides to determine accurately the age of Ben's injuries. The histology slides of the dura showed "layers of healing" going back possibly many months. Dr. Leestma testified that he also observed iron on the histology slides, which indicated healing of five to seven days. Based on the dark color and granularity of the blood, Dr. Leestma testified that Ben's subgaleal hematoma was three to seven days old. Dr. Leestma opined that Ben had chronic subdural hematoma.

¶ 82    Dr. Leestma testified that, because of the chronic subdural hematoma, it was not possible to opine with a reasonable degree of medical certainty as to the force necessary to cause Ben's injuries. He said, "Once a child has a subdural hematoma and some form of healing, then the

- 27 -

2014 IL App (2d) 120383-U

injury threshold is very likely much less." Dr. Leestma opined that a short fall, such as from a child throwing himself backward from a sitting position, could exacerbate a chronic subdural hematoma. Ben's simple linear skull fracture was consistent with a short fall. Dr. Leestma explained that "symptoms can appear and escalate alarmingly." Dr. Leestma was under the impression that Ben had been ill for a couple of days before he died. Dr. Leestma acknowledged that Ben's injuries were also consistent with being slammed to the floor. He admitted that there was also evidence of a recent injury and that Ben's throwing himself backwards could not have caused all of his injuries.

¶ 83    Dr. Shaku Teas testified for the defense as an expert in forensic pathology. She testified that Ben suffered from a subgaleal hemorrhage, a subarachnoid hemorrhage, and a subdural hemorrhage. Dr. Teas saw a "defect" on the skull but could not be sure that it was a fracture. She not only viewed the histology slides prepared by Dr. Choi but also prepared her own slides, because that was the best way to determine the age of the injury. Dr. Teas observed a neomembrane, iron, collagen, fibroblasts, granulation tissue, and macrophages, all of which are indicative of healing. Dr. Teas opined that Ben suffered from a chronic subdural hematoma that was weeks old and had re-bled. She further opined that Ben's "injury occurred way more than 30 minutes" prior to his becoming unresponsive. She explained that a healing chronic subdural hematoma can re-bleed from a minor injury or even spontaneously. She said that nonspecific symptoms such as fussiness, sleepiness, lethargy, and projectile vomiting can indicate head injury. Dr. Teas elaborated that very young children, though maybe not 16-month-old children are "brain stem creatures," not using their higher functions; so any deficits might not be apparent.

¶ 84    Dr. Manuel Montez testified as an expert in forensic pathology in the State's rebuttal

- 28 -

2014 IL App (2d) 120383-U

case. On the morning of January 16, 2009, he physically examined Ben's body. He noted the fresh contusion on the outside of the scalp. Dr. Montez also observed a subgaleal hemorrhage, a subdural hemorrhage, a subarachnoid hemorrhage, each with fresh blood. Dr. Montez saw a through-and-through skull fracture, which he concluded, from manually manipulating it, was fresh, because it was not sticky like it would have been if the bone had started to mend. Dr. Montez opined that Ben died of non-accidental abusive head trauma that occurred after 3:30 p.m. on the day he died. He further opined that Ben could not have generated enough force himself to cause his own injuries.

¶ 85    Dr. Montez testified that Ben did not have a chronic subdural hematoma that was visible to the naked eye. Dr. Montez elaborated that a microscopic chronic subdural hematoma would be "too small to do anything." He further explained that if a chronic subdural hematoma were big enough to have an effect, neurological deficits would have been apparent. Dr. Montez testified that he viewed a 53 second video taken of Ben in November 2008. In the video, Ben was in his home with his family, pushing around a toy shopping cart as he practiced walking. From his review of the video, and Ben's medical and day care records, Dr. Montez concluded that Ben had no motor, audio, visual, or speech deficits.

¶ 86                                    ANALYSIS

¶ 87                              Motion to Suppress

¶ 88    Defendant contends that the trial court erred in denying her motion to suppress statements because her statements were "coerced, involuntary, and unreliable," and thus, inadmissible. Defendant limits her argument on appeal to her statements to Chief Filenko and Detective Curran at the Lake Zurich police station. The hearing on defendant's motion to suppress statements spanned several days, during which the trial court heard testimony and viewed the DVDs of the

- 29 -

G_103

2014 IL App (2d) 120383-U

interview. The court, aware of the factors it was to consider in determining the voluntariness of defendant's statements, made the following findings of fact.

¶ 89    On January 16, 2009, defendant voluntarily accompanied Chief Filenko and Detective Curran. Defendant was not handcuffed, searched, or put in the back of a squad car. The officers were not in uniform. At the beginning of the interview and past the first break, defendant seemed at ease; the officers were cordial and friendly; the pace was relaxed. Defendant "clearly understood her constitutional rights" and waived them. As the conversation continued, defendant was alternately loud and calm; sometimes she cried. The officers' tone was okay. Defendant's affect was sometimes flat, but she remained cooperative. At one point, defendant became angry and defiant. In response to defendant's "physical and verbal energy," the officers leaned back away from defendant and toward the wall. The court found that "by all indications, she wants to talk, and may not always like what she's hearing, but she's happy to talk." The court noted defendant's comment that she was claustrophobic, and that her parents did not know where she was, but also found that defendant did not say that she wanted to leave. Defendant later said she wanted to go home to be with her family and her puppy but was still cooperative and conversational. Defendant was not overly suggestible; she actually denied what police told her for hours. She became defensive and angry and "stood her own ground." The court reasoned that the fact that defendant's story changed did not mean that the officers made her change it. The court ruled that defendant's confession was voluntary.

¶ 90    "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). The voluntariness of a confession is determined by an examination of the totality of the

- 30 -

G_104

2014 IL App (2d) 120383-U

circumstances. *People v. Murdock*, 2012 IL 112362, ¶ 30. The court should consider such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of the detention and questioning; the duration of the interrogation; the presence of *Miranda* warnings; whether there was any physical or mental abuse by the police; and the legality and duration of the detention. *People v. Willis*, 215 Ill. 2d 517, 536 (2005). No single factor is dispositive. *Murdock*, 2012 IL 112362, ¶ 30. When a defendant challenges the voluntariness of her confession in a motion to suppress, the State bears the burden of proof that the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2012); *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Our review of the trial court's ruling on a motion to suppress is governed by a two-pronged standard of review. *People v. Cosby*, 231 Ill. 2d 262, 271 (2008). We accord great deference to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence. *Cosby*, 231 Ill. 2d at 271. However, we review *de novo* the ultimate legal question of whether suppression was warranted. *Cosby*, 231 Ill. 2d at 271.

¶ 91    Our review of the DVDs reveals that the trial court's findings were not against the manifest weight of the evidence. We first examine defendant's characteristics and condition at the time of the questioning; defendant was a 22-year-old high school graduate, with some college, and a significant work history. While she might not have been at the top of her class, defendant was certainly a fully functioning and intellectually capable adult. Dr. Hanlon's testimony that defendant's verbal IQ was in the "borderline range" does not undermine what the video recording shows. That defendant had no criminal history did not appear to impede her ability to assert herself when she felt it necessary. Several times, defendant raised her voice to the officers, disagreed with what they said, clapped her hands at them for emphasis, and was, at

- 31 -

2014 IL App (2d) 120383-U

one point, told to sit down because she was getting "an attitude." Throughout the interview, defendant was articulate and showed no apparent communication difficulties.

¶ 92    Regarding the duration of the interrogation, although defendant was in the interview room for about 10 hours, as the trial court found, she spent several hours of that time by herself—she was not subjected to 10 hours of interrogation. The officers repeatedly asked defendant if she needed anything; she generally declined but did have several beverages.

¶ 93    With respect to the presence of *Miranda* warnings, defendant was given her *Miranda* rights, said that she understood them, and signed a written waiver. Defendant never indicated that she wanted a lawyer, that she wanted to leave, or that she did not want to talk. The DVDs support the trial court's finding that defendant wanted to talk and voluntarily waived her *Miranda* rights. Though not expressly arguing that the court's finding was against the manifest weight of the evidence, defendant asserts that her waiver was invalid. She points to her comments to officers, after confessing to throwing Ben to the floor, which reflected a belief that she was going home that night—that she wanted to go home and play with her puppy, that she would go to her boyfriend's because it was closer, and that it would take awhile for her car to warm up. According to defendant these comments "demonstrate that she did not understand the magnitude of the situation." We recognize that these few comments at the end of the interview suggest that, at that point in time, defendant might have believed that she would be going home that evening. Nonetheless, she had not been arrested or formally charged at that point. In any event, the presence of *Miranda* warnings is but one factor to be considered in determining the voluntariness of a confession. *Murdock*, 2012 IL 112362, ¶ 30. We conclude that defendant's waiver was valid. See *People v. Braggs*, 209 Ill. 2d 492, 515 (2003) ("A criminal suspect is not required to know and understand every possible consequence of a waiver of the Fifth

- 32 -

2014 IL App (2d) 120383-U

Amendment privilege for it to be knowingly and intelligently made."); *People v. Foster*, 168 Ill. 2d 465, 479 (1995) ("Where the record shows that a defendant's limited mental capacity did not interfere with his ability to understand his *Miranda* rights and voluntarily waive them, his statements will not be suppressed.").

¶ 94    Regarding whether there was any physical or mental abuse by the police, the officers were never abusive or threatening toward defendant in any manner. They were generally solicitous toward her. Even when they were frustrated by her changing stories, they counseled her that she was losing credibility, which would not help her. The officers' tones were generally calm and their voices were raised rarely. The minimal amount of profanity they used was certainly not directed at defendant. While defendant did say several times that she was scared, reviewing the interview as a whole and defendant's demeanor throughout, we conclude that while she may have been scared of the potential consequences she faced, she was not afraid of the officers.

¶ 95    With respect to the final factor, the detention was legal and of a reasonable duration. Defendant voluntarily accompanied the officers from her place of employment at a reasonable hour of the day. We note that defendant filed a separate motion to quash, in which she argued that she had been illegally seized. The trial court denied this motion and defendant does not contest that ruling on appeal. Defendant was in the Lake Zurich interview room for about 10 hours before she was placed under arrest. This length of time was not unreasonable, especially given that the investigation was of the death of a 16-month-old infant. We conclude that the relevant factors support the trial court's determination that defendant's confession was voluntary.

¶ 96    Defendant specifically contends that the officers "relentlessly demanded that Defendant incriminate herself," that defendant's repeated denials "served only to elevate the Detectives'

- 33 -

G_107

2014 IL App (2d) 120383-U

accusations that she was a liar and a murderer," and that the officers were angry and threatening. Defendant contends that the officers "constructed scenarios and compelled her to agree to them by taking advantage of her fright, naiveté, mental capability and overall psychological makeup." Defendant asserts that she had "no choice but to adopt their false story" and believed that was the only way she could leave.

¶ 97    Defendant's assertions are belied by the DVDs. There is no indication that either Chief Filenko or Detective Curran had a preconceived idea of what happened. The officers relied on what Detective Hyde had told them at the briefing the night before, which in turn was based on what Dr. Choi had told Detective Hyde during the autopsy. The two main premises upon which the officers conducted the interview were that Ben's injuries were caused shortly before he became unresponsive and that Ben himself could not have generated enough force to cause them. Defendant had not been singled out. All three of the caregivers in Ben's room, as well as Crystal, were interviewed.

¶ 98    Also telling is that the officers spent a significant amount of time with defendant exploring her various stories. To the extent that the officers were skeptical of defendant's stories, such skepticism was not unwarranted given the inconsistency between defendant's ever-changing stories and the medical evidence. As defendant repeatedly denied doing anything to Ben, the officers spent quite a bit of time exploring her vague assertions that perhaps Nancy had done something to Ben. Later, when defendant told the officers that she had dropped Ben, they spent a great deal of time discussing the details of that scenario. They repeatedly asked her to explain and demonstrate that scenario so that they could verify that it was consistent with the medical evidence.

G_108

2014 IL App (2d) 120383-U

¶ 99    Defendant's reliance on *Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir.

2011), is unavailing. *Aleman* involved an arrestee's civil rights action against police officers,

whose interrogation of Mr. Aleman about the death of a child in his care violated his *Miranda*

rights. *Aleman*, 662 F.3d at 900.  The court addressed the issue of whether the "confession" had

been induced by a particular police officer's lies about the medical reports. *Aleman*, 662 F.3d at

906.  The police officer repeatedly said that three doctors had said that the baby had been shaken

in such a way that he would have become unresponsive immediately, "meaning that Aleman's

shaking must have caused [the baby's] injury." *Aleman*, 662 F.3d at 902.  Mr. Aleman had

shaken the baby gently when he became unresponsive pursuant to performing CPR. *Aleman*,

662 F.3d at 901.  Mr. Aleman confessed, " 'I know in my heart that if the only way to cause [the

injuries] is to shake that baby, then, when I shook that baby, I hurt that baby...I admit it.  I did

shake the baby too hard.' " *Aleman*, 662 F.3d at 902.  The Seventh Circuit Court of Appeals

reasoned that the "lies convinced Aleman that he must have been the cause" of the baby's death

because the doctors had excluded any other possibility. *Aleman*, 662 F.3d at 906.  The court

explained that the crucial word in the confession was "if."  The court elaborated, "By lying about

the medical reports, [the officer] changed 'if' to 'because' and thereby forced on Aleman a

premise that led inexorably to the conclusion that he must have been responsible for [the baby's]

death; the lie if believed foreclosed any other conclusion." *Aleman*, 662 F.3d at 906.

¶ 100   Unlike in *Aleman*, the officers here did not lie about the medical evidence and did not

force a conclusion on defendant.  As discussed above, they relied on the medical evidence from

Dr. Choi's autopsy that Ben's injury occurred within a short time frame from when he became

unresponsive and that Ben himself could not have generated the force necessary to cause his own

injuries.  Moreover, the medical evidence that the officers shared with defendant did not exclude

- 35 -

G_109

2014 IL App (2d) 120383-U

the possibilities that Ben had been hit in the head, that Ben had fallen from the changing table, or that Ben had been slammed against the wall—any of which could have been done by either Nancy or defendant. The officers clearly had not singled out defendant and were not focused on a predetermined conclusion that she had thrown Ben to the floor. They asked many different questions and explored various possibilities with defendant.

¶ 101                    *Corpus Delicti* Rule

¶ 102   Within her argument that the evidence was insufficient to prove her guilty beyond a reasonable doubt, defendant contends that the use of her confession at trial violated the *corpus delicti* rule. The *corpus delicti* is defined as the commission of a crime. *People v. Lara*, 2012 IL 112370, ¶ 17. To obtain a valid conviction, the State must prove beyond a reasonable doubt both the *corpus delicti* and the identity of the offender. *Lara*, 2012 IL 112370, ¶ 17. Because courts historically have not trusted out-of-court confessions, which could be coerced or unreliable, the *corpus delicti* rule arose. *Lara*, 2012 IL 112370, ¶ 19. The rule provides that, "[w]hen a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Lara*, 2012 IL 112370, ¶ 17. The independent corroborative evidence must "*tend to show*" that a crime was committed but need not prove the commission of the offense beyond a reasonable doubt. (Emphasis in original.) *Lara*, 2012 IL 112370, ¶ 18. "If the corroborating evidence is sufficient, it may be considered, together with the defendant's confession, to determine if the State has sufficiently established the *corpus delicti* to support a conviction." *Lara*, 2012 IL 112370, ¶ 18.

¶ 103   Here, the medical evidence tended to show that Ben was the victim of murder. Drs. Brunner and Lum, Ben's pediatricians, each testified for the State that Ben had no prior medical conditions that would have caused his injuries. Dr. Orozco, the emergency room physician,

- 36 -

2014 IL App (2d) 120383-U

opined for the State that there was a "very high suspicion for nonaccidental trauma." Dr. Choi, who performed the autopsy, opined that Ben "died of craniocerebral injuries due to blunt trauma" and that the injuries were very recent. Dr. Greenbaum opined that Ben died "of head injury involving blunt force trauma" consistent with having been thrown to the floor shortly or immediately before he became unresponsive. Dr. Greenbaum further concluded that Ben did not have a chronic subdural hematoma, that he could not have caused his own injuries, and that his vomiting two days earlier was not related to his death. Taken in the aggregate, the State's independent medical evidence established that Ben was the victim of abuse that caused severe injuries to discrete parts of his head shortly before he became unresponsive and that Ben himself could not have generated enough force to cause his own injuries. Overall, this evidence tended to show that Ben was the victim of murder, which corroborated defendant's confession that she forcefully threw Ben to the floor and that he landed on his head.

¶ 104 The State's nonmedical independent evidence further corroborated defendant's confession. Ben's parents, Amy and Andy, as well as Ben's pediatricians, testified that Ben was a healthy baby. Amy and Dr. Brunner testified that Ben was fine all day on Tuesday, the day before he died. Amy, along with Nancy and Gwendy, testified that Ben was fine all day on Wednesday, the day he died, up until the time that Gwendy went home at about 3:30 p.m., while Ben was eating his snack, as usual. This evidence tends to show that something happened to Ben shortly before he became unresponsive at 3:50 p.m., which is consistent with the State's medical evidence, and corroborates defendant's confession that she threw Ben down at about 3:35 or 3:40 p.m. The testimony of Gwendy, Nancy, and the director, Sandy Jenner, established that only three people—Gwendy, Nancy, and defendant—cared for Ben at Minee-Subee on the day he died. Therefore, only Nancy and defendant were with Ben during the 20 minutes or so before he

- 37 -

G_111

2014 IL App (2d) 120383-U

became unresponsive. Defendant's confession that she threw Ben as she was wiping his hands after his snack was corroborated by Nancy's testimony that defendant was the one who cleaned up the children at Ben's table. Defendant told police that Nancy did not see her throw Ben, because Nancy's back was turned as she washed dishes at the sink; these circumstances were exactly corroborated by Nancy's testimony. Nancy's testimony that the children were restless and fussy and that the room was noisy further corroborated defendant's statement describing the same circumstances.

¶ 105 We conclude that the State's independent evidence tended to show that a murder had been committed and was sufficiently corroborative of defendant's confession. Accordingly, the *corpus delicti* rule was satisfied and defendant's confession was properly admitted for the jury's consideration. See *Lara*, 2012 IL 112370, ¶ 47 (explaining that a properly admitted confession is "one stick in the evidentiary bundle" to be used by the trier of fact and that "[s]etting the bar too high for finding sufficient corroboration of a defendant's confession under the *corpus delicti* rule would intrude on the scope of the fact finder's exclusive duties").

¶ 106 Nonetheless, defendant maintains that the medical evidence was not independent. She asserts that Dr. Choi had not determined the cause of death at the conclusion of the January 15 2009, autopsy.[1] Defendant further asserts that, on January 16, 2009, Dr. Choi conducted

---

[1] Defendant cites pages in the appendix to her brief on appeal, where she included a copy of Dr. Choi's autopsy report. Our review of the record indicates that the report was not admitted into evidence. Accordingly, we will not consider it. *In re Marriage of Duggan*, 376 Ill. App. 3d 725, 746 (2007) (noting that materials outside the record on appeal may not properly be included in an appendix).

- 38 -

G_112

2014 IL App (2d) 120383-U

"experiments" to make Detective Curran's interpretations of defendant's statements "fit" Ben's injuries. Defendant's arguments are belied by the record.

¶ 107   At trial, Dr. Choi was asked specifically if he had formed a cause-of-death opinion based on his January 15, 2009, autopsy. He answered affirmatively and testified that, based on that autopsy, he opined that Ben died of "craniocerebral injuries due to blunt trauma." Evidence technician David Thomas testified that, on January 16, 2009, while he was in the autopsy room with Dr. Choi and Deputy Coroner Paul Foreman, he received phone calls from Detective Curran, relating stories that defendant had told. Each time Dr. Choi would re-enact with Ben's body defendant's version of events. There is absolutely no evidence that Dr. Choi's team concocted any scenarios. Dr. Choi simply determined whether what defendant described could have caused Ben's injuries. Thomas related to Detective Curran that defendant's initial stories about Ben's having thrown himself backwards and about defendant's dropping Ben could not have caused the injuries. There is no evidence that Dr. Choi's team ever told Detective Curran that defendant threw Ben on the floor or even suggested any possible scenario.

¶ 108   In support of her position, defendant relies on *People v. Rivera*, 2011 IL App (2d) 091060, and *People v. Nieves*, 87 P.3d 851 (Ariz. App. Ct. 2004). In *Rivera*, this court reversed for insufficiency of the evidence the defendant's conviction of first-degree murder based on an underlying criminal sexual assault. *Rivera*, 2011 IL App (2d) 091060, ¶ 46. We began by recounting the complete lack of evidence: there was no physical evidence linking the defendant to the offense (*Rivera*, 2011 IL App (2d) 091060, ¶ 29); DNA evidence determined that the defendant was not the source of the sperm found in the victim (*Rivera*, 2011 IL App (2d) 091060, ¶ 30); and no reasonable trier of fact could have found the jailhouse informants' testimony credible (*Rivera*, 2011 IL App (2d) 091060, ¶ 38). We then considered the remaining

G_113

2014 IL App (2d) 120383-U

evidence—the defendant's confession. We held that admission of the confession, the product of a statement written by police, which was obtained over four days of interrogation by 10 different law enforcement officers, who provided details of the crime in leading questions, violated the *corpus delicti* rule. *Rivera*, 2011 IL App (2d) 091060, ¶¶ 44-45.

¶ 109 *Rivera* is distinguishable. Notwithstanding defendant's claim that the officers' "interrogations were replete with leading questions, suggestions, and indeed demands," the DVDs reveal otherwise. The officers related the medical evidence they had received from the briefing the night before—that a great deal of force, an amount that Ben could not have generated himself, was necessary to cause Ben's injuries and that Ben suffered the injuries shortly before becoming unresponsive. This was unlike the situation in *Rivera* where officers admitted to asking leading questions that included such details of the crime as what the victim had been wearing (*Rivera*, 2011 IL App (2d) 091060, ¶ 11).

¶ 110 In support of her position that the officers asked leading questions, defendant cites isolated portions of the transcript of her interview. We reiterate that our review of the DVDs reveals nothing improper about the interview. Furthermore, defendant's specific citations are taken out context. For example, defendant alleges that the officers told her that she was with Ben when he was injured. The citation provided was from a portion of the interview just after defendant suggested that Nancy had done something, and the officers were asking defendant if she were covering up for someone. Detective Curran said, "[F]rom what you were telling us, you were in the room." Defendant further points to Chief Filenko's comment that the force involved was akin to "being dropped from the second floor of a building onto some concrete." This statement reflects the language that Dr. Choi testified he probably used with Detective Hyde. Notably, Chief Filenko made this statement in connection with the discussion of what

- 40 -

G_114

2014 IL App (2d) 120383-U

Nancy might have done; he told defendant that she had the opportunity to either "be a good witness or a co-conspirator in a murder." Defendant asserts that the officers told her that she was frustrated with Ben, but the portion of the interview she cites was still in the context of exploring Nancy's possible involvement, wherein Detective Curran said, "We think this could have been either someone getting real frustrated or an accident." Defendant next asserts that the officers told her that she had lost patience with Ben or lost control because "he aggravated the hell out of her." The officers asked defendant if she had lost her patience and told her it would be understandable. In the context of reminding defendant that she had changed her story several times, Chief Filenko told defendant that she was "running out of time." Similarly, where defendant says the officers told her what happened—that Ben's head hit the floor not the chair— was a point after which defendant had admitted to being angry and forcefully putting Ben on the floor.

¶ 111  Even taken together, the comments cited by defendant do not indicate, as she maintains, that the officers told her what happened and that the only "truth" they would accept was that she was guilty. As discussed above, the officers spent a significant amount of time with defendant exploring her various versions of events, including her vague assertions that perhaps Nancy had done something and that defendant had accidentally dropped Ben as she was putting him down. They repeatedly asked her to explain and demonstrate each scenario so that they could verify defendant's stories with the medical evidence. The record establishes that the officers knew that Ben suffered a tremendous amount of force to his head shortly before becoming unresponsive, but that they had no preconceived notions regarding how it had happened or who was responsible for it.

- 41 -

G_115

2014 IL App (2d) 120383-U

¶ 112   In *Nieves*, the court reversed the defendant's conviction of first-degree murder, holding that the *corpus delicti* rule was not satisfied.   There, the only independent evidence was the medical examiner's opinion that the victim's death was unexplained, which was not corroborative of the defendant's confession to smothering her infant.   *Nieves*, 87 P.3d at 857. The court noted that, after he learned of the defendant's confession, the medical examiner changed his opinion to conclude that asphyxia due to smothering could not be ruled out as a cause of death.   *Nieves*, 87 P.3d at 854.   Not only is *Nieves* not binding on this court (*Kostal v. Pinkus Dermatopathology Lab., P.C.*, 357 Ill. App. 3d 381, 395 (2005)), but also it is inapposite. Here, unlike the medical examiner in *Nieves*, Dr. Choi testified that he concluded that Ben died of craniocerebral injuries due to blunt trauma before he learned of defendant's confession.   That Dr. Choi did not know exactly how Ben suffered the blunt trauma did not render the cause of death unexplained.   Rather than changing his opinion, Dr. Choi simply helped police verify whether defendant's various versions of what happened to Ben were consistent with his autopsy findings—that Ben died of blunt force trauma.

¶ 113                                     Sufficiency of the Evidence

¶ 114   Having determined that defendant's confession was properly considered by the jury, we turn to defendant's contention that the State failed to prove her guilty beyond a reasonable doubt of first-degree murder.   When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant.   *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 32.   Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)   *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307,

- 42 -

G_116

2014 IL App (2d) 120383-U

319 (1979)).  The reviewing court should not substitute its judgment for that of the trier of fact, who is responsible for weighing the evidence, assessing the credibility of witnesses, resolving conflicts in the evidence, and drawing reasonable inferences and conclusions from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).  However, a reviewing court must set aside a defendant's conviction if a careful review of the evidence reveals that it was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 115  Here, consistent with the defense theory at trial, defendant contends that the evidence established that Ben suffered a blunt force trauma to the head in October 2008, months before his death, and developed a chronic subdural hematoma, exhibiting symptoms of that injury until the day he died, when he threw himself backwards and hit his head on the tile floor, aggravating the prior injury and causing a re-bleed.  Defendant further contends that the evidence establishes that Nancy was the only adult in the classroom when Ben injured himself, and that, therefore, defendant was unconnected to Ben's death.  According to defendant, the evidence creates more than a reasonable doubt about her guilt.  Although defendant's assessment of the evidence represents a conclusion that the jury possibly could have adopted, for the following reasons, it was certainly not the only reasonable one.

¶ 116  The State's medical experts testified that Ben was the victim of abuse that caused severe injuries to discrete parts of his head shortly before he became unresponsive, that those injuries caused his death, and that Ben himself could not have generated enough force to cause his own injuries.  Specifically, Dr. Orozco, the emergency room physician, testified that there was a "very high suspicion for non-accidental trauma."  Dr. Choi opined that Ben died of blunt force trauma inflicted recently, probably the same day.  Dr. Greenbaum testified that she saw no

- 43 -

2014 IL App (2d) 120383-U

evidence of chronic subdural hematoma and that Ben's injuries were "fairly recent." She elaborated that Ben's being completely normal in his activities, behavior, and eating the day before and the day of his death was not a picture of a child with a chronic subdural hematoma. Although she thought that viewing the histology slides was unnecessary in this case, Dr. Greenbaum testified that her review of the autopsy photographs was consistent with what Dr. Choi reported he saw under the microscope—that there was no evidence of a chronic subdural hematoma. Ben's pediatricians testified that Ben was a healthy baby, that he had no medical condition that would have contributed to his death, and that his increasing head circumference was not a cause for concern. Dr. Manuel Montez's rebuttal testimony was substantially corroborative of the State's other medical experts.

¶ 117   In contrast, defense experts testified that they observed signs of healing in Ben's head injuries, which indicated the injuries were weeks or months old. Dr. Leestma testified that a review of the histology slides was necessary to determine the age of Ben's injuries; Dr. Teas even prepared some of her own slides. They both testified that Ben suffered a chronic subdural hematoma that could have re-bled if he threw himself backwards. Dr. Leestma testified that even a short fall, such as Ben's throwing himself backwards, could have exacerbated his chronic subdural hematoma. Dr. Leestma testified that Ben's simple linear skull fracture was consistent with a short fall; Dr. Teas testified that she could not even be sure that Ben suffered a skull fracture.

¶ 118   The jury was presented with a battle of experts regarding the timing of Ben's injuries and the cause of death. It was the sole province of the jury to weigh this evidence and to assess the credibility of the witnesses. *Sutherland*, 223 Ill. 2d at 242. We note that all of the experts agreed that Ben suffered from a subgaleal hematoma, a subdural hematoma, and a subarachnoid

- 44 -

2014 IL App (2d) 120383-U

hematoma—all of which were in separate compartments of the head. Indeed, even one of the defense experts, Dr. Leestma, acknowledged that Ben's injuries were consistent with having been thrown to the floor and that Ben's throwing himself backward could not have caused all of his injuries. On this record, we cannot say that no rational trier of fact could have found that Ben died of blunt force trauma at the hands of another shortly before becoming unresponsive.

¶ 119  Given defendant's confession that she forcefully threw Ben down on the floor after cleaning him up from snack, a rational trier of fact could have found that defendant was the person who inflicted blunt force trauma upon Ben. We will not repeat our discussion from above explaining how defendant's confession was corroborated by the other evidence.

¶ 120  Moreover, the jury was not required to disregard defendant's confession, even assuming that it believed defendant's theory that Ben had a chronic subdural hematoma. As the jury was instructed (Illinois Pattern Jury Instruction, Criminal, No. 7.15 (4th ed. 2000)), it was not necessary that defendant's act of throwing Ben to the floor be the sole and immediate cause of his death; the jury must have found only that defendant's act contributed to Ben's death. *People v. Krueger*, 260 Ill. App. 3d 841, 848 (1994). Thus, the jury was not required to reject defendant's confession even if it believed Nancy's testimony that Ben threw himself backwards minutes before he became unresponsive. Several witnesses testified that it was not uncommon for Ben to throw himself backwards; the jury was not required to find that this tantrum resulted in death. As noted above, even defense expert Dr. Leestma acknowledged that Ben's throwing himself backward could not have caused all of his injuries. A rational trier of fact could have found both that Ben had a chronic subdural hematoma that re-bled when he threw himself backwards with Nancy and that defendant threw Ben forcefully to the floor as the two scenarios are not mutually exclusive.

G_119

2014 IL App (2d) 120383-U

¶ 121   Defendant relies on *People v. Smith*, 185 Ill. 2d 532 (1999), in support of her contention

that the State failed to prove her guilty beyond a reasonable doubt.  In *Smith*, the supreme court

reversed the defendant's murder conviction, because it rested solely on the testimony of one

eyewitness, whose testimony and credibility were completed undermined in several ways.

*Smith*, 185 Ill. 2d at 542-46.  *Smith* is inapposite to the present case.  As we have discussed at

length, the State produced ample evidence—including medical experts, testimony of defendant's

co-workers and Ben's parents, and defendant's confession—to prove defendant's guilt beyond a

reasonable doubt.

¶ 122   Defendant's arguments boil down to a request that we usurp the jury's role in weighing

the evidence and assessing the credibility of the witnesses.  This we cannot do.  *People v.

Larson*, 379 Ill. App. 3d 642, 654 (2008) ("We, as a reviewing court, are not to substitute our

own judgment for that of the jury.").  As explained above, defendant's confession was properly

before the jury, because it was voluntary and because the *corpus delicti* rule was satisfied.

Therefore, the confession was evidence to be weighed by the jury with all of the other evidence.

Defendant's theory of the case was not the only reasonable conclusion to be drawn from all of

the evidence.  Accordingly, because the evidence was not so unreasonable, improbable, or

unsatisfactory as to create a reasonable doubt of the defendant's guilt (*Evans*, 209 Ill. 2d at 209),

we hold that the State proved defendant guilty beyond a reasonable doubt of first-degree murder.

¶ 123               Ineffective Assistance of Counsel: Jury Instruction

¶ 124   Defendant next argues that defense counsel was ineffective for failing to tender a jury

instruction defining the term "reckless."  To succeed on a claim of ineffective assistance of trial

counsel, a defendant must satisfy the well-established standard set forth in *Strickland v.

Washington*, 466 U.S. 668 (1984).  *People v. Patterson*, 217 Ill.2d 407, 441 (2005); *People v.

- 46 -

2014 IL App (2d) 120383-U

*Lemke*, 384 Ill. App. 3d 437, 447 (2008). Under the two-pronged *Strickland* test, a defendant must first show that his counsel's performance was deficient in that it fell below an objective standard of reasonableness. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). In demonstrating the deficiency, the defendant must overcome the strong presumption that counsel's conduct might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Houston*, 226 Ill. 2d at 144. Under the second prong, the defendant must demonstrate that the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different. *Houston*, 226 Ill. 2d at 144; *Lemke*, 384 Ill. App. 3d at 447. A failure to satisfy either prong is fatal to the ineffective-assistance argument. *Houston*, 226 Ill. 2d at 144-45; *Lemke*, 384 Ill. App. 3d at 447.

¶ 125    In the present case, defendant requested that the jury be instructed on the lesser-included offense of involuntary manslaughter as an alternative to the charge of first-degree murder. The trial court instructed the jury that a person commits the offense of involuntary manslaughter when he or she "unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another." Illinois Pattern Jury Instruction, Criminal, No. 7.07 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 7.07). Defendant also requested an instruction on the lesser-included offense of reckless conduct as an alternative to the charged offense of aggravated battery. The trial court instructed the jury that a person commits the offense of reckless conduct when he or she "recklessly performs any act which causes great bodily harm to another person." Illinois Pattern Jury Instruction, Criminal, No. 11.37 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.37). The committee notes to both IPI Criminal 4th No. 7.07 and IPI Criminal 4th No. 11.37 state that Illinois Pattern Jury Instruction, Criminal, No. 5.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.01) be given.

G_121

2014 IL App (2d) 120383-U

IPI Criminal 4th No. 5.01 explains that: "A person [(is reckless) (acts recklessly)] when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

¶ 126   Defendant's argument fails, because she does not overcome the strong presumption that counsel's decision not to request a jury instruction defining recklessness was sound trial strategy. See *Lemke*, 384 Ill. App. 3d at 450 (stating that counsel's decision regarding jury instructions is widely recognized as a matter of trial strategy and generally will not support an ineffective-assistance-of-counsel claim). The defense theory was consistent throughout the entire case, from opening statements to closing arguments. Defendant's theory of the case was that her confession was false and that she did nothing to Ben. Defense counsel posited in the opening statement and argued in closing that Ben died as a result of a chronic subdural hematoma that re-bled when he threw himself backwards and hit his head on the tile floor moments before becoming unresponsive, while defendant was out of the classroom. The defense elicited testimony from its experts in support of that theory. Counsel could have believed that an instruction on the definition of recklessness would have caused the jury to focus on defendant's conduct, counter to the defense theory of the case.[2]   Put another way, the concept of recklessness would be relevant

---

[2] Counsel's request for jury instructions on the lesser-included offenses was granted, over the State's objection, after the trial court confirmed with defendant that counsel had consulted with her and that it was her choice as well to request the instructions. Counsel reasonably could have believed that, given the full array of defendant's videotaped statements, it was prudent to offer to the jury alternatives to the charged offenses.

- 48 -

2014 IL App (2d) 120383-U

only if the jury believed that defendant did drop or throw Ben—the conclusion that counsel desired to avoid. Consequently, we determine that counsel here made a strategic decision not to instruct the jury on the definition of recklessness. See *Lemke*, 384 Ill. App. 3d at 450 ("It is axiomatic that the effort to confine instructions to those that best support the theory of the defense is what trial strategy is all about." (Internal quotation marks omitted.)).

¶ 127 We recognize, as defendant points out, that defense counsel argued in closing that defendant's conduct was, at most, reckless. Defense counsel's reference to recklessness was limited to less than two pages of transcript, wherein defense counsel stated, "There is no intent. If and, again, it is a big if[,] if you believe this occurred, it occurred within seconds, and that is a reckless act." Defense counsel reasonably could have believed that it was necessary for him at least to acknowledge that the jury might find that defendant dropped or threw Ben. We cannot say that defense counsel's brief and isolated reference to recklessness in closing undermines the presumption that counsel's decision not to request IPI Criminal 4th No. 5.01 was the product of sound trial strategy. Accordingly, we reject defendant's ineffectiveness claim. *Houston*, 226 Ill. 2d at 144-45 (a failure to satisfy either *Strickland* prong is fatal to the claim); *Lemke*, 384 Ill. App. 3d at 447 (same).

¶ 128 The cases upon which defendant relies are inapposite. See *People v. Thurman*, 104 Ill. 2d 326 (1984) (holding that the issues instruction on involuntary manslaughter must include the language "without lawful justification" when there was evidence of self defense); *People v. Lowry*, 354 Ill. App. 3d 760 (2004) (holding that trial counsel was ineffective for failing to give instruction defining "knowingly"—the mental state at issue—where the jury submitted a question to the court expressly asking for the definition); *People v. Howard*, 232 Ill. App. 3d 386 (1992) (holding that there was reversible error on the specific facts in the case, where the State

- 49 -

G_123

2014 IL App (2d) 120383-U

improperly characterized involuntary manslaughter as a cop-out in its closing argument, and the court failed to instruct the jury on the mental state of recklessness); *People v. Bolden*, 103 Ill. App. 2d 377 (1968) (holding there was reversible error where the jury instruction on involuntary manslaughter neither mentioned the required mental state of recklessness nor defined it).

¶ 129    Defendant further maintains that the questions submitted by the jury during deliberations reflect its confusion as to the meaning of recklessness.    The jury submitted the following to the trial court:

> "1. If 1st degree murder:
>
>> a.   Do we have to decide on aggravated battery?
>>
>> b.   Do we have to decide on reckless conduct?
>
> 2. If manslaughter, do we have to decide on a & b above?
>
> 3. What is reckless conduct?
>
> 4. What is aggravated battery?"

The court and the parties interpreted questions 1 and 2 as questions of law, reflecting the jury's lack of understanding as to how to return the verdict forms.    By agreement of the parties, the court answered questions 1 and 2 in the affirmative with a brief explanation.    The court and the parties interpreted questions 3 and 4 as pertaining to the offenses named therein, and all agreed that the jury had been instructed on the definitions of those offenses.    The court instructed the jury accordingly.    Notwithstanding defendant's assertion to the contrary, we see nothing in the jury's questions to indicate that it was "clearly seeking guidance" as to the definition of recklessness.    Rather, questions 3 and 4 expressly referred to the offense of reckless conduct (which was offered as an alternative to the charged offense of aggravated battery) and to the

- 50 -

2014 IL App (2d) 120383-U

charged offense of aggravated battery. The trial court gave the jury both the definitional and the issues instructions for each of these offenses.

¶ 130                              Expert Testimony

¶ 131   Defendant's final argument is that the trial court abused its discretion in allowing Dr. Montez to testify beyond the scope of his expertise in the State's rebuttal case. A person may testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and if his testimony will aid the trier of fact in reaching its conclusions. *People v. Swart*, 369 Ill. App. 3d 614, 631 (2006). The trial court enjoys discretion in deciding whether to admit a person as an expert, and we will disturb that decision only upon an abuse of that discretion. *Swart*, 369 Ill. App. 3d at 631.

¶ 132   Here, Dr. Montez testified as an expert in forensic pathology. Defendant raises no argument regarding Dr. Montez's qualifications in that capacity. Instead, defendant argues that Dr. Montez's testimony exceeded the scope of his expertise because he rendered a neurological opinion. Because we conclude that Dr. Montez did not render a neurological opinion, we reject defendant's argument.

¶ 133   While testifying about the cause of death, Dr. Montez opined that Ben did not have chronic subdural hematoma visible to the naked eye. He further testified that it was not necessary to view the histology slides to look for a chronic subdural hematoma because this was "not a microscopic cause of death." Dr. Montez said that he could determine the "cause, mechanism, and manner" from a visual inspection of Ben. He elaborated that, if a chronic subdural hematoma were large enough to be seen by the naked eye, Ben would have exhibited "some neurologic deficit." Dr. Montez testified that, in order to determine if Ben had any neurologic deficit, he reviewed Ben's medical records, day care records, and the 53-second video

- 51 -

G_125

2014 IL App (2d) 120383-U

taken of Ben in his home in November 2008. Based on his review, Dr. Montez concluded that Ben was not suffering from any motor, audio, visual, or speech deficits. He explained that, if Ben had a chronic subdural hematoma, he would have expected that these areas would have been affected.

¶ 134    This "neurological testimony" of which defendant complains reflected Dr. Montez's observations, based on medical records, day care records, and the video, that Ben was developing normally. The testimony served to rebut Dr. Teas' testimony that Ben's chronic subdural hematoma was asymptomatic because deficits would not be apparent in young children who are "brain stem creatures" and do not have higher functions such as walking and talking. Dr. Montez did not render an opinion about Ben's neurological condition. Rather, he testified that, based on his observations, and consistent with the medical and day care records, Ben was functioning normally—not as a child with a chronic subdural hematoma. This testimony merely helped to explain his opinion regarding the cause and timing of death.

¶ 135                                 CONCLUSION

¶ 136    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 137    Affirmed.

- 52 -

G_126

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,  )
                                  )
          Plaintiff,        )
                                  )
    v.                   )    Case No.  09 CF 252
                                  )
MELISSA CALUSINSKI,        )
                                  )
          Defendant.      )

### AFFIDAVIT OF EUPIL CHOI, M.D.

I, Eupil Choi, M.D., first duly sworn under oath and based upon my personal and direct knowledge, hereby depose and state as follows:

1.    That I am a physician Board Certified in Anatomic Pathology, Clinical Pathology and Forensic Pathology.

2.    That I performed the autopsy on Benjamin on January 15, 2009 and an additional examination on January 16, 2009.

3.    That I prepared a report pursuant to that autopsy and testified to my findings at the trial of Melissa Calusinski, which began on November 7, 2011.

4.    That in my report and testimony, I missed that Benjamin had suffered an old, *GRL sc* significant injury that pre-dated January 14, 2009.

5.    That the photomicrographs and histology slides of Benjamin reveal there are numerous siderphages, positive iron stains, and hemosiderin lade microphages which confirm the existence of a *JRC sc* well developed, organizing subdural membrane, which indicated an older injury that pre-dated January 14, 2009.



6.    That I thought that cellular structure was of mesenchymal origin, but at the time of his death, Benjamin had a well developed, organizing subdural membrane, which indicated an older injury that pre-dated January 14, 2009.

7.    That it is my opinion based on a reasonable degree of medical certainty, that at the time of his death, Benjamin Kingan had suffered a ~~significant~~ head injury prior to January 14, 2009, as evidenced by the well developed, organizing subdural membrane present, which indicated an older injury that pre-dated January 14, 2009.

_____
Eupil Choi, M.D.

SUBSCRIBED AND SWORN TO
before me this 22 day
of July, 2013

_____
NOTARY PUBLIC

OFFICIAL SEAL
JAMES R KIRBY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/15/15

## AUTOPSY REPORT

NAME:   Benjamin Kingan

SEX:    Male

AGE:    16 months

RACE:   White

DATE OF DEATH: 1/14/09

DATE EXAMINED: 1/15/09

EXAMINED BY: E. Choi, MD

JAN 3 1 2009



SS-10

Benjamin Kingan                                                    Page 1

Postmortem examination of the body, BENJAMIN KINGAN, a 16 month
old, male, White, is authorized by the coroner and is performed
at 2:30 p.m., of January 15, 2009, at the Coroner's facility
in Waukegan.

Present are Deputy Coroner Paul Forman and Investigator Adam
Hyde of Lincolnshire Police Department.

The body is received clad in a diaper which is unsoiled.

EXTERNAL EXAMINATION:

The body is that of a slender built and tendered appearing male,
White, weighing 22 pounds (9980 grams), and measuring 30 inches
in length, and appearing somewhat younger looking than the
stated age of 16 months.

Rigidity in the elbow and knees joints is present to an equal
extent. Dependent livor is on the posterior part of the body.

No significant change is noted on the back skin and buttocks.

The head hair is light brown. The irides are brown. The sclerae
and palpebral conjunctivae are clear and showing no hemorrhage.
The pupils are equal in size.

MEDICAL MANAGEMENT INDICATE CHANGES:

1.  In the right nostril, there is a nasogastric tube in situ.

2.  In the mouth, there is an endotracheal tube in situ.

3.  On the dorsal of the left hand, there is an IV line in
    situ.

4.  On the right and left antecubital fossae and left ankle,
    there are acute puncture marks.

5.  On the left groin, there is an acute puncture mark which
    is covered by a bandage.

6.  On the left pretibial area, there is an intraosseous needle
    in situ.

G_130

<u>Benjamin Kingan</u>                                    Page 2

   7.   In the internal genitalia and rectum, there are draining
        tubes in situ.

   8.   On the anterior mid chest, there is a rectangular appearing
        defibrillator mark.

No fluid escapes from the nostrils. Around the nostrils and
mouth, there are dry stains. The upper jaw shows four incisors
and two second premolars. The lower jaw shows four incisors
and two second premolars. No significant change is noted in
the oral mucosa. The mucosa of the lips show no contusion or
hemorrhage.

The neck configuration appears usual showing no wound.

Circumferences of the head, chest and abdomen are 19.5, 18.0,
and 16.5 inches, respectively.

Physical growth shows 10th and 5th percentiles for weight and
length. The head circumference is 90th percentiles for age.

The back of the head is flat and firm.

The upper extremities appear symmetrical and showing no
deformity.

The chest shows no deformity.

The abdomen is flat and soft.

The external genitalia are of normal male and circumcised. The
testes are descended. The anus appears usual showing no anomaly.

The lower extremities appear symmetrical and showing no
deformity.

The skin is not dehydrated. Skin turgor is present.

Maldevelopment is not observed.

G_131

Benjamin Kingan                                    Page 3

SKIN BRUISE:

1. On the left forehead below the hairline level, there is a bluish skin bruise, 0.3 inch.

2. On the right upper arm below the axilla level, there is a pinkish bruise, 0.3 inch.

3. Above the left zygoma and left axilla, there are focal areas of light brownish dry skin change.

INTERNAL EXAMINATION:

CENTRAL NERVOUS SYSTEM:   A bimastoid incision is made.

Evidence of Injury:

1. On the back of the head, right and left paramedian, there is an extensive subgaleal hemorrhage involving the posterior part of the parietal bone including parietal foramen, lambda, and extending above the nuchal line. Overall, it measures 4 by 4 inches.  The area is thickened due to hemorrhage, hematoma and edema.

2. There is a horizontally disposed fracture, 0.8 inch, extending from the sagittal suture situated above the right parietal foramen.  Corresponding inner table shows fracture line, zigzag-shaped, 0.8 inch.

3. The skin above the corresponding fracture site shows a faint appearing reddish discolored area, 1 inch.  There is no abrasion.  There is no laceration.

4. When the right dura is opened, the blood is gushed out. It is not coagulated blood.  It weighs 8 grams. On the right anterior and middle cranial fossae, there are streaks of subdural blood stains.

5. The brain weighs 1162 grams.  Edema is noted over the convexities.  On the right hemisphere, there are subarachnoid hemorrhages along the vessels of the anterior frontal and posterior central gyri.  There are focal areas of subarachnoid hemorrhage on the superior aspect of the cerebellum.  On the base of the brain, there are subarachnoid hemorrhage blood stains along the midline of the frontal lobe and basal aspects of the temporal lobes.

<u>Benjamin Kingan</u>                                    Page 4

6.  There is no basal skull fracture on dura stripping.  On
    transectioning, there is no intracerebral hemorrhage.
    There is no subcortical contusion.  The ventricles are
    not dilated.  The septum is at the midline.  The basal
    ganglia appears usual.  No blood content is noted in the
    ventricles.  There is no hemorrhage in the pons.  There
    is no intracerebellar hemorrhage.

NECK ORGANS:  There is no soft tissue hemorrhage in the neck.
The tongue shows no hematoma.  The epiglottic rim shows no edema.
There is no deposit in the hypopharynx.  The thyroid is of normal
size.  The hyoid and thyroid cartilage are intact.  The esophagus
has no content.  It shows grayish white mucosa lining.  The
gastroesophageal junction is normal.  The trachea contains
watery fluid and creamy mucus threads.  The bronchiole trees
contain no food particles.  The thymus weighs 42 grams.  There
is no petechiae.  The venous return is normal.

RESPIRATORY SYSTEM:  No bruise is noted in the subcutis of the
thoracic and abdominal wall.  The rib cage is intact, no
fracture.  No fluid content is noted in the pleural cavities.
The combined weight of the lungs is 287 grams.  It shows
congestion and edema on transectioning.  Inflammatory
consolidation and hemorrhage is not observed on transected
lungs.

CARDIOVASCULAR SYSTEM:  The pericardial sac is free of adhesion.
The heart weighs 64 grams.  It shows no abnormal blood flow
track.  On the epicardium of the left ventricle near the apex,
there is a thickened yellow fat tissue, 0.3 inch.  The ventricles
are not thickened.  There is no shunting in the septum.  The
foramen ovale is closed.  The mitral leaflets show no anomaly.
The aortic cusps appear normal.  The right and left coronary
ostia are in normal position.  Endocardial fibrosis is absent.
The aorta shows no anomaly.

PERITONEAL AND CAVITY APPEARANCES:  The peritoneal cavity
contains about 15 mL of clear fluid.  All intra-abdominal organs
are in their usual anatomic location.  The abdominal wall and
base of the mesentery shows no hemorrhage.

HEPATOBILIARY SYSTEM:  The liver weighs 488 grams.  On
transectioning, the cut surfaces are beefy red, compressible

Benjamin Kingan                                        Page 5

and soft.   The gallbladder is normal.

LYMPHATIC SYSTEM:  The spleen weighs 54 grams.  It has an intact capsule and is firm in consistency.

ENDOCRINE SYSTEM:  The adrenals are of normal size showing no hemorrhage.   The pancreas displays no pathologic change.

URINARY SYSTEM:  The perirenal soft tissue is stripped with ease.  The combined weight of the kidneys is 80 grams. The cortical surfaces are smooth, shiny, beefy red, and firm in consistency.  The renal pelves are not dilated.  The retroperitoneum appears usual.  The urinary bladder is devoid of content.

GASTROINTESTINAL TRACT:  The stomach is not distended.  It contains about 15 mL of dairy product, no other food particle is noted.  The gastric mucosa is congested showing no hemorrhage. The small and large intestine is of no special note showing soft brownish well formed content in the large bowel.

Toxicology of blood, bile, and vitreous is taken.

PATHOLOGICAL SUMMARY:

   1.  Craniocerebral injuries.

   2.  Subgaleal hemorrhage.

   3.  Fractured skull.

   4.  Subdural hematoma.

   5.  Scene investigation.

   6.  Police investigation.

   7.  The eyeballs are enucleated.  There is no hemorrhage on the optic nerve sheaths.

OPINION:

Pending further studies.

EC:kl  1/16/09

SS-15

Benjamin Kingan                                                    Page 6

Follow-UP:

On January 16, 2009 at 4:00 p.m., a further examination is
conducted on the body of BENJAMIN KINGAN, a 16 month old, male,
White, and the following observations are made.

Present are Deputy Coroner Paul Forman and Investigator Dave
Thomas of Lake County Major Crime Task Force.

1.    Incisions are made on the back extending from
      the neck to the coccyx and extending to the
      buttocks. No hemorrhage is noted in the
      subcutis and soft tissue of the area.  On the
      musculatures of the superficial and deeper layers
      of the neck, there is no hemorrhage and no old
      hematoma.  There is no fracture of the cervical
      spine.  The dorsal and costal surfaces of the
      shoulder blades show no hemorrhage.  The
      musculatures of the back and buttocks show no
      hemorrhage.

2.    Incisions are made on the flexor and extensor
      aspects of the arms from the shoulders to the
      wrists. The bruise on the right upper arm as
      previously noted shows an area of subcutis
      hemorrhage. On the right and left antecubital
      fossae, there are areas of hemorrhage due to
      earlier medical treatment punctures.
      No other hemorrhage is noted in the subcutis of
      the soft tissue and musculatures of the arms.

3.    The testicular tunics show no hemorrhage and
      normal appearing testicles.

4.    Incisions are made on the anterior and posterior
      thighs and lower legs.  An area of subcutis
      hemorrhage is noted on the left groin due to
      earlier medical treatment punctures.  There is no
      other hemorrhage in the subcutis of the soft
      tissues and musculatures of the lower extremities.

5.    The spinal cord is exposed by an anterior approach.
      There is no fracture of the spine.  The spinal
      cord shows no epidural or subdural hematoma. The
      cord is intact from the cervical segment to the
      filum terminale.

Benjamin Kingan                                    Page 7

In Summary,

    1.   No hemorrhage in the skin and musculatures of the
          neck, back, spine, buttocks, arms and legs.

    2.   A bruise of the right upper arm as previously noted.

OPINION:

This 16 months, male, White, Benjamin Kingan died of Cranio-
Cerebral Injuries due to Blunt Trauma of the Head.

Addendum:
Date of Birth: August 31, 2007
Age:          16 months

EC:kl  1/18/09

BENJAMIN KINGAN ———— —— — ——  ·  ——————Page 1

FOLLOW UP:

MICROSCOPIC EXAMINATION:

MC# 3618

HEART:     No myocarditis.

LIVER:     Sinusoid congestion.

PANCREAS: Normal.

TESTES:    No hemorrhage.

CNS:       1.   Focal areas of subarachnoid hemorrhage.
           2.   Blood stains on the dura.  No subdural
                membranes.  No blood clot in the sinus.
           3.   No meningitis.

SKIN:      1.   Forehead, hemorrhage in the subcutis
                adipose tissue.
                No inflammatory cells present.
           2.   Back of head, hemorrhage in the
                hypodermis.
           3.   Side of head, hemorrhage in the
                hypodermis.
           4.   Right upper arm, streaks of hemorrhage
                in the subcutis adipose tissue.

EC:kl   2/5/09

G_137

Benjamin Kingan
1 year 5 months

# CDC Growth Charts: United States



Weight-for-age percentiles:
Boys, birth to 36 months

SOURCE: Developed by the National Center for Health Statistics in collaboration with
the National Center for Chronic Disease Prevention and Health Promotion (2000).

CDC

CB-160

G_138



CDC Growth Charts: United States

Length-for-age percentiles: Boys, birth to 36 months

Published May 30, 2000.
SOURCE: Developed by the National Center for Health Statistics in collaboration with
the National Center for Chronic Disease Prevention and Health Promotion (2000).

CB-161



CDC Growth Charts: United States

Head circumference-for-age percentiles: Boys, birth to 36 months

Benjamin
Kingan
1 year 5 months

Published May 30, 2000.
SOURCE: Developed by the National Center for Health Statistics in collaboration with
the National Center for Chronic Disease Prevention and Health Promotion (2000).

SAFER · HEALTHIER · PEOPLE™

CB-162

G_140



INFANT/CHILD BODY CHART

Richard L. Keller, M.D
Coroner

NAME: Benjamin Kingan

AGE: 1 YR 5 MO   RACE: White   DATE OF DEATH: 01/14/2009

EYES: Brown Clear   HAIR: Lyer brown   HEIGHT: 30 (2¼)   WEIGHT: 22 lbs

PROPERTY:

SEX: Male

G_141



..., male, lateral view.

Name

Age _____ Race _____ Sex _____

Autopsy No _____

Date  /  /

JAN 1 5 2009

Benjamin Krogan

1 yr M / M / W

Skin

Ba 1162
edema ⊕

Tvx

skin
blood red

SGH   4x4

thick
blood

L.

SAH

Cerebellum

L. ARM          R. ARM

Cat. No. 44-1-005-00

CB-169



Cat. No. 44-1-013-00

G_143

JAN 1 5 2009

Benjamin Kingan

1y 5m /M/W

CNS: _See diagram_

B-1162

NECK: Tone, Epi, Hypo Thyroid → ϕ    H+TC+ ϕ    Trachea .

Thymus 42  No petechiae    VC → ϕ    (creamy mucous throat)

watery fluid ↓

Eso → Φ

RS: R 166

L 114

____

280

Conjant=    No fluid

edema    No Fx

No Consolidation, No Leak

CV: 64



FB - Closed

RC

LAD > ϕ    W. per thicked    AORTA  ϕ

CIR

thick yellow = fat ( .3 )

LIVER: 488  Red + ϕ    GB ⊕

SPLEEN: 54

ES: ⊕  + ⊕

US: R ⊕    Redm — ϕ    UB nothing

L 42

___

8.0

STOMACH: = 15 ml or dining product

SMALL: ϕ

LARGE: soft brown, Well formed .    APP ⊕

FLUID    15 ml

BASE OF MESENTERY  ϕ

IG:

OB-171

| Case Number | 09011417491 | Date-Time | 1/14/09 5:49 pm | Case Type | Inquest |
| Reporting Person | Adam Hyde | Of | Lincolnshire Police | Phone | (847) 883-9900 |
| Deputy Coroner | Forman | | | | |

## Decedent Information

| | | | | |
|---|---|---|---|---|
| Name | Benjamin Kingan | | Date of Birth | 08/31/2007 |
| Address | 840 Swallow Street | | Age (yrs) | 1 or Mo Days |
| | Deerfield, IL 60015 | | Race | White |
| Phone | (847) 325-5176 | SSN | Organ Donor | No    Sex  M |
| Occupation | | Business Type | | |

## Next of Kin

TCF    No

| | | | |
|---|---|---|---|
| Name | Amy Kingan | Relationship | Mother |
| Address | 840 Swallow Street | Phone | (847) 325-5176 |
| | Deerfield, IL 60015 | Alt. Phone | |
| Notified by | Present | | |

## Death Location

| | | | |
|---|---|---|---|
| Hospital | Yes    ER/OR/InPat/DOA   ER | Date of Death | 01/14/2009 |
| Hospital Name | Condell Medical Center | Time of Death | 04:50    am ☒pm |
| Address | 801 S Milwaukee Avenue | Hospice No. | |
| | Libertyville, IL 60048 | | |
| Pronounced By | Dr Adriana Orozco | Cremation No | |

## Police

| | | | |
|---|---|---|---|
| Police Dept | Lincolnshire Police | Police Phone | (224) 629-6107 |
| Police Officer | Adam Hyde | Incident Time | 1/14/09 5:56 pm |
| | | Report Number | C09-00095 |

## Physician/Autopsy

| | | | |
|---|---|---|---|
| Physician | Trish Brunner | Phone | (847) 729-6480 |
| Being Treated For | Per parents no PMHX | Date Last Seen | 12/01/2008 |
| Falls/Trauma/Frac | None Reported/None Observed | | |
| Contacted By | | Autopsy | Yes |
| Pathologist | Eupil Choi, M.D. | Autopsy Date | |
| Gross Findings | Incident Location - Minee-Subee Day Care Center, 400 | Report Rcvd | |

## Death Cause

| | | | |
|---|---|---|---|
| Manner | Pending | | |
| Immediate Cause | Pending | | |
| Due To | | Due To | |
| Other Conditions | | | |

## Funeral Home

| | | | |
|---|---|---|---|
| Funeral Home | Kolssak Funeral Home | Phone | (847) 537-6600 |
| Released By | | Date | |

G_145

1/15.    1/15/09    2:30 PM      D.10: 1/4/09    4:50 PM

Benjamin Kingan

16 months / M / W

22 lb

30"

Medical management?

bruise    left forehead    .3"

     Rt upper arm    .3"

CNS    SGH    4×4", hemorrhage, herniation + edema

     Fx    .8"        micro B (?)

                          1.

     SKN    reddish discolored area   ["   2.

                                     3.

       SDH    8 gm, Rt & ant middle cranial fossae, streaks of SD blood stain

         B = 1162 edema, SAH, anterior frontal al post. central gyri

            SAH, direct brain

Skin Incisions:    Φ

Dx   C-C Inj, blunt trauma of head



JAN 23 03 04:31 FROM:VILLAGE LIBERTYVILLE 847-362-9453 T-951 P.17/22 F-440

| | | | |
|---|---|---|---|
| REGISTRATION DISTRICT NO. 49,5 | STATE OF ILLINOIS CERTIFICATE OF DEATH | | |
| LOCAL FILE NUMBER 42F | | STATE FILE NUMBER | |

**STATE OF ILLINOIS CERTIFICATE OF DEATH**

1. DECEDENT'S LEGAL NAME (Include AKA's if any) (First, Middle, Last): **Benjamin Andrew Kingan**
2. SEX: **Male**
3. DATE OF DEATH (Mo/Day/Year) (Spell Month): **January 14, 2009**

4. COUNTY OF DEATH: **Lake**
5a. AGE-AT LAST BIRTHDAY (Years): **1**
5b. UNDER 1 YEAR — Months / Days:
5c. UNDER 1 DAY — Hours / Mins:
6. DATE OF BIRTH (Mo/Day/Year): **August 31, 2007**

7a. CITY OR TOWN: **Libertyville**
7b. HOSPITAL OR OTHER INSTITUTION NAME (If not in either give street and number): **Condell Medical Center**

7c. PLACE OF DEATH (Check only one: see instructions):
IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☒ Emergency Room/Outpatient ☐ Dead on Arrival
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice facility ☐ Nursing Home/Long term care facility ☐ Decedent's home ☐ Other (Specify)

8. RESIDENCE — City or Town of Decedent (First, Middle, Last): **Evanston, IL.**
9. SOCIAL SECURITY NUMBER: **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**
10a. MARITAL STATUS AT TIME OF DEATH: ☐ Married ☐ Married but separated ☐ Widowed ☐ Divorced ☒ Never Married ☐ Unknown
10b. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage): **N/A**
11. EVER IN U.S. ARMED FORCES? ☐ Yes ☒ No

15a. RESIDENCE (Street and Number): **840 Swallow Street**
15b. APT NO.:
15c. CITY OR TOWN: **Deerfield**
15d. INSIDE CITY LIMITS? ☐ Yes ☒ No

12. COUNTY: **Lake**
12a. STATE: **IL**
13g. ZIP CODE: **60015**
14. FATHER'S NAME (First, Middle, Last): **Andrew Scott Kingan**
15. MOTHER'S NAME PRIOR TO FIRST MARRIAGE (First, Middle, Last): **Amy E. Drueck**

16a. INFORMANT'S NAME: **Andrew Scott Kingan**
16b. RELATIONSHIP: **Father**
16c. MAILING ADDRESS (Street and Number, City or Town, State, Zip Code): **840 Swallow Street Deerfield, IL 60015**

17. METHOD OF DISPOSITION: ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Other (Specify)
18. PLACE OF DISPOSITION (Name of cemetery, crematory, other place): **Vernon Township Cemetery**
19. LOCATION - CITY, TOWN, AND STATE: **Lincolnville, IL**
20. DATE OF DISPOSITION (Mo/Day/Year): **January 21, 2009**

21a. FUNERAL HOME NAME: **Kolssak Funeral Home**
STREET AND NUMBER: **189 S. Milwaukee Ave, Wheeling, IL 60090**

21b. FUNERAL DIRECTOR'S SIGNATURE: **Jonathan A. Kolssak**
21c. FUNERAL DIRECTOR'S ILLINOIS LICENSE NUMBER: **034-015553**

22. LOCAL REGISTRAR'S SIGNATURE: *Kevin L Bowers* Dy. D *Jean Putnam*
23. DATE FILED WITH LOCAL REGISTRAR (Mo/Day/Year): **January 23, 2009**

CAUSE OF DEATH (See instructions and examples)
26. PART I. Enter the chain of events—diseases, injuries or complications—that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing etiology. If the decedent had a dementia related disease, Parkinson's Disease, or Parkinson Dementia Complex; indicate in Part I or Part II. DO NOT ABBREVIATE. Enter only one cause on a line. Add additional lines if necessary.

APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. **Cranio-Cerebral Injuries** — Due to (or as a consequence of): — **Sudden**

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST → b. **Blunt Trauma Of The Head** — Due to (or as a consequence of):

c. — Due to (or as a consequence of):

PART II. Enter other significant conditions contributing to death but not resulting in the underlying cause given in PART I.
25. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No
26. WERE AUTOPSY FINDINGS USED TO COMPLETE THE CAUSE OF DEATH? ☒ Yes ☐ No

27. DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ Probably ☒ No ☐ Unknown
28. IF FEMALE: ☐ Not pregnant within past 12 months ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to 1 year before death ☐ Unknown if pregnant within the past 12 months
29. MANNER OF DEATH: ☐ Natural ☐ Suicide ☐ Homicide ☐ Accident ☐ Pending Investigation ☐ Could not be determined

Date: **January 14, 2009**
30. TIME OF INJURY: **3:51** ☐ A.M. ☒ P.M.
32. PLACE OF INJURY (e.g. Decedent's home; construction site; restaurant; wooded area): **Day Care Center**
33. INJURY AT WORK? ☐ Yes ☒ No

34. LOCATION OF INJURY — Street and Number: **400 Marriott Drive**
Apartment Number:
City or Town: **Lincolnshire**
State: **IL**
Zip Code: **60069**

35. DESCRIBE HOW INJURY OCCURRED: **Child Was Forcefully Thrown To The Floor By An Adult Child Care Worker.**
36. IF TRANSPORTATION INJURY, SPECIFY: ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify)

37. I (DID) (DID NOT) ATTEND THE DECEASED AND LAST SAW HIM/HER ALIVE ON (Mo/Day/Year):
38. WAS MEDICAL EXAMINER OR CORONER CONTACTED? ☒ Yes ☐ No
39. DATE PRONOUNCED DEAD (Mo/Day/Year): **January 14, 2009**
40. TIME OF DEATH: **04:50** ☐ A.M. ☒ P.M.

41. CERTIFIER (Check only one):
☐ Physician in charge of patient's care - To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☐ Physician in attendance at time of death only - To the best of my knowledge, death occurred at the date, and place, and due to the cause(s) and manner stated.
☒ Medical Examiner/Coroner - On the basis of examination and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated.

42. NAME, ADDRESS AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH (Item 26): **Richard L. Keller, M.D. 26 N. Martin Luther King, Jr. Avenue Waukegan, IL 60085**
43. PHYSICIAN'S LICENSE NUMBER:

44. TITLE OF CERTIFIER: **Coroner**
45. DATE CERTIFIED (Mo/Day/Year): **January 21, 2009**
46. SIGNATURE OF CERTIFIER:

47. DECEDENT'S EDUCATION - Check the box that best describes the highest degree or level of school completed at the time of death.
☒ 8th grade or less
☐ 9th - 12th grade; no diploma
☐ High school graduate or GED completed
☐ Some college credit, but no degree
☐ Associate degree (e.g. AA, AS)
☐ Bachelor's degree (e.g. BA, AB, BS)
☐ Master's degree (e.g. MA, MS, MEng, MEd, MSW, MBA)
☐ Doctorate (e.g. PhD, EdD) or Professional degree (e.g. MD, DDS, DVM, LLB, JD)
☐ Unknown

48. DECEDENT OF HISPANIC ORIGIN? - Check the box that best describes whether the decedent is Spanish/Hispanic/Latino. Check the "No" box if decedent is not Spanish/Hispanic/Latino.
☒ No, not Spanish/Hispanic/Latino
☐ Yes, Mexican, Mexican American, Chicano
☐ Yes, Puerto Rican
☐ Yes, Cuban
☐ Yes, other Spanish/Hispanic/Latino (Specify)

49. DECEDENT'S RACE - Check one or more races to indicate what the decedent considered himself or herself to be.
☒ White
☐ Black or African American
☐ American Indian or Alaska Native (Name of the enrolled or principal tribe)
☐ Asian Indian ☐ Chinese ☐ Filipino ☐ Japanese ☐ Korean
☐ Vietnamese ☐ Other Asian (Specify)
☐ Native Hawaiian ☐ Guamanian or Chamorro ☐ Samoan
☐ Other Pacific Islander (Specify)
☐ Other (Specify)

49. DECEDENT'S USUAL OCCUPATION (Indicate type of work done during most of working life. DO NOT USE RETIRED): **Toddler**
51. BUSINESS/INDUSTRY (Kind of business or industry, NOT COMPANY NAME): **Child**

Printed by the Authority of the State of Illinois P.O. #101109 15M 7/97

SS-21

G_148

(Rev. 3/69)

## Report of Coroner's Physician to the

Coroner of _____ LAKE _____ County, Illinois

I, _____ Eupil Choi _____ M. D., have made a necropsy on the body identified to me by the coroner of this county as being:

Name _____ Benjamin Kingan _____ Date of Death _____ 01/14/2009

Place of Death (city, village, or twp) _____ Libertyville

Place of Examination (city, village, or twp) _____ Waukegan

In my opinion, the cause of death was as follows:

[Enter only one cause per line for (a), (b), and (c).]

| | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| IMMEDIATE CAUSE (a) _Pending further Studies_ | |
| CONDITIONS, IF ANY WHICH GAVE RISE TO IMMEDIATE CAUSE (a) STATING THE UNDERLYING CAUSE LAST. DUE TO OR AS A CONSEQUENCE OF (b) _____ | |
| DUE TO, OR AS A CONSEQUENCE OF (c) _____ | |

OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED THE TERMINAL CONDITIONS GIVEN ABOVE.

My conclusions are based on the following observations and findings.

1. 22' , 30°
   Cranio Cerebral Injuries
2. Sub Blunt Trauma of the Head
   1. Subgaleal hemorrhage
   2. Fracture of Skull
   3. Subdural hematoma
3. Scene investigation
4. Police Investigation
5. Paramedics reports
6. B, B, wt.
7. Tissue Stock for Section
8. Examination of eyes.

Date _____ 01/15/2009 _____ Signed _____ M.D.

Coroner's Physician

INSTRUCTIONS: 1. Prepare this form in triplicate. Use typewriter for all entries except signature.
2. Sign original and first copy in pen and ink.
3. Mail original and first copy to the coroner. Retain last copy.

G_149

**LakeCounty**

Coroner's Office
Richard L. Keller, M.D.
Coroner

## INFANT/CHILD BODY CHART

NAME: Benjamin Kingan          DATE OF DEATH: 01/14/2009

AGE: 1 YR 5 MO    RACE: White    HEIGHT: 30(21)    WEIGHT: 22 lbs

EYES: Brown Clear    HAIR: Light brown    PROPERTY: _____

SEX: Male



G_150

Full body, male, lateral view.

Name_____

Age _____ Race _____ Sex _____

Autopsy No. _____

Date    /    /



JAN 1 5 2009

Benjamin Kingan

1 y 5 M / M / W    Skin

B = 1162
edema

Frx

SAH    4x4

thick
blood

L ARM        R ARM

cerebellum

Cat. No. 44-1-005-00

SS-78

G_151



Vertebral column and rib cage, left and right lateral views

Name_____  Autopsy No._____

Age _____ Race _____ Sex _____  Date  /  /

JAN 1 5 2009
Benjamin Kirgan
14 yr M | M | W

8 gm

SD blood stains

base of brain:
blood stain (SAH)
along to vessels

Fx    outer table    Inner table
~8    ~8

Cat. No. 44-1-013-00

SS-29

G_152

JAN 1 5 2009

Benjamin Kingan

1½ 5M / M / W

CNS: *[illegible]*
B=1162

NECK: *[illegible]*, Hypo Thyroid → φ     H + [illegible]     Trachea·
Thymus 42  No petechiae   VL ? φ     *[illegible]*

RS:  R 166
     L 114
     ———
     280

Congest ⊓     No fluid
edema       No Fx
No consolidation, No Pneu

CV: 64

FO – Closed
RC
LAD  > φ
CIR
thick yellow *[illegible]* (.3)

AORTA  φ

LIVER: 488  *[illegible]*  ÷ φ

GB φ

SPLEEN: 54

ES: φ  ÷ φ

US: R *[illegible]* φ
    L 42
    ———

UB *[illegible]*

STOMACH: ⊓  15 ml or *[illegible]* product

SMALL: φ

LARGE: soft brown, *[illegible]*

APP φ

FLUID  *[illegible]* 15 ml
BASE OF MESENTERY φ

IG:

SS 30

G_153

JAN 1 5 2009

Benjamin Kingson

1 y 5M / M / W

CNS: Sean diagram
B=1162

NECK: Tongue, Epi, Hyp- Thyroid → φ    Not TCc φ    Trachea:
Thymus 42. No petechiae   VCz φ    creamy mucous thick
                                          w/ thin fluid ↓

E Sm → φ   4

RS: R 166
    L 114
    ───
    280

Congest    No fluid
edema      No Fx
No consolidation, No lesions

CV: 64

FO - Closed
RC
LAD > φ
CIR
thick yellow = fat (.3)

U2 per Luckard

AORTA  φ

LIVER: 488  Red  & φ

GB (+)

SPLEEN: 54

ES: (φ)  & (φ)

US: R 39 (φ)
    L 43
    ──
    80

Retro → φ

UB urine

STOMACH: ← 15 ml clear dairy product

SMALL: → φ

APP (+)

LARGE: soft brown, well formed

FLUID         15 ml
BASE OF MESENTERY  φ

IG:

G_154

## AUTOPSY REPORT

NAME:    Benjamin Kingan        DATE OF DEATH: 1/14/09
SEX:      Male                  DATE EXAMINED: 1/15/09
AGE:      16 months          EXAMINED BY: E. Choi, MD
RACE:     White

FEB 0 2009

BENJAMIN KINGAN                                    Page 1

FOLLOW UP:

MICROSCOPIC EXAMINATION:

MC# 3618

HEART:      No myocarditis.

LIVER:      Sinusoid congestion.

PANCREAS: Normal.

TESTES:     No hemorrhage.

CNS:        1.   Focal areas of subarachnoid hemorrhage.
            2.   Blood stains on the dura.  No subdural
                 membranes.  No blood clot in the sinus.
            3.   No meningitis.

SKIN:       1.   Forehead, hemorrhage in the subcutis
                 adipose tissue.
                 No inflammatory cells present.
            2.   Back of head, hemorrhage in the
                 hypodermis.
            3.   Side of head, hemorrhage in the
                 hypodermis.
            4.   Right upper arm, streaks of hemorrhage
                 in the subcutis adipose tissue.


EC:kl    2/5/09

SS-20

## IN THE CIRCUIT COURT OF LAKE COUNTY

STATE OF ILLINOIS,          )
                              )
        Plaintiff,        )
                              )    Case No. 09 CF 252
       v.              )
                              )    Honorable Daniel Shanes,
MELISSA CALUSINSKI,    )    Judge Presiding.
                              )
        Defendant.      )
                              )

## AFFIDAVIT OF NANCY L. JONES, M.D.

Under penalties as provided by Section 1-109 of the Code of Civil Procedure, 735 ILCS 5/1-109, I, Nancy L. Jones, M.D., certify that the statements set forth in this Affidavit are true, correct, and accurate:

1.    I am of legal majority and can truthfully and competently testify to the matters contained herein based upon my personal knowledge. The factual statements herein are true and correct to the best of my knowledge, information, and belief.

2.    I am a board certified clinical, anatomic, and forensic pathologist. I am currently self-employed as an independent consulting forensic pathologist. Previously, I worked for 26 years in the Medical Examiner's Office of Cook County, serving as the Chief Medical Examiner from 2007 until my retirement in 2012. I have been declared an expert and testified in Illinois courts over 900 times. My curriculum vitae is attached and incorporated herein as Exhibit A.

3.    I have performed in excess of 10,000 autopsies. About 10 to 15% of those autopsies have been on infants or small children. I teach, publish, and lecture in the field of forensic pathology. I have given numerous lectures on child trauma and death, and I have published on the topic as well.

DEFENDANT'S EXHIBIT

1

4.     All opinions stated in this affidavit are within a reasonable degree of medical and scientific certainty.

5.     In January 2009, Lake County Deputy Coroner Paul Forman contacted me regarding the above-captioned case. He advised me that Dr. Eupil Choi had performed an autopsy on the deceased, Ben Kingan, and that he was seeking consultation about Dr. Choi's findings and opinions.

6.     With respect to Ben Kingan's injuries, Mr. Forman informed me that there were acute injuries only. Specifically, he described an acute skull fracture, acute subdural and subarachnoid hemorrhages, a subgaleal hemorrhage, and cerebral edema.

7.     Based on the specific information given to me by Mr. Forman, I provided him with some information concerning abusive head trauma and provided references that I thought would assist Mr. Forman in the Coroner's Office investigation.

8.     In 2012, I met with Defendant Melissa Calusinski's attorney, Paul DeLuca, at which time I learned that there was an organizing subdural membrane discovered by the forensic pathologist and neuropathologist retained by the defense. I thereafter prepared an affidavit for post-trial motion purposes.

9.     To date, I have been provided with substantially more information about the case, and I have reviewed that information in reaching the opinions below. Specifically, I have reviewed all the gross photographs and microphotographs taken by Dr. Choi, Dr. Shaku Teas, and Dr. Thomas Rudd; the original autopsy histology slides created by Dr. Choi, the re-cuts prepared by Dr. Rudd, and the new slides created by Dr. Teas and Dr. Rudd; the sworn trial testimony of Dr. Choi and Dr. Manuel Montez; the report and sworn trial testimony of Dr. Teas; the report of Dr. Jan Leetsma; the sworn trial testimony of Sean Curran and Nancy Kallinger; the transcript of the Lake County Major Crimes Task Force's interview of Defendant Melissa

2

Calusinski; and affidavits previously submitted by myself and Dr. Lawrence Blum. I have also reviewed a letter sent by Dr. Choi to Dr. Rudd following a recent review of all the original and additional autopsy materials that Dr. Choi did at the request of Dr. Rudd. I have also reviewed Dr. Choi's affidavit of January 22, 2013 wherein Dr. Choi admits that he failed to recognize that, at the time of his death, Ben Kingan had a developed, organizing subdural membrane which indicated an older injury. In June 2015, I was provided additional x-rays of Ben Kingan's skull that I have been informed were not disclosed to the defense. Attached and incorporated as Group Exhibit B (Ben_Kingan 2, 3)

10.     My review of these materials has confirmed that, at the time of his death, Ben Kingan had a well-developed, organizing subdural membrane that was missed by Dr. Choi during his initial postmortem examination and by Dr. Montez during his unofficial examination.

11.     The subdural membrane is clearly visible in the gross autopsy photographs.

12.     Review of the photomicrographs and histology slides reveal the existence of numerous siderophages, positive iron stains, and hemosiderin laden macrophages, confirming the existence of the well-developed, organizing subdural membrane.

13.     In short, it is my opinion that Ben Kingan had suffered at least one previous subdural hemorrhage, which was undergoing organization at the time of his death. Again, this old injury was missed by Dr. Choi and Dr. Montez.

14.     A review of the materials provided revealed that Ben Kingan suffered a head injury in October 2008 and exhibited symptoms of a head injury, including repetitive vomiting and lethargy. The degree of organization seen in the microscopic studies is consistent with a subdural hemorrhage of 2 to 3 months of age.

15.     In addition to an old injury, it is also my opinion that autopsy photographs reveal a recent subdural and subarachnoid hemorrhage.

3

16.     According to Nancy Kallinger, Ben Kingan struck his head, while in her presence at the Child Care Center on the day of his death, and he became unresponsive within 30 minutes.

17.     The symptoms exhibited by Ben Kingan at the time of his injury, in October 2008, are consistent with a significant concussion, and it is my opinion that the mechanism of Ben Kingan's death in January 2009 was cerebral edema consistent with a significant concussion, following cumulative incidents of head-banging. Additionally, the gross photographs taken at the autopsy and on January 16, 2009, show that what had been identified as a "0.8 inch linear skull fracture" was near to, but not involved in, the "4 inch by 4 inch" subgaleal hemorrhage on the back of Ben Kingan's head.

18.     Because there was no hemorrhage seen in the periosteum or the subgaleum in the area of this defect, and the fact that a shorter, similar appearing defect was present in the left parietal bone, the lack of hemorrhage in the area would speak against these being blunt trauma injuries.  The lack of hemorrhage would be more consistent with a normal variation in the skull, known as accessory suture rather than a fracture.

19.     Further, the gross photographs of the subgaleal hemorrhage show an area of brown discoloration, indicating that there is at least one portion of that area showing evidence of healing. Unfortunately, according to the record provided by Dr. Choi, there was no histologic section taken from the area where the brown discoloration is seen, to age this particular injury.

20.     The degree of organization of the subdural membrane is too well-developed for the subdural membrane and the organizing subgaleal hemorrhage to have occurred at the same time.

21.     In my opinion, the pattern of injuries sustained by Ben Kingan, does not reflect the manner in which Defendant Melissa Calusinski demonstrated throwing him to the ground in the interrogation videos. Defendant Melissa Calusinski demonstrated that she was holding Ben

4

Kingan with his face directed away from her. If she had in fact held Ben Kingan in this manner, the injuries found at autopsy were entirely inconsistent with her video demonstration. If she had held Ben Kingan with him facing towards her body, Ben Kingan would have sustained a different pattern of injuries given the force and movement she demonstrated in the videos that I reviewed.

22.     On June 11, 2015, Dr. Rudd provided me with additional x-rays that I had not reviewed previously.

23.     My understanding is that x-rays of Ben_Kingan 2 and 3 of Group Exhibit B were not disclosed to the defense attorneys prior to or during the trial.

24.     Of particular significance is x-ray Ben_Kingan 3 of Group Exhibit B. This x-ray reveals that Ben Kingan's head is shaped like an old-fashioned light bulb, which is abnormal for a toddler Ben Kingan's age. It was known that Ben Kingan's head circumference stayed around the 50th percentile for about the first year of his life; at his 15-month visit, Ben Kingan's head circumference had grown to the 75th percentile;  and at the time of his death, his head circumference measured in the 95th percentile;  this evidence combined with the findings on the previously undisclosed x-ray Ben_Kingan 3 of Group Exhibit B are indicators of significant head trauma that occurred well before his death.

25.     The head shape in x-ray Ben_Kingan 3 of Group Exhibit B is consistent with previous swelling of the brain which lead to the enlargement of the skull. The brain was swollen to a degree that resulted in the loss of the normal subarachnoid space. It is my opinion this brain swelling caused the abnormal light bulb shape of Ben Kingan's head.

26.     While the head of a child Ben Kingan's age may swell a small amount overnight due to *acute* injury, it is highly unlikely that such a child's head would swell to the extent illustrated on x-ray Ben_Kingan 3 of Group Exhibit B.  Furthermore, it is unlikely that a child's

G_161

head would swell to the extent illustrated by x-ray Ben_Kingan 3 of Group Exhibit B within the short amount of time Defendant Melissa Calusinski had contact with the child before his death.

27.     Swelling of the head due to an *acute* injury is manifested by separation of the cranial sutures. No such separation is seen in x-ray Ben_Kingan 3 of Group Exhibit B, which would indicate that the enlargement of the head had occurred sometime in the past, and is not related to any *acute* injury. It is my opinion, after reviewing x-ray Ben_Kingan 3 of Group Exhibit B, that the fact that the sutures were not separated, indicates that, it is more likely than not, Ben Kingan had a chronic, as opposed to an acute, condition.

28.     I have been able to identify an accessory suture that is visible in the right parietal bone on x-ray Ben_Kingan 3 of Group Exhibit B. The accessory suture further supports my opinion that, it is more likely than not, the pathologist Dr. Choi mistakenly identified this accessory suture as a skull fracture.

29.     It is my opinion that had the defense experts been provided with x-ray Ben_Kingan 3 of Group Exhibit B, they would not have concluded that the mechanism of death was a re-bleed. Rather, the defense experts would have concluded that the mechanism of death was cerebral edema, arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident, witnessed by Nancy Kallinger, within 15-20 minutes of Ben Kingan becoming unresponsive.

30.     It is my opinion that, at trial, neither the prosecution or defense experts accurately described the mechanism of death. It is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted.

6

31.     Because of the above-stated opinions, it is also my opinion that Defendant Melissa Calusinski's description of inflicting a fatal injury on Ben Kingan was inconsistent with the cerebral edema mechanism of death I have described and the evidence cited above.

32.     Again, all the foregoing opinions are within a reasonable degree of medical and scientific certainty.

**FURTHER AFFIANT SAYETH NOT**

Nancy Jones, M.D.

Subscribed and sworn before me,
a Notary Public, this 20 day of June, 2015.

Notary Public

OFFICIAL SEAL
SCOTT T PANEK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/13/17

7

G_163

Page 1

# CURRICULUM VITAE
## NANCY L. JONES, M.D.

| | | |
|---|---|---|
| Personal Information: | Marital Status: | Single |
| | Date of Birth: | August 31, 1952 |
| | City of Birth: | Pittsburgh, Pennsylvania |

Home Address:     7125 N. Mc Alpin Avenue
Chicago, Illinois 60646-1219

| | | |
|---|---|---|
| Education: | 1966-1970 | Vincentian High School |
| | | Pittsburgh, Pennsylvania |
| | | Valedictorian |
| | 1970-1974 | DePaul University |
| | | Chicago, Illinois |
| | | Bachelor of Science, Biology with High Honor |
| | 1974-1975 | St Joseph Hospital School of Medical Technology |
| | | Chicago, Illinois |
| | | M.T. ASCP |
| | 1978-1982 | Chicago Medical School |
| | | North Chicago, Illinois |
| | | Medical Degree |
| | 1982-1984 | University of Chicago |
| | | Chicago, Illinois |
| | | Residency in Anatomic Pathology |
| | 1984-1986 | University of Chicago |
| | | Chicago, Illinois |
| | | Residency in Clinical Pathology |
| | 1986-1987 | Office of the Medical Examiner of Cook County |
| | | Chicago, Illinois |
| | | Residency in Forensic Pathology |

Licensure:     State of Illinois 1982
Medical License 036-067140

| | | |
|---|---|---|
| Board Certification: | 1986 | Certified by the American Board of Pathology in Anatomic and Clinical Pathology |
| | 1987 | Certified by the American Board of Pathology in Forensic Pathology |

Professional Affiliation:     American Academy of Forensic Sciences
American Association for the Advancement of Science
American Society of Clinical Pathologists

Professional Affiliation:     Chicago Pathology Society

Page 2

|  | College of American Pathologists |
|--|--|

College of American Pathologists
United States and Canada Academy of Pathology
Illinois Registry of Anatomic Pathology
Illinois Coroners and Medical Examiner's Association
International Association of Coroners and Medical Examiners
National Association of Medical Examiners
New York Academy of Science
Physicians for Social Responsibility

**Current Position:**
Independent Consulting Forensic Pathologist
Chief Medical Examiner July 31, 2007 to July 31, 2012, Retired.
Acting Chief Medical Examiner June 22, 2007 to July 31, 2007
Office of the Medical Examiner of Cook County
Chicago, Illinois

Assistant Medical Examiner July 1986 to June 22, 2007
Office of the Medical Examiner of Cook County
Chicago, Illinois

**Academic Appointments:**
Professor of the Practice of Pathology July 2003- to present
Clinical Assistant (Affiliate) Professor of Pathology 1988 -1993
Clinical Associate (Affiliate) Professor of the Practice of Pathology
1993 -June 2003
Chicago Medical School
North Chicago, Illinois

Associate Professor of the Practice of Pathology (Affiliate)
Medical Director of the Pathologists' Assistant Program 2000- June 2006
Interim Program Director of the Pathologists' Assistant Program 2000-
February, 2003
Interim Medical Director of the Department of Clinical Laboratory
Sciences 2001- 2007
Clinical instructor Department of Clinical Laboratory Sciences
2000- 2014
Rosalind Franklin University of Medicine and Science
North Chicago, Illinois

Course co-ordinator and instructor
Forensic Certificate Program
Northwestern University School of Continuing Studies
Chicago, Illinois
2001- 2010

**Consultation Service:**
Consulting Forensic Pathologist
Coroner's Office
County of Lake, Illinois 1988 – present

Consulting Forensic Pathologist
Coroner's Office
Mc Henry County, Illinois 1999 – present

**Awards:**
1980:   Outstanding Young American Woman

G_165

Page 3

| | |
|---|---|
| 1982: | Dean's Award, Chicago Medical School |
| 1982: | Board of Trustee's Scholastic Award, Chicago Medical School |
| 1986: | Young Investigator's Award |
| | Academy of Clinical Laboratory Physicians and Scientists |
| 1995: | 100 Woman Making a Difference |
| | Today's Chicago Woman |
| 1995: | Office of the Medical Examiner of Cook County |
| | Certificate of Commendation |
| 1996: | Certificate of Recognition |
| | Chicago Police Department |
| 1997, 1999, 2002: | Certificate of Appreciation |
| | Midwest Homicide Investigators Association |
| 2000: | 1999 Distinguished Alumnus Award, Chicago Medical School |
| 2000: | Strathmore's Who's Who |
| 2001, 2007: | Certificates of Service for Child Death Review and the Children of Illinois, Illinois Department of Children and Family Services |
| 2002: | Alpha Omega Alpha Medical Honor Society, Delta Chapter |
| 2003: | 2002 Ruth H. Rosengarden Victim Service Provider Award |
| | Lake County, Illinois State's Attorney |
| 2007, 2008: | America's Top Pathologists 2007, 2008 |
| | Consumer's Research Council of America |
| 2009-2010: | Presidential Who's Who Among Business and Professional Achievers |
| 2010: | Presidential Who's Who Among Business and Professional Achievers Medical Examiner of the Year |
| 2010: | Outstanding Speaker Award |
| | American Association for Clinical Chemistry |
| 2011: | Appreciation Plaque from Chicago Jewish Funerals |

| | | |
|---|---|---|
| Committees: | 1981-1982: | Admissions Committee |
| | | Chicago Medical School |
| | 1992- 2000 | Student Activities Committee Chicago Medical School Alumni Association |
| | 1993-2000 | Membership Committee Chicago Medical School Alumni Association |
| | 1996- Present | Distinguished Alumni Committee, Chicago Medical School Alumni Association Board of Governors |
| | 2002-2006: | Homecoming Weekend Committee, Chair |
| | | Board of Governors, Chicago Medical School Alumni Association |
| | 2007- 2012: | Fatality Management Committee, Chicago Health System Coalition for Preparedness and Response |
| | 2007- 2012: | Incident Response Committee, Cook County Urban Area Security Initiative |
| | | Federal Emergency Management Agency |

| | | |
|---|---|---|
| Appointments: | 1992- Present | Board of Governors Chicago Medical School Alumni Association |
| | 1996-1997: | President of the Alumni Association Chicago Chapter |
| | 1995-2013: | Cook County South Child Death Review Team Department of Children and Family Services Public Act 88-614 Vice Chairman 2007-2009 |

Page 4

| Appointments: | 2000-2004: | Illinois Attorney General's Forensic Advisory Board |
|---|---|---|
| | 2002-2003: | Treasurer, Board of Governor's Executive Committee Chicago Medical School Alumni Association |
| | 2002- 2014: | Merit Scholarship Committee Chicago Medical School |
| | 2003-2005: | Secretary, Board of Governor's Executive Committee Chicago Medical School Alumni Association |
| | 2005-2007: | Second Vice President, Board of Governor's Executive Committee Chicago Medical School Alumni Association |
| | 2007-2009: | President, Board of Governor's Executive Committee Chicago Medical School Alumni Association |
| | 2012 - | DePaul University College of Science and Health Advisory Council |

| Teaching: | 1975-1978: | St Joseph Hospital School of Medical Technology Microbiology Laboratory |
|---|---|---|
| | 1982-1983: | School of Histotechnology University of Chicago Hospital and Clinics |
| | 1986: | Clinical instructor for Clinical Pathophysiology Course for second year Medical Students, University of Chicago |
| | 1986-2007 | Instructor in Forensic Pathology to Forensic Pathology Residents and visiting Medical Students and Residents, Cook County Medical Examiner's Office |
| | 1986- | Trial Practice Course of the Chicago Bar Association |
| | 1986- | Trial Practice Course of the Kent Law School I.I.T. |
| | 1989: | Illinois Coroners Basic Training Course of the Illinois Valley Crime Prevention Commission |
| | 1989-present | Lecturer University of Illinois, Chicago School of Physical Therapy |
| | 1990-present | Lecturer Forensic Pathology Trauma Nurse Specialist Course Cook County Hospital |
| | 1991: | Forensic Pathology - Loyola University Medical Center Department of Pathology lecture series |
| | 1991: | Child Abuse - Cook County State's Attorneys, Juvenile Court Division August 16, 1991 |
| | 1992- | Illinois Department of Children and Family Services Child Welfare Training Institute |
| | 1993: | Gunshot Wounds, Child Abuse, Blunt Trauma Injuries, Asphyxial Deaths Cook County State's Attorney's Office, Criminal Division |
| | 1995: | The Role of the Forensic Pathologist in Cases of Child Abuse and Neglect Cook County State's Attorney's Office Seminar on Handling Cases Involving Crimes Committed Against Children April 22, 1995 |
| Teaching: | 1997-2005 | Kent Law School Juvenile Law Class Child Abuse and Shaken Baby Syndrome Chicago, Illinois  Sept 17, 1997  Sept 20, 2000 Nov 5, 2003 Oct 7, 1998Oct 10, 2001  Nov 3, 2004 Sept 29, 1999  Oct 16, 2002  Oct 19, 2005 |

Page 5

| 1999: | Kent Law School |
| | Effective Expert Witness Program |
| | Chicago, Illinois |
| | June 23, 1999 |
| 2000: | Kent Law School |
| | Effective Expert Witness Program |
| | Chicago, Illinois |
| | June 7, 2000 |
| 2000-2003: | Course Director Pathologist's Assistant Program |
| | Rosalind Franklin University of Medicine and Science |
| | North Chicago, Illinois |
| 2001-2009: | Medical Advisor/Medical Director |
| | Clinical Laboratory Sciences Program |
| | Rosalind Franklin University of Medicine and Science |
| | North Chicago, Illinois |
| 2005 -2010 | Course Coordinator and Instructor |
| | Northwestern University School of Continuing Studies |
| | Chicago, Illinois |
| 2008- 2012: | Program Director, Robert J. Stein, MD Institute of |
| | Forensic Medicine, Forensic Pathology Training Program |

Publications:

1. Bitter, M.A., Nachman, J., Jones, N.L., Franklin, W.A., LeBeau, M.M., Vardiman, J.W. "Non-lymphoblastic Lymphoma in Children". Cancer Volume 59: 2099-2103, 1987.

2. Seelagy, M.M., Vogelzang, N.J., Jones, N.L., Stephens, J. "Aggressive Epitheliod Sarcoma" ANNALS OF MEDICINE.

3. Jones, N.L., Esterly, J.R. "Perinatal Autopsies" Letter to the Editor N.E.J.M. Volume 310: 393-394, 1984

4. Esterly, J.R., Jones, N.L. "Factors in Perinatal Mortality" abstract Presented at the Great Lakes Perinatal Research Conference September 23-24, 1984 Itasca, Illinois

5. Jones, N.L., Harrison, H.H., Barron, W., Bur, M., Wells, B., Bissell, M.G. "Comparison of Home Monitor (Glucoscan) with Automated (ASTRA & KDA) Measurement of Blood Glucose in Diabetic Pregnancy" abstract. Presented at the Academy of Clinical Laboratory Physicians and Scientists Meeting May 30, 1986 Chicago, Illinois.

Publications:
6. Bur, M., Jones, N.L., Franklin, W.A.,Vardiman,J.W. "Cell Proliferation in Follicular Lymphomas" abstract. HYBRIDOMA, 1986.

7. Fisfalen,M.E., Cajulis, R., Franklin, W.A., Ryan, M., Jones, N.L., DeGroot, L.J. "Expression of HLA Class I and II Antigens on Benign and Malignant Thyroid Epithelium and Correlation with Mononuclear Cell Infiltrates." abstract LAB INVESTIGATIONS, 1986.

8. Fisfalen, M.E., Franklin, W.A., DeGroot, L.J., Cajulis, R.S., Soltani, K., Ryan, M., Jones, N.: "Expression of HLA ABC and DR antigens in thyroid neoplasia and

Page 6

correlation with mononuclear leukocyte infiltration." Journal of Endocrinological Investigation, 13, 41-8, 1990.

9.   Kalelkar, M.B., Jones, N.L., Kirschner, R. "Maternal Mortality: Review of Death in Cook County 1984 - 1991." Abstract. Presented at the 1992 Annual Meeting of the American Academy of Forensic Sciences, Feb. 1992, New Orleans, La.

10.  Fildes, J., Reed, L., Jones, N., Martin, M., Barrett, J. "Trauma: The Leading Cause of Maternal Death." Presented at the 51st Annual Session of the American Association for the Surgery of Trauma, September 11-14, 1991, Philadelphia, PA. THE JOURNAL OF TRAUMA, Vol. 32, No. 5 May 1992.

11.  Wu Chen, N.B., Donoghue, E.R., An, T.L., Choi, E., Jones, N.L., Mittell, K.A., Ryder, N.E. "Post Mortem Tissue Distribution of Venlafaxine." Abstract. Presented at the 1996 Annual Meeting of the American Academy of Forensic Sciences, Feb., 1996, Nashville, Tenn.

12.  Jones, N.L. ATLAS OF FORENSIC PATHOLOGY
Igaku-Shoin, New York 1996.

13.  Denton, J.S., Jones, N.L. "Sudden Intrapartum Death Associated With Epidural Bupivicaine". Case Reports. Presented at the 2000 National Association of Medical Examiners Annual Meeting, Sep., 2000, Indianapolis, In.

14.  Wu Chen, N. B., Donoghue, E. R., Fusaro, A. J., Jones, N. L., Lifschultz,, BD, Jakalski, J. L., Mittel, K.. A., Reich, Jr., J. R.. " Zolpidem Intoxication" Abstract. Presented at the 2002 Annual Meeting of the American Academy of Forensic Sciences, Feb. 2002, Atlanta, Georgia.

15.  Non-pharmaceutical Fentanyl-Related Deaths-Multiple States, April 2005-March 2007
Morbidity and Mortality Weekly Report
Department of Health And Human Services
Centers for Disease Control and Prevention
July 25, 2008/Vol.57/No. 29
Atlanta, Georgia

Employment:      St Joseph Hospital, Chicago, Illinois
Medical Technologist, Microbiology
1975-1978, full time;
1979- 1988, full and part time.
Technical Supervisor, Microbiology 1978.

Lectures:       Topics in Forensic Pathology
St. Catherine's Hospital
East Chicago, Indiana
October 22, 1987

Ballistics for the Clinician
Cook County Hospital
Department of Emergency Medicine
Chicago, Illinois
March 9, 1989

Ballistics

Page 7

Cook County Hospital - Trauma Unit
Chicago, Illinois
October 13, 1989

Ballistics
National Conference on Clinical Forensic Medicine
Sponsored by the Illinois Chapter of the American College
of Emergency Physicians
Chicago, Illinois
May 4, 1990

Murdering Mothers
National Conference on Clinical Forensic Medicine
Sponsored by the Illinois Chapter of the American College
of Emergency Physicians
Chicago, Illinois
May 5, 1990

**Forensic Pathology**
**Coroner's Office** Orientation and Death Investigation
Sponsored by the Lake County, Illinois Coroner's Office
Grayslake, Illinois
April 18, 1990

The Forensic **Pathologist** and Child Abuse
Cook County Hospital
Department of Pediatrics
Grand Rounds Presentation
September, 1990

**Forensic Pathology**
**Northwest Indiana EMS** Training Program
Sponsored by Porter Memorial Hospital
Valparaiso, Indiana
November 2, 1991

Laboratory Aspects of Forensic Pathology
Chicago Society for Medical Technology , Scientific Assembly Program
Park Ridge, Illinois
February 6, 1992

Lectures:       Handgun and Gang Violence
Illinois Academy of Criminology
Chicago, Illinois
March 25, 1992

Pathological Analysis and Laboratory Value Interpretation
Accurate Clinical Interpretation
Building a Defense Strategy Against Allegations of Medical Malpractice
MMI Company
Coronado, California
July 23, 1993
Sudden Infant Death Syndrome
Office of the Cook County Public Guardian
October 21, 1993

Page 8

Forensic Pathology
Coroner's Office Orientation and Death Investigation
Sponsored by the Lake County, Illinois Coroner's Office
Grayslake, Illinois
February 3, 1994

The Role of the Forensic Pathologist in Clinical Medicine
Chicago Medical School Alumni Association
Chicago Chapter
North Chicago, Illinois
March 13, 1994

The Expanding Role of Radiology in Forensic Medicine
Illinois State Society of Radiologic Technologists
59th Annual Conference
Chicago, Illinois
September 15, 1994

Infant & Child Abuse Homicides
Chicago Police Detectives Association
Chicago, Illinois
April 11, 1995

Trauma Recognition
Chicago Police Department
Area Five Detective Division
January 25, 1996

Child Abuse
Cook County Juvenile Court Hearing Officers
Chicago, Illinois
February 15, 1996

Lectures:          Forensic Aspects of Traffic Fatalities
                   Sharp Force Injuries
                   Forensic Aspects of Deaths in Police Custody
                   Drug Related Deaths
                   Medicolegal Death Investigation Seminar in Forensic Medicine
                   Oshkosh, Wisconsin
                   March 31, 1996

                   Gunshot Wounds
                   Kansas Association of Criminal Defense Lawyers
                   Spring CLE and Annual Meeting
                   Kansas City, Missouri
                   April 19, 1996

                   Forensic Pathology
                   Concordia University Sociology 431 (Death and Dying)

Page 9

River Forest, Illinois
May 2, 1996

Forensic Aspects of Traffic Fatalities
Sharp Force Injuries
Forensic Aspects of Deaths in Police Custody
Drug Related Deaths
Medicolegal Death Investigation Seminar in Forensic Medicine
Kansas City, Missouri
July 14, 1996

Cause of Death Determination
United States Department of Justice
Office of Legal Education
Prosecution of Federal Homicide Cases Seminar
Los Angeles, California
September 25, 1996

Forensic Aspects of Traffic Fatalities
Sharp Force Injuries
Forensic Aspects of Deaths in Police Custody
Drug Related Deaths
Forensic Aspects of Fire Deaths
Medicolegal Death Investigation Seminar in Forensic Medicine
Garden City, Kansas
October 19-20, 1996

Child Abuse
Midwest Homicide Investigators Association
Elmhurst, Illinois
February 28, 1997

Child Abuse
Chicago Police Detectives Association
Chicago, Illinois
March 11, 1997

Lectures:            Forensic Aspects of Gunfire Injuries
                     Forensic Aspects of Blunt Force Injuries
                     Forensic Aspects of Deaths in Police Custody
                     Forensic Aspects of Mass Disasters
                     Forensic Aspects of Electrical and Aquatic Deaths
                     Medical Legal Death Investigation Seminar in Forensic Medicine
                     Macon, Georgia
                     March 20, 1997

Forensic Aspects of Aquatic Deaths
Chicago Police Department Marine Unit
Chicago, Illinois
March 27, 1997

Forensic Pathology
Concordia University Sociology 431 (Death & Dying)
River Forest, Illinois

Page 10

May, 1997

Mechanism and Cause of Death Investigation
North Regional Major Crimes Task Force
Wilmette, Illinois
July 16, 1997

Medical Forensics
Cook County Hospital
Department of Emergency Medicine
August 13, 1997

Death Investigation
Palatine Police Department Homicide Task Force
MCAT Training
Palatine, Illinois
October 9, 1997

Death Investigation
Midwest Homicide Investigators Association
Naperville, Illinois
October 24, 1997

Practical Pediatric Forensic Pathology
Chicago Pathology Society
Chicago, Illinois
December 8, 1997

Pathology of Fire Victims
Northwestern University Traffic Institute
Evanston, Illinois
May 13, 1998

Lectures:

Forensic Pathology of Gunfire Injuries
Forensic Pathology of Asphyxial Deaths
Crime Scene Reconstruction Conference
Southeast Community College
Lincoln, Nebraska
June 17, 1998

The Role of the Medical Examiner
Surgical Grand Rounds
Mount Sinai Medical Center
Chicago, Illinois
August 20, 1998

The Culture of Forensic Pathology
Finch University of Health Sciences / The Chicago Medical School
Department of Microbiology and Immunology
North Chicago, Illinois
February 9, 1999

Investigation of Decomposed and Buried Bodies

Page 11

Chicago Police Detectives Association
Chicago, Illinois
February 9, 1999

Investigation of Decomposed and Buried Bodies
North Regional Major Crimes Task Force
Glenview, Illinois
March 17, 1999

Shaken Baby Syndrome
Cook County State's Attorney's Office
Juvenile Division
Chicago, Illinois
April 14, 1999

Recognition of Child Abuse and the Investigation of
Deaths Due to Child Abuse
North Suburban Juvenile Officers Association
Rolling Meadows, Illinois
April 16, 1999

Investigation of Decomposed and Buried Bodies
Midwest Homicide Investigators Association
Aurora, Illinois
May 28, 1999

Child Abuse: The Forensic Pathologist's Perspective
Illinois State Police Conference on Child Homicide and Child Abuse
Des Plaines, Illinois
October 26, 1999

Lectures:

Forensic Pathology
Chicago Medical School Alumni Association Winter Meeting
Glendale, California
January 15, 2000

Hanging and Other Asphyxial Deaths
Natural Diseases Which May Appear As Unnatural Deaths
Midwest Homicide Investigators Association
Elmhurst, Illinois
March 24, 2000

Forensic Pathology
Lake County Bar Association
Waukegan, Illinois   March 28, 2000

The Forensic Autopsy
North East Multi Regional Training
Bridgeview, Illinois
April 4, 2000
April 28, 2000

Shaken Baby Syndrome

Page 12

North Suburban Juvenile Officers Association
Schaumburg, Illinois
April 28, 2000

Forensic Pathology
Rolling Meadows High School
Rolling Meadows, Illinois
September 28, 2000

The 1995 Chicago Heat Wave The story behind the headlines
Chicago Medical School  Distinguished Alumni Symposium
Standard Club
Chicago, Illinois
October 28, 2000

Forensic Evidence
Cook County State's Attorney's Office
Chicago, Illinois
February 7, 2001

Forensic Pathology and Children's Deaths
Northwestern University School of Law
Chicago, Illinois
February 27, 2001

Forensic Pathology
The John Marshall Law School
Chicago, Illinois
March 23, 2001

Lectures:          Broken Heads and Busted Bellies
A Brief Review of Abusive Head and Abdominal Injuries
Department of Pediatrics Grand Rounds
Cook County Hospital
October 2, 2001

The Autopsy
Louis University College of Arts and Sciences
Homicide- Violent Crimes Course (81-520-1)
Chicago, Illinois
October 9, 2001

Forensic Pathology
Rolling Meadows High School
Rolling Meadows, Illinois
October 11, 2001

Forensic Pathology
Kent Law School
Chicago, Illinois
October 16, 2001

Forensic Pathology

Page 13

John Marshall Law School
Chicago, Illinois
October 30, 2001

Topics In Forensic Pathology and Death Investigation
Major Case Assistance Team
Ameritech Training Center
Hoffman Estates, Illinois
November 15, 2001

Laboratory's Role in Forensic Investigations
Chicago Society for Clinical Laboratory Science
Oakton Community College
Des Plaines, Illinois
February 19, 2002

Investigating Infant and Child Deaths
Mid States I.A.I. Divisions 2002 Educational Conference
Peoria, Illinois
March 27, 2002

Drowning Deaths
Chicago Police Department
Marine Unit
Chicago, Illinois
March 28, 2002

Lectures:

Forensic Pathology
John Marshall Law School
Chicago, Illinois
April 16, 2002

Investigating Infant and Child Deaths
Midwest Homicide Investigator's Association
Elmhurst, Illinois
April 26, 2002

The Science & Art in the Determination of Cause and Manner of Death
Northwestern University School of Law
Short Course Program for Defense and Prosecuting Attorneys
Chicago, Illinois
July 26, 2002

Forensic Pathology
Kent Law School
Chicago, Illinois, September 24 and October 8, 2002

Battered Kids & Child Abuse
Case Findings: Death Due to Head Trauma
DuPage Juvenile Officer's Association and Oakton Community College
Youth & Violence Seminar
Oakbrook, Illinois
October 22, 2002

Page 14

Laboratory's Role in Forensic Investigations
Chicago Society for Clinical Laboratory Science
Grant Hospital
Chicago, Illinois
November 7, 2002

Forensic Pathology
Rolling Meadows High School
Rolling Meadows, Illinois
December 10, 2002

Forensic Pathology
School of Biomedical and Health Information Sciences
College of Applied Health Science
University of Illinois at Chicago
Chicago, Illinois
March 10, 2003

Gunshot Wounds and Blunt Trauma Injuries
Office of Professional Standards
Chicago Police Department Detective Division
Chicago, Illinois
March 26, 2003

Lectures:

Forensic Pathology
The John Marshall Law School
Chicago, Illinois
April 15, 2003

Investigation of Infant and Child Deaths:
The Forensic Pathologist's Perspective
North Suburban Juvenile Officers Association
South Barrington, Illinois
April 18, 2003

Forensic Pathology
Rush Presbyterian Hospital Clinical Laboratories
Medical Technologists
2003 Laboratory Week
Chicago, Illinois
April 24, 2003

Investigation of Infant and Child Deaths
Illinois Division of the International Association for Identification
2003 Educational Conference
Crown Plaza Hotel
Springfield, Illinois
May 19, 2003

Blunt Trauma Injuries
Sharp Injury
Gunshot Wounds

Page 15

Child Abuse
Chicago Police Department Academy
Detective Training
Chicago, Illinois
June 13, 2003

Forensic Pathology
Naval Hospital Corps School
Great Lakes, Illinois
June 25, 2003

Forensic Pathology
Kent Law School
Chicago, Illinois
September 30 and October 7, 2003

Forensic Pathology
John Marshall Law School
Chicago, Illinois
October 21, 2003

Lectures:  Child Abuse and Investigation of Child Deaths
Illinois Department of Human Services
Health Works Medical Case Management
Chicago, Illinois
November 17, 2003

Forensic Pathology
Rolling Meadows High School
Rolling Meadows, Illinois
December 1, 2003

Physical Injury and Blunt Head Trauma in Children and Infants
Safe From the Start
Hoffman Estates
January 13, 2004

Death Investigation and Wound Evaluation
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois
January 23, 2004

Forensic Pathology
Highland Park Hospital Paramedics Class
Highland Park Hospital
Highland Park, Illinois
January 27, 2004

Abusive Head and Abdominal Trauma in Children
Mid West Homicide Investigators Association

Page 16

Westmont, Illinois
February 27, 2004

Evidence Based Forensic Pathology
Northwestern University Law School
Chicago, Illinois
March 2, 2004

Investigation of Deaths Due to Drowning
Wound Evaluation and Death Investigation
Chicago Police Department Marine Unit Training
Chicago Police Department Training Academy
Chicago, Illinois
April 1, 2004

Wound Evaluation and Death Investigation
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois
April 22, 2004

Lectures:         Child Abuse
MINEESUBEE Child Care Facility
Hanover Park, Illinois
May 12, 2004

Wound Evaluation and Death Investigation
Major Crime Assistance Task Force
SBC Training Institute
Hoffman Estates, Illinois
June 17, 2004

Biomechanics of Head and Abdominal Trauma in Child Abuse
Children's Memorial Hospital
Grand Rounds
Chicago, Illinois
September 13, 2004

Illicit Drug and Alcohol Deaths
DePaul College of Law – Criminal Drug Policy Class
Chicago, Illinois
September 15, 2004

Forensic Pathology/Medicine and the Pathologist's Assistant
Crossing the Styx and Not Crossing Jordan
American Association of Pathologists' Assistants
Chicago, Illinois
October 4, 2004

Wound Evaluation and Death Investigation
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois

Page 17

November 2, 2004

Forensic Pathology
John Marshall Law School
Chicago, Illinois
November 9, 2004

Forensic Pathology
Rolling Meadows High School
Rolling Meadows, Illinois
November 15, 2004

Forensic Pathology
Kent Law School
Chicago, Illinois
November 16 and 23, 2004


Lectures:              Forensic Pathology:
                       The Science and Art In The Determination of Cause and Manner of Death
                       Cook County State's Attorney's Office
                       Chicago, Illinois
                       November 17, 2004

                       Injury Causation in Homicide Cases
                       National College of District Attorneys
                       Forensic Evidence Seminar
                       San Francisco, California
                       December 6, 2004

                       Death Investigation and Wound Evaluation
                       Investigation of Childhood and Infant Deaths Related to Trauma
                       South Suburban Major Crime Task Force
                       Chicago Ridge, Illinois
                       January 26, 2005
                       February 9, 2005

                       Forensic Pathology
                       John Marshall Law School
                       Chicago, Illinois
                       March 22, 2005

                       Blunt Trauma and Child Abuse
                       Northwestern University School of Continuing Studies
                       Investigation of Death & Death Scenes Forensics Program
                       Chicago, Illinois
                       April 12, 2005

                       Investigation of Natural and Accidental Childhood and Infant Deaths
                       Sexual Assault of Children
                       Investigation of Childhood and Infant Deaths Related to Trauma and Abuse
                       Northern Illinois Training Advisory Board

Page 18

Basic Youth Officer Course
Rockford, Illinois
April 14, 2005

Injury Causation in Homicide Cases
Sexual Assault Homicides
National College of District Attorneys
Prosecuting Homicide Cases Course
San Francisco, California
April 18, 2005

Sharp Force Injury
Northwestern University School of Continuing Studies
Investigation of Death & Death Scenes Forensics Program
Chicago, Illinois
April 19, 2005

Lectures:               Kinematics in Pediatric Trauma
Illinois State Council
Emergency Nurses Association
31st Annual Spring Symposium
Oak Brook, Illinois
April 29, 2005

Fatal Child Maltreatment
Forensic 350- Forensic Pediatrics
Pritzker School of Medicine
University of Chicago
Chicago, Illinois
May 17, 2005

Pathology:  Injury Causation in Homicide Cases
Texas District & County Attorneys Association
DNA & Expert Witness Seminar
Galveston, Texas
June 8, 2004

Injury Causation in Homicide Cases
Cross Examination of Defense Witness Workshop
Career Prosecutor's Course
National College of District Attorneys
Charleston, South Carolina    June 22,23, 2005

The Medical Examiner's Perspective on Fatal Child Abuse
17th Annual Crimes Against Children Conference
Dallas Children's Advocacy Center and The Dallas Police Department
Dallas, Texas
August 17 and 18, 2005

Injury Causation in Homicide Cases and Child Abuse
24th Criminal Law Advocacy Course
The Judge Advocate General's Legal Center and School
Charlottesville, Virginia

Page 19

September 19, 2005

Establishing Medical Proof: Injury Causation in Domestic Violence Homicide
Cases Including Strangulation Fatalities
Elder Abuse- Investigation and Prosecution Issues and Medical Proof (with
Candace Heisler, JD)
15th Annual National Conference on Domestic Violence
Reno, Nevada
October 24, 2005

Expert Witness Testimony in Juvenile & Criminal Courts in Cook County
(With Richard G. Cenar, JD)
The Multi-disciplinary Pediatric Education and Evaluation Consortium
Annual Conference
Chicago, Illinois
November 9, and November 10, 2005

Lectures:            Forensic Issues/ Pathology
Lake County Bar Association
Capital Litigation Training Program
Lake Bluff, Illinois
November 10, 2005

Investigation of Infant and Childhood Deaths
Illinois Department of Human Services
Community Health Nurses
Oak Park, Illinois
January 26, 2006

The Forensic Investigation of Infant and Childhood Deaths
Cook County State's Attorney's Office
Juvenile Justice and Child Protection Division
Chicago, Illinois
March 22, 2006

Death Investigation and the Clinical Laboratory
Rush Presbyterian St. Luke's Medical Center
Chicago, Illinois
April 28, 2006

Injury Causation in Homicide Cases
Accidental or Intentional: Child Homicides
National College of District Attorneys
Prosecuting Homicide Cases Course
Phoenix, Arizona
May 8, 2006

The Pathologist's Perspective of Fatal Child Abuse
Cook County Child Advocacy Center
Lipinski Pavilion
Justice, Illinois
May 10, 2006

Sharp Force Injury

Page 20

Northwestern University School of Continuing Studies
Investigation of Death & Death Scenes Forensics Program
Chicago, Illinois
May 16, 2006

Blunt Trauma and Child Abuse
Northwestern University School of Continuing Studies
Investigation of Death & Death Scenes Forensics Program
Chicago, Illinois
May 23, 2006

Lectures:        The Pathologist's Perspective of Fatal Child Abuse
Forensic 350- Forensic Pediatrics
Pritzker School of Medicine
University of Chicago
Chicago, Illinois
May 30, 2006

Death Investigation and Wound Evaluation
Chicago Police Department Training
Detective Training
Chicago, Illinois
June 5, 2006

Pathology and Injury Causation in Adult and Child Homicides
Midwest Homicide Investigators Association
Village Hall
Addison, Illinois
June 16, 2006

Injury Causation in Homicide Cases
Cross Examination of Defense Witness Workshop
Career Prosecutor's Course
National College of District Attorneys
Charleston, South Carolina
June 26, 27, 2006

Establishing Medical Proof: Injury Causation in Domestic Violence Homicide
Cases Including Strangulation Fatalities
16th Annual National Conference on Domestic Violence
Houston, Texas
October 23, 2006

The Medical Examiner's Perspective on Fatal Child Abuse
Northern Illinois Regional Conference on Child Abuse
Working Together to Improve the Interdisciplinary Response to Child Maltreatment
Chicago Children's Advocacy Center
NIU Centers
Hoffman Estates, Illinois
November 3, 2006

Page 21

Forensic Issues and Pathology
Lake County Bar Association
Capital Litigation Training Program
Lake Bluff, Illinois
November 14, 2006

Determination of Cause of Death in Homicide Cases
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois
December 18, 2006

Lectures:          Clinical Identification of Abuse
Head Trauma
Child Maltreatment One Day Workshop
Illinois Department of Human Services
Division of Community Health and Prevention and
The Nurse Excellence Committee
Oak Park, Illinois
January 25, 2007

Forensic Pathology
Lake Forest College
Center for Chicago Programs
Lake Forest, Illinois
February 14, 2007

Forensic Pathology
Illinois State Bar Association Criminal Justice Section Council
Science in the Courtroom Continuing Legal Education Program
Lombard, Illinois
February 23, 2007

Determination of Cause of Death in Homicide Cases
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois
February 28, 2007

Forensic Pathology
Illinois Institute for Continuing Legal Education
Office of the State Appellate Defender
Defending Illinois Death Penalty Cases in 2007
Chicago, Illinois
March 20, 2007

Drowning Deaths
Chicago Police Department Marine Unit
Chicago Police Department Training Academy
Chicago, Illinois
April 2, 2007

Death Investigation and the Clinical Laboratory
College of American Pathologists

G_184

Page 22

Lunch and Learn National Laboratory Week
Northfield, Illinois
April 25, 2007

Medical Examiner, Why We Do What We Do
Lifelong Learning Through Continuing Education
2nd Annual Continuing Education Workshops
Malcolm X College Mortuary Science Program
Chicago, Illinois
April 27, 2007

Lectures:    Sharp Force Injury
Northwestern University School of Continuing Studies
Investigation of Death & Death Scenes Forensics Program
Chicago, Illinois
May 22, 2007

Blunt Trauma and Child Abuse
Northwestern University School of Continuing Studies
Investigation of Death & Death Scenes Forensics Program
Chicago, Illinois
May 29, 2007

Pathology and Injury Causation
Career Prosecutor Course
National College of District Attorneys
Charleston, South Carolina
June 11, 2007

Forensic Pathology Recurring Issues
Capital Litigation Trial Bar Training Seminar
University of Illinois
Chicago, Illinois
June 22, 2007

Kinematics
Cook County Hospital Trauma Nurse Specialty Course
Chicago, Illinois
October 2, 2007
Establishing Medical Proof: Injury Causation in Domestic Violence Homicide
Cases
17th Annual National Conference on Domestic Violence
National Association of District Attorneys
Orlando, Florida
October 28, 2006

Forensic Pathology
Cook County Hospital Trauma Nurse Specialty Course
Chicago, Illinois
October 30, 2007

Forensic Pathology
Kent Law School
Chicago, Illinois

Page 23

November 6 and November 20, 2007

Forensic Pathology
Defending Illinois Death Penalty Cases in 2007
Illinois Institute for Continuing Legal Education
Fairview Heights, Illinois
November 9, 2007

Lectures:                    Death Investigation and Wound Evaluation
Chicago Police Department Training Academy
Detective Training
Chicago, Illinois
January 14, 2008

Forensic Pathology: The Science & Art in Determination of Cause and Manner of
Death
Defending Illinois Death Penalty Cases
Illinois Institute for Continuing Legal Education
Chicago, Illinois
March 5, 2008

The Real CSI
Academy of Criminology
Chicago, Illinois
April 1, 2008

The Real CSI
College of American Pathologists
Lunch and Learn Program
Northfield, Illinois
April 21, 2008

Child and Infant Death Investigation
Major Crime Assistance Team
Prairie Arts Center/Village Hall
Schaumburg, Illinois
May 15, 2008

The Medical Examiner/ A History and Discussion of the Art and Science of Forensic
Death Investigation
Illinois State Society of American Medical Technologists Meeting
Roosevelt University
Schaumburg, Illinois
May 16, 2008

Death Investigation and Wound Evaluation
Chicago Police Department Training Academy
Forensic Services Division Training
Chicago, Illinois
July 14, 2008

Forensic Pathology
Northwestern University School of Law
Annual Short Course for Prosecuting Attorneys and Defense Attorneys

Page 24

Northwestern University School of Law
Chicago, Illinois
July 23, 2008

Lectures:        Evidence of Injury and Cause of Death in Traffic Crashes:
                 A Medical Examiners Perspective
                 State's Attorney/Prosecutor DUI Seminar:
                 Advanced Training for Prosecutors
                 Chicago, Illinois
                 August 22, 2008

                 Dead Doctor vs Live Doctor: Looking at Child Abuse from
                 Two Different Perspectives
                 13th Annual Symposium
                 Illinois Child Death Review Teams
                 Springfield, Illinois
                 September 4, 2008

                 Everything You Wanted to Know About the Medical Examiner's Office and More
                 Pathology Grand Rounds
                 Children's Memorial Hospital
                 Chicago, Illinois
                 September 17, 2008

                 Forensic Investigation of Infant and Childhood Deaths and Injury Causation in
                 Homicides
                 Child Advocacy Center
                 DuPage County Major Crime Task Force
                 Naperville, Illinois
                 October 20, 2008

                 Everything You Wanted to Know About the Medical Examiner's Office and Things
                 You Didn't Want to Know
                 Chicago Crime Commission
                 Know Your Chicago
                 University of Illinois at Chicago
                 Chicago, Illinois
                 October 21, 22, 2008

                 Issues in Pathology
                 Defending Illinois Death Penalty Cases in 2008
                 Illinois Institute for Continuing Legal Education
                 Springfield, Illinois
                 November 18, 2008

                 Issues in Forensic Pathology
                 Illinois Coroners and Medical Examiners Association Meeting
                 Chicago, Illinois
                 November 25, 2008

                 Clinical Identification of Abuse
                 Head Trauma

G_187



Page 25

Illinois Department of Human Service's Division of Community Health & Prevention
Child Maltreatment Conference
Chicago, Illinois
January 22, 2009

Lectures:                Forensic Pathology: The Real CSI
Worsham College of Mortuary Science
Wheeling, Illinois
April 8, 2009

Forensic Pathology: The Real CSI
Malcolm X College
Chicago, Illinois
April 17, 2009

CSI: Crime Scene Investigation or
Confounding Scientific Information
College of American Pathologists
Lunch and Learn Lecture Series
Northfield, Illinois
April 20, 2009

Sharp Injuries
Northwestern University School of Continuing Studies
Death and Death Scene Investigation Course
Chicago, Illinois
April 21, 2009

Blunt Trauma Injuries and Child Abuse
Northwestern University School of Continuing Studies
Death and Death Scene Investigation Course
Chicago, Illinois
April 28, 2009

Forensic Pathology:
Recurring Issues in Capital Cases
A Capital Litigation Trial Bar CLE Training
Chicago, Illinois
May 15, 2009

Aging, Elder Abuse and the Medical Examiner
Chicago Advanced Detective Training Course
Chicago Police Training Academy
Chicago, Illinois
June 23, 2009
June 30, 2009

Clinical Laboratory Science and Forensic Pathology
American Society for Clinical Laboratory Science
77th Annual meeting
Chicago, Illinois
July 23, 2009

Page 26

| | |
|---|---|
| Lectures: | The Medicine Behind the Mystery |
| | Lunch and Learn |
| | College of American Pathologists |
| | Northfield, Illinois |
| | April 19, 2010 |

Elemental Analysis & Interpretation of Findings
Postmortem Evaluation of Heavy Metals
40th Annual Society of Forensic Toxicologists Meeting
Richmond, Virginia
October 19, 2010

Kinematics
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 5, 2010

Forensic Pathology
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
November 2, 2010

Post-Mortem Examinations- An Important Investigative Tool
National Association of Civilian Over Sight Of Law Enforcement Meeting
Chicago, Illinois
May 21, 2011

Tahara After Autopsy: or How to Get Along with Your Local Medical Examiner
9th North American Chevra Kadisha and Jewish Cemetery Conference
Skokie, Illinois
June 12, 2011

Kinematics
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
September 27, 2011

Forensic Pathology
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 25, 2011

Forensic Investigation of Infant and Childhood Deaths
DuPage County Juvenile Officers Association
Glen Ellyn, Illinois
October 26, 2011

Forensic Investigation of Infant and Childhood Deaths
South Suburban Police Departments
Markham Court House
Markham, Illinois
November 3, 2011

Page 27

Lectures:              Forensic Pathology
Kent Law School
Chicago, Illinois
April 3, 2012 and April 17, 2012

Kinematics
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 1, 2012

Forensic Pathology
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 30, 2012

Postmortem Evaluation of Toxic Chemicals, Drugs & Poisons in Cause of Death
2013 American Association of Legal Nurse Consultants Forum
Chicago, Illinois
April 5, 2013

Forensic Pathology
Kent Law School
Chicago, Illinois
April 16 and April 23, 2013

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Collinsville, Illinois
August 22, 2013

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Mount Vernon, Illinois
September 26, 2013

Kinematics
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 1, 2013

Forensic Pathology
Cook County Trauma Nurse Specialty Course
Chicago, Illinois
October 28, 2012

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Fairview Heights, Illinois
December 5, 2013


Lectures:              The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation

Page 28

Sandy, Utah
February 27, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Champaign, Illinois
March 20, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Springfield, Illinois
March 27, 2014

Forensic Pathology
Kent Law School
Chicago, Illinois
April 15 and April 22, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Fairview Heights, Illinois
September 11, 2014

Kinematics
Cook County Hospital Trauma Nurse Specialty Course
Chicago, Illinois
September 29, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
West Lafayette, Indiana
October 16, 2014

Forensic Pathology
Cook County Hospital Trauma Nurse Specialty Course
Chicago, Illinois
October 20, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Rockford, Illinois
October 30, 2014

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Mt. Vernon, Illinois
December 4, 2014

Lectures:                    The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Peoria, Illinois
December 18, 2014

Page 29

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Springfield, Illinois
January 8, 2015

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Champaign, Illinois
January 29, 2015

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Sandy, Utah
February 26, 2015

The WZ 5-Day Seminar for Lead Homicide Investigators
Forensic Death Investigation
Mattoon, IL
April 23, 2o15

Forensic Pathology
Kent Law School
Chicago, Illinois
April 21 and April 28, 2015


Peer Reviewed Journal Reviewer:       Journal of Forensic and Legal Medicine
Elsevier Publishing
2007 - Present


Office of Justice Peer Reviewer Program     2010- Present




Volunteer Work:     1987 - 1997    Prairie Hills Junior High School Career Day

          1993 - 1997    Lake Forest High School Dimensions

          1993    Thornridge High School Career Day

Page 30

| | |
|---|---|
| 1999 | New Trier High School Assembly Presentation |
| 2000 | Providence-St. Mel School Career Day |
| 2002 | Rolling Meadows High School Biological Sciences Field Day |
| 2004 | Rolling Meadows High School Biological Sciences Field Day |
| 2005 | Rolling Meadows High School Biological Sciences Field Day |
| 2006 | Rolling Meadows High School Biological Sciences Field Day |
| 2007 | Rolling Meadows High School Biological Sciences Field Day |
| 2011 | American Society for the Prevention of Cruelty to Animals |
| 2013- Present | Chicago Police Department Memorial Foundation |

5/2015



G_194

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　Case No. 09 CF 252
　　　　　　　　　　　　　　　　　)
MELISSA CALUSINSKI,　　　　　　　)　　Honorable Daniel Shanes,
　　　　　　　　　　　　　　　　　)　　Judge Presiding.
　　　　　Defendant.　　　　　　　)

<u>AFFIDAVIT OF PAUL CALUSINSKI</u>

Paul Calusinski, being first duly sworn on oath, deposes and states as
follows:

1.　　I am Melissa Calusinski's father.

2.　　I received a call on my cell phone on Wednesday, June 10, 2015 at
approximately 2:45 p.m.  The number came up on my phone as "Private."

3.　　When I answered, a male voice spoke and said, "Mr. Calusinski, you
need to tell your attorneys to get the second set of x-rays of Benjamin Kingan from
the Lake County Coroner's Office."

4.　　I did not recognize the person's voice.  I asked him, "Who is this?" The
person hung up without answering.

5.　　I subsequently contacted the Lake County Coroner's Office, and
learned that there was in fact a second set of x-rays taken of Benjamin Kingan.

6.　　I have since provided that information to Melissa's attorneys.



DEFENDANT'S
EXHIBIT
_E_

FURTHER AFFIANT SAYETH NAUGHT.

Paul Calusinski

Subscribed and Sworn to Before Me
this 18th Day of June, 2015.

Notary Public

OFFICIAL SEAL
SCOTT T PANEK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/13/17

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
                                     )
         Plaintiff,            )
                                     )
v.                                    )     Case No. 09 CF 252
                                     )
MELISSA CALUSINSKI,       )     Honorable Daniel Shanes,
                                   )     Judge Presiding.
         Defendant.         )

### AFFIDAVIT OF THOMAS A. RUDD, M.D.

      Thomas A. Rudd, M.D., being first duly sworn, on oath deposes and states as follows:

      1.    I am of legal majority and can truthfully and completely testify to the matters contained herein based upon my personal knowledge.

      2.    The factual statements herein are true and correct to the best of my knowledge, information, and belief.

      3.    On June 10, 2015, I received a call from Paul Calusinski regarding Benjamin Kingan.

      4.    Mr. Calusinski told me that he had received a phone call from someone he did not know, who told him that there were a "second set" of x-rays taken of Benjamin Kingan.

      5.    After receiving Mr. Calusinski's call, I reviewed the entire file pertaining to Benjamin Kingan (Case#09011417491).

      6.    Upon reviewing the file, I could not find any x-rays.



1

7.     I requested that Deputy Coroner Michael Reid to search for x-rays in our system.

8.     Deputy Reid then informed me that he found the x-rays Mr. Calusinski was referencing.

9.     I requested that copies of the x-rays be made, and the copies were then sent to the defendant's attorney, Kathleen Zellner, and staff Forensic Pathologist, Nancy Jones, M.D.

FURTHER AFFIANT SAYETH NAUGHT

Thomas A. Rudd, MD

Subscribed and Sworn to Before Me
   this 18th Day of June, 2015.

Notary Public

OFFICIAL SEAL
SCOTT T PANEK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/13/17

2

G_198

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
                                    )
      Plaintiff,              )
                                    )
v.                                 )     Case No. 09 CF 252
                                    )
MELISSA CALUSINSKI,       )     Honorable Daniel Shanes,
                                    )     Judge Presiding.
      Defendant.        )

<u>AFFIDAVIT OF PAUL DELUCA</u>

Paul DeLuca, being first duly sworn on oath, deposes and states as follows:

1.     I am an attorney licensed to practice law in the State of Illinois.

2.     I was the lead attorney that represented the defendant, Melissa Calusinski, at trial in the above-captioned matter.

3.     I reviewed all of the discovery tendered by the State and third-parties prior to trial.

4.     During the course of pretrial discovery I subpoenaed the Lake County Coroner's Office twice for production of its entire file, which would include any x-rays taken of Benjamin Kingan prior to, during, or after the autopsy.

5.     At a subsequent status date, assistant state's attorney Christen Bishop advised the Court that there were x-rays taken but that the x-rays were not readable or legible.

6.     A copy of the illegible x-rays referenced by Ms. Bishop was produced to me on disc. A copy of the disc is attached to this affidavit as Exhibit A.

1



G_199

7.     I reviewed the disc that was produced by the State.  The disc had a total of three images, labeled "Ben_Kingan1", "Ben_Kingan2", and "Ben_Kingan3."

8.     The image labeled "Ben_Kingan1" is blank.

9.     The image labeled "Ben_Kingan2" is blank.

10.    The image labeled "Ben_Kingan3" is dark, but appears to be an x-ray of the lower body.

11.    These are the only three x-rays that were ever produced to me by either the State or the Lake County Coroner's Office.

12.    Since Melissa Calusinski's trial, I have since been informed that another set of x-rays of Benjamin Kingan was taken at the Lake County Coroner's Office that includes readable x-rays.

13.    I have reviewed a copy of this second set of x-rays.  They are attached to this affidavit on disc as Exhibit B.

14.    There are five images on this disc, labeled, "Ben_Kingan1", "Ben_Kingan2", "Ben_Kingan3", "Ben_Kingan4", and "Ben_Kingan5."

15.    The image "Ben_Kingan1" on Exhibit B is similar to the "Ben_Kingan1" image that was produced to me on Exhibit A, except the image on Exhibit B has additional information at the top including "Patient", "Age", "Gender", "Provider", "Date Acquired", "Laterality", and "Anat. Region".

16.    The image "Ben_Kingan2" on Exhibit B is bright and appears to be of Benjamin Kingan's head and upper body.  This image was never produced to me.

2

17.     The image "Ben_Kingan3" on Exhibit B appears to be a readable x-ray of Benjamin Kingan's head and upper body.  This image was never produced to me by either the State or the Lake County Coroner's Office.

18.     The image "Ben_Kingan4" on Exhibit B is similar to the "Ben_Kingan3" image that was produced to me on Exhibit A, except the image on Exhibit B has additional information at the top including "Patient", "Age", "Gender", "Provider", "Date Acquired", "Laterality", and "Anat. Region".

19.     The image "Ben_Kingan5" on Exhibit B appears to be a brighter, readable x-ray of Benjamin Kingan's lower body.  This image was never produced to me by either the State or the Lake County Coroner's Office.

20.     If the x-ray image "Ben_Kingan3" had been produced to me (the readable x-ray of Benjamin Kingan's head), I absolutely would have given the x-ray to my experts who testified at trial, Dr. Teas and Dr. Leetsma.  The x-ray would have been essential to determining the veracity of the prosecution's experts' claims that Benjamin Kingan suffered a "through and through" fracture.

21.     I also absolutely would have given the x-ray to my experts to determine what, if any, information it might provide regarding the cause of Benjamin Kingan's death.

22.     It is my understanding that if the x-ray image "Ben_Kingan3" had been reviewed by a pathologist, they would have concluded based on the image that Ben had a chronic condition of brain swelling that caused the brain to push the skull into malformation, similar to a light bulb.

3

23.    It is also my understanding that had a pathologist reviewed the x-ray image "Ben_Kingan3" they would have detected an accessory suture at the sight the prosecution was claiming there was a fracture, which was not correlated with any injury.

24.    This would have led my experts to conclude that Ben died a **hypoxic** death, as opposed to a re-bleed.

25.    The failure of the prosecution to produce this x-ray **significantly** impeded my ability to consult with my experts, **cross-examine** the State's **experts**, and ultimately defend my client.

FURTHER AFFIANT SAYETH NAUGHT.

Paul DeLuca

Subscribed and Sworn to Before Me
    this 18th Day of June, 2015.

Notary Public

OFFICIAL SEAL
NICHOLAS CURRAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/09/17

4

G_202



**DELUCA - EXHIBIT A**
**(1ST SET OF X-RAYS)**



**DELUCA - EXHIBIT B**
**(2ND SET OF X-RAYS)**



G_203

SUBPOENA-SUBPOENA DUCES TECUM

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF
ILLINOIS )
)
)        NO.   09 CF 352
V. )
)
)
MELISSA CALUSINSKI )
)
SUBPOENA

COPY

Out cut 9-28-9

TO: Keeper of Records – Lake County Coroner Office
    26 North Martin Luther King, Jr. Avenue, Waukegan, IL 60085

YOU ARE COMMANDED TO appear to testify before the HONORABLE   Victoria A. Rossetti
at 18 North County Street, Waukegan, Illinois, 60085 in Courtroom   C205   on   October 13
_____, 20 09 .
Time of appearance   9:00   a.m./p.m.

    YOU ARE COMMANDED ALSO to bring the following:

    Please see attached

in your possession or control.
    YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO
PUNISHMENT FOR CONTEMPT OF THIS COURT.

SEAL

Witness,   September 25 , 20 09
_____
SALLY D. COFFELT
Clerk of the Circuit Court
Lake County, Illinois

NAME:  Paul DeLuca
ATTORNEY FOR:  Melissa Calusinski
ADDRESS:  1 S. 660 Midwest Road  #200
CITY:  Oakbrook Terrace, IL 60181
TELEPHONE:   630-627-9900

I served this subpoena by handing a copy to _____
on _____, 20_____ . I paid the witness $_____ for witness and
mileage fees.

Signed and Sworn to before
me _____, 20_____ .

_____
    Notary Public

DEFENDANT'S
EXHIBIT

H

171-226 Rev. 2/00

G_204

Any and all morgue photographs, histology slides, microscopic reports, microscopic examination of the brain, DC and blood culture report, first call sheet and any and all other notes and/or recordings including any lab results of any items tested regarding the autopsy performed by Dr. Choi on BENJAMIN KINGAN, on January 15, 2009.

In lieu of appearance, compliance can be made by sending the requested records to the courtroom listed herein prior to the next court date.



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To

Street, Apt. No.;
or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006                    See Reverse for Instructions

G_206

SUBPOENA-SUBPOENA DUCES TECUM

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
             Plaintiff, )
                    )    NO.   09 CF 252
        V.                )
                    )
MELISSA CALUSINSKI )
             Defendant. )

### SUBPOENA

TO:  Dr. Eupil Choi/ Lake County Coroner's Office
      26 N. Martin Luther King, Jr. Avenue, Waukegan, IL

YOU ARE COMMANDED TO appear to testify before the HONORABLE    Christopher Stride
at 18 North County Street, Waukegan, Illinois, 60085 in Courtroom   221   on   September 29
_____, 20 10 .
Time of appearance   1:30   ~~a.m.~~/p.m.

      YOU ARE COMMANDED ALSO to bring the following:
Your complete file regarding the autopsy of Benjamin Kingan performed
on or about 1/15/09. The complete file to include but not limited to
all photographs, all notes, memorandum or any other documents in said
file.

in your possession or control.
      YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO
PUNISHMENT FOR CONTEMPT OF THIS COURT.

SEAL

Witness,   September 24, 2010
                       SALLY D. COFFELT
                       Clerk of the Circuit Court
                       Lake County, Illinois

NAME:  Paul DeLuca    ARDC# 3123271
ATTORNEY FOR:  Melissa Calusinski
ADDRESS: 1 S. 660 Midwest Rd. #200
CITY:  Oakbrook Terrace, IL    60181
TELEPHONE:  630-627-9900

I served this subpoena by handing a copy to _____
on _____, 20_____ . I paid the witness $_____ for witness and
mileage fees.

_____

Signed and Sworn to before
me _____, 20_____ .

_____
      Notary Public

**DEFENDANT'S EXHIBIT**
I

171-226 Rev. 2/00

G_207

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,        )
                                        )
      Plaintiff,                        )
                                        )
v.                                      )        Case No. 09 CF 252
                                        )
MELISSA CALUSINSKI,                     )        Honorable Daniel Shanes,
                                        )        Judge Presiding.
      Defendant.                        )

---

## AFFIDAVIT OF PAUL FORMAN

---

      Now comes your affiant, Paul Forman, and states under oath as follows:

1.    I am an adult and reside in Illinois. I am not under the influence of any alcohol. I am giving this statement freely, voluntarily and intelligently.

2.    I have not been promised or received anything in exchange for this truthful statement.

3.    I have personal knowledge of the facts stated herein and will testify to them if called upon to do so.

4.    I was employed by the Lake County Coroner's Office in January, 2009.

5.    I performed duties in relation to the death of Benjamin Kingan.

6.    I took x-rays of Benjamin Kingan, including an x-ray of his head.

7.    I was present when Dr. Choi reviewed the x-rays, including the head x-ray, and observed him reviewing the x-rays. All of the x-rays I took were clear and readable.

FURTHER YOUR AFFIANT SAYETH NAUGHT

                                        Paul Forman

Subscribed and Sworn
to before me this 21 day of June, 2015.

                   
Notary Public

OFFICIAL SEAL
JAMES F. KIRBY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/15/15



DEFENDANT'S
EXHIBIT
5

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 CF 252 |
| | ) | |
| MELISSA CALUSINSKI, | ) | Honorable Daniel Shanes, |
| | ) | Judge Presiding. |
| Defendant. | ) | |

## AFFIDAVIT OF DR. JAN EDWARD LEESTMA

Now comes your affiant, Jan Edward Leestma, M.D. and states under oath as follows:

1. I am of legal majority and can truthfully and competently testify to the matters contained herein based upon my personal knowledge. The factual statements herein are true and correct to the best of my knowledge, information and belief.

2. With this affidavit it is my intention to offer additional information and opinions in this case.

3. My opinions within this affidavit are stated to a reasonable degree of medical certainty.

4. I am a licensed medical doctor and am board-certified in Anatomic Pathology and Neuropathology.

5. I have now reviewed the affidavit of Dr. Nancy Jones dated June 20, 2015 and the drawing referenced therein as Exhibit D-1 to that affidavit.



DEFENDANT'S
EXHIBIT
tabbies
K

G_209

6.     I concur in the findings and opinions set forth in Dr. Jones affidavit of June 20,

2015.

     FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____

Jan Edward Leestma, M.D.

Subscribed and Sworn
to before me this ꓸ23ꓸ
day of June, 2015.

_____
Notary Public

OFFICIAL SEAL
SCOTT T PANEK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/13/17