# EXHIBIT H

Circuit Court of Lake County, Illinois, Opinion Denying Post-Conviction Petition filed September 30, 2016

FILED

SEP 3 0 2016

*Keith Brin*
**CIRCUIT CLERK**

STATE OF ILLINOIS    )
                    ) SS
COUNTY OF LAKE    )

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS    )
                                        )
          v.                      )    09 CF 252
                                          )
MELISSA CALUSINSKI    )

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on Defendant's petition for post-conviction relief pursuant to 725 ILCS 5/122-1 *et seq.* Having reviewed the record, statutory authority and case law, considered the evidence, and being fully advised, the court now finds as follows:

## BACKGROUND

On January 14, 2009, 16-month-old Benjamin Kingan died from a head injury while attending a local daycare center. In November 2011, a jury found Defendant, one of his daycare providers, guilty of his murder. In February 2014, the Second District Appellate Court affirmed the conviction and sentence on appeal (*People v. Calusinski*, 2014 IL App (2d) 120383-U), and the Illinois Supreme Court subsequently denied discretionary review.

In June 2015, Defendant filed a petition for post-conviction relief. In her petition, Defendant initially claimed in various ways that new material evidence proves her actual innocence, and that the State withheld certain x-rays in violation of *Brady v. Maryland*, 373 U.S.

1

H_01

83 (1962).[1] Arguing that those claims are not credible or supported by the evidence, the State

moved to dismiss Defendant's petition. In June 2016, this court denied the State's motion and

set the matter for an evidentiary hearing. On the final day of that evidentiary hearing in

September 2016, Defendant moved to amend the petition to allege that the conviction violated

the Due Process Clause, arguing that one of the State's witnesses provided perjured testimony

during the trial. The court took that motion under advisement.[2]

Even a cursory review of the record reveals that the trial (which lasted well over two

weeks) contained conflicting evidence, as does the evidence adduced at the three-day post-

conviction hearing. The parties agree that resolution of Defendant's post-conviction claims

require the court to consider the evidence presented at the hearing in the context of the trial

record. *See People v. Coleman*, 2013 IL 113307 ¶ 97 (trial court must consider all the evidence,

"both old and new together").

This court presided over the trial, observed the witnesses testify, and is familiar with the

evidence. *See People v. Carter*, 2013 IL App (2d) 110703, ¶ 96 (preferable to have the same

court preside over both trial and post-conviction proceedings to weigh evidence); *People v.*

*Pendleton*, 223 Ill.2d 458, 473 (2006) (trial judge's experience and familiarity with defendant's

trial is significant when fact-finding and credibility determinations are made); *cf., People v.*

*Caballero*, 206 Ill.2d 65, 87-88 (2002) (*de novo* review when no new evidence is presented,

---

[1] Defendant's petition does not claim that her trial counsel was ineffective and, in response to a question from the court during the evidentiary hearing, defense counsel expressly confirmed that Defendant is not claiming she received the ineffective assistance of trial counsel. *Hearing Record*, Aug. 18, 2016, p. 53. This confirmation has particular significance in light of Defendant's motion to amend the petition to include her claim regarding possible perjured trial testimony. Defendant has therefore explicitly waived any argument regarding the potential ineffectiveness of trial counsel. See 725 ILCS 5/122-3.

[2] When she moved to amend the petition, Defendant confirmed that she would not require more time to present additional evidence in support of that claim.

2

credibility of witnesses not a concern, and circuit court had no familiarity with underlying trial).

This court will now resolve the conflicts in the evidence from the hearing. Unless otherwise

noted, the court resolves all credibility determinations in favor of the judgment it has reached.

Because this court's decision ultimately rests on the evidence presented at both

Defendant's trial and her post-conviction hearing, the court will summarize the pertinent

testimony and evidence from each proceeding.

### Trial Testimony[3]

The State's theory at trial was essentially that 16-month-old Ben Kingan died as a result

of being thrown to the ground by Defendant, causing acute brain injuries resulting in his death.

The defense's trial theory was that Ben suffered from chronic and undiagnosed head injuries that

were re-aggravated and re-bled each time he banged his head, ultimately resulting in his death.

Ben and his twin sister, Emily, were born on August 31, 2007, to Amy and Andy Kingan.

At nine weeks old, Ben and Emily began attending day care at Minee-Subee in Lincolnshire with

their older siblings. Defendant worked as the full-time teacher's assistant in their classroom.

Ben was a healthy baby and met all of his developmental milestones. When Ben was

angry and seated, he had a habit of throwing himself backward and hitting his head on the floor

behind him. The behavior did not alarm Amy or the daycare staff, and Ben's pediatrician, Dr.

Daniel Lum, described it as fairly normal. At trial, Dr. Lum testified he did not know of a child

seriously injuring himself from this habit.

---

[3] Unless otherwise noted, facts in this section are drawn from the Second District Appellate Court's decision in *People v. Calusinski*, 2014 IL App (2d) 120383-U, and constitute factual findings of this court for purposes of resolving the petition for post-conviction relief.

3

On October 27, 2008, while at day care, Ben woke from his nap with a golf-ball sized lump on the back of his head. The day care employees could not explain how Ben got the lump. When Amy contacted Dr. Lum, he did not recommend any special care since Ben did not vomit, lose consciousness, and was acting normally. Ben did develop a fever two days later, and the pediatrician who examined him, Dr. Patricia Brunner, did not think that further tests on his head were necessary.

On December 1, 2008, at Ben's 15-month-old well-baby visit, Dr. Lum found Ben's growth age appropriate and that he was "growing beautifully." Since his 12-month-old well-baby visit Ben's head circumference had increased from the 50th percentile to the 75th percentile, and Dr. Lum did not see any issues with that fact. At the time of his death, Ben's head circumference was in the 95th percentile.

In January 2009, Gwendy Bautista was the lead teacher in Ben's classroom, and Defendant was Gwendy's full-time assistant. Nancy Kallinger also worked at Minee-Subee, moving between classrooms as needed. Ben's classroom served eight children, ages 12 to 20 months. The classroom was carpeted except for the tiled kitchen area that contained a sink/counter area facing the wall, a changing table, two high chairs, and two tables with four chairs each.

On Monday, January 12, 2009, after his nap at daycare, Ben was pale and coughing but without fever. Around 4:00 p.m. Ben began "almost spewing" vomit. At home that evening, Ben vomited again. He later slept as usual and was fine throughout the night. The following day, Ben stayed home with Amy. He did not vomit and appeared normal. Ben was smiling and giggling as Amy took him on some errands, including a stop at the pediatrician's office to pick

H_04

up a prescription for one of Ben's siblings. Dr. Brunner briefly observed Ben playing with toys on the floor, and he seemed perfectly normal.

On Wednesday, January 14, 2009, Ben returned to daycare, where he ate breakfast and was acting and playing normally. Gwendy Bautista testified that Ben seemed "fine", "normal", and was "acting like his normal self". *Trial Record,* p. 2957-65. Ben ate well at lunch and took a nap. When he woke up, he was happy to do an art project with Gwendy, involving gluing shapes of paper and feathers on a sheet of paper. *Trial Record*, p. 2966-68. After the rest of the children woke up, Gwendy and Defendant buckled them into their chairs, and served animal crackers. Nancy Kallinger came into the classroom to relieve Gwendy around 3:30 p.m.

When the children began to get loud and antsy, Nancy and Defendant unbuckled them from their chairs, washed their hands, and let them play. Several children were fussy, including Ben. Defendant stepped out of the classroom for a few minutes. Between 3:35 and 3:45 p.m., Nancy put Ben down on the tiled kitchen floor, and he threw himself backwards. Nancy testified that she did not actually see Ben hit his head but assumed he did because he cried a little. Nancy then sat Ben back up and went to the sink to wash her hands. When she turned back around, Ben was again lying on the tiled floor. Nancy carried him over to and put him in a bouncy chair.

When Defendant returned, Nancy left the classroom for 10 to 20 minutes. Before Nancy left, she told Defendant that Ben was in the bouncy chair, and starting to fall asleep. At approximately 3:50 p.m.,[4] Defendant found Ben unresponsive in the bouncy seat and called for assistance. Staff members responded by commencing CPR and calling 911. Paramedics quickly arrived and transported Ben to Condell Medical Center in Libertyville. He was pronounced dead at 4:50 p.m.

---

[4] The court acknowledges that these times may not necessarily correspond; it is simply a synthesis of the evidence admitted at trial.

At trial, the jury viewed a 10.5 hour video interview of Defendant. In statements recorded on the video, Defendant stated that she had become frustrated and angry because she was alone with the screaming children. At some point, she picked Ben up, and he was wiggling and squirming in her arms. Defendant confessed that she threw Ben down on the tile floor and Ben hit his head hard. Defendant re-enacted her actions in the video. The jury was also presented with a booking room video that included various statements Defendant later made to another police officer.

The State presented several doctors who testified about the injuries, and concluded that Ben died from a traumatic, violent blow to the head.

Dr. Eupil Choi testified as an expert in anatomical, clinical, and forensic pathology. He performed Ben's autopsy on the afternoon of January 15, 2009, in the presence of Deputy Coroner Paul Forman and Detective Adam Hyde, and a second examination on the afternoon of January 16, 2009, in the presence of Forman and Officer David Thomas. *Trial Record*, pp. 3562, 4033-35. Dr. Choi conducted both an external and internal examination of Ben's body. *Trial Record*, p. 3563. His internal examination of Ben's head revealed a four-by-four inch subgaleal hemorrhage—an area of bleeding between the scalp and the skull—on the back of the head. *Trial Record*, p. 3575. Dr. Choi also discovered a .8 inch linear skull fracture, visible on both sides of the skull, "complete through the thickness of the skull." *Trial Record*, pp. 3581-86. The fracture was visible to the naked eye. *Trial Record*, pp. 3580-81. Dr. Choi identified to the jury the fracture in photographs admitted into evidence. *Trial Record,* pp. 3583-87.

When Dr. Choi cut the dura, which lies under the skull, "the blood was gush out [sic]." *Trial Record*, p. 3589. The blood was fresh, red and not coagulated. *Trial Record*, p. 3589. Beneath the subdural area, Dr. Choi found a subarachnoid hemorrhage. *Trial Record,* p. 3590.

6

H_06

Dr. Choi noted swelling in the brain caused by the pressure of the subdural hematoma. *Trial Record*, p. 3595. Dr. Choi opined that Ben's injuries were caused by a hard, flat surface. *Trial Record*, pp. 3598-99. Based on his examination, Dr. Choi opined that Ben "died of craniocerebral injuries due to blunt trauma" and the injuries were recent. *Trial Record*, p. 3599. Ultimately, Dr. Choi opined that Ben's injuries were consistent with having been thrown to the floor by someone. *Trial Record*, pp. 3605-06.

When asked specifically about x-ray images, Dr. Choi testified in pertinent part as follows:

> Q:   [D]id you take an x-ray of this fracture?
>
> A:   Yes, I did.
>
> Q:   Why did you take an x-ray of the fracture?
>
> A:   Well, that's another documentation of the fractures by way of taking x-ray.
>
> Q:   Did you do that before you began the internal exam?
>
> A:   Yes
>
> Q:   And did the x-ray come out?
>
> A:   I look again after the autopsy and in asking the people, no, it was a poor quality. It didn't show.
>
> Q:   It was a poor quality x-ray, correct? Well, let me ask you this, Doctor. Could you see anything on the film?
>
> A:   No, I didn't see the fracture line on the x-ray.
>
> Q:   All right. Is that because it may have been a poor quality?
>
> A:   It could be.

*Trial Record*, pp. 3635-36.

Dr. Jordan Greenbaum testified as an expert in forensic pathology and child abuse. She stated that Ben suffered a subgaleal hemorrhage, a subdural hemorrhage, and a subarachnoid hemorrhage, each with fresh blood, consistent with fairly recent trauma. *Trial Record*, pp. 3461-

7

79. According to Dr. Greenbaum, these hemorrhages were caused by impact with a flat surface, such as a floor or wall. Each of these areas was separate or compartmentalized from the others, indicating either contact or a whiplash motion as the mechanism of injury. *Trial Record*, pp. 3461-78.

In Dr. Greenbaum's opinion, Ben died of a head injury involving blunt force trauma. *Trial Record*, p. 3452. She further opined that Ben died as a direct result of being thrown to the floor and that the injury happened "shortly if not immediately before he became very symptomatic". *Trial Record*, p. 3494. Dr. Greenbaum noted that Ben would not have been actively playing, eating, interacting with others, or making collages with his teacher with such a lethal injury. *Trial Record*, p. 3494. She did not believe that Ben's injuries were consistent with his having thrown himself backward because such trivial forces would not have caused the damage present in Ben's skull. *Trial Record*, p. 3542-43. According to Dr. Greenbaum, Ben's vomiting two days before his death was unrelated to his death, because after being ill he was completely normal in all aspects and then "essentially die[d] in 20 minutes." *Trial Record*, p. 3542. She testified that this was not a picture of a child with a chronic subdural hematoma, because children with that condition do not get better and then worse; in addition, she added that kids with chronic subdurals generally make it to the emergency room for treatment. *Trial Record*, p. 3542.

Dr. Greenbaum further testified that Ben also suffered from a skull fracture that she could see in the autopsy photographs with her naked eye. *Trial Record*, p. 3472. She testified that the fracture was visible in photographs both of the outside and inside of the skull, and identified the fracture to the jury in photographs admitted into evidence. *Trial Record*, pp. 3475-76. Dr. Greenbaum stated that the fact that a through-and-through fracture existed visible on both the

8

H_08

outside and inside of the skull is significant because it is consistent with a true fracture and a trauma injury impact to the head enough to crack the skull. *Trial Record*, p. 3476. Dr. Greenbaum also stated that not all instances of abuse with impact to the head include skull fractures. *Trial Record*, p. 3446.

The defense presented expert medical evidence opining that Ben initially suffered a head injury—a chronic subdural hematoma—when he bumped his head in October 2008, and that this injury was re-aggravated and re-bled each time he banged his head, ultimately resulting in his death.

Dr. Jan Edward Leestma testified first for the defense as an expert in anatomical pathology and neuropathology. Dr. Leestma initially testified that there "may be a mixture of ages in [the] scalp hemorrhage" including "a deep scalp hemorrhage on the right posterior side of the head that certainly has an acute or a recent component to it." *Trial Record*, pp. 3720-21. Dr. Leestma also observed in the histology slides a chronic subdural hematoma (also referred to as a neomembrane or new membrane) that he dated as a couple of weeks old. *Trial Record*, pp. 3722-23. He testified that he observed iron and "iron containing scavenger cells" called hemosiderin, which are part of the aging and healing process, and appear about five to seven days after injury. *Trial Record*, pp. 3726-29.

Dr. Leestma testified that, because of the chronic subdural hematoma, it was not possible to opine to a reasonable degree of medical certainty as to the force necessary to cause Ben's injuries. *Trial Record*, p. 3739. In his opinion, a short fall, such as from a child throwing himself backward from a sitting position, could exacerbate a chronic subdural hematoma. *Trial Record,* pp. 3741-42. Dr. Leestma stated that the fracture observed during the autopsy was consistent with a short fall. *Trial Record,* p. 3752. On cross-examination, Dr. Leestma

9

acknowledged that Ben's injuries were also consistent with being slammed to the floor. *Trial Record*, p. 3769. He admitted that there was also evidence of a recent injury and that Ben's throwing himself backwards could not have caused all of his injuries. *Trial Record*, pp. 3769-70.

Dr. Shaku Teas testified for the defense as an expert in forensic pathology. She testified that Ben suffered from a subgaleal hemorrhage, a subarachnoid hemorrhage, and a subdural hemorrhage. *Trial Record*, pp. 4219-22. In examining histology slides made from Ben's tissues, Dr. Teas observed a neomembrane, iron, collagen, fibroblasts, and granulation tissue, all of which are indicative of healing. *Trial Record,* pp. 4238, 4247-48. Dr. Teas concluded that Ben suffered from a chronic subdural hematoma that was weeks old and had re-bled, opining that Ben's "injury occurred way more than 30 minutes" prior to his becoming unresponsive. *Trial Record*, pp. 4252-53. She explained that a healing chronic subdural hematoma can re-bleed from a minor injury or even spontaneously. *Trial Record*, p. 4253. She said that nonspecific symptoms such as fussiness, sleepiness, lethargy, and projectile vomiting can indicate head injury. *Trial Record*, p. 4208. Dr. Teas stated that deficits in skills or functioning might not be apparent in very young children, because they are "brain stem creatures", although she admitted this description may not include 16–month–old children. *Trial Record*, p. 4209.

Dr. Teas testified that she observed a defect in the skull "that could possibly be a skull fracture. I am not a 100 percent sure it is a skull fracture." *Trial Record*, pp. 4274-75. She would not commit to labelling the defect being a fracture just by looking at a photograph that had been admitted into evidence. *Trial Record*, pp. 4274-75. When asked whether she could tell the age of a fracture just by looking at a photograph, Dr. Teas responded as follows:

> No, you cannot....You have to take a section actually to differentiate, first of all, is it a fracture. Or, number two, is it an abnormal suture ... [a] lot of children have what we call abnormal sutures from different areas. Sometimes they can

mimic fractures, and so you need to take a section and look at it under a microscope, especially if the fracture is small and linear.

*Trial Record*, p. 4230.

In the State's rebuttal case, Dr. Manuel Montez testified as an expert in forensic pathology. He testified that on the morning of January 16, 2009, he physically examined Ben's body, noting a fresh contusion on the outside of the scalp. *Trial Record*, p. 4519. Dr. Montez also observed a subgaleal hemorrhage, a subdural hemorrhage, and a subarachnoid hemorrhage, each with fresh blood. *Trial Record*, pp. 4520, 4587.

Dr. Montez testified that he observed a "through and through fracture" on Ben's skull. *Trial Record,* p. 4520. In court, he identified to the jury the fracture on autopsy photographs of the inside and outside of the skull. *Trial Record*, pp. 4527-29. Dr. Montez testified that with his bare hands, he touched the inside of the skull where the edges of the fracture were not completely together and he could feel a ridge. *Trial Record,* p. 4521. When he further manipulated the skull, he saw that the two edges of the fracture were not sticky, and described stickiness as one of the first signs of a healing fracture. *Trial Record,* pp. 4521-22. From these observations and manipulations, Dr. Montez concluded the fracture was fresh. *Trial Record*, p. 4529.

Dr. Montez further testified that the impact of a potential chronic subdural hematoma would depend upon its size, stating that "if it is microscopic, then it is insignificant. It will be too small to do anything." *Trial Record*, pp. 4539-40. Dr. Montez reviewed Ben's medical and daycare records as well as viewed video of Ben from November 2008, and concluded that Ben did not appear to have any deficits in his motor skills, hearing, speech, or problems in coordination. *Trial Record*, p. 4543. He opined that Ben could not generate enough force by

11

H_11

himself to cause the different injuries to his skull. *Trial Record*, p. 4554. On cross-examination, Dr. Montez stated that a simple linear fracture like the one he observed in Ben's skull is common for children under two years of age and not fatal to the child. *Trial Record*, p. 4564.

### Hearing Testimony

On the first day of the post-conviction evidentiary hearing, one of Defendant's trial attorneys, Paul DeLuca, testified that he filed an appearance (along with another attorney, Daniel Cummings, who did not testify at the hearing) on behalf of Defendant in August 2009. Over the next several months, he issued subpoenas to the Coroner requesting any and all information pertaining to Ben's autopsies, although he did not specifically request x-rays. He subsequently received various reports from the coroner, but not x-ray images. DeLuca testified that he believed x-ray images ought to have existed because Dr. Choi's report referred to the existence of a skull fracture.

On September 7, 2011, Assistant State's Attorney Christen Bishop stated in open court that the State had tendered to the defense a compact disk (the "September 2011 disk") with three x-rays that were not readable or legible and that the State could not provide any additional information until the person at the coroner's office in charge of the x-rays returned from vacation. DeLuca responded that the defense would work with the State to see what they could "glean from it". The court then invited the parties to later revisit the issue with the court should it become an issue. *Trial Record*, pp. 1812-14. The State also filed with the court its written supplemental answer to discovery documenting its tender of the disk to the defense, which reflected that the disk also contained the viewing software. In October 2011, the court

specifically ordered the coroner's office to make its exhibits available to both the State and the defense for inspection. *Trial Record*, pp. 1982-83.

At the post-conviction evidentiary hearing, DeLuca acknowledged receiving the disclosure, and agreed that it clearly stated the disk included the software program required to view the x-rays. DeLuca testified that when he opened the disk on his office computer, he saw three illegible x-rays labelled with the file extension ".jpg", [5] which the court describes as follows: BenKingan1.jpg (white outline of half-circle with u-shaped line on left and no visible bones); BenKingan2.jpg (child's upper body, faintly showing ribs, upper arms and shoulder bones); and BenKingan3.jpg (darkened image of child's lower body).

DeLuca testified that the disk also included icons for a computer program called "Tiger", but neither he nor his secretary were able to activate the program at that time. DeLuca did not try to open the files on a different computer or take further steps in this regard. He further testified that he did not give the September 2011 disk to his medical experts, and did not ask them if they could enhance the x-rays on the disk.

At the hearing, DeLuca testified that when he learned of Ben Kingan's October 2008 bump on the head, his trial strategy became that this bump was the original source of Ben's fracture and ultimately focused on re-bleeding from a chronic subdural hematoma as Ben's cause of death. DeLuca stated the existence of a fracture was part of the defense's theory of cause of death. DeLuca testified that after the trial he became aware of what he called a "second set of x-rays" that showed the absence of a skull fracture. He described these images including text at the top identifying the patient as Ben Kingan, as being taken on January 15, 2009, and containing the

---

[5] The hearing transcript spells the file extension ".jpeg" while the actual spelling on the September 2011 disk is ".jpg". Both stand for "joint photographic experts group" and are essentially interchangeable. See generally www.support.microsoft.com/en-us/kb/272399 (last visited Sept. 27, 2016). For simplicity, the court will use the ".jpg" spelling.

13

file extension ".tiff". He claimed that if he had x-rays that showed no skull fracture prior to trial it would have impacted his choice of experts and affected his trial strategy. He stated that although some of the defense experts questioned the existence of the fracture, they could not be sure. According to DeLuca, without legible x-rays, the defense had nothing to rebut the evidence that a skull fracture existed.

On cross-examination, DeLuca confirmed he received a report in April 2011 from Dr. Teas, one of his retained experts. DeLuca acknowledged that in that report, Dr. Teas stated she met with Dr. Choi on September 23, 2010 (approximately one year prior to the September 2011 disclosure), and relied upon x-rays, as well as other materials, in forming her opinions in the case. DeLuca stated that he was unaware whether these x-rays were legible, and he did not know what his expert looked at. He also admitted that he received Dr. Teas's report in April 2011— five months prior to the State's Attorney's discovery of the x-ray images—as well as her notes from her earlier meeting with Dr. Choi in which Dr. Teas specifically recommended obtaining the images.

The State entered into evidence the report DeLuca received from Dr. Teas, dated April 14, 2011. In addition to stating that she relied upon x-rays of Ben Kingan to form her opinion, Dr. Teas's report provided: "Dr. Choi has described a small linear skull fracture in the right parietal region. This possible fracture is located at the periphery of the subgaleal hemorrhage.....The defect on the right side could also represent an accessory suture. No histology section was taken to confirm that this was a fracture or a suture. Histology would also have helped to possibly age it if it was fracture." Dr. Teas' report concludes: "I do not know if there was a fracture but if it is a fracture, it is not significant.....If the fracture or the timing of the

subgaleal hemorrhage are an issue (they appear to be so) I would recommend exhuming the body to evaluate both histologically."

On the last day of the hearing, Defendant presented a new affidavit by DeLuca. In that affidavit, he states that after providing his earlier testimony, he again reviewed his file and found the x-ray images relied upon by Dr. Teas in her April 2011 report. *DeLuca September 2016 Affidavit,* ¶ 4. He further states that those x-rays were identical to those he received from the State's Attorney in September 2011. *Id.*, ¶ 5.

Paul Forman testified he worked as Deputy Coroner for the Lake County Coroner's office from 2005 to May 2011. His duties required him to collect evidence on suspicious deaths, transport bodies, and assist pathologists with autopsies, including taking x-rays of the bodies. Forman stated he received little training in taking x-rays, mainly attending a 20-30 minute in-house presentation and teaching himself.

Forman testified that he was the Deputy Coroner assigned to the death investigation of Ben Kingan, and took five x-rays of Ben's skull during the autopsy on January 15, 2009. He described his x-rays as "clear and readable", which he explained meant one "can see something, a basic outline or silhouette", and "not completely dark." Forman described the x-rays eponymously as "Paul quality", which he clarified meant that on a scale of "poor" to "good", they were "fair". According to Forman, in other cases, Dr. Choi would request x-rays to be retaken if they were of poor quality, but that he did not do so in this case.

Forman testified that following the January 15 autopsy, he stitched Ben's skull and body back together, and that it was still in that condition when Dr. Choi began his second examination the afternoon of January 16. Forman further testified that, prior to the January 16 examination, Dr. Manuel Montez arrived at the coroner's office to review Dr. Choi's January 15 notes and

15

preliminary report, but (in contrast to his trial testimony) Dr. Montez did not view or physically examine the body.

Current Coroner Dr. Thomas Rudd testified that he has been in office since December 2012 and began reviewing the Kingan file that same month. He testified that the file did not contain print-outs of x-ray images. Dr. Rudd stated that DeLuca provided him with autopsy photographs, transcripts of the trial, Dr. Teas's glass slides, and transcripts of various statements made by Defendant. Dr. Rudd explained that the slides showed a portion of Ben's brain contained membrane with iron deposits, which indicated an old or chronic trauma, not a new or acute one. In April 2013, Dr. Rudd reviewed the file with others, including forensic pathologist Dr. Nancy Jones. (Dr. Jones had initially consulted with the coroner's office around the time of the autopsy. In 2012, she consulted with DeLuca in preparation for post-trial motions and prepared an affidavit containing various opinions in this case.) In response to Dr. Rudd's request in 2013, she again produced a report. Dr. Rudd stated that at this point he did not know whether x-rays existed for this case and did not search for any.

Dr. Rudd testified that he had known Defendant's father, Paul Calusinski, for some time. Dr. Rudd testified that on June 10, 2015, Defendant's father contacted Dr. Rudd to state that he (Paul Calusinski) had received an anonymous phone call about a "second set of x-rays" at the coroner's office. According to Dr. Rudd, he (Dr. Rudd) then contacted Deputy Coroner Mike Reid, who showed him five x-ray images, three of the head and two of the lower body, and told him that one or two of the images were newly saved. Dr. Rudd then identified five images from the disk created on June 10, 2015 (the "June 2015 disk") as the images Reid provided to him, which the court describes as follows: BenKingan1.tiff (white outline of half-circle with u-shaped line on left and no visible bones); BenKingan2.tiff (child's upper body, faintly showing ribs,

16

upper arms and shoulder bones); BenKingan3.tiff (same as BenKingan2.tiff with more bone detail); BenKingan4.tiff (darkened image of child's lower body); and BenKingan 5.tiff (lightened image of child's lower body). Each of these images contained text at the top, including identifying the patient as Ben Kingan and the "date acquired" as January 15, 2009, and reflected a .tiff file format.

Dr. Rudd testified that he examined the images and did not see a skull fracture. He then made copies of these five images and sent them to Dr. Jones and Defendant's current attorney, Kathleen Zellner. Dr. Jones subsequently issued a second report in which she changed her opinion on the cause of death.

Dr. Rudd confirmed he is currently running for re-election. He admitted to speaking with numerous press outlets about this case and obtaining publicity from this case beginning in 2013. Dr. Rudd testified that he has appeared in public wearing buttons containing the message "Free Melissa", and that he associates with various local activists who publically demonstrate on behalf of Defendant. According to Dr. Rudd, June 10, 2015, was "a big day" because he believed he found clear x-rays that showed Defendant was innocent.

Defendant's father, Paul Calusinski, testified[6] that he received a phone call on the telephone at his home about his daughter's case on June 10, 2015. On cross-examination, Calusinski admitted that in his June 2015 affidavit, he stated he received that call not at home but instead on his cell phone. Calusinski testified that the affidavit was brought to him by someone from Ms. Zellner's office, and that he just "glanced" through it before signing it with the notary.

---

[6] The court notes that neither party intended to call Paul Calusinski to testify at the hearing (instead relying upon his earlier affidavit) until the defense rebuttal case. As a result, he was permitted to remain in the gallery and observe the testimony of the other witnesses during hearing. Nonetheless, the court permitted him to testify despite its earlier reciprocal order excluding witnesses.

Deputy Coroner Mike Reid has worked at the Coroner's office for 13 years. Reid testified that one of his duties is assisting pathologists at autopsies, including taking x-rays. Reid stated that his training primarily occurred on the job, learning from other deputy coroners. Reid stated his involvement in this case began when Dr. Rudd asked him to look for x-rays on June 10, 2015.

Reid explained that the coroner's x-ray machine consists of a generating unit and recording process. The generating unit attached to the wall is over 13 years old, outdated, and not like current hospital machines. In 2009, the generating unit would beam the x-rays onto a photosensitive plate that reacts to x-rays similar to film. Reid stated the plate was then fed through a reading device that extracts the image from the plate and uploads it to a computer software program called Tigerview, which is used to view the images. According to Reid, that software has been updated a few times.

Reid also explained that the x-rays are stored on a single computer in the autopsy room of the coroner's office. The computer requires a login password to access the files. According to Reid, an Assistant State's Attorney would not be able access the x-ray files without a login to the coroner's system.

On June 10, 2015, Dr. Rudd asked Reid whether any x-rays existed for Ben Kingan. Reid then went to the x-ray computer, accessed the Kingan file, and located x-ray images. Reid then informed Dr. Rudd, who asked whether the x-rays were readable. Reid examined the x-rays; because they did not look "tremendously usable", he used the Tiger software to brighten the image of Ben's upper body and head. Reid then saved that adjusted image in the Kingan folder on the computer. Reid informed Dr. Rudd that the images were adjustable. Dr. Rudd asked him to make a disk of all the images, and Reid used the Tiger software to export all the images to a

18

compact disk (the "June 2015 disk"). Reid specifically testified that he never told Dr. Rudd that he found a "second set of x-rays."

During the hearing, Reid accessed the coroner's computer containing x-ray files. The patient files are listed alphabetically by name and Reid displayed Ben Kingan's file onscreen for the court. Five thumbnail images appeared. Reid stated that four images appeared when he first pulled up the file on June 10, 2015, and that he created the fifth image when he made the adjustments to one of the original images. One thumbnail, identified by Reid as the one he adjusted, appeared larger than the other four.

Former Assistant State's Attorney Matthew DeMartini testified that he reviewed a copy of the September 2011 disk when it was tendered to the defense. That disk contained three x-rays plus the Tigerview program to view them. DeMartini explained that the viewing program could enlarge the x-ray, as well as change its brightness or tint. DeMartini stated he had no difficulty opening the program on the desktop computer in his office. He also stated he attempted to improve the x-ray images using the Tigerview program. DeMartini confirmed that the disk tendered to DeLuca contained the identical software he used himself.

DeMartini testified that on September 16, 2011, he met with Deputy Coroner Reid at the coroner's office to see whether Reid could improve the x-ray images. He described the coroner's office as a secure facility, and DeMartini (lacking access himself) was ushered inside. Reid brought DeMartini to the x-ray computer in the examining room. Reid used the computer the entire time; DeMartini did not touch the machine. Reid pulled up three x-rays from the Kingan file and used Tigerview to make similar adjustments that DeMartini had attempted in his office, but ultimately could not enhance the images any better than DeMartini could.

State's Attorney Investigator William Biang testified that he has been a sworn law enforcement officer since 1978, rising to chief of the Waukegan Police Department before serving as a State's Attorney investigator for the past eight years. Biang obtained the cell phone records of both Dr. Rudd and Defendant's father, Paul Calusinski, for June 10, 2015, the date Paul Calusinski stated in his affidavit that he received an anonymous phone call on his cell phone concerning the alleged existence of a second set of x-rays. The records revealed that neither man received a call from a number that could not be identified. The records also showed that multiple calls occurred at that time between Paul Calusinski, Dr. Rudd, DeLuca, and the office of Defendant's current counsel, Kathleen Zellner. On cross-examination, Biang stated that the records only show that the respective phones made or received those calls, and not who actually spoke during those conversations.

Biang also interviewed Deputy Coroner Forman prior to the hearing. On July 28, 2015, Biang met Forman at a local Panera Bread restaurant. At that time, Forman told Biang that he had taken two x-rays of Ben Kingan at the autopsy, one each of the head and torso. Forman said he took the x-rays on film, Dr. Choi looked at them on the "light box", and Forman tagged the film and put it into a file. Forman indicated he did not know how to upload x-rays onto the computer at that time. On August 6, 2016, Biang met Forman in front of Forman's home in Antioch. Forman told Biang he had no formal training in taking x-rays and was not a radiologist. Forman again told Biang he took two x-rays, but Forman could not recall whether they were with film or digitally uploaded into a computer. At that time, Forman stated he felt "pushed down many different roads" and he "didn't like it". Forman did not explain what he meant by these statements.

20

David Thomas, a police officer for the Lake Bluff Police Department from 2001 to 2013, testified that in 2009, he was a member of the Lake County Major Crimes Task Force and acted as the second-in-charge of the evidence technician group on the Ben Kingan case.

Thomas attended Ben Kingan's autopsy on the afternoon of January 16, 2009, and identified a series of approximately 50 photographs depicting the course of the examination generally and the condition of Ben's head specifically. At the beginning of the examination, Ben's skullcap was detached from his head. Thomas observed Forman stitch the head closed following the examination and before they attempted to duplicate the mechanism of Ben's injuries.

On cross-examination, Thomas confirmed that he was not responsible for sewing up the body and was unaware of any protocols requiring the body to be stitched before storage each evening. He was unaware if Forman removed any stitching from the skull cap prior to his arrival. Thomas was not present at the autopsy on January 15, 2009, and did not know whether the brain had been removed and dissected prior to January 16.

Eric Stauffacher is a software engineer for Televere Systems, the company that created Tigerview, the digital x-ray software used in the Coroner's office. Tigerview allows customers (usually doctors, dentists, veterinarians, and sometimes coroners) to shoot an x-ray and then load it into the software to view on a computer. Stauffacher reviewed the Coroner's x-ray computer and records. Tigerview software version 7.0.12 was first installed in August 2008, and was updated to version 7.7.3 on January 21, 2015.

Stauffacher explained that the Tigerview program is not involved in the actual taking of x-rays. An x-ray machine first shoots the x-ray onto a white phosphorus plate, and a program called ScanX then scans the image and transfers it to the Tigerview software. The quality of the

H_21

x-ray machine and the skill of the technician affect what is uploaded to Tigerview. For example, the amount of radiation used in taking an x-ray is a factor that affects the quality of the image: too much radiation results in an x-ray image that is too dark, while too little radiation yields an x-ray image that is too light. Stauffacher also stated that every particular computer monitor will show an x-ray image differently based on the monitor's manufacturer and individual screen settings.

During the hearing,[7] Stauffacher accessed the coroner's computer containing x-ray files and displayed Ben Kingan's x-ray images onscreen for the court. Five thumbnail images of x-rays appeared, with one larger than the other four. Stauffacher opened one of the thumbnail images; it included text regarding the patient's name and the date acquired at the top. Stauffacher explained that the text is called the patient overlay. The overlay is not actually a part of the x-ray, and the image can therefore be exported either with or without this text.

Each image has a corresponding "properties" file, which displays information such as the file format, its location, size, as well as three date and time stamps: "created", "modified", and "accessed". The "created" date reflects when the Windows operating system "believed" the file was created, while the "modified" date reflects the date Tigerview acquired the image. However, because of the Tigerview software upgrade on January 21, 2015, x-ray files created before the upgrade all reflect a "created" date of January 23, 2015, two days after the upgrade. For those files, the "modified" date reflects the actual date the x-ray image was acquired by Tigerview. That upgrade also makes the thumbnail images larger with new images for ease of viewing.

---

[7] Stauffacher testified on August 19, 2016.

22

Stauffacher testified Tigerview stores images with a .tig file extension designation, which he explained is simply a Televere designation of a .tiff file format in the Tigerview program. He further explained that the Tigerview software sequentially numbers x-ray images as they enter the program. Thus, the filenames img48.tig, img49.tig, and img50.tig reflect that these images uploaded one after the other, while file img446.tig uploaded later than those three, and file img710.tig uploaded even later still.

Stauffacher accessed the filename and properties for each of the Ben Kingan x-ray images on the coroner's computer, as follows:

- img48.tig displayed a darkened thumbnail image of a child's lower body, with a "created" date of January 23, 2015, and "modified" date and time of January 15, 2009, 2:42:10 p.m.

- img49.tig displayed a thumbnail image of a child's upper body, with a "created" date of January 23, 2015, and "modified" date and time of January 15, 2009, 2:52:40 p.m.

- img50.tig displayed a nearly blank grey thumbnail, with a "created" date of January 23, 2015, and "modified" date and time of January 15, 2009, 2:58:38 p.m.

- img446.tig displayed a lightened thumbnail image of a child's lower body, with a "created" date of January 23, 2015, and the "modified" date and time of August 30, 2011, 4:09:59 p.m.

- img710.tig displayed a larger thumbnail image than the others, showing the same perspective and position as img49.tig, with a "created" date of June 10, 2015, and a "modified" date and time of June 10, 2015, 2:03:56 p.m.

Stauffacher accessed img49.tig with the Tigerview program. He used sidebar tools to adjust the image so that bones were more visible. He explained that this did not create a new x-

23

H_23

ray, but simply changed the light levels on the image that already existed in the Tigerview system.

Tigerview allows images to be exported to a compact disk (CD). The user has options such as whether to apply any viewer adjustments, embed annotations, and include a CD viewer. Stauffacher stated that the CD viewing software allows adjustments to the images similarly to the software on the coroner's computer. Stauffacher then demonstrated how the x-ray images could be adjusted, using the .jpg images from the September 2011 disk containing the 2008 version of Tigerview. The court observed Stauffacher adjust the images so that they looked similar to the adjustments he made with the Tigerview program on the coroner's computer. Stauffacher also testified that Televere had a support line for Tigerview available to non-customers.

The State presented People's exhibit 137, depicting side-by-side x-ray images of Ben's skull. Stauffacher created the exhibit using the 2008 version of Tigerview. He adjusted BenKingan2.jpg from the September 2011 disk, as shown on the left side of the exhibit. BenKingan3.tiff from the June 2015 disk appears on the right side of the exhibit. BenKingan3.tiff contains text absent from BenKingan2.jpg, which Stauffacher explained is the patient overlay that the user has the option of exporting with an image to a CD.

On cross-examination, Stauffacher stated that a .jpg file is a compressed version of a .tiff file. He explained that files are commonly converted to .jpg for a number of reasons. For example, he explained that many of Televere's customers wish to send files by e-mail. Accordingly, Tigerview provides the user the option to select the file format in which to export an image, such as .jpg to reduce the file size and facilitate e-mailing. In addition, he explained that .jpg is a common format that can be opened by many varieties of software. He admitted that the more compressed the file is, the "blockier" it may appear. Stauffacher concluded that when it

24

comes to image quality, it is "garbage in, garbage out", which he explained meant the image uploaded into Tigerview determines whether it is clear in Tigerview and that it is not the format of the export.

Stauffacher compared the properties of the images from the September 2011 disk with the properties of the images from the June 2015 disk. Each of the September 2011 images was in a .jpg format, and the size of each measured in kilobytes. Each of the June 2015 images was in a .tiff format, and the size of each measured in megabytes. Stauffacher testified that, because the June 2015 images were exported with the writing on them, Tigerview treated them as color images and increased the file size. In addition, he testified that .tiff files are generally larger than .jpg files regardless.

Without objection, the defense called Jeff Mueller to testify[8] as an expert in "imaging". Mueller described his background in computer science and familiarity with all types of images, file formats, and their manner of storage on a computer's hard drive. He stated he is familiar with both the 2008 and 2013 versions of Tigerview. Mueller testified that the 2008 version of Tigerview would default to exporting images as .jpg files, and that he examined the coroner's computer, including everything relevant to Ben Kingan.

At the hearing, using his own laptop, Mueller displayed x-ray images that he copied from the coroner's computer and from the September 2011 disk. In comparing the images, Mueller noted that the images from the coroner's computer were in .tiff file format, with a file size between 16 and 18 megabytes. The images from the September 2011 disk were in .jpg file format, with file sizes between 400 and 600 kilobytes. Mueller demonstrated his attempts to recreate the September 2011 images from the .tiff files on his laptop, manipulating them to near

---

[8] Mueller testified on September 16, 2016.

the same size as the .jpg files. Mueller also stated he had earlier spent hours trying to improve the images on the September 2011 disk to be like images on the coroner's computer, but knew he would be unable to do so because they were in the .jpg format.

On cross-examination, Mueller stated that he had never done a forensic examination for a criminal case. Mueller admitted he was unfamiliar with the term "write-blocker" in a forensic context, but that he did not alter the data in this case in any way. In addition, he confirmed that he had contacted Televere's customer assistance more than once while working on this case, and that they even "remoted" into his laptop to assist him use the software.

State's Attorney Investigator Dean Kharasch testified that he has been a sworn law enforcement officer for 20 years, an investigator with the Lake County State's Attorney's office for 15 of those years, and assigned to the cybercrimes division for the past 10 years. He has received training in forensic analysis of computers, networks, and digital or electronic media, and performed over 2000 computer forensic examinations. Kharasch explained that forensic examinations involve the analysis of digital media. Various tools, called "write-blockers", allow the examination of a computer's data without altering it. Kharasch stated that the goal of a forensic examination is not to alter the data, and Kharasch is trained to access data in a non-invasive manner.

According to Kharasch, when performing the forensic analysis of a computer, the examiner initially obtains a forensic image. A forensic image is a bit by bit, exact duplicate and verified copy of the computer's original data. Obtaining a forensic image preserves the data without the original being altered.

Kharasch was present on August 22, 2016, when Mueller examined the coroner's computer at the coroner's office.[9] According to Kharasch, Mueller did not begin by obtaining a forensic image. Instead, Kharasch observed Mueller accessing the computer as a regular user would—by turning it on, and "clicking around".

Kharasch observed Mueller access the Tigerview program, various files, and even the coroner's network drive. Mueller then accessed the Ben Kingan x-ray images file folder in Tigerview, showing five thumbnail images. Kharasch began photographing the computer screen to document Mueller's actions. Mueller then accessed one of the images of the skull, adjusted the brightness, and saved the image. The Ben Kingan folder now contained six images, which Kharasch documented with a photograph of the screen.

After Mueller accessed the coroner's network drive, he placed a USB flash drive into the coroner's computer and copied files onto the flash drive. Mueller downloaded hundreds of data files and images. Kharasch also observed Mueller go onto the internet from the coroner's computer to access the computer's internet history. Kharasch stated that Mueller "most definitely" altered data on the coroner's computer.

The defense presented Dr. Robert Zimmerman, chief of pediatric magnetic imaging at Children's Hospital of Philadelphia, as an expert in pediatric neuroradiology. Dr. Zimmerman testified that a linear fracture in the back area of the skull is commonly associated with abuse and generally occurs in situations where there is shaking with impact, such as when a child is shaken and his head repeatedly hits the floor. Abuse typically yields a long linear fracture or several fractures. He also testified that the absence of a fracture goes against a diagnosis of traumatic impact and suggests a more accidental injury.

---

[9] The computer had been introduced into evidence as State's Exhibit 32. At the conclusion of evidence on August 19, 2016, by agreement of the parties, it was withdrawn and returned to the coroner's office.

Dr. Zimmerman reviewed Defendant's recorded confession, and in his opinion, Defendant's re-enactment is not consistent with the injuries that Ben sustained because Ben was facing away from Defendant. He stated that this positioning would lead to a possible linear fracture in the front of the skull, not the back.

Dr. Zimmerman viewed the x-ray image BenKingan2.jpg from the September 2011 disk. Describing the image as "horrible", he added he would have fired the technician who took it. In his opinion, the image was not sufficient to diagnosis a skull fracture. In addition, he did not believe using software to lighten the image would yield an image of the quality needed to make such a diagnosis. Dr. Zimmerman also viewed the x-ray image BenKingan3.tiff from the June 2015 disk, which he found of sufficient quality, and stated his opinion that no fracture in the back of the skull is present. Dr. Zimmerman admitted that the x-ray was taken from Ben's front, and he did not view any images from the side or the back of the head.

Dr. Zimmerman testified that he did not believe it was possible for someone to have examined Ben Kingan's skull and actually touch or manipulate a fracture in the occipital parietal bone but not have that fracture appear on an x-ray. He specifically testified that it was not possible for a fracture to exist without appearing in an x-ray.

The defense presented affidavits by Dr. Nancy Jones, which reflected that she has board certifications in clinical, anatomic, and forensic pathology. Dr. Jones initially consulted with Deputy Coroner Forman concerning this case in January 2009. At that time, Forman informed Dr. Jones that only acute injuries existed, and Dr. Jones provided information and references accordingly. In 2012, after the trial, Dr. Jones reviewed various information from defense medical experts, including their opinions of an organizing subdural membrane, and prepared an affidavit for Defendant's post-trial motions.

28

In a June 2015 affidavit, Dr. Jones stated that "a review of the photomicrographs and histology slides reveal the existence of numerous siderophages, positive iron stains, and hemosiderin laden macrophages, confirming the existence of the well-developed, organizing subdural membrane."  In her opinion, the autopsy photographs reveal a recent subdural and subarachnoid hemorrhage in addition to an old injury.

Dr. Jones noted that the autopsy photographs show that what had been identified as a .8 inch linear skull fracture was near to, but not involved in, the 4-inch-by-4-inch subgaleal hemorrhage on the back of Ben's head.  Dr. Jones also stated that there was no hemorrhaging in the area of the skull defect, and a similar defect existed on the left side of Ben's skull.  Dr. Jones concluded that the lack of hemorrhage in the area near the defects would weigh against them resulting from blunt trauma injuries.  The lack of hemorrhage would be more consistent with a normal variation in the skull called an accessory suture rather than a fracture.  The autopsy photographs also show an area of brown discoloration in the hemorrhage, indicating healing.

Dr. Jones relied upon BenKingan3.tiff to determine that Ben's head was abnormally shaped.  Dr. Jones stated: "It was known that Ben Kingan's head circumference stayed around the 50[th] percentile for about the first year of his life; at his 15-month visit, Ben Kingan's head circumference had grown to the 75th percentile; and at the time of his death, his head circumference measured in the 95th percentile; this evidence combined with the findings on the previously undisclosed x-ray [BenKingan3.tiff from the June 2015 disk] are indicators of significant head trauma that occurred well before his death."  According to Dr. Jones, the head shape shown in the x-ray is consistent with previous swelling of the brain which led to the enlargement of the skull.

29

According to Dr. Jones, swelling of the head due to an acute injury may occur overnight, but not to the extent seen in BenKingan3.tiff. Swelling of the head from an acute injury is also manifested by the separation of cranial sutures. BenKingan3.tiff showed that the cranial sutures were not separated, indicating a chronic condition. Further, Dr. Jones identified an accessory suture on the right parietal bone, and opined that it was this suture that Dr. Choi misidentified as a fracture.

Dr. Jones concluded that in her opinion, if the defense experts had been provided with BenKingan3.tiff from the June 2015 disk, they would not have concluded that the mechanism of death was a re-bleed. Rather, the defense experts would have concluded that the mechanism of death was cerebral edema, arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident within 15-20 minutes of Ben becoming unresponsive. Dr. Jones stated that it is impossible to conclude, to a reasonable degree of medical certainty, that the final head injury was intentionally inflicted.

Dr. Choi also provided several affidavits in conjunction with this proceeding. In his first affidavit, attached to Defendant's original June 2015 petition for post-conviction relief, Dr. Choi stated that he missed that Ben "had suffered an old ~~significant~~ [sic] injury that pre-dated January 14, 2009." *Choi July 2013 Affidavit,* ¶ 4. In the affidavit, the word "significant" appears crossed-out and initialed by Dr. Choi and the notary. He continues: "[T]he the photomicrographs and histology slides of Benjamin reveal there are numerous siderphages, positive iron stains, and hemosiderin lade microphages which confirm the existence of a ~~well~~ [sic] developed, organizing subdural membrane, which indicated an older injury that pre-dated January 14, 2009." *Id.,* ¶ 5. Again, the word "well" appears crossed-out and initialed by Dr. Choi and the notary. Dr. Choi

30

H_30

concludes: "[I]t is my opinion based on a reasonable degree of medical certainty, that at the time

of his death, Benjamin Kingan has suffered a ~~significant~~ [sic] head injury prior to January 14,

2009, as evidenced by the well-developed, organizing subdural membrane present, which

indicated an older injury that pre-dated January 14, 2009." *Id.*, ¶ 7. Again, the word

"significant" appears crossed-out and initialed by Dr. Choi and the notary.

      In a subsequent affidavit, presented at the hearing by the State, Dr. Choi stated that in a

review of the histology slides several years after trial, he did observe "some iron cells." *Choi*

*September 2016 Affidavit*, ¶ 5. He further stated that he crossed out the words "significant" and

"well developed" in his July 2013 affidavit because his opinion is that "this was not a significant

injury or a well-developed organizing subdural membrane." *Id.*, ¶ 6. Dr. Choi concludes that his

opinion as to Ben's cause of death has not changed; the death was not the result of a re-bleed or

"due to cerebral edema arising from repetitive concussions which were produced by a significant

head injury on October 27, 2008 and which subsequently developed later into a chronic

hematoma and additional head banging incidents culminating in a final head banging incident

within 15 minutes of death." *Id.*, ¶ 7.

## ANALYSIS

      The Post–Conviction Hearing Act (Act) (725 ILCS 5/122–1 *et seq.*) provides a defendant

with a method to challenge her conviction if she can show that she has suffered what the law

deems to constitute a substantial deprivation of her constitutional rights. *People v. Pendleton*,

223 Ill.2d 458, 473 (2006). Illinois law also allows post-conviction relief under the Act on a

claim of actual innocence based upon newly discovered evidence. *People v. Washington*, 171

Ill.2d 475 (1996); *People v. Coleman*, 2013 IL 113307. In her post-conviction petition,

31

H_31

Defendant makes two main claims: that the State withheld evidence in violation of her due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and that this evidence shows that she is actually innocent. Defendant has also requested leave to amend her petition to add a claim that her conviction was obtained through the use of perjured trial testimony. The court will address that issue first.

### Defendant's request for leave to amend -- claim of perjured trial testimony

The court conducted the post-conviction evidentiary hearings on August 18, August 19, and September 16, 2016. On the afternoon of September 14 (two days prior to the conclusion of the hearing), Defendant requested leave to add a claim that the State obtained her conviction with the presentation of perjured trial testimony.

The Act creates a three-stage process for the adjudication of post-conviction petitions. *People v. Johnson*, 401 Ill.App.3d 685, 691 (2d Dist. 2010). In the first stage, the trial court may dismiss the petition if it fails to state the gist of a claim or is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2). If the petition is not dismissed, it advances to the second stage where the State may either answer or move to dismiss the petition, either in whole or in part. *Johnson*, 401 Ill.App.3d at 691; 725 ILCS 5/122-5. For claims not dismissed at that stage, the trial court will then conduct an evidentiary hearing on the merits. *Johnson*, 401 Ill.App.3d at 691; 725 ILCS 5/122-6. Defendant's original petition has progressed through the entire three stages of the post-conviction process.

The Act also provides that the trial court "may in its discretion make such order as to amendment of the petition . . . as shall be appropriate, just and reasonable and as is generally provided in civil cases." 725 ILCS 5/122-5. The Code of Civil Procedure provides that the trial

32

court may, in an exercise of its discretion, allow a pleading to be amended "at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2-616(c). That said, a review of case law in Illinois reveals that such amendments (indeed, requests to permit such amendments) are typically brought not during trials but at the pleading stage, often after the discovery of a defect in the original pleading to prevent a dismissal based upon the pleadings (often without prejudice); indeed, Defendant's citations are to cases along those lines: *People v. Brown*, 336 Ill.App.3d 711 (1st Dist. 2002) (second stage post-conviction proceeding, addressing summary dismissal on the pleadings); *People v. Scullark*, 325 Ill.App.3d 876 (1st Dist. 2001) (at pleadings stage, permitting amendment to cure defect regarding allegation of lack of culpable negligence (pre-*Pitsonbarger*)); *Cantrell v. Wendling*, 249 Ill.App.3d 1093 (5th Dist. 1993) (dram shop action, amendment of pleadings to survive 2-615 motion to dismiss).

In this case, because Defendant sought to add the new claim at the eleventh hour of the evidentiary hearing, that claim never progressed through the typical post-conviction process. The State did not have the opportunity, as the Act provides, to move to dismiss the claim, and the court did not have the opportunity to evaluate it for dismissal. Despite this avoidance of second-stage scrutiny, the allowance of material amendments remains largely within the discretion of the trial court. *Brown*, 336 Ill.App.3d at 716–17.

Defendant claims that Deputy Coroner Forman's August 18 hearing testimony shows Dr. Montez presented false trial testimony for the State when Dr. Montez stated he physically examined the body of Ben Kingan the morning of January 16, 2009. A pleading may be amended to add a new theory of recovery (even after the close of evidence) if the evidence supports the new cause of action and the other party is not unfairly taken by surprise. *People v.*

33

*Washington*, 256 Ill.App.3d 445, 449 (1st Dist. 1993), *aff'd*, 171 Ill.2d 475 (1996). While Defendant correctly points out that the significance of Dr. Montez's testimony has been argued by the parties during the proceedings, it is also true that Defendant's specific claim that Dr. Montez's testimony was perjured and therefore constitutes an independent basis for post-conviction relief had never been raised until her request to amend. Thus, the State may well have been taken by surprise. Yet, in this case, the court finds the State was not *unfairly* taken by surprise. Defendant's request did not occur after the close of evidence. The State was present during Forman's August 18 testimony (the basis of Defendant's request to add this claim), and therefore could plan for and present its response on the September hearing date—which, in fact, the State did. As a result, the court in its discretion grants Defendant's request for leave to amend her petition.

Turning to the merits of Defendant's claim, the court finds that its sole evidentiary basis is Forman's hearing testimony. Forman testified that he stitched Ben's skull together after the first autopsy on January 15, 2009. He further stated that when Dr. Montez came to the coroner's office the following morning he did not physically touch or examine the body. Forman testified that when Dr. Choi began his second examination later that afternoon, the skull was still stitched together. From this testimony—and this alone—Defendant concludes that Dr. Montez must have falsely testified at trial that he physically examined the body and actually touched a fracture in Ben's skull.

At a third-stage evidentiary hearing, it is the court's function to serve as fact finder, to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts. *People v. Carter*, 2013 IL App (2d) 110703, ¶ 74. Based upon its

34

opportunity to view Forman testify, consider his manner while testifying, and weigh that testimony in light of all the evidence, the court finds that this testimony lacks credibility.

First, Forman's testimony has been directly refuted. It is undisputed that Officer Thomas attended the second examination with Forman and Dr. Choi on January 16, 2009. When Thomas first saw the body that day, the skull cap was not stitched to the head. In addition, the series of photographs from that examination clearly support Thomas' testimony. The first photographs show the head with the skull cap removed. No stitches are present, and there are no stitch marks or holes that would suggest that stitches had been removed. The photographs taken at the conclusion of the examination depict stitches of large white twine holding the skull cap to the head. The twine created visible holes in the skin on the head that would be noticeable had the twine been removed. It is clear to the court that Ben's skull cap was not stitched to his head after the autopsy on January 15, 2009, as Forman testified.

Aside from this extrinsic evidence contradicting Forman's testimony in this regard, his credibility was also impeached in other ways. While on the witness stand, Forman clearly and repeatedly stated that he took five x-rays of Ben's body on January 15, 2009. This testimony was inconsistent with his earlier statements to Investigator Biang in two separate meetings about a year apart in which he stated that he took two x-rays. More importantly, both versions are contradicted by the evidence from the coroner's computer showing three x-rays of Ben's body were taken on January 15, 2009.

Finally, the court notes that it also had the opportunity to observe and evaluate Dr. Montez's testimony during trial, similar to its opportunity to evaluate Forman's testimony at the hearing. *See Pendleton*, 223 Ill.2d at 473 (trial judge's experience and familiarity with defendant's trial is significant when fact-finding and credibility determinations are made).

Having considered all the evidence, the court finds that Defendant has failed to present credible evidence showing a constitutional deprivation based upon perjured testimony. As a result, this newly-added claim for post-conviction relief is denied.

### Defendant's *Brady* claim:

### 1. A "second set of x-rays" never existed

Defendant's petition alleges that the State failed to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* claim must show: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill.2d 56, 73-74 (2008). The *Beaman* court further explained:

> Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. To establish materiality, an accused must show the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* (citations and quotations omitted).

Defendant launched her post-conviction expedition based upon claims that a "second set of x-rays" of Ben Kingan's autopsy existed that the State withheld from the defense in violation of *Brady*. Both DeLuca and Dr. Rudd refer to the June 2015 disk as a "second set of x-rays", implying that a first, illegible set was taken and tendered to the defense, and that a second, more readable set was then taken and withheld. This second set of x-rays, according to Defendant, shows that Ben's skull was not fractured, and therefore supports her theory that Ben's death was not the result of a violent intentional act, but rather the result of an injury sustained in October

2008 and aggravated by his repeated head-banging. However, after a complete review, the evidence clearly establishes that no "second set of x-rays" ever existed.

Preliminarily, the court notes that it is unclear in this case whether knowledge of materials possessed by the coroner's office can be imputed to the State's Attorney for *Brady* purposes. In *In re C.J.*, 166 Ill.2d 264 (1995), the Illinois Supreme Court considered the scope of the State's constitutional discovery obligations. In *C.J.*, the defense alleged that the Department of Children and Family Services (DCFS) destroyed potentially exculpatory evidence. The trial court found that DCFS's actions were imputed to the State and constituted a constitutional violation. The supreme court disagreed, writing that "[g]iven that child abuse has both criminal and social welfare implications, DCFS and the State's Attorney may naturally share some involvement in a particular case. However, that criminal prosecution may result from that involvement is insufficient to impute knowledge between the agencies." *C.J.*, 166 Ill.2d at 270. Indeed, nearly a quarter of a century ago, the Illinois Supreme Court held that if it "were to conclude that the knowledge of every State employee who is involved in a criminal case is imputed to the prosecution, the control over criminal cases would be placed in the hands, and at the mercy, of every employee who touches the case." *People v. Robinson*, 157 Ill.2d 68, 79-80 (1993) (possession of items by officer of Department of Corrections not imputed to State).

In *People v. Leach*, 2012 IL 111534, the Illinois Supreme Court addressed whether a coroner's report (coincidentally involving our same Dr. Choi) constitutes testimonial hearsay pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004). In addressing that question, the court held that the coroner's "office is not a law enforcement agency and it does not conduct autopsies and prepare autopsy reports with the primary purpose of their being used as evidence in future criminal trials of targeted individuals. Even if Dr. Choi knew or suspected that his report in this

37

H_37

case would likely be used in a future criminal trial, his function was not the production of evidence for use at trial." *Leach*, 2012 IL 111534, ¶ 125 (internal quotations omitted). Thus, the court concluded that the report did not constitute testimonial hearsay, because the medical examiner's office performed the autopsy as required by its own duties under the law. *Leach*, 2012 IL 111534, ¶ 127.

As applied to this case, the question becomes whether the coroner's possession of the x-rays is imputed to the State for *Brady* purposes. Read together, *C.J.*, *Robinson*, and *Leach* would seem to suggest that such knowledge should not automatically be imputed. Without that imputation, Defendant's *Brady* claim fails. However, because the parties did not fully address the issue, the court will assume without deciding that the coroner's possession should be imputed to the State's Attorney for *Brady* purposes in this case.

While Deputy Coroner Forman has never been reliable about the number of x-rays he took, it is clear that he only took x-rays of Ben Kingan on January 15, 2009—and the court finds that in fact he took three. In September 2011, those three x-rays were exported from the coroner's computer and provided to the parties. Further, DeLuca received the disk containing the x-rays as well as the means to view and adjust them with the Tigerview program in the September 2011 disk at that time.[10]

Defendant's father, Paul Calusinski, claimed that on June 10, 2015, he received an anonymous call on his cellular phone that the coroner's office may have a set of heretofore unknown x-rays. Although it is clear that Mr. Calusinksi and Dr. Rudd were in regular contact, Mr. Calusinski's cell phone records do not support this claim, and he now testifies that the call

---

[10] It is interesting to note that DeLuca actually had the x-rays several months before the State did. In his September 7, 2016, affidavit, DeLuca admits that he was in possession of the x-rays that Dr. Teas relied upon for her April 2011 report to him. The court finds it is not unreasonable to infer that Dr. Teas gave DeLuca those x-rays at or about the time she gave him her April 2011 report.

came through on his house phone. The court appreciates that Mr. Calusinksi would likely do or say anything to help his daughter. While Mr. Calusinski's (along with Dr. Rudd's) sensational assertions from June 10, 2015, propelled Defendant's claims, in the end the facts do not support them.

What is certain—and of far greater importance—is that on June 10, 2015, Deputy Coroner Reid, at Dr. Rudd's direction, located the x-ray images in the computer. Reid adjusted one and saved it with a new name. He then exported all the images to the June 2015 disk. With the June 2015 disk, Dr. Rudd announced the existence of a "second set of x-rays" (while repeating Mr. Calusinski's account of an anonymous phone call).

The evidence shows that in 2011, the Tigerview software defaulted to exporting images in a .jpg format, while in 2015, the upgraded version defaulted to exporting images in a .tiff format. It is also apparent that, based on their overall testimony and seemingly minimal training in this regard at the coroner's office, neither deputy coroner was aware there may be a difference.

Based upon the credible witness testimony, exhibits, and the court's observations during the hearing, the court makes the following findings correlating the various images, file names, and other data, easily presented in the chart below:

| Description of x-ray image | Filename on coroner's computer | Date entered in Tigerview on coroner's computer | Filename on September 2011 disk | Filename on June 2015 disk |
|---|---|---|---|---|
| white semi-circular outline, u-shaped line to the left; no bones visible | img50.tig | January 15, 2009 | BenKingan1.jpg | BenKingan1.tiff |

39

| child's upper body, faintly showing ribs, upper arms & shoulders; | img49.tig | January 15, 2009 | BenKingan2.jpg | BenKingan2.tiff |
|---|---|---|---|---|
| same as image above; more bone detail, including small marks on sides of skull | img710.tig | June 10, 2015*<br><br>* Reid created file using Tigerview to adjust img49.tig | not present on this disk | BenKingan3.tiff |
| darkened image of child's lower body[11] | img48.tig | January 15, 2009 | BenKingan3.jpg | BenKingan4.tiff |
| lightened image of child's lower body[11] | img446.tig | August 30, 2015 | not present on this disk | BenKingan5.tiff |

Thus, the following central facts emerge: BenKingan1.jpg (as exported to the September 2011 disk) and BenKingan1.tiff (as exported to the June 2015 disk) are copies of img50.tig, an x-ray image originally taken on January 15, 2009.

BenKingan2.jpg (as exported to the September 2011 disk) and BenKingan2.tiff (as exported to the June 2015 disk) are copies of img49.tig, an x-ray image originally taken on January 15, 2009.

BenKingan3.tiff (as exported to the June 2015 disk) is a copy of img710.tig, an adjusted version of img49.tig done on June 10, 2015, as described by Reid.

Consequently, the x-ray images on the June 2015 disk do not constitute a second set of x-rays, but instead are reproductions, in a different file format, of the same x-ray images taken on January 15, 2009, or, as with BenKingan3.tiff, an adjustment of one those images made by Reid on June 10, 2015.

---

[11] Defendant acknowledged in her closing argument at the hearing that the lower body images are not important to this case; the court agrees and finds them immaterial to these proceedings.

The careful observer will note how Defendant's *Brady*-related theories have evolved over the course of these proceedings. During the evidentiary hearing, Defendant appears to have stepped back from her claim that a "second set of x-rays" existed; in the end, she seems to agree that three x-rays were taken on January 15, 2009, and that the State did tender those x-rays (along with the Tigerview software) to DeLuca on the September 2011 disk. Instead, Defendant now seems to be arguing that because the .jpg file format is a compressed version of a .tiff file, the different file formats constitute distinct, independent items of evidence.[12] According to Defendant, this compression resulted in .jpg images that lacked the detail required to determine that no fracture existed in Ben's skull.

The testimony and evidence provided by Tigerview engineer Stauffacher conclusively refute Defendant's claim. During his in-court demonstration, the court observed Stauffacher use the same Tigerview software DeLuca possessed from the September 2011 disk to adjust the variables on the .jpg images to brighten and display more bone detail. Indeed, Stauffacher did this so quickly and easily as to make it seem like child's play. In addition, as Stauffacher testified, every particular computer monitor will show an x-ray image differently based on the monitor's manufacturer and individual screen settings. This is consistent with common experience; pictures may often appear with variations in color, tint, and brightness depending upon the individual and particular settings on a computer and its monitor screen. Adjusting those types of settings—which is essentially what the Tigerview software does—simply does not constitute a *Brady* issue on the facts of this case.

---

[12] Neither party has cited any authority addressing whether different file formats constitute distinct items of evidence. Indeed, after searching both State and federal case law across the United States, the court has not discovered any that squarely addresses this issue. In any event, this case ultimately is resolved based upon its particular facts.

People's Exhibit 137 depicts BenKingan2.jpg from the September 2011 disk after Stauffacher adjusted it with the same software available to DeLuca in a side-by-side comparison with BenKingan3.tiff from the June 2015 disk. The images are substantially similar. Not only do they show the identical body position in the same perspective, both display the same amount of detail in the skull and bones of the upper body. The court notes that the adjusted BenKingan2.jpg image shows two small marks in the skull, one on the left and one on the right, as does BenKingan3.tiff. Dr. Jones refers to these in her affidavit to support her theory of cerebral endema. The court finds no material difference in this case between BenKingan2.jpg and BenKingan3.tiff for *Brady* purposes. Exhibit 137 appears as follows:



H_42

And to resolve any uncertainty for the reader, recall that the image on the left is from the .jpg format on the September 2011 disk and the image on the right is the .tiff format on the June 2015 disk.

Defense software engineer Mueller testified that, based upon his training and experience, the .jpg files could not be modified to look similar to the June 2015 disk .tiff files. He may be a capable software engineer, but Mueller's credibility in this regard was undercut not only by Stauffacher's easy success in doing so, but also Mueller's failure to utilize—and apparent ignorance of—basic forensic procedures regarding preserving original evidence when he examined the coroner's computer and files. In a case such as this, where the primary issue is whether Defendant received all the x-ray images from the coroner, Mueller inexplicably and inexcusably trampled on the evidence by exposing the coroner's computer to potential contamination from the internet, accessing the county network, and ultimately saving another modified x-ray image in the Kingan folder, all after the computer itself had been admitted into evidence during the hearing. The court has no confidence in the forensic integrity of the computer following its withdrawal from evidence on August 19, 2016.

The credible evidence demonstrates that the x-rays on the June 2015 disk are copies of three x-rays originally taken January 15, 2009, and provided to DeLuca on the September 2011 disk, or modifications of those January 15, 2009, x-ray images. It is undisputed that the State delivered three x-rays, as well as the Tigerview program to view and adjust those x-rays, to DeLuca on the September 2011 disk. Once DeLuca had that disk, Defendant possessed all the

43

autopsy x-rays taken of Ben Kingan—that not only the State possessed, but anyone else as well.[13]  No other x-ray images of Ben Kingan were taken after his death.

Upon his receipt of the September 2011 disk (if not before), DeLuca had the means to adjust those images similarly as Deputy Coroner Reid did in June 2015, and as Stauffacher later did for the court.  In other words, DeLuca had the means to adjust BenKingan2.jpg with the Tigerview software to create a similar image to BenKingan3.tiff.  Indeed, in September 2011 the court invited the parties to further address the issue should they deem it appropriate, and in October 2011 granted both parties access to the coroner's office exhibits, which included the files on the coroner's computer.  *Trial Record*, pp. 1812-14, 1982-83.  That DeLuca did not pursue it (perhaps because the presence or absence of a fracture was not actually material to the defense, as considered below) does not transform this into a *Brady* violation.

In sum, the court finds that the State did not fail to disclose evidence to the defense as alleged by Defendant.  *See Beaman*, 229 Ill.2d at 73-74.

### 2. The June 2015 disk images do not constitute material evidence under *Brady*

Separately, Defendant must also show that the x-rays are material based upon the facts of this case to establish a *Brady* violation.  To establish materiality, Defendant must show that the x-ray images from the June 2015 disk could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  See *Beaman,* 229 Ill.2d at 73-74.  Having weighed the potential impact of the x-ray images on the verdict (see *People v. Harris*, 206 Ill.2d 293, 311 (2002)), the court finds that Defendant's claims fail in this regard, as well.

---

[13] Noting again that DeLuca actually had those images in his possession since April 2011 with his receipt of the Teas report.

44

Defendant's post-conviction theory is that the June 2015 x-ray images show that Ben's skull was not fractured. At trial, Dr. Choi testified that he observed, with his naked eye, a fracture that went completely through the skull, and identified that fracture to the jury on autopsy photographs. Dr. Greenbaum similarly identified a fracture on the autopsy photographs of both inside and outside the skull, describing it as a through-and-through fracture. Dr. Montez also showed the jury a fracture on autopsy photographs of both inside and outside the skull. Dr. Montez further testified that he physically touched and manipulated a through-and-through fracture with his hands. Even defense expert Dr. Leestma presumed the existence of a fracture in his testimony.

That said, the jury also heard testimony suggesting that a fracture did not exist. Dr. Choi himself admitted he could not see a fracture in the x-ray image. And Dr. Teas could not definitively say whether a fracture existed; confronted with autopsy photographs, she indicated that additional testing (which Dr. Choi did not perform) would be needed to determine whether the described defect was a fracture or a suture.

Defendant now adds to the mix BenKingan3.tiff and Dr. Zimmerman, who testified at the post-conviction hearing that no fracture could have actually existed because he did not see one on the x-ray. Defendant argues that this would rebut the other evidence concerning the existence of a facture.

Yet the evidence from the hearing (and common experience) demonstrates that various factors—such as the density of an object, amount of radiation used, quality of the x-ray machine, position of the body, and skill of the technician—affect the quality of an x-ray image. Apparently deputy coroners received no formal training in taking x-rays, no instruction on positioning the body, and simply practiced on the job. Dr. Zimmerman himself stated, when

45

viewing the BenKingan2.jpg x-ray image from the September 2011 disk, that he would have

fired the technician who produced it—and yet he testified that the same image, adjusted with the

readily available Tigerview software, showed no fracture existed. The Stauffacher axiom holds

true: garbage in, garbage out. As so many factors can affect whether a fracture would be visible

on an x-ray, it does not necessarily follow that it is impossible for an x-ray *not* to show a

fracture. Therefore, Dr. Zimmerman's testimony fails to establish that the June 2015 x-rays

could reasonably be taken to put the whole case in a different light.

In addition, the testimony of Defendant's own trial experts illuminates the non-

materiality of the x-rays. In her April 2011 report to DeLuca, Dr. Teas states she cannot

tell whether a fracture exists, but if there is one, it is not significant. She suggests a

further microscopic evaluation be conducted if the existence of a fracture is an issue. At

trial, while reviewing autopsy photographs, Dr. Teas again questioned the existence of a

skull fracture. Every time she was asked to render an opinion, either before trial to

DeLuca or during trial for the jury, Dr. Teas never suggested that a "better" x-ray image

would affect her opinion.

It is also interesting to note that, upon receiving Dr. Teas's April 2011 report, DeLuca

took no steps to obtain clearer or more readable x-ray images. Nor did he attempt to seek any

assistance in utilizing the Tigerview program. Further, he made no effort to observe the original

x-rays at the coroner's office, despite the court granting him a specific order to do so. The court

finds that DeLuca's course of action was consistent with his trial strategy—which did not depend

upon the presence or absence of a fracture.

Dr. Jones, along with Dr. Zimmerman, is the medical premise of Defendant's

post-conviction claims. But like Dr. Teas, she opined that no skull fracture existed based

46

upon her examination of the autopsy photograph and other records—without mention of the June 2015 x-ray images. *See Jones 2015 Affidavit,* ¶¶ 17-19. Because Dr. Jones did not rely upon the images from the June 2015 disk to reach the central assertion of Defendant's post-conviction claims—that no skull fracture existed—they were clearly not significant as a basis of her opinion. The images simply do not constitute material evidence for *Brady* purposes.

The court finds that the images from the June 2015 could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the original trial verdict. *See Beaman,* 229 Ill.2d at 73-74. There is no *Brady* violation here.

### Actual innocence claim:  x-rays would not lead to different result on retrial

Illinois law also allows relief under the Act on a claim of actual innocence based upon newly discovered evidence. *People v. Washington,* 171 Ill.2d 475 (1996); *People v. Coleman,* 2013 IL 113307. To support an actual innocence claim, the law provides that the newly discovered evidence must be "new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial." *Washington,* 171 Ill.2d at 489 (internal quotations omitted); *Coleman,* 2013 IL 113307, ¶ 96. The *Coleman* court explained:

> New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. Material means the evidence is relevant and probative of the petitioner's innocence. Noncumulative means the evidence adds to what the jury heard. And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result.

47

*Coleman*, 2013 IL 113307, ¶ 96. The Illinois Supreme Court further explained that, at the evidentiary hearing stage, "the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. The trial court does not re-decide a defendant's guilt in determining whether to grant relief; rather, it considers all the evidence, both old and new together, to in effect predict what another jury would likely do. *Id.* Requests for a new trial based on newly discovered evidence are not looked upon with favor by the courts and must be closely scrutinized. *Carter*, 2013 IL App (2d) 110703, ¶ 75.

As addressed in the *Brady* analysis above, the x-rays on the June 2015 disk are copies of the x-rays taken at the autopsy on January 15, 2009, and provided to the defense in September 2011. As the defense had copies of the x-rays and the means to view and modify them before trial, any modifications reflected in the June 2015 images (*i.e.* BenKingan3.tiff) could have been accomplished prior to trial through the exercise of due diligence. Accordingly, these images are not new.

Dr. Zimmerman's testimony also fails to meaningfully support Defendant's claim of actual innocence. While it is true that Dr. Zimmerman is the only witness to unequivocally testify that no fracture existed, his opinion is based primarily upon the x-rays from the June 2015 disk, and specifically BenKingan3.tiff. An expert's conclusion fails to constitute new evidence when that conclusion is based upon evidence that was available prior to trial. *People v. Patterson*, 192 Ill.2d 93, 140 (2000). As the court found above, Defendant possessed the x-rays before trial, and adjustments to those images (like BenKingan3.tiff on the June 2015 disk) were

48

available to her with the exercise of due diligence. Thus, Dr. Zimmerman's conclusion does not constitute new evidence warranting a new trial.

Dr. Jones's affidavits are similarly unavailing in this regard. Her conclusions are based upon adjustments to the January 15, 2009, x-rays reflected on the June 2015 disk (which the court has repeatedly found to have been available with the exercise of due diligence) and evidence utilized at trial. Like Dr. Zimmerman's, her conclusions therefore fail to constitute new evidence. *Patterson*, 192 Ill.2d at 140. Moreover, although Dr. Jones's opinion that Ben suffered from a cerebral endema differs from the conclusions of Defendant's experts at trial, the underlying reasons for that opinion are mere repetitions of what the jury heard at trial. Her conclusion that the defect in the skull is a suture rather than a fracture echoes Dr. Teas's testimony. Likewise, her conclusions regarding evidence of healing in Ben's skull mirrors both Dr. Teas and Dr. Leestma. Similarly, Dr. Leestma (like Dr. Jones) referred to signs of more recent hemorrhaging. Finally, Dr. Jones herself indicated that BenKingan3.tiff (from the June 2015 disk) merely reinforces the testimony the jury heard at trial about Ben's head growth. Dr. Jones's cumulative testimony does not meaningfully add to what the jury heard and therefore does not support Defendant's claim of actual innocence. *Coleman*, 2013 IL 113307, ¶ 96.

These findings alone are enough to defeat Defendant's actual innocence claim. But even if these images did constitute newly discovered evidence, they and the conclusions derived from them are not of such conclusive character as would probably change the result on retrial. See *Coleman*, 2013 IL 113307, ¶ 96.

Defendant's post-conviction argument is that the June 2015 images show that Ben's skull was not fractured. A trial court must consider all the evidence, both old and new together, to in effect predict what another jury would likely do if it also heard the

49

new evidence. *Coleman*, 2013 IL 113307, ¶ 97. Evidence that merely contradicts or impeaches a witness is typically not of such a conclusive nature so as to justify post-conviction relief. *People v. Montes*, 2015 IL App (2d) 140485, ¶ 25. At best, that is all Defendant could hope for here.

As discussed in detail above, the June 2015 x-rays images, Dr. Zimmerman's testimony, and Dr. Jones's affidavits fail to convince that the jury's verdict would probably be different. Suffice it to say that considering all the evidence, old and new together, this evidence is hardly of such conclusive character as to change the result on retrial. See *Coleman*, 2013 IL 113307, ¶ 96. As a result, Defendant's claim based on actual innocence must fail.

## CONCLUSION

For the reasons stated, it is hereby ordered that the petition for post-conviction relief is denied.

> Defendant is notified as follows: The court entered an order on the date noted below, a copy of which is enclosed. You have a right to appeal. In the case of a post-conviction proceeding involving a judgment imposing a sentence of death, the appeal is to the Illinois Supreme Court. In all other cases, the appeal is to the Illinois Appellate Court in the district in which the Circuit Court is located. If you are indigent, you have a right to a transcript of the record of the post-conviction proceedings and to the appointment of counsel on appeal, both without cost to you. To preserve your right to appeal, you must file a notice of appeal in the trial court within 30 days from the date the order was entered.

ENTERED: _____Daniel B. Shanes_____
                           Judge Daniel B. Shanes

Dated this 30th day of September, 2016
at Waukegan, Illinois.

50

H_50