# EXHIBIT I

Petitioner's Brief in the
Illinois Court of Appeals
(Post-Conviction Appeal) filed
June 2, 2017

**No. 2-16-0825**

# In the
# Appellate Court of Illinois
## Second Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

v.

MELISSA CALUSINSKI,

*Defendant-Appellant.*

_____

Appeal from the Circuit Court of the Nineteenth Judicial Circuit,
Lake County, No. 09 CF 252.
The Honorable **Daniel Shanes**, Judge Presiding.

**BRIEF OF DEFENDANT-APPELLANT
MELISSA CALUSINSKI**

KATHLEEN T. ZELLNER
(ktzemployees@gmail.com)
DOUGLAS H. JOHNSON
KATHLEEN T. ZELLNER
  & ASSOCIATES, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

*Counsel for Defendant-Appellant*

**ORAL ARGUMENT REQUESTED**

 

No. 2-16-0825

In the

# Appellate Court of Illinois

## Second Judicial District

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee,*

v.

MELISSA CALUSINSKI,

*Defendant-Appellant.*

_____

Appeal from the Circuit Court of the Nineteenth Judicial Circuit,
Lake County, No. 09 CF 252.
The Honorable **Daniel Shanes**, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLANT
## MELISSA CALUSINSKI

## POINTS AND AUTHORITIES

NATURE OF THE CASE ................................................................................................1

    720 ILCS 5/9-1(a)(2) (West 2008) .........................................................................1

    720 ILCS 5/12-4.3(a) (West 2008) .........................................................................1

    *People v. Calusinski,*
      2014 IL App (2d) 120383-U).................................................................................1

    *People v. Calusinski,*
      386 Ill. Dec. 479 (2014).........................................................................................1

ISSUES PRESENTED FOR REVIEW ..........................................................................2

JURISDICTION ..............................................................................................................2

    Ill. Const. VI, §6 .....................................................................................................2

    Illinois Supreme Court Rule 651 ............................................................................2

STATEMENT OF FACTS ...............................................................................................3

    Evidentiary Hearing.................................................................................................3

    Defendant's *Brady* Violation Claim .......................................................................3

    The State's Case Re: Brady Violation Claim .......................................................19

    Defendant's Perjury Claim ...................................................................................24

    The State's Case Re: Perjury Claim......................................................................33

    The Trial Court's Ruling Defendant's Brady Claim.............................................35

    Trial Court's Ruling: Actual Innocence Claim....................................................39

    Trial Court's Ruling: Perjury Claim ....................................................................40

ARGUMENT ................................................................................................................41

I_03

I.  THE TRIAL COURT ERRED IN DISMISSING DEFENDANT'S POST-CONVICTION-PETITION AFTER THE EVIDENTIARY HEARING BECAUSE DEFENDANT MADE A SUBSTANTIAL SHOWING THAT HER CONSTITUTIONAL RIGHTS UNDER *BRADY V. MARYLAND* WERE VIOLATED ............................................................................41

***Introduction*** ................................................................................41

***Standard of Review*** .....................................................................41

*People  v. Harris,*
    224 Ill. 2d 115 (2007) .................................................................41

*People v. Pendleton,*
    223 Ill. 2d 458 (2006) .................................................................41

*People v. Beaman,*
    229 Ill. 2d 56 (2008) ...................................................................41

*People v. Coleman,*
    183 Ill. 2d 366 (1998) .................................................................42

*People v. Andoh,*
    2016 IL App (1st) 133461-U .......................................................42

***Requirements of a Brady Claim*** .....................................................42

*Brady v. Maryland,*
    373 U.S. 83 (1963) ......................................................................42

*People v. Burt,*
    205 Ill. 2d 28 (2001) ...................................................................42

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..............................................................42, 43

*Strickler v. Greene,*
    527 U.S. 263 (1999) ....................................................................42

*Berger v. United States,*
    295 U.S. 78 (1935) ......................................................................42

*United States v. Bagley,*
    473 U.S. 667 (1985) ..............................................................42, 43

I_04

***Readable X-rays Showing No Skull Fracture were Favorable to Defendant***.....43

*People v. Carballido*,
   2015 IL App (2d) 140760 ...................................................................44

*People v. Nichols*,
   63 Ill. 2d 443 (1976) ........................................................................44

***Brady is Violated When State Makes Partial Disclosure that Misleads
Defense Counsel*** ...................................................................46

*United States v. Bagley*,
   473 U.S. 667 (1985).........................................................................46

*Brady v. Maryland*,
   373 U.S. 83 (1963)......................................................................46, 47

***Brady is Violated When the State Modifies Evidence Prior to Disclosure*** .........47

*Brady v. Maryland*,
   373 U.S. 83 (1963).........................................................................47

*Pena v. State*,
   353 S.W.3d 797 (Tex. Crim. App. 2011) .........................................47

*United States v. Boyd*,
   833 F. Supp. 1277 (N.D. Ill. 1993) aff'd, 55 F.3d 239 (7th Cir. 1995).............48

*McArthur v. State of Florida*,
   671 So.2d 867 (Fla. 4th Dist. 1996)...................................................48

***Trial Court Disregarded Defendant's Expert Witnesses and Based Its Decision
on Its Own Non-Expert Interpretation of the X-Ray Images and Metadata***......48

***Withheld Evidence Was Material*** .......................................................54

*People v. Harris*,
   206 Ill.2d 293 (2002) .....................................................................54

*People v. Coleman*,
   183 Ill. 2d 366 (1998) ....................................................................55

*People v. Beaman*,
   229 Ill. 2d 56 (2008) ......................................................................55

*People v. Smith,*
  352 Ill. App. 3d 1095 (1st Dist. 2004)................................................56

***Substantial Showing Made at Evidentiary Hearing*** ...........................57

*People v. Ward,*
  2013 IL App (4th) 120001–U, 2013 WL 3306152 ............................57

***The Prosecution Converted the TIFF X-Rays into a JPEG Format and***
***Adjusted the Window Width. However, if This Court Finds Otherwise,***
***the Coroner's Possession of the X-Rays Should Be Imputed to***
***the State's Attorney for* Brady *Purposes*** ............................................57

*Brady v. Maryland,*
  373 U.S. 83 (1963)........................................................................57, 58

*In re C.J.,*
  166 Ill.2d 264 (1995) ............................................................58, 59, 60

*People v. Robinson,*
  157 Ill.2d 68 (1993) ..............................................................58, 59, 60

*People v. Leach,*
  2012 IL 111534.....................................................................................58

*Crawford v. Washington,*
  541 U.S. 36 (2004)...............................................................................59

*People v. Stechly,*
  225 Ill. 2d 246 (2007) ...................................................................59, 60

**II.**   **THE TRIAL COURT ERRED IN DISMISSING DEFENDANT'S POST-**
       **CONVICTION PETITION AFTER THE EVIDENTIARY HEARING**
       **BECAUSE DEFENDANT MADE A SUBSTANTIAL SHOWING THAT**
       **HER CONVICTION RESULTED FROM THE PRESENTATION OF**
       **PERJURED EVIDENCE** ....................................................................60

***Standard of Review*** .................................................................................60

*People v. Scott,*
  194 Ill.2d 268 (2000) ..........................................................................60

*People v. Morgan,*
  212 Ill.2d 148 (2004) ..........................................................................60

*People v. Newkirk*,
   2012 IL App (2d) 111226-U ................................................................60

*People v. Ellis*,
   315 Ill. App. 3d 1108 (1st Dist. 2000) ............................................60

*People v. Hood*,
   45 Ill.App.3d 425 (1977) ....................................................................61

***Knowing Use of Perjured Testimony*** ...................................................63

*People v. Olinger*,
   176 Ill.2d 326 (1997) ...............................................................63, 64

*Napue v. Illinois*,
   360 U.S. 264 (1959) ............................................................................63

*People v. Jimerson*,
   166 Ill.2d 211 (1995) .........................................................................63

*People v. Brown*,
   169 Ill. 2d 94 (1995) .........................................................................63

*People v. Beard*,
   301 Ill. App. 3d 279 (4th Dist. 1998) .............................................64

*People v. Perkins*,
   292 Ill. App. 3d 624 (1st Dist. 1997) .............................................64

*Brady v. Maryland*,
   373 U.S. 83 (1963) ............................................................................67

*People v. Hood*,
   45 Ill.App.3d 425 (1977) ....................................................................67

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ...............................................................67, 69

*People v. Smith*,
   352 Ill. App. 3d 1095 (1st Dist. 2004) ...................................68, 69

*People v. Ellis*,
   315 Ill. App. 3d 1108 (1st Dist. 2000) ............................................69

CONCLUSION .........................................................................................70

I_07

## NATURE OF THE CASE

This appeal arises from the dismissal of Defendant's post-conviction petition after a third stage evidentiary hearing. On November 16, 2011, following a jury trial, Defendant was convicted of the first degree murder (720 ILCS 5/9-1(a)(2) (West 2008)) of 16-month-old Benjamin Kingan ("Ben"), who attended the daycare center where Defendant was employed as a teacher's assistant. Also in connection with Ben's death, Defendant was convicted of aggravated battery of a child (720 ILCS 5/12-4.3(a) (West 2008)), which merged into the first-degree murder conviction. Defendant was sentenced to thirty-one (31) years in the Illinois Department of Corrections. (C.596-600; R.4947).[1] Defendant filed a direct appeal and the Second District Appellate Court affirmed Defendant's conviction and sentence. (C.892-943; *People v. Calusinski*, 2014 IL App (2d) 120383-U). On September 24, 2014, the Illinois Supreme Court denied discretionary review. *People v. Calusinski*, 386 Ill. Dec. 479 (2014).

On June 23, 2015, Defendant filed a timely post-conviction petition. (C.945-1090). On September 30, 2016, the trial court granted leave to Defendant to file an Amended Petition For Post-Conviction Relief, adding a claim that she was denied due process as a result of the State's knowing use of perjury to cause her conviction. (C.1471-75; 1517-18). Also on September 30, 2016, the trial court dismissed the petition after an evidentiary hearing. (C.1485-1534). This is a direct appeal from that order. Defendant filed a timely Notice of Appeal. (C.1535-1536). No questions are raised on the pleadings.

---

[1] The common law record shall be denoted "C.__" and the report of proceedings "R.__").

## ISSUES PRESENTED FOR REVIEW

**I.**         **Whether the trial court erred in finding that Defendant failed to make a substantial showing that she suffered a *Brady* violation.**

**II.**        **Whether the trial court erred in finding that Defendant failed to make a substantial showing that her conviction resulted from the State's knowing use of perjured testimony.**

## JURISDICTION

This is an appeal from an order of the trial court of Lake County dismissing Defendant's post-conviction petition at the third stage after an evidentiary hearing. On September 30, 2016, the trial court entered a final judgment granting the State's motion to dismiss the petition. (C.1485-1535). A timely notice of appeal was filed on September 30, 2016. (C.1535-1536). Jurisdiction therefore lies in this court pursuant to Ill. Const. VI, §6, and Supreme Court Rule 651.

I_09

## STATEMENT OF FACTS

### *Evidentiary Hearing*

After considering the parties' filings, the trial court held that "Defendant is, in fact, seeking a new trial based upon factual claims. In order to determine what those facts actually are and, therefore, determine whether a new trial is warranted, this court will accordingly hold a hearing on those claims." (R.4997).

### *Defendant's <u>Brady</u> Violation Claim*

Defendant's trial counsel, Paul DeLuca ("Mr. DeLuca"), had been a criminal defense attorney for over thirty years at the time of the evidentiary hearing. (R.5006-5008). Mr. DeLuca testified at the evidentiary hearing that at trial, the State relied upon Dr. Eupil Choi's ("Dr. Choi") autopsy finding from his January 15, 2009, autopsy of Benjamin Kingan ("Ben") that he observed a skull fracture which he described in the autopsy report as a "horizontally disposed fracture . . . extending from linear skull fracture in the occipital parietal area of the skull." (R.5012; Def. Ex. 12[2]). Dr. Choi's autopsy report did not reference any skull x-rays being taken during the autopsy. (R.5011-12; Def. Ex. 12).

Mr. DeLuca became lead counsel for Defendant in August 2009, having taken over the case from another law firm. (R.5009). Mr. DeLuca received the other law firm's discovery file when he took over the case. (R.5009). Because the State had not produced any x-rays to Defendant's initial counsel, there were no x-rays in the discovery file transmitted to Mr. DeLuca. (R.5009). Mr. DeLuca testified as to the discovery that he pursued pre-trial. Mr. DeLuca issued several subpoenas for discovery. (R.5009-16).

---

[2] Hereinafter, exhibits from the evidentiary hearing shall be denoted "Def. Ex. __" or "Peo. Ex. __."

I_10

On September 28, 2009, Mr. DeLuca issued a subpoena to the Lake County Coroner's office, requesting "[a]ny and all morgue photographs, histology slides, microscopic reports, microscopic examination of the brain, DC and blood culture report, first call sheet and any and all other notes and/or recordings including any lab results of any items tested regarding the autopsy performed by Dr. Choi on [Ben], on January 15, 2009." (Def. Ex. 1).

On September 27, 2010, Mr. DeLuca issued a subpoena to Dr. Choi for "[his] complete file regarding the autopsy of [Ben] performed on or about 1/15/09, the complete file to include but not limited to all photographs, all notes, memorandum, or any other documents in said file." (R.5013) (Def. Ex. 2). Mr. DeLuca received additional documents, but not x-rays. (R.5014).

On December 14, 2010, Mr. DeLuca issued another subpoena, this time to Mr. Forman at the Coroner's office, who was present at the autopsy. (R.5014-15) (Def. Ex. 3). Mr. DeLuca requested "a copy of Dr. Choi's personal DVD containing photographs taken of the autopsy of [Ben] on or about 1/15/09." (Def. Ex. 3). Mr. DeLuca had learned that Dr. Choi had taken photographs during the autopsy. (R.5015). Again, Mr. DeLuca received documents in response to his subpoena, but x-rays were not included in the production. (R.5016).

Mr. DeLuca testified that he did not specifically request skull x-rays in these subpoenas because the autopsy report did not refer to any x-rays being taken during the autopsy. (R.5011) (Def. Ex. 12).

Because he knew that Dr. Choi identified a skull fracture during the autopsy based upon his review of the autopsy report (Def. Ex. 12), Mr. DeLuca suspected that Dr. Choi

may have taken x-rays during the autopsy. (R.5012-13). Acting on his suspicion, Mr. DeLuca had a conversation with former Assistant State's Attorney Christen Bishop[3] ("former ASA Bishop") regarding discovery. (R.5014). Specifically, Mr. DeLuca asked former ASA Bishop if there were any x-rays in the file. (R.5014).

On September 7, 2011, eight weeks before the trial began, former ASA Bishop gave Mr. DeLuca a disk containing three x-ray images and she represented to the trial court that the images "were not legible or readable." (R.5016; 5036) (Def. Ex. 8). Two of the images were of the upper torso, including the skull, and one was of the lower torso. (R.5400) (Def. Ex. 8). Former ASA Bishop further explained to the trial court that the employee, Lake County Deputy Coroner Michael Reid ("Deputy Reid"), from the Coroner's office who was responsible for producing the x-rays was out of town but that she would check with him when he returned. (R.5017).

On September 7, 2011, after Mr. DeLuca received the disk from former ASA Bishop, he attempted to open it at his office. (R.5036; 5038). Upon opening the disk on his office computer, Mr. DeLuca observed three image files and other icons. (R.5037-38). The first image Mr. DeLuca observed showed what appeared to be a white outline of the top of a skull. (R.5037) (Def. Ex. 8). The second image Mr. DeLuca observed was very dark, almost to the point of being black. (R.5037). The third image Mr. DeLuca observed showed Ben's lower torso, from the middle of his waist to his feet. (R.5037). Because the images appeared dark and illegible, Mr. DeLuca asked his secretary for assistance. (R.5037-38). Mr. DeLuca attempted to open the other files on the disk, but nothing opened. (R.5038).

---

[3] Ms. Bishop was appointed as a Judge to the Nineteenth Judicial Circuit of Lake County in 2012.

On September 9, 2011, the State filed a Supplemental Answer to Discovery (Def. Ex. 5), which memorialized former ASA Bishop's production of a "[CD] with 3 digital x-ray images, purporting [sic] to be of [Ben]" and "the program required to view the [x-ray] images" on 9/7/11. (Def. Ex. 5) (R.5039). Mr. DeLuca and his secretary attempted to open the program required to view the x-ray images, which was called TigerView, but neither of them could open it. (R.5038-39).

After Defendant's trial, Mr. DeLuca attempted to open TigerView again. (R.5040). Although he could not open the program on his computer, Mr. DeLuca's secretary was able to open TigerView on her computer. (R.5040). When they tried to enhance the second x-ray image, which showed the head, the entire image appeared white. (R.5040). Mr. DeLuca testified at the evidentiary hearing that the x-ray images contained in the disk produced to him on September 7, 2011 by former ASA Bishop were JPEG files. (R.5040).

Mr. DeLuca testified that he formulated his pre-trial and trial strategy based upon the autopsy finding of Dr. Choi that Ben's skull had been fractured. (R.5018-20) (Def. Ex. 12). Additionally, Mr. DeLuca testified that because Dr. Choi "didn't take sections of [the skull fracture]" for the purposes of creating histology slides, he could not dispute the existence of the skull fracture absent skull x-rays that showed no fracture. (R.5020). In the absence of skull x-rays demonstrating there was no fracture, Mr. DeLuca had no choice but to proceed with a defense that assumed there was a skull fracture. (R.5018-19). Mr. DeLuca had learned previously that Ben had an incident in late October 2008 where he came home from daycare with a very large bump on his head. (R.5018). Ben's mother took Ben to the doctor to examine the bump on his head. (R.5018-19). At that

6

time, the doctor performed no diagnostic imaging, including x-rays, to determine whether Ben had suffered a skull fracture. (R.5019). Mr. DeLuca, forced to accept the erroneous premise that Dr. Choi had identified a skull fracture during the autopsy, formulated a trial strategy in which the October 2008 incident was the original source of the skull fracture. (R.5019). Mr. DeLuca also learned that Ben was a "head banger," meaning Ben had a tendency to throw himself back while sitting such that the back and top of his head struck the floor when something upset him. (R.5019). Mr. DeLuca proceeded with the theory that Ben's fatal injury started with the incident in October 2008 and that every time he banged his head, his injury got worse. (R.5019). Ultimately, Mr. DeLuca's theory of defense was that Ben's fatal injury was a rebleed of a chronic subdural hematoma. (R.5019).

Mr. DeLuca testified about the experts he would have hired had he been provided with readable x-rays of the skull. (R.5020). Specifically, Mr. DeLuca would have contacted a pediatric neuroradiologist to determine whether or not there was a skull fracture. (R.5020-21). The pediatric neuroradiologist would have determined there was no skull fracture, and Mr. DeLuca would have been able to refute the testimony of various witnesses, including Dr. Choi, that there was a skull fracture. (R.5021; 5025). Mr. DeLuca testified at the evidentiary hearing that Dr. Choi testified at trial that the x-rays were not legible and that he could not identify a skull fracture from the x-rays, but that he knew there was a skull fracture because he had observed it with the naked eye. (R.5021-22).

With a pediatric neuroradiologist confirming there was no fracture, Mr. DeLuca could have refuted the accuracy of Defendant's reenactment in the videotaped confession.

(R.5021). Although Mr. DeLuca discussed the reliability of Defendant's reenactment in the videotaped confession with his medical experts, the experts could not refute the reenactment because they did not have x-rays that showed no skull fracture. (R.5022-23). Mr. DeLuca testified at the evidentiary hearing that if the medical experts knew that there was no skull fracture, they could have shown that Ben did not sustain a fatal injury in the manner Defendant demonstrated in her videotaped confession. (R.5023). Therefore, Defendant's confession was false because she could not have injured Ben in the manner she described. (R.5023).

In 2015, the Coroner's office located and produced legible x-rays of Ben and Mr. DeLuca reviewed them. (Def. Ex. 9) (R.5040-41). The 2009 x-rays had been saved in a TIFF file format. (R.5042). The TIFF format is an uncompressed format that, in simple terms, contains all underlying data. (R.5043). Mr. DeLuca testified at the evidentiary hearing that the sizes of the JPEG files he received from former ASA Bishop on September 7, 2011, were two or two-and-one-half percent of the sizes of the TIFF image files he viewed in 2015. (R.5042-43). Mr. DeLuca testified at the evidentiary hearing that the JPEG files he received before trial were compressed and contained "very little data." (R.5043).

On cross-examination, the State presented Mr. DeLuca with a typed letter from Dr. Teas, dated April 14, 2011. (R.5067-68) (Peo. Ex. 4). In this letter, Dr. Teas indicated she had reviewed certain materials, including x-rays of Ben. (R.5057). Mr. DeLuca testified at the evidentiary hearing that he "assumed that [Dr. Teas] reviewed the x-rays at the Coroner's office." (R.5058). On redirect, Mr. DeLuca testified that he did

not know where Dr. Teas reviewed the x-rays. (R.5073). Mr. DeLuca testified that Dr. Teas never informed him that she was given clear, legible x-rays. (R.5071).

Mr. DeLuca corrected that testimony with an affidavit provided to the trial court, at the conclusion of the evidentiary hearing. Mr. DeLuca's affidavit was admitted into evidence and stipulated to by the State. (R.5516; Def. Ex. 34). Mr. DeLuca informed the trial court in his affidavit that he had reexamined his trial file and he was able to confirm that the x-rays Dr. Teas was referring to in her April 14, 2011, letter were the same illegible x-rays he received from the State on September 7, 2011. (Def. Ex. 34, ¶¶ 4-5).

The State also admitted Peo. Ex. 1, which is identical to Def. Ex. 8 and contains the JPEG x-rays that were given to Mr. DeLuca on September 7, 2011. Mr. DeLuca testified that image two from the original disk was brighter when the State displayed it at the evidentiary hearing. (R.5066). Mr. DeLuca testified that none of the State's experts, other than Dr. Choi, had looked at the x-rays. (R.5071). Neither Dr. Montez nor Dr. Greenbaum had looked at the x-rays. (R.5071).

Jeffrey Mueller ("Mr. Mueller") testified for Defendant. (R.5388). Mr. Mueller has a bachelor's degree in computer science and electronics. Within the field of computer science, he has specialized in imaging and video. (R.5391). Mr. Mueller described his work as an imaging specialist as working with "all types of different images from infrared, invisible light to the x-ray spectrum, chromatic spectrum." (R.5391).

Without objection, Mr. Mueller was accepted as an expert in software engineering with a subspeciality in "imaging." (R.5398-99) (C.1509). Mr. Mueller described his background in computer science, and specifically his subspecialty in imaging, which requires a familiarity with all types of images, file formats including JPEG and TIFF

files, physics, infrared, and sensor technology. (R.5392-93). He has been hired by commercial and governmental clients to improve the quality of images. (R.5394-95).

Mr. Mueller is familiar with the 2008 and 2013 versions of TigerView Software involved in the case and has used the programs himself. (R.5395-96; 5460-61). He had used the TigerView CD viewer that exports files prior to this case. (R.5480). Mr. Mueller explained that there are common characteristics of images including visible light spectrum, infrared, and x-ray. (R.5392). All images have common features of compression and contrast. (R.5392).

Mr. Mueller has examined the Coroner's computer. (R.5399). He testified that he examined "everything relevant to the Ben Kingan files" which included the following items:

> "TigerView software itself, the way the images appeared on the Coroner's computer, any files that were remaining on hard drive of the entire computer . . . specific files to see if there were any remnants . . . the Microsoft database, which is maintained by the TigerView application itself, which maintains a specific record, detailed record of all images as well as patients." (R. 5399).

Mr. Mueller also reviewed the three images given to Mr. DeLuca by the State on September 7, 2011, which were in JPEG format (Def. Ex. 8) (R.5400; 5486) and the images reviewed by Dr. Teas, which were also in JPEG format. (Def. Ex. 31) (R.5400; 5450). Finally, Mr. Mueller reviewed the TIFF images on the Coroner's computer (R.5400-01).

Mr. Mueller identified Def. Ex. 8 as the three DeLuca images from the September 2011 disk and the underlying metadata for those images. (Def. Ex. 25). Mr. Mueller explained that the three DeLuca images were in JPEG format, meaning they had been compressed "significantly." (R.5401-02). "BenKingan1," which is an outline of

Ben's skull, is a JPEG image compressed to 267 kilobytes. (R.5403) (Def. Ex. 25). "BenKingan2," which is an image of Ben's upper torso and skull, is a JPEG image compressed to 411 kilobytes. (R.5403) (Def. Ex. 25). "BenKingan3" is an outline of Ben's lower torso. (R.5400).

Mr. Mueller identified three TIFF images saved on the Coroner's computer in 2009 and produced in 2015 to the defendant. (Def. Ex. 9). Coroner's Image 48 is an "uncompressed and highest quality" TIFF image of the lower torso and was acquired[4] on January 15, 2009, and was a file with 17.8 megabytes (R. 5406, 5491). Coroner's Image 49 is an "uncompressed and highest quality" TIFF image of Ben's skull also acquired on January 15, 2009, and was a file size of 16.6 megabytes. (R.5407). Coroner's Image 50 is also an "uncompressed and highest quality" TIFF image of Ben's head that was created on that date and had a file size of 17.2 megabytes. (R.5407-408). All three of the TIFF images had been on the Coroner's computer since 2009. (Def. Ex. Group 29) (R.5409).

Mr. Mueller demonstrated for the court a comparison of the DeLuca images in Def. Ex. 8 and metadata of those images (Def. Ex. 25) with the three TIFF images saved on the Coroner's computer in 2009 and recovered in 2015 (Coroner's Images 48, 49, 50)

Mr. Mueller, in referring to the Coroner's computer images 48, 49, and 50, offered his expert opinion that there was "absolutely no evidence of [any file being saved in the JPEG format] on the entire hard drive." (R.5409). Therefore, all of the files were

---

[4] As the trial court noted, "because of the Tigerview software upgrade on January 21, 2015, x-ray files created before the upgrade all reflect a "created" date of January 23, 2015, two days after the upgrade. For those files, the "modified" date reflects the actual date the x-ray image was acquired by Tigerview." Images 48, 49 and 50 on the Coroner's computer were all acquired on January 15, 2009, the date of the first autopsy when Mr. Forman took the 3 x-ray images and saved them in a TIFF format. (C.1506) (Def. Ex. Group 29).

saved in the TIFF format in 2009, including Coroner's Images 48, 49, and 50 of Ben. (R.5406-08).

The Defense presented Def. Ex. 39, depicting side-by-side x-ray images with the DeLuca 2011 JPEG images on the left and the Coroner's 2009 TIFF Images 48, 49, and 50 on the right.[5] (R.5410-5412).

Mr. Mueller explained that the 2008 TigerView software in operation in 2011 allowed the user to choose to export the images in either TIFF or JPEG format. (R.5415-18).

Using the 2008 TigerView software which was available in 2011, Mr. Mueller was able to improve quality of Coroner's TIFF Image 50 of Ben's skull, which was saved on the Coroner's computer in 2009. (R.5415).

However, Mr. Mueller, using the 2008 Tigerview software[6], was not able to improve the JPEG 2011 DeLuca image BenKingan1, which is the same image as the Coroner's Image 50. (R.5418). Mr. Mueller attempted to  Mr. Mueller explained that he could not improve the quality of  Mr. DeLuca's images for a number of reasons, "most specifically [because the file] was exported as a very very low quality JPEG as well as being blanked out like that." (R.5419). Mr. Mueller testified that, in addition to being exported as a JPEG, another modification was made to the image prior to being exported. (R. 5421-22).

Mr. Mueller demonstrated to the trial court how the very poor quality of the DeLuca image was created prior to being exported as a JPEG.  Mr. Mueller was able to

---

[5] Both sides software experts explained that the term TIG extension is a TigerView proprietary file name but the underlying format is a TIFF file format. (R.5306, 5498) (C.1507).

[6] 7.0.12 is the 2008 TigerView version. (R.5416).

modify Coroner's Image 50, the 2009 TIFF image with 17.2 uncompressed megabytes (R. 5423) to the DeLuca BenKingan1 Image with 267 kilobytes, by adjusting the window width to three, so that there were "three shades of grey, so we have basically pure grey or pure white." (R.5426). Mr. Mueller then demonstrated that he could choose the JPEG option and could export the file as a JPEG image. (R.5425). In order for Mr. Mueller to obtain the image Mr. DeLuca received with the same file size of 267 kilobytes, Mr. Mueller had to "reduce the quality down as low as" he could and export in JPEG. (R.5425).

When Mr. Mueller viewed the 718 other images on the Coroner's computer, he did not see a single image that had been reduced as severely as the Ben Kingan skull image 50. (R.5427) (Def. Ex. 45.) (R. 5431). The Ben Kingan skull image 50 had been modified more than any of the other 718 images on the Coroner's computer by reducing the window width to three. (R.5427). Mr. Mueller testified that there was "no other image with that narrow of a window width." (R. 5427). While the Ben Kingan image had a window width of three, "the window width of the other 718 file images [was] in the thousand[s]." (R.5428).

Mr. Mueller was able to access image data from the Coroner's computer on Ben's Images. (R.5432-33) (Def. Ex. 46) (R.5434). Mr. Mueller identified Ben's ID number as 24 in this database and he was able to see the metadata for the three images of Ben taken on January 15, 2009. Mr. Mueller testified that he wanted to analyze the brightness contrast, gamma, and window width adjustments for the images. (R.5433). Mr. Mueller testified that Ben Kingan skull image 50 had a window width maximum 65,532. (R.5434-35) Mr. Mueller testified that the window width maximum for image 50 was reduced to

"the minimum that the [graphical user interface] allowed, which was three, that result[ed] in the blank outline." (R.5435). No modifications to the window width data were made to image 49, which was of Ben's upper torso.  (R.5435). Image 48, which showed Ben's lower torso, had "a contrast adjustment, a brightness adjustment, a window minimum adjustment as well as a gamma adjustment."  (R.5436).  Mr. Mueller testified that the DeLuca JPEG images were created on September 6, 2011.  (R.5436).

Mr. Mueller demonstrated for the trial court a comparison of adjusted DeLuca images with the Coroner's images. (Def. Ex. 40.) (R.5439-42). The images on the left of Exhibit 40 were the JPEG images given to Mr. DeLuca; the images on the right were the Coroner's TIFF images. (R.5441).  As previously described, Coroner's image 49 was of Ben's upper torso and skull, which was labeled Ben Kingan 2 in Mr. DeLuca's images. (R.5441-42).  Mr. Mueller testified that he was able to adjust the brightness and contrast of the DeLuca image Ben Kingan 2, but he was not able to alter the underlying metadata of that image. (R. 5443).  Mr. Mueller testified that the image given to Mr. DeLuca in September 7, 2011 was a "significantly darkened image" as opposed to the image created on the Coroner's computer in 2009, which was in TIFF format with underlying metadata showing 16.6 megabytes in size.  (R.5440). (Def. Ex. Group 29). When Mr. Mueller adjusted the BenKingan2 image given to Mr. DeLuca, the metadata did not change. (R.5442-43).  In order for Mr. Mueller to recreate the image provided to Mr. DeLuca, Mr. Mueller exported the image in JPEG "at very low quality JPEG … then [one] had to use photoshop to darken the image."  (R.5443).

In his demonstration, Mr. Mueller attempted to recreate the DeLuca image on the left by exporting the TIFF image on the right of Def. Ex. Group 29 to a JPEG format,

resulting in a reduction in the size of the file. (R.5443-44). The size was reduced by half or even as much as three times. (R.5443-44). Mr. Mueller could not reduce the file to near the 411 kilobytes until he put the file on another computer and further reduced the quality. (R.5444-45). Mr. Mueller concluded that "to a reasonable degree of software engineering certainty and imaging certainty" in addition to being exported in JPEG format, modifications were made to the DeLuca BenKingan2 image (Image 49) on another computer, someone opened photoshop to recreate the darkness level, and further reduced the quality by exporting it into a JPEG again, while sliding down the quality until he was able to obtain the 411 kilobytes. (R.5445). Those adjustments were the only way Mr. Mueller could recreate that image from the 2009 original TIFF file. (R.5445). With those adjustments, Mr. Mueller was able to reduce the file size to match the size of the DeLuca BenKingan2 image. (R.5445-46).

Mr. Mueller explained that if one could have accessed the Coroner's computer in 2011 and adjusted the image saved in 2009, the image could have been made more clear. (R.5447). Mr. Mueller was able to make those adjustments in less than 10 seconds. (R.5447). Even if the image was "totally darkened in TIFF format," as long as it was in TIFF format, it would be "extremely simple" to clarify the image "very quickly." (R.5448).

Mr. Mueller had access to the 2008 TigerView CD viewer that Mr. DeLuca had prior to the trial. (R.5496). Mr. Mueller spent hours trying to improve the JPEG images that had been given to Mr. DeLuca and applied "many different commonatorics [sic] of contrast, brightness [and] window width" and there was "nothing that [he] could do." (R.5496). Mr. Mueller tried to improve the quality of the images, although he already

15

knew that he would be unable to improve the images because they were in JPEG format. (R.5496-97). However, Mr. Mueller explained, he could spend his "entire life" trying to make the darkened JPEG image on the disk given to Mr. DeLuca the same and he could not do so. (R.5447-48).

Mr. Mueller also reviewed the x-rays provided to Dr. Teas. (R.5448-50). Mr. Mueller testified that those three Dr. Teas x-rays were in the JPEG format. (R.5450). (Def. Group Ex. 31.) Like the images Mr. DeLuca received, the file size had been reduced on those images. (R.5451). In fact, the BenKingan2 image that Dr. Teas reviewed actually had a lower file size (200 kilobytes) than the BenKingan2 image Mr. DeLuca received (411 kilobytes). (R.5442-42).

On cross-examination, Mr. Mueller denied altering the data on the Coroner's computer during the forensic exam. (R. 5460). On the older version of the TigerView software, the user could choose to export images in TIFF or JPEG file formats. (R.5468; 5500). If the user did not specifically select the TIFF file format when exporting, the TigerView software defaulted and exported images as JPEG files. (R.5468). The newer versions defaulted to TIFF format. (R.5470).

Mr. Mueller explained that if one were to alter that image at any time, there would be a record of the alteration. (R.5489). Thus, if Mr. Mueller had altered any data on the Coroner's computer during his examination of the computer, there would have been a record of the changes, and the State did not produce any record of changes made during Mr. Mueller's examination of the Coroner's computer. Mr. Mueller did not alter any images whatsoever, he simply copied the existing images off the Coroner's computer. (R.5492).

Mr. Mueller testified that he analyzed the entire hard drive and there was no evidence on the Coroner's computer that any images were in JPEG format. (R.5493; 5499). He explained that one could export in JPEG in order to email a file or put it on a thumb drive of small capacity. (R.5494). However, the 2009 images in this case were copied onto a CD, which has a capacity of approximately 700 megabytes. (R.5494-95). Therefore, Mr. Mueller explained, all three TIFF images could have easily been put on a CD. (R.5495).

Mr. Mueller testified that from January 15, 2009 forward, the TIFF images of Ben were always saved on the Coroner's computer. (R.5498). Mueller testified that "[t]hey had the highest quality images available." (R.5498). Mr. Mueller testified that one could choose to export the images in a TIFF format or in a JPEG format. (R. 5500).

Dr. Robert Zimmerman ("Dr. Zimmerman") testified for Defendant as an expert in pediatric neuroradiology. (R.5114, 5116). Dr. Zimmerman is the Chief of Pediatric Neuroradiology at the Children's Hospital of Philadelphia (R.5114), is a member of the American College of Radiology Section on Neuroradiology, and was a consultant to the American Academy of Pediatrics Subcommittee on Head Injury. (Def. Ex. 19). Dr. Zimmerman is board certified in radiology, diagnostic radiology, and neuroradiology. (Def. Ex. 19). He explained that through application of the principles of neuroradiology, one can ascertain whether trauma to a victim is accidental or abusive. (R.5117-18). A linear fracture in the occipital parietal area of the skull is associated with an "impact injury" where the occiput is hit against the ground in a forceful manner. (R.5118). Abusive head traumas cause fractures. (R.5118). The absence of a fracture would "go

against" a diagnosis of abusive head trauma. (R.5118). The lack of a skull fracture points to a self-inflicted or accidental head trauma. (R.5118).

Dr. Zimmerman reviewed Defendant's videotaped confession prior to the evidentiary hearing. (R.5119). He explained that the reenactment on the video as to what Defendant did to Ben is not consistent with a linear skull fracture. (R.5119-5120). The occiput (back) of the head did not hit the ground in the reenactment. (R.5120). Had Ben been thrown as depicted on the video, Dr. Zimmerman explained, the fracture would have been in the front of the head. (R.5120).

Dr. Zimmerman reviewed Peo. Ex. 1 and explained that the image would not allow him to diagnose a skull fracture. (R.5121). No determination could be made from the poor image. (R.5121-5122). Lightening up the image would not aid to any interpretation of that poor image. (R.5123). But upon viewing the TIFF image (Def. Ex. 9), Dr. Zimmerman was able to testify to a reasonable degree of radiological certainty that no fracture of the skull was present. (R.5123-5124). The images Dr. Zimmerman reviewed in his career were usually in TIFF uncompressed format. (R.5123).

Dr. Zimmerman further explained that subgaleal, subarachnoid, and subdural hemorrhages were not exclusively indicative of abusive head trauma. (R.5130). Subgaleal, subarachnoid, and subdural injuries are common in accidental falls of children and can occur in self-inflicted head banging. (R.5130).

Dr. Zimmerman had authored medical studies and articles that noted that a linear skull fracture is a significant finding pointing toward abusive head trauma. (R.5131). He testified unequivocally that it would have been impossible for someone to have examined

Ben's skull and touched a fracture because no fracture was present on the x-ray saved in the TIFF format. (Def. Ex. 9)[7] (R.5131).

### The State's Case Re: Brady Violation Claim

Former ASA Matt DeMartini ("former ASA DeMartini") testified as a State witness. (R.5246). He testified that prior to Defendant's trial, he reviewed an x-ray disk that contained three images and a program to view them. (R.5247). He claimed he had not had any problems opening the program. (R.5248). But, while he could change the tint and brightness of the image, he could not improve the quality. (R.5249). The images were of poor quality. (R.5264). The prosecution team decided that he should make an appointment with Deputy Reid to determine "if he could do anything with these images that [he] could not do on [his] desktop." (R.5249; 5259). Former ASA DeMartini claimed he met with Deputy Reid on September 16, 2011. (R.5250). Former ASA DeMartini claimed another prosecutor made the disk that contained the poor images. (R.5272).

Former ASA DeMartini claimed that Deputy Reid pulled up the images on the Coroner's computer with former ASA DeMartini present and adjusted them. (R.5253). Although former ASA DeMartini had previously testified he had not had a problem opening up the program, he testified that Deputy Reid showed him how to use the program. (R.5248; 5266). Former ASA DeMartini testified that Deputy Reid could not do anything on the Coroner's office computer to enhance the quality of the images over the quality former ASA DeMartini could achieve when he worked with the disk (Peo. Ex. 1) at the State's Attorney's Office's computer. (R.5253-5254; 5258). Former ASA

---

[7] No witness at the evidentiary hearing would rebut this testimony.

DeMartini never advised the trial court that the images could not be made better, despite the fact that the trial court had previously been advised that the prosecution was working on making the images better. (R.5267-5268).

Former ASA DeMartini testified that he did not know how to convert a file to JPEG. (R.5280). However, Former ASA DeMartini admitted that the writing on the disk was his writing. (Peo. Ex. 1) (R.5281). He did not know how many disks were turned over to the defense. (R.5282).

On redirect examination, former ASA DeMartini acknowledged that he might have gotten a disk from the Coroner's office, but he denied copying the disk himself. (R.5286).

Eric Stauffacher ("Mr. Stauffacher"), the State's expert, does not have a four year computer software degree and his initial duties at Televere Systems were in customer service, taking calls through an 800 number. (R.5327). Mr. Stauffacher's role did not involve determining the quality of images or discriminating between the quality of images. (R.5330). As to that area of expertise, Mr. Stauffacher conceded "my opinion doesn't really matter." (R.5331).

At the evidentiary hearing, utilizing the Coroner's computer, Mr. Stauffacher opened Ben's file and manipulated the images. (R.5295; 5297-99). He demonstrated that adjustments to a file were automatically saved in a new file while the original file was retained. (R.5301-03). He explained the dating and naming systems applied by the software. (R.5304-05).

Mr. Stauffacher testified that files were automatically saved on the Coroner's computer in a TIFF format (R.5306; 5331). Mr. Stauffacher testified that a JPEG image

is a compressed format of lesser quality than a TIFF. (R.5331-32; 5347-48). Metadata gives information about the underlying data in a particular image. (R.5332). He explained that Peo. Ex. 1, also labeled Def. Ex. 8, contained images in the JPEG format. (R.5333).

Mr. Stauffacher was asked why an image saved as a TIFF image would be converted to a JPEG image. (R.5333). He responded that one reason would be to reduce the file size for emailing. (R.5333-34; 5358). He said another reason for such a conversion is because a JPEG file is more popular (R.5348-49) and can be opened by more software. (R.5349). He provided no other reasons why a TIFF image would be compressed to a JPEG lesser quality image.

Mr. Stauffacher was presented with Def. Ex. 25 (a group of exhibits which included properties pages showing the underlying metadata for the x-ray images contained in Def. Ex. 8 and Peo. Ex. 1) and he explained that metadata showed the file had been exported to a CD on September 6, 2011. (R.5335-36; 5352). The first file in Def. Ex. 8 and Peo. Ex. 1, "BenKingan1" had been converted to JPEG and gray scale had been applied to it. (R.5336-37). The size of the file was 267 kilobytes, much smaller than a normal TIFF file. (R.5335; 5352). Such a reduction from TIFF file format to JPEG amounted to a 98% reduction in file size. (R.5335).

Mr. Stauffacher was presented with Def. Ex. 26 (which reflected metadata underlying the 2015 x-rays saved as TIFF images contained in Def. Ex. 9) that applied to five images, consisting of four images and the fifth image which was copy. (R.5339-40; 5344). Mr. Stauffacher admitted the TIFF images were of higher quality. (R.5344). He also admitted that he would defer to a pediatric neuroradiologist as the quality of images

because his "opinion really doesn't matter on quality of the images." (R.5344-45).

When asked if a JPEG file format would maintain image quality, Mr. Stauffacher responded "you would really have to ask an image expert on that." (R.5348). After this admission by Mr. Stauffacher, the trial court barred him from offering an expert opinion as to the quality of images, explaining that "if you are asking any kind of opinion, it has to be within the scope of what the [trial court] finds the witness is able to discuss." (R.5357).

Finally, Mr. Stauffacher agreed that in this case, while conversions to JPEG are utilized due to file size where a TIFF is too large for an email, the JPEG file at issue in this case was copied to a disk. (R.5358). Here, the TIFF file was subsequently copied to a disk, Mr. Stauffacher admitted, demonstrating that the TIFF file was not too large to be copied to a disk. (R.5358-59).

Deputy Reid testified as a witness for the State. Deputy Reid testified that his involvement in the case did not begin until June 10, 2015, when he was asked to review Ben's file by Lake County Coroner Dr. Thomas Rudd ("Dr. Rudd"). (R.5211). Mr. DeLuca had testified that according to former ASA Bishop, "the person who would be responsible for producing those at the Coroner's office was out of town" when the illegible x-rays were produced on September 7, 2011. (R.5017). According to Mr. Mueller, the x-ray images produced by the State on September 7, 2011, were created on September 6, 2011, when Deputy Reid was on vacation. (R.5017; 5436) (Def. Ex. 33). Deputy Reid testified that on June 10, 2015, he opened up Ben's file on the Coroner's computer and opened up the four images he found there. (R.5215-17; 5222; 5238). Deputy Reid adjusted the image of the body and head and was able to brighten the image.

(R.5217; 5223; 5238-39). The additional fifth image he created was saved with the adjustments applied to it. (R.5239). Deputy Reid was sure those four images were saved in a TIFF file format. (R.5229). He created a disk of the images that were there. (R.5217-19).

Deputy Reid denied any involvement in the Calusinski case until June 10, 2015. (R.5211). He testified that he never took images and converted them into a JPEG format, nor did he apply grayscale to the images. (R.5234-35). Deputy Reid did not recall ever having any interaction with Former ASA DeMartini about the case or trying to brighten Ben's images for him. (R.5237). Deputy Reid denied copying the images on a disk, and he testified that "it sounds about right" that he was on vacation in September of 2011. (R.5227).

Dean Kharasch ("Mr. Kharasch") testified for the State. (R.5537). Mr. Kharasch was an investigator for the Lake County State's Attorney's office. (R.5538). Mr. Kharasch testified that in forensically examining the Coroner's computer, image expert Mr. Mueller "altered" the data on that computer. (R.5562-63). Mr. Karasch clarified that he meant that Mr. Mueller created and saved an additional image. (R.5580). More specifically, Mr. Mueller did not erase or modify any of the three original TIFF image files saved on the Coroner's computer. (R. 5573-74; 5580). Mr. Kharasch did not have any training in imaging or in software engineering, and he had majored in music and theater in college. (R.5564). He had never written a software program or worked for an imaging company as a consultant. (R.5587).

### Defendant's Perjury Claim

Mr. DeLuca testified at the evidentiary hearing that Dr. Montez testified at trial as a rebuttal witness and that he did not have a surrebuttal witness to refute his opinions. (R.5026). Mr. DeLuca testified that Dr. Montez primarily focused on the skull fracture in his trial testimony. (R.5026; 5071-72). Mr. DeLuca testified that Dr. Montez described touching the jagged edges of the skull fracture with his fingers on January 16, 2009. (R.5027-28). Further, Dr, Montez testified not only that the act that caused Ben's injury was intentional, but also was "a violent throw to the ground." (R.5028-29; 4536). Mr. DeLuca testified that Dr. Montez ruled out the possibility that Ben's injury was self-inflicted or accidental and instead told the jury that Ben's injury was caused "at the hands of another." (R.5029; 4572-73; 4535). Mr. DeLuca testified at the evidentiary hearing that the defense was wholly unprepared for Dr. Montez's rebuttal testimony; they "had no notes . . . had no warning about [Dr. Montez's opinions]." (R.5030). Dr. Montez was the last witness at trial, meaning he was the last witness to talk to the jury. (R.5030). Although Mr. DeLuca had requested a report from Dr. Montez in phone conversations before trial, Dr. Montez did not provide Mr. DeLuca with a report. (R.5030).

At trial, Dr. Montez testified that he came to the Coroner's office to do a "curbside counsel" on January 16, 2009, in the morning. (R.4575-76). According to Dr. Montez, Mr. Forman and Investigator Mike Young were present at the time of his alleged examination of Ben's body. (R.4575). Mr. DeLuca testified at the evidentiary hearing that Dr. Montez testified that he actually saw the fracture, felt the fracture, and even added that it was .8 inches long. (R.5027-28; 5059-60). At trial, Dr. Montez described his purported examination of Ben's skull as follows:

I_31

"At that time I then after examining the dura in the brain, I went back and looked at the head just to make sure what I was seeing was what I was seeing. Again, I focused this time I went inside out. I focused on the fracture. At the time that I was examining [Ben], I had gloves on. I took the gloves off because I wanted to touch the fracture itself to make sure it was fresh because it looked fresh to me. I took the gloves off and I touched the inside part of the skull where the edges of the skull fractured [sic] were not completely together. You could feel a ridge there.

The other thing I did I took the skull and moved it. A 16-month old child still has a pliable skull. It is not completely rigid. What I was able to do is move it, and I saw that fracture itself. The two edges it wasn't sticky, and stickiness is one of the first signs you see when bones start to mend.

I then stepped back from there and looked at the subgaleal tissue. Again, the area underneath the scalp that is on top of the skull. And I looked at the blood that was collected there. It was dense, packed, fresh blood that was underneath the scalp surface, which was underneath a contusion that was on top of the skull." (R.4520-21).

"I saw this portion of the head. Not only that, I was able to take my hand and touch this portion of the scalp, and it was consistent with a fresh injury. It was thickened, and packed, and loaded with flesh blood layer after layer in the subgaleal tissues below the scalp." (R.4541-42).

Dr. Montez described examining the brain but he never mentioned that it had been dissected and was in the viscera bag in the abdomen. (R.4519). Dr. Montez testified that he observed blood over the surface of the brain but he never mentioned that it had been dissected and was in the viscera bag in the abdomen. (R.4519). Dr. Montez specifically testified that he examined the brain and noted blood collecting on the brain in the subarachnoid spaces. (R.4552). Dr. Montez ruled out the existence of a chronic subdural hematoma based upon his visual inspection of the brain. (R.4557).

Dr. Montez went on to describe a "linear fracture which [was] almost an inch long, and it [went] to full thickness of the skull." (R.4546). According to Dr. Montez, the skull fracture meant that Ben had been the victim of a violent, intentional throw to the ground with significant force. (R.4536). Dr. Montez ruled out that the head injury was

self-inflicted and he ruled out that it was accidental.  (R.5029; 4572-73).

The following testimony was elicited in pre-trial hearings:

A.  Det. Hyde testified in a pre-trial hearing that Dr. Choi had told him that there was a skull fracture.  (R.154).

B.  Dr. Choi's autopsy report indicated that Ben had a skull fracture. (Def. Ex. 12).

C.  Det. Curran testified that he was told by Det. Hyde "that [Ben's] skull had been . . . cracked."  (R.603-604).

D.  According to Det. Filenko, Det. Curran told Defendant, during her interrogation, that Ben's skull had been cracked.  (R.674-76).

E.  The trial court  cited  Dr. Choi's autopsy report in a  pre-trial ruling, stating, "[Dr. Choi's] conclusions were that the cause of death was blunt force trauma to the head consistent with a one-to-two story fall and a skull fracture that was about an inch or two long."  (R.1009).

F.   In another  pre-trial hearing  Det. Curran testified that Dr. Choi identified a skull fracture during the autopsy on January 15, 2009. (R.1302). Det. Hyde testified, at a pre-trial hearing, that he informed investigators that Ben had a skull fracture.  (R.1588).

At trial, the State's claim that Ben suffered a skull fracture was critically important in establishing the manner of death was a homicide and not an accident. During the trial, the State referenced the skull fracture no fewer than thirty-two times.  (C.950). Numerous State witnesses testified that Ben's skull was fractured. The skull fracture was crucial to the prosecution's case against Defendant.   The false medical evidence that

I_33

Ben's skull had been fractured was crucial to the success of the State's prosecution of Defendant.

    A.   The State, in its opening statement at trial, represented to the jury that Dr. Choi would testify about the skull fracture he found on Ben's head and that the bloody area corresponded to this fracture. (R.2606).

    B.   Det. Hyde testified that Dr. Choi pointed out the area of the skull fracture to him during the autopsy and that he could see it without using a magnifying glass. (R.3291).

    C.   Det. Hyde testified that the skull fracture was directly beneath a discolored area on Ben's scalp as shown in autopsy photographs. (R.3295-96).

    D.   The State's expert, Dr. Greenbaum, testified that "abusive head trauma is a broad term that encompasses all types of injury to the head, primarily not just a goose bump but skull fractures . . .." (R.3439).

    E.   Dr. Greenbaum later testified that the presence of a skull fracture confirms that there was as "impact to the head with significant force, enough to crack the skull." (R.3445).

    F.   Dr. Greenbaum testified that "if there's a hard impact to the head the skull may break and it absorbs that energy and there's a break, there's a crack in the skull and that would be a skull fracture so that would involve the bone underneath the scalp." (R.3458).

    G.   According to Dr. Greenbaum, Dr. Choi's autopsy finding that "[Ben] had a broken skull bone" was significant to her expert opinion. (R.3458-59).

H.  Dr. Greenbaum testified that she was able to see the skull fracture in photographs with her naked eye (R.3470) and later identified it in an autopsy photograph. (R.3473).

I.  Dr. Greenbaum testified that the finding of a skull fracture is important because it is consistent with a trauma injury of enough force to crack the skull. (R.3474).

J.  Dr. Choi testified that he saw an area of fracture on Ben's head. (R.3578).

K.  Dr. Choi testified that he observed the fracture with his naked eye and described it as being .8 inches in length. (R.3579).

L.  Dr. Choi testified that People's Trial Ex. 36, an autopsy photograph, showed the skull fracture he observed. (R.3581).

M.  According to Dr. Choi, the skull fracture is visible on the exterior of the skull in People's Trial Ex. 44. (R.3583). Therefore, Dr. Choi testified that the fracture went all the way through the thickness of Ben's skull. (R.3584-85).

N.  Dr. Choi testified that he took an x-ray of the skull fracture but that the fracture was not visible in the x-ray. (R.3633-34).

O.  Detective George Filenko ("Det. Filenko") testified that he received information from Detective Adam Hyde ("Det. Hyde") that the autopsy revealed that there was a skull fracture (R.3807) and the fracture was so severe that it was similar to what would result from a fall from a two story building. (R.3882).

P.  Det. Filenko testified that he told Defendant that "Ben died as a result of a skull fracture" during her interrogation. (R.3901).

Q.  Detective Sean Curran ("Det. Curran") testified that Det. Hyde had informed him that Ben "had suffered a skull fracture." (R.3992).

R.  Dr. Montez testified that he found "significant trauma, violent trauma to the head" when he examined Ben.  (R.4518).  Dr. Montez described "an inch long through and through fracture of the skull itself."  (R.4519).

S.  Dr. Montez testified that Peo. Ex. 36 at trial showed a "linear fracture which is almost an inch long, and it [went] to full thickness of the skull."  (R.4546).

T.  Dr. Montez went on to testify that he touched the skull fracture with his bare hands.  (R.4547-48).

U.  Dr. Montez testified that, based upon his examination of Ben, the skull fracture was new because it did not show any sign of healing.  (R.4555).

According to Dr. Montez, Ben could not have inflicted the skull fracture because he could not have generated the force required to fracture a pliable skull. (R.4572-73).

During closing arguments at trial, the State argued as follows:

A.  "The skull fracture.  It is a skull fracture.  Simple as that . . . Dr. Choi saw it.  We talked about what the [d]efense expert said about all these things.  It was a skull fracture through and through with blood in between."  (R.4647).

B.  "Ladies and gentlemen, use your common sense and experience.  This line is a fracture in the skull.  You do not need a doctor to see a fracture.  What did Dr. Montez say?  Remember how he manipulated the skull?  He manipulated the skull.  Why?  To see how old that was.  Look at that red substance in the crack and the two sides.  What is that?  Fresh blood.  That is a fresh fracture."  (R.4716-17).

29

I_36

C. Former ASA Bishop stated in her opening, "[f]irst proposition we have to show [is] that the Defendant [per]formed an action [that] caused death. We have it. What were the acts? Threw him to the ground. Cracked his head. Fractured." (R.4732).

Mr. DeLuca testified that he could not dispute Dr. Montez's conclusions because he did not possess any readable x-rays that would have conclusively proven there was no skull fracture and therefore Dr. Montez's testimony was demonstrably false. (R.5022; 5025-26; 5028; 5030).

Mr. DeLuca testified at the evidentiary hearing that had he known that Ben's skull had not been fractured, his entire strategy of defense would have changed. (R.5020). First and foremost, Mr. DeLuca testified, he would have retained a pediatric neuroradiologist to have opined on the significance of an absence of a skull fracture. (R.5020). Mr. DeLuca would have attacked the confession differently if he had known that Ben had not suffered a skull fracture. (R.5023). Mr. DeLuca would have been able to tell the jury that Defendant's videotaped confession, which contained a reenactment by her of the fatal blow inflicted to Ben's skull, was absolutely contrary to the indisputable fact that Ben suffered no skull fracture. (R.5022-23). Furthermore, Mr. DeLuca would have retained a pediatric neuroradiologist who would have testified that Defendant's rendition of the final blow that she inflicted on Ben's skull is inconsistent with the type of blow that would have been necessary to cause a linear skull fracture. (R.5119-20).

The Lake County Deputy Coroner that had been assigned to investigate Ben's death, Mr. Forman, testified at the evidentiary hearing. (R.5074-75). Mr. Forman attended the first autopsy of Ben on January 15, 2009, at about 2:00 p.m. (R.5086) (Def.

Ex. 12).  Dr. Choi conducted the autopsy and Detective Hyde was present.  (R.5086).

Mr. Forman took x-rays of Ben's skull.  (R.5078).  The x-rays were clear and readable

when he presented them to Dr. Choi and Dr. Choi had no issue with their quality.

(R.5078-79).  In other cases, when Dr. Choi was dissatisfied with the quality of x-rays, he

would ask that Mr. Forman retake the x-rays and he did not do so with the x-rays of

Ben's skull.  (R.5106-107).   Prior to the time he left his employment with the Coroner's

office, Mr. Forman had never been asked to place the x-rays he took of Ben on a disk.

(R.5093).

After Dr. Choi completed the autopsy on January 15, 2009, Mr. Forman took the

skull to the autopsy sink, washed and scrubbed the inside and outside of the skull, then

dried it with a towel, so there was no sticky residue on the skull.  (R.5084-85).  The brain,

having been examined and dissected, was placed with other organs in the viscera bag.

(R.5083) (Def.Ex.14). Mr. Forman placed the viscera bag, with the dissected brain inside,

in the abdomen, then stitched the abdomen closed.  (R. 5080-81).  Finally, Mr. Forman

stitched up Ben's skull.  (R.5084).  Mr. Forman identified a photograph depicting that the

skull was sewn up.  (R.5082-83) (Def. Ex. 18).

The first autopsy did not have an opinion as to the cause of death and simply

stated, "[p]ending further studies."  (Def. Ex. 12).

The next day, January 16, 2009, Mr. Forman met with Coroner Keller and Dr.

Montez about the case between 10:30 a.m. and noon at the Lake County Coroner's Office

on the first floor in the administrative area.  (R.5087).  Mr. Forman provided Dr. Montez

with the following documents and photographs: Mr. Forman's preliminary narrative

regarding the case; a copy of the necropsy report filed by Dr. Choi on January 15, 2009;

and Dr. Choi's body charts and notes from the January 15, 2009, autopsy. (R.5088). Mr. Forman explained to Dr. Montez the scene photographs and the autopsy photographs. (R.5088). When Mr. Forman was asked if Dr. Montez examined the body, he specifically said, "Dr. Montez did not view the body." (R.5088). Mr. Forman explained that Dr. Montez proceeded to do the following:

> "Dr. Montez put the folder [of documents] up under his arm, looked at Coroner Kellner, asked Coroner Keller what he wanted him, meaning Dr. Montez, to do with this information. Coroner Keller said I would like for you to review it. He told Dr. Montez there would not be a need for a report because he just wants to make sure that Dr. Choi was on the right track with this case because the Task Force had expressed concerns." (R.5089-88).

If Dr. Montez had examined the body, Mr. Forman's job mandated that he would have to accompany Dr. Montez to examine the body. (R.5089). Dr. Montez took documents but he did not view or examine Ben's body, then Dr. Montez left the office. (R.5088-89).

A second postmortem exam took place on January 16, 2009, at 4:00 p.m. (R.5090) (Def. Ex. 12). Dr. Choi was present with Mr. Forman. (R.5091). The rough sutures were still in place when that exam began. (R.5091-92). Mr. Forman made the following observations about the condition of Ben's body at the beginning of the second post-mortem examination:

> "[Ben's] head [was] still stitched up as it was on January 15 . . . The dissected brain was still in the visceral bag in the abdominal cavity, and the abdominal cavity was sewn shut as [he had] left it on the 15th." (R.5091-92).

Mr. Forman testified that there was no evidence whatsoever that anyone had examined Ben's body. (R.5092). Everything was in place just as Mr. Forman had left the body on the previous day. (R.5092).

### *The State's Case Re: Perjury Claim*

William Biang ("Mr. Biang") testified for the State. (R.5593). Mr. Biang was an investigator for the Lake County State's Attorney's Office. (R.5593). Mr. Biang testified as to phone records produced pursuant to subpoena, specifically identifying subscribers' phone numbers and the times, dates, and duration of various phone calls. (R.5593-5633). The trial court explained that "the fact that there are records does not mean that any particular person was on the other end of the phone. It's simply evidence that those phones were used in a way that they were indicated … the [c]ourt is only going to consider competent evidence before it." (R.5619-5620).

Mr. Biang also interviewed Mr. Forman repeatedly for the State's Attorney's Office. (R.5633). Mr. Biang claimed that during an interview on July 28, 2015, Mr. Forman told him he took two x-rays on film, one of the head and one of the torso, and Dr. Choi viewed them on a light box. (R.5633-34). Mr. Biang next claimed that on August 5, 2016, Mr. Forman told him he took two x-rays and could not recall if they were taken on film or with the computer. (R.5635-37).

On cross-examination, Mr. Biang admitted he had met with Mr. Forman three or four times. (R.5641). The trial court sustained objections to inquiries regarding Mr. Biang's interviews of Mr. Forman on July 28, 2015, and August 5, 2016. (R.5644, 5646-49). Mr. Biang admitted he told Mr. Forman on August  he had a grand jury subpoena to serve upon him after Mr. Forman testified at the evidentiary hearing. (R.5652). The trial court sustained objections to any questions about whether or not Mr. Biang truly possessed a grand jury subpoena for Mr. Forman, and what the nature of those proceedings was. (R.5652-53). The Defense was not given a copy of the grand jury

subpoena.  Defense counsel sought to establish that evidence explaining Mr. Biang's pursuit of Mr. Forman and his interactions with Mr. Forman would damage Mr. Biang's credibility as to the statements he attributed to Mr. Forman in his testimony on direct examination at the evidentiary hearing.  (R.5652-53). The trial court barred defense counsel's proposed inquiries and ruled that "anything to the present date doesn't matter." (R.5653).  The trial court subsequently permitted the State to elicit testimony from Mr. Biang claiming Mr. Forman told him he had a mental illness.  (R.5661).  This subject matter had previously been barred, but the trial court allowed it through Mr. Biang, ruling that Defendant "had made Mr. Forman more central to" the knowing perjury claim. (R.5658).

Evidence Technician David Thomas ("Mr. Thomas") testified that he had attended Ben's autopsy on the afternoon of January 16, 2009.  (R. 5669; 5671).  He identified photographs purportedly taken on that date.  (R.5676-77, 5692-93).  Defendant objected, pointing out that the photographs Mr. Thomas sought to testify to were not time and date stamped and, in reality, had been taken on January 15, 2009.  (R.5693-94).  The trial court acknowledged that the previously viewed photographs had time and date stamps while the photographs at issue did not.  (R.5695).  The trial court asked the State when the photographs were taken.  (R.5696).  Mr. Thomas claimed they were taken on January 16, 2009.  (R.5696).  The trial court overruled Defendant's objection.  (R.5696-97).

On cross-examination, Mr. Thomas testified that when he observed Ben on January 16, 2009, it was apparent Ben's brain had been removed and dissected. (R.5703).  The focus of the second autopsy was on Ben's lower body.  (R.5703).  Mr.

Thomas did not know if Ben's skull had been scraped prior to the autopsy he viewed. (R.5704). He did not look closely at the skull at any time. (R.5704). Mr. Thomas had never sewn up a body in relation to an autopsy. (R.5704-705). He was unaware of protocols governing such procedures. (R.5705). He agreed that once the autopsy was completed, the skull cap would be sewn on. (R.5705). Because Mr. Thomas was not present for the autopsy on January 15, 2009, he did not know if the skull cap was sewn on. (R.5705).

Mr. Thomas also was unaware whether Mr. Forman had removed any stitching from the skull cap prior to Mr. Thomas' arrival on the 16th. (R.5706). All he knew, Mr. Thomas admitted, was that when he arrived, the skull cap was not stitched. (R.5706). Mr. Thomas admitted he was not testifying that the skull cap was left off all night long because he did not know that. (R.5707).

The State rested and the proofs were closed. (R.5709-10). After closing arguments (R.5710-5787), the trial court took the matter under advisement. (R.5787).

### The Trial Court's Ruling Defendant's Brady Claim

On September 30, 2016, the trial court dismissed the post-conviction petition in a written order. (C.1485-1535). The trial court acknowledged that Mr. DeLuca testified that if he had known that x-rays showed no skull fracture existed, "it would have impacted his choice of experts and affected his trial strategy." (C.1498). The trial court also acknowledged that Mr. DeLuca explained that since there were no x-rays, the defense had nothing to rebut the State's evidence that Ben's skull was fractured. (C.1498). The trial court further acknowledged that former ASA DeMartini testified that he went to see Deputy Reid at the Coroner's Office. Deputy Reid used the computer and

35

"pulled up three x-rays from the Kingan file and used TigerView to make similar adjustments that DeMartini had attempted in his office, but ultimately could not enhance the images any better than DeMartini could." (C.1503).

The trial court reviewed the testimony of State "expert" Mr. Stauffacher at length in its opinion. (C.1505-1509). Then, the trial court made passing reference to defense expert Mr. Mueller's testimony. (C.1509-1511).

The trial court granted Defendant's request for leave to add a claim that her conviction was obtained through the use of perjured testimony. (C.1516-1518). Specifically, Defendant claimed Dr. Montez testified falsely that he physically observed and examined Ben's body on January 16, 2009. (C.1517). On September 30, 2016, the trial court denied the claim. (C.1520).

The trial court determined that because the parties did not fully address the issue of whether the Coroner's possession of the x-rays is imputed to the State for *Brady* purposes, the trial court would assume without deciding that the Coroner's possession should be imputed to the State's Attorney for *Brady* purposes in this case. (C.1522). The trial court further found that in 2011, the default setting for exporting images was a JPEG format. (C.1523). However, the trial court failed to recognize that there were no JPEG files saved on the Coroner's computer in 2011 or 2015 because the files only were saved in a TIFF format. (Def. Exs. 29; 30) (R.5499-5500). Mr. Mueller explained that the term "TIG extension" is "just a file name" and "[t]he underlying bit stream is a TIFF file format. They didn't change [it]. All they did was slap a name on it." (R.5498). Mr. Mueller testified that "the images were always there on the Coroner's computer" as TIFF images. (R.5498). Mr. Mueller testified that TigerView doesn't store images on the

Coroner's computer in a JPEG format. (R.5499). The TIFF uncompressed data was vastly superior to the compressed JPEG data. As Def. Ex. Group 29 shows, the underlying metadata for Image 48 is 17.8 megabytes, Image 49 is 16.6 megabytes, and Image 50 is 17.2 megabytes, while the compressed JPEG image is 267 kilobytes. (R.5406-407). The trial court recognized that Defendant argued that exporting the images in the compressed JPEG format created images that lacked detail required to determine that no skull fracture existed. (C.1525).

The trial court denied Defendant's *Brady* claim. (C.1525-28). In doing so, the trial court explained that "TigerView engineer Stauffacher conclusively refute[d] [sic] Defendant's claim. During his in-court demonstration, the court observed Stauffacher use the same TigerView software Mr. DeLuca possessed from the September 2011 disk to adjust the variables on the .jpg images to brighten and display more bone detail. Indeed, Stauffacher did this so quickly and easily as to make it seem like child's play." (C.1525). The trial court relied upon Peo. Ex. 137, which "depicts BenKingan2.jpg from the September 2011 disk [image on the left] after Stauffacher adjusted it with the same software available to Mr. DeLuca in a side-by-side comparison with BenKingan3.tiff from the June 2015 disk [image on the right]. The images are substantially similar. Not only do they show the identical position in the same perspective, both display the same amount of detail in the skull and bones of the upper body. The court notes that the adjusted BenKingan2.jpg image shows two small marks in the skull, one on the left and one on the right, as does BenKingan3.tiff . . . The court finds no material difference in this case between BenKingan2.jpg and BenKingan3.tiff for *Brady* purposes." (C.1526).

The trial court criticized Mr. Mueller for "saving another modified x-ray image in the Kingan folder, all after the computer itself had been admitted into evidence during the hearing." (C.1527). The trial court failed to acknowledge that Deputy Reid and Mr. Stauffacher had done exactly the same thing when they created a copy of the head image they were adjusting in 2015. (R.5284; 5301-03).

The trial court concluded that the x-rays on the 2015 disk were copies of the original x-rays taken in 2009 and given to Mr. DeLuca on the 2011 disk "or modifications of those January 15, 2009, x-ray images." (C.1527). The trial court held that because Mr. DeLuca had the disk prior to trial, "Defendant possessed all the autopsy x-rays taken of Ben Kingan." (C.1528).

The trial court criticized Mr. DeLuca for failing to seek assistance in utilizing the software on the 2011 disk to enhance the images. (C.1530). The trial court again ignored Mr. Mueller's testimony that the JPEG images could not be enhanced.

The trial court also found that the x-rays were not material "based upon the facts of this case to establish a *Brady* violation." (C.1528). The trial court stated that "Defendant must show that the x-ray images from the June 2015 disk could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (C.1528). The trial court also stated "having weighed the potential impact of the x-ray images on the verdict . . ., the court finds that Defendant's claim fails in this regard, as well." (C.1528). The trial court cited the trial testimony of: Dr. Choi who claimed he observed the fracture with his naked eye and it went completely through the skull and he identified the fracture to the jury on autopsy photographs; Dr. Greenbaum who similarly identified the fracture on the autopsy photographs as being inside and

outside the skull; Dr Montez who showed the jury a fracture on autopsy photographs both inside and outside the skull and testified that "he physically touched and manipulated a through-and-through fracture with his hands; and Dr Leestma, Defendant's expert, who "presumed the existence of a fracture" in his testimony. (C.1529). The trial court inadvertently established the materiality of the *Brady* claim by pointing out the sheer number of trial experts who told the jury, in no uncertain terms, that there was a skull fracture. None of these experts were provided with the clear, readable x-rays that existed in 2009 on the Coroner's computer in a TIFF format. Those x-rays conclusively demonstrate that there was no skull fracture.

The trial court, without the assistance of a radiology expert, determined that because "so many factors can affect whether a fracture would be visible on an x-ray, it does not necessarily follow that it is impossible for an x-ray *not* to show a fracture. Therefore, Dr. Zimmerman's testimony fails to establish that the June 2015 x-rays could reasonably be taken to put the whole case in a different light." (C.1530).

The trial court also stated that Mr. DeLuca took no steps to get clear, more readable x-rays, to seek any assistance in utilizing the TigerView program, or to observe the original x-rays at the Coroner's office.  (C.1530).

### Trial Court's Ruling: Actual Innocence Claim

In denying Defendant's claim of actual innocence, the trial court found that Defendant possessed the x-rays before trial, and adjustments to those images were available to her with the practice of due diligence (C.1532-33). The trial court admitted that Dr. Zimmerman unequivocally testified that no skull fracture existed, but found that, because Defendant possessed the x-rays before trial to make that determination, Dr.

Zimmerman's testimony is not new evidence. (C.1532-33). Further, the trial court concluded, the images would not likely change the result on retrial. (C.1534). The trial court completely ignored the simple undisputed fact that Mr. DeLuca was provided JPEG compressed images with 2% of the data of the TIFF images, and with a window width reduced from thousands to three, that were readily available for disclosure to the Defendant in 2011. (R.5043).

### Trial Court's Ruling: Perjury Claim

On September 16, 2016, the trial court heard argument on Defendant's motion to amend the petition to include a claim that Defendant was convicted as a result of perjured testimony. (R.5367-5386). The trial court took the matter under advisement, and in its ruling on September 30, 2016, granted leave to Defendant to amend her petition with a perjury claim. (R.5386). The trial court specifically found that "the State was not unfairly taken by surprise" by this claim. (C.1518).

The trial court found that Defendant's perjury claim was based *solely* upon the evidentiary hearing testimony of Mr. Forman. (C.1518). According to the trial court, Mr. Forman testified that he stitched Ben's skull together after the first autopsy on January 15, 2009. Mr. Forman testified that, contrary to Dr. Montez's trial testimony, he had physically examined the body and actually touched the fracture on Ben's skull, when he actually had not. (C.1518).

The trial court found that Mr. Forman's testimony was refuted by the testimony of Mr. Thomas, who attended the second examination with Mr. Forman and Dr. Choi on January 16, 2009. The trial court focused on Mr. Thomas' testimony that he observed that the skull cap was removed and saw no visible stitching marks. The trial court also found

that Mr. Forman was impeached by his statement that he took 5 x-rays of Ben's body on January 15, 2009, with his contradictory statements to Investigator Biang that he took two x-rays (C.1519). The trial court also noted that it had the opportunity to observe and evaluate Dr. Montez's trial testimony. (C.1519). Without further explanation, the trial court ruled that "the Defendant has failed to present credible evidence showing a constitutional deprivation based upon perjured testimony." (C.1520).

## ARGUMENT

I. **THE TRIAL COURT ERRED IN DISMISSING DEFENDANT'S POST-CONVICTION-PETITION AFTER THE EVIDENTIARY HEARING BECAUSE DEFENDANT MADE A SUBSTANTIAL SHOWING THAT HER CONSTITUTIONAL RIGHTS UNDER *BRADY V. MARYLAND* WERE VIOLATED.**

### *Introduction*

Prior to trial, the State possessed readable x-rays that established that Ben had not suffered a skull fracture. The lack of a skull fracture showed that Ben was not the victim of a homicide, supporting Defendant's theory and undercutting the State's theory. But those favorable, readable x-rays were not disclosed to Defendant. As a result, Defendant was convicted. A textbook *Brady* violation occurred.

### *Standard Of Review*

In noncapital cases, the Act provides a three-stage process for adjudicating post-conviction petitions. *People v. Harris,* 224 Ill. 2d 115, 125 (2007). When a petition advances through a third-stage evidentiary hearing (725 ILCS 5/122–6 (West 2000)), and fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous. *People v. Pendleton,* 223 Ill. 2d 458 (2006); *People v. Beaman*, 229 Ill. 2d 56, 71–72 (2008). This deferential standard

41

reflects the understanding that the trial court is in the best position to observe and weigh the credibility of the witnesses. *People v. Coleman,* 183 Ill. 2d 366, 384–85 (1998); *People v. Andoh*, 2016 IL App (1st) 133461-U, ¶ 21.

### Requirements of a Brady Claim

In *Brady v. Maryland,* 373 U.S. 83 (1963), the Court held that the State violates an accused's constitutional right to due process of law by failing to disclose evidence. A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *People v. Burt,* 205 Ill. 2d 28, 47 (2001). To comply with *Brady,* the prosecutor has a duty to learn of favorable evidence known to other government actors. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Supreme Court has, therefore, noted "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene,* 527 U.S. 263, 281 (1999). The prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Strickler,* 527 U.S. at 281, quoting *Berger v. United States,* 295 U.S. 78, 88 (1935).

The United States Supreme Court has made it clear that exculpatory evidence need not be evidence that would have produced an acquittal. *Kyles*, 514 U.S. at 434. It need only be evidence "favorable to the accused," *Brady*, 373 U.S. at 87, and of the nature that it creates a "reasonable probability" that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681 (1985). "[A] showing of materiality does not require

demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 682). Stated simply, "[s]uch evidence is favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676.

Here, the trial court's decision to dismiss the petition after the evidentiary hearing was manifestly erroneous. Defendant established that readable x-rays of Ben showing no skull fracture were available on the Coroner's computer in 2009 in a TIFF format. Those readable x-rays showing no skull fracture completely supported the theory Defendant sought to present at the trial. When Dr. Zimmerman was asked if the "lack of skull fracture point[s] more to self-inflicted or accidental head trauma [than abusive head trauma]," he answered "[y]es." (R.5118).

However, the favorable, readable x-rays showing no skull fracture were not disclosed by the State to Defendant. The fact that the jury was prohibited from hearing evidence based upon the readable x-rays showing no skull fracture, including all the implications that flowed from that crucial medical fact, undermines confidence in the verdict.

### Readable X-rays Showing No Skull Fracture were Favorable to Defendant

Defendant submits that she met her burden and established at the evidentiary hearing that the lack of a skull fracture, as demonstrated by the readable x-rays, would "go against a diagnosis" of abusive head trauma. (R.5118).

Courts have found withheld evidence to be favorable in the context of a *Brady* claim in cases where a defendant has made a much lesser showing than Defendant has

43

here.  In the recent case of *People v. Carballido*, 2015 IL App (2d) 140760, ¶¶ 70-71, the trial court explained that "when it is not clear whether the undisclosed evidence would be favorable, we should presume that it would be favorable." *Id.  See*, *e.g., People v. Nichols,* 63 Ill. 2d 443 (1976) (where the prosecution failed to turn over a shoe left at the scene of the crime, presumably belonging to one of the perpetrators, "[t]he shoe must be considered as evidence favorable to the defendants").  The Court continued: "To hold otherwise would discourage the State from disclosing evidence as required. When the State fails to disclose evidence as required, it enables its witnesses to testify inaccurately without check." *Carballido*, 2015 IL App (2d) at ¶¶70-71.  Here, because the readable x-rays were not disclosed, Defendant was unable to impeach the numerous witnesses that testified Ben suffered a skull fracture.  Those witnesses testified inaccurately and without check.

The favorable nature of the readable x-rays which showed no skull fracture was established at the evidentiary hearing.  Trial defense counsel Mr. DeLuca testified as to how he formulated his trial strategy and how the lack of any readable x-rays greatly influenced his strategy.  (R.5018-5021).

If Mr. DeLuca had been provided with readable skull x-rays, he would have retained a pediatric neuroradiologist such as Dr. Zimmerman.  (R.5020).  As the Chief of Pediatric Neuroradiology at Children's Hospital in Philadelphia, Dr. Zimmerman had extensive experience differentiating abusive head trauma from accidental head trauma.  (R. 5118).  Dr. Zimmerman reviewed the TIFF x-ray images that existed in 2009 and testified that the absence of a linear skull fracture on the occipital parietal part of a child's head "goes against" the diagnosis of abusive head trauma.  (R.5118).  Dr. Zimmerman

44

I_51

testified that the other findings of hemorrhaging at three levels of the brain are not exclusively indicative of abusive head trauma and can occur in accidental or self-inflicted head trauma. (R.5130-31). Mr. DeLuca was deprived of the opportunity to refute the State's claim that the skull fracture was caused by Defendant throwing Ben to the floor as she demonstrated in her videotaped reenactment. Dr. Zimmerman testified that he had reviewed Defendant's interrogation video and that in the reenactment, "the occiput did not hit the ground . . . ." (R.5120).

Disclosure of the readable x-rays would have been favorable to Defendant in an additional way. Multiple experts testified for the State that Ben's skull had been fractured. Proper disclosure would have permitted Mr. DeLuca to impeach those experts. For example, the State's star witness, Dr. Montez, testified that he observed the fracture and actually testified that he felt the fracture with his hand after taking his exam gloves off. (R.4520). This testimony was devastating to Defendant's case. But had the readable x-rays been produced, Dr. Zimmerman, or another qualified pediatric neuroradiologist, would have testified at trial as Dr. Zimmerman did at the evidentiary hearing. At the evidentiary hearing, in direct response to the trial court's inquiry, Dr. Zimmerman stated unequivocally that it is not possible for a clinician to have observed a fracture, in the area of the occipital parietal bone, when that fracture did not appear in an x-ray. (R.5133). If Dr. Zimmerman or any pediatric neuroradiologist had offered this testimony at Defendant's trial, it would have established that Dr. Montez's testimony of visualizing and touching the fracture was false.

***Brady is Violated When State Makes Partial Disclosure that Misleads Defense Counsel***

*Brady* requires disclosure of exculpatory information, not just exculpatory documents and tangible things. *See Bagley,* 473 U.S. at 677 ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination."). In *Bagley,* the prosecution disclosed *misleading* information or what might be deemed "half-truths"; the United States Supreme Court concluded that such a disclosure violated *Brady.* In *Bagley*, the defense counsel had asked for disclosure of any inducements made to witnesses, and the prosecutor failed to disclose that the *possibility* of a reward had been held out to the witnesses. The prosecution had provided affidavits from the witnesses stating that they had received no *promises* of reward in return for the information provided, but the affidavits made no mention that the possibility of a reward had been held out to them.

The *Bagley* Court disagreed that such a disclosure was sufficient: "While the government is technically correct that the blank contracts did not constitute a 'promise of reward,' the natural effect of these affidavits would be misleadingly to induce defense counsel to believe that O'Connor and Mitchell provided the [inculpatory] information . . . without any "inducements." *Id.* at 684.

*Bagley* made it clear in 1985 that *Brady* is violated when the prosecution makes a partial disclosure that misleads defense counsel into believing that no further exculpatory evidence as to a certain issue exists.

In the case at bar, the prosecution disclosed unreadable x-rays to Mr. DeLuca on September 7, 2011, and then continued to mislead Mr. DeLuca into believing no readable

x-rays existed. This is clearly a *Brady* violation because the prosecutor's partial disclosure misled Mr. DeLuca into believing there were no readable x-rays of Ben's skull, and, as Mr. DeLuca testified, this dramatically affected his trial strategy. (R.5018-20).

### *Brady is Violated When the State Modifies Evidence Prior to Disclosure*

Modification of evidence prior to disclosure led the court to find a *Brady* violation in *Pena v. State*, 353 S.W.3d 797, 815 (Tex. Crim. App. 2011). In that case, the State possessed a videotape that included audio of a conversation capturing the defendant speaking with the arresting officer. However, in discovery, the State disclosed a videotape to the defendant that did not contain the audio portion. Although it was undisputed that the videotape was disclosed, the court still found that a *Brady* violation had occurred. The court reached this conclusion based upon the exculpatory nature of the audio portion of the tape that had been withheld.

The same result is required here. In *Pena*, the prosecution removed the audio portion of the videotape prior to disclosing it to the defense, which removed the exculpatory nature of the evidence. The State in *Pena* disclosed a videotape and the State here disclosed x-rays. However, the State's disclosure of the unreadable and illegible x-rays did not contain the exculpatory evidence that the original x-rays possessed. Only the 2009 TIFF x-rays held exculpatory value to Defendant, and they were not disclosed. Just as in *Pena*, the State's disclosure amounted to no disclosure at all. Defendant's *Brady* rights were violated.

Defendant was under no obligation to investigate whether she could somehow enhance or improve the x-rays. The prosecutor advised the court on September 7, 2009

that the x-rays were unreadable and illegible. Defendant was entitled to rely on the State's representation and not launch her own investigation. See, *United States v. Boyd*, 833 F. Supp. 1277, 1358-59 (N.D. Ill. 1993) aff'd, 55 F.3d 239 (7th Cir. 1995) (taking the prosecution at its word is not a failure to exercise due diligence).

*McArthur v. State of Florida*, 671 So.2d 867 (Fla. 4th. Dist. 1996) also offers guidance on this issue. On appeal, defendant argued that the State committed a discovery violation when it disclosed a particular pair of shorts as being the ones the victim wore during an attack. The disclosed shorts were not torn during the attack as the victim had claimed. But during trial, the State introduced a pair of torn shorts as the victim's shorts. The appellate court found that a discovery violation occurred, holding that "furnishing misleading and inaccurate discovery is tantamount to providing no discovery at all". *McArthur*, at 671 Co.2d at 870.

Here, a discovery violation occurred when the State produced unreadable x-rays that were misleading to Mr. DeLuca in 2011. It is undisputable that the State had readable x-rays on the Coroner's computer that should have been produced.

### Trial Court Disregarded Defendant's Expert Witnesses and Based Its Decision on Its Own Non-Expert Interpretation of the X-Ray Images and Metadata

The trial court did its own radiological comparison of the two x-rays in Peo. Ex. 137. The trial court identified the image on the left as the BenKingan2 JPEG DeLuca image from the September 2011 disk. The court identified the image on the right as the BenKingan3 TIFF image discovered in June 2015 on the Coroner's computer. The court concluded that the images were "substantially similar" after Mr. Stauffacher brightened the image with the software provided to Mr. DeLuca in 2011. The court stated that the images show the identical position in the same perspective, and both display "the same

amount of detail in the skull and bones of the upper body." As support for its conclusion, the court noted that the adjusted BenKingan2 JPEG image shows two small marks in the skull, one on the left and one on the right, as does BenKingan3 TIFF. The court ignored the testimony of the pediatric neuroradiologist Dr. Zimmerman and of the computer imaging expert Mr. Mueller, and found "no material difference" between DeLuca BenKingan2 JPEG and BenKingan3 TIFF for *Brady* purposes. (C.1526). The court's conclusion is based on the State's fatally flawed argument that brightening the JPEG image replenishes the ninety eight percent lost data of the TIFF image. .

Clearly, the trial court did not possess the credentials of a pediatric neuroradiologist or imaging expert to make such interpretations. When Mr. Stauffacher was asked to compare the quality of the TIFF image to the JPEG image, he agreed that he would defer to a neuroradiologist or an expert in child abuse to determine which image was superior. (R.5344-45). Mr. Stauffacher specifically stated, "my opinion doesn't really matter on the quality of the images. It really [sic] whoever the physician is." (R.5344-45). Despite Mr. Stauffacher's candid admission of no expertise in radiology or imaging that would allow him to offer an opinion on the quality of the images, the trial court stated, "TigerView engineer Stauffacher conclusively refute[d] Defendant's claim." (C.1525).

The trial court stated, "[d]uring his in-court demonstration, the court observed Mr. Stauffacher use the same TigerView software DeLuca possessed from the September 2011 disk to adjust the variables on the .jpg images to brighten and display more bone detail. Indeed, Stauffacher did this so quickly and easily as to make it seem like child's play." (C.1525). It is indisputable that the court did not possess the expertise of a

49

pediatric neuroradiologist such as Dr. Zimmerman to offer an opinion about comparing the "bone detail" in the JPEG and TIFF images. And yet the court concluded there was no *Brady* issue based upon its own examination and conclusions of the bone detail in the JPEG images. (C.1525).

Defendant established that readable and legible x-rays were available to the prosecution in January 2009. It is undisputed that those images were saved on the Coroner's computer in a TIFF format.

It is undisputed that the TIFF x-rays that existed on the Coroner's computer as of January 15, 2009, were never disclosed. There is simply no reason that the TIFF images were not produced. They could have been exported to a disk in the uncompressed TIFF format so that they remained readable, but they were not. Instead, the prosecutor advised the trial court in 2011 that the x-rays she had disclosed to Mr. DeLuca were unreadable and illegible. (R.5016). Mr. DeLuca described the disk that he received and the attempts he made to improve the images and make them readable. He was unable to improve the images on the disk he received. (R.5040).

The trial court's opinion was manifestly erroneous and demonstrates that the trial court fundamentally misunderstood the undisputed computer data interpreted by Defendant's expert Mr. Mueller, who established that the images provided to Mr. DeLuca on September 7, 2011, had been deliberately modified by compressing them into a JPEG format and reducing the window width. While the Ben Kingan image had a window width of three, "the window width[s] of the other 718 file images were in the thousand[s]." (R.5428). Clearly, the DeLuca JPEG images had been deliberately altered to make them unreadable. The trial court, most likely because of its own ignorance of

computer metadata and technology, was misled by Mr. Stauffacher's demonstration in which he brightened the DeLuca JPEG images. The trial court failed to recognize that no matter how bright the JPEG images were, they represented a fraction of the data in the TIFF images; the JPEG image was only 267 kilobytes in size, which was a 98% reduction in file size from the TIFF images saved on the Coroner's computer. (R.5335). By analogy, the trial court would find that two books of similar thickness contain identical information even though one book had blank pages and the other did not. The trial court clearly did not comprehend the metadata of the images which was undisputed. The DeLuca images were essentially blank, and the Coroner's TIFF images were full of data.

The trial court ignored the testimony of highly qualified imaging and computer software engineer Mr. Mueller. (R.5388-5501). Mr. Mueller explained that the images Mr. DeLuca received could not be improved. (R.5411-15; 5418). The images had been compressed into JPEG format, altered in many ways, and exported in such low quality that any significant improvement was impossible. (R.5401-403; 5411-15; 5418-20; 5425-27; 5445). Mr. Mueller concluded that even he, as an expert, could spend his "entire life" trying to make the darkened JPEG image the same as the TIFF image created in January 2009, and he could not do so. (R.5447-48). Improving the quality from the disk was not child's play, it was impossible.

The trial court failed to recognize that the sender in 2009 had the option of sending the images in either a TIFF or JPEG format. (R.5415-18). Mr. Stauffacher could only come up with one pertinent reason why a TIFF file would be converted to a JPEG format, and that was if it was necessary to send the information in an email with limited storage space. Mr. Stauffacher's explanation had no relevance to the State's disclosure to

Mr. DeLuca on September 7, 2011. Mr. DeLuca was given a disk containing the x-rays in JPEG format. Mr. Stauffacher admitted all of the uncompressed TIFF images could be saved to a disk because a disk has ample storage space. (R.5333-34; 5358).

Most importantly, the undisputed fact is that the TIFF images were converted and modified to unreadable JPEG images. Defendant submits that the evidence at the evidentiary hearing established that the State intentionally took steps to reduce the quality of the images prior to disclosing them to Mr. DeLuca. Mr. Mueller explained that modifications were applied to the images prior to their disclosure. Unlike any of the hundreds of other images on the Coroner's computer, the images at issue were reduced to a minimum window width. (R.5427-28).

Former ASA DeMartini was clearly untruthful at the evidentiary hearing when he described meeting with Deputy Reid on September 16, 2011. Deputy Reid stated that his involvement in Defendant's case began on June 10, 2015, when he retrieved the TIFF images from the Coroner's computer at Dr. Rudd's request. (R.5211; 5229). Deputy Reid specifically denied that he ever copied the Ben Kingan x-ray images to a disk in response to a discovery subpoena. (R.5227). Deputy Reid admitted that he was on vacation in September 2011. (R.5227). It is undisputed that the disk of unreadable images provided to Mr. DeLuca on September 7, 2011, was created on September 6, 2011. (R.5436). When former ASA Bishop provided the disk to Mr. DeLuca in open court, she specifically referred to the fact that the Coroner's employee who was responsible for producing the x-rays was out of town. (R.5017). The evidence is clear that Deputy Reid was not the person who created the disk of compressed JPEG images that were given to Mr. DeLuca. Deputy Reid was on vacation when this event occurred.

Deputy Reid admitted that although a user code was required to access the Coroner's computer, it was possible that the computer may have been left open, meaning no code was required to access the records stored within. (R.5228). Deputy Reid also testified that he never recalled compressing a TIFF file down to a JPEG file.

Former ASA DeMartini's testimony at the evidentiary hearing was not credible. He claimed to have met with Deputy Reid on September 16, 2011, when Reid was on vacation. (R.5250). Former ASA DeMartini claimed that Deputy Reid opened the same TigerView program that DeMartini had on his disk of the three Ben Kingan images. (R.5252). Former ASA DeMartini claimed that Deputy Reid attempted everything he could do on the Coroner's computer to adjust the images to make them readable, but Deputy Reid was unsuccessful in that effort. (R.5253-54). Former ASA DeMartini's testimony is demonstrably false because the Coroner's computer did not store JPEG images in 2011. The images were all saved in a TIFF format so it is not possible that former ASA DeMartini's testimony is truthful that Deputy Reid accessed images of the same quality on the Coroner's computer as the JPEG images on former ASA DeMartini's disk. The untruthfulness of former ASA DeMartini's explanation is demonstrated by Mr. Mueller's testimony that the TIFF images were approximately 17.2 megabytes, compared to the JPEG 267 kilobytes. The simple truth is that former ASA DeMartini never had a meeting with Deputy Reid. Former ASA DeMartini is most likely the individual who exported the Coroner's images in JPEG, reduced the window width to three on September 6, 2011, and provided the disks to his superior former ASA Bishop who disclosed them to Mr. DeLuca on September 7, 2011. Further proof of this assertion is

demonstrated by the fact that former ASA DeMartini's handwriting is on the sleeve of the disk provided to Mr. DeLuca on September 7, 2011. (R.5254-55).

But whether or not the conversion was intentional or by accident is irrelevant to Defendant's *Brady* claim. The trial court can accept the State's argument that the x-rays were accidently provided in JPEG format and the window width was accidentally reduced to a fraction of the normal window width, and still must find Defendant's right under *Brady* was violated. The determining fact is that Defendant received unreadable x-rays, not the State's motive for providing them. Even assuming the State converted the x-rays to the unreadable form by accident, the fact remains that the State possessed evidence that Defendant was entitled to have. In converting that evidence as it did prior to providing it to Defendant, the State removed its favorable quality. Therefore, no disclosure occurred because the evidence had been obfuscated prior to its production.

The Coroner's TIFF images were transformed, either intentionally or inadvertently, into unreadable and therefore worthless images that prevented the indisputable conclusion that Ben did not suffer a skull fracture. Contrary to the trial court's conclusion, it is indisputable that nothing could be done to improve the quality of the DeLuca JPEG images. The TIFF images, which existed on the Coroner's computer from January 15, 2009, clearly provided exculpatory evidence for Defendant.

### Withheld Evidence Was Material

Once the court finds that evidence was favorable to Defendant and withheld from Defendant, it must determine whether the evidence is material. Evidence is material if there is a reasonable probability that the result of the trial would have been different had it been disclosed. *People v. Harris* 206 Ill.2d 293, 311 (2002). An accused must show

that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Coleman,* 183 Ill. 2d at 393. The impact of the evidence on the verdict can be determined by viewing the strength of the evidence presented by petitioner as well as the evidence presented by the State at trial. See *People v. Beaman*, 229 Ill. 2d 56, 78 (2008).

The testimony and argument about the skull fracture cannot be deemed immaterial. Multiple witnesses testified that Ben's skull was fractured throughout the pre-trial proceedings. (R.157-159; 360; 604-605; 675-677; 1010; 1303; 1586; 1589). In the opening statement at trial, the prosecutor explained that Dr. Choi would advise the jury about the "skull fracture" he found "on the top right part of Ben's head." (R.2606). Additional witnesses, including numerous physicians, testified repeatedly about the skull fracture. (R.3293; 3297-98; 3441; 3460-61; 3472; 3474; 3475-76; 3580-81; 3583; 3585-88; 3635-36; 3674; 3809; 3903; 3994; 4519-21; 4527-30; 4536; 4553-54; 4587). The State continued to emphasize the skull fracture in closing arguments. (R.4697-98; 4715). The State argued that Defendant "threw [Ben] to the ground. Cracked [Ben's] head. Fractured." (R.983).

In total, at the trial, the words "skull fracture" were uttered 93 times. The word "fracture" alone was mentioned 275 times. The skull fracture was mentioned ten times at the interrogation, and the court must consider the impact the withheld readable x-rays would have had on the jury's interpretation of the videotaped interrogation of Defendant and the statements elicited from her. On the videotape, the police repeatedly advised Defendant that Ben's skull had been fractured. Only after those repeated admonitions did Defendant make statements the State deemed inculpatory. The now known fact that

Ben's skull was not fractured would have provided Defendant with powerful evidence to establish that Defendant's statements were not a reflection of reality. Rather, any and all inculpatory statements stemmed from the detectives' repeated assertions that Ben's skull had been fractured. Their assertions are now known to be false.

At the evidentiary hearing, the State argued that even if the trial court believed that the x-rays were favorable and not disclosed, the withheld x-rays were not material. As shown in greater deal in Issue II, the State's position is disingenuous. The State relied heavily on the "fact" that Ben's skull was fractured at the trial. The State should not now be permitted to present an argument clearly rebutted by the record. *See, People v. Smith*, 352 Ill. App. 3d 1095, 1102 (1st Dist. 2004) (the State is not permitted to rely heavily on evidence at trial, then claim in a later proceeding the evidence was immaterial to the conviction). *Smith* dictates that the State's strategy here should not be accepted. The State's argument completely lacked merit and the trial court erred in accepting it. Just as in *Smith*, the State should not now be permitted to contradict the clear record, which establishes the crucial importance of the (now known to be non-existent) skull fracture to the State's theory at trial.

Finally, the trial court determined that there was no significant difference between the TIFF images Defendant claimed were improperly withheld and the JPEG images produced to Mr. DeLuca. The trial court found the images were "substantially similar." (C.1526). This determination was manifestly erroneous. Comparison of images suitable for making radiological findings requires the knowledge base of a qualified expert. Dr. Zimmerman was the only witness at the trial or the evidentiary hearing that reviewed the

x-rays and possessed the expertise to testify to what they did and did not show. The trial court is not qualified to make this finding.

### *Substantial Showing Made at Evidentiary Hearing*

To be successful at the third stage and ultimately have his petition granted, a defendant has to make a substantial showing of a constitutional violation. *Pendleton,* 223 Ill.2d at 473. A "substantial showing" is a showing that is "real and weighty" as opposed to "illusory and trivial." *People v. Ward,* 2013 IL App (4th) 120001–U, ¶ 109, 2013 WL 3306152.

The undisputed medical evidence establishing that Ben's skull had not been fractured was anything but illusory and trivial. This was not a case involving a minor witness offering equivocal testimony in combination with overwhelming evidence of guilt at trial. Rather, this case involved scientific evidence that permitted a highly qualified expert to draw crucial and concrete conclusions in favor of Defendant that the State could not rebut. Defendant made the required substantial showing and relief should have been granted.

### *The Prosecution Converted the TIFF X-Rays into a JPEG Format and Adjusted the Window Width. However, if This Court Finds Otherwise, the Coroner's Possession of the X-Rays Should Be Imputed to the State's Attorney for* Brady *Purposes.*

The trial court decided that "because the parties did not fully address the issue, the court will assume without deciding that the Coroner's possession should be imputed to the State's Attorney for *Brady* purposes in this case." (C.1522). It is the position of Defendant that the State waived this argument by not raising it with the trial court.

However, if the court determines that this issue was not waived, the Coroner's possession of the x-rays should be imputed to the State's Attorney for *Brady* purposes.

I_64

The trial court cited *In re C.J.*, 166 Ill.2d 264 (1995), *People v. Robinson*, 157 Ill.2d 68, 79-80 (1993) and *People v. Leach*, 2012 IL 111534 and determined that those cases suggest that the Coroner's possession of the x-rays should not necessarily be automatically imputed to the State for *Brady* purposes. (C.1522). Still, the trial court assumed "without deciding that the Coroner's possession [of the x-rays] should be imputed to the State for *Brady* purposes." (C.1522). Defendant submits that the trial court's assumption was in accordance with Illinois law.

In *C.J.*, the respondent argued that DCFS acted as a prosecutorial agent of the State when it destroyed evidence favorable to him. The respondent contended that DCFS's conduct was imputable to the State and as a result, the respondent's due process rights were violated. The Court disagreed, refusing to find that all DCFS workers were agents of the prosecution. *C.J.*, 166 Ill. 2d at 318. The *C.J.* Court cited *People v. Robinson*, 157 Ill.2d 68, 80 (1993) for the proposition that "[i]f this court were to conclude that the knowledge of every State employee who is involved in a criminal case is imputed to the prosecution, the control over criminal cases would be placed in the hands, and at the mercy, of every employee who touches the case." *People v. Robinson*, 157 Ill.2d 68, 80 (1993).

Defendant is not seeking to impute the conduct of any and all state employees unconnected to the prosecution to the State. Here, the Coroner's office worked hand in hand with the prosecution from the beginning of the investigation. State expert Dr. Choi conducted two autopsies pursuant to his duties with the Coroner's office. A police investigator was present for both autopsies. As information was gathered during one autopsy, it was relayed to the detectives that were interrogating Defendant. With law

enforcement present, Dr. Choi and the Coroner's office conducted experiments dictated by information provided by the interrogating detectives. State rebuttal expert Dr. Montez stated that he worked with the Coroner's office to formulate his opinions in the case. Prosecutor Bishop advised the trial court that she was working with the Coroner's office to determine whether the illegible and unreadable x-rays could be improved. Therefore, under the circumstances of this case, unlike the situation in *C.J.*, there is evidence to support the conclusion that the Coroner's office functioned, intentionally or otherwise, as an aid to the prosecution in this case. *C.J.*, 166 Ill. 2d at 270-271. This cooperation between the Coroner's office and the prosecution also distinguishes *Leach*, the third case cited by the trial court relating to the issue.

As in *Leach*, the Illinois Supreme Court addressed whether certain evidence constituted testimonial hearsay pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004) in *People v. Stechly*, 225 Ill. 2d 246 (2007). In resolving that issue, the Court first had to determine whether the witnesses providing the testimony were acting as agents of the State. The defendant argued that the two witnesses were acting as agents of the State when they took statements from the victim of sexual abuse, thus their knowledge should be imputed to the State. The Court agreed and found that those two witnesses were mandated reporters that had a duty to cooperate with law enforcement. *Id.* at 300-301. The witnesses' function was to gather information to pass on to law enforcement authorities and they did so. *Id.* at 301. Thus, the Court deemed the witnesses arms of the prosecution. *Id.*

In *Stechly*, the State relied on *C.J.* and *Robinson* and for its argument that State employees are not state agents simply because they are required to investigate. *Id.* at 303.

The Court agreed but determined that the witnesses were state agents under the specific circumstances of the case. The *Stechly* Court noted that *C.J.* explained "where DCFS acts at the behest of and in tandem with the State's Attorney, with the intent and purpose of assisting in the prosecutorial effort, *DCFS functions as an agent of the prosecution.*" (emphasis added.) *C.J.,* 166 Ill.2d at 270 citing *People v. Robinson,* 157 Ill.2d 68 (1993) (imputation of such knowledge requires an individualized focus on the factual circumstances); *Stechly*, 225 Ill. 2d at 304.

As described above, the Coroner's office acted at the behest of, and in tandem with, the State's Attorney's Office in this case. Under these circumstances, the Coroner's office functioned as an agent of the prosecution. Therefore, the trial court correctly imputed the Coroner's possession of the x-rays to the prosecution.

**II.    THE TRIAL COURT ERRED IN DISMISSING DEFENDANT'S POST-CONVICTION PETITION AFTER THE EVIDENTIARY HEARING BECAUSE DEFENDANT MADE A SUBSTANTIAL SHOWING THAT HER CONVICTION RESULTED FROM THE PRESENTATION OF PERJURED EVIDENCE.**

*Standard of Review*

A trial court's ruling on a post-conviction petition following an evidentiary hearing is entitled to substantial deference. *People v. Scott,* 194 Ill.2d 268 (2000). Where, pursuant to the Act, a trial court conducts an evidentiary hearing, considers new evidence, and considers the credibility of the witnesses, the trial court's decision will be affirmed unless it is manifestly erroneous. *People v. Morgan,* 212 Ill.2d 148, 155 (2004); *People v. Newkirk*, 2012 IL App (2d) 111226-U, ¶ 33. Clearly, a conviction obtained by the knowing use of perjured testimony, which reasonably could have affected the jury's verdict, will be set aside. *People v. Ellis*, 315 Ill. App. 3d 1108, 1112 (1st Dist. 2000).

Once a defendant shows at an evidentiary hearing that perjury occurred at the defendant's trial, the burden is on the State to show beyond a reasonable doubt that perjury did not contribute to the defendant's conviction. *People v. Hood*, 45 Ill.App.3d 425 (1977).

Here, perjury occurred at Defendant's trial. At the trial, the State presented the testimony of Dr. Montez as an expert in forensic pathology. (R.4515-16). Dr. Montez testified that he took off his gloves and "touched the inside part of [Ben's] skull where the edges of the skull fractured were not completely together. You could feel a ridge there." (R.4520). Dr. Montez added that he was able to move the skull and he "saw the fracture itself." *Id.*

At the evidentiary hearing, the testimony of Mr. Forman and Dr. Zimmerman established that perjury occurred at Defendant's trial. (R.5087-89; 5133). The trial court overlooked the fact that Dr. Zimmerman's testimony that there was no skull fracture also corroborated Defendant's claim that Dr. Montez committed perjury at the trial when he testified that he touched and manipulated the fracture. (C.1517-1520).

Mr. Forman attended both autopsies conducted by Dr. Choi. Mr. Forman performed his duties and responsibilities in relation to these autopsies, which included taking the x-rays of Ben's skull for Dr. Choi (R.5078-79); stitching the skull cap back on after the first autopsy on January 15, 2009. Mr. Forman testified that his responsibility as the Deputy Coroner after the completion of the autopsy, was to "clean[] up where Dr. Choi had worked, plac[e] the organs that Dr. Choi had looked at and dissected as part of the autopsy process back into the body, . . . [and] stitch the body back up in preparation to be released to the funeral home. (R.5080). Mr. Forman identified Def. Ex. Group 18 as a

photograph of Ben's stitched skull. (R.5082-83). Mr. Forman also washed and scrubbed the inside and outside of the skull. (Def. Ex. 16) (R.5084). Mr. Forman identified a photograph of the viscera bag containing cross-cut sections of Ben's brain (Def. Ex. 17) (R.5085).

Mr. Forman explained that Dr. Montez reviewed documents and photographs, but never observed Ben's body. Had he done so, Mr. Forman was required to be present. Mr. Forman testified that because he was a case deputy responsible for Ben's body, and at this point the body was evidence, he would have been required to accompany Dr. Montez to examine the body and he did not. (R.5088-89). According to Dr. Montez, Mr. Forman and Investigator Mike Young were present at the time of his alleged examination of Ben's body. (R.4575).

Dr. Montez's trial testimony that he observed blood over the surface of Ben's brain during his alleged examination of the body is flatly contradicted by the fact that brain had been dissected and placed in a viscera bag. (Def. Ex. 17). Dr. Montez never mentioned the dissected brain or removing it from the viscera bag in his trial testimony. (R.4519). Furthermore, Dr. Montez's trial testimony that he "was able to take [his] hand and touch this portion of the scalp, and it was consistent with a fresh injury. It was thickened, and packed, and loaded with flesh blood layer after layer in the subgaleal tissues below the scalp," is flatly contradicted by Mr. Forman's testimony that he had washed the skull after Dr. Choi had scraped the skull. (R.4541-42) (Def. Ex. 16) (R.5084).

In addition to Mr. Forman's eyewitness testimony, Dr. Zimmerman provided expert testimony that Ben did not have a skull fracture. Dr. Zimmerman testified that if

Ben had a skull fracture, it would have appeared on the TIFF image x-ray which Dr. Zimmerman reviewed. Dr. Zimmerman's testimony that Ben absolutely did not have a skull fracture refutes Dr. Montez's testimony about touching and manipulating a fracture and support Mr. Forman's testimony that Dr. Montez never examined Ben's body on January 16, 2009. Therefore, Dr. Zimmerman provides unrebutted evidence that Dr. Montez committed perjury in his trial testimony about the existence of Ben having a skull fracture. The trial court overlooked the undisputed fact that Dr. Zimmerman's testimony corroborated Defendant's claim that Dr. Montez committed perjury in his trial testimony.

### Knowing Use of Perjured Testimony

The State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process of law. *People v. Olinger,* 176 Ill.2d 326, 345 (1997), see also *Napue v. Illinois,* 360 U.S. 264, 269 (1959). The same principles apply even when the State, although not soliciting the false evidence, allows it to go uncorrected when it appears. *Olinger,* 176 Ill.2d at 345. Nor does it matter that the witness' false testimony goes only to that witness' credibility; the resulting conviction is nonetheless tainted. *People v. Jimerson,* 166 Ill.2d 211, 224 (1995). This is so because the "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Olinger,* 176 Ill.2d at 345, quoting *Napue,* 360 U.S. at 269.

The State is not permitted to avoid responsibility for the testimony of Dr. Montez. While a defendant must show that the prosecution knowingly used false or perjured testimony to entitle her to post-conviction relief, *People v. Brown,* 169 Ill. 2d 94 (1995),

the knowledge requirement is satisfied if there is knowledge on the part of the representatives or agents of the prosecution. *People v. Beard*, 301 Ill. App. 3d 279, 285 (4th Dist. 1998). Here, Dr. Montez was provided information about the case by the State. He was consulted by the State. He was called to testify at trial by the State. As such, Dr. Montez was an agent of the prosecution. His knowledge must be imputed to the prosecution.

In *Olinger,* a key prosecution witness testified incompletely about the benefit he had received in exchange for his testimony. 176 Ill.2d at 346-48. As a result, the Illinois Supreme Court found the defendant had made a substantial showing that the witness committed perjury. *Id.* at 348. The *Olinger* court then remanded the matter for an evidentiary hearing to determine whether the defendant's right to due process of law had been violated. *Id.* at 352.

In *People v. Perkins*, 292 Ill. App. 3d 624 (1st Dist. 1997), the court explained that a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood the false testimony could have affected the jury's verdict. The *Perkins* court found that there was substantial evidence of defendant's guilt, but due to the danger that there was any likelihood that the false testimony affected the jury's verdict, relief was granted. *Perkins*, at 292 Ill. App. 3d 633–34.

Both *Olinger* and *Perkins* demonstrate the close scrutiny that must be exercised when a defendant raises the issue of perjury at his trial. In this case, the fact that perjury occurred was even clearer than in those cases. Further, the damage to Defendant's right to a fair trial was far more prejudicial and severe than in *Olinger* and *Perkins*, demonstrating conclusively that relief is warranted.

I_71

Here, Mr. Forman testified not only to what he did and what he saw, but also that his job dictated his conduct. Mr. Forman made it clear that if Dr. Montez had examined Ben's body, or even observed it, Mr. Forman's job required that he be present with Dr. Montez because he was responsible for the caretaking of Ben's body. (R.5089). Mr. Forman did not simply claim that Dr. Montez had no involvement in the case. Rather, he recalled providing Dr. Montez with photographs and documents, then watching as Dr. Montez *left the Coroner's office without examining Ben's body*. (R.5088-5089) (emphasis added).

It was Mr. Forman's job to sew up the skull cap after Dr. Choi's initial examination. He performed that duty. (R.5084). Mr. Forman added that when Dr. Choi began his second examination of Ben, he observed nothing to suggest that Ben's body had been examined by Dr. Montez, or anyone, since Dr. Choi's initial autopsy. (R.5092). Mr. Forman even identified a photograph showing clearly that the skull cap was sewn up. (R.5081). Thus, Mr. Forman testified to his recollections, and those recollections were completely consistent with his duties and responsibilities. There was simply no reason to doubt Mr. Forman's testimony.

But as it did repeatedly in its ruling, the trial court completely discarded Mr. Forman's testimony and accepted that of State's Attorney Investigator Mr. Biang. The trial court ruled that Mr. Forman's credibility was weakened because he testified that he took five x-rays when other evidence suggested he took fewer x-rays. (C.1519). For that conclusion, the trial court relied upon the testimony of State's Attorney Investigator Mr. Biang, an individual still employed by that office with a clear interest in the case. Mr. Biang had chased Mr. Forman down for years and in the days prior to his testimony. He

claimed Mr. Forman made inconsistent statements to him. Mr. Forman, on the other hand, had no interest in the case. He was not affiliated with either party at the time of the evidentiary hearing.

The trial court also relied upon the testimony of Mr. Thomas. However, Mr. Thomas never saw Dr. Montez examine the body. Instead, he testified to what he observed when Dr. Choi examined Ben's body for the second time. (R.5671). Mr. Thomas identified photographs, but the photographs were not time and date stamped.[8] (R.5693). Mr. Thomas claimed that Ben's head was not sewn up at the beginning of that examination, attempting to suggest that Dr. Montez could have examined Ben's head in between Dr. Choi's examinations. However, Mr. Thomas's testimony was completely undercut on cross-examination. Mr. Thomas admitted that Ben's brain had been removed and dissected when he observed Ben and that the focus of the second exam was on Ben's lower body. (R.5703-704). Mr. Thomas further admitted that he did not look closely at Ben's skull during the examination. (R.5703-704). Mr. Thomas also was forced to admit that he had never sewn up a body after an autopsy and he was unaware of applicable protocols. (R.5705). Mr. Thomas did know that once an autopsy is completed, a skull cap would be sewn on. (R.5705). In the end, Mr. Thomas admitted that unlike Mr. Forman, since he was not present for the first autopsy, he did not know whether the skull cap was sewn on. (R.5705). Thus, the trial court erred in relying upon Mr. Thomas' testimony.

Further, the trial court completely ignored the testimony of Dr. Zimmerman in relation to Defendant's claim that she was convicted based on Dr. Montez's perjurious

---

[8] The trial court acknowledged that previously viewed photographs had time and date stamps, but those identified by Mr. Thomas did not. (R.5695).

testimony. The trial court did find that Dr. Zimmerman "unequivocally testif[ied] that no fracture existed." (C.1532). That reference was in relation to Defendant's *Brady* claim. However, in addressing Defendant's perjury claim, the trial court did not reference this unequivocal testimony. Had the trial court done so, it would have been forced to conclude that the evidence at the evidentiary hearing established that Dr. Montez was not truthful when he testified he observed and touched the fracture that Dr. Zimmerman testified did not exist. Dr. Zimmerman's credentials were unquestionable and his testimony was unimpeached. There was simply no justifiable reason for the trial court to ignore his testimony.

Instead of crediting Dr. Zimmerman, the trial court simply held that it "had the opportunity to observe and evaluate Dr. Montez's testimony during trial." (C.1519). Interestingly, the trial court did not further explain that it found Dr. Montez's trial testimony credible. Still, the trial court denied Defendant's claim that his perjury caused her conviction. (C.1520). In any event, the trial court erred in discarding the testimony of Mr. Forman and Dr. Zimmerman, while apparently accepting Dr. Montez's trial testimony.

Had the trial court correctly found that perjury occurred at the trial, the State had the burden of demonstrating that the perjury did not cause the conviction. *See, Hood, supra.* To do so, the State would have to have shown that the perjury was not "material" to Defendant's conviction. "Materiality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *citing, Kyles v. Whitley,* 514 U.S. 419, 435 (1995). Materiality "is not a sufficiency of evidence test." *Id.*

Perhaps anticipating its burden, the State argued at the evidentiary hearing that Ben's skull fracture was not material and not an important part of its presentation at trial. The State's position is completely disingenuous.

The State attempted the same strategy in *People v. Smith*, 352 Ill. App. 3d 1095, 1102 (1st Dist. 2004). There, the State argued that although perjury may have occurred at the defendant's trial, relief was not warranted because the perjury was not material to the conviction. A forensic scientist had testified at trial that the defendant's clothing contained the victim's blood. In a later appeal, the State argued that the testimony was not material to its case. The trial court reviewed the record and determined that the State had not only presented the forensic scientist's testimony, but also relied upon that testimony in its opening and closing statements. *Id.* Under those circumstances, the testimony could not be deemed immaterial. *Id.*

The same result reached in *Smith* is required here. The testimony and argument about the skull fracture cannot be deemed immaterial. Multiple witnesses testified that Ben's skull was fractured throughout the pre-trial proceedings. (R.157-159; 360; 604-605; 675-677; 1010; 1303; 1586; 1589). In the opening statement at trial, the prosecutor explained that Dr. Choi would advise the jury about the "skull fracture" he found "on the top right part of Ben's head." (R.974). Additional witnesses, including numerous physicians, testified repeatedly about the skull fracture. (R.3293; 3297-98; 3441; 3460-3461; 3472; 3474; 3475-3476; 3580-3581; 3583; 3585-3588; 3635-3636; 3674; 3809; 3903; 3994; 4519-4521; 4527-4530; 4536; 4553-4554; 4587). The State continued to emphasize the skull fracture in closing arguments. (R.4697-4698; 4715). The State argued that Defendant "threw [Ben] to the ground. Cracked [Ben's] head. Fractured."

(R.983). Just as in *Smith*, the State should not now be permitted to contradict the clear record which establishes the crucial importance of the (now known to be non-existent) skull fracture to the State's theory at trial.

In total, at the trial, the words "skull fracture" are uttered 93 times. The word "fracture" alone is mentioned 275 times. The skull fracture was even mentioned numerous times at the interrogation.

The State relied so heavily upon the skull fracture at trial because it never could have obtained a conviction had the jury known the true fact that Ben's skull was not fractured. The lack of a fracture destroyed the credibility of Defendant's "confession" because that "confession" was obtained through the videotaped interrogation wherein the detectives relied upon the existence of the skull fracture to extract that "confession." The lack of a fracture also established the veracity of Defendant's position at trial that Ben was not injured through abusive head trauma. At the same time, the lack of a fracture destroyed the credibility of the State's witnesses that testified such a fracture existed.

In summary, Defendant established at the evidentiary hearing, through the testimony of Dr. Zimmerman alone as well as in combination with Mr. Forman, that perjury occurred at the trial. The State cannot possibly demonstrate beyond a reasonable doubt that the perjury did not contribute to the conviction when the skull fracture played such an important role at the trial. While the State may attempt to argue the evidence was sufficient apart from the perjury about the skull fracture, it must be noted that "materiality is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 435. If trial court concludes that the perjury could have affected the jury's verdict, the verdict must be set aside. *People v. Ellis*, 315 Ill. App. 3d 1108, 1112 (1st Dist. 2000).

Defendant's conviction must be reversed.

## **CONCLUSION**

For the reasons stated herein, Defendant-Appellant, Melissa Calusinski, respectfully asks trial court to reverse the trial court's order dismissing her post-conviction petition, and/or grant her any other relief deemed appropriate.

Respectfully submitted,

Melissa Calusinski

By: Kathleen T. Zellner
Attorney for Defendant

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road,
Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

70

I_77

**CERTIFICATE OF COMPLIANCE**

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages contained in the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 70 pages.

Kathleen T. Zellner