# EXHIBIT J

Illinois Court of Appeals Order
Denying Post-Conviction Appeal
filed June 11, 2018

2018 IL App (2d) 160825-U
No. 2-16-0825
Order filed June 11, 2018

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-252 |
| MELISSA CALUSINSKI, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

---

JUSTICE ZENOFF delivered the judgment of the court.
Justices Burke and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court held that the State did not violate *Brady v. Maryland* where the arguably undisclosed evidence was not material; the trial court's finding that the State did not knowingly present perjured testimony at trial was not against the manifest weight of the evidence; thus, the appellate court affirmed the trial court's denial of defendant's amended postconviction petition.

¶ 2    Defendant, Melissa Calusinski, appeals an order of the Circuit Court of Lake County denying her amended postconviction petition after a third-stage evidentiary hearing. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

2018 IL App (2d) 160825-U

¶ 4    Following a jury trial in 2011, defendant was convicted of the first-degree murder (720 ILCS 5/9-1(a)(2) (West 2008)) of 16-month-old Benjamin Kingan (Ben), and she was sentenced to 31 years' incarceration in the Illinois Department of Corrections. This court affirmed defendant's conviction and sentence in *People v. Calusinski*, 2014 IL App (2d) 120383-U (*Calusinski I*), and our supreme court denied leave to appeal.

¶ 5    On June 23, 2015, defendant filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant alleged actual innocence and that the State committed a *Brady* violation (see *Brady v. Maryland*, 373 U.S. 83 (1963)) by withholding an exculpatory autopsy X-ray. That petition proceeded to a third-stage evidentiary hearing in 2016. During the hearing, defendant requested leave to amend her petition to include the allegation that the State presented perjured testimony at trial. The court granted leave to amend in its order denying postconviction relief. At the request of both parties, the trial court admitted the entire trial record into evidence.

¶ 6    The following facts are taken from the trial record, the record of the postconviction proceedings, the documents, photographs, and discs in evidence, the trial court's findings in its postconviction ruling, and our decision in *Calusinski I*.

¶ 7                                    A. Ben

¶ 8    Ben was born on August 31, 2007, to Amy and Andy Kingan. At nine weeks of age, he and his twin sister, Emily, began attending day care at Minee-Subee in Lincolnshire, Illinois. Ben was a healthy baby. His habit of throwing himself backward from a sitting position and hitting his head on the floor when he was angry did not alarm Amy or the day care staff. Ben's pediatrician, Dr. Daniel Lum, described "head-banging" as common, and Dr. Lum never knew of a child seriously injuring himself from the habit.

J_02

2018 IL App (2d) 160825-U

¶ 9      On October 27, 2008, Ben woke from a nap at day care with an unexplained bump on the back of his head. He was acting normally, and he was not vomiting. Dr. Lum advised Amy that nothing needed to be done. Two days later, Ben developed a fever. A different pediatrician in Dr. Lum's practice, Dr. Patricia Brunner, examined Ben's head. Dr. Brunner found some slight swelling but no skull fracture.

¶ 10      On December 1, 2008, Ben's head circumference had increased from being in the 50th percentile three months earlier to the 75th percentile. At the time of his death in January 2009, Ben's head circumference was in the 95th percentile. Dr. Brunner testified at trial that she had no "issues" with Ben's head circumference. Ben had been treated for anemia, acid reflux, and eczema, but, in Dr. Brunner's opinion, he had no medical conditions that led to his death. Dr. Lum echoed that Ben's head was growing normally and that there was nothing about his medical condition that would have caused his death.

¶ 11      On January 12, 2009, Ben was coughing and vomiting. Amy kept him home on January 13, although he was no longer vomiting. On that date, Dr. Brunner saw Ben, and she felt that he was fine. Ben attended day care on January 14, 2009. That afternoon, at about 3:35 p.m., Ben threw himself backward onto the floor in the presence of day-care worker Nancy Kallinger. Because Ben cried a little, Kallinger thought that he hit his head. At 3:50 p.m., Ben was found unresponsive, and day care workers performed CPR. Paramedics transported Ben to Condell Hospital in Libertyville, Illinois.

¶ 12      Dr. Adriana Orozco was the attending physician in the pediatric emergency room. She testified at trial that Ben was in "full arrest." According to Dr. Orozco, he had no respiration and no spontaneous cardiac activity. Ben had a "very, very low" heart rate, and he was "fixed and dilated." Ben did not respond to treatment or stimuli. Dr. Orozco opined that Ben had suffered a

J_03

2018 IL App (2d) 160825-U

"significant" head injury. She pronounced Ben dead at 4:50 p.m. An autopsy was performed on January 15, 2009, and again on January 16, 2009.

¶ 13                                              B. Defendant

¶ 14      In January 2009, defendant was 22 years old. Her IQ was "borderline," but she was not mentally retarded. Defendant worked as a teacher's assistant in Ben's classroom at Minee-Subee. According to defendant, Ben became antsy and fussy after his snack on the afternoon of January 14, 2009. At approximately 3:45 p.m., defendant was the only staff member in the room when she observed that Ben was lethargic. Then she saw that he was foaming from his nose and mouth. She summoned help.

¶ 15      On January 16, 2009, the police interrogated defendant from approximately 9:30 a.m. until 7 p.m. Initially, defendant denied knowing what had happened to Ben. At 1:25 p.m., she told the police that he threw himself backward from a sitting position and hit his head. The police left the interrogation room. They returned at 3 p.m. and told defendant that their expert physician said that Ben could not have hurt himself that way.[1] Defendant then stated that she accidentally dropped Ben and he hit his head on a wooden snack chair. She demonstrated that Ben's feet were about 12 to 18 inches off the floor when she dropped him. The police left the room again. At 4:10 p.m., they returned and told defendant that their doctor had "ruled out" her story. Through 6:30 p.m., defendant continued to insist that Ben's head hit the chair. Then, one of the officers stated as a fact that she threw Ben onto the floor, and when defendant started to mention the

_____

[1] Throughout the interrogation, the police were consulting with forensic pathologist, Dr. Eupil Choi, who performed the autopsies. As the police described to Dr. Choi defendant's versions of what happened, he experimented to determine whether her explanations were plausible.

2018 IL App (2d) 160825-U

chair again, the officer said, "Please." Defendant then admitted that she threw Ben to the tile floor because she was frustrated with him being fussy. She stated that Ben's head hit the tile floor and bounced. She forcefully threw a notebook to the floor to demonstrate how hard she had thrown Ben. Defendant also demonstrated with a small teddy bear held about waist-high and facing away from her. The crucial movements take place off-camera, but defendant stated three times during that demonstration that Ben hit the back of his head. She was placed under arrest.[2]

¶ 16        C. The State's Pretrial Disclosure of Autopsy X-Rays

¶ 17    Defendant was represented by private attorney Paul DeLuca. Prior to trial, DeLuca served the Lake County Coroner's Office with subpoenas requesting its entire file on Ben Kingan. DeLuca did not specifically request X-rays, because none were mentioned in Dr. Choi's autopsy reports. On September 7, 2011, approximately a month and a half before trial, the State tendered a disc containing three X-ray images from the Lake County Coroner's Office. The prosecutor indicated that confusion in the Coroner's Office had precluded earlier discovery of the evidence. The prosecutor informed the court that the images were not readable or legible. Both sides represented that they would try to work out the difficulties. The judge invited the parties to return to court if the problem did not resolve itself. On September 9, 2011, the State filed a

---

[2] In *Calusinski I*, we rejected defendant's contention that her confession was coerced. We noted that she was not subjected to 10 hours of interrogation, as she was alone in the room for several hours. *Calusinski I*, 2014 IL App (2d) 120383-U, ¶ 92. She was given *Miranda* warnings, stated that she understood them, and she provided a voluntary, signed written waiver of her rights. *Calusinski I*, 2014 IL App (2d) 120383-U, ¶ 93. We particularly noted that the police were never abusive or threatening toward defendant in any manner and that they were generally solicitous toward her. *Calusinski I*, 2014 IL App (2d) 120383-U, ¶¶ 92, 94.

- 5 -

J_05

2018 IL App (2d) 160825-U

supplemental answer to discovery. The document stated that the disc containing the X-ray images, along with the software program required to view the images, had been disclosed. On October 21, 2011, at DeLuca's request, the court entered an order allowing him to view all of the evidence in the Coroner's possession.

¶ 18    Dr. Shaku Teas, the defense's expert forensic pathologist, prepared a written report for DeLuca dated April 14, 2011, in which she stated that she had reviewed numerous materials related to the case, including the Coroner's X-rays.[3] Dr. Teas gave DeLuca a disc containing the X-rays that she had received directly from the Coroner's Office.

¶ 19                    D. The Battle of the Experts At Trial

¶ 20    At trial, the State's theory was that Ben died of acute brain injuries caused by defendant throwing him to the floor with enough force to fracture his skull. Defendant's theory was that Ben died from a re-bleed of a chronic subdural hematoma that was caused by his head-banging. In the postconviction proceedings, defendant claimed that the State withheld exculpatory evidence in the form of a readable X-ray showing that there was no skull fracture. To understand the issues raised by the postconviction petition, we detail the medical evidence at trial.

¶ 21    At trial, Dr. Choi opined that Ben died of craniocerebral injuries due to blunt trauma. Dr. Choi testified that Ben's injuries were consistent with being thrown to a flat surface. According to Dr. Choi, Ben's injuries were "very recent." Dr. Choi testified that he did not see anything to support the defense theory that death was caused by a re-bleed of an old injury. Dr. Choi found fresh bleeding in three different areas of Ben's head. The pathologist described a subgaleal hemorrhage, a subdural hemorrhage, and a subarachnoid hemorrhage. The subgaleal hemorrhage

---

[3] At trial, when asked to list the materials she reviewed, Dr. Teas did not mention the X-rays.

J_06

2018 IL App (2d) 160825-U

was beneath the scalp and measured 4 inches by 4 inches, covering 90% of Ben's head. The subdural hemorrhage was beneath the dura but above the brain. The subarachnoid bleeding was in the brain. Additionally, Dr. Choi observed grossly—with his naked eye—a linear skull fracture measuring .8 inch. Dr. Choi described the fracture as having penetrated the skull completely. He referred to it as a "through-and-through" fracture. Dr. Choi identified photographs taken at the autopsy depicting the fracture. One photograph in evidence shows the fracture as a thin line on the outside of the skull. Another photograph in evidence depicts the same thin line on the inside of the skull.

¶ 22    On cross-examination, DeLuca asked Dr. Choi if he took an X-ray of the fracture. Dr. Choi responded that such an X-ray was taken but that it was of poor quality. Dr. Choi admitted that he did not see a fracture on the X-ray, possibly because of the poor quality of the image. On redirect examination, Dr. Choi testified that sometimes very small fracture lines cannot be seen on X-rays.

¶ 23    Dr. Jordan Greenbaum, an expert in child abuse and forensic pathology, testified for the State at trial. Dr. Greenbaum described the areas of fresh bleeding that Dr. Choi had described. She testified that she saw the skull fracture in the autopsy photographs, and that skull fractures are usually apparent to the naked eye. She also described the fracture as "through-and-through." To her, that indicated an injury with enough impact to the head to "crack" the skull. In Dr. Greenbaum's opinion, Ben's injuries were inflicted by another person, they occurred shortly before he became symptomatic, and he died as a result of being thrown to the floor. Dr. Greenbaum further testified that Ben did not have a chronic subdural hematoma. She opined that his prior vomiting was unrelated to his death. Dr. Greenbaum also opined that Ben's habit of throwing himself backward would not generate enough force to "cause the damage we see here."

2018 IL App (2d) 160825-U

¶ 24    Dr. Jan Edward Leestma, an expert in neuropathology, testified as a defense expert at trial. Dr. Leestma opined that Ben had a chronic subdural hematoma which could be exacerbated by a short fall. Dr. Leestma noted a recent injury. He also noted a "simple linear fracture" in the autopsy photographs that was consistent with a short fall. According to Dr. Leestma, Ben's injuries were due to an impact. He could not rule out that Ben was slammed to the floor.

¶ 25    Dr. Teas testified for the defense at trial that Ben suffered from a chronic subdural hematoma that was weeks old. She opined that he died from an impact injury on January 14, 2009, that caused a re-bleed. Dr. Teas saw a skull "defect" in the autopsy photographs that could be a fracture or an abnormal suture.[4] According to Dr. Teas, to determine whether such a defect is a fracture, a pathologist must take a section of the defect and look at it microscopically. Dr. Teas testified that a lot of children have abnormal sutures which mimic fractures, so a section is needed, especially if the suspected fracture is small and linear. She testified that without seeing a section of the purported fracture, which Dr. Choi did not prepare, she could not be certain whether the defect was a fracture or an abnormal suture. Dr. Teas also testified that, as a forensic pathologist, she was familiar with skull fractures in children.

¶ 26    The State called Dr. Manuel Montez in rebuttal at trial. Dr. Montez was a forensic pathologist who consulted for the Lake County Coroner's Office. According to Dr. Montez, he examined Ben's body on the morning of January 16, 2009. He found "significant trauma, violent trauma to the head." Dr. Montez testified that an autopsy had already been performed and the brain had been removed. He testified that he went "to where the organs were kept" to examine the dura and the brain. He then examined the skull. Dr. Montez testified that he observed a

---

[4] In this context, "suture" refers to the line of union between the bones of the skull. See Webster's Third New International Dictionary 2304 (1993).

J_08

2018 IL App (2d) 160825-U

through-and-through skull fracture. He testified that he took off his gloves and felt the fracture from the inside of the skull. He described the fracture as "fresh," and testified that he could feel its ridges when he moved the bones. According to Dr. Montez, the fracture had not begun to heal, because it was not sticky. He opined that Ben's injuries were not consistent with a preexisting condition such as a chronic subdural hematoma. According to Dr. Montez, Ben could not have generated enough force to cause his own injuries. Dr. Montez believed that the injury occurred on January 14, 2009, after 3:30 p.m. and before 3:51 p.m., when the paramedics were called. Dr. Montez opined that the cause of death was non-accidental abusive head trauma and that the manner of death was homicide at the hands of another person.

¶ 27    The jury found defendant guilty of first-degree murder, and this court affirmed.

¶ 28                              E. A Second Look

¶ 29    On June 10, 2015, defendant's father called the Lake County Coroner, Dr. Thomas Rudd, to ask about a "second set of X-rays." Dr. Rudd retrieved Ben's physical file, but there were no X-rays in it. Dr. Rudd then asked Deputy Coroner Mike Reid to bring him the X-rays.

¶ 30    We digress to explain how the X-rays came into being and how they were reproduced for DeLuca prior to trial. There was conflicting testimony at the postconviction hearing, so we rely on the trial court's findings of fact, exhibits in evidence, and the undisputed testimony of various witnesses.

¶ 31    Paul Forman was the deputy coroner assigned to Ben's case. He was no longer employed in that capacity as of June 10, 2015. During the January 15, 2009, autopsy, Forman took three digital X-rays. The first X-ray showed a semi-circular outline with a u-shaped line to its left. The middle X-ray showed a frontal view of Ben's head and upper torso. The third X-ray showed Ben's lower torso. The X-rays were stored on the Coroner's computer. The computer program

- 9 -

J_09

2018 IL App (2d) 160825-U

used for viewing the X-rays was called Tigerview. This program allowed the viewer to adjust the brightness and contrast of the images. The default file extension was TIFF.[5] The TIFF images were uncompressed and rendered the high quality demanded by radiologists. The peculiarity of the program was that it copied an image every time the viewer made and saved adjustments to it.

¶ 32     The disc that the State tendered to DeLuca in discovery (hereinafter the "DeLuca disc") contained the three images that Forman made during the autopsy. However, the images on the DeLuca disc were JPEG files. Those file images were compressed, with a resulting loss of data. In a nutshell, the images on the DeLuca disc were severely degraded. In viewing the DeLuca disc, this court noted that the middle image showing Ben's head and upper torso (hereinafter the "JPEG skull image") is opaque black. By clicking on the Tigerview icon, the brightness and contrast can be adjusted. With a simple adjustment, the bones in the X-ray become visible. The trial court found that the 2011 Tigerview software by default exported the images from the Coroner's computer to discs as JPEGs. However, the evidence also showed that it was possible to export them as TIFFs. Had that been done, the evidence showed, the images on the DeLuca disc would have been identical to those stored on the Coroner's computer.

¶ 33     Now, we return to the events of June 2015. When Reid opened the computer file containing Ben's X-rays, he found four images. The fourth image was a copy of the X-ray of Ben's lower torso. Reid then adjusted the brightness on the TIFF skull image and saved it. That action created a fifth image. Reid exported all five images to a disc (hereinafter the Rudd disc). The 2015 version of Tigerview by default exported those images as TIFFs.

¶ 34     Dr. Rudd is a pathologist. He reviewed the TIFF skull image and did not see a fracture. He then reviewed the tissue slides and saw evidence of a healing subdural hematoma. He

_____

[5] The file extension was alternatively called .tig.

- 10 -

2018 IL App (2d) 160825-U

consulted with forensic pathologist Dr. Nancy L. Jones. Ultimately, Dr. Rudd concluded that the manner of Ben's death could not have been homicide, and he was given permission by the State of Illinois to change the manner of death on the death certificate from "homicide" to "undetermined." Dr. Rudd furnished the Rudd disc to defendant's attorneys.

¶ 35    Dr. Rudd also asked Dr. Choi to revisit his opinions. Dr. Choi acknowledged that he missed evidence of an old injury, but he did not think that was significant. Dr. Choi did not change his opinion that Ben's skull was fractured or that the manner of death was homicide.

¶ 36                    F. The Postconviction Hearing

¶ 37    Defendant's original postconviction petition raised two issues: (1) actual innocence and (2) whether the State violated *Brady* by failing to disclose the TIFF skull image prior to trial.

¶ 38    DeLuca testified that he could not view the images on the DeLuca disc because the Tigerview software would not work. He testified that had he known that the TIFF skull image existed, he would not have pursued the trial strategy that Ben's death was caused by a re-bleed of an old injury. DeLuca testified that he would have shown a readable X-ray to a neuroradiologist.

¶ 39    Matt DeMartini, a former Lake County assistant state's attorney, testified that he requested Reid to try to make the autopsy X-rays legible before trial, but that Reid was unable to do so. Reid testified that he did not recall DeMartini's request.

¶ 40    Much of the evidence adduced at the hearing centered on the creation of the autopsy X-rays and the difference between the TIFF files and the JPEG files. Eric Stauffacher, a software engineer for the company that created Tigerview, explained the Tigerview software. He demonstrated its use in real time for the judge in the courtroom. According to the judge's findings, Stauffacher, "as easy as child's play," rendered the skull image on the DeLuca disc

2018 IL App (2d) 160825-U

equal in quality to the TIFF skull image.[6] From this demonstration, the court concluded that the State turned over the equivalent of the TIFF skull image.

¶ 41    With respect to the materiality of the TIFF skull image, defendant presented the testimony of Dr. Robert Zimmerman, who was chief of pediatric neuroradiology and chief of pediatric magnetic imaging at Children's Hospital of Philadelphia. According to Dr. Zimmerman, the TIFF skull image did not show a skull fracture. According to Dr. Zimmerman, a skull fracture that was able to be seen by the naked eye would show up on an X-ray. Dr. Zimmerman also testified that the JPEG skull image could not be manipulated with software to improve its quality so that it could be interpreted by a well-qualified radiologist. Dr. Zimmerman opined that the absence of a skull fracture would point "more to" a self-inflicted or accidental head trauma than one intentionally inflicted by another person. According to Dr. Zimmerman, the way defendant demonstrated to police how she threw Ben to the floor could not have happened, because Ben would have fallen on his face. The fracture would have been to his forehead, not the back of his head.

---

[6] The Coroner's actual computer was in evidence. The court allowed it to be withdrawn and returned to the Coroner's Office prior to its examination by defendant's imaging expert, Jeff Mueller. The court found that Mueller's examination compromised the computer's integrity. During his examination, Mueller created yet a sixth image. The State's forensic computer expert disagreed with Mueller's methodology, but he did not dispute Mueller's conclusions that the three X-rays that Forman took were saved to the computer as TIFF files, that those same images were provided to DeLuca as JPEG files, and that it was possible in 2011 to export the images to a disc as TIFF files.

2018 IL App (2d) 160825-U

¶ 42    Defendant also presented Dr. Jones's affidavit dated June 20, 2015.[7] She reviewed the TIFF skull image on June 11, 2015. She opined that Ben's skull was abnormally shaped like an old-fashioned light bulb. She further opined that the growth in Ben's head circumference indicated head trauma that had occurred "well before his death." In Dr. Jones's opinion, the head shape was consistent with swelling of the brain that led to the enlargement of the skull over time. Dr. Jones concluded that Ben suffered from a chronic, rather than an acute, condition. Dr. Jones identified what Dr. Choi found to be a skull fracture as an "accessory suture." She opined that, had the defense experts been provided with the TIFF skull image prior to trial, they would not have concluded that the mechanism of death was a re-bleed. "Rather," she opined, "the defense experts would have concluded that the mechanism of death was cerebral edema, arising from repetitive concussions, which were produced by a significant head injury in October 2008 and additional head-banging incidents culminating in a final head-banging incident, witnessed by [Kallinger], within 15-20 minutes of [Ben] becoming unresponsive."[8]

¶ 43    Forman testified that Dr. Montez did not examine Ben's body on January 16, 2009. According to Forman, he (Forman) stitched up Ben's head after the January 15 autopsy, so Dr. Montez could not have handled the skull on the sixteenth. Forman was defendant's witness, but defense counsel made clear that this testimony was unexpected. In light of it, defendant's attorneys sought leave to amend the postconviction petition to include the claim that the State used perjured testimony at trial. The court took the request under advisement.

¶ 44    On September 30, 2016, the court filed a 50-page memorandum opinion and order. The court allowed the amendment of the petition. The court examined the testimony both at trial and

_____

[7] Dr. Jones was unavailable to testify, and the parties stipulated to the use of her affidavit.

[8] On appeal, defendant omitted any reference to Dr. Jones in her briefs.

2018 IL App (2d) 160825-U

at the postconviction hearing in minute detail, made extensive findings of fact and conclusions of law, and denied the amended petition. Briefly summarized, the court found: (1) Forman's testimony regarding Dr. Montez was not credible; (2) the X-rays that were disclosed to DeLuca were the same as those taken at Ben's autopsy; (3) the TIFF skull image was not material under *Brady* standards; and (4) defendant failed to carry her burden to establish actual innocence. We will incorporate additional pertinent facts into our Analysis as needed for a complete discussion of the issues.

¶ 45    Defendant filed a timely notice of appeal.

¶ 46                                II. ANALYSIS

¶ 47    On appeal, defendant does not pursue her actual innocence claim. She argues that the trial court erred in finding that she failed to make a substantial showing of a *Brady* violation and that her conviction resulted from the State's knowing use of perjured testimony. We address the second issue first, as Dr. Montez's trial testimony potentially impacts the first issue. Initially, we look at well-established principles that guide our review.

¶ 48                          A. Postconviction Procedures

¶ 49    The Act provides a remedy for an imprisoned defendant whose rights were substantially violated at his or her original trial. *People v. Myers*, 386 Ill. App. 3d 860, 864 (2008). A postconviction petition is a collateral proceeding that permits an inquiry only into constitutional issues that were not, and could not have been, raised on direct appeal. *Myers*, 386 Ill. App. 3d at 864. The trial court may properly look to the record of the defendant's trial in determining the sufficiency of his or her postconviction claims. *People v. Wade*, 47 Ill. 2d 38, 41 (1970).

¶ 50    The Act sets forth a three-stage process for the adjudication of postconviction petitions. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 27. At the first stage, the trial court

- 14 -

2018 IL App (2d) 160825-U

independently assesses the petition, and the court can summarily dismiss a petition that is frivolous or patently without merit. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 28. If a petition survives the first stage, it advances to the second stage, where a defendant can obtain appointed counsel, if necessary, and the State can move to dismiss the petition. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 29.

¶ 51     At the second stage, all well-pleaded facts not rebutted by the record are taken as true, and the court does not engage in any fact-finding. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 29. If a defendant makes a substantial showing of a constitutional violation, the petition then advances to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved. *Hotwagner*, 2015 IL App (5th) 130525, ¶¶ 29, 30.

¶ 52     At the third stage, a defendant must make a substantial showing of a constitutional violation. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 30. The court may receive proofs through affidavits, testimony, or other evidence. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 30. A reviewing court will not reverse the court's decision unless it is manifestly erroneous. *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). Under this standard, the appellate court gives great deference to the trial court's factual findings, because the trial court is in the best position to weigh the credibility of the witnesses. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 31. A ruling is manifestly erroneous if it contains error that is clearly evident, plain, and indisputable. *Hotwagner*, 2015 IL App (5th) 130525, ¶ 3.

¶ 53                    B. Whether The State Used Perjured Testimony

¶ 54     It is well established that the State's knowing use of perjured testimony to obtain a criminal conviction violates due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). A conviction that was obtained by the knowing use of perjured testimony will be set aside if there

- 15 -

J_15

2018 IL App (2d) 160825-U

is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Olinger*, 176 Ill. 2d at 345. At a third-stage evidentiary hearing, the defendant must show that the State knowingly used perjured testimony, not just that perjury took place. *People v. Berland*, 115 Ill. App. 3d 272, 274 (1983).

¶ 55    At trial, there were essentially two issues for the jury to resolve: (1) whether defendant threw Ben to the floor and (2) whether defendant's acts caused or contributed to Ben's death. Causation came down to a battle of the experts. The State presented Dr. Montez as its rebuttal witness. Dr. Montez testified that he examined Ben's body on the morning of January 16, 2009. He testified that he removed his gloves and felt the recent through-and-through skull fracture. He further testified that he examined Ben's brain. Based upon his examination, Dr. Montez concluded that Ben was murdered.

¶ 56    At the postconviction hearing, Forman testified that Dr. Montez participated in a discussion about Ben's case on the morning of January 16, but that he did not examine Ben's body.

¶ 57    Forman testified that he took five X-rays of Ben's body at the autopsy on January 15. Forman also testified that he sewed the skull cap back on after that autopsy and that it was still stitched together when Dr. Choi began his second examination on the afternoon of January 16. According to Forman, Dr. Montez could not have examined Ben's brain on January 16, because the brain was inside a viscera bag.[9]

¶ 58    A State's Attorney's investigator testified that Forman previously, on two occasions, stated that he took two film X-rays of Ben's body.

---

[9] A "viscera bag" was described as a bag in which all of the internal organs were placed after the autopsy. A photograph in evidence depicts this item.

2018 IL App (2d) 160825-U

¶ 59    To further rebut Forman's testimony, the State presented the testimony of David Thomas, a police officer who was present at the second autopsy on the afternoon of January 16. Thomas testified that Ben's body was on the autopsy table when he entered the room.

¶ 60    Thomas identified People's Exhibit 152 as a photograph accurately depicting the condition of the body when he first saw it. The photograph is a color close-up of Ben's body lying on its back on a plastic sheet that covered the autopsy table. The body had been cut open from the collar bones to the groin, and all of the internal organs were missing. The top half of the skull was missing as well. Thomas testified that the skull was on the autopsy table, but he did not look at it closely. On cross-examination, Thomas stated that he did not know whether the skull had been attached prior to his arrival in the autopsy room. However, he testified that there was no indication that the head had previously been stitched together. Thomas also testified that it was apparent that the brain had been removed and dissected.

¶ 61    Thomas testified that Dr. Choi experimented to determine whether the versions of events that defendant was relating to the police during her interrogation could have happened as she described. According to Thomas, they had to put the skull back onto the body to do the experiments. Forman, Thomas stated, used a thick white twine to make a "generic" stitch. People's Exhibits 200 and 201 are color photographs in evidence showing Ben's head. The top half of the skull was placed over the bottom half, and the back scalp flap had been loosely stitched to the front flap with white twine, resembling cotton butcher's twine, in two places at the top of the head. Clearly visible are holes in the scalp where the twine was laced through it before tying the knots to keep the scalp in place.

¶ 62    The court found Forman's testimony not credible. The Coroner's own computer showed that three digital X-rays were taken on January 15. Further, the court found that "Ben's skull cap

- 17 -

2018 IL App (2d) 160825-U

was not stitched to his head after the autopsy on January 15, 2009, as Forman testified." The court relied on the photographs that we described above, noting that "the twine created visible holes in the skin on the head that would be noticeable had the twine been removed." Thus, the court concluded, Forman's credibility was undermined. Finally, the court noted that, as the trial judge, it had observed Dr. Montez's testimony and found Dr. Montez to be credible.

¶ 63    Defendant contends that (1) Forman's testimony that he stitched the skull cap back on after the January 15 autopsy should have been believed, (2) Dr. Montez's trial testimony was contradicted by the known evidence, and (3) Dr. Zimmerman corroborated Forman's testimony.

¶ 64    Defendant addresses a threshold issue to which the State does not directly respond. Defendant had to show that there was State action to deprive defendant of her liberty based on false testimony. See *People v. Cihlar*, 111 Ill. 2d 212, 216-17 (1986) (in a postconviction proceeding, a defendant must show action by the State to present perjured testimony). The prosecutor trying the case need not have known that the testimony was false, as long as any representative or agent of the State knew that it was false. *People v. Smith*, 352 Ill. App. 3d 1095, 1101 (2004).

¶ 65    Here, there is no evidence that any of the prosecutors suborned perjury or committed any impropriety, and defendant does not so claim. Rather, defendant argues that Dr. Montez knew that his testimony was false and that he was a State agent. Defendant argues that Dr. Montez was provided information by the State and was called as a State's witness. In *Smith*, a criminalist who testified falsely for the prosecution was found to be a State agent. *Smith*, 352 Ill. App. 3d at 1101. There is no discussion in *Smith* of the relationship between the State and the criminalist, so we do not know whether the criminalist was employed by a state agency or the police. For purposes of this discussion, we will assume, without deciding, that Dr. Montez was a State actor.

2018 IL App (2d) 160825-U

¶ 66    Defendant asserts that the court erred in rejecting Forman's testimony and relying on
Thomas's testimony. Defendant argues that Forman's testimony was consistent with his job
duties and that he was a disinterested witness. On the other hand, defendant questions the
photographs that Thomas relied on, as they did not contain date stamps. We are mindful that, at
the third-stage evidentiary hearing, the judge serves as the fact finder, and it is the court's
function to determine witness credibility, decide the weight to be given the testimony and
evidence, and resolve evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 67    Forman impaired his own credibility when he testified that he took five digital X-rays and
then told an investigator, on two separate occasions, that he took two *film* X-rays. Neither
version was possible. Defendant's own computer expert established that three digital X-rays
were taken on January 15, 2009.

¶ 68    There was a sufficient foundation laid for the admission of the January 16 autopsy
photographs into evidence. Thomas testified that they accurately depicted the body as it appeared
on the afternoon of January 16, 2009. All that is required for a photograph's admission is the
testimony of a witness who has personal knowledge of the object, person, or scene depicted, and
who attests that the photograph is a fair and accurate representation of that which it purports to
depict. *People v. Fountain*, 179 Ill. App. 3d 986, 994 (1989).

¶ 69    The photographs were part of a sequence that included pictures of Dr. Choi conducting
the experiments. The evidence established that those experiments were done on the afternoon of
January 16, because they coincided with defendant's interrogation on that date. One photograph
shows an experiment being done before the skull cap was sewn back on, and two others show
experiments with the skull cap and scalp sewn in place with twine. Forman's own testimony
established that the brain was removed and dissected on January 15, so there would have been no

- 19 -

J_19

2018 IL App (2d) 160825-U

reason to remove the skull cap on January 16, only to sew it on again.[10] Accordingly, we cannot say that the court's determination that Forman was not credible was against the manifest weight of the evidence.

¶ 70    Nor was Dr. Montez's trial testimony contrary to known facts, as defendant suggests. Defendant claims that Dr. Montez could not have examined the brain, because it was in the viscera bag. Dr. Montez testified that after he observed the violent trauma to the head, *he went to where the organs were kept* to examine the dura and the brain. The only possible meaning is that the dura and the brain were not inside the skull. Thus, Dr. Montez's testimony was not inconsistent with the brain being in the viscera bag.

¶ 71    Next, defendant asserts that Dr. Zimmerman's testimony corroborated Forman. Defendant's logic goes thusly: Dr. Zimmerman testified that there was no skull fracture because it did not show up on the X-ray; therefore, Dr. Montez could not have felt and manipulated a fracture; therefore, Dr. Montez was not truthful. This is a somewhat artful way of arguing that Dr. Montez must have committed perjury because Dr. Zimmerman disagreed with him. It is also an attempt to bolster Forman's implausible testimony.

¶ 72    Defendant maintains that the court should have taken Dr. Zimmerman's opinion into account in determining whether Dr. Montez committed perjury. The crux of Forman's testimony was that Dr. Montez did not examine Ben's body. Dr. Zimmerman could not speak to that. Regarding a skull fracture, Dr. Zimmerman looked at an X-ray; he did not examine Ben's skull or the autopsy photographs. Dr. Choi testified that small linear fractures sometimes do not show

---

[10] The purpose of the January 16, 2009, autopsy was the internal examination of Ben's arms, legs, and spine.

2018 IL App (2d) 160825-U

up on X-rays. Thus, the court did not err in failing to take Dr. Zimmerman's opinion into account.

¶ 73    Moreover, Dr. Zimmerman's opinion has to be given its proper perspective. Throughout her briefs, and at oral argument, defendant emphatically postulated that Dr. Zimmerman's opinion was the only expert opinion deserving of any weight. Yet Dr. Zimmerman's opinion that there was no skull fracture is disputed by Drs. Choi, Greenbaum, Montez, and Leestma. Even Dr. Teas conceded the possibility of a fracture. Hence, Dr. Zimmerman is only one more expert in a classic battle of experts, *i.e.*, different experts examining roughly the same information and arriving at opposite conclusions. See *People v. Smith*, 253 Ill. App. 3d 443, 446-47 (1993) (describing a battle of arson experts). When confronted with a battle of the experts, it is "for the trier of fact to evaluate the expert testimonies and weigh their relative worth in context." *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007). In plain words, the trial court was not required to accept Dr. Zimmerman's testimony over that of the other experts, including Dr. Montez.[11]

¶ 74    Defendant relies on *Olinger* and *People v. Perkins*, 292 Ill. App. 3d 624 (1997). In *Olinger*, one Stalder, whose testimony put the murder weapon in the defendant's hands, testified falsely about the consideration the State gave him for his testimony, and the State did not correct the false testimony. *Olinger*, 176 Ill. 2d at 345-46. In *Perkins*, which was a direct appeal, the evidence showed that the State's witnesses either lied or gave misleading testimony about their favorable treatment by the State in exchange for their testimony. *Perkins*, 292 Ill. App. 3d at 630-31. Those cases are inapposite. In both *Olinger* and *Perkins*, the defendants proved that perjury occurred. Here, there was no such proof.

_____

[11] This is central to our discussion of the *Brady* issue, *infra*, and we will elaborate upon it when scrutinizing Dr. Zimmerman's opinions.

2018 IL App (2d) 160825-U

¶ 75                        C. Whether the State Violated *Brady v. Maryland*

¶ 76     Defendant contends that the State did not disclose readable X-rays that were in its possession prior to trial. Specifically, defendant argues that the TIFF skull image was favorable evidence because it showed no skull fracture. Defendant concludes that the absence of a skull fracture proves that no homicide occurred.

¶ 77                          1. The "*Brady* Rule"

¶ 78     In a criminal case, the prosecution is required to disclose evidence that is favorable to the accused and material to either guilt or innocence. *Brady*, 373 U.S. at 87. A "*Brady* claim" requires a showing that (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching, (2) the evidence was suppressed by the State either willfully or inadvertently, and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *Beaman*, 229 Ill. 2d at 73-74; *People v. Thomas*, 364 Ill. App. 3d 91, 101 (2006). The State's duty to disclose applies even though the defense makes no request for exculpatory evidence and where such evidence is known to the police or others acting on behalf of the government, but not to the prosecutor. *People v. Coleman*, 206 Ill. 2d 261, 285 (2002). The *Brady* rule requires a prosecutor to learn of any favorable evidence of which others acting on behalf of the government are aware. *Coleman*, 206 Ill. 2d at 285. Such evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the State disclosed the evidence. *Thomas*, 364 Ill. App. 3d at 101. A reasonable probability of a different result is one that undermines confidence in the trial's actual outcome. *Thomas*, 364 Ill. App. 3d at 101. Under this test, the appellate court does not examine the sufficiency of the evidence; rather, the defendant must demonstrate that the favorable evidence could reasonably

2018 IL App (2d) 160825-U

have put the whole case in such a different light as to undermine confidence in the verdict. *Thomas*, 364 Ill. App. 3d at 101.

¶ 79                    2. The TIFF Skull Image was Favorable to Defendant

¶ 80    Defendant asserts that the TIFF skull image was favorable because it would have allowed her to impeach the witnesses who testified to the existence of a skull fracture, and it would have established that Dr. Montez's testimony was false. We have already explained that it would not undermine Dr. Montez's testimony to that degree. However, the absence of a skull fracture would tend to strengthen the defense theory that Ben died of an exacerbation of an old injury. Dr. Greenbaum testified that the force applied to Ben's head was enough to crack his skull, and she concluded that Ben could not have generated enough force to do that by throwing himself backward. The lack of a skull fracture could indicate that less force was used. Thus, the evidence would have assisted defendant in her defense. See *Beaman*, 229 Ill. 2d at 75 (in considering whether undisclosed evidence is favorable to the accused, we consider whether it assists him or her in presenting a defense).

¶ 81                    3. What the State Disclosed

¶ 82    As noted, Forman took three X-rays at Ben's January 15, 2009, autopsy that were saved to the Coroner's computer as TIFF files. The State argues that it disclosed those X-rays. Defendant maintains that the State's disclosure violated the *Brady* rule because the JPEG images on the DeLuca disc were illegible, even when enhanced with the Tigerview software. To be clear: both sides agree that three X-rays were taken and disclosed.[12] The issue is whether the disclosure comported with due process. Defendant relies on *United States v. Bagley*, 473 U.S.

_____

[12] The trial court found that the so-called "second set of X-rays" that defendant's father referenced in his telephone call to Dr. Rudd never existed.

- 23 -

J_23

2018 IL App (2d) 160825-U

667, 683 (1985), for the proposition that a misleading disclosure constitutes a *Brady* violation. In *Bagley*, the Government's disclosure failed to include information that its star witnesses were promised monetary rewards. *Bagley*, 473 U.S. at 667. The United States Supreme Court held that the disclosure misleadingly induced defense counsel to believe that the Government's witnesses could not be impeached on the basis of bias or interest arising from inducements offered by the Government. *Bagley*, 473 U.S. at 683. Here, defendant claims that the JPEG skull image contained so much less data than the TIFF skull image that DeLuca was misled into believing that he could not challenge the existence of the skull fracture at trial.

¶ 83　　　　　4. Whether Defendant Had to Pursue Additional Discovery

¶ 84　　A preliminary question is whether defendant had to pursue additional discovery to obtain legible X-rays. In *People v. Patterson*, 154 Ill. 2d 414, 456 (1992), the State inadvertently failed to produce missing pages from police officers' notes, and the court noted that "defense counsel did not then pursue additional discovery to obtain that information." Here, when DeLuca could not make the X-ray images visible with the software, he did not return to the trial court for assistance. Nor did DeLuca view the TIFF X-rays on the Coroner's computer, despite the fact that he had obtained a court order allowing him to do so.

¶ 85　　At oral argument, defendant asserted that the State misled DeLuca into believing that better images did not exist. The prosecutor represented to the court that the images on the DeLuca disc were unreadable and illegible, and DeMartini testified at the postconviction hearing that Reid was unable to produce better images from the Coroner's computer. Thus, we agree that DeLuca had little reason to suspect the existence of a legible skull X-ray.

¶ 86　　　　　5. Whether the State's Disclosure Implicated *Brady*

2018 IL App (2d) 160825-U

¶ 87     The court found that there was no discovery violation,[13] relying on Stauffacher's in-court

demonstration of the Tigerview software. The court found that both the TIFF skull image and the

JPEG skull image displayed "the same amount of detail in the skull and bones of the upper

body" after Stauffacher lightened the skull image. The court also found that the State disclosed

the software with which to make the JPEG skull image "substantially similar" to the TIFF skull

image. The finding that both images were "substantially similar" is an implicit finding that the

JPEG skull image was legible to a radiologist seeking to interpret it.

¶ 88     We agree with defendant that the court did not possess the expertise to opine whether a

radiologist could interpret the enhanced JPEG skull image. Dr. Zimmerman's opinion that the

JPEG skull image was not of sufficient quality to permit interpretation and that lightening the

image would not improve its quality was unrebutted. Nevertheless, it is not necessary for us to

opine whether the State's disclosure constituted a discovery violation, because, even assuming a

violation, defendant cannot show that the TIFF skull image was material.

¶ 89                    6. The TIFF Skull Image Was Not Material

¶ 90     To determine whether the TIFF skull image was material, we look at the impact of the

allegedly undisclosed evidence on the verdict. *Beaman*, 229 Ill. 2d at 78. Defendant's entire

theory on postconviction is summed up in one sentence in her opening brief: "The lack of a skull

fracture showed that Ben was not the victim of a homicide." Defendant's assertion that there was

no skull fracture is based *solely* on Dr. Zimmerman's testimony that "no fracture could have

---

[13] The court *sua sponte* raised the question whether the prosecution was bound to disclose

evidence in the Coroner's possession and then assumed, without deciding, that it was. On appeal,

the State does not contest that it had the duty to disclose the X-rays, and we assume that it did.

The X-rays were taken at Dr. Choi's direction, and the State disclosed Dr. Choi as its expert.

2018 IL App (2d) 160825-U

existed because he did not see a fracture on the [TIFF skull image]." Thus, defendant contends that the TIFF skull image is fully exculpatory.[14]

¶ 91    For Dr. Zimmerman to be right, four other experts have to be wrong. Drs. Choi and Montez both saw the fracture with their naked eyes, and Dr. Montez felt and manipulated it without gloves. Drs. Greenbaum and Leestma saw the fracture in the autopsy photographs. Dr. Teas also saw the defect in the autopsy photographs, although she was unsure whether it was a fracture or an abnormal suture. Significantly, defendant did not provide evidence at the postconviction hearing that any of these experts changed their opinions in light of Dr. Zimmerman's testimony. Indeed, the photographs in evidence clearly portray the purported fracture described by Dr. Choi, both on the outside and the inside of the skull. Thus, the trial court, in determining the credibility of the witnesses, was justified in rejecting Dr. Zimmerman's opinion.

¶ 92    At oral argument, defendant argued that Dr. Zimmerman should be believed because his qualifications as a nationally renowned neuroradiologist are superior to the qualifications of the others. That lands us squarely within *Sims*, where the court rejected a similar argument. In *Sims*, the victim died over five hours after the defendant perpetrated an armed robbery at the store where she was employed. *Sims*, 374 Ill. App. 3d at 232. At trial, a deputy Cook County medical examiner testified for the State that the stress the victim endured during the robbery caused her diseased heart to fail, resulting in her death. *Sims*, 374 Ill. App. 3d at 241-42. The defendant called a famous cardiologist who testified that neither stress nor heart disease played a role in the victim's death. *Sims*, 374 Ill. App. 3d at 245. The jury convicted the defendant of felony murder. *Sims*, 374 Ill. App. 3d at 232. On appeal, the defendant argued that his expert's testimony should

---

[14] Defendant posits that the skull fracture was the only evidence of an acute injury.

- 26 -

J_26

2018 IL App (2d) 160825-U

have been given more weight than the State's expert because the defense expert was a world-renowned cardiologist. *Sims*, 374 Ill. App. 3d at 251. The appellate court rejected the defendant's argument, explaining that when experts offer divergent conclusions, the jury is entitled to believe one expert over the other. *Sims*, 374 Ill. App. 3d at 251. The court also made clear that it would not reweigh the experts' testimonies based on their respective qualifications. *Sims*, 374 Ill. App. 3d at 251.

¶ 93    From *Sims*, we conclude the following: (1) the trial court was not required to give Dr. Zimmerman's opinion more weight than the experts who testified to the existence of the skull fracture at trial, and (2) this court cannot reweigh the experts' testimonies based on their respective qualifications.

¶ 94    To determine the probable impact of Dr. Zimmerman's opinion on the jury's verdict, we examine his testimony from the postconviction hearing in detail. Dr. Zimmerman did not see a fracture on the TIFF skull image. At trial, Dr. Choi testified that he did not see the fracture on the X-ray, possibly due to the poor quality of the X-ray, or because small linear fractures do not always show up on an X-ray. Dr. Zimmerman's failure to see a fracture would not change the verdict, because the jury already heard from Dr. Choi that the fracture was not visible on the X-ray.

¶ 95    Dr. Zimmerman also testified that no fracture could have existed because he did not see it on the X-ray. However, he did not testify that he examined either the skull or the autopsy photographs. Thus, the trial court was justified in finding that Dr. Zimmerman's claim is dubious, because two forensic pathologists saw the fracture when they examined Ben's skull. Additionally, Drs. Greenbaum and Leestma saw the fracture in the photographs. Dr. Teas as well saw what could be a fracture in the photographs. This court has viewed multiple photographs in

2018 IL App (2d) 160825-U

evidence depicting the purported fracture. Contrary to Dr. Zimmerman's testimony, which leaves the impression that nothing existed, something is indisputably there.

¶ 96   Further, common experience shows that conditions of ill-being can exist but not be visible on an X-ray. That is why physicians routinely order additional tests such as CT scans and MRIs. Nor does the record support that only a neuroradiologist can diagnose a skull fracture. Indeed, Dr. Teas testified that forensic pathologists are trained and qualified to do so.

¶ 97   Additionally, Dr. Zimmerman's testimony doubting defendant's confession ignores the actual record. Because defendant held the stuffed bear facing away from her when she demonstrated off-camera how the incident happened, Dr. Zimmerman concluded that Ben would have fallen onto his face and fractured his forehead, not the back of his head. However, this ignores that defendant stated three times during the demonstration that Ben hit the back of his head.

¶ 98   Significantly, Dr. Zimmerman did not exclude homicide as the manner of Ben's death. He testified only that the absence of a fracture "would go against" a diagnosis of abusive head trauma and that the absence of a fracture would "point more to" self-inflicted or accidental head trauma than homicide.

¶ 99   Moreover, Dr. Choi testified at trial that the poor quality of the X-ray might have obscured the fracture. Dr. Choi would have been referencing the TIFF skull image, as there were no JPEG images on the Coroner's computer. The quality of the TIFF skull image was raised by the evidence at the postconviction hearing also. Defendant maintains that the court improperly advocated for the State in questioning the quality of the TIFF skull image but the record supports the court's musing. Forman testified that he had no formal training in taking X-rays, and that the

2018 IL App (2d) 160825-U

X-rays he took at Ben's autopsy were "Paul quality," the implication being that he was denigrating their quality.

¶ 100   We conclude that there is no reasonable probability that Dr. Zimmerman's testimony would have changed the result of defendant's trial. His opinion merely contradicted that of four other experts, two of whom actually examined Ben's skull. We are also mindful that the trial court assesses the credibility of new witnesses and resolves evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34. Accordingly, we cannot say that the court's resolution of the conflict was manifestly erroneous.

¶ 101   For these reasons, we determine that defendant has not shown that the TIFF skull image would put the whole case in such a different light as to undermine confidence in the verdict.

¶ 102   We are aware of the Third District's recent decision in *People v. Del Prete*, 2017 IL App (3d) 160535, where the appellate court affirmed the trial court's grant of a postconviction petition. In *Del Prete*, the defendant day-care worker was convicted of first-degree murder arising from the death of I.Z., who was a three-month old infant in her sole care. *Del Prete*, 2017 IL App (3d) 160535, ¶¶ 3-5.

¶ 103   At trial, the State's theory was that I.Z. died of shaken baby syndrome (SBS) and that the defendant was the perpetrator because she was the only adult with I.Z. when the infant collapsed. *Del Prete*, 2017 IL App (3d) 160535, ¶ 49. The State's expert, Dr. Flaherty, testified that I.Z. was violently shaken and that the ill effects of the abuse would have been immediate. *Del Prete*, 2017 IL App (3d) 160535, ¶¶ 12, 13. The State also presented Dr. Jeff Harkey, the pathologist who performed the autopsy on I.Z. Dr. Harkey opined as to the cause of death, but he did not testify that he generally disagreed with SBS. *Del Prete*, 2017 IL App (3d) 160535, ¶ 9. The defense called an expert, Dr. Tucker, who testified that I.Z. had both acute and chronic subdural

2018 IL App (2d) 160825-U

hematomas and that her injuries occurred 18 to 24 hours before she collapsed at the day care facility. *Del Prete*, 2017 IL App (3d) 160535, ¶ 16. Dr. Tucker opined that coughing, sneezing, holding breath, movement, turning the head quickly, or falling could have caused a re-bleed of a chronic subdural hematoma. *Del Prete*, 2017 IL App (3d) 160535, ¶ 16.

¶ 104   After the defendant lost her direct appeal and her postconviction petition was denied, she learned of a letter from the lead detective to Dr. Flaherty stating that Dr. Harkey was known not to agree with SBS and that Dr. Harkey had previously testified for the defense in SBS cases. *Del Prete*, 2017 IL App (3d) 160535, ¶ 23. The State had not disclosed the letter to the defense prior to trial. *Del Prete*, 2017 IL App (3d) 160535, ¶ 23. The trial court granted the defendant leave to file a successive postconviction petition, and the matter proceeded to an evidentiary hearing. *Del Prete*, 2017 IL App (3d) 160535, ¶¶ 24, 25. At the hearing, Dr. Harkey testified that he disagreed with SBS in that it pinpointed the perpetrator as the last person with the child before the child collapsed. *Del Prete*, 2017 IL App (3d) 160535, ¶ 35. According to Dr. Harkey, it was possible for a baby to have a delayed collapse. *Del Prete*, 2017 IL App (3d) 160535, ¶ 36. Defense counsel testified that, had he known about the undisclosed letter, he would have interviewed Dr. Harkey and discovered his general disagreement with SDS. *Del Prete*, 2017 IL App (3d) 160535, ¶ 38. Based on these facts, the trial court granted the postconviction petition. *Del Prete*, 2017 IL App (3d) 160535, ¶¶ 49-56.

¶ 105   The appellate court held that the State's failure to disclose the letter invoked *Brady*, and in discussing materiality, the court emphasized that the defendant did not confess and there were no eyewitnesses. *Del Prete*, 2017 IL App (3d) 160535, ¶ 53.

¶ 106   *Del Prete* is distinguishable from our case. First, the defendant in *Del Prete* did not confess, although she did make the admission that she might have shaken I.Z. "a little harder"

2018 IL App (2d) 160825-U

than she thought. *Del Prete*, 2017 IL App (3d) 160535, ¶ 6. Here, defendant's confession is consistent with Ben's injuries. Contrary to defendant's contention, the police did not lie to her about the fracture's existence. Dr. Choi informed the police of his findings, and, during the second autopsy, he experimented to determine that defendant's multiple explanations of how Ben was injured were physically impossible. The police relayed to defendant what the physical evidence showed. When the police told defendant that her versions were not consistent with the medical evidence, she finally confessed to throwing him to the floor with force.

¶ 107   Second, in *Del Prete*, the State's theory rested on one expert's opinion. Here, the State presented multiple opinions that the fracture existed. Also, we disagree with defendant's contention that the defense had to concede the fracture's existence at trial because DeLuca did not have the benefit of the TIFF skull image. Defendant was prudent to concede the fracture because the evidence is overwhelming that it existed. Dr. Leestma, defendant's neuropathologist, saw it in the autopsy photographs. Dr. Teas also saw a defect that she said could be a skull fracture. Defendant could not credibly deny what her own experts saw.

¶ 108   Third, in *Del Prete*, Dr. Harkey's disagreement with SBS opened up a whole new defense. Here, the evidence consistent with defendant's innocence—that Ben's injuries were caused by a re-bleed of a chronic subdural hematoma in the final head-banging incident—is the defense that DeLuca ably presented at trial.[15]

¶ 109   Finally, because the standard of review is so highly deferential—the opposite conclusion must be clearly evident (see *People v. Coleman*, 2013 IL 113307, ¶ 98)—the result in *Del Prete* does not dictate that we reach the same result in the present case. For the reasons discussed, we

---

[15] Defendant did not claim ineffective assistance of counsel either in her direct appeal or her postconviction petitions.

2018 IL App (2d) 160825-U

hold that the court's denial of defendant's amended postconviction petition was not manifestly erroneous.

¶ 110                                 III. CONCLUSION

¶ 111    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 112    Affirmed.