# EXHIBIT K

Petitioner's Petition for Leave to Appeal to the Illinois Supreme Court filed July 16, 2018

**No.**

# In the

# Supreme Court of Illinois

PEOPLE OF THE STATE OF ILLINOIS,

*Plaintiff-Respondent,*

v.

MELISSA CALUSINSKI,

*Defendant-Petitioner.*

_____

Petition for Leave to Appeal from the Appellate Court of Illinois,
Second Judicial District, No. 2-16-0825.
There Heard on Appeal from the Circuit Court of the Nineteenth Judicial Circuit,
Lake County, No. 09 CF 252.
The Honorable **Daniel Shanes**, Judge Presiding.

**PETITION FOR LEAVE TO APPEAL
PURSUANT TO ILLINOIS SUPREME COURT RULES 315 & 612**

KATHLEEN T. ZELLNER
(ktzemployees@gmail.com)
KATHLEEN T. ZELLNER
 & ASSOCIATES, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212

E-FILED
7/16/2018 2:48 PM
Carolyn Taft Grosboll
SUPREME COURT CLERK

*Counsel for Defendant-Petitioner*

**ORAL ARGUMENT REQUESTED IF PETITION IS GRANTED**

 COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER 

K_01

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

## PRAYER FOR LEAVE TO APPEAL

Petitioner-Appellant **Melissa Calusinski** respectfully petitions this Court for leave to appeal, pursuant to Illinois Supreme Court Rule 315 and 612, from the judgment of the Appellate Court affirming the denial of her petition for postconviction relief.

## HISTORY IN THE APPELLATE COURT

In an unpublished opinion dated June 11, 2018, the Appellate Court, Second District, affirmed the denial of **Melissa Calusinski**'s postconviction petition following a third-stage evidentiary hearing. (Opinion, pp. 1-32).

## POINTS RELIED ON FOR REVIEW OF THE JUDGMENT BELOW

The Appellate Court agreed that the undisclosed TIFF image of Benjamin Kingan's ("Ben") skull was favorable to **Melissa Calusinski** because **"**the absence of a skull fracture would tend to strengthen the defense theory that Ben died of an exacerbation of an old injury. Dr. Greenbaum testified that the force applied to Ben's head was enough to crack his skull, and she concluded that Ben could not have generated enough force to do that by throwing himself backward. The lack of a skull fracture could indicate that less force was used. Thus, the evidence would have assisted defendant in her defense." (Opinion, p. 23). Also, the Appellate Court agreed with **Melissa Calusinski** that "[t]he prosecutor represented to the court that the images on the DeLuca disc were unreadable and illegible, and DeMartini testified at the postconviction hearing that Reid was unable to produce better images from the

1

K_02

Coroner's computer. Thus, we agree that DeLuca had little reason to suspect the existence of a legible skull X-ray." (Opinion, p. 24).

Despite the Appellate Court's findings that support **Melissa Calusinski**'s claim, it determined that the materiality requirement of *Brady v. Maryland* (373 U.S. 83, 87 (1963)) was not met by the State's failure to disclose a TIFF skull image. The Appellate Court determined that **Melissa Calusinski's** entire theory on postconviction was summed up in one sentence in her opening brief: "The lack of a skull fracture showed that Ben was not the victim of a homicide." (Opinion, p. 25). The Appellate Court found that **Melissa Calusinski's** assertion that there was no skull fracture "is based *solely* on Dr. Zimmerman's testimony [at the postconviction evidentiary hearing] that 'no fracture could have existed because he did not see a fracture on the [TIFF skull image].' Thus, defendant contends that the TIFF skull image is fully exculpatory." (Opinion, pp. 25-26). The Appellate Court disagreed with **Melissa Calusinski's** expert, Dr. Robert Zimmerman ("Dr. Zimmerman"), a pediatric neuroradiologist. The Appellate Court made the following findings:

1. In order for Dr. Zimmerman to be correct, "four other [trial] experts have to be wrong. Drs. Choi and Montez both saw the fracture with their naked eyes, and Dr. Montez felt and manipulated it without gloves. Drs. Greenbaum and Leestma saw the fracture in the autopsy photographs." (Opinion, p. 26).

2. That "[s]ignificantly, Defendant did not provide evidence at the postconviction hearing that any of these experts changed their opinions in light of Dr. Zimmerman's testimony." (Opinion, p. 26).

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_03

The Appellate Court criticized the trial court for "not possessing the expertise" to opine whether a radiologist could interpret the enhanced JPEG skull image. (Opinion, p. 25). Ironically, the Appellate Court also stepped into the shoes of an expert witness and made the following three medical findings:

1. "Indeed, the photographs in evidence clearly portray the purported fracture described by Dr. Choi, both on the outside and the inside of the skull." (Opinion, p. 26).

2. "Contrary to Dr. Zimmerman's testimony, which leaves the impression that nothing existed, *something is indisputably there*," referring to the autopsy photographs. (Opinion, p. 27) (emphasis added).

3. "Further, common experience shows that conditions of ill-being can exist but not be visible on an x-ray. That is why physicians routinely order additional tests such as CT scans and MRIs." (Opinion, p. 28).

The Appellate Court made a significant factual error when it concluded that when Dr. Eupil Choi ("Dr.Choi") testified that the "poor quality of the x-ray might have obscured the fracture," he was referencing "the TIFF skull image as there were no JPEG images on the Coroner's computer." (Opinion, p. 28). Significantly, the Appellate Court failed to realize that the 2008 images were stored in a JPEG format and Dr. Choi was looking at JPEG images and not the very-clear TIFF image, which was withheld from all of the trial experts and recovered in 2015. (R.5468; 5470). The Appellate Court failed to recognize or address the significance of the trial experts being deprived of the clear, legible TIFF skull image. The trial experts had to resort to viewing autopsy photographs or relying upon the testimony of two forensic pathologist, who

3

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

claimed to have touched the fracture but were actually manipulating an accessory suture. (R.4228).

## STATEMENT OF FACTS

On January 14, 2009, 16-month-old Ben died from a head injury while attending a local daycare center. In November 2011, a jury found **Melissa Calusinski**, one of his daycare providers, guilty of his murder. In February 2014, the Second District Appellate Court affirmed the conviction and sentence on appeal (*People v. Calusinski,* 2014 IL App (2d) 120383-U) *(Calusinski I)*, and the Illinois Supreme Court subsequently denied discretionary review.

At the time of the postconviction evidentiary hearing in 2016, **Melissa Calusinski's** trial counsel, Paul DeLuca ("Mr. DeLuca"), had been a criminal defense attorney for over thirty years. (R.5006-5008).

On September 7, 2011, after Mr. DeLuca received the x-ray disk from former ASA Bishop, he attempted to open it at his office. (R.5036, 5038). Upon opening the disk on his office computer, Mr. DeLuca observed three image files and other icons. (R.5037-38). The first image Mr. DeLuca observed showed what appeared to be a white outline of the top of a skull. (R.5037) (Pet.Ex. 8).[1] The second image Mr. DeLuca observed was very dark, almost to the point of being black. (R.5037). The third image Mr. DeLuca observed showed Ben's lower torso, from the middle of his waist to his feet. (R.5037). Because the images appeared dark and illegible, Mr. DeLuca asked his secretary for

---

[1] Petitioner-Appellant's exhibits from the evidentiary hearing are cited as (Pet.Ex. __).

4

assistance. (R.5037-38). Mr. DeLuca attempted to open the other files on the disk, but nothing opened. (R.5038).

Mr. DeLuca testified that he formulated his pre-trial and trial strategy based upon the autopsy finding of Dr. Choi that Ben's skull had been fractured. (R.5018-20) (Pet.Ex. 12). Additionally, Mr. DeLuca testified that, because Dr. Choi "didn't take sections of [the skull fracture]" for the purposes of creating histology slides, he could not dispute the existence of the skull fracture absent skull x-rays that showed no fracture. (R.5020).

In the absence of skull x-rays demonstrating there was no fracture, Mr. DeLuca had no choice but to proceed with a defense that assumed there was a skull fracture. (R.5018-19). Mr. DeLuca had learned previously that Ben had an incident in late October 2008 where he came home from daycare with a very large bump on his head. (R.5018). Ben's mother took Ben to the doctor to examine the bump on his head. (R.5018-19). At that time, the doctor performed no diagnostic imaging, including x-rays, to determine whether Ben had suffered a skull fracture. (R.5019). Mr. DeLuca, forced to accept the erroneous premise that Dr. Choi had identified a skull fracture during the autopsy, formulated a trial strategy in which the October 2008 incident was the original source of the skull fracture. (R.5019). Mr. DeLuca also learned that Ben was a "head banger," meaning Ben had a tendency to throw himself back while sitting such that the back and top of his head struck the floor when something upset him. (R.5019). Mr. DeLuca proceeded with the theory that Ben's fatal

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_06

injury started with the incident in October 2008 and that every time he banged his head, his injury got worse. (R.5019). Ultimately, Mr. DeLuca's theory of defense was that Ben's fatal injury was a rebleed of a chronic subdural hematoma. (R.5019).

The materiality of the existence or non-existence of a skull fracture was demonstrated during the trial when the State referenced the existence of a skull fracture thirty-two times. (C.950). During closing arguments at trial, the State argued as follows:

A. Former ASA Bishop stated in her opening, "[f]irst proposition we have to show [is] that the Defendant [per]formed an action [that] caused death. We have it. What were the acts? Threw him to the ground. Cracked his head. Fractured." (R.4732).

B. "Ladies and gentlemen, use your common sense and experience. This line is a fracture in the skull. You do not need a doctor to see a fracture. What did Dr. Montez say? Remember how he manipulated the skull? He manipulated the skull. Why? To see how old that was. Look at that red substance in the crack and the two sides. What is that? Fresh blood. That is a fresh fracture." (R.4716-17).

C. "The skull fracture. It is a skull fracture. Simple as that . . . Dr. Choi saw it. We talked about what the [d]efense expert said about all these things. It was a skull fracture through and through with blood in between." (R.4647).

Mr. DeLuca testified that he could not dispute Dr. Montez's conclusions because he did not possess any legible x-rays that would have conclusively proven there was no skull fracture, and, therefore, Dr. Montez's testimony was demonstrably false. (R.5022; 5025-26; 5028; 5030).

6

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_07

At the evidentiary hearing, Mr. DeLuca testified about the experts he would have hired had he been provided with legible TIFF skull x-rays. (R.5020). Specifically, Mr. DeLuca would have contacted a pediatric neuroradiologist, such as Dr. Zimmerman, to determine whether or not there was a skull fracture. (R.5020-21). The pediatric neuroradiologist would have determined there was no skull fracture, and Mr. DeLuca would have been able to refute the testimony of various witnesses, including Dr. Choi, that there was a skull fracture. (R.5021, 5025). Mr. DeLuca testified at the evidentiary hearing that Dr. Choi testified at trial that the x-rays were not legible and that he could not identify a skull fracture from the x-rays, but that he knew there was a skull fracture because he had observed it with his naked eye. (R.5021-22, 5025).

In 2015, the Coroner's office located and produced legible x-rays of Ben and Mr. DeLuca reviewed them. (Pet.Ex. 9) (R.5040-41). The 2009 x-rays had been saved in a TIFF file format. (R.5042). The TIFF format is an uncompressed format that, in simple terms, contains all underlying data. (R.5043). Mr. DeLuca testified at the evidentiary hearing that the sizes of the JPEG files he received from former ASA Bishop on September 7, 2011, were two or two-and-one-half percent of the sizes of the TIFF image files he viewed in 2015. (R.5042-43). Mr. DeLuca testified at the evidentiary hearing that the JPEG files he received before trial were compressed and contained "very little data." (R.5043).

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_08

Jeffrey Mueller ("Mr. Mueller") testified for **Melissa Calusinski**. (R.5388). Mr. Mueller has a bachelor's degree in computer science and electronics. Within the field of computer science, he has specialized in imaging and video. (R.5391). Mr. Mueller described his work as an imaging specialist as working with "all types of different images from infrared, invisible light to the x-ray spectrum, chromatic spectrum." (R.5391).

Without objection, Mr. Mueller was accepted as an expert in software engineering with a subspecialty in "imaging." (R.5398-99) (C.1509). Mr. Mueller described his background in computer science, and specifically his subspecialty in imaging, which requires a familiarity with all types of images, file formats including JPEG and TIFF files, physics, infrared, and sensor technology. (R.5392-93). He has been hired by commercial and governmental clients to improve the quality of images. (R.5394-95).

Mr. Mueller is familiar with the 2008 and 2013 versions of TigerView Software involved in the case and has used the programs himself. (R.5395-96; 5460-61). He had used the TigerView CD viewer that exports files prior to this case. (R.5480).

Mr. Mueller reviewed the three images given to Mr. DeLuca by the State on September 7, 2011, which were in JPEG format (Pet.Ex. 8) (R.5400; 5486) and the images reviewed by Dr. Shaku Teas ("Dr. Teas"), which were also in JPEG format. (Pet.Ex. 31) (R.5400; 5450). Finally, Mr. Mueller reviewed the TIFF images on the Coroner's computer. (R.5400-01).

8

Mr. Mueller identified Pet.Ex. 8 as the three DeLuca images from the September 2011 disk and the underlying metadata for those images. (Pet.Ex. 25). Mr. Mueller explained that the three DeLuca images were in JPEG format, meaning they had been compressed "significantly." (R.5401-02). "BenKingan1," which is an outline of Ben's skull, is a JPEG image compressed to 267 kilobytes. (R.5403) (Pet.Ex. 25). "BenKingan2," which is an image of Ben's upper torso and skull, is a JPEG image compressed to 411 kilobytes. (R.5403) (Pet.Ex. 25).

Mr. Mueller explained that the 2008 TigerView software in operation in 2011 allowed the user to choose to export the images in either TIFF or JPEG format. (R.5415-18). If the user did not specifically select the TIFF file format when exporting, the TigerView software defaulted and exported images as JPEG files. (R.5468). The newer 2011 version defaulted to a TIFF format. (R.5470).

Using the 2008 TigerView software, which was available in 2011, Mr. Mueller was able to improve the quality of Coroner's TIFF Image 50 of Ben's skull, which was saved on the Coroner's computer in 2009. (R.5415).

However, Mr. Mueller, using the 2008 TigerView software, was not able to improve the JPEG 2011 DeLuca image, BenKingan1. (R.5418). Mr. Mueller explained that the computer skull image had been deliberately manipulated by the State prior to it being disclosed to Mr. DeLuca. Mr. Mueller could not improve the quality of Mr. DeLuca's images for a number of reasons, "most

9

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_10

specifically [because the file] was exported as a very very low quality JPEG as well as being blanked out like that." (R.5419). Mr. Mueller testified that, in addition to being exported as a JPEG, another deliberate modification was made to the image prior to being exported. (R.5421-22).

Mr. Mueller demonstrated to the trial court how the very poor quality of the DeLuca image was created prior to being exported as a JPEG. Mr. Mueller was able to modify Coroner's Image 50, the 2009 TIFF image with 17.2 uncompressed megabytes (R.5423) to the DeLuca BenKingan1 Image with 267 kilobytes, by adjusting the window width so that there were "three shades of grey..." (R.5426). Mr. Mueller then demonstrated that he could choose the JPEG option and could export the file as a JPEG image. (R.5425). In order for Mr. Mueller to obtain the image Mr. DeLuca received with the same file size of 267 kilobytes, Mr. Mueller had to deliberately "reduce the quality down as low as" he could and export in JPEG. (R.5425).

In his demonstration, Mr. Mueller attempted to recreate the DeLuca image on the left by exporting the TIFF image on the right of Pet.Group Ex. 29 to a JPEG format, resulting in a reduction in the size of the file. (R.5443-44). The size was reduced by half or even as much as three times. (R.5443-44). Mr. Mueller could not reduce the file to near the 411 kilobytes until he put the file on another computer and further reduced the quality. (R.5444-45). Mr. Mueller concluded that "to a reasonable degree of software engineering certainty and imaging certainty," in addition to being exported in JPEG format,

10

K_11

modifications were made to the DeLuca BenKingan2 image (Image 49) on another computer. Someone opened photoshop to recreate the darkness level, and further reduced the quality by exporting it into a JPEG again while sliding down the quality until he was able to obtain the 411 kilobytes. (R.5445). Those adjustments were the only way Mr. Mueller could recreate that image from the 2009 original TIFF file. (R.5445). With those adjustments, Mr. Mueller was able to reduce the file size to match the size of the DeLuca BenKingan2 image. (R.5445-46).

Mr. Mueller explained that if one could have accessed the Coroner's computer in 2011 and adjusted the image saved in 2009, the image could have been made more clear. (R.5447). Mr. Mueller was able to make those adjustments in less than ten seconds. (R.5447). Even if the image was "totally darkened in TIFF format," as long as it was in TIFF format, it would be "extremely simple" to clarify the image "very quickly." (R.5448).

Mr. Mueller had access to the 2008 TigerView CD viewer that Mr. DeLuca had prior to the trial. (R.5496). Mr. Mueller spent hours trying to improve the JPEG images that had been given to Mr. DeLuca, applying "many different commonatorics [sic] of contrast, brightness [and] window width," and there was "nothing that [he] could do." (R.5496). Mr. Mueller explained, he could spend his "entire life" trying to make the darkened JPEG image on the disk given to Mr. DeLuca the same as the TIFF image but he was unable to do so. (R.5447-48).

11

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

The State attempted to rebut Mr. Mueller's testimony with the testimony of Eric Stauffacher ("Mr. Stauffacher"), an employee of Televere Systems. Mr. Stauffacher admitted that he lacked the qualifications to render an opinion on the images. (R.5330-31; 5348).

Dr. Zimmerman testified for **Melissa Calusinski** as an expert in pediatric neuroradiology. (R.5114, 5116). Dr. Zimmerman is the Chief of Pediatric Neuroradiology at the Children's Hospital of Philadelphia (R.5114), a member of the American College of Radiology Section on Neuroradiology, and a consultant to the American Academy of Pediatrics Subcommittee on Head Injury. (Pet.Ex. 19). Dr. Zimmerman is board certified in radiology, diagnostic radiology, and neuroradiology. (Pet.Ex.19). He explained that, through application of the principles of neuroradiology, one can ascertain whether trauma to a victim is accidental or abusive. (R.5117-18). A linear fracture in the occipital parietal area of the skull is associated with an "impact injury" where the occiput is hit against the ground in a forceful manner. (R.5118).

Abusive head traumas cause fractures. (R.5118). The absence of a fracture would "go against" a diagnosis of abusive head trauma. (R.5118). The lack of a skull fracture points to a self-inflicted or accidental head trauma. (R.5118).

Dr. Zimmerman reviewed **Melissa Calusinski**'s videotaped confession prior to the evidentiary hearing. (R.5119). He explained that the reenactment on the video as to what **Melissa Calusinski** allegedly did to Ben is not

12

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

consistent with a linear skull fracture. (R.5119-20). The occiput (back) of the head did not hit the ground in the reenactment. (R.5120). Had Ben been thrown as depicted on the video, Dr. Zimmerman explained, the fracture would have been in the front of the head. (R.5120).

With a pediatric neuroradiologist confirming there was no fracture, Mr. DeLuca could have refuted the accuracy of **Melissa Calusinski**'s reenactment in the videotaped confession. (R.5021). Although Mr. DeLuca discussed the reliability of her reenactment in the videotaped confession with his medical experts, the experts could not refute the reenactment because they did not have the TIFF x-rays that showed no skull fracture. (R.5022-23).

Dr. Zimmerman could not make any medical diagnosis about the existence of a skull fracture from the very poor quality JPEG images provided to Mr. DeLuca by the State. (R.5121-22). Lightening up the image would not aid to any interpretation of that poor image. (R.5123). But upon viewing the TIFF image (Pet.Ex. 9), Dr. Zimmerman was able to testify *to a reasonable degree of radiological certainty that no fracture of the skull was present.* (R.5123-5124), (emphasis added).

Dr. Zimmerman further explained that subgaleal, subarachnoid, and subdural hemorrhages, such as the ones observed in Ben's brain during his autopsy, were not exclusively indicative of abusive head trauma. (R.5130). According to Dr. Zimmerman, subgaleal, subarachnoid, and subdural injuries

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_14

are common in accidental falls of children and can occur as a result of self-inflicted head banging. (R.5130).

Dr. Zimmerman had authored medical studies and articles that noted that a linear skull fracture is a significant finding pointing toward abusive head trauma. (R.5131). He testified unequivocally that it would have been impossible for someone to have examined Ben's skull and touched a fracture because no fracture was present on the x-ray saved in the TIFF format. (Pet.Ex. 9) (R.5131).

The Appellate Court erroneously determined that "there is no reasonable probability that Dr. Zimmerman's testimony would have changed the result of defendant's trial. His opinion merely contradicted that of four other experts, two of whom actually examined Ben's skull. We are also mindful that the trial court assesses the credibility of new witnesses and resolves evidentiary conflicts." (Opinion, p. 29). The State chose not to call any of its trial experts to rebut the testimony of Dr. Zimmerman.

## ARGUMENT

### *Appellate Court Improperly Offered Its Own Medical Opinion*

The Appellate Court agreed with **Melissa Calusinski** that the trial court was not qualified to read the x-rays in the case. (Opinion, p. 25). Thus, it is manifestly erroneous for the Appellate Court to have made its own medical findings as outlined above on page 3. The Appellate Court determined, from its

14

own review of the autopsy photographs, that a fracture existed and that a fracture would not necessarily have appeared on an x-ray. (Opinion, pp. 26-28).

The Appellate Court's medical conclusions must be discarded because the court has rendered an opinion that would require medical expertise that it does not possess. It is well-settled that a court cannot interject its personal opinions into the cases before it. Simply put, the Appellate Court's medical opinions are not sufficient to trump Dr. Zimmerman's expertise or even detract from the certainty of his **unrebutted** testimony (emphasis added). The State had the opportunity to rebut Dr. Zimmerman's evidentiary hearing testimony with its own experts, and it failed to do so. The Appellate Court cannot simply rely upon the testimony of the State's medical experts at trial because *none of those experts had reviewed the TIFF skull x-ray,* which was not disclosed until 2015, four years after the trial. Therefore, the testimony of Dr. Zimmerman is wholly unrebutted.

A judge is "free to accept or reject as much or as little as [he] pleases of a witness's testimony." *People v. Nelson,* 246 Ill.App.3d 824, 830 (1st Dist. 1993). But a determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law. *People v. Wallenberg*, 24 Ill.2d 350, 354 (1962). While a judge sitting as trier of fact is presumed to have considered only admissible evidence in making his decision (*Id.*), this presumption can be

15

rebutted through affirmative evidence in the record. *People v. Kent,* 111 Ill.App.3d 733, 740 (1st Dist. 1982); *People v. Jackson*, 409 Ill. App. 3d 631, 647 (1st Dist. 2011).

In the case of *Wallenberg*, the defendant's principal defense was that he could not have committed a robbery because he was awaiting assistance for a flat tire far away from the crime scene when the robbery occurred. (*Id.).* As part of this alibi, the defendant claimed he was delayed in repairing his flat tire due to the absence of gas stations in a certain area of Chicago. *(Id.).* The trial court found the defendant guilty, deciding that "[the defendant] told me there were no gas stations on that stretch of the street where he could get air. I happen to know different. I don't believe his story." *Id.* at 353-354. The *Wallenberg* Court reversed the defendant's conviction, holding that "[w]hile the evidence appearing in the record may be sufficient to establish the guilt of the defendant, the credibility of defendant and the defense of alibi were minimized and, in fact, entirely negated by the trial court's resort to personal beliefs." *Id.* at 354.

Similarly, the Appellate Court here relied upon its own personal belief in interpreting the autopsy photographs and concluding that a skull fracture was present. Dr. Zimmerman's testimony demonstrates that **Melissa Calusinski**'s confession was based upon false medical evidence. Additionally, **Melissa Calusinski** was deprived of the opportunity to cross-examine the State's medical experts and to confront them with the newly disclosed TIFF

16

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

skull image to refute their claims that this was a homicide because of the existence of a skull fracture.

The danger of the Appellate Court's practice in this case is clear from the conclusions it drew. As noted above, the Court reviewed photographs, which are indisputably inferior to any x-rays, much less the TIFF images that Dr. Zimmerman evaluated. Contrary to the Appellate Court's conclusion, Dr. Zimmerman explained that "something" was absolutely not present on the legible TIFF x-ray, and that was a fracture. (Opinion, p. 8).

### *Melissa Calusinski Satisfied Her Burden to Present Evidence to Shift the Burden to the State to Disprove Her Claim*

The Appellate Court stated that **Melissa Calusinski** failed to present evidence that any of the State's trial experts changed their minds after Dr. Zimmerman reviewed the previously undisclosed TIFF image and determined no skull fracture was present. There is no requirement that a petitioner, in a third-stage evidentiary hearing pursuant to the Postconviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) call the State's trial experts and present them with previously-undisclosed medical evidence and secure the recantations of their trial testimony. The State's own expert, Dr. Greenbaum, concurred, in her trial testimony, that the best way to determine the presence of a skull fracture is to take x-rays. (R.3533). Obviously, this presumes that the x-rays that are disclosed by the State would be legible.

### *The Sims Case*

17

The Appellate Court held that it need not accept the testimony of Dr. Zimmerman simply because he was a nationally-recognized expert with credentials superior to any of the State witnesses. The Appellate Court stated that this conclusion was supported by *People v. Sims*, 374 Ill.App. 3d 231, 232 (2007). But *Sims* offers no support for the State or the Appellate Court. In that case, the issue before the Appellate Court was the defendant's attempt to have the reviewing court re-weigh the expert testimony as to the decedent's cause of death, and give more weight to Dr. Messer's testimony as a "world-renowned" cardiologist, who was more qualified than Dr. Denton, a deputy medical examiner for Cook County's Medical Examiner Office. (*Id.* at 251). On appeal, the defendant raised the argument that Dr. Messer was better qualified, so the Appellate Court should re-weigh the evidence and determine that the jury verdict, which accepted Dr. Denton's opinion, was insufficient to find defendant guilty. The Appellate Court declined to re-weigh the evidence as to who was "better qualified to offer an opinion," and concluded that Dr. Denton's opinion "was sufficient for the jury to find Defendant guilty. The cause of death is a question of fact, which must be left to the trier of fact." (*Id.* at 251).

Here, the evidence was presented in a third-stage evidentiary hearing, not in a jury trial. The Appellate Court erroneously concluded that *Sims* was applicable because it misunderstood that **Melissa Calusinski** was not asking the court to compare the credentials of her pediatric neuroradiologist to the

18

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

State's trial experts. Rather, **Melissa Calusinski** had her pediatric neuroradiologist interpret the previously-undisclosed TIFF images and render an opinion that there was no skull fracture. The State's trial experts had never seen the TIFF images at the time of their trial testimony. Therefore, **Melissa Calusinski's** pediatric neuroradiologist provided the only opinions that the trial court and Appellate Court could evaluate.

In *Sims*, the court applied a sufficiency of evidence analysis. The sufficiency of evidence question is "whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19. (1979). Accordingly, where the evidence is so "unreasonable, improbable, or unsatisfactory" as to justify a reasonable doubt as to the defendant's guilt, a conviction will be reversed. *People v. Smith*, 185 Ill.2d 532, 542 (1999). *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 25.

**Melissa Calusinski** should not be bound by the much more rigorous sufficiency of evidence standard in determining the materiality of her *Brady* claim. The leading Supreme Court case on the issue of materiality is *Kyles v. Whitley*, 514 U.S. 419 (1995). The *Kyles* Court noted that "the question is not whether the defendant would more likely than not have received a different verdict with evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id* at 434-38. A "reasonable probability" is lower than a preponderance of evidence standard.

19

It is demonstrated where the defense shows that the failure "undermined confidence" in the conviction. *Youngblood v. West Virginia,* 547 U.S. 867, 869-70 (2006).

**Melissa Calusinski** has demonstrated that the absence of a skull fracture in the previously-undisclosed TIFF images undermines confidence in the homicide verdict against her. It is undisputed that Ben did not have a skull fracture, and his death is consistent with an accident or self-infliction, not homicide. After the disclosure of the TIFF skull image showing the absence of a fracture, the cause of death on his death certificate was changed from homicide to undetermined on July 14, 2015. (Pet.Ex. 27) (R.5150-60).

## CONCLUSION

For the reasons set forth above, **Melissa Calusinski** respectfully requests that this Court grant leave to appeal.

Respectfully submitted,

*/s/ Kathleen T. Zellner*
KATHLEEN T. ZELLNER
*Attorney for Defendant/Petitioner*
IL Bar No. 6184574.
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, IL 60515
Telephone: (630) 955-1212
Email: attorneys@zellnerlawoffices.com

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

## SUPREME COURT RULE 341(c) CERTIFICATE OF COMPLIANCE

Pursuant to Supreme Court Rule 341(c), I certify that this Petition for Leave to Appeal conforms to the requirements of Rules 341(a) and (b). The length of this Petition, excluding the appendix, is 20 pages.


*/s/ Kathleen T. Zellner*
KATHLEEN T. ZELLNER

SUBMITTED - 1505404 - Kathleen Zellner - 7/16/2018 2:48 PM

K_22

## NOTICE OF FILING and PROOF OF SERVICE

### In the Supreme Court of Illinois

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| *Plaintiff-Respondent,* | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| MELISSA CALUSINSKI, | ) | |
| | ) | |
| *Defendant-Petitioner.* | ) | |

The undersigned, being first duly sworn, deposes and states that on the 16th day of July, 2018, the Petition for Leave to Appeal was electronically filed and served upon the Clerk of the above court and that on the same day, a pdf of same was e-mailed to the following counsel of record:

Norbert J. Goetten, Director
Mr. Lawrence Bauer
Deputy Director
State's Attorney Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123
2nddistrict.eserve@ilsaap.org

Lisa M. Madigan
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62706
info@lisamadigan.org

Mr. Michael G. Nerheim
Lake County State's Attorney
18 North County Street
Waukegan, Illinois 60085
SScheller@lakecountyil.gov

Within five days of acceptance by the Court, the undersigned states that she will send to the above court thirteen copies of the Petition for Leave to Appeal bearing the court's file-stamp.

*/s/  Kathleen T. Zellner*
Kathleen T. Zellner

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

*/s/  Kathleen T. Zellner*
Kathleen T. Zellner