IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA CALUSINSKI, R88005, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 19 C 2122 |
| | ) | |
| GLEN AUSTIN, Warden, | ) | The Honorable |
| | ) | Martha M. Pacold, |
| Respondent. | ) | Judge Presiding. |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules) and this Court's order, respondent[1] answers the above-captioned habeas corpus petition.

## BACKGROUND

Petitioner was charged with the January 14, 2009 murder of sixteen-month-old Ben Kingan, having confessed to angrily throwing the child to the floor of the daycare center where she worked. *People v. Calusinski*, 2014 IL App (2d) 120383-U

---

[1] The proper habeas respondent is the person who has custody of the petitioner. *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004). Petitioner is currently incarcerated at Logan Correctional Center, where Beatrice Calhoun is acting warden. Calhoun should be substituted as respondent. *See* Habeas Corpus Rule 2(a); Fed. R. Civ. P. 25(d).

(Pet. Exh. B) ¶¶ 2-4, 68.[2]  A Lake County, Illinois jury found petitioner guilty and the court sentenced her to thirty-one years in prison.  *Id.* ¶ 2.

## I.    Pre-Trial Disclosure of Autopsy X-Rays

About a month before trial, in September 2011, the prosecutor tendered a disc containing three x-ray images from the coroner's office, explaining that he had just become aware of the existence of the x-rays and was attempting to provide copies to defense counsel, but that the images on the disc were not "readable or legible."  *People v. Calusinski*, 2018 IL App (2d) 160825-U (Pet. Exh. J) ¶ 17.  The parties informed the court they would try to resolve the issue.  *Id.*  The State filed a supplemental answer to discovery reflecting its disclosure of both the images and the software program required to view them.  *Id.*  At petitioner's counsel's request, in October 2011, the court entered an order permitting counsel "to view all of the evidence in the Coroner's possession."  *Id.*  Separately, and six months earlier, in April 2011, Dr. Shaku Teas, petitioner's forensic expert, provided a report to petitioner's counsel that stated that she had reviewed the x-ray images.  *Id.* ¶ 18.

## II.    Evidence Presented at Trial

### A.    Ben's medical history

The evidence at trial established that Ben was generally healthy and met all of his developmental milestones, although he had been diagnosed with acid reflux disease.  Pet. Exh. B ¶ 6.  When angry, Ben had a habit of throwing himself

---

[2] The state court's factual findings are presumed to be correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015).

backwards. *Id.* ¶ 7. Dr. Daniel Lum, Ben's primary pediatrician, testified that this habit was common and he "never knew of a child seriously injuring himself" as a result of it. *Id.*

More than two and a half months before his death, on October 27, 2008, daycare staff noticed a bump on the back of Ben's head and notified his mother. *Id.* ¶ 8. Dr. Lum advised her that no treatment was necessary because Ben was behaving normally, and he had not lost consciousness or vomited, two symptoms that might indicate a serious head injury. *Id.* Two days later, Ben was taken to the doctor's office with a 103.5-degree fever. *Id.* ¶ 9. Dr. Patricia Brunner examined Ben's head and found "some slight swelling" but was unconcerned because Ben was not exhibiting symptoms like vomiting. *Id.* Dr. Brunner found no signs of head trauma, skull fracture, or any abnormality apart from the slight swelling. *Id.* After Ben's fever persisted for a few days, he was diagnosed with an ear infection. *Id.* ¶ 10. On November 20, 2008, Ben's mother called Dr. Lum because Ben was spitting up and not being "quite himself." *Id.* ¶ 11. Dr. Lum concluded that the symptoms were likely due to Ben's acid reflux. *Id.*

On December 1, 2008, Dr. Lum took various measurements at Ben's fifteen-month well-baby visit. *Id.* ¶ 12. According to Dr. Lum, Ben's growth was appropriate for his age and his head was growing normally. *Id.* Since his one-year visit, Ben's head circumference had moved from the 50th to the 75th percentile, which Dr. Lum did not find concerning. *Id.*

On January 12, 2009, two days before his death, Ben vomited several times at daycare. *Id.* ¶ 21. That evening, he vomited several more times at home but went to sleep as usual. *Id.* He stayed home from daycare the next day and was "fine all day." *Id.* ¶ 23. His mother took him on several errands, including to the doctor's office to pick up a prescription. *Id.* There, a doctor observed Ben playing on the floor and testified that he was "perfectly normal and fine." *Id.*

### B.    Ben's death

Ben returned to the daycare center on January 14, 2009. *Id.* ¶ 25. Gwendy Bautista, the lead teacher in Ben's classroom, noted that he had acted and played normally throughout the morning. *Id.* Bautista went home at 3:30 p.m. after being relieved by Nancy Kallinger. *Id.* Petitioner was assisting in the classroom all day. *Id.* When the children finished their snacks, they became "restless, "antsy," and "fussy." *Id.* ¶ 26. Kallinger and petitioner began to wash up the children and set them down to play. *Id.* Petitioner washed up Ben. *Id.* Kallinger went to a sink and began washing dishes with her back to the loud room. *Id.* Shortly thereafter, Petitioner left the room for several minutes. *Id.* In petitioner's absence, Kallinger checked Ben's diaper and put him down on the tiled floor. *Id.* Ben threw himself backwards; Kallinger did not see if he hit his head, although he did begin to cry. *Id.* She sat Ben upright and turned to wash her hands. *Id.* When she turned back, Ben was lying down again. *Id.* She placed Ben in a bouncy chair and he started to fall asleep. *Id.* Petitioner returned, and Kallinger left the room. *Id.* ¶ 27.

Petitioner's sister, Crystal Calusinski, was working at the daycare center's front desk that afternoon. *Id.* ¶ 28. She received an intercom call for help from petitioner and ran to the classroom. *Id.* According to Crystal, Ben was in the bouncy chair with "foam coming out of his nose." *Id.* She picked Ben up, called for help, and began CPR. *Id.* Other workers called 9-1-1, and paramedics took Ben to the hospital. *Id.*

Dr. Adriana Orozco, an emergency room doctor, testified that Ben was not breathing upon arrival, and his heart was not beating. *Id.* ¶ 30. He showed signs of a significant head injury. *Id.* Despite resuscitation efforts, Ben was pronounced dead. *Id.* Dr. Orozco opined, based on her observations in the emergency room, that there was a "very high suspicion for nonaccidental trauma." *Id.* ¶ 78.

## C.    Petitioner's inconsistent statements and confession

Detective Adam Hyde spoke with the daycare workers on the evening of Ben's death. *Id.* ¶ 32. Petitioner told Hyde that she and Kallinger were feeding the children snacks and, when it became extremely hectic, she called Crystal in to help. *Id.* ¶ 33. Ben crawled to his bouncy chair, and petitioner noticed that he was falling asleep one minute later. *Id.* He did not respond to his name, and she noticed blood and foam coming from his nose. *Id.* Petitioner said that Crystal then began performing CPR. *Id.* Detective Hyde told petitioner that Kallinger had not mentioned Crystal, and petitioner looked away from him before admitting that Kallinger was not present. *Id.* ¶ 34. She subsequently admitted that Crystal was

not there until, a few minutes later, he became lethargic and petitioner called for help. *Id.*

Two days later, petitioner agreed to speak with police officers at a police station. *Id.* ¶ 44. Petitioner spoke with the officers over the course of nine-and-a-half hours, with several long breaks. *Id.* ¶ 48. The interviews were video-recorded and played for the jury. *Id.* ¶ 47. Petitioner initially told officers that Kallinger briefly left the classroom after the children's snack. *Id.* ¶ 50. Ben was starting to fall asleep in a bouncy chair and did not respond to his name. *Id.* Petitioner went to him and saw orange-red foam coming from his nose and called Crystal for help. *Id.*

Petitioner at first denied any knowledge of Ben's head injury, but repeatedly told the officers to speak with Kallinger. *Id.* ¶ 52. Petitioner explained that she was always careful with the children's heads, but Kallinger sometimes did not watch the children's heads and might bang them accidentally. *Id.* She "began to speculate that maybe [Kallinger] had done something." *Id.* ¶ 53. Petitioner denied having done anything herself, and noted that Kallinger had been alone with Ben while petitioner went to the bathroom and that "Ben often cried when [Kallinger] entered the room." *Id.*

Petitioner later suggested that Ben may have hit his head during CPR. *Id.* ¶ 55. A detective asked her if Ben had fallen from the changing table, and petitioner responded "I am telling you the truth, I did not drop him." *Id.* The detective said, "Or?" And petitioner responded, "Anything, nothing serious." *Id.*

6

Petitioner admitted to becoming frustrated with Ben at times but said she would "deal with it." *Id.* She eventually said, "Ok. I, to be honest, I have yelled like I said, 'not nice,' but he was sitting up and he just like drops, and like he, like I heard him hit his head." *Id.* ¶ 57. She said that she had omitted this from her prior statement to the police because she was nervous. *Id.*

After an hour-and-a-half-long break, petitioner stated that she was afraid that if it were her fault, no one would talk to her, and she would "probably get a fine, or go to jail or something." *Id.* ¶¶ 58-59. She told the officers that she accidentally dropped Ben while Kallinger was at the sink, and he hit his head on a chair. *Id.* ¶ 59. Ben did not cry and seemed fine, although he became sleepy after five minutes. *Id.* Petitioner demonstrated how she dropped Ben by dropping a teddy bear, but the detective told her that it did not seem like such a fall would have caused Ben's injuries. *Id.* ¶ 61. Petitioner said Ben had hit his head "really hard" but denied "slam[ming]" him. *Id.* Petitioner admitted that she had not told the paramedics or the other daycare workers what had happened and claimed that she had not done so because she "just wasn't thinking." *Id.* ¶ 64.

Eventually, petitioner explained that Ben did not want to be held, and "she became frustrated and she put him down and he hit the edge of the chair." *Id.* ¶ 68. She was angry and frustrated because Ben was squirming, other children were screaming, and Kallinger was "just" doing dishes. *Id.* She confessed that she got angry and, as she explained, "I went boom." *Id.* She demonstrated how she threw Ben down on the floor. *Id.* Petitioner said that Ben's head hit the floor really hard

and bounced; she demonstrated this by forcefully slamming a notebook onto the floor.  *Id.* ¶ 69.

### D.    The autopsy

Two autopsies were conducted by Dr. Eupil Choi, on January 15th and 16th,[3] respectively.  Pet. Exh. J, ¶ 12.  Choi testified that Ben died of "craniocerebral injuries due to blunt force trauma" caused by striking a hard, flat surface.  Pet. Exh. B ¶¶ 37-38.  Ben's injuries were consistent with having been thrown to the floor, and Choi opined that the injuries were less than one day old.  *Id.* ¶ 38.  Choi's internal examination found a 0.8-inch fracture that went completely through the skull and was visible from both sides (the interior and exterior).  *Id.*  Photographs of the fracture were introduced into evidence, showing the thin fracture line on the inside and outside of the skull.  Pet. Exh. J ¶ 21.

Choi also discovered fresh bleeding extending through three layers of membrane covering the surface of his brain.  Pet. Exh. B ¶ 38.  After the autopsy, he created histology microscope slides to determine whether the wounds showed evidence of past healing, and found none.  *Id.* ¶ 40.  On cross-examination, Choi testified that an x-ray image was taken of Ben's skull, but it was of poor quality.  Pet. Exh. J ¶ 22.  He admitted that he did not see a fracture on the x-ray image but explained that sometimes fractures cannot be seen on x-ray images.  *Id.*

---

[3] At the second autopsy, Dr. Choi examined the body to determine whether Ben's injuries were consistent with petitioner's various accounts of the events.  Pet. Exh. B ¶ 107.

### E. Further expert testimony

Dr. Lum testified that nothing in Ben's known medical history could have caused his death. Pet. Exh. B ¶ 77. Dr. Brunner concurred with Dr. Lum and opined that Ben did not have a traumatic brain or head injury prior to the day of his death. *Id.*

The State also presented the testimony of Dr. Jordan Greenbaum, an expert in forensic pathology and child abuse. *Id.* ¶ 79. Greenbaum testified that Ben had a fracture that penetrated all the way through his skull. Pet. Exh. J ¶ 23. Ben also had bleeding in the membranes covering his brain. Pet. Exh. B ¶ 79. The bright color of the blood indicated that the injury was recent. *Id.* She opined that Ben's injuries were caused by striking a flat surface, such as a floor or wall. *Id.* Greenbaum opined that Ben died of a head injury from blunt force trauma as a direct result of being thrown to the floor. *Id.* The injury happened "shortly before if not immediately before" he began showing symptoms. *Id.* Ben's injuries were not consistent with his having thrown himself backward, because the damage was too severe. *Id.*

Greenbaum acknowledged that minor trauma can create small areas of bleeding in the skull — a subdural hematoma — that can become chronic and "rebleed." *Id.* ¶ 80. Greenbaum noted that such a chronic injury is usually evident to the naked eye, and she did not see evidence of one in Ben. *Id.* Moreover, Ben "essentially die[d] in twenty minutes," which was atypical for a chronic injury. *Id.* Additionally, Ben's histology slides showed no sign of healing. *Id.*

Petitioner presented testimony from Drs. Jan Edward Leestma and Shaku Teas. *Id.* ¶¶ 81-83. Leestma opined that Ben had a chronic subdural hematoma. *Id.* ¶ 81. He viewed Ben's histology slides and concluded, contrary to the other experts, that they showed "layers of healing" over several months. *Id.* According to Leestma, the chronic hematoma rendered it impossible to determine the amount of force that caused Ben's injuries because a chronic condition would have lowered his "injury threshold." *Id.* ¶ 82. A child throwing himself backward could exacerbate the original injury. *Id.* Leestma believed that Ben's skull fracture was consistent with a short fall, but conceded that it was also consistent with being slammed to the floor. *Id.* He also admitted that there was evidence of a recent injury and that Ben's throwing himself backwards could not have caused all of his injuries. *Id.*

Dr. Teas testified that Ben had a "defect" on the skull, but she could not be sure that it was a fracture. *Id.* ¶ 83. She viewed the histology slides prepared by Dr. Choi and prepared her own slides. *Id.* Teas observed multiple signs of healing and opined that Ben suffered from a weeks-old chronic subdural hematoma that had re-bled. *Id.* She explained that a healing subdural hematoma can re-bleed from a minor injury or even spontaneously. *Id.* She further opined that Ben's "injury occurred way more than 30 minutes" prior to his becoming unresponsive. *Id.*

Dr. Manuel Montez, a forensic pathologist who consulted for the Lake County Coroner's Office, testified for the State in rebuttal. *Id.* ¶ 84. He physically examined Ben's body on January 16, 2009, before Dr. Choi's second autopsy, and

observed fresh blood in three different layers of membrane covering Ben's brain and a through-and-through skull fracture. *Id.* He manually manipulated the fracture and concluded that it was fresh because it was not sticky as it would have been if the bone had started to mend. *Id.* Dr. Montez opined that Ben died of non-accidental abusive head trauma that occurred on the afternoon he died and that Ben could not have generated enough force to cause his own injuries. *Id.* Montez further testified that Ben had no visible chronic subdural hematoma and that a microscopic chronic subdural hematoma would have been "too small to do anything." *Id.* ¶ 85. Furthermore, if a chronic subdural hematoma were large enough to have an effect on Ben, neurological deficits would have been apparent. *Id.*

## III.    Postconviction Proceedings[4]

In 2015, petitioner filed a filed a state postconviction petition, *see* 725 ILCS 5/122-1, *et seq.*, alleging that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding an exculpatory autopsy x-ray image. Pet. Exh. J ¶ 5. She later amended the petition to add a claim that the State had suborned perjury from Dr. Montez at trial because Montez had not actually viewed Ben's skull as he claimed. *Id.* The petition proceeded to an evidentiary hearing before the same judge who had presided over petitioner's trial. *Id.*

---

[4] Petitioner's conviction was affirmed on direct appeal, where she raised claims not relevant here. *See* Pet. Exh. B ¶ 2.

### A.      The x-ray images

Testimony at the evidentiary hearing established that Paul Forman, the deputy coroner assigned to Ben's case, took three digital x-rays of Ben's body during the autopsy, including one x-ray of Ben's skull. *Id.* ¶ 31. The x-rays were stored on the coroner's computer using a program called Tigerview, which allows a user to adjust an image's brightness and contrast. *Id.* By default, the program saves the images as TIFF files, a type of file that shows high-quality images. *Id.* When copying the images to a disc, the software exported the images as compressed JPEG files by default. *Id.* ¶ 32. Consequently, the State tendered the x-rays to defense counsel as JPEG files, and the images were degraded relative to the original TIFF files due to a much lower resolution. *Id.* A 2015 review of the coroner's computer file on Ben's case uncovered the original high-quality TIFF versions of the x-rays that formed the basis of petitioner's *Brady* claim. *Id.* ¶ 33.

Forman testified that he had little training in taking x-rays and had largely taught himself. *People v. Calusinski*, No 09 CF 252 (Cir. Ct. Lake Cty. Sept. 30, 2016) (Pet. Exh. H) at 15. The images he took of Ben were only "fair." *Id.* He testified that Dr. Montez could not have viewed Ben's skull on January 16, 2009, because Forman had "stitched Ben's skull and body back together" following the first autopsy on January 15, 2009. *Id.* He stated that Montez had reviewed Choi's notes prior to the second autopsy, but the expert did not view Ben's body. *Id.* Forman's testimony was contradicted by testimony of an officer who saw Ben's body

on January 16, 2009, at the second autopsy, and by pictures taken that day. *Id.* at 35.

Petitioner's trial counsel testified that he could not view the JPEG files he was given because the Tigerview software did not work on his computer. Pet. Exh. J ¶ 38. Counsel further testified that his trial strategy had been to argue that Ben's October 2008 bump on his head was the source of his skull fracture. Pet. Exh. H at 13. Had he known that better quality x-rays existed, counsel claimed, he would have chosen different experts and his strategy would have been to contest the existence of a fracture. *Id.* at 14.

### B. The computer experts

The State presented the testimony of Eric Stauffacher, a software engineer for the company that created Tigerview. Pet. Exh. H at 21. During the hearing, Stauffacher opened the JPEG file depicting Ben's head x-ray from the disc that was tendered to defense counsel. *Id.* at 24. Using the program provided on that disc, Stauffacher adjusted the x-ray so that it looked "substantially similar" to the TIFF x-ray. *Id.* at 24, 42.

Petitioner presented the testimony of Jeff Mueller as an expert in "imaging." *Id.* at 25. Mueller testified that he spent hours using Tigerview trying to adjust the images of the JPEG files to be similar to the TIFF files, but he was unable to do so. *Id.* Mueller admitted he had never conducted a forensic examination in a criminal case. *Id.*

13

### C. Petitioner's medical experts

Dr. Robert Zimmerman, a specialist in pediatric neuroradiology, reviewed the TIFF versions of the x-rays and testified that they did not show a skull fracture. Pet. Exh. J ¶ 41. Zimmerman testified that a fracture large enough to be seen by the naked eye would have been visible on an x-ray. *Id.* He further opined that the JPEG versions of the x-ray could not have been sufficiently improved to allow a radiologist to interpret it. *Id.* He concluded that the absence of a skull fracture pointed "more to" accidental head trauma. *Id.*

Petitioner also presented the affidavit of Dr. Nancy Jones, a forensic pathologist. *Id.* ¶ 42. Jones reviewed the TIFF x-ray and opined that the growth of Ben's head was indicative of head trauma that occurred "well before his death." *Id.* She concluded that Ben had a chronic condition and had died from a re-bleed arising from repeated concussions caused by Ben's head-banging. *Id.* Dr. Jones also concluded that the line on Ben's skull was not a fracture but a naturally occurring anomaly called an "accessory suture." *Id.*

### D. Trial court's findings and appeal

The trial court denied petitioner's claims in a written opinion. Pet. Exh. H. The court found that Forman's testimony that Dr. Montez had not examined Ben's skull was not credible, citing the autopsy photographs, contradictory testimony from other witnesses, and inconsistencies in Forman's testimony. *Id.* at 35-36. It also found that Mueller's credibility as an imaging expert was undercut by Stauffacher's demonstration and by Mueller's "failure to utilize — and apparent ignorance of —

basic forensic procedures." *Id.* at 43. The court noted that Mueller "inexplicably and inexcusably trampled on the evidence" by failing to follow the forensic procedures to preserve the evidence. *Id.*

The Illinois Appellate Court affirmed. Pet. Exh. J. The court held that the State had not violated *Brady* because the TIFF x-rays were not material, concluding "that there [wa]s no reasonable probability that Dr. Zimmerman's testimony would have changed the result of defendant's trial." *Id.* ¶ 100. The court also rejected petitioner's perjury claim, declining to overrule the trial court's credibility findings. *Id.* ¶ 73.

Petitioner filed an unsuccessful petition for leave to appeal (PLA) to the Illinois Supreme Court, raising only her *Brady* claim. PLA, *People v. Calusinski*, No. 123792 (Ill.) (Pet. Exh. K); *see also* Pet. Exh. L.

## IV. Federal Habeas Petition

Petitioner timely filed this habeas petition, arguing that the State

(1) violated *Brady* by disclosing JPEG versions of the x-rays, rather than the TIFF files, Doc. 1 at 10; and

(2) suborned perjury by presenting Dr. Montez's testimony that he had viewed Ben's skull and manually examined the fracture, *id.* at 17.

## ANALYSIS

## I. Habeas Principles

A habeas petitioner may not re-litigate claims that a state court previously adjudicated on the merits unless the relevant state court judgment "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1);
*Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), or "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court
proceeding," 28 U.S.C. § 2254(d)(2). A state court's factual determinations are
presumed to be correct and must be rebutted by clear and convincing evidence. 28
U.S.C. § 2254(e)(1); *Davis*, 135 S. Ct. at 2199-2200. Thus, a federal court may not
grant habeas relief under § 2254(d)(2) unless "the petitioner can show by clear and
convincing evidence that the state court's factual determinations were
unreasonable." *Harding v. Walls*, 300 F.3d 824, 828 (7th Cir. 2002).

The habeas standards are demanding and intended only to "guard against
extreme malfunctions in the state criminal justice systems." *Harrington v. Richter*,
562 U.S. 86, 102 (2011) (citation omitted). Even if a federal court disagrees with a
state court's holding, habeas relief is unavailable unless the state court's ruling
"was so lacking in justification that there was an error well understood and
comprehended in existing law beyond any possibility for fairminded disagreement."
*Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).

## II.   Claim One is Meritless.

Claim One — alleging that the State violated *Brady* by producing JPEG
versions of the x-rays instead of the TIFF versions — fails because the state
appellate court reasonably rejected it. *See* Pet. Exh. J ¶ 100. Under *Brady*, the
prosecution has a duty to disclose "evidence favorable to an accused which is
material either to guilt or to punishment." *Brady*, 373 U.S. at 87-88. To establish a

16

*Brady* violation, petitioner must prove that (1) the evidence was favorable to her; (2) the prosecution suppressed the evidence; and (3) the evidence was material such that the failure to disclose it prejudiced petitioner. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The appellate court's express holding that the TIFF versions were not material was correct, and at the very least, reasonable. And its adjudication of the claim was all the more reasonable because the x-rays were not "suppressed" for purposes of *Brady*.

> **A.      The state court reasonably concluded that the TIFF versions of the x-rays were not material.**

The state court correctly identified and reasonably applied the governing *Brady* standard in holding that the TIFF files were not material. *See* Pet. Exh. J ¶ 78. A petitioner must show that suppressed evidence was material, *Giglio v. United States*, 405 U.S. 150, 154 (1972), such that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). A "reasonable probability" exists only if the undisclosed evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

There was no reasonable probability that petitioner would have been acquitted had the TIFF x-ray had been produced because the additional evidence that Ben suffered a skull fracture was strong. Autopsy photographs clearly depicted a thin line on both the interior and exterior of Ben's skull. Pet. Exh. J ¶ 21. Drs. Choi and Montez saw the fracture "with their naked eyes." *Id.* ¶ 91. Montez felt and manipulated the fracture. *Id.* Another state expert, Dr. Greenbaum, and

petitioner's own expert, Dr. Leestma, also saw the fracture in the autopsy photographs. *Id.*

Moreover, the jury heard testimony that the fracture did not appear on the x-ray and that the visible line in the photographs may have been something other than a fracture. On cross-examination, Dr. Choi testified that he had viewed an x-ray scan of Ben's head and did not see the fracture on the x-ray. Pet. Exh. J ¶ 22; *see also* Report of Proceedings of Jury Trial, *People v. Calusinski*, No 09 CF 252 (Cir. Ct. Lake Cty.) (Resp. Exh. B) at 3635-36.[5] Choi further explained that small fractures are not always visible on an x-ray. Pet. Exh. J ¶ 22; Resp. Exh. B at 3674. Petitioner's expert, Dr. Teas, testified that the visible line on Ben's skull was possibly a defect and not a fracture. Pet. Exh. B ¶ 83. Thus, any additional expert testimony that the x-ray did not show a fracture or that a fracture did not exist would have been cumulative to evidence rejected by the jury. Accordingly, the state court's determination that there was no reasonable probability that production of the TIFF skull x-ray would have changed the result of petitioner's trial was correct, or at the very least reasonable.

Nor is there a reasonable probability that production of the TIFF files would have caused defense counsel to change his trial strategy. Defense counsel's postconviction testimony that the TIFF files would have changed his trial strategy was both incredible and rebutted by the record. Defense counsel claimed that he

---

[5] Pin citations to the Resp. Exh. B refer to the consecutive numbering at the center of the bottom of each page.

did not believe that he could challenge the existence of a skull fracture because he had not seen the TIFF files. Pet. Exh. H at 13-14. But counsel *did* challenge the existence of a fracture at trial: he elicited Choi's testimony that the x-ray did not show a fracture. Pet. Exh. J ¶ 22; Resp. Exh. B at 3674. And counsel presented Dr. Teas's opinion that the visible crack in Ben's skull was not a fracture. Pet. Exh. B ¶ 83. Even before trial, defense counsel knew that he could challenge the existence of Ben's skull fracture, given that Teas sent counsel a report stating that she had viewed the autopsy x-rays, she questioned whether a skull fracture existed, and that defense counsel should obtain the x-rays and have further tests performed to evaluate the potential fracture. Pet. Exh. H at 14. Despite this directive, counsel did not have further tests performed. *Id.* at 45. Given counsel's demonstrated knowledge and inaction, there is no reasonable probability that he would have changed his trial strategy had he been provided the higher-quality TIFF version of the disclosed x-ray image. Accordingly, there is no reasonable probability that the outcome of petitioner's trial would have been any different.

There is no merit to petitioner's argument that the state court's determination was unreasonable because it applied a sufficiency-of-the-evidence standard rather than the materiality standard required by *Brady. See* Doc. 2 at 40. The state appellate court correctly (1) noted that *Brady* governed petitioner's claim, and (2) recited Brady's materiality standard, i.e., that "evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the State disclosed the evidence." Pet. Exh. J at ¶ 78. The court

reiterated that standard in holding that the TIFF skull x-ray was not material. *Id.*
¶¶ 100-01. While petitioner correctly notes that the state court also cited an Illinois
case that addressed a sufficiency claim, *id.* ¶¶ 92-93 (citing *People v. Sims*, 374 Ill.
App. 3d 231 (2007)), petitioner misapprehends the court's reason for doing so. The
appellate court cited *Sims* in support of its rejection of petitioner's related argument
that it should overturn the lower court's credibility determinations. *Id.* ¶ 93. This
underlying proposition, that the trier of fact that heard the witnesses' testimony is
best-suited to weigh the witnesses' credibility, is fully consistent with Supreme
Court law; indeed, the same principle governs this Court's review of petitioner's
habeas claim. *See, e.g.*, *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("[F]ederal
habeas courts [have] no license to redetermine credibility of witnesses whose
demeanor has been observed by the state trial court, but not by them.").

Petitioner also contends that the state court made an unreasonable finding of
fact because it credited the State's witnesses over Dr. Zimmerman. Doc. 2 at 51.
She asserts that Zimmerman's testimony should have been taken as conclusive and
unquestionable because none of the other experts viewed the TIFF images before
rendering their opinions. *Id.* But petitioner's premise is incorrect: the record
reflects that at least Dr. Choi — and likely also Dr. Teas — viewed the TIFF images
before testifying.

Forman, who had little training with x-rays, testified that he took several x-
rays that were, at best, of "fair quality." Pet. Exh. H at 15. Those x-rays were
saved in the coroner's computer as TIFF files. Pet. Exh. J ¶ 31. Dr. Choi performed

Ben's autopsy in the coroner's office long before the discovery discs were made. Pet. Exh. B ¶ 37. Choi testified that he viewed x-rays. Pet. Exh. J ¶ 22. The only reasonable inference is that he viewed the TIFF files that existed on the coroner's computer, for he cannot have reviewed the JPEG files because they did not exist yet. Moreover, Choi characterized the images as "poor quality," but did not call the x-rays unreadable. *Id.* In fact, he was able to read the x-rays well enough to state on cross-examination that they did not show the fracture that was clearly visible on Ben's skull. *Id.* Thus, the reasonable inference is that Choi viewed the TIFF files of the x-rays, which were readable but not good, Pet. Exh. H at 15, rather than the JPEG versions, which were characterized as "unreadable." Therefore, contrary to petitioner's claim, Dr. Choi's opinion was informed by the TIFF images.

Petitioner's own expert, Dr. Teas, also apparently viewed the TIFF images. Teas met with Dr. Choi and viewed x-ray images at the coroner's office. Pet. Exh. H at 14. She recommended that defense counsel obtain copies of the x-rays. *Id.* It is reasonable to infer that the images she reviewed were in a readable format because there would be no value in pursuing unreadable images.

Regardless, petitioner offers no support for her claim that the TIFF images constitute irrefutable proof that there was no fracture. Although Zimmerman testified that the fracture would show up on an x-ray image, Pet. Exh. J ¶ 41, Choi testified to the contrary that an x-ray image might miss a fracture, *id.* ¶ 22. The state court's credibility determination resolving their conflicting testimony is entitled to deference on habeas review. *Marshall*, 459 U.S. at 434. Furthermore,

Dr. Teas, who viewed the x-rays, could not rule out that the visible line on Ben's skull was a skull fracture.  Pet. Exh. B ¶ 83.

Citing an affidavit from Choi, petitioner falsely asserts that Choi reviewed the TIFF images after trial and "admitted he had been wrong and the cause of B.K.'s death was re-aggravation of an existing injury."  Doc. 2 at 51.  As the state appellate court correctly noted, however, "Dr. Choi did not change his opinion that Ben's skull was fractured or that the manner of death was homicide."  Pet. Exh. J ¶ 35.  In the affidavit, Choi admits that he missed evidence of a preexisting head injury, but he did not believe that the preexisting injury was significant. Pet. Exh. G at 127 (In fact, Choi crossed out the word "significant" where it appeared in several places before signing the affidavit prepared for him by petitioner's counsel.) And his affidavit makes no mention of the cause of death.  *Id.* at 127-28.

In sum, neither the state court's factual findings nor its judgment was unreasonable, and Claim One is meritless.

**B.     The State did not suppress the x-ray images.**

The state court's judgment is reasonable for the additional reason that the State did not suppress the x-ray images.  Evidence is "suppressed" under *Brady* "when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008); *see also Jardine v. Dittmann*, 658 F.3d 772, 776 (7th Cir. 2011).

The State did not fail to disclose the existence of the x-rays: petitioner was informed that x-rays were taken and given a disc containing both the images and the software necessary to view the images. Pet. Exh. J ¶ 17. In the process of copying the images to the disc, the files were inadvertently[6] compressed to lower quality JPEG files. *Id.* ¶ 32. But the State simultaneously provided software that could be used to adjust the JPEG images to look "substantially similar" to the original TIFF images. Pet. Exh. H at 42. Further, petitioner's expert was allowed to view and did in fact view the original x-ray image files in the coroner's office and relied upon them in a report. *Id.* at 14. Defense counsel demonstrated awareness of the x-rays by eliciting Dr. Choi's admission that the x-rays did not show a skull fracture. Pet. Exh. J ¶ 22. Because petitioner's counsel knew that the x-rays were taken, because one of her experts had access to and relied upon the images, and because defense counsel elicited Choi's admission that the skull fracture was not visible on the images, the State did not suppress the x-ray evidence.

Moreover, the TIFF images were readily available to defense counsel had he simply exercised reasonable diligence. Dr. Teas informed counsel that she had seen the x-rays and recommended that they should be obtained, Pet. Exh. H at 14; that recommendation should have alerted counsel to the existence of the better-quality TIFF images. And the JPEG files counsel did receive could be adjusted with the software program provided with the JPEG files so that they appeared substantially

---

[6] Although Mueller opined that the files were deliberately degraded, the state court did not find him credible and questioned his expertise. Pet. Exh. H at 43.

similar to the original, TIFF images. *Id.* at 42. Although Zimmerman testified that the adjusted images were still inadequate to render an opinion, they would be virtually indistinguishable from the TIFF images to a layman such as defense counsel. *See id.* at 42 (adjusted JPEG image and TIFF image depicted side by side). Had defense counsel made reasonable efforts to adjust the images, he would have been further alerted to the need to seek out an x-ray expert. That expert then could have viewed the original x-rays at the coroner's office as Dr. Teas had. But defense counsel made little effort to adjust the quality of the JPEG x-rays, trying it only briefly on a single computer. *Id.* at 13. He made no further efforts to adjust the images and did not give them to any medical experts. *Id.*

Furthermore, during pre-trial discovery, when the trial court was made aware of the difficulty in viewing the x-rays, it ordered that both parties be permitted to access the coroner's computer that contained the original TIFF files. *Id.* at 44. Defense counsel simply chose not to do so. *Id.* Thus, with reasonable diligence, the TIFF images would have been readily available to defense counsel and petitioner. Accordingly, the State did not suppress the images and Claim One is meritless on that basis as well.

## III. Claim Two is Procedurally Defaulted and Meritless.

### A. Claim Two is procedurally defaulted because it was not raised in one complete round of state court review.

Claim Two — alleging that the State suborned perjury by Dr. Montez — is procedurally defaulted because it was not raised before the Illinois Supreme Court. *See* Pet. Exh. K (raising only *Brady* claim). Federal habeas review is allowed only if

24

the petitioner has given the state courts a meaningful opportunity to consider his claims by presenting them in "one complete round" of state court review, including in a PLA to the Illinois Supreme Court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 848 (1999). Petitioner's failure to do so results in procedural default of Claim Two. *Id.*

### B.     Claim Two is also meritless.

Procedural default aside, Claim Two is meritless. Petitioner argues only that the state court's rejection of Claim Two was based on an unreasonable determination of fact. *See* Doc. 2 at 55-62. That challenge "will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness." *Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011) (citations omitted). Petitioner must therefore demonstrate by clear and convincing evidence that the state court's findings were unreasonable, § 2254(e)(1), a substantial burden, given that the state court's credibility determinations are entitled to particular deference, *Marshall*, 459 U.S. at 434 ("[F]ederal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Petitioner argues that Dr. Montez, who testified at trial that he had examined Ben's skull on January 16, 2009, must have committed perjury because Forman claimed that he had sewn the skull back into the head following the first autopsy on January 15, 2009, and that he had never seen Dr. Montez examine the body. *See* Doc. 2 at 61-62. The trial court heard both Forman's and Montez's

25

testimony and credited Montez over Forman. Pet. Exh. J ¶ 62. This was reasonable, given that there was no evidence the head had been closed before the second autopsy, and photographs contradicted Forman's testimony that he had sewn up the head before Montez viewed it. This Court should reject petitioner's only argument in support of her assertion that this finding was unreasonable — that Dr. Zimmerman's opinion that there was no skull fracture corroborates Forman's testimony, *see* Doc. 2 at 61-62 — because Dr. Zimmerman had no knowledge regarding whether Dr. Montez examined Ben's skull. Zimmerman offered only a contrary opinion about the existence of a skull fracture. The fact that Dr. Zimmerman disagreed with Dr. Montez's medical opinion does not show that Montez did not examine Ben's body; it merely shows that the experts disagreed. Petitioner has provided no clear and convincing evidence demonstrating that the state court's credibility finding was unreasonable, and therefore her claim must fail.

Moreover, petitioner's claim fails even if one assumes (contrary to the evidence and the state court's findings) that Dr. Montez committed perjury. To succeed on a claim that the State suborned perjury, petitioner must show that "the prosecution knew or should have known of the perjury." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959). Petitioner cannot do so. Instead, she argues, without citation to authority, that knowledge of falsity "must be imputed to the prosecution" because Montez was a state witness. *See* Doc. 2 at 57-58. But if that were the test, it would nullify *Napue*'s requirement that a petitioner must show that the prosecution knew of

perjury, for knowledge would be imputed to the prosecutor merely because the witness testified on behalf of the State. Indeed, to the contrary, courts have held that a government witness's knowledge of his own perjury is not imputed to the prosecution. *United States v. Stewart*, 433 F.3d 273, 299 (2d Cir. 2006); *see also Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1387 (7th Cir. 1994) (requiring petitioner to show prosecutor knew police officer's testimony was false). Accordingly, Claim Two is meritless as well as defaulted.

## IV. Petitioner Is Not Entitled to a Certificate of Appealability.

Upon denying habeas relief, this Court should decline to certify any claim for appeal because petitioner has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would not debate that petitioner's claims are procedurally defaulted and meritless, *see Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (certification unwarranted where reasonable jurists would not find district court's assessment of constitutional claims and procedural questions debatable).

## CONCLUSION

This Court should deny petitioner's petition for a writ of habeas corpus and decline to issue a certificate of appealability.

August 26, 2019

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By:     /s/ Nicholas Moeller
        NICHOLAS MOELLER, Bar No. 6316749
        Assistant Attorney General
        100 West Randolph Street, 12th Floor
        Chicago, Illinois 60601-3218
        TELEPHONE: (312) 814-5643
        FAX: (312) 814-2253
        E-MAIL: nmoeller@atg.state.il.us

## **CERTIFICATE OF SERVICE**

I certify that on August 26, 2019, I electronically filed the above **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system, which provided service to the following CM/ECF user:

>Kathleen T. Zellner
>Kathleen T. Zellner & Associates, P.C.
>1901 Butterfield Road, Suite 650
>Downers Grove, Illinois 60515
>attorneys@zellnerlawoffices.com
>
>*Counsel for Petitioner*

>/s/ *Nicholas Moeller*
>Nicholas Moeller, Bar No. 6316749
>Assistant Attorney General
>100 West Randolph Street, 12th Floor
>Chicago, Illinois 60601-3218
>Phone: (312) 814-5643
>Fax: (312) 814-2253
>Email: nmoeller@atg.state.il.us